# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

AMERICAN ACADEMY OF HIV
MEDICINE; HIV MEDICINE
ASSOCIATION, a division of the
INFECTIOUS DISEASES SOCIETY OF
AMERICA; INTERNATIONAL
ASSOCIATION OF PROVIDERS OF AIDS
CARE; JENNIFER K. BRODY, MD; and
CHRISTOPHER B. FOX, NP,

*Plaintiffs*,

v.

HEALTH RESOURCES AND SERVICES
ADMINISTRATION; THOMAS J. ENGELS,
in his official capacity as the Administrator of
the Health Resources and Services
Administration; U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES; and
ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of the U.S. Department
of Health and Human Services,

*Defendants*.

Case No.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      LGBTQ[1] people, and particularly transgender people, have faced a long history of hostility, neglect, bigotry, and erasure by the institutions charged with safeguarding their health. This includes the HIV/AIDS crisis, when an untold and disproportionate number of gay men and transgender women, particularly people of color, suffered and died as their government looked the other way.

---

[1]      LGBTQ refers to lesbian, gay, bisexual, transgender, and queer people. Throughout this Complaint, Plaintiffs use "LGBTQ" as an umbrella term to be read as inclusive of all people with these sexual or gender identities.

2.      Since 1981, when AIDS was first discovered, LGBTQ people have been disproportionately affected by the HIV/AIDS epidemic. So much so that even though HIV may be acquired by anyone, some considered HIV/AIDS to be a "gay plague."

3.      By the late 1980's, the HIV/AIDS epidemic had created a need for primary medical care that exceeded the capacity of local health departments, hospital emergency rooms, and other healthcare providers. People living with HIV were struggling to obtain desperately needed medical care.

4.      The federal government began to respond to the HIV/AIDS epidemic, after much delay, toward the end of the 1980s and early 1990s. In 1990, for example, Congress created the Ryan White HIV/AIDS Program ("the Ryan White Program" or "the Program").

5.      Since its inception, the Ryan White Program, which is administered by the Health Resources and Services Administration ("HRSA"), has helped states, communities, and people living with HIV cope with the impact of the HIV/AIDS epidemic. The Program supports systems of care for people living with HIV who do not have adequate health insurance or sufficient financial resources to access the care they need, tailoring programs based on local needs and resources. The Program is founded on strong partnerships between the federal government, states, and local communities in need. The Program emphasizes and facilitates access to outpatient, primary care to improve overall health outcomes and minimize costly emergency room visits and hospitalizations.

6.      Congress directed that funding under the Ryan White Program be targeted to historically underserved communities and populations, and that patients in need receive comprehensive medical and mental healthcare to assure the best overall health outcomes, including compliance with HIV treatment. This approach has been a resounding public health success.

Among other things, it has helped to achieve rates of viral suppression in the population served by the Ryan White Program that far exceed that of the general population of patients living with HIV. This, in turn, has helped contain the spread of HIV/AIDS in the larger population.

7.     Transgender people living with HIV have particularly benefited from access to HIV care and comprehensive primary care through the Ryan White Program. Thousands of transgender people living with HIV have long relied on Ryan White-funded clinics and medical practices for their HIV care and their overall health needs. Defendants have long recognized—and reaffirmed as recently as 2024—that affirming healthcare (i.e., care that is mindful and respectful of a transgender patient's identity) and medical treatment for gender dysphoria (including gender-affirming hormone therapy) are a necessary part of providing comprehensive care to transgender patients with HIV. Affirming healthcare and medical treatment for gender dysphoria (known as "gender-affirming medical care") are also crucial to encouraging such patients to enter and stay in treatment for HIV, increasing adherence to antiretroviral therapy ("ART"), and viral suppression. And healthcare providers have relied on the government's long-time understanding that Ryan White funds can and should be used to address the comprehensive primary health needs of patients with HIV, including the treatment of co-occurring conditions, to build integrated care models that provide holistic care to all patients living with HIV, including transgender patients.

8.     Yet, notwithstanding HIV's disproportionate impact on transgender people and the historical success of the Ryan White Program in achieving viral suppression in this population, Defendants have sought to restrict transgender people's access to HIV care through the Ryan White Program. Defendants have adopted a policy that HRSA funding recipients may not acknowledge, affirm, or respect the identities of transgender people, and may not use federal funding in a way that promotes so-called "gender ideology," including through the provision of gender-affirming

3

medical care. This is just one piece of the Trump administration's broad campaign to erase the identities of transgender people and limit their ability to participate in public life, including by limiting access to the medical care some transgender people need to live authentically as themselves.

9.      Defendants have recently sought to operationalize the administration's discriminatory directives by adopting a new set of "FY2026 HRSA General Terms and Conditions," issued on March 11, 2026, as well as by issuing Ryan White Program Notices of Funding Opportunities, like the ones pertaining to Ryan White Part B Supplemental, Ryan White Part C, and Ryan White Part F, issued on June 8, 2026. These are the "Challenged Conditions" at issue in this case.

10.     These discriminatory directives have caused confusion, fear, and concern among HIV care providers and transgender patients living with HIV who rely on Ryan White funding. If implemented, the Challenged Conditions would require HIV care providers to refuse to acknowledge, affirm, or respect the identities of their transgender patients and would forbid these providers from using Ryan White funding to provide transgender patients with gender-affirming hormone therapy—even though the Ryan White Statute explicitly contemplates such care as an outpatient service provided as part of a patient's primary care. These actions, in turn, risk exacerbating the HIV epidemic by making it less likely that transgender patients will engage with HIV care, reducing adherence to HIV treatment regimens, and increasing the likelihood of HIV transmission in the broader community.

11.     Defendants' actions are not just unconscionable; they are unlawful. They flaunt the text, purpose, and structure of the Ryan White statute as well as statutory and constitutional guarantees against discrimination.

4

12.     Plaintiffs are HIV care providers and associations whose members are HIV care providers. They bring this case to prevent the devastating consequences of Defendants' actions from occurring. In doing so, they assert multiple claims.

13.     Under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, federal agencies—including the U.S. Department of Health and Human Services ("HHS") and HRSA—must act rationally, transparently, and in accordance with the law. Defendants have done the opposite here.

14.     Additionally, Defendants' conduct runs afoul of Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116, which prohibits discrimination based on sex in federally funded health programs, including in HIV care programs administered or funded by HHS and HRSA.

15.     Beyond their statutory infirmities, Defendants' actions violate core constitutional protections. The Fifth Amendment's guarantee of equal protection bars the federal government from targeting a group for disfavored treatment, including based on sex and transgender status, which is precisely what Defendants are attempting to do here. The First Amendment, in turn, is violated because the government unlawfully seeks to leverage funding to regulate speech outside the contours of the program itself and threatens to withhold benefits for a censorious purpose.

16.     Because the federal government cannot pick and choose whose health matters based on politics or prejudice, and to prevent irreparable harm to HIV care providers and their transgender patients, Plaintiffs seek injunctive relief to stop Defendants from enforcing or implementing the discriminatory policies at issue and to stop and set aside the incorporation and implementation of said policies within Ryan White funding streams. Preliminary injunctive relief

is necessary to preserve the status quo while this Court evaluates the legality of Defendants' actions.

17.    The stakes could not be higher. At its core, this lawsuit is about whether the federal government may single out an already marginalized group for exclusion from the nation's public health agenda. Under our Constitution and laws, the answer must be no.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States and the United States Constitution; 28 U.S.C. § 1346, as a civil action against the United States founded upon the Constitution, an Act of Congress, or an executive regulation; and 28 U.S.C. § 1361, as an action to compel an officer or agency to perform a duty owed to plaintiffs.

19.    Jurisdiction also is proper under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

20.    An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

21.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), (c)(2), and (e)(1). Plaintiff Dr. Jennifer K. Brody is a resident of this district who resides in Boston, Massachusetts, as are members of Associational Plaintiffs. Each defendant is an agency of the United States or an officer of the United States sued in their official capacity, and Defendant HRSA maintains an office in Boston, Massachusetts. A substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within the District of Massachusetts.

## PARTIES

### A. Plaintiffs

22.     Plaintiff **American Academy of HIV Medicine (the "Academy")** is a nonprofit membership organization based in Washington, DC. It is the leading independent organization of healthcare professionals dedicated to providing excellence in HIV care and prevention. The Academy's mission is to ensure healthcare professionals have the resources needed to prevent, treat, and care for those with or at risk for HIV and related conditions to achieve optimal health.

23.     The Academy's membership of HIV practitioners and credentialed providers, which together amount to over 5,000 providers, give direct care to the majority of patients living with HIV in the United States.

24.     Academy members rely on the Ryan White Program to provide comprehensive healthcare to patients living with HIV, including transgender patients. Almost half of the Academy's members rely on funding under the Ryan White Program to provide gender-affirming medical care to their patients living with HIV.

25.     Among the members of the Academy whose practices and patients stand to be impacted by the Challenged Conditions are Plaintiffs Dr. Jennifer K. Brody and Nurse Practitioner Christopher B. Fox, as well as Dr. Michelle Collins-Ogle, who is based in North Carolina, and Nurse Practitioner Danielle Doe, who is based in Massachusetts.

26.     Academy members rely on all parts of the Ryan White Program to provide health services and care for their patients living with HIV, including transgender patients. This includes Plaintiff Brody and her patients who benefit from Parts A, B, and C; Plaintiff Fox and his patients who benefit from Parts A, B, and F; Dr. Collins-Ogle and her patients who benefit from Parts B, B Supplemental, and C; and NP Doe and her patients who benefit from Parts B, C, D, and F.

7

27.    Plaintiff **HIV Medicine Association ("HIVMA")**, a division of the **Infectious Diseases Society of America ("IDSA")**, is an organizational component of IDSA comprising nearly 6,000-member healthcare professionals who advance a comprehensive and humane response to the HIV pandemic, informed by science and social justice. IDSA is based in Arlington, Virginia, and is a national professional medical society representing 13,000 physicians, scientists, and other health professionals who specialize in infectious diseases.

28.    HIVMA works to increase access to healthcare services and coverage for people living with HIV and populations heavily impacted by HIV and to foster a robust, diverse, and culturally competent HIV workforce.

29.    HIVMA members have led the Ryan White Medical Providers Coalition ("the Coalition") for more than twenty years. The Coalition comprises HIV clinicians and is a leading voice in federal advocacy related to Ryan White HIV/AIDS Program funding and policies. Many HIVMA members provide gender-affirming medical care to their patients living with HIV in accordance with well-established clinical guidelines, like HIVMA's own *Primary Care Guidance for Providers Who Care for Persons with Human Immunodeficiency Virus*.

30.    Among the members of HIVMA whose practices and patients stand to be impacted by the Challenged Conditions are Plaintiff Dr. Brody, as well as members Dr. Collins-Ogle and Dr. Rachel Roe, who is based in Tennessee.

31.    HIVMA members rely on all parts of the Ryan White Program to provide health services and care for their patients living with HIV, including transgender patients. This includes Plaintiff Brody and her patients who benefit from Ryan White Parts A, B, and C; Dr. Collins-Ogle and her patients who benefit from Parts B, B Supplemental, and C; and Dr. Roe and her patients who benefit from Parts A, B, B Supplemental, C, D, and F.

32.    Plaintiff **International Association of Providers of AIDS Care ("IAPAC")** is a nonprofit membership organization based in Washington, DC. It was founded more than four decades ago with a mission to improve access to and the quality of prevention, care, treatment, and support services delivered to people living with and affected by HIV and comorbid diseases, including tuberculosis and viral hepatitis. With more than 30,000 members globally, including in the United States, and programming in more than 150 countries, IAPAC is the largest association of clinicians and allied health professionals working to end AIDS as a public health threat by 2030.

33.    IAPAC members rely on funding under the Ryan White Program to provide comprehensive healthcare to patients living with HIV, including transgender patients.  Many IAPAC members use Ryan White funding to provide gender-affirming medical care to their patients living with HIV.

34.    Among the members of IAPAC whose practices and patients stand to be impacted by the Challenged Conditions is Plaintiff Dr. Brody as well as member Dr. Collins-Ogle.

35.    IAPAC members rely on all parts of the Ryan White Program to provide health services and care for their patients living with HIV, including transgender patients. This includes Plaintiff Dr. Brody and her patients who benefit from Parts A, B, and C, and Dr. Collins-Ogle and her patients who benefit from Parts B, B Supplemental, and C.

36.    Plaintiff **Jennifer K. Brody, MD, MPH** is a primary care physician based in Boston, Massachusetts. She is affiliated with the Boston Health Care for the Homeless Program (BHCHP). She specializes in addiction medicine, HIV/AIDS treatment, and internal medicine, and serves as the Director of BHCHP's HIV Program. She is board-certified in Internal Medicine and Addiction Medicine by the American Board of Internal Medicine and is a certified HIV Specialist

9

through the American Academy of HIV Medicine. Dr. Brody is a member of the American Academy of HIV Medicine, HIVMA, and IAPAC.

37.    Dr. Brody and her patients benefit from funding under Parts A, B, and C of the Ryan White Program, which supports the integrated delivery of medical care, medications, and critical support services for low-income individuals living with HIV. In her clinical practice, Dr. Brody provides gender-affirming medical care, including hormone therapy, as part of comprehensive HIV treatment to HIV positive transgender patients.

38.    Plaintiff **Christopher B. Fox, NP** is a nurse practitioner specializing in HIV care and prevention and an Assistant Professor of Medicine in the Division of Internal Medicine and Geriatrics at Oregon Health & Science University ("OHSU") in Portland, Oregon. At OHSU, he delivers HIV primary care to approximately 300 patients, consults on HIV management, and leads an OHSU telehealth Program. NP Fox has written chapters in Collins-Bride & Saxe's Clinical Guidelines textbook on *Advanced Practice Nursing: HIV Infection in Adolescents and Adults* and *Primary Care of HIV-Infected Adults*. NP Fox is a member of the American Academy of HIV Medicine and is a certified HIV Specialist through the American Academy of HIV Medicine.

39.    NP Fox and his patients benefit from funding under Parts A, B, and F of the Ryan White Program. NP Fox is the primary care provider for the majority of his transgender patients living with HIV. He provides gender-affirming medical care as part of his patients' primary care.

40.    Plaintiffs **Dr. Brody** and **NP Fox** are collectively referred to as the **Provider Plaintiffs**. Provider Plaintiffs assert claims on behalf of themselves and on behalf of their transgender patients living with HIV who rely on the Ryan White Program for their medical care.

41.    Plaintiffs **The Academy**, **HIVMA**, and **IAPAC** are collectively referred to as the **Associational Plaintiffs**. Associational Plaintiffs assert claims on behalf of their members who

10

receive Ryan White funding and on behalf of their members' transgender patients living with HIV who rely on the Ryan White Program for their medical care.

**B. Defendants**

42.    Defendant **Health Resources and Services Administration ("HRSA")**, an agency of the U.S. Department of Health and Human Services, is the primary federal agency responsible for improving access to healthcare for people who are uninsured, geographically isolated, or medically vulnerable. Through its HIV/AIDS Bureau, HRSA administers the Ryan White Program. HRSA is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1). HRSA is headquartered in Washington, DC, and it maintains an office in Boston, Massachusetts.

43.    Defendant **Thomas J. Engels** is the Administrator of the HRSA. He is sued in his official capacity. As HRSA Administrator, he is responsible for setting policy for HRSA and for planning, managing, and coordinating the programs and activities of all HRSA bureaus and offices.

44.    Defendant **U.S. Department of Health and Human Services ("HHS")** is an executive cabinet department of the United States government. It houses and oversees HRSA. HHS is responsible for the administration of federal health programs, including the Ryan White Program. HHS is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1). HHS is headquartered in Washington, DC.

45.    Defendant **Robert F. Kennedy, Jr.** is the Secretary of HHS. He is sued in his official capacity. As Secretary, he is responsible for all aspects of the operation and management of HHS, including all its programs, operating divisions, and activities, as well as for implementing HHS's duties under federal law.

**FACTUAL BACKGROUND AND ALLEGATIONS**

## I.    LGBTQ People and HIV

46.    The Human Immunodeficiency Virus ("HIV") epidemic emerged in the early 1980's as a devastating and poorly understood public health crisis. At the outset, many young and otherwise healthy people became ill with a wide array of rare and often deadly infections, later identified as Acquired Immunodeficiency Syndrome ("AIDS").

47.    AIDS was initially perceived not as a national health problem but as a problem for "homosexuals" and intravenous drug users.

48.    In the early years of the HIV epidemic, the federal government's response was marked by delay and inaction, even as thousands of people—disproportionately gay men, transgender women, and people of color—were dying.[2] As a 2011 report by the Institute of Medicine (now the National Academy of Medicine) documents, "Because of the marginal status of these groups, societal response to the epidemic was slow."[3]

49.    In response to this vacuum, grassroots activists mobilized to demand urgent governmental action, challenge stigma, and advocate for access to lifesaving treatment and research. These advocacy efforts fundamentally reshaped the national response to HIV and laid the groundwork for a more robust federal role.

50.    Still, as the 2011 Institute of Medicine report documents, "It was not until there was widespread awareness that AIDS was affecting the 'mainstream' population that the disease

---

[2]    Theodore J. Padamsee, *Fighting an Epidemic in Political Context: Thirty-Five Years of HIV/AIDS Policy Making in the United States*, 33 Soc. Hist. Med. 1001, 1003–05 (2020).

[3]    Institute of Medicine, *The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding* 68, (2011).

garnered significant attention. Indeed, it was Ryan White, an Indiana adolescent who contracted AIDS through treatment for hemophilia, who became the sympathetic face of AIDS to the nation."[4]

51.     Against this backdrop of sustained community advocacy and mounting public pressure, Congress enacted the Ryan White Comprehensive AIDS Resources Emergency Act of 1990 to establish a national system of care for individuals living with HIV, particularly those with limited financial resources.[5] Though the Act was named after the young cisgender straight white teenager who captured the nation's attention, the statute nonetheless reflected a deliberate shift from indifference toward a comprehensive, equity-driven public health response designed to improve access to care, promote retention in treatment, and address the structural barriers that had previously left marginalized populations without adequate medical and support services.[6]

### A.  HIV Disproportionately Affects LGBTQ People and Communities of Color.

52.     Although HIV affects people across the United States, the epidemic continues to fall disproportionately on LGBTQ people and communities of color.[7]

53.     In the latest publicly compiled national data, lesbians, gay men, and bisexual individuals accounted for 67% of the estimated 31,800 new HIV infections in 2022.[8] Black people comprised approximately 12% of the U.S. population but accounted for 37% of estimated new HIV infections, while Hispanic or Latino people comprised approximately 18% of the population but accounted for 33% of new infections.[9] The Centers for Disease Control and Prevention

---

[4]      *Id.*

[5]      Institute of Medicine, *Public Financing and Delivery of HIV/AIDS Care: Securing the Legacy of Ryan White* 37–39, (2005).

[6]      The White House, *National HIV/AIDS Strategy for the United States 2022–2025* 6–8 (2021), https://tinyurl.com/4ab8rv2d [https://perma.cc/2GH5-JJV8].

[7]      HIV.gov, *U.S. Statistics* (Feb. 25, 2026), https://tinyurl.com/3dzufnk5 [https://perma.cc/5TKH-E4GK]

[8]      *Id.*

[9]      *Id.*

("CDC") reports that in 2023 Black and Hispanic or Latino individuals each accounted for more than one-third of new HIV diagnoses nationwide, far exceeding their proportionate share of the general population.[10]

54.    Within the broader HIV epidemic, transgender individuals, particularly transgender women, experience some of the highest rates of HIV prevalence in the country and the most significant barriers to care.

55.    The CDC estimates that approximately 14% of transgender women in the United States are living with HIV, a rate far exceeding that of the overall population.[11] HIV prevalence among transgender women is more than 34 times higher than among other adults of reproductive age.[12] In another CDC study of transgender women in major U.S. cities, approximately 42% tested positive for HIV, with even higher rates among Black transgender women.[13]

56.    The burden of HIV among transgender women is compounded by stark racial disparities. Black transgender women account for a disproportionate share of HIV diagnoses, representing approximately 44% of diagnoses among transgender women, followed by Hispanic/Latina transgender women at 26%.[14] These disparities mirror broader patterns of racial inequity in the HIV epidemic while illustrating their particularly acute impact within transgender communities.

---

[10]    Centers for Disease Control & Prevention, *HIV Diagnoses, Deaths, and Prevalence: 2025 Update* (Apr. 29, 2025), https://tinyurl.com/5n85xfmf [https://perma.cc/U9CT-JR66]

[11]    Centers for Disease Control & Prevention, *Sexually Transmitted Infections Treatment Guidelines: 2021, Transgender and Gender Diverse Persons* (2021), https://tinyurl.com/jcjskthp [https://perma.cc/PLX2-H25M].

[12]    Marc A. Pitasi et al., *HIV Testing and Linkage to Care Among Transgender Women Who Have Sex with Men: 23 U.S. Cities*, 24 AIDS Behav. 2442 (2020), https://tinyurl.com/bde7f5yb [https://perma.cc/RDF5-3MNR].

[13]    Centers for Disease Control & Prevention, *HIV Infection Among Transgender Women — Seven U.S. Cities, 2019–2020*, 71 Morbidity & Mortality Wkly. Rep. 1 (2022); see also American Hospital Association, CDC Reports 42% HIV Rate in Transgender Women Surveyed in 7 Cities (Apr. 19, 2021), https://tinyurl.com/4bahvssk [https://perma.cc/L5FP-SVVC].

[14]    Centers for Disease Control & Prevention, *Sexually Transmitted Infections Treatment Guidelines: 2021 Transgender and Gender Diverse Persons* (2021), https://tinyurl.com/jcjskthp [https://perma.cc/PLX2-H25M].

57.    This disproportionate impact is driven not by individual behavior alone, but by well-documented structural and social determinants of health. Federal public health authorities recognize that stigma, discrimination, poverty, homelessness, and limited access to culturally competent healthcare significantly increase HIV risk among transgender women.[15] Empirical studies confirm that these factors – including housing instability, lack of insurance, and barriers to gender-affirming medical care – are strongly associated with increased HIV incidence. As a result, transgender women face heightened exposure to HIV alongside diminished access to the very services designed to prevent and treat it.[16]

## II.    The Ryan White Program

58.    The Ryan White HIV/AIDS Program ("the Ryan White Program") is the largest federal program dedicated to HIV care and treatment. Congress enacted the Ryan White Comprehensive AIDS Resources Emergency Act (hereafter, the "Ryan White CARE Act" or the "Ryan White statute"), codified as amended at 42 U.S.C. §§ 300ff–11 to 300ff–140, in 1990 to provide a complete system of care for low-income individuals living with HIV who lack sufficient health coverage or financial resources.[17] The statute was amended and reauthorized in 1996, 2000, 2006, and 2009.

59.    Congress created the Ryan White Program expressly to meet the *comprehensive* health-related needs of those living with HIV. The statute's central purpose is to "improve the

---

[15]    Centers for Disease Control & Prevention, *HIV, Fast Facts: HIV and Transgender People* (Mar. 28, 2024), https://tinyurl.com/mvd7bduh [https://perma.cc/HW73-GHW8].

[16]    Elana Morris et al., *Characteristics Associated with Pre-Exposure Prophylaxis Discussion and Use Among Transgender Women Without HIV Infection —National HIV Behavioral Surveillance Among Transgender Women, Seven Urban Areas, United States, 2019–2020*, 73 Morbidity & Mortality Wkly. Rep. (Supp. 2024), https://tinyurl.com/27xmstnc [https://tinyurl.com/27xmstnc].

[17]    Health Res. & Servs. Admin., U.S. Dep't of Health & Hum. Servs., HIV/AIDS Bureau, Policy Clarification Notice 21-02, *Determining Client Eligibility & Payor of Last Resort in the Ryan White HIV/AIDS Program* (Oct. 19, 2021), https://tinyurl.com/32ad2yjv [https://perma.cc/HY9G-WJJ7].

quality, availability and organization of health care and support services for individuals and families with HIV/AIDS" who are low-income and lack the resources to otherwise obtain care. 42 U.S.C. § 300ff–21. Thus, the Ryan White Program functions as a payer of last resort by providing care to those with HIV who cannot otherwise access it.

60.    The Ryan White statute embodies a broad mandate to provide not only HIV care, but also healthcare services beyond those specifically related to HIV/AIDS treatment, including core medical services, such as outpatient services to treat co-occurring conditions, and support services for people living with HIV. Congress reiterated that broad mandate when it reauthorized the Ryan White Program in 2006, explaining that the statute's purpose "is to address the unmet care and treatment needs of persons living with HIV/AIDS by funding primary health care and support services that enhance access to and retention in care." H.R. Rep. No. 109-695, at 2 (2006).

61.    Congress also understood that States and local governments are best positioned to identify the particular needs of their communities. Congress therefore structured the Ryan White Program to provide funding to States and local jurisdictions, which in turn determine how to allocate the funds to the providers in their communities through a system of local planning councils and healthcare consortia that are tasked with determining the needs of the local population living with HIV/AIDS. *See Ryan White Care Act Amendments of 2000*, 146 Cong. Rec. S10029-02, S10030 (2000) ("The bill remains primarily a system of grants to State and local jurisdictions, thereby ensuring that grantees can respond to local needs. States, EMAs [Eligible Metropolitan Areas], and the affected communities will still decide how to best prioritize and address the healthcare needs of their HIV-positive citizens. This bill reinforces the ability of States and [Eligible Metropolitan Areas] to identify and meet local needs."). Thus, the Ryan White Program

16

allows the States and local jurisdictions to determine how to serve the needs of persons living with HIV.

62.    The Ryan White Program has been a resounding success and is viewed as one of the most successful public health programs in the United States. It is estimated that Ryan White serves more than 600,000 people annually, which is more than half of all people diagnosed with HIV in the United States.[18] And 91.4% of patients who receive care under Ryan White achieve viral suppression, which is significantly better than the national average of 67.2%.[19]

### A.  The Structure of the Ryan White Program

63.    The statutory framework of the Ryan White Program reflects a comprehensive, public health-oriented approach to HIV care that integrates medical treatment, medications, and supportive services necessary to achieve optimal health outcomes. *See* 42 U.S.C. §§ 300ff–14(b)–(d), 300ff–26(a), 300ff–51(b). The statute is organized into multiple Parts, each addressing different components of the national HIV care system. *See generally* 42 U.S.C. §§ 300ff–11 to 300ff–140. Together, the Program establishes a coordinated system of care designed to provide a continuum of HIV services—from diagnosis to treatment to long-term disease management—and other medical care aimed at providing comprehensive care to people living with HIV. *See*, *e.g.*, 42 U.S.C. §§ 300ff–11, 300ff–21, 300ff–51.

64.    Part A provides grants to Eligible Metropolitan Areas ("EMAs") and Transitional Grant Areas ("TGAs"). 42 U.S.C. § 300ff–11(a), (b). Part B provides grants to States and Territories. 42 U.S.C. § 300ff–21(a). Part C provides Early Intervention Services grants to public and nonprofit entities to support early intervention services and outpatient care for individuals with

---

[18]    Health Res. & Servs. Admin, U.S. Dep't of Health & Hum. Servs., Ryan White HIV/AIDS Program Annual Data Report: Ryan White HIV/AIDS Program Services Report 2024  (Dec. 2025), at 1, https://tinyurl.com/57d96udt [https://perma.cc/69XX-63FF].

[19]    *Id*. at 2.

HIV. 42 U.S.C. § 300ff–51(a). Part D provides grants for family-centered care for women, infants, children, and youth living with HIV. 42 U.S.C. § 300ff–71(a). And Part F authorizes a range of demonstration and training programs, including initiatives to improve HIV care delivery and workforce capacity. 42 U.S.C. § 300ff–100, 300ff–111, 300ff–121.

65.    Part A provides funding to EMAs and TGAs—cities and other local jurisdictions— that are disproportionately affected by HIV. 42 U.S.C. § 300ff–11(a), (b).

66.    To allocate Part A funds, the statute establishes HIV health services planning councils made up of healthcare providers, community-based organizations, social service providers, and others. 42 U.S.C. § 300ff–12(b). Those councils are authorized to determine the needs of the local population living with HIV, paying "particular attention to . . . subpopulations and historically underserved communities." *Id. See also Ryan White Care Act Amendments of 2000*, 146 Cong. Rec. S10029-02, S10030 (2000) (stating that underserved communities include rural communities and women, youth, and minorities). Councils are empowered to establish priorities for the allocation of funds, develop a comprehensive plan for the organization and delivery of health and support services, and assess the effectiveness of the services provided.

67.    Part B provides formula grants to States and Territories to improve the quality, availability, and organization of HIV healthcare and support services for individuals and families with HIV/AIDS. 42 U.S.C. § 300ff–21. The statute requires States' HIV Consortia to use awarded grants to ensure access to care for low-income individuals and those with limited or no access to health insurance coverage. 42 U.S.C. § 300ff–27(b)(7)(b).

68.    Similar to Part A's planning councils, under Part B, States must establish HIV Consortia consisting of healthcare providers, community organizations, and others, with the same responsibilities and priority-setting powers. 42 U.S.C. § 300ff–23.

18

69.    As with Part A, Part B also requires that Consortia assess the needs in their community, develop a comprehensive plan for the organization and delivery of health and support services, assess the effectiveness of the services provided, and prioritize essential health services. *See* 42 U.S.C. § 300ff–23(a), (c).

70.    States and Consortia must provide assurances that Part B funds will be used to address disparities in access and outcomes, including among disproportionately affected populations. 42 U.S.C. § 300ff–23(b)(1), 300ff–27(b)(3), 300ff–27(b)(5).

71.    Part B also established the AIDS Drug Assistance Program ("ADAP"), which provides access to HIV medications and related treatments. 42 U.S.C. § 300ff–26(a). ADAP funds must be used to provide FDA-approved HIV-related medications and, where applicable, treatments for opportunistic infections. 42 U.S.C. § 300ff–26.

72.    Part C provides grants directly to public and nonprofit entities to support early intervention services – such as testing, referrals, and medical evaluations – for individuals living with HIV. 42 U.S.C. § 300ff–51.

73.    The purpose of Part C is to support outpatient and ambulatory health services that facilitate early diagnosis, entry into care, and ongoing treatment. 42 U.S.C. § 300ff–51.

74.    Part C providers must target individuals who are underserved or at risk of not receiving appropriate HIV care, including those facing structural barriers to treatment. 42 U.S.C. § 300ff–52(a)(1).

75.    Funds under Parts A, B, and C must be used to provide "core medical services" and "support services" for individuals living with HIV. 42 U.S.C. §§ 300ff–14(a), 300ff–22, 300ff–51.

76.    "Core medical services" encompass a broad array of services and are not limited to specific HIV treatment. They include outpatient and ambulatory health services, ADAP treatments,

oral healthcare, medical nutrition therapy, mental health services, substance abuse outpatient care, and other services. 42 U.S.C. § 300ff–14(c)(3), 300ff–22(b), 300ff–51(c). The statute requires that not less than 75% of Part A funds be used for "core medical services," unless a waiver is granted. 42 U.S.C. § 300ff–14(c)(1).

77.     "Support services" are broadly defined as services "that are needed for individuals with HIV/AIDS to achieve their medical outcomes." 42 U.S.C. § 300ff–14(d), 300ff–22(c), 300ff-51(d). The statute lists several examples of those services, including "respite care for persons caring for individuals with HIV/AIDS, outreach services, medical transportation, linguistic services, and referrals for health care and support services." 42 U.S.C. § 300ff–14(d)

78.     Part D provides funding for public and nonprofit private entities to provide "family-centered care involving outpatient or ambulatory care . . . for women, infants, children, and youth with HIV/AIDS." 42 U.S.C. § 300ff–71(a).

79.     Funding awarded under Part D may be used for a variety of services, including case management, referrals for social and support services, and "additional services necessary to enable the patient and the family to participate in the program established by the applicant pursuant to such subsection including services designed to recruit and retain youth with HIV." 42 U.S.C. § 300ff–71(b).

80.     Part F provides funding for several types of projects: special projects of national significance that "quickly respond to emerging needs of individuals receiving assistance," 42 U.S.C. § 300ff–101; projects to further educate healthcare providers about HIV/AIDS prevention and treatment, 42 U.S.C. § 300ff–111; and initiatives such as the Minority AIDS Initiative aimed at addressing "the disproportionate impact of HIV/AIDS on, and the disparities in access, treatment, care, and outcomes for, racial and ethnic minorities," 42 U.S.C. § 300ff–121.

### B.  Gender-Affirming Medical Care and the Ryan White Program

###   i.  Gender-Affirming Medical Care

81.    Many transgender people experience distress as a result of the incongruence between a person's gender identity and their birth-assigned sex. Gender dysphoria is a medical condition marked by the clinically significant distress arising from the incongruence between a person's gender identity and their birth-assigned sex.

82.    The American Psychiatric Association codifies gender dysphoria as a diagnosis in the *Diagnostic and Statistical Manual of Mental Disorders, 5th edition, Text Revision* (DSM-5-TR).[20] Gender dysphoria is also recognized as a clinical diagnosis globally, including by the World Health Organization.[21]

83.    Medical treatment for gender dysphoria aims to reduce, or even eliminate, the clinically significant distress associated with gender dysphoria by aligning a transgender person's body with their gender identity and thus allowing them to live in a manner consistent with such identity. This treatment is often referred to as "gender-affirming medical care."

84.    Healthcare providers who provide gender-affirming medical care, including those who participate in the Ryan White Program, "are informed by expert evidence-based guidelines."[22] These guidelines provide a framework for the safe and effective treatment of gender dysphoria.

85.    For example, the World Professional Association for Transgender Health and the Endocrine Society have published widely accepted guidelines for treating gender dysphoria.[23]

---

[20]    Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 511 (5th ed., Text Rev. 2022).

[21]    World Health Org., *Gender Incongruence*, International Classification of Disease (11th rev. 2018).

[22]    Nat'l Acad. Scis., Eng'g & Med., *Understanding the Well-Being of LGBTQI+ Populations* 361 (Patterson, Sepúlveda & White eds., 2020).

[23]    Eli Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, 23 Int'l J. Transgender Health S1 (2022); Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869 (2017); *see also* Univ. of Cal., San Francisco, Gender Affirming Health Program, *Guidelines for the Primary*

86.     In the context of HIV care, this also includes guidelines like those published by Associational Plaintiffs,[24] as well as those issued by the HHS Panel on Antiretroviral Guidelines for Adults and Adolescents, which prior to 2025, including the September 2024 version, contained a section titled "Transgender People with HIV."[25]

87.     Under these guidelines, it may be medically necessary and appropriate to treat transgender people experiencing gender dysphoria with gender-affirming hormone therapy, which typically includes prescribing testosterone for transgender men and estrogen and testosterone suppression for transgender women.

88.     Medical treatment recommended for and provided to transgender people with gender dysphoria is effective. Gender-affirming medical care can substantially reduce lifelong gender dysphoria. And transgender people's mental health outcomes consistently improve after receiving gender-affirming medical treatment. In many instances, this care is lifesaving treatment.

89.     Gender-affirming medical care is also safe and supported by robust evidence comparable to that supporting other medical treatments.

### ii.   Gender-Affirming Medical Care Is A "Core Medical Service."

90.     Gender-affirming medical care qualifies as a "core medical service" under the Ryan White Program. It has long been provided by recipients of Ryan White funding to transgender persons living with HIV/AIDS.

---

*and Gender-Affirming Care of Transgender and Gender Nonbinary People* (Madeline B. Deutsch ed., 2d ed. 2016), https://tinyurl.com/cbhjzchs [https://perma.cc/X5SJ-JKCX] (revision forthcoming).

[24]     *E.g.*, Michael Horberg et al., *Primary Care Guidance for Providers Who Care for Persons With Human Immunodeficiency Virus: 2024 Update by the HIV Medicine Association of the Infectious Diseases Society of America*, Clinical Infectious Diseases, (2024), https://doi.org/10.1093/cid/ciae479; Int'l Advisory Panel on HIV Care Continuum Optimization, *IAPAC Guidelines for Optimizing the HIV Care Continuum for Adults and Adolescents*, 14 J. Intn'l Assoc. Providers AIDS Care, Suppl. 1, S3-S34 (2015), https://tinyurl.com/ynr2p2dm [https://doi.org/10.1177/2325957415613442].

[25]     U.S. Dep't of Health and Hum. Servs, Panel on Antiretroviral Guidelines for Adults and Adolescents, *Guidelines for the Use of Antiretroviral Agents in Adults and Adolescents with HIV* (Sep.12, 2024) (Attached as **Exhibit F**).

22

91.    Congress has repeatedly made clear that it enacted Ryan White to fund a wide array of core medical services for persons living with HIV that may or may not be tailored to specifically treat HIV itself.

92.    The Ryan White statute defines "core medical services" to include "outpatient and ambulatory health services." *See* 42 U.S.C. §§ 300ff–14(b)(1), 300ff–22(b)(1), 300ff–51(c). These services include treatment for "co-occurring conditions" of individuals living with HIV. *Id.* §§ 300ff–14(c), 300ff–22(b), 300ff–51(c).

93.    And in the 2006 Ryan White reauthorization, Congress ensured that the definition of outpatient and ambulatory services encompassed the broad range of treatment and care necessary to address the health needs of people living with HIV. *See* H.R. Rep. No. 109-695, at 2, 4 (2006). The legislative purpose of these provisions is to fund "primary health care and support services that enhance access to and *retention* in care." *Id.* at 2 (emphasis added).

94.    Congress has additionally explained that "the provision of funds for medical case management, including treatment adherence services, [is] a core medical service." H.R. Rep. No. 109-695, at 4 (2006). Indeed, Congress specifically provided "additional guidance to its intent regarding the application of the core medical services requirement and services that may or may not fall within the defined list of core medical services," explaining that a "core medical service in Parts A, B, and C shall include funding case management services that increase access to and retention in medical care." *Id.*

95.    HRSA has defined outpatient and ambulatory health services as "diagnostic and therapeutic-related activities [provided] directly to a client by a licensed health care provider in an outpatient medical setting."[26] HRSA policy states that allowable activities include the "treatment

---

[26]    Health Res. & Servs. Admin., U.S. Dep't of Health & Hum. Servs., *Ryan White HIV/AIDS Program Services Report Manual* 111 (2025).

and management of physical and behavioral health conditions" and "[p]rescription and management of medication therapy."[27] These definitions encompass a wide range of services delivered in outpatient settings, including ongoing therapeutic interventions and medication management.

96.    Many forms of gender-affirming medical care, including gender-affirming hormone therapy, clinical monitoring, and related medical services, are provided in outpatient settings by licensed providers.

97.    For transgender people living with HIV, gender-affirming medical care addresses co-occurring conditions (namely, gender dysphoria, and often-times other associated co-occurring mental health conditions, like depression and anxiety resulting from gender dysphoria) that affect the health of such individuals living with HIV.

98.    In addition, providing gender-affirming medical care is crucial to enhancing access to and retention in HIV medical care, and accordingly falls under the broad Ryan White mandate.

99.    Indeed, access to healthcare that respects and affirms a patient's gender identity generally and gender-affirming medical care particularly are essential and evidence-based components of comprehensive HIV prevention and treatment for transgender individuals. Federal public health authorities have expressly recognized that "[p]roviding gender-affirming care is an important strategy to effectively address the health and medical needs of transgender people with HIV."[28]

100.    As HRSA has previously recognized, patients are more likely to be engaged and stay in treatment "[w]hen primary and behavioral health services are located within the same

---

[27]    Health Res. & Servs. Admin., U.S. Dep't of Health & Hum. Servs., Policy Notice 16-02 at 7–8 (2016).

[28]    Health Res. & Servs. Admin., U.S. Dep't of Health & Hum. Servs., *Gender-Affirming Care in the Ryan White HIV/AIDS Program* 1 (Dec. 16, 2021), https://tinyurl.com/53rv6x8c [https://perma.cc/E86F-69HY].

24

medical system and facility—also known as a "one-stop shop" approach—or when linkages and referrals to behavioral health services are offered."[29]

101.    Gender-affirming medical care directly improves engagement in HIV prevention and treatment. The CDC has found that access to a healthcare provider with whom transgender patients feel comfortable discussing gender-related health needs is associated with increased uptake of HIV testing, pre-exposure prophylaxis, and treatment, as well as improved clinical outcomes such as viral suppression.[30]

102.    Conversely, the absence or denial of gender-affirming medical care creates significant barriers to HIV care, undermining both individual and public health outcomes. Transgender individuals face pervasive discrimination in healthcare settings, with federal data showing that many are denied care or receive lower-quality services because of their gender identity. These barriers are directly linked to reduced access to HIV prevention and treatment services and poorer health outcomes.[31]

103.    Medical and public health consensus consistently confirms that effective HIV care for transgender populations requires a "comprehensive" and "whole-person" approach that integrates biomedical treatment with interventions addressing social determinants of health, stigma, and gender affirmation.[32]

---

[29]    Health Res. & Servs. Admin., U.S. Dep't of Health & Hum. Servs., *HRSA CAREAction Newsletter* (Feb. 2018), https://tinyurl.com/he5nzr7b [https://perma.cc/FKR9-TSNA].

[30]    Kathryn Lee et al., *Factors Associated with Use of HIV Prevention and Health Care Among Transgender Women—Seven Urban Areas, 2019–2020*, 71 Morbidity & Mortality Wkly. Rep. 673, 673–79 (2022), https://tinyurl.com/asvwvxa3 [https://perma.cc/T8T6-UHNH].

[31]    Pamela W. Klein et al., *HIV-Related Outcome Disparities Between Transgender Women Living with HIV and Cisgender People Living with HIV Served by the Health Resources & Services Administration's Ryan White HIV/AIDS Program: A Retrospective Study*, PLOS Medicine (May 28, 2020).

[32]    Mary S. Neumann et al., *Comprehensive HIV Prevention for Transgender Persons*, 107 Am. J. Pub. Health 207 (2017).

### iii. Gender-Affirming Medical Care Falls Within the Requirement to Provide Comprehensive Services to Underserved Populations.

104. Ryan White funds must be used to support "comprehensive" outpatient health services for individuals living with HIV. 42 U.S.C. § 300ff–23. Grant recipients must ensure that care addresses "the special care and service needs of the populations and subpopulations" served. *Id.* This requirement reflects Congress's intent that care be tailored to the medical and structural needs of specific subpopulations affected by HIV. *See* 42 U.S.C. § 300ff–11. And as Congress has noted, "HIV/AIDS disproportionately affects people in poverty, racial/ethnic populations, and others who are underserved by healthcare and prevention systems." H.R. Rep. No. 109-695, at 2 (2006).

105. The Ryan White statute requires prioritization of such underserved and disproportionately affected populations. 42 U.S.C. §§ 300ff–12(b)(1), 300ff–12(b)(4)(B)(ii).

106. Transgender people—particularly transgender women of color—are among the populations most disproportionately affected by HIV in the United States.[33]

107. Accordingly, Ryan White recipients must design services that are aimed at reaching and retaining transgender individuals in care. *See* 42 U.S.C. § 300ff–12(b)(4)(B)(ii).

108. The Ryan White Program emphasizes continuity of care and retention in treatment as core program goals. *See* 42 U.S.C. § 300ff–81. The Senate Report that accompanied the enactment of the Ryan White statute explains that planning bodies may seek information about "the types of specialized services needed to bring vulnerable subpopulations into care and to retain them in care." S. Rep. No. 106-294, at 17 (2000). And the purpose of the 2006 reauthorization was

---

[33]    *See, e.g.*, Centers. for Disease Control & Prevention, *HIV Surveillance Report Diagnoses, Deaths, and Prevalence of HIV in the United States and 6 Territories and Freely Associated States*, 2022(2023), https://tinyurl.com/2nmm4kf5 [https://perma.cc/XRN7-38PB].

to address unmet needs by funding services that "enhance access to and retention in care." H.R. Rep. No. 109-695, at 2; *see also id.* at 15.

109. Because under the Ryan White Program, support and medical services must facilitate comprehensive care, providing gender-affirming medical care is consistent with Congress's multiple mandates to target funding to effectively reach, treat, and retain in care members of vulnerable and historically underserved communities.

### C. The Federal Government Has Previously Recognized that Gender-Affirming Medical Care Is Covered by the Ryan White Program.

110. Defendants HHS and HRSA have expressly observed that gender-affirming medical care is an important component of medical care for transgender people living with HIV and falls within the ambit of care covered by Ryan White.

111. On December 16, 2021, HRSA issued a Program Letter that stated that "RWHAP [Ryan White Program] funds may be used to support gender affirming care across various HRSA RWHAP core medical and support service categories."[34] In the letter, HRSA further recognized that providing gender-affirming medical care is "an important strategy to effectively address the health and medical needs of transgender people with HIV."

112. The agency has further recognized that gender-affirming medical care improves engagement in HIV care and supports retention in treatment.

113. As HRSA explained, gender affirmation includes medical interventions (such as hormone therapy and surgeries), social components (such as use of correct names and pronouns), and psychological components, all of which may be necessary to support positive health outcomes.

---

[34] Health Res. & Servs. Admin., U.S. Dep't of Health & Hum. Servs., *Gender Affirming Care and the Ryan White HIV/AIDS Program* (Dec. 16, 2021), https://tinyurl.com/53rv6x8c [https://perma.cc/E86F-69HY].

114.   HRSA further emphasized that Ryan White providers may deliver gender-affirming medical care through multiple service categories, including core medical services and support services.

115.   HRSA's guidance reflects the agency's interpretation that providing gender-affirming medical care is consistent with Ryan White's statutory purpose of improving access to care, retention in treatment, and clinical outcomes for people living with HIV.

### D. Ryan White Planning Bodies Across the Country Have Identified Serving Transgender People and Providing Gender-Affirming Medical Care as Priorities in HIV Treatment.

116.   Ryan White Part A Planning Councils and Part B Consortia are congressionally mandated entities responsible for organizing and directing the delivery of HIV care under the Ryan White Program. These bodies are tasked with assessing the needs of people living with HIV within their communities, establishing service priorities, and allocating federal funds to ensure access to comprehensive, medically appropriate care for people living with HIV. *See* 42 U.S.C. § 300ff–12(b)–(d), § 300ff–27(b).

117.   To make these determinations, the Ryan White statute requires the Planning Councils and Consortia to conduct comprehensive needs assessments, evaluate epidemiological trends, assess gaps in care, and incorporate input from people living with HIV and affected communities. *See* 42 U.S.C. § 300ff–12(b)(4).[35]

118.   Across multiple jurisdictions nationwide, Ryan White planning bodies and statewide HIV plans identify transgender people as a population disproportionately affected by HIV and incorporate strategies intended to improve engagement in care for transgender people

---

[35]   Health Res. & Servs. Admin., & Centers for Disease Control & Prevention, *Integrated HIV Prevention and Care Plan Guidance, Including the Statewide Coordinated Statement of Need*, CY 2022–2026 2–5 (2020), https://tinyurl.com/2kp4abj2 [https://perma.cc/UD5R-MC5S].

living with HIV, including through the provision of gender-affirming medical care. These plans commonly discuss barriers such as stigma, discrimination, housing instability, and lack of provider competency, and many include strategies relating to culturally responsive care, integrated service delivery, workforce training, and coordination with gender-affirming healthcare services.

119.    Statewide and local Ryan White planning documents in Massachusetts,[36] Oregon,[37] California,[38] Arizona,[39] New York,[40] Texas,[41] Florida,[42] Louisiana,[43] Alabama,[44] and Washington,[45] as well as local jurisdictions including Boston,[46] Portland,[47] San Francisco,[48] Los Angeles,[49] San

---

[36]    Mass. Dep't of Pub. Health et al., *Massachusetts Integrated HIV/AIDS Prevention and Care Plan: HIV/AIDS Services in the Commonwealth: 2017-2021*, https://tinyurl.com/4euy2udp [https://perma.cc/UV3J-AYLP] (last visited May 13, 2026).

[37]    Or. Health Auth. et al., *Oregon's 2022-2026 Integrated Plan and Statewide Coordinated Statement of Need* (2022), https://tinyurl.com/3cjxr4fj [https://perma.cc/H5A5-KMHW].

[38]    Cal. Dep't of Pub. Health Off. of AIDS, *Ending the HIV Epidemic: California Consortium for CDC PS19-1906*, https://tinyurl.com/mtfbkm96 [https://perma.cc/U67V-HE28] (last visited May 13, 2026).

[39]    Ariz. Dep't of Health Servs., *Arizona HIV/STI/HEP C Integrated Plan 2022-2026* (2022), https://tinyurl.com/2pncs8k3 [https://perma.cc/LV62-F2JQ] (last visited May 13, 2026).

[40]    N.Y.C. Health Dep't, *Application for Grant Funding* (2020), https://tinyurl.com/5dauxze2 [https://perma.cc/TH4Q-EVMH] (last visited May 13, 2026).

[41]    Texas HIV Syndicate., *Achieving Together: A Community Plan to End the HIV Epidemic in Texas* (2018), https://tinyurl.com/4hb29p65 [https://perma.cc/F4BL-VSJ8] (last visited May 13, 2026).

[42]    Fla. Dep't of Health et al., *State of Florida Integrated HIV Prevention and Care Plan* (2023) https://tinyurl.com/4y5mfwh8 [https://perma.cc/ELN6-VGFR].

[43]    La. Dep't of Health, et al., *Louisiana Integrated HIV Prevention and Care Plan Including the Statewide Coordinated Statement of Need CY 2022–2026* (2022), https://tinyurl.com/jwr9xvt5 [https://perma.cc/6M5T-VDSX] (last visited May 13, 2026).

[44]    Ala. Dep't of Pub. Health, *Integrated HIV Prevention and Care Plan* (2022), https://tinyurl.com/2kr2kr76 [https://perma.cc/KCT8-8H4L].

[45]    Wash. State Dep't of Pub. Health, *Washington State Integrated HIV Prevention and Care Plan CY 2022-2026* (2022), https://tinyurl.com/2afu6ven [https://perma.cc/6JZC-TAR2].

[46]    Bos. EMA Ryan White Plan. Council & Boston Pub. Health Comm'n, *Boston EMA Ryan White Part A: Integrated HIV Prevention and Care Plan 2017-2021*, https://tinyurl.com/mrxy5a2d [https://perma.cc/HXX5-CWTQ] (last visited May 13, 2026).

[47]    *Supra* note 37.

[48]    S.F. Dep't of Pub. Health, *San Francisco's Integrated Ending the Epidemics Plan 2024-2026 (2024) Strategies and Activities*, https://tinyurl.com/4hvmze5x [https://perma.cc/B82X-HE7B] (last visited May 13, 2026).

[49]    Cnty. of L.A. Pub. Health et al., *Los Angeles County Integrated HIV Prevention and Care Plan, 2022-2026* (2022), https://tinyurl.com/552z3uah [https://perma.cc/2PUL-NDFG].

Diego,[50] Seattle,[51] Austin,[52] Dallas County,[53] and Fort Worth/Arlington/Tarrant County,[54] identify transgender communities as priority populations and/or populations disproportionately affected by HIV.

120.    Several jurisdictions additionally note the importance of gender-affirming healthcare in connection with HIV service delivery. For example, Massachusetts's Integrated HIV Prevention and Care Plan discusses aligning HIV prevention, care, and treatment services with gender-affirming healthcare services and references provider education relating to hormone therapy and HIV treatment.[55]

121.    New York City Ryan White planning materials reference gender-affirming counseling and linkages to gender-affirming medical care.[56] Arizona's statewide HIV planning documents reference provider education relating to gender-affirming medical care.[57]

---

[50]    San Diego HIV Plan. Grp. et al., *Getting to Zero: 2019 Update to San Diego County's Integrated Plan for HIV Care, Prevention, Testing and Surveillance* (2019), https://tinyurl.com/yc6874wy [https://perma.cc/N4SH-PXUF].

[51]    *Supra* note 45.

[52]    Austin Area Comprehensive HIV Plan. Council, *Integrated HIV Prevention and Care Plan 2017-2021* (2016), https://tinyurl.com/2u4zazb6 [https://perma.cc/QHW4-YHNH] (last visited May 13, 2026).

[53]    Community Solutions, Inc., *Dallas Regional Integrated HIV Prevention and Care Plan CY 2022-2026* (2022), https://tinyurl.com/3u5mbe8k [https://perma.cc/F7T6-KYVS].

[54]    North Central Texas HIV Planning Council, *CY 2022 to 2026 Integrated HIV Prevention and Care Plan: Fort Worth-Arlington Transitional Grant Area* (2022), https://tinyurl.com/48ew4cxu [https://perma.cc/J9FF-JGYJ].

[55]    Mass. Dep't of Pub. Health, Bureau of Infectious Diseases and Lab'y Scis., *Mass. Integrated HIV/AIDS Prevention and Care Plan. HIV/AIDS Services in the Commonwealth: 2017-2021* 66-70, 77-79 (2016): *accord* https://tinyurl.com/4freeh6k [https://perma.cc/3F8S-45VB]. Bos. Pub. Health Comm'n, *Boston EMA Ryan White Part A: Integrated HIV Prevention & Care Plan 2017-2021* 18 (2016) https://tinyurl.com/mrxy5a2d [https://perma.cc/3SZN-W5L8].

[56]    N.Y. HIV Health & Hum. Servs. Planning Council, Needs Assessment Comm., *Achieving Gender Affirming Care in the Ryan White Part A Portfolio* (2018)10–13, https://tinyurl.com/838cuteb [https://perma.cc/YZ49-QJQG].

[57]    Ariz. Dep't of Health Servs., *Arizona HIV/STI/Hep C Integrated Plan: 2022-2026* (2022), 4, https://tinyurl.com/2pncs8k3 [https://perma.cc/WYD4-P8WK].

122.    Local planning materials from entities in Los Angeles and San Diego similarly discuss integrating gender-affirming medical care into HIV-related service delivery and provider training.[58]

123.    Ryan White and HIV planning materials from jurisdictions in Texas likewise reference gender-affirming medical care and transgender-focused HIV services, including the Dallas County Ryan White Standards of Care, which address gender-affirming medical care, and the Austin Ryan White provider trainings concerning gender-affirming medical care and HIV.[59]

124.    Florida, Louisiana, and Alabama integrated HIV planning materials similarly identify transgender populations as communities disproportionately affected by HIV and discuss culturally competent care, stigma reduction, workforce education, and barriers to care affecting transgender individuals living with HIV.[60]

125.    The aforementioned examples do not account for all the HIV and Ryan White planning bodies that, consistent with the Ryan White Program's purpose to comprehensively provide for the health needs of people living with HIV, have provided guidance and set forth priorities that account for the needs of transgender people living with HIV, including gender-affirming medical care when indicated. Numerous additional statewide and local HIV planning bodies, Ryan White planning councils, and integrated HIV prevention and care plans similarly recognize transgender communities, discuss barriers to care affecting transgender individuals

---

[58]    L.A. Cnty. Comm'n on HIV, Planning Committee Meeting Minutes (Oct. 21, 2025); San Diego HIV Health Servs. Planning Council, *Practice Guidelines for the Care of Persons Living with HIV/AIDS* (Sept. 22, 2021), https://tinyurl.com/3btnrs69 [https://perma.cc/L7T6-AMDR].

[59]    Dallas Cnty. Health & Hum. Servs., *FY 2025 Standards of Care & Service Delivery Guidelines* (2025), https://tinyurl.com/y924sasv [https://perma.cc/7YCK-EZHF]; Admin. Agency, Report Submitted to the Austin Area Comprehensive HIV Planning Council, (Oct. 24, 2024), https://tinyurl.com/zhpd7xza [https://perma.cc/8RHU-KJQM].

[60]    Fla. Dep't of Health, *supra* note 42; La. Dep't of Health, *supra* note 43; Ala. Dep't of Pub. Health, *supra* note 44.

living with HIV, and incorporate strategies relating to gender-affirming healthcare services as part of effective HIV care delivery.[61]

### E.  The Ryan White Program Is a Public Health Success.

126.    By authorizing broad categories of medical and support services and empowering local planning bodies and providers to direct resources how and where they are most needed, Congress created one of the most successful public health programs in the Nation's history.[62]

127.    As of 2024, the Program had achieved "record-breaking" viral suppression rates exceeding 90% among clients receiving medical care – far above national averages.[63]

128.    The program has achieved such success that scholars and healthcare experts have likewise described it as an "exemplar" for chronic disease management models addressing conditions and other complex chronic illnesses because of its integrated care structure and coordinated support services.[64]

129.    The Program's success stems from preserving the very statutory structure Congress enacted: flexible, locally responsive, comprehensive systems of care designed to meet all the primary care and HIV-specific health needs of people living with HIV.

---

[61]    *See*, *e.g.*, Pamela W. Klein et al., *HIV-related Outcome Disparities Between Transgender Women Living with HIV and Cisgender People Living with HIV Served by the Health Resources and Services Administration's Ryan White HIV/AIDS Program*, PLOS Medicine (2020).

[62]    *See* David A. Reznik et al., *Documenting Successes 30 Years After Passage of the Ryan White CARE Act*, 32 J. Health Care Poor & Underserved 5 (2021), https://tinyurl.com/2h2dhttp [https://perma.cc/6LU5-24EF]

[63]    *See* Health Res. & Servs. Admin., U.S. Dep't of Health & Hum. Servs., *Ryan White HIV/AIDS Program Achieves Record-Breaking Viral Suppression Rate Among Its More Than 576, 000 Clients* (Dec. 2, 2024), https://tinyurl.com/yjj72yba [https://perma.cc/E4FX-3Y6Y].

[64]    *See* Jesse C. Thomas et al., *The Ryan White HIV/AIDS Program: An Innovative Model for Chronic Care Delivery*, JAMA (2015), https://tinyurl.com/yh43k5w4 [https://perma.cc/7GNL-2FRZ].

**III.    The Trump Administration's All-Encompassing Attacks Against Transgender People**

130.    From its very first day office, the Trump Administration has engaged in a wide-ranging campaign to exclude transgender people from public life and deny them access to the healthcare that enables them to live authentically.

131.    The Administration has employed countless levers to erase any mention or recognition of transgender people from and by any part of the federal government and has demanded the same from every federal funding recipient.

132.    For example, on January 20, 2025, President Trump issued Executive Order 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8650 (Jan. 20, 2025) ("Gender Order"), a cross-cutting effort to reverse existing protections and deny recognition of transgender people's existence.

133.    The Gender Order expresses a disparaging, demeaning, idiosyncratic, and unscientific viewpoint about transgender people and gender identity, denying that transgender people exist, deeming them "false," ordering their exclusion from government recognition and protection in numerous aspects of their lives, and demanding that others do the same.

134.    Section 2(a) of the Gender Order states that a person's "sex" is an "immutable biological classification as either male or female" and that it "does not include the concept of 'gender identity.'" Section 2 of the Gender Order establishes that it is the "policy of the United States to recognize two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality."

135.    Section 2 of the Gender Order defines what it terms "gender ideology" as "replac[ing] the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice

versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body."

136.    In addition, Section 2 of the Gender Order defines what it terms "gender identity" as "reflect[ing] a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex."

137.    Section 3(e) of the Gender Order demands that agencies "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology."

138.    Section 3(g) of the Gender Order prohibits the use of federal funds "to promote gender ideology" and directs each agency to "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology."

139.    The Gender Order further mandated all federal agencies to interpret sex-based terms as birth-assigned sex, including with regard to government-issued identification documents and personnel records, § 3(c), (d); rescinded provisions of prior executive orders combating discrimination against LGBTQ people, § 7(b); mandated housing in accordance with a person's birth-assigned sex in federal prisons and federally-funded shelters, § 4; and directed federal agencies to rescind guidance, forms, and policies acknowledging the existence of transgender people, §§ 3(e), 7(c).

140.    Also on January 20, 2025, President Trump issued Executive Order 14148, *Initial Rescissions of Harmful Executive Orders and Actions*, 90 Fed. Reg. 8237 (Jan. 20, 2025), which

rescinded several Biden Administration Executive Orders that provided protections for transgender people.

141.    On January 27, 2025, President Trump then issued Executive Order 14183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025) ("Military Ban Order"), banning transgender people from serving in the military, and revoked Executive Order 14004, which had allowed all qualified persons to serve in the military. As justification, President Trump declared that "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service" and "is not consistent with the humility and selflessness required of a service member."

142.    On January 28, 2025, President Trump also issued Executive Order 14187, *Protecting Children From Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771 (Jan. 28, 2025) ("Denial-of-Care Order"), declaring that "it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another," and directing the immediate defunding of medical institutions that provide gender-affirming medical care to transgender people under the age of nineteen.

143.    Additional Executive Orders followed, with the Administration using the power of the purse to enforce its erasure of transgender people and its refusal to recognize any form of systemic discrimination; threatening federal funding for schools that recognize and affirm transgender students' identities; and barring transgender athletes from school sports. *See*, *e.g.*, Exec. Order 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025); Exec. Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025); Exec. Order 14190,

*Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan 29, 2025); Exec. Order 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 5, 2025) ("Sports Ban EO").

144.    These Executive Orders employ dehumanizing, inaccurate rhetoric to cast transgender people, gender-affirming medical care, and transgender-inclusive policies as an existential threat to "the validity of the entire American system," Gender Order § 1, as antithetical to "an honorable, truthful, and disciplined lifestyle," lacking "humility and selflessness," Military Ban Order § 1, and as a source of "endangerment, humiliation, and silencing of women and girls," Sports Ban Order § 1.

145.    Far from mere policy preferences, courts have recognized that these Executive Orders, particularly the Gender Order, seek to erase transgender people and punish the organizations that provide them necessary services and care.[65]

146.    Federal agencies have taken immediate and continuous actions, pursuant to the Gender Order, to carry out the Administration's campaign against transgender people.

147.    The Office of Management and Budget promised to stop the use of federal funds to promote "transgenderism."[66] The Office of Personnel Management (OPM) instructed federal agencies, including HHS and HRSA, to "[t]ake down all outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology."[67]

---

[65]    *See, e.g., Endocrine Soc'y v. Fed. Trade Comm'n*, No. 26-cv-00512-JEB, 2026 WL 1257289, at *2 (D.D.C. May 7, 2026); *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 443–44 (D. Md. 2025); *San Francisco A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184, 1215–16 (N.D. Cal. 2025); *Orr v. Trump*, 778 F. Supp. 3d 394, 417–18 (D. Mass. 2025), *appeal pending*, No. 25-1579 (1st Cir.).

[66]    Memorandum from Matthew J. Vaeth, Acting Director, Off. of Mgmt. & Budget, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025), https://tinyurl.com/3zpchy7r [https://perma.cc/6UM5-XBV8].

[67]    Memorandum from Charles Ezell, Acting Director, U.S. Off. of Pers. Mgmt., *Initial Guidance Regarding President Trump's Executive Order Defending Women* (Jan. 29, 2025), https://tinyurl.com/243c49d6 [https://perma.cc/M2HN-SRLY].

148. Agencies have removed references to transgender people from government websites. Among the materials removed, altered, or rendered inaccessible were webpages containing statistics regarding HIV among transgender people, HIV testing resources tailored to transgender communities, and datasets used by researchers and providers to monitor HIV transmission and health disparities.[68]

149. For example, large amounts of public information about HIV and the health of teens, transgender, and LGBTQ people abruptly disappeared from CDC websites, including materials relating to HIV diagnoses, HIV prevention, and LGBTQ health disparities.[69]

150. Researchers and scientists have also been ordered to remove any mention of transgender people or recognition of gender identity from any federally funded research,[70] and have had federally funded studies pulled or suspended for simply mentioning transgender people.[71]

151. Agencies have likewise sought to end access to gender-affirming medical care, which enables the transgender people who need it to live authentically, as well as to punish those who express affirming viewpoints about gender-affirming medical care.

152. For example, OPM issued a program carrier letter regarding the Federal Employees Health Benefits Program decreeing that "chemical and surgical modification of an individual's sex

---

[68] *See* Ahmed Steenhuysen & Ted Hesson, *U.S. Health Agencies Scrub HIV, Other Data to Remove 'Gender Ideology'*, Reuters (Feb. 1, 2025), https://tinyurl.com/4jfvfhts [https://perma.cc/YK9S-NGQH]

[69] *See* Sophie Gardner, *Public Health Information Pulled Offline in Response to Trump Orders*, Politico (Jan. 31, 2025), https://tinyurl.com/yrktcxy6 [https://perma.cc/9Z63-K3RT].

[70] *See* Carla K. Johnson, *Health Info Wiped from Federal Websites Following Trump Order Targeting Transgender Rights*, PBS News (Jan. 31, 2025), https://tinyurl.com/3c94xtf6 [https://perma.cc/NY2C-5UZT]; Jeremy Faust, *BREAKING NEWS: CDC Orders Mass Retraction and Revision of Submitted Research Across All Science and Medicine Journals. Banned terms must be scrubbed.*, Inside Medicine (Feb. 1, 2025), https://tinyurl.com/5t537e9p [https://perma.cc/YFU8-6SVJ]; Apoorva Mandavilli & Roni Caryn Rabin, *C.D.C. Site Restores Some Purged Files After 'Gender Ideology' Ban Outcry*, N.Y. Times (Feb. 3, 2025), https://tinyurl.com/2ep9x83f; Will Stone and Pien Huang, *Some Federal Health Websites Restored, Others Still Down, After Data Purge*, NPR (Feb. 6, 2025), https://tinyurl.com/58wyv5w8 [https://perma.cc/ZA5Y-3BQE].

[71] Fenit Nirappil, *Trans health, research programs ordered to stop by Trump administration*, The Washington Post (Feb. 4, 2025), https://tinyurl.com/5bay7edt [https://perma.cc/6QJX-V9ZW].

traits through medical interventions (to include 'gender transition' services) will no longer be covered under the FEHB or PSHB Programs," regardless of age.[72] And the federal Bureau of Prisons has eliminated access to gender-affirming medical care and discontinued access to gender-affirming clothing and toiletries for transgender people in its custody.[73]

153.    The U.S. Department of Justice ("DOJ") has likewise publicly pronounced its intent to target those who provide and support gender-affirming medical care.[74] Indeed, DOJ has issued administrative subpoenas to more than twenty healthcare institutions across the country whose care for their patients includes gender-affirming medical care.[75] And more recently, DOJ has escalated its efforts by issuing at least two criminal grand jury subpoenas to healthcare institutions providing gender-affirming medical care.[76]

154.    The Federal Trade Commission has similarly issued civil investigative demands to medical organizations that acknowledge transgender people's existence and express support for gender-affirming medical care.[77]

155.    HHS and Secretary Kennedy, as well as HRSA and Administrator Engels, have taken numerous actions to effectuate this administration's policy to erase transgender people and

---

[72]    U.S. Off. of Pers. Mgmt., Federal Employees Health Benefits Program Carrier Letter (2025), https://tinyurl.com/247n89dd [https://perma.cc/KWT3-46LC].

[73]    *See* U.S. Dep't of Just., Bureau of Prisons, Program Statement, *Management of Inmates with Gender Dysphoria*, No. 5260.01 (Feb. 19, 2026), https://tinyurl.com/3cwbfxxh [https://perma.cc/4ABM-YXMG].

[74]    *See*, *e.g.*, FBI (@FBI), X.com (June 2, 2025), https://tinyurl.com/5966hpdc [https://perma.cc/6WRE-RZRG]; Memorandum from Brett A. Shumate to All Civil Division Employees (Jun. 11, 2025), https://tinyurl.com/t88ju6xh [https://perma.cc/D3DB-H7XA]; Memorandum from the Att'y Gen. to Select Component Heads, (Apr. 22, 2025), https://tinyurl.com/y6xcv8jk [https://perma.cc/CG7Z-8HRA].

[75]    *See* Jo Yurcaba, *DOJ Subpoenas More Than 20 Doctors and Clinics That Provide Trans Care to Minors*, NBC News (July 10, 2025), https://tinyurl.com/5fa2d853 [https://perma.cc/3C7G-S3MA].

[76]    *See* Chris Geidner, *The fight over DOJ's invasive trans care subpoenas is coming to a head*, Law Dork (June 4, 2026), https://tinyurl.com/yx5fjh74; Celine Castronuovo, *DOJ Targets NYU With Criminal Subpoena for Trans Health Records*, Bloomberg Law (May 12, 2026), https://tinyurl.com/3ne88ew4.

[77]    *See* Vittoria Elliott, *The FTC Is Ramping Up to Target Transgender Rights*, Wired (Apr. 24, 2026), https://tinyurl.com/3z6uc9mx [https://perma.cc/5HU8-8J6Z].

deny their existence, as well as diminish transgender people's access to the healthcare that they need.

156.   On February 19, 2025, HHS published a document titled "Defining Sex: Guidance for Federal Agencies, External Partners, and the Public Implementing Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."[78] The document adopts and mirrors in large part the definitions and language set forth in the Gender Order.

157.   In addition, HRSA Administrator Engels has decreed that: "It is a HRSA priority to recognize that a person's sex as either male or female is unchangeable and determined by objective biology, and to ensure its programs accurately reflect science, including the biological reality of sex."[79] In doing so, Administrator Engels referenced and incorporated into HRSA's priorities the aforementioned "Defining Sex" guidance issued by HHS based on the Gender Order.

158.   Critically, and particularly relevant to this case, HHS has erased transgender people from its guidelines regarding the medical treatment for people with HIV. Through the Panel on Antiretroviral Guidelines for Adults and Adolescents, HHS regularly publishes and updates the "Guidelines for the Use of Antiretroviral Agents in Adults and Adolescents with HIV." Prior to 2025, these guidelines contained a section titled "Transgender People with HIV" and the September 2024 version mentioned the term "transgender" 190 times.[80] Yet, and notwithstanding that transgender people are disproportionately affected by HIV, following the Administration's

---

[78]   U.S. Dep't of Health & Hum. Servs., *Defining Sex: Guidance for Federal Agencies, External Partners, and the Public Implementing Executive Order 14168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Feb. 19, 2025), https://tinyurl.com/4xjd89m8 [https://perma.cc/L3NP-B25R].

[79]   Health Res. & Servs. Admin., U.S. Dep't of Health & Hum. Servs., *Advancing HRSA's Mission Through Focused, Accountable Action* (2025), https://tinyurl.com/yc6h2ph6 [https://perma.cc/5TS2-8LE2].

[80]   U.S. Department of Health and Human Services, *Panel on Antiretroviral Guidelines for Adults and Adolescents, Guidelines for the Use of Antiretroviral Agents in Adults and Adolescents with HIV* (September 12, 2024).

decree to erase transgender people, the September 2025 version of the guidelines eliminated the section on "Transgender People with HIV" and contains only 13 mentions of the term "transgender," of which all but one are contained in the titles of cited references.[81]

159.    HRSA also removed from all of its websites the December 16, 2021 Program Letter regarding the use of Ryan White funds to support gender-affirming medical care for transgender patients living with HIV. It made the 2021 letter publicly available again only after a court ordered the restoration of websites and other resources that were unlawfully erased. *See Doctors for Am. v. Off. of Pers. Mgmt.*, 766 F. Supp. 3d 39 (D.D.C. 2025). Still, HRSA appended the following disclaimer to the Program Letter: "Disclaimer: Per a court order, HHS is required to restore this website as of 11:59 PM February 14, 2025. Any information on this page promoting gender ideology is extremely inaccurate and disconnected from the immutable biological reality that there are two sexes, male and female. The Trump Administration rejects gender ideology and condemns the harms it causes to children, by promoting their chemical and surgical mutilation, and to women, by depriving them of their dignity, safety, well-being, and opportunities. This page does not reflect biological reality and therefore the Administration and this Department rejects it."

160.    On April 7, 2025, HRSA issued a letter to Ryan White Program awardees and stakeholders stating that the December 2021 Program Letter regarding the use of Ryan White funds to support gender-affirming medical care "co-opted the program's patient-centered mission in favor of radical ideological agendas and policies" and constituted "a vehicle for broader social or medical experimentation."[82]

---

[81]    U.S. Department of Health and Human Services, *Panel on Antiretroviral Guidelines for Adults and Adolescents, Guidelines for the Use of Antiretroviral Agents in Adults and Adolescents with HIV* (September 25, 2025).

[82]    Letter from Thomas J. Engels, Adm'r., Health Res. & Servs. Admin., to Ryan White HIV/AIDS Program Awardees and Stakeholders (Apr. 7, 2026), https://tinyurl.com/4neauwpd [https://perma.cc/K3TZ-HWEF].

161.   On January 9, 2026, HRSA issued a new "FY 2026 HRSA General Terms and Conditions," which incorporates the HHS Grants Policy Statement that HHS revised with an effective date of October 01, 2025 and which requires recipients to comply "with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including the requirements set forth in Presidential Executive Order 14168 titled Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." HRSA included these requirements notwithstanding a federal court order prohibiting it from doing so.[83]

162.   On March 11, 2026, HRSA issued the operative and updated "FY 2026 HRSA General Terms and Conditions" at issue in this case, which are addressed in further detail below.

163.   Ultimately, the current Administration, operating as a unitary executive, has engaged in a rapid and coordinated rollback of rights and protections previously afforded to transgender Americans. These actions are meant to express moral disapproval of transgender people and disdain towards those whose gender identity does not match their sex at birth.

**IV.   Defendants Adopt the Challenged Conditions Giving Effect to the Gender Order.**

164.   As noted, on March 11, 2026, HRSA adopted the updated "FY 2026 HRSA General Terms and Conditions" ("**Updated FY2026 General Terms**") at issue in this case.[84]

165.   The Updated FY2026 General Terms apply to and are incorporated into all federal funding provided through and administered by HRSA, including any funding under the Ryan White Program.

166.   The Updated FY2026 General Terms give effect to and implement the Gender Order's directive that federal funding recipients not promote gender ideology by prohibiting

---

[83]   *See Rhode Island Coal. Against Domestic Violence v. Kennedy*, 812 F.Supp.3d 180, 202 (D.R.I. 2025).

[84]   Health Res. & Servs. Admin., U.S. Dep't of Health & Hum. Servs., *HRSA General Terms and Conditions of Award* 1–2 (Mar. 11, 2026), https://tinyurl.com/4y9zu5cr [https://perma.cc/GK9K-2FZ4] (Attached as **Exhibit A**).

federal funding recipients under HRSA-administered programs from acknowledging, affirming, or respecting the identities of transgender people and from using federal funds to provide gender-affirming medical care.

167.    The Updated FY2026 General Terms do so in multiple ways.

168.    First, the Updated FY2026 General Terms expressly require that funding recipients "[a]pply[] sex-based definitions grounded in biological reality."

169.    Second, the Updated FY2026 General Terms require funding recipients to "ensure that all activities funded" under the program be "implemented in a manner consistent with HRSA's mission and strategic priorities."

170.    HRSA's "strategic priorities," which the Updated FY2026 General Terms directly link to, specify that: "It is a HRSA priority to recognize that a person's sex as either male or female is unchangeable and determined by objective biology, and to ensure its programs accurately reflect science, including the biological reality of sex."

171.    The HRSA strategic priorities further specify that HRSA "will not provide funding under the Ryan-White HIV/AIDS Program (RWHAP) for purposes unrelated to the statute," referencing the April 7, 2025, letter that referred to the affirmation of transgender people's identities and the provision of gender-affirming medical care as "social or medical experimentation" that is part of "radical ideological agendas and policies."

172.    Third, the Updated FY2026 General Terms incorporate the HHS Grants Policy Statement that requires federal funding recipients to certify that they are "compliant with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681 et seq., including the requirements set forth in Presidential Executive Order 14168 titled Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," and that

they will remain so. This is the same term that HHS and HRSA have been enjoined from including on any notice of award by a federal court in Rhode Island.[85]

173. Further implementing the Gender Order's directive to prohibit federal funding recipients from promoting gender ideology by acknowledging and affirming transgender people's identities, including by providing gender-affirming medical care, HRSA has promulgated discriminatory conditions through Notices of Funding Opportunities ("NOFOs") under the Ryan White Program.

174. A NOFO sets forth the core parameters of a funding opportunity, including applicant eligibility, the purpose and scope of funded activities, application requirements, and evaluation criteria. It also specifies available funding, the period of performance, and the binding terms, conditions, and limitations governing the use of awarded funds.

175. NOFOs define the substantive scope of permissible programmatic services and impose certifications and other requirements as a condition of funding.

176. On November 3, 2025, HRSA released the NOFO for the AIDS Drug Assistance Program ("**ADAP NOFO**"), part of Part B of the Ryan White Program, that provides access to life-saving medications and related services for low-income people living with HIV.

177. The ADAP NOFO provides that "if an ADAP provides sex hormones, it may only allow such hormones to be dispensed to treat HIV/AIDS or prevent the serious deterioration of health arising from HIV/AIDS, rather than for non-statutory purposes such as specified sex-trait modification procedures." The NOFO further states that HRSA "will prioritize funding to States

---

[85] *See Rhode Island Coal. Against Domestic Violence*, 812 F.Supp.3d at 202; *see also supra*, ¶ 161.

that require clinical documentation and the use of a prior authorization process before sex hormones are approved for dispensing to ADAP clients."[86]

178.    On June 8, 2026, HRSA released the NOFO for the Ryan White HIV/AIDS Program Part B States/Territories Supplemental Grant Program ("**Part B Supplemental NOFO**"). The Part B Supplemental NOFO provides that "[a]ll activities proposed in [an] application and budget narrative must align with applicable law, including but not limited to statutes, executive orders, federal regulations and applicable judicial holdings." It further states that discretionary awards "shall not be used to fund, promote, encourage, subsidize, or facilitate . . . denial by the recipient of the sex binary in humans, or the belief that sex is a chosen or mutable characteristic," and warns that applications that do not align with those requirements "will not receive funding to the extent permitted by law and applicable court orders."[87]

179.    The Part B Supplemental NOFO also expressly incorporates into its terms the Updated FY2026 General Terms and HRSA Priorities which, among other restrictions, require "[a]pplying sex-based definitions grounded in biological reality."

180.    On June 5 and 8, 2026, HRSA also released NOFOs for the Ryan White HIV/AIDS Program Part C Capacity Development Program ("**Part C NOFO**") and the Ryan White HIV/AIDS Program Part F Dental Reimbursement Program ("**Part F NOFO**").[88] The Part C

---

[86]    Health Res. & Servs. Admin., U.S. Dep't of Health & Hum. Servs., *Notice of Funding Opportunity, AIDS Drug Assistance Program (ADAP) Emergency Relief Funds (ERF)*, Opportunity No. HRSA-26-012 (Nov. 3, 2025) https://tinyurl.com/mrynfnsp [https://perma.cc/GEN8-Z7AC].

[87]    Health Res. & Servs. Admin., U.S. Dep't of Health & Hum. Servs., *Notice of Funding Opportunity, Ryan White HIV/AIDS Program Part B States/Territories Supplemental Grant Program*, Opportunity No. HRSA-26-074 (June 8, 2026) (Attached as **Exhibit B)**.

[88] Health Res. & Servs. Admin., U.S. Dep't of Health & Hum. Servs., *Notice of Funding Opportunity: Ryan White HIV/AIDS Program Part C Capacity Development Program*, Opportunity No. HRSA-26-061 (June 5, 2026) (Attached as **Exhibit C**); Health Res. & Servs. Admin., U.S. Dep't of Health & Hum. Servs., *Notice of Funding Opportunity: Ryan White HIV/AIDS Program Part F Dental Reimbursement Program*, Opportunity No. HRSA-26-085 (June 8, 2026) (Attached as **Exhibit D**).

NOFO and Part F NOFO contain the same terms referenced above as the Part B Supplemental NOFO.

181.    Further, NOFOs related to the Ryan White Program are also forecasted for this year, including NOFOS for Ryan White HIV/AIDS Program Part D.[89]

182.    Together, the Updated FY2026 General Terms, any similar terms added to Ryan White Program NOFOs, and any other actions implementing the Gender Order with regard to the Ryan White Program constitute the **Challenged Conditions** in this case.

183.    The Challenged Conditions, including the Updated FY2026 General Terms, the Part B Supplemental NOFO, the Part C NOFO, and the Part F NOFO, constitute final agency action under the APA, 5 U.S.C. § 704.

184.    The Challenged Conditions operationalize and implement the Gender Order, including by mirroring its language, incorporating HHS's "Defining Sex" guidance, and using language that similarly denies the existence of transgender people.

185.    The Challenged Conditions require Ryan White funding recipients to discriminate against their transgender patients living with HIV by prohibiting them from acknowledging, affirming, or respecting their transgender patients' identities and prohibiting them from providing gender-affirming medical care to their transgender patients living with HIV, notwithstanding that such care is outpatient care for a co-occurring condition that is permitted under the Ryan White statute.

---

[89] *Ryan White HIV/AIDS Program Part D – Women, Infants, Children and Youth grant Supplemental Funding*, Grants.gov (May 27, 2026), https://tinyurl.com/5xczkhme [https://simpler.grants.gov/opportunity/c1497685-1cac-4066-8720-ceb122a573a6, archived at https://perma.cc/U4J4-TKWD]; *Ryan White HIV/AIDS Program Part D Coordinated HIV Services and Access to Research for Women, Infants, Children, and Youth (WICY) Existing Geographic Service Areas*, Grants.gov (May 27, 2026), https://tinyurl.com/ycahsv5r [https://perma.cc/36TX-LYXL].

186. The Challenged Conditions are not limited to the provision of direct services. By prohibiting the use of funds to "promote," "encourage," or "facilitate" the recognition that transgender people exist and of the care that they need, the Challenged Conditions extend to patient counseling, care coordination, referrals, and programmatic support. HIV care providers participating in the Ryan White Program are thus placed in the untenable position of either complying with the Challenged Conditions or adhering to accepted medical standards and ethical obligations to their patients.

187. In practical effect, the Challenged Conditions prohibit Ryan White funding recipients from providing affirming HIV care and gender-affirming medical care to their transgender patients, notwithstanding the medical necessity of such care and its well-documented role in effective HIV treatment and retention in care.

### V. The Impact of the Challenged Conditions on Plaintiffs and their Transgender Patients Living with HIV

188. If implemented, the Challenged Conditions will cause immediate and irreparable harm to HIV providers, like Provider Plaintiffs and Associational Plaintiffs' members; their transgender patients living with HIV; and the broader public health systems that rely on the Ryan White Program.

189. The Challenged Conditions undermine the integrated model of HIV care that Congress designed the Ryan White Program to support and will force providers like Provider Plaintiffs and Associational Plaintiffs' members to choose between complying with the Challenged Conditions or providing medically necessary care consistent with accepted standards of medicine, their professional medical judgment, their ethical obligations, and state anti-discrimination laws.

190. The Challenged Conditions will also cause Provider Plaintiffs and Associational Plaintiffs' members to undergo significant operational changes, including workflow changes,

46

service disruptions, staffing adjustments, hiring freezes, delayed procurements, staff layoffs, and program closures.

191. The Challenged Conditions' prohibition on using Ryan White funding for the provision of gender-affirming medical care for transgender patients with HIV will cause transgender patients of Provider Plaintiffs and Associational Plaintiffs' members to lose access to this care, as no source of funding is sufficient to replace the funding provided by the Ryan White Program.

192. The loss of access of gender-affirming medical care will result in adverse health outcomes and negatively affect the health and wellbeing of the transgender patients of Provider Plaintiffs and Associational Plaintiffs in a variety of ways. For example, the loss of access to gender-affirming medical care for these patients will result in exacerbated and untreated gender dysphoria, which in turn can result in severe anxiety and depression, post-traumatic stress disorder, eating disorders, substance abuse, self-harm, and suicidality.

193. Even more broadly, in barring funding recipients from acknowledging, affirming, or respecting their transgender patients' identities in any context, the Challenged Conditions require providers to discriminate against their transgender patients living with HIV in the provision of HIV-specific care and all other care, regardless of whether they are providing gender-affirming medical care.

194. The prohibition on Ryan White funding recipients from acknowledging, affirming, or respecting their transgender patients' identities and providing gender-affirming medical care will negatively affect the HIV care of the transgender patients of Provider Plaintiffs and Associational Plaintiffs' members.

195. The transgender patients of Provider Plaintiffs and Associational Plaintiffs' members largely seek care specifically because providers offer affirming, integrated healthcare in trusted clinical environments. If Plaintiffs are no longer able to provide gender-affirming medical care or are forced to deny or disrespect patients' identities, patients will likely perceive that their providers and the healthcare system are unwilling or unable to meet their basic healthcare needs.

196. This breakdown in trust will cause many transgender patients to disengage from care altogether. Transgender patients who lose access to affirming HIV care and gender-affirming medical care are likely to stop attending appointments, discontinue HIV treatment, avoid healthcare settings, and become disconnected from critical support services. For many patients, particularly those facing structural barriers such as homelessness, poverty, transportation instability, or prior experiences of discrimination, re-engagement in care after disengagement is extremely difficult or impossible.

197. The resulting health consequences will be immediate and severe. Patients who disengage from HIV care experience interruptions in antiretroviral treatment, leading to increased viral load, weakened immune systems, disease progression, opportunistic infections, hospitalization, development of drug resistance, and increased risk of progression to AIDS. Such disruptions in care are also likely to worsen depression, anxiety, trauma, suicidality, and other mental health conditions among transgender patients living with HIV.

198. Patients who lose access to consistent outpatient HIV care are more likely to rely on emergency departments and crisis-based care settings, which are not equipped to provide coordinated HIV treatment. This results in poorer health outcomes, increased healthcare costs, and additional strain on already burdened healthcare systems.

199.    These harms are especially acute for the members of Associational Plaintiffs practicing in medically underserved communities, including rural areas, non-Medicaid expansion states, and communities experiencing homelessness. For Associational Plaintiffs' members practicing in non-Medicaid expansion states, the Ryan White Program often serves as the only source of HIV care for low-income transgender patients because many patients have no alternative healthcare coverage. For members practicing in rural areas, transgender patients frequently lack transportation, financial resources, or access to providers competent to provide affirming HIV care or gender-affirming medical care outside of Ryan White-funded HIV clinics. Members practicing at programs serving individuals experiencing homelessness further report that transgender patients experiencing homelessness face severe barriers to maintaining continuity of HIV treatment absent integrated, Ryan White-supported services.

200.    The Challenged Conditions also risk causing broader public health harms. Loss of viral suppression among transgender people living with HIV increases the risk of HIV transmission in the broader community, undermining decades of progress in controlling the HIV epidemic and reversing gains in reducing HIV incidence. Interruptions in HIV treatment can also contribute to transmission of drug-resistant HIV strains, creating long-term public health consequences and increasing the complexity and cost of future HIV treatment.

201.    The Challenged Conditions are also likely to destabilize HIV care infrastructure nationwide. Provider Plaintiffs and Associational Plaintiffs' members will face operational confusion and uncertainty about how to comply with vague and unworkable restrictions, increasing administrative burden, compliance costs, staffing pressures, and legal risk. Clinics may reduce services, eliminate programs, lay off staff, freeze hiring, delay procurements, or close programs altogether, further limiting access to HIV care for vulnerable populations.

49

202.  HIV care providers, like Provider Plaintiffs and Associational Plaintiffs' members, may also suffer profound moral distress as they are forced to deny medically necessary care to transgender patients living with HIV. These harms exacerbate existing workforce shortages within the HIV care system and threaten the long-term stability of the nation's already depleted HIV workforce. Some providers may even leave the field entirely if forced to comply with the Challenged Conditions.

## CLAIMS FOR RELIEF

### Count I – Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious

203.  Plaintiffs restate and reallege each of the foregoing paragraphs as if fully set forth herein.

204.  Defendants HHS and HRSA are "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

205.  The APA directs courts to "hold unlawful and set aside agency action[s]" that are "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A).

206.  Agency action is arbitrary and capricious when it relies on factors which Congress has not intended it to consider, entirely fails to consider an important aspect of the problem, offers an explanation that runs counter to the evidence before the agency, or makes a decision that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

207.  An agency action is also arbitrary and capricious when the action is not based on consideration of the relevant factors that Congress intended the agency to weigh in making its determination.

208.  When an agency action deviates from past policy or practice, the agency must provide a more detailed justification than would suffice for a new policy created on a blank slate. Additionally, when the prior policy has engendered serious reliance interests, the agency must

50

assess those reliance interests, determine whether they were significant, and weigh any such interest against competing policy concerns.

209. Providing a pretextual reason for taking agency action that is incongruent with what the record reveals about the agency's priorities and decision-making process can also be a basis for setting aside agency action as arbitrary and capricious. So can issuing decisions featuring unjustifiable bias or partisanship.

210. The Challenged Conditions are arbitrary and capricious for myriad reasons, any one of which would be sufficient to render them unlawful.

211. *First*, the Challenged Conditions fail to consider the factors relevant to issuing Ryan White funds that will best serve the purposes of the Ryan White CARE Act. Congress structured the Ryan White Program to provide comprehensive care for *all* individuals living with HIV/AIDS—including "those communities and populations that have been historically most underserved, as well as those that are experiencing rapid increases in HIV infection and AIDS case counts." S. Rep. No. 106-294, at 12 (2000). Congress intended Ryan White funds to "improve the quality of life for those infected or affected" by the HIV/AIDS epidemic by strengthening care retention rates, increasing viral suppression, and bettering overall health outcomes. H. Rep. No. 109-695, at 2 (2006). And Congress "recognize[d] and affirm[ed]" that the HIV/AIDS epidemic is "best be addressed through a local process" familiar with "shifting trends in the local epidemic, disparities in health care access and outcomes, and the need for capacity development within the HIV health care infrastructures." S. Rep. No. 106-294, at 13. The Challenged Conditions run roughshod over those Congressional mandates in several respects, as further alleged below and because they ignore that gender-affirming medical care is outpatient care that is covered by the Ryan White Program.

51

212.    *Second*, the Challenged Conditions entirely fail to consider several important aspects of the problem and, in fact, run counter to the evidence before Defendants. The Challenged Conditions ignore the strong medical consensus that gender-affirming medical care is evidence-based and, for many patients living with HIV/AIDS, medically necessary to achieve long-term positive health outcomes for the patient and for the broader community. Similarly, the Challenged Conditions disregard the well-documented links between access to gender-affirming medical care and improved HIV/AIDS-related health outcomes, including continued participation in care and consistent viral suppression. Indeed, the Challenged Conditions go beyond banning the use of Ryan White funding for gender-affirming medical care and prohibit caregivers from in any way acknowledging the existence of transgender people—including, for example, by using their correct pronouns. Congress intended to foster positive medical outcomes for patients living with HIV/AIDS by making it less likely that people living with HIV who rely on the Ryan White Program will discontinue their engagement with their HIV care and fall out of care altogether, but the Challenged Conditions undercut that intention. Finally, the Challenged Conditions ignore that Congress wanted decision-makers rooted in their local communities—not distant federal bureaucrats—to identify, prioritize, and ultimately provide community-specific care to individuals living with HIV/AIDS.

213.    *Third*, the Challenged Conditions fail to acknowledge—let alone justify—their departure from Defendants' prior policies regarding the use of Ryan White funding to support gender-affirming medical care. In the December 2021 Program Letter, Defendants told Plaintiffs that "[p]roviding gender-affirming care is an important strategy to effectively address the health and medical needs of transgender people with HIV." Defendants told Plaintiffs that Ryan White funds could be used to help transgender patients receive a variety of forms of gender-affirming

medical care—including "access to gender-affirming hormone therapy"; "purchas[ing] and maintain[ing] private health insurance, Medicaid, and Medicare coverage" that can support the health needs of transgender people with HIV; providing mental health services for individuals suffering from gender dysphoria and the social and emotional stress related to transgender discrimination, stigma, and rejection; and providing housing, case management, and substance use disorder treatment services for transgender individuals. The Challenged Conditions reverse those positions. Yet, the Challenged Conditions fail to reasonably explain that about-face or even acknowledge that Defendants are detouring from a beaten path. This provides an independent basis for finding them to be arbitrary and capricious.

214.    *Fourth*, the Challenged Conditions fail to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns. Plaintiffs have used Ryan White funds to structure integrated care models to improve retention rates and viral suppression among transgender individuals living with HIV. Caregivers have made significant investments in staffing and facilities to provide holistic care to people living with HIV—offering gender-affirming medical care along with other necessary medical treatment, case management, medical transportation, access to specialists, and hospice care. The Challenged Conditions will disrupt that infrastructure and force caregivers to choose between receiving crucial government support and honoring their commitments to provide the most effective and complete care to their patients. The loss of access to complete and affirming care will also shatter the trust of patients—undermining their important reliance interests, seriously jeopardizing their health and well-being, and damaging the public health goals of controlling the spread of HIV. The Challenged Conditions exacerbate that impact by barring caregivers from

53

showing transgender patients living with HIV the basic respect of acknowledging their identities, even when providing medical services not banned by the Challenged Conditions.

215.   *Fifth*, the Ryan White statute prescribes a degree of separation between the federal government and the entities that disburse Ryan White funding to service providers. The overriding purpose of the statute is to financially enable "public or private nonprofit entities" to "develop[], organiz[e], coordinat[e] and operat[e]" "effective and cost efficient systems" to "deliver[] [] essential services to individuals and families with HIV disease." 42 U.S.C. § 300ff. Accordingly, the Act empowers local Planning Councils and Consortia—not Defendants—to "determine the size and demographics of the population of individuals with HIV/AIDS, as well as the size of and demographics of the estimated population of individuals with HIV/AIDS who are unaware of their HIV status"; to "determine the needs of such population[s]"; and to "establish priorities for the allocation of" Ryan White funding within their communities, including "how best to meet each such priority." 42 U.S.C. § 300ff–12(b)(4)(A)-(C) (Part A). Similarly, the Act directs the Secretary to issue "supplemental grants to States" to "enable *such States*" to provide "comprehensive services" in "emerging communities within the State that are not eligible to receive grants under Part A." 42 U.S.C. § 300ff–30(a) (Part B. Supp.) (emphasis added). Yet the Challenged Conditions disrupt this.

216.   All told, the Challenged Conditions are not the products of reasoned decision-making. Defendants have offered no coherent explanation of how these changes serve Congress's purposes in providing Ryan White funding. Nor have they attempted to justify singling out one form of medical treatment from all other forms of HIV-specific and non-HIV-specific medical care that are funded by Ryan White. Instead, they self-evidently reflect unjustifiable bias against the LGBTQ community and rely on pretextual reasons that are incongruent with what the record

54

reveals about the agency's priorities and decision-making process. The Challenged Conditions thus represent precisely the type of agency action that violates the arbitrary-and-capricious standard.

217.    Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 that the Challenged Conditions violate the APA because they are arbitrary and capricious; provide preliminary relief staying implementation of the Challenged Conditions under 5 U.S.C. § 705 pending final judgment; and preliminarily and permanently enjoin Defendants from imposing the Challenged Conditions.

### Count II – Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A) Not in Accordance with Law

218.    Plaintiffs restate and reallege paragraphs 1 through 202 as if fully set forth herein.

219.    The APA directs courts to "hold unlawful and set aside agency action[s]" that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

220.    The Challenged Conditions contravene critical components of the Ryan White CARE Act.

221.    The purpose of the Ryan White CARE Act is to "make financial assistance available to States and other public or private nonprofit entities to provide for the development, organization, coordination[,] and operation of more effective and cost efficient systems for the delivery of essential services to individuals and families with HIV disease" and to "provide emergency assistance to localities that are disproportionately affected by the [HIV/AIDS] epidemic." 42 U.S.C. § 300ff.

222.    To achieve that purpose, the Ryan White statute mandates that funding be provided to establish a comprehensive system of care for low-income individuals living with HIV/AIDS who lack sufficient health coverage or financial resources. *See* 42 U.S.C. § 300ff–11(a) (Part A);

42 U.S.C. § 300ff–21 (Part B); *id.* § 300ff–29a (Part B Supp.); *id.* § 300ff–51 (Part C); *id.* § 300ff–71 (Part D).

223. The Ryan White statute also mandates that funding be used to provide "core medical services" and "support services" that improve access to and retention of comprehensive medical care, increase viral suppression, and improve overall health outcomes. *See* 42 U.S.C. § 300ff–14(c) – (d) (Part A); *id.* § 300ff–22(a) (Part B); *id.* § 300ff–29a (Part B Supp.); *id.* § 300ff–51(b) (Part C); *id.* § 300ff–71 (Part D).

224. Core medical services include "outpatient and ambulatory health services," as well as medical care for the treatment of "co-occurring conditions" of patients living with HIV participating in the Ryan White Program. *See* 42 U.S.C. §§ 300ff–14(b)(1), 300ff–22(b)(1), 300ff–51(c).

225. The Challenged Conditions violate the Congressional command to allow for coverage of outpatient and ambulatory health services, including medical care for the treatment of co-occurring conditions like gender dysphoria, by, among other things, prohibiting recipients of Ryan White funding from providing comprehensive care to people living with HIV and imposing restrictions that will indisputably *reduce* rather than *enhance* retention in care for people from underserved populations and will therefore lead to lower viral suppression rates.

226. The Challenged Conditions also violate the Affordable Care Act. *See* 42 U.S.C. § 18001 *et seq*.

### *Section 1554 of the Affordable Care Act*

227. Section 1554 of the Affordable Care Act, also known as the "Noninterference Mandate," prohibits HHS, and its component agencies, from promulgating a regulation or substantive policy that "creates any unreasonable barriers to the ability of individuals to obtain

56

appropriate medical care," "impedes timely access to health care services," or "limits the availability of health care treatment for the full duration of a patient's medical needs." 42 U.S.C. § 18114.

228. The Challenged Conditions create unreasonable barriers to the ability of transgender Ryan White patients to obtain gender-affirming medical care by prohibiting the use of Ryan White funding for such care notwithstanding that patients that rely on Ryan White do so because they otherwise lack the economic means to obtain necessary medical care. The Challenged Conditions also erect barriers to the ability of transgender Ryan White patients to obtain HIV care by making it less likely that they can obtain comprehensive care from a single provider and requiring that Ryan White funding recipients not acknowledge and respect the identities of their transgender patients.

229. The Challenged Conditions impede timely access to healthcare services by making it more difficult, or even impossible, for transgender Ryan White patients to access the gender-affirming medical care they need.

230. By prohibiting the use of Ryan White funds for gender-affirming medical care notwithstanding the Ryan White Program's purpose to provide people living with HIV with full comprehensive care, including for any co-occurring conditions, the Challenged Conditions limit the availability of healthcare treatment, in this case gender-affirming medical care, for the full duration of a patient's medical needs, in this case gender dysphoria.

### Section 1557 of the Affordable Care Act

231. For the reasons described in Count V (Section 1557 of the Affordable Act), paragraphs 247 through 261, which Plaintiffs incorporate by reference as if fully set forth herein,

57

the Challenged Conditions constitute unlawful discrimination that violates Section 1557 of the Affordable Care Act and are therefore not in accordance with law.

232.   Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 that the Challenged Conditions violate the APA because they are not in accordance with law; provide preliminary relief staying implementation of the Challenged Conditions under 5 U.S.C. § 705 pending final judgment; and preliminarily and permanently enjoin Defendants from imposing the Challenged Conditions.

**Count III – Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(C)**
**Exceeds Statutory Authority**

233.   Plaintiffs restate and reallege paragraphs 1 through 202 as if fully set forth herein.

234.   The APA directs courts to hold unlawful and set aside agency actions that exceed the agency's "statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

235.   An agency has no power to act—including under its regulations—unless and until Congress authorizes it do so by statute. Accordingly, any action that an agency takes outside the bounds of its statutory authority is *ultra vires* and violates the Administrative Procedure Act.

236.   Nothing in the Ryan White statute or any other legislation authorizes Defendants to impose unauthorized extra-statutory funding conditions that categorically bar recipients from providing gender-affirming medical care for transgender individuals living with HIV under the Ryan White Program or from acknowledging, affirming, and respecting transgender patients' identities.

237.   Defendants have thus gone beyond what Congress has permitted it to do.

238.   Plaintiffs therefore ask the Court to declare under 5 U.S.C. § 706 that the Challenged Conditions violate the APA because they exceed Defendants' statutory authority; provide preliminary relief staying implementation of the Challenged Conditions under 5 U.S.C. §

705 pending final judgment; and preliminarily and permanently enjoin Defendants from imposing the Challenged Conditions.

**Count IV – Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(B)**
**Contrary to Constitutional Right, Power, Privilege, or Immunity**

239.    Plaintiffs restate and reallege paragraphs 1 through 202 as if fully set forth herein.

240.    The APA requires courts to "hold unlawful and set aside" any agency action that is taken "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

241.    For the reasons described in Count VI (Equal Protection), paragraphs 262 through 283, and Count VII (Free Speech), paragraphs 284 through 299, which Plaintiffs incorporate by reference as if fully set forth herein, the Challenged Conditions are contrary to constitutional right.

242.    In addition, Article I of the United States Constitution vests Congress with the powers to make laws and control the public fisc. The Presentment Clause provides that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States." U.S. CONST. art. I, § 7, cl. 2. The Appropriations Clause provides that no "[m]oney shall be drawn from the Treasury, but in Consequence of Appropriations made by Law," U.S. CONST. art. I, § 9, cl. 7, and the Spending Clause vests Congress with the power to expend Treasury funds for the "general Welfare of the United States." U.S. CONST. art. I, § 8, cl. 1.

243.    What is more, an agency has no power to act unless and until Congress authorizes it to do so by statute. An agency's actions and regulations cannot operate independently of the statute that authorized them.

244.    For the reasons described in Count III (Exceeds Statutory Authority), paragraphs 233 through 238, which Plaintiffs incorporate by reference as if fully set forth herein, Defendants have adopted and promulgated the Challenged Conditions without any statutory authority.

245.    By adopting and promulgating the Challenged Conditions without any statutory authority, Defendants have violated the separation of powers, and the Challenged Conditions are therefore contrary to constitutional power in violation of the APA.

246.    Because Defendants acted beyond the power Congress has conferred upon them, Plaintiffs are entitled to declaratory and injunctive relief, including a declaration under 28 U.S.C. § 2201 that the Challenged Conditions unlawfully exceed Defendants' authority and preliminary and permanent injunctive relief preventing the Challenged Conditions from taking effect or being enforced.

### Count V – Violation of the Affordable Care Act, 42 U.S.C. § 18116

247.    Plaintiffs restate and reallege paragraphs 1 through 202 as if fully set forth herein.

248.    Section 1557 of the Affordable Care Act provides that "an individual shall not . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, . . . or under any program or activity that is administered by an Executive Agency," on the basis of sex. 42 U.S.C. § 18116(a).

249.    Section 1557 also prohibits discrimination against an individual or entity based on, inter alia, the sex of an individual with whom the individual or entity has a relationship or association.

250.    Defendants HRSA and HHS are covered entities under Section 1557.

251.    Discrimination based on transgender status constitutes discrimination on the basis of sex under Section 1557 of the ACA.

252.    Withholding healthcare solely because such care is provided for the purpose of aligning a patient's gender presentation with an identity different from their sex assigned at birth

60

is discrimination based on transgender status, and thus discrimination on the basis of sex under Section 1557 of the ACA.

253. The Challenged Conditions discriminate based on sex by requiring healthcare providers participating in the Ryan White Program to withhold healthcare from their transgender patients for the purpose of gender transition or treatment of their gender dysphoria.

254. The Challenged Conditions discriminate based on sex against the transgender patients to whom the Provider Plaintiffs and Associational Plaintiffs' members provide healthcare. These patients face barriers to asserting their own claims and protecting their own interests.

255. By requiring that Plaintiffs deny gender-affirming medical care to transgender patients as a condition of participating in the Ryan White program, the Challenged Conditions deny Plaintiffs' patients the ability to obtain the same medications, procedures, and comprehensive primary care to which they are entitled under the Ryan White Program, because of their sex.

256. By directing Provider Plaintiffs and Associational Plaintiffs' members to withhold healthcare if it "den[ies] . . . the sex binary in humans" or if it encourages "the belief that sex is a chosen or mutable characteristic," the Challenged Conditions force Plaintiffs to withhold medically necessary healthcare from their patients or to forgo participating in the Ryan White program.

257. By directing Provider Plaintiffs and Associational Plaintiffs' members to deny the existence of transgender people and to refuse to recognize, acknowledge, affirm, or respect the identities of their transgender patients, the Challenged Conditions force Plaintiffs to discriminate based on sex against their transgender patients.

258. Defendants do not have the power to override Section 1557 of the ACA and require Plaintiffs to engage in precisely the discrimination that Section 1557 prohibits.

259.    Even if, *arguendo*, the Challenged Conditions were not facial discrimination based on sex, they are the direct product of the Administration's discriminatory animus toward transgender people – disapproval and prejudice rooted in the fact that a transgender person's gender identity does not align with their sex assigned at birth – and therefore operate to deny them access to the care that allows them to live as themselves.

260.    Plaintiffs are entitled to a declaration that the Challenged Conditions violate Section 1557 of the ACA.

261.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing the Defendants from enforcing or implementing the Challenged Conditions, including incorporating the Challenged Conditions in any notice of award under the Ryan White Program.

### Count VI – Violation of the Fifth Amendment Equal Protection Guarantee

262.    Plaintiffs restate and reallege paragraphs 1 through 202 as if fully set forth herein.

263.    The Fifth Amendment to the United States Constitution guarantees that no person shall be "deprived of life, liberty, or property, without due process of law."

264.    The Fifth Amendment's Due Process Clause makes the Fourteenth Amendment's guarantee of equal protection applicable to the federal government, its agencies, its officials, and its employees.

265.    Discrimination because a person is transgender constitutes (1) discrimination based on a sex, which requires courts to apply, at minimum, intermediate scrutiny when evaluating the constitutionality of the government's discrimination, and (2) discrimination based on transgender status, which requires courts to apply heightened scrutiny to such discrimination.

266.    Government discrimination against transgender people because of their transgender status bears indicia of a suspect classification requiring heightened scrutiny by the courts:

a.  Transgender people have suffered a long history of extreme discrimination, both *de jure* and *de facto*, and continue to suffer such discrimination to this day;

b.  Transgender people are a discrete and insular group and lack the political power to protect their rights through the legislative process. Transgender people have largely been unable to secure explicit local, state, and federal protections to protect them against discrimination, and have been and continue to be regularly targeted for discrimination by legislation, regulations, and other government action;

c.  A person's gender identity or transgender status bears no relation to a person's ability to contribute to society; and

d.  Gender identity is a core, defining trait that is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment. Gender identity is also generally fixed at an early age and highly resistant to change.

267.    The Challenged Conditions discriminate against Plaintiffs based on sex and transgender status by depriving them of Ryan White funding based on whether they care for transgender people, attend to their transgender patients' health needs, and acknowledge and respect the identities of their transgender patients.

268.    The Challenged Conditions also discriminate based on sex and transgender status against the transgender patients to whom Plaintiffs provide healthcare. These patients face barriers to asserting their own claims and protecting their own interests.

269.    The Challenged Conditions were issued for the openly discriminatory purpose of expressing governmental disapproval of transgender people and rendering them unequal to others.

They are status-based classifications of persons undertaken for their own sake, something the Constitution's Equal Protection guarantee does not permit.

270. By prohibiting healthcare providers from providing gender-affirming medical care to transgender patients living with HIV using Ryan White funds, the Challenged Conditions intentionally deny Plaintiffs' patients the ability to obtain the same medications and procedures available to other patients, as well as the comprehensive primary care to which they are entitled under the Ryan White Program, because of their sex and transgender status.

271. The Challenged Conditions facially and intentionally discriminate based on sex and transgender status by requiring healthcare providers participating in the Ryan White Program to withhold healthcare from their transgender patients for the purpose of gender transition, that is, helping a patient's gender presentation to align with an identity different from their sex assigned at birth.

272. The Challenged Conditions create a facial classification based on sex because they adopt and direct the espousal of idiosyncratic and unscientific sex-based definitions as a condition of Ryan White funding and direct Ryan White funding recipients not to "promote gender ideology."

273. Similarly, by conditioning Ryan White funding on the adoption of "sex-based definitions grounded in biological reality" and on recipients not promoting "gender ideology," the Challenged Conditions discriminate based on transgender status on their face by expressing a disparaging, demeaning, idiosyncratic, and unscientific viewpoint about transgender people.

274. Where Defendants use "sex-trait modification procedures" as a proxy for transgender status, like HRSA did through the ADAP NOFO, Defendants facially and intentionally discriminate based on sex and transgender status. This is particularly so when Defendants permit Ryan White funds to be used for the same medications and procedures for other patients.

275. Even if, *arguendo*, the Challenged Conditions did not facially classify based on sex and transgender status, they are the direct product of the Administration's discriminatory animus toward transgender people – disapproval and prejudice rooted in the fact that a transgender person's gender identity does not align with their sex assigned at birth – and therefore operate to deny them access to the care that allows them to live as themselves.

276. The Challenged Conditions seek to effectuate the Administration's discriminatory purpose of expressing and effectuating its disapproval of and prejudice towards transgender people because the sex the identify with does not align with their sex assigned at birth and therefore deny them access to the care that allows them to live as themselves.

277. The Challenged Conditions are part and parcel of Defendants' efforts to combat so-called "gender ideology," which the Administration defines as the mere recognition or acknowledgement that a person may identify with a sex that differs from their sex assigned at birth, i.e. a transgender person.

278. The Challenged Conditions lack even a rational or legitimate justification, let alone the exceedingly persuasive one that is constitutionally required.

279. The Challenged Conditions also lack adequate tailoring under any standard of review.

280. The Challenged Conditions were promulgated, adopted, and issued for the openly discriminatory purpose of preventing transgender people from expressing a gender identity different from their sex designated at birth—and expressing governmental disapproval of people who do so—which are not even legitimate governmental interests under any standard of review.

281.    The Trump Administration has been clear that its goal is to erase the transgender community from participation in society—an effort that results in the literal denial of equal protection and causes ongoing harm to the Plaintiffs and the people that they serve.

282.    Plaintiffs are entitled to a declaration that the Challenged Conditions violate the equal protection component of the Fifth Amendment.

283.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing the Defendants from enforcing or implementing the Challenged Conditions, including incorporating the Challenged Conditions in any notice of award under the Ryan White Program.

### Count VII – Violation of the First Amendment
### Free Speech Clause

284.    Plaintiffs restate and reallege paragraphs 1 through 202 as if fully set forth herein.

285.    The First Amendment prohibits the government from abridging the freedom of speech. Ordinarily, the government may not regulate speech based on its substantive content or the message it conveys.

286.    In the context of federal funding, the government may attach certain conditions to eligibility for that funding, but there are limitations on the types of conditions that the government may attach to federal funds without violating the First Amendment.

287.    Funding conditions can result in an unconstitutional burden on First Amendment rights if the condition seeks to leverage funding to regulate speech outside the contours of the program itself or if it seeks to suppress dangerous ideas and restrict speech based on viewpoint absent any relationship to the purpose of the funded program.

288.    The Updated FY2026 General Terms that HRSA seeks to attach to funding under the Ryan White Program incorporate the "Defining Sex" guidance issued by HHS implementing the Gender Order.

289. The NOFOs issued in June 2026 expressly refer to the Updated FY2026 General Terms and the HRSA Priorities, and use similar language prohibiting Ryan White funding to "promote, encourage, subsidize, or facilitate . . . denial by the recipient of the sex binary in humans, or the belief that sex is a chosen or mutable characteristic."

290. The Challenged Conditions and the Gender Order on which they rely, taken together, express a disparaging and unscientific view of gender identity, repudiates the existence of transgender people, deems their identities to be false, orders their exclusion from government recognition and protection, and seeks to coerce others to do the same by threatening termination of federal funding and other penalties. This violates the First Amendment in two distinct ways.

291. *First*, through the Challenged Conditions, the government has placed a speech condition on the recipient of the subsidy rather than on a particular program or service—a condition that violates the First Amendment.

292. The Challenged Conditions create a funding condition that does not further the objectives of the Ryan White Program and thus places an unconstitutional burden on the First Amendment rights of Provider Plaintiffs and Associational Plaintiffs' members. Indeed, the Ryan White Program statute has no programmatic message that allows the government to regulate speech concerning "gender" as deemed necessary for the Ryan White Program's legitimate objectives.

293. Rather, the Challenged Conditions seek to coerce and penalize federal funding recipients, including Provider Plaintiffs and Associational Plaintiffs' members, whose speech, trainings, research, and services acknowledge the existence of transgender people and advocate for their equality and respect.

67

294.    *Second*, even in the provision of subsidies, the government may not aim at the suppression of dangerous ideas.

295.    Through the Challenged Conditions, the government violates the First Amendment by threatening to withhold benefits for a censorious purpose. The First Amendment does not tolerate the administration of subsidy programs with a censorious purpose.

296.    The Challenged Conditions are designed and intended to silence, defund, and otherwise penalize Plaintiffs for acknowledging that transgender people exist and providing them with humanitarian HIV services under the Ryan White Program. Plaintiffs cannot competently provide such services to every patient the Ryan White Program intends to reach without acknowledging people's diverse backgrounds and experiences, including their sex and gender identity.

297.    Provider Plaintiffs and Associational Plaintiffs' members, as well as the transgender patients they serve under the Ryan White Program, suffer irreparable harm as a direct result of the HRSA's unlawful imposition of the Challenged Conditions.

298.    Plaintiffs are entitled to a declaration that the Challenged Conditions violate the First Amendment's Free Speech Clause.

299.    Plaintiffs are further entitled to a preliminary and permanent injunction preventing the Defendants from enforcing or implementing the Challenged Conditions, including incorporating the Challenged Conditions on any notice of award under the Ryan White Program.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

A. A declaration that the Challenged Conditions are unlawful and unconstitutional, including as follows:

      i.  The Challenged Conditions violate the APA because they are arbitrary and capricious, not in accordance with law, contrary to constitutional right or power, and in excess of statutory authority;

      ii.  The Challenged Conditions violate Section 1557 of the Affordable Care Act;

      iii.  The Challenged Conditions violate the right to equal protection of Provider Plaintiffs and Associational Plaintiffs' members, as well as their transgender patients, guaranteed under the Fifth Amendment; and

      iv.  The Challenged Conditions violate the right to free speech of Provider Plaintiffs and Associational Plaintiffs' members guaranteed under the First Amendment.

B. Preliminary relief under 5 U.S.C. § 705 temporarily setting aside and postponing the effective date of the Challenged Conditions, and preventing their inclusion in any future notices of funding opportunities and notices of award under any part of the Ryan White Program, including any future funding opportunities;

C. Permanent relief under 5 U.S.C. § 706 holding unlawful and setting aside the Challenged Conditions;

D. Preliminary and permanent injunctive relief enjoining Defendants, including their employees, agents, servants, attorneys, successors and any person or entity in active

69

concert or participation with them, from implementing, enforcing, effectuating, or giving effect to the Challenged Conditions—or any materially similar policy that prohibits Ryan White funding recipients from acknowledging, affirming, and/or respecting the identities of transgender patients or from providing gender-affirming medical care under the Ryan White Program—against Provider Plaintiffs and Associational Plaintiffs' Members.

E.   Waive the requirement for the posting of a bond of security for the entry of temporary and preliminary relief;

F.   Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees; and

G.   Grant any other and further relief that this Court may deem just and proper.

Dated: June 10, 2026

Respectfully submitted,

 /s/ Omar Gonzalez-Pagan

Jeffrey S. Trachtman*
Jason M. Moff*
Stephen P. Ferguson*
Hannah Kanter*
**Herbert Smith Freehills Kramer (US) LLP**
1177 Avenue of the Americas
New York, New York 10036
Telephone: 212-715-9100
Jeffrey.Trachtman@hsfkramer.com
Jason.Moff@hsfkramer.com
Stephen.Ferguson@hsfkramer.com
Hannah.Kanter@hsfkramer.com

Ryan P. Trumbauer*
**Herbert Smith Freehills Kramer (US) LLP**
2000 K Street NW 4th Floor
Washington, DC 20006
Telephone: 202-775-4500
Ryan.Trumbauer@hsfkramer.com

* Motions for admission *pro hac vice* forthcoming

José I. Abrigo*
Omar Gonzalez-Pagan (BBO No. 678517)
Jessica Polansky*
Charlie Ferguson*
**Lambda Legal Defense
and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: 212-809-8585
Facsimile: 855-535-2236
jabrigo@lambdalegal.org
ogonzalez-pagan@lambdalegal.org
jpolansky@lambdalegal.org
cferguson@lambdalegal.org

Kenneth D. Upton, Jr.*
**Lambda Legal Defense
and Education Fund, Inc.**
3656 North Halsted Street
Chicago, Illinois 60613
Telephone: 312-663-4413
Facsimile: 855-535-2236
kupton@lambdalegal.org

Pelecanos*
**Lambda Legal Defense
and Education Fund, Inc.**
800 South Figueroa St., Suite 1260[†]
Los Angeles, California 90017
Telephone: 213-382-7600
Facsimile: 855-535-2236
pelecanos@lambdalegal.org

[†] Mailing address only

*Attorneys for Plaintiffs*

71