**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

AMERICAN ACADEMY OF HIV
MEDICINE; *et al.*,

        *Plaintiffs*,

        v.

HEALTH RESOURCES AND SERVICES
ADMINISTRATION; *et al.*,

        *Defendants*.

Case No. 1:26-cv-12638-WGY

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY RELIEF UNDER 5 U.S.C. § 705 AND PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................................ ii

TABLE OF AUTHORITIES .............................................................................................. iv

INTRODUCTION ................................................................................................................ 1

BACKGROUND .................................................................................................................. 2

    A.  HIV/AIDS Disproportionately Affects Transgender People. ......................................... 2

    B.  Providing Gender-Affirming Medical Care Through the Ryan White Program Furthers the Program's Purpose, as Set by Congress. ....................................... 3

    C.  The Challenged Conditions Prevent Healthcare Providers from Acknowledging their Transgender Patients and Providing Gender-Affirming Medical Care. ................... 5

    D.  The Challenged Conditions Are Part of a Broader Systematic Campaign Against Transgender People. ................................................................................ 7

    E.  The Challenged Conditions Will Cause Harm to Plaintiffs and Their Patients. .............. 7

LEGAL STANDARD ......................................................................................................... 10

ARGUMENT ...................................................................................................................... 10

    I.    Plaintiffs Have Standing. .................................................................................. 10

        A.  Provider Plaintiffs Have Standing. ............................................................ 10

        B.  Associational Plaintiffs Have Standing. .................................................... 11

    II.    Plaintiffs Are Likely to Succeed on the Merits. ............................................... 13

        A.  The Challenged Conditions are Final Agency Actions for Purposes of the APA. ........................................................................................ 13

        B.  The Challenged Conditions Violate the APA Because They Are Arbitrary and Capricious. ................................................................................ 14

            1.  The Challenged Conditions Are Contrary to the Purpose and Structure of the Ryan White Program. ................................................ 15

            2.  The Agency's Change in Policy Ignores the Evidence Before Defendants and Ignores Important Reliance Interests. .......................... 17

        C.  The Challenged Conditions Violate the APA Because They Are Not in Accordance with Law. ..................................................................... 21

     1.    The Challenged Conditions Are Contrary to the Ryan White Program's Enabling Statute. ................................................................................ 21

     2.    The Challenged Conditions Violate Section 1554 of the ACA. ............................ 23

    D.   The Challenged Conditions Violate the APA Because They Are in Excess of Statutory Authority and Violate the Separation of Powers. ........................................ 26

    E.   The Challenged Conditions Unlawfully Discriminate Based on Transgender Status and Sex. ................................................................................ 29

    F.   The Challenged Conditions Violate the Right to Free Speech. ................................ 34

III.   Provider Plaintiffs, Associational Plaintiffs' Members, and Their Transgender Patients Will Suffer Irreparable Harm Absent a Preliminary Injunction. ...................... 37

IV.   The Remaining Factors Favor Preliminary Relief. ............................................................ 39

V.   The Court Should Require No Bond. .................................................................................. 40

CONCLUSION ................................................................................................................................ 40

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Adkins v. City of New York*,
   143 F.Supp.3d 134 (S.D.N.Y. 2015) ................................................................ 33

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
   570 U.S. 205 (2013)................................................................................ 34, 35

*Am. Ass'n of Physicians for Hum. Rts., Inc. v. Nat'l Institutes of Health*,
   795 F.Supp.3d 678 (D. Md. 2025) .....................................................11, 32, 33, 37

*Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*,
   461 U.S. 402 (1983)....................................................................................... 15

*Bennett v. Spear*,
   520 U.S. 154 (1997)....................................................................................... 13

*Biden v. Nebraska*,
   600 U.S. 477 (2023)....................................................................................... 27

*Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v. United States Dep't of Health & Hum. Servs.*,
   557 F.Supp.3d 224 (D. Mass. 2021) ................................................................ 33

*Bostock v. Clayton County*,
   590 U.S. 644 (2020)................................................................................ 31, 33

*California ex rel. Becerra v. Azar*,
   950 F.3d 1067 (9th Cir. 2020)..................................................................... 24, 25

*California v. Kennedy*,
   802 F.Supp.3d 273 (D. Mass. 2025) ................................................................ 10

*California v. Trump*,
   786 F.Supp.3d 359 (D. Mass. 2025) ................................................................ 28

*Carlan v. Fenway Cmty. Health Ctr., Inc.*,
   2025 WL 1000478 (D. Mass. Mar. 28, 2025),  *appeal pending*, No. 25-1315 (1st Cir.).......... 31

*Cincinnati Soap Co. v. United States*,
   301 U.S. 308 (1937)....................................................................................... 27

*City & Cnty. of S.F. v. Azar*,
   411 F.Supp.3d 1001 (N.D. Cal. 2019)................................................................ 11

*City of Arlington v. FCC*,
   569 U.S. 290 (2013)....................................................................................... 27

*City of Chicago v. Noem*,
No. 25 C 12765, 2025 WL 3251222 (N.D. Ill. Nov. 21, 2025) ................................. 28

*City of Providence v. Barr*,
954 F.3d 23 (1st Cir. 2020) ................................................................. 29

*Cnty. of Santa Clara v. Trump*,
250 F.Supp.3d 497 (N.D. Cal. 2017) ...................................................... 28

*Ctr. for Biological Diversity v. Zeldin*,
171 F.4th 356 (D.C. Cir. 2026) ............................................................ 21

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .......................................................................... 10

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .................................................................. 15, 17, 19

*Doe v. Austin*,
755 F.Supp.3d 51 (D. Me. 2024) ......................................................... 32

*Doe v. Horne*,
115 F.4th 1083 (9th Cir. 2024) ........................................................... 32

*Doe v. Snyder*,
28 F.4th 103 (9th Cir. 2022) .............................................................. 31

*E.E.O.C. v. Astra U.S.A., Inc.*,
94 F.3d 738 (1st Cir. 1996) ............................................................... 39

*Edmo v. Corizon, Inc.*,
935 F.3d 757 (9th Cir. 2019) ............................................................. 19

*Endocrine Soc'y v. Fed. Trade Comm'n*,
No. CV 26-512 (JEB), 2026 WL 1257289 (D.D.C. May 7, 2026) ............................. 7

*Evancho v. Pine-Richland Sch. Dist.*,
237 F.Supp.3d 267 (W.D. Pa. 2017) ...................................................... 33

*F.V. v. Barron*,
286 F.Supp.3d 1131 (D. Idaho 2018) ..................................................... 33

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ............................................................... 15, 17, 19

*Fed. Elec. Comm'n v. Cruz*,
596 U.S. 289 (2022) .......................................................................... 28

*Food & Drug Admin. v. R.J. Reynolds Vapor Co.*,
606 U.S. 226 (2025).................................................................................11

*Free the Nipple-Fort Collins v. City of Fort Collins*,
916 F.3d 792 (10th Cir. 2019) ............................................................... 39

*Freedom Network USA v. Trump*, Civ. Act. No. 25 C,
12419, 2026 WL 800392 (N.D. Il. Mar. 23, 2026) ................................ 14

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ........................................................ passim

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ............................................................................... 12

*Illinois v. Fed. Emergency Mgmt. Agency*,
801 F.Supp.3d 75 (D.R.I. 2025) ............................................................ 14

*In re Aiken Cnty.*,
725 F.3d 255 (D.C. Cir. 2013)............................................................... 29

*Ing v. Tufts Univ.*,
81 F.4th 77 (1st Cir. 2023) .................................................................... 31

*INS v. Chadha*,
462 U.S. 919 (1983)............................................................................... 29

*Karnoski v. Trump*,
926 F.3d 1180 (9th Cir. 2019) .............................................................. 33

*Koala v. Khosla*,
931 F.3d 887 (9th Cir. 2019)................................................................. 36

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986)............................................................................... 28

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)................................................................... 40

*Legal Servs. Corp. v. Velazquez*,
531 U.S. 533 (2001)............................................................................... 35

*Level the Playing Field v. FEC*,
961 F.3d 462 (D.C. Cir. 2020)............................................................... 21

*Massachusetts v. Nat'l Institutes of Health*,
770 F.Supp.3d 277 (D. Mass. 2025), *judgment entered,* No. 1:25-CV-10338, 2025
WL 1063760 (D. Mass. Apr. 4, 2025), and *aff'd*, 164 F.4th 1 (1st Cir. 2026).............. 21, 37, 39

*Massachusetts v. HHS*,
682 F.3d 1 (1st Cir. 2012) ................................................................. 32, 33

*Massachusetts v. United States*,
435 U.S. 444 (1978) ............................................................................... 27

*Mayor of Baltimore v. Azar*,
973 F.3d 258 (4th Cir. 2020) ............................................................ 24, 26

*Motor Vehicle Ass'n v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983) ................................................................................. 14

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
763 F.Supp.3d 36 (D.D.C. Feb. 3, 2025) ............................................... 27

*Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*,
779 F. Supp. 3d 149 (D.N.H. 2025) ...................................................... 27

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) ...................................................................... 35, 36, 37

*New Jersey v. Trump*,
131 F.4th 27 (1st Cir. 2025) .................................................................. 10

*New York v. McMahon*,
784 F.Supp.3d 311 (D. Mass. 2025) .................................................. 39, 40

*New York v. Trump*,
171 F.4th 1 (1st Cir. 2026) .................................................................... 38

*New York v. Trump*,
764 F.Supp.3d 46 (D.R.I. 2025) ......................................................... 28, 29

*Nken v. Holder*,
556 U.S. 418 (2009) .......................................................................... 10, 39

*Oregon v. Kennedy*,
No. 6:25-CV-02409-MTK, 2026 WL 1048354 (D. Or. Apr. 18, 2026) .................................. 38

*Orr v. Trump*,
778 F.Supp.3d 394 (D. Mass. 2025), *appeal dismissed as moot and injunction vacated
on other grounds,* No. 25-1579 (1st Cir. June 5,2026) ......................................... 7, 34

*Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*,
280 F.3d 278 (3d Cir. 2002) .................................................................. 13

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) .................................................................................. 27

*PFLAG, Inc. v. Trump,*
769 F.Supp.3d 405 (D. Md. 2025) ...................................................... 29, 32, 37

*Pineda v. Skinner Servs., Inc.,*
22 F.4th 47 (1st Cir. 2021) ........................................................................ 40

*Planned Parenthood of Maryland, Inc. v. Azar,*
No. 20-cv-00361-CCB, 2020 WL 3893241 (D. Md. July 10, 2020) ...................................... 24

*Planned Parenthood S. Atl. v. Baker,*
941 F.3d 687 (4th Cir. 2019) ..................................................................... 37

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) ............................................................................. 34

*Regan v. Taxation with Representation of Wash.,*
461 U.S. 540 (1983) ............................................................................. 36

*Rhode Island Coal. Against Domestic Violence v*. Kennedy,
812 F.Supp.3d 180 (D.R.I. *2025), appeal d*ismissed sub nom. *Rhode Island Coal.*
*Against Domestic Violence v. United States Dep't of Hous. &* Urb. Dev., No.
25-2229,2026 WL 926474 (1st Cir. Jan. 5, 202 ........................ 13, 14, 19, 37

*River Street Donuts, LLC v. Napolitano,*
558 F.3d 111 (1st Cir. 2009)...................................................................... 15

*Romer v. Evans,*
517 U.S. 620 (1996) ............................................................................. 34

*Rosenberger v. Rector & Visitors of Univ. Va.,*
515 U.S. 819 (1995) ............................................................................. 34

*Rosselló Nevares,*
305 F.Supp.3d 327 (D.P.R. 2018) ................................................................. 34

*Rust v. Sullivan,*
500 U.S. 173 (1991)............................................................................. 35

*San Francisco A.I.D.S. Found. v. Trump,*
786 F. Supp. 3d 1184 (N.D. Cal. 2025)..................................................... passim

*Sindicato Puertorriqueño de Trabajadores v. Fortuño,*
699 F.3d 1 (1st Cir. 2012) ...................................................................... 38

*Student Gov't Ass'n v. Bd. of Tr. of Univ. of Massachusetts,*
868 F.2d 473 (1st Cir. 1989) .................................................................... 36

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) ........................................................................................ 12

*Talbott v. United States*,
775 F. Supp. 3d 283 (D.D.C. 2025), *aff'd in part, vacated in part, remanded, No.
25*-5087, 2026 WL 1532205 (D.C.Cir. 2026) .................................................... 7, 33

Talbott v. United States,
No. 25-5087, 2026 WL 1532205 (D.C. Cir. June 1, 2026) ........................................ 38

*Thakur v. Trump*,
No. 25-4249, 2026 WL 1466303 (9th Cir. May 26, 2026) ....................................... 36

*Tirrell v. Edelblut*,
748 F.Supp.3d 19 (D.N.H. 2024) ...................................................... 31, 32, 33

*U.S. Dep't of Agric. v. Moreno*,
413 U.S. 528 (1973) ......................................................................................... 34

*United Food & Com. Workers Union Loc. 751 v. Brown Grp.*, Inc.,
517 U.S. 544 (1996) ......................................................................................... 12

*United States v. Virginia*,
518 U.S. 515 (1996) ......................................................................................... 32

*Warth v. Seldin*,
422 U.S. 490 (1975) ......................................................................................... 13

*Washington v. Trump*,
768 F.Supp.3d 1239 (W.D. Wash. 2025) ............................................................11

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
485 F.Supp.3d 1 (D.D.C. 2020) ..................................................................11, 24, 25

**Constitution**

U.S. Const. amend. I ........................................................................................ 34

U.S. Const. art. I, § 7, cl. 2............................................................................... 29

U.S. Const. art. II, § 3 ..................................................................................... 29

**Statutes**

5 U.S.C. § 704.................................................................................................. 13

5 U.S.C. § 705.............................................................................................. 10, 40

5 U.S.C. § 706(2)(A)...................................................................................... 14, 21

5 U.S.C. § 706(2)(B)–(C) ............................................................................ 26, 30

38 U.S.C. § 1803 ............................................................................................... 22

42 U.S.C. §§ 300ff *et seq.* ....................................................................... passim

42 U.S.C. §§ 18114(1)–(5) ............................................................................... 28

42 U.S.C. § 18116(a) ................................................................................. 28, 30

Further Consolidated Appropriations Act, Pub. L. No. 118-47, § 526 (2024) ............................ 27

**Regulations**

45 C.F.R. § 92.4 ............................................................................................... 30

**Executive Orders**

Executive Order 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg.  (Jan. 20, 2025) ............................ 5

**Other Authorities**

*Comorbid*, *Merriam-Webster.com Dictionary*, Merriam-Webster, https://tinyurl.com/33c2ajee (accessed June 9, 2026) ............................................................................... 23

H. Rep. 109-695 (2006) ................................................................................. 16

Health Res. & Servs. Admin., U.S. Dep't of Health & Hum. Servs., Ryan White HIV/AIDS Program: Legislation (Dec. 2024), https://tinyurl.com/4m3hkcfe [https://perma.cc/D7DK-PZSL] ............................................................................................. 4

S. Rep. No. 106-294 (2000) ..................................................................... 15, 16, 28

## INTRODUCTION

Effectively addressing the HIV/AIDS epidemic requires affirming, culturally competent healthcare tailored to the health needs of LGBTQ people living with HIV, including transgender people living with HIV. Yet, seeking to turn back the clock to the early days of the HIV/AIDS epidemic, the current administration is deliberately attacking the ability of transgender patients living with HIV who rely on the Ryan White HIV/AIDS Program ("the Ryan White Program") to access needed healthcare. The government thus threatens not only the health and wellbeing of transgender people living with HIV, but also our Nation's ability to finally end the HIV/AIDS epidemic.

As part of the administration's campaign to repudiate the existence of transgender people and single them out for discrimination and opprobrium, Defendants have adopted a policy to prohibit healthcare providers participating in the Ryan White Program from acknowledging, affirming, or respecting their transgender patients' identities, including by prohibiting the provision of gender-affirming medical care as treatment for gender dysphoria. This policy, which effectuates one of the President's executive orders targeting transgender people, is set forth in guidance documents, the Health Resources and Services Administration's ("HRSA") general terms and conditions, and notices of funding opportunity relating to the Ryan White Program (hereafter the "Challenged Conditions," further defined in Plaintiffs' Complaint (at ¶¶ 164–187) and at Background § C, *infra*).

Providers who do not abide by these conditions risk losing access to the critical funding that allows them to care for *all* people living with HIV that rely on the Ryan White Program, which supports over half of all Americans living with HIV. Congress specifically intended Ryan White funding to support comprehensive healthcare for the most vulnerable populations. But when providers are compelled to disavow their transgender patients' existence and deny them necessary

medical care, the trust between the patients and their doctors will be broken and transgender patients will stop showing up for HIV care, risking their lives and public health generally. It is no understatement to say that, because of the Challenged Conditions, people will die.

The Challenged Conditions are not just harmful; they are illegal. They violate the Administrative Procedure Act ("APA"), the Affordable Care Act ("ACA"), the Fifth Amendment, and the First Amendment. Accordingly, and because the Challenged Conditions will cause immediate and grave harm to Plaintiffs, as well as threaten to damage the Ryan White Program's remarkable public health success, Plaintiffs and their patients, respectfully request that this Court temporarily set aside or enjoin the Challenged Conditions pending resolution of this case, just as other courts have done with regard to similar policies and executive action. The status quo will protect not only the lives, health, and wellbeing of the transgender people living with HIV who rely on the Ryan White Program for their healthcare, but also our Nation's HIV care infrastructure.

## BACKGROUND

Provider Plaintiffs and Associational Plaintiffs' members are healthcare providers who offer comprehensive HIV care and primary care, including gender-affirming medical care, to their transgender patients living with HIV, through the Ryan White Program.[1] They, along with their transgender patients living with HIV who rely on the Ryan White Program for their healthcare needs, will suffer irreparable harm should the Challenged Conditions go into effect.[2]

### A. HIV/AIDS Disproportionately Affects Transgender People.

Transgender people—particularly transgender women—bear a profoundly disproportionate burden of the country's HIV epidemic. Notwithstanding progress to end the

---

[1] Brody Decl. ¶ 20; Fox Decl. ¶¶ 31–34; Collins-Ogle Decl. ¶¶ 20–23; Doe Decl. ¶¶ 22–27; Roe Decl. ¶ 20; Packett Decl. ¶ 23; Weddle Decl. ¶ 10; Zuniga Decl. ¶ 13.
[2] Brody Decl. ¶¶ 5, 17; Fox Decl. ¶¶ 42–45; Collins-Ogle Decl. ¶¶ 5, 15–16; Roe Decl. ¶ 7; Doe Decl. ¶¶ 8, 14; Packett Decl. ¶¶ 5–6; Weddle Decl. ¶¶ 5–6, 17–18; Zuniga Decl. ¶¶ 5–6.

epidemic, HIV continues to be a major public health concern among sexual and gender minority populations.[3] The risk of acquiring HIV among transgender and other gender-minority individuals is thirteen times that of the cisgender population.[4] According to the Centers for Disease Control and Prevention ("CDC"), transgender people make up 2% of new HIV diagnoses in recent year-to-year data despite comprising only about 1% of the United States population aged 13 and older. *Id.* The CDC further estimates that approximately 14% of transgender women in the United States are living with HIV, with prevalence rates reaching 44% among Black transgender women and 26% among Hispanic/Latina transgender women.[5] This disproportionate impact is driven by structural barriers like stigma, discrimination, poverty, homelessness, and lack of access to culturally competent and gender-affirming healthcare, all of which significantly impair access to HIV prevention and treatment services.[6]

### B. Providing Gender-Affirming Medical Care Through the Ryan White Program Furthers the Program's Purpose, as Set by Congress.

Congress created the Ryan White Program as a comprehensive, integrated system of HIV care. The goal of the Program is to offer a safety net for people living with HIV by providing outpatient HIV care, treatment, and support services to those without health insurance or who experience gaps in coverage.[7] Following its initial adoption and implementation, the Ryan White Program was expanded by Congress to address the unmet care and treatment needs of people living with HIV by focusing funding on primary healthcare and support services to enhance access to and retention in care and adherence to daily treatment.[8]

Because HIV is a complex, chronic condition that disproportionately affects medically and

---

[3] Zuniga Decl. ¶ 19.
[4] Zuniga Decl. ¶ 20.
[5] Abrigo Decl., Ex. A
[6] Zuniga Decl. ¶¶ 24–25; *see also* Zuniga Decl., Ex. D at 1–2.
[7] Weddle Decl. ¶ 16. Packett Decl. ¶ 25.; Collins-Ogle Decl. ¶ 5.
[8] Weddle Decl. ¶ 17.

socially vulnerable populations, Congress structured the Ryan White Program to address the full spectrum of health and supportive service needs of people living with HIV.[9] It does so to prevent new HIV infections, improve health outcomes for people living with HIV, reduce the health disparities affecting people living with HIV, and achieve integrated and coordinated efforts that address the HIV/AIDS epidemic. *Id.* Over half of all people diagnosed with HIV are served through the Ryan White Program, and many would not have access to necessary healthcare services and treatment without the program.[10]

The Ryan White statute repeatedly references coordinated "systems of care," continuity of care, retention in care, and outpatient primary healthcare for people living with HIV. *See* 42 U.S.C. §§ 300ff–11, 300ff–12(b)(4), 300ff–21, 300ff–23(a), (c), 300ff–51, 300ff–71. Consistent with that structure, as HRSA explains, the various parts of the Ryan White Program "give [Ryan White] recipients flexibility to address HIV care needs."[11] The statute authorizes broad categories of outpatient and ambulatory health services, mental health treatment, substance use treatment, medical case management, transportation, outreach, and adherence support services. *See* 42 U.S.C. §§ 300ff–14(c)–(d), 300ff–22(b)–(c), 300ff–51(c)–(d), 300ff–71(b).

Under the Ryan White statute, local planning councils and state consortia are charged with assessing local epidemiological data; identifying unmet service needs among affected subpopulations and historically underserved communities; establishing funding priorities based on the priorities of the communities with HIV for whom the services are intended; and designing coordinated systems of care pursuant to the statute's broad purpose, as set by Congress. *See* 42 U.S.C. §§ 300ff–12(b)(1), (b)(4)(B)(ii), (d); 300ff–23(a), (c); 300ff–27(b)(7)(B).

---

[9] Packett Decl. ¶ 25.
[10] Weddle Decl. ¶ 15.
[11] Health Res. & Servs. Admin., U.S. Dep't of Health & Hum. Servs., *Ryan White HIV/AIDS Program: Legislation* (Dec. 2024), https://tinyurl.com/4m3hkcfe [https://perma.cc/D7DK-PZSL].; *see also* Packett Decl. ¶ 27.

Providing affirming healthcare (i.e., care that is mindful and respectful of a transgender patient's identity) and medical treatment for gender dysphoria (i.e., "gender-affirming medical care"), such as gender-affirming hormone therapy, through the Ryan White Program furthers the Program's central goals of retention in care, treatment adherence, and long-term viral suppression for people living with HIV.[12] Patients living with HIV are more likely to remain engaged in treatment when they receive integrated and affirming care addressing their broader healthcare needs.[13] Ryan White-funded providers have long incorporated gender-affirming medical care into integrated HIV treatment models designed to improve adherence and retention in care.[14] Ryan White planning councils, planning bodies, and consortia across the country likewise recognize transgender people as a priority population disproportionately affected by HIV and have prioritized strategies that fund and emphasize gender-affirming care to improve engagement in HIV treatment and health outcomes. *See* Compl. ¶¶ 116–125 (collecting guidance).

**C. The Challenged Conditions Prevent Healthcare Providers from Acknowledging their Transgender Patients and Providing Gender-Affirming Medical Care.**

This case challenges conditions imposed on recipients of Ryan White funding through Defendants' implementation of Executive Order 14168, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8650 (Jan. 20, 2025) ("Gender Order"), which directs that federal funding not be used to promote "gender ideology," including through the FY 2026 HRSA General Terms and Conditions ("Updated FY2026 General Terms"), issued on March 11, 2026, and the Ryan White Program Notices of Funding Opportunity ("NOFOs") issued or projected to be issued in June 2026.[15]

---

[12] Brody Decl. ¶¶ 5, 17; Fox Decl. ¶¶ 5, 16–18; Collins-Ogle Decl. ¶ 5; Roe Decl. ¶ 7.
[13] Brody Decl. ¶¶ 13–15; Fox Decl. ¶¶ 16–18; Collins-Ogle Decl. ¶¶ 5–16.
[14] Brody Decl. ¶¶ 5, 12–17; Fox Decl. ¶¶ 5, 11, 16–18; Collins-Ogle Decl. ¶¶ 5, 10, 14–15; Weddle Decl. ¶¶ 10, 12, 17; Zuniga Decl. ¶¶ 13–14.
[15] Abrigo Decl., Ex. B (HRSA GTC), Ex. I (Part B Suppl. NOFO), Ex. J (Part C NOFO), Ex. K (Part F NOFO).

The Updated FY2026 General Terms require Ryan White funding recipients to "apply[] sex-based definitions grounded in biological reality" and incorporate HRSA's "strategic priorities," which specify that, "[i]t is a HRSA priority to recognize that a person's sex as either male or female is unchangeable and determined by objective biology, and to ensure its programs accurately reflect science, including the biological reality of sex."[16] The NOFOs incorporate the Updated FY2026 General Terms and further implement them in various ways, such as by prohibiting the use of Ryan White funds for "sex-trait modification procedures" or "to fund, promote, encourage, subsidize, or facilitate . . . denial by the recipient of the sex binary in humans, or the belief that sex is a chosen or mutable characteristic."[17]

The Updated FY2026 General Terms and the NOFOs implement the Gender Order. The Gender Order commands federal agencies to reject recognition of transgender identities and implement policies based on sex assigned at birth, including by denying gender-affirming medical care for transgender people.[18]

Together, the Updated FY2026 General Terms, any similar terms in the NOFOs, and any other actions implementing the Gender Order with regard to the Ryan White Program constitute the "Challenged Conditions" in this case. *See* Compl. ¶¶ 164-187; *see also id.* ¶¶ 156-157.

The Challenged Conditions apply or will apply across Ryan White funding streams, including Parts A, B, C, D, and F, incorporated through HRSA grant conditions and various Notices of Award. Compl. ¶¶164-187. In concert, the Challenged Conditions impose restrictions on Ryan White-funded providers providing integrated HIV care to transgender patients, including hormone therapy and other affirming care delivered as part of outpatient primary healthcare. Compl. ¶¶ 90–

---

[16] Abrigo Decl., Ex. B (HRSA GTC) and Ex. C (HRSA Priorities).
[17] Abrigo Decl., Ex. D (ADAP NOFO), Ex. I (Part B Suppl. NOFO), Ex. J (Part C NOFO), Ex. K (Part F NOFO).
[18] Abrigo Decl. Ex. E.

103, 164–187. Compliance with the Challenged Conditions would require providers to either (1) refrain from acknowledging, affirming, or respecting the identities of transgender people and from using federal funds to provide medically indicated gender-affirming medical care to transgender patients living with HIV or (2) risk losing critical Ryan White funding necessary to operate their HIV programs and to care for their patients living with HIV, including transgender people.[19]

**D. The Challenged Conditions Are Part of a Broader Systematic Campaign Against Transgender People.**

The Challenged Conditions do not arise in isolation. They are part of a broader government-wide effort to erase recognition of transgender people and restrict access to gender-affirming medical care. *See generally* Compl. ¶¶ 130–163. They are "part of a constellation of close-in-time executive actions directed at transgender Americans that contained powerfully demeaning language." *Orr v. Trump*, 778 F.Supp.3d 394, 417 (D. Mass. 2025) (documenting actions), *appeal dismissed as moot and injunction vacated on other grounds,* No. 25-1579 (1st Cir. June 5, 2026); *see also Endocrine Soc'y v. Fed. Trade Comm'n*, No. CV 26-512 (JEB), 2026 WL 1257289, at *2 (D.D.C. May 7, 2026); *Talbott v. United States*, 775 F.Supp.3d 283, 330-32 (D.D.C. 2025), *aff'd in part*, *vacated in part, remanded,* No. 25-5087, 2026 WL 1532205 (D.C. Cir. 2026).

**E. The Challenged Conditions Will Cause Harm to Plaintiffs and Their Patients.**

The Challenged Conditions are particularly harmful in the context of the HIV epidemic because transgender people, especially transgender women of color, experience disproportionately high rates of HIV and significant barriers to healthcare. *See* Background Section A, *supra*.[20] The Challenged Conditions undermine longstanding public health efforts designed to improve engagement in HIV care for populations disproportionately affected by HIV and threaten to

---

[19] Brody Decl. ¶¶ 5, 17; Fox Decl. ¶¶ 5, 16–18; Collins-Ogle Decl. ¶¶ 5, 15–16; Roe Decl. ¶ 7; Doe Decl. ¶¶ 8, 14, 19; Packett Decl. ¶¶ 5–6; Weddle Decl. ¶¶ 5–6, 17–18; Zuniga Decl. ¶¶ 5–6; Compl. ¶¶ 188–202; Abrigo Decl. Ex. L.
[20] Weddle Decl. ¶ 6; Zuniga Decl. ¶ 6; Brody Decl. ¶¶ 11, 17; Roe Decl. ¶¶ 7, 13.

destabilize integrated HIV treatment systems developed over decades through the Ryan White Program.[21]

The Challenged Conditions thus threaten immediate and concrete harm to Provider Plaintiffs, Associational Plaintiffs' members, and their patients. Ryan White-funded HIV programs are structured around integrated models of care that depend on providers being able to offer affirming, comprehensive, and continuous treatment to transgender patients living with HIV.[22]

Transgender patients living with HIV already face substantial barriers to healthcare engagement, including stigma, discrimination, unstable housing, mental health conditions, and distrust of medical systems.[23] Integrated gender-affirming medical care and care that respects patients' identities promotes trust, retention in care, medication adherence, and long-term viral suppression.[24]

The Challenged Conditions directly threaten those treatment relationships. Being able to acknowledge and respect the identities of transgender patients who rely on the Ryan White Program for their HIV care and other health needs, and to provide them with gender-affirming medical care when indicated through Ryan White funds, is "critical to maintaining patient trust, adherence to antiretroviral therapy, retention in care, and sustained viral suppression." Collins-Ogle Decl. ¶ 5. "Research . . . consistently shows that when transgender people feel supported and affirmed in their identity by health care providers, they are more likely to access HIV testing, engage with pre-exposure prophylaxis, adhere to ART [antiretroviral therapy], and achieve viral suppression." Zuniga Decl. ¶ 35. If Ryan White-participating clinics and providers are prohibited

---

[21] Weddle Decl. ¶¶ 6, 15–18; Packett Decl. ¶¶ 5–6, 10–13; Zuniga Decl. ¶¶ 6, 12–14; Collins-Ogle Decl. ¶¶ 5, 12–15; Compl. ¶¶ 81–125, 126–129, 143–163.
[22] Brody Decl. ¶¶ 13–17; Fox Decl. ¶¶ 5, 10–11; Collins-Ogle Decl. ¶¶ 14–16; Doe Decl. ¶¶ 13, 22.
[23] Compl. ¶¶ 54–57, 99–103; Brody Decl. ¶¶ 5, 11, 17; Packett Decl. ¶ 32; Zuniga Decl. ¶ 38.
[24] Brody Decl. ¶ 5; Fox Decl. ¶¶ 16–18; Collins-Ogle Decl. ¶¶ 15–16.

from acknowledging and respecting the identities of their transgender patients or lose their ability to provide gender-affirming medical care, patients will be less "open and honest with their healthcare providers about symptoms, behaviors, and healthcare needs," which will lead to "misdiagnosis, missed diagnosis, not being offered preventative health services like screenings, and other adverse health outcomes." Fox Decl. ¶ 40. Causing "transgender patients to lose trust in their healthcare providers and [] clinic[s] in general," in turn, "lead[s] to a lack of engagement in healthcare and avoidance of dealing with acute or chronic illness." Brody Decl. ¶ 17.[25] This can result in "missed medications," "treatment interruptions," "loss of viral suppression," and "significant deterioration in mental health, including increased depression and suicidality," *Id.* as well as resistance to medications that were previously effective, limiting treatment options.[26] Transgender patients who disengage from care may develop preventable complications of their HIV infection and other conditions, "which are significantly more difficult to treat once they have progressed." Brody Decl. ¶ 37.

These harms are especially acute in medically underserved communities, including rural and non-Medicaid expansion jurisdictions where Ryan White-funded HIV clinics often serve as the only viable source of competent HIV care and gender-affirming medical care for transgender patients living with HIV,[27] as well as for homeless patients who "often have lasting consequences because re-engagement is extremely challenging." Brody Decl. ¶ 53.

The Challenged Conditions also harm Plaintiffs and their members by disrupting integrated HIV care programs and interfering with their ability to deliver evidence-based HIV treatment

---

[25] Fox Dec. ¶ 40; Doe Decl. ¶ 44; *see also* Packett Decl. ¶ 31; Brody Decl. ¶ 26; Roe Decl. ¶ 36.
[26] Packett Decl. ¶¶ 32, 42; Zuniga Decl. ¶ 38; Weddle Decl. ¶ 53; Doe Decl. ¶¶ 43–45; Roe Decl. ¶¶ 35–37; Brody Decl. ¶ 5.
[27] Collins-Ogle Decl. ¶¶ 11–12; Roe Decl. ¶¶ 7, 9, 11.

consistent with accepted medical standards.[28]

Absent preliminary relief, Plaintiffs and their patients are likely to suffer irreparable harm, including disruption of treatment relationships, loss of medically necessary care, reduced retention in HIV treatment, worsening health outcomes, and increased risk of HIV transmission.[29]

## LEGAL STANDARD

A party seeking a preliminary injunction must show: "(1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest." *New Jersey v. Trump*, 131 F.4th 27, 33 (1st Cir. 2025) (citation modified). The final two factors merge where the government is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The APA independently authorizes a reviewing court to stay final "agency action" to "prevent irreparable injury." 5 U.S.C. § 705. The standard for granting a § 705 stay is the same as that for obtaining a preliminary injunction. *See California v. Kennedy*, 802 F.Supp.3d 273, 281 (D. Mass. 2025).

## ARGUMENT

### I. Plaintiffs Have Standing.

"To have standing, a plaintiff must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019) (citation modified). Each Provider Plaintiff and Associational Plaintiff satisfies this standard.

### A. Provider Plaintiffs Have Standing.

Provider Plaintiffs have standing under the APA because they are regulated parties adversely affected by agency action and their interests are "within the zone of interests to be

---

[28] Packett Decl. ¶¶ 5–6, 11–13; Weddle Decl. ¶¶ 5–6, 11–13; Zuniga Decl. ¶¶ 5–6, 11–14, 31.
[29] Brody Decl. ¶¶ 5, 17; Fox Decl. ¶ 20; Collins-Ogle Decl. ¶¶ 15–16; Roe Decl. ¶ 7.

protected or regulated by the statute." *See Food & Drug Admin. v. R.J. Reynolds Vapor Co.*, 606 U.S. 226, 232–33 (2025). Plaintiffs are Ryan White-funded HIV providers directly regulated by the Challenged Conditions and are precisely the entities Congress intended to operate the comprehensive systems of HIV care established under the Ryan White Program.

As a direct result of Defendants' conduct, Provider Plaintiffs face immediate and concrete injuries to their medical practices, professional obligations, and Ryan White-funded HIV programs. The Challenged Conditions force providers to choose between continuing to provide affirming healthcare and gender-affirming medical care to transgender patients living with HIV and risk losing critical Ryan White funding or ending their provision of respectful, medically appropriate care to their transgender patients in violation of accepted standards of medicine and thereby disrupting longstanding treatment relationships.[30]

Provider Plaintiffs also have third-party standing to assert the rights of their transgender patients living with HIV. Courts have consistently recognized that healthcare providers may assert the constitutional and statutory rights of their transgender patients where challenged government action interferes with the provision of medical care. *See, e.g.*, *Am. Ass'n of Physicians for Hum. Rts., Inc. v. Nat'l Institutes of Health*, 795 F.Supp.3d 678, 693–94 (D. Md. 2025) ("*GLMA*"); *San Francisco A.I.D.S. Found. v. Trump*, 786 F.Supp.3d 1184, 1212–13 (N.D. Cal. 2025) ("*SFAF*"); *Washington v. Trump*, 768 F.Supp.3d 1239, 1258 (W.D. Wash. 2025); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F.Supp.3d 1, 34–36 (D.D.C. 2020); *City & Cnty. of S.F. v. Azar*, 411 F.Supp.3d 1001, 1011 (N.D. Cal. 2019).

### B. Associational Plaintiffs Have Standing.

Associational Plaintiffs satisfy the requirements for associational standing because: "(a)

---

[30] Doe Decl. ¶¶ 51–52; Brody Decl. ¶ 39; Fox Decl. ¶¶ 44–45.

[their] members would otherwise have standing to sue in their own right; (b) the interests [they] seek[] to protect are germane to the organization[s'] purpose[s]; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199–201 (2023).

First, Associational Plaintiffs each have members who independently possess standing for the same reasons Provider Plaintiffs have standing.[31]

Second, the interests Associational Plaintiffs seek to protect are germane to their organizational missions: The Academy exists to support HIV practitioners and promote accessible, quality HIV care, including through education, credentialing, and advocacy relating to integrated HIV treatment; HIVMA advances access to healthcare services for people living with HIV and supports a robust and culturally competent HIV workforce; and IAPAC's mission is to expand access to and improve the quality of HIV prevention, care, treatment, and support services for people living with HIV worldwide.[32] Ensuring that their members can continue to provide evidence-based care for transgender patients living with HIV falls squarely within those missions.

Third, neither Plaintiffs' claims nor the requested relief requires participation of individual members. *See United Food & Com. Workers Union Loc. 751 v. Brown Grp*., Inc., 517 U.S. 544, 546 (1996) ("individual participation is not normally necessary when an association seeks prospective or injunctive relief for its members") (citation omitted). Plaintiffs challenge the legality of Defendants' nationwide funding conditions under the APA, Section 1557 of the Affordable Care Act, and the Constitution. They seek declaratory and injunctive relief prohibiting

---

[31] Packett Decl. ¶¶ 5–6, 11–13; Weddle Decl. ¶¶ 5–6, 10, 15–18; Zuniga Decl. ¶¶ 5–6, 12–14; Brody Decl. ¶¶ 16–20; Fox Decl. ¶¶ 31–34; Collins-Ogle Decl. ¶¶ 20–25; Roe Decl. ¶¶ 20–21; Doe Decl. ¶¶ 22–28.
[32] Packett Decl. ¶¶ 7–13; Weddle Decl. ¶¶ 7–13; Zuniga Decl. ¶¶ 7–11.

their enforcement. Because the claims turn on the lawfulness of Defendants' policies, not member-specific factual determinations, any relief would benefit all affected members and their patients alike and does not require their individual participation. *See Warth v. Seldin*, 422 U.S. 490, 515 (1975).

Furthermore, Associational Plaintiffs have derivative standing to assert claims on behalf of the transgender patients of its provider members. *See Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 293 (3d Cir. 2002) ("If on remand the Pennsylvania Psychiatric Society warrants associational standing to represent its members, we conclude it also may have derivative authority to raise the claims of its members' patients.").

## II. Plaintiffs Are Likely to Succeed on the Merits.

### A. The Challenged Conditions are Final Agency Actions for Purposes of the APA.

The APA authorizes judicial review of "final agency action." 5 U.S.C. § 704. An agency action is final when it "mark[s] the consummation of the agency's decisionmaking process" and determines "rights or obligations . . . from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation modified).

The Challenged Conditions, including the Updated FY2026 General Terms and the Part B Supplemental, Part C, and Part F NOFOs, are final agency action under the APA. Assessing a previous version of the HRSA General Terms and Conditions at issue here, another court in this Circuit held that "[t]he insertion of the Challenged Conditions into prospective and current grant agreements" constitutes final agency action. *Rhode Island Coal. Against Domestic Violence v. Kennedy*, 812 F.Supp.3d 180, 191 (D.R.I. 2025) ("*R.I. Coalition*") (finding prior version of HRSA's general terms as well as NOFOs to be final agency action), *appeal dismissed sub nom. Rhode Island Coal. Against Domestic Violence v. United States Dep't of Hous. & Urb. Dev.*, No. 25-2229, 2026 WL 926474 (1st Cir. Jan. 5, 2026).

"As numerous other courts have likewise explained, the decision to attach the conditions [to NOFOs] can be final even if the final decision to award the funds and issue the NOFOs is still pending." *Illinois v. Fed. Emergency Mgmt. Agency*, 801 F.Supp.3d 75, 89 (D.R.I. 2025) (holding that final agency action had occurred where "the challenged conditions remain applicable to all FY 2025 grants"); *see also Freedom Network USA v. Trump*, Civ. Act. No. 25 C 12419, 2026 WL 800392, at *19 (N.D. Il. Mar. 23, 2026) (conditions attached to NOFOs "demonstrated the consummation of [defendant's] decision-making process regarding its priorities and considerations in evaluating grant applications" and they "require[] an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance.").

Accordingly, the Challenged Conditions—funding requirements that compel grantee conduct "in no uncertain terms"—constitute final agency action. *See Freedom Network USA*, 2026 WL 800392, at *19.[33]

### B. The Challenged Conditions Violate the APA Because They Are Arbitrary and Capricious.

The APA directs reviewing courts to "hold unlawful and set aside agency action[s]" that are arbitrary or capricious. 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious when it "relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). Agency action is also arbitrary and capricious when the agency has failed to "consider[] the factors relevant to" its decision "that will best serve the purposes" of the statute it

---

[33] In addition, as numerous courts have found, the agency action here—the implementation of grant terms and conditions—is not committed to exclusive agency discretion. *See R.I Coalition*, 812 F.Supp.3d at 192-93. Accordingly, the Challenged Conditions are subject to judicial review under the APA.

is applying. *Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 413 (1983); *see also River Street Donuts, LLC v. Napolitano*, 558 F.3d 111, 117 (1st Cir. 2009) (same).

In addition, when agency action deviates from past policy or practice, the agency must provide a "more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And when the prior policy "has engendered serious reliance interests," *id.*, the agency must "assess [those] reliance interests, determine whether they were significant, and weigh any such interest against competing policy concerns," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020).

The Challenged Conditions are arbitrary and capricious for multiple reasons, any one of which is sufficient to render them unlawful. Plaintiffs are therefore likely to succeed on Count I.

> **1. The Challenged Conditions Are Contrary to the Purpose and Structure of the Ryan White Program.**

The Challenged Conditions contravene the purpose and structure of the Ryan White Program. Congress set forth several clear purposes that Defendants were required to consider in structuring the Ryan White Program. *First*, Congress directed that the Program provide comprehensive care for *all* individuals living with HIV, and particularly "those communities and populations that have been historically most underserved, as well as those that are experiencing rapid increases in HIV infection and AIDS case counts." S. Rep. No. 106-294, 12 (2000); *see also*, 42 U.S.C. § 300ff–12(b) (requiring local planning councils to determine the needs of the local population living with HIV and establish priorities paying "particular attention to" the needs of "disproportionately affected and historically underserved groups"); 42 U.S.C. § 300ff–52(a)(2) (directing that funding recipients "shall serve underserved populations"). *Second*, Congress directed Ryan White funds to be used to "improve the quality of life for those infected or affected" by the HIV epidemic by strengthening care retention rates, increasing viral suppression, and

bettering overall health outcomes. H. Rep. 109-695, 2 (2006). *Third*, Congress "recognize[d] and affirm[ed]" that the HIV epidemic is "best addressed through a local process" spearheaded by decisionmakers familiar with "shifting trends in the local epidemic, disparities in healthcare access and outcomes, and the need for capacity developing with the HIV health care infrastructures." S. Rep. No. 106-294, 13; *see also* 42 U.S.C. § 300ff–12(b) (requiring the creation of local planning councils); § 300ff–23(a), (c) (establishing consortia and directing them to demonstrate a record of service to subpopulations that reflect local incidence of HIV, based on identified needs of those communities).

The Challenged Conditions flout those congressional mandates. *First*, instead of supporting historically underserved groups, such as transgender people, the Challenged Conditions require Plaintiffs to discriminate against transgender patients by refusing to acknowledge, respect, or affirm their identities in any respect, even if unconnected to the provision of gender-affirming medical care, and prohibit Plaintiffs from providing gender-affirming medical care.[34] As the statute contemplated, "Ryan White-funded clinics open the door for treatment for transgender patients who often do not access routine healthcare because clinicians can address patients' comprehensive health needs, including gender-affirming medical care, when administering HIV care." Zuniga Decl. ¶ 35.[35] But the Challenged Conditions would discourage many prospective patients from accessing and retaining HIV-related care altogether.[36]

*Second*, the Challenged Conditions would harm the health, wellbeing, and quality of life for individuals infected or affected by HIV by reducing care retention rates, decreasing viral suppression, and worsening overall health outcomes population-wide, which will "create[] an

---

[34] S*ee* Weddle Decl. ¶ 22; Zuniga Decl. ¶¶ 19–26, 34.
[35] *See also* Collins-Ogle Decl. ¶¶ 20, 23, 36; Fox Decl. ¶ 29; Roe Decl. ¶ 19–21.
[36] *See* Collins-Ogle Decl. ¶¶ 28–30, 41–45; Fox Decl. ¶ 30; Roe Decl. ¶ 24–31; Zuniga Decl. ¶ 38; *cf.* Weddle Decl. ¶ 49 (noting the likely economic impact of the Challenged Conditions)

exponential problem that compromises public health." Weddle Decl. ¶¶ 54–55.[37] By dissuading transgender patients from accessing and retaining HIV-related care, the Challenged Conditions are likely to "increas[e] the risk of transmitting HIV . . . [to] the community-at-large" across demographic groups. Weddle Decl. ¶ 53.[38] This will diminish overall patient- and community-health outcomes across the country well-beyond the community of individuals living with HIV who are transgender.[39]

*Third*, the Challenged Conditions ignore Congress's determination that local entities, specifically, the State Consortia and local planning councils—not Defendants—are best equipped to analyze shifting trends in local HIV epidemics, to address disparities in healthcare access and outcomes in local communities, and to build effective local HIV health-care infrastructure. *See* Background Section B, *supra*. Instead, Defendants seek to impose a global rule that prohibits respectful and affirming care for an entire population without considering local conditions or priorities.

### 2. The Agency's Change in Policy Ignores the Evidence Before Defendants and Ignores Important Reliance Interests.

The Challenged Conditions fail to acknowledge—let alone justify—Defendants' departure from their prior policies supporting respecting transgender patients' identities and the use of Ryan White funding for gender-affirming medical care. Those prior policies were based on the scientific consensus that gender-affirming medical care is beneficial and medically necessary for people with gender dysphoria and enhances treatment adherence. Further, those prior policies "engendered serious reliance interests," *Fox Television*, 556 U.S. at 515, that Defendants also failed to adequately assess, *see Regents of the Univ. of Cal.*, 591 U.S. at 33.

---

[37] *See* Collins-Ogle Decl. ¶¶ 30, 35, 41–48; Packett Decl. ¶ 42; Zuniga Decl. ¶ 38; Weddle Decl. ¶ 53.
[38] *See also* Collins-Ogle Decl. ¶ 64; Weddle Decl. ¶ 42; Zuniga Decl. ¶ 38.
[39] *See* Collins-Ogle Decl. ¶¶ 41–48; Zuniga Decl. ¶ 38.

As Defendants themselves acknowledged in 2021: "Providing gender-affirming medical care is an important strategy to effectively address the health and medical needs of transgender people with HIV." Weddle Decl., Ex. J. Defendants explained that healthcare providers could use Ryan White funds to help transgender patients receive a variety of forms of gender-affirming medical care including by "purchas[ing] and maintain[ing] private health insurance, Medicaid, and Medicare coverage" that can support the health needs of transgender people with HIV; providing mental health services for individuals suffering from gender dysphoria and social and emotional stress stemming from anti-transgender discrimination, stigma, and rejection; and providing housing, case management, and substance use disorder treatment services for transgender individuals. *Id.* at 2.

Similarly, 2024 guidance published by HHS previously affirmed, *inter alia*, that "[a]dherence to [gender-affirming] hormone therapy correlates with adherence to ART," that "integrating HIV care with gender care facilitates treatment and is associated with higher rates of viral suppression," that "care integration makes it easier to discuss concerns about drug–drug interactions between HIV treatment and gender-affirming medications," that "HIV care services should be provided within a gender-affirmative care model to reduce potential barriers to ART [antiretroviral therapy] adherence and to maximize the likelihood of achieving sustained viral suppression," and that "[i]ntegrating hormone therapy with HIV services is the recommended practice." Weddle Decl., Ex. F at I-102–03. Not only did HHS delete the chapter "Transgender People with HIV" from the 2025 version of the guidelines, without any explanation, but the Challenged Conditions completely ignore this guidance.[40]

The Challenged Conditions abandon this guidance and now prohibit the very forms of care

---

[40] Weddle Decl. ¶ 32; *see also* Weddle Decl., Ex. G (2025 version of HHS guidelines); Compl. ¶ 158.

that Defendants previously encouraged, without any acknowledgement of the change, much less the "more detailed justification" that such an about-face requires. *See Fox Television*, 556 U.S. at 515.

In reversing course now, Defendants ignore the strong scientific consensus that gender-affirming medical care is evidence-based and, for many transgender patients living with HIV, necessary to achieve long-term positive health outcomes for the patient and for the broader community.[41] That consensus is shared by nearly every major medical association.[42] What is more, Defendants ignore that access to gender-affirming medical care is crucial to encouraging continued participation in comprehensive healthcare, including HIV treatment, which in turn helps maintain viral suppression and control the spread of HIV infections in the larger population.[43]

Defendants have also altogether failed to "assess whether there were reliance interests" in their prior policy, "determine whether they were significant, and weigh any such interest against competing policy concerns." *Regents of the Univ. of Cal.*, 591 U.S. at 33. In a recent case, a court preliminarily enjoined similar funding conditions that barred the promotion of "gender ideology." *R.I. Coalition*, 812 F.Supp.3d at 199. That court found a likelihood of success on the merits that the conditions were arbitrary and capricious in part because "it is impossible for this Court to find that the Defendants considered the harmful impact their decision would have on . . . the vulnerable populations they serve." *Id*. at 193 (quotation omitted).

Plaintiffs have used Ryan White funds to structure entire care models that improve

---

[41] *See* Weddle Decl. ¶¶ 40–41, 53.

[42] *See* Abrigo Decl., Ex. F (collecting statements from, *inter alia*, the American Medical Association, American Academy of Pediatrics, American College of Physicians, American Psychiatric Association, American Psychological Association, Endocrine Society, World Health Organization, and World Professional Association for Transgender Health); *see also* Abrigo Decl., Ex. G. *See also Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 595 (4th Cir. 2020), *as amended* (Aug. 28, 2020); *Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019).

[43] *See* Zuniga Decl. ¶ 34; Packett ¶ 17; Weddle Decl., Ex. F (2024 HHS guidelines) at I-102–03.

retention rates and viral suppression among transgender individuals living with HIV.[44] Plaintiffs and their members have made significant investments in staffing and facilities to provide holistic care to people living with HIV—interweaving gender-affirming medical care as a part of treatment plans that include other necessary medical treatment, family support, case management, medical transportation, access to specialists, and hospice care.[45]

The Challenged Conditions will disrupt that infrastructure by forcing providers to forgo crucial government support for current staff and programs unless they are willing to abandon their commitments to offer comprehensive and effective care to *all* their patients.[46] Such abandonment of care would shatter patients' trust, which in turn would undermine their reliance interests, jeopardize their health and wellbeing, and damage the Ryan White Program's public health goal of controlling the spread of HIV.[47] The Updated FY2026 General Terms worsen that impact by barring Plaintiffs from communicating with transgender patients living with HIV using the pronouns and other language that aligns with their identities, even when providing medical services not banned by the Challenged Conditions. *See* Updated FY2026 General Terms § 5(b) (requiring "sex-based definitions grounded in biological reality"). This would make it impossible for Plaintiffs—often the only providers to whom transgender individuals have access—to provide any care at all.[48]

\* \* \*

All told, the Challenged Conditions are not the products of reasoned decision-making

---

[44] *See* Collins-Ogle Decl. ¶¶ 17, 21–22; Doe Decl. ¶ 23; Brody Decl. ¶ 20.
[45] *See* Brody Decl. ¶¶ 11–12; Doe Decl. ¶ 23.
[46] *See* Doe Decl. ¶¶ 22, 31–41; Packett Decl. ¶ 35.
[47] *See* Roe Decl. ¶¶ 14–16, 27–28; Plackett Decl. ¶ 31.
[48] *See* Fox Decl. ¶ 39 ("If we cannot continue to . . . use a patient's name, gender identity, and pronouns, it is likely that our transgender patients would stop coming and would drop off from all care, including HIV care."); Roe Decl. ¶ 25 ("[B]eing able to acknowledge and affirm my transgender patients' identities[] is essential to building trust with [them]. . . . That trust directly affects whether my patients remain in care.").

proceeding from a rational assessment of data, evidence, potential impact, or reliance interests. Defendants can offer no coherent explanation of how the Challenged Conditions serve Congress's purposes in providing Ryan White funding. Nor have they attempted to justify singling out one type of recipient (transgender people) and one form of medical treatment from all other types of core medical services (both HIV-specific and non-HIV-specific) funded by Ryan White. This lack of explanation renders the Challenged Conditions arbitrary and capricious. *See Massachusetts v. Nat'l Institutes of Health*, 770 F.Supp.3d 277, 305 (D. Mass. 2025) ("*Massachusetts v. NIH*") ("[A]gencies must provide reasons that both exhibit sufficient consideration of the relevant factors and pertinent aspects of the problem and demonstrate a rational connection between the facts and choice that was made."), *judgment entered,* No. 1:25-CV-10338, 2025 WL 1063760 (D. Mass. Apr. 4, 2025), and *aff'd*, 164 F.4th 1 (1st Cir. 2026).

Instead, the Challenged Conditions self-evidently reflect "unjustifiable bias." *Level the Playing Field v. FEC*, 961 F.3d 462, 464 (D.C. Cir. 2020). The Challenged Conditions thus appear to be yet another attempt from the current Administration to target and stigmatize the transgender community—all while ignoring the considered judgments of Congress and the state and regional councils and consortia that Congress empowered to formulate treatment priorities.

**C.    The Challenged Conditions Violate the APA Because They Are Not in Accordance with Law.**

The APA directs reviewing courts to "hold unlawful and set aside agency action[s]" that are "not in accordance with law." 5 U.S.C. § 706(2)(A). "An agency action that violates a statute is not in accordance with law within the meaning of the APA." *Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356, 376 (D.C. Cir. 2026) (citation modified). Plaintiffs are likely to succeed on Count II because the Challenged Conditions contravene the plain text of both the Ryan White statute and the Affordable Care Act.

### 1. The Challenged Conditions Are Contrary to the Ryan White Program's Enabling Statute.

The Challenged Conditions disregard both the foundational principles and the statutory scheme codified in the Ryan White statute. The Ryan White statute mandates that funding be provided to establish a system of comprehensive care that "improve[s] the quality, availability[,] and organization of health care services for individuals and families with HIV/AIDS." 42 U.S.C. § 300ff-21 (Part B); *see also id.* § 300ff-11(a) (Part A); *id*. § 300ff-29a (Part B Supp.); *id*. § 300ff-51 (Part C); *id*. § 300ff-71 (Part D). The Ryan White statute further requires that funding be used to provide "core medical services" and "support services" for persons living with HIV, to improve access to and retention of HIV-related care, increase viral suppression, and improve overall health outcomes. *See* 42 U.S.C. § 300ff-14(c)–(d) (Part A); *id.* § 300ff-22(a) (Part B); *id.* § 300ff-29a (Part B Supp.); *id.* § 300ff-51(b) (Part C); *id.* § 300ff-71 (Part D). The statute defines "core medical services" to encompass "outpatient and ambulatory health services," "including services regarding the co-occurring conditions of the individual" for an individual living with HIV/AIDS. 42 U.S.C. §§ 300ff-14(c), 300ff-22(b) (identical), 300ff-51(c) (identical).

Core medical services can include gender-affirming medical care. "The term 'outpatient care' means care and treatment of a disability, and preventive health services, furnished to an individual other than hospital care or nursing home care." 38 U.S.C. § 1803.[49] And according to the Ryan White Statute, "[t]he term 'co-occurring conditions' means one or more adverse health conditions in an individual with HIV/AIDS, without regard to whether the individual has AIDS

---

[49] This is consistent with the ordinary meaning of the term. *See*, *e.g.*, *Outpatient Services*, Health Library, New York-Presbyterian Hospital, (May 1, 2025) https://tinyurl.com/z3vhrdxy [https://perma.cc/9V9C-TYFS] ("Outpatient services are medical procedures, surgeries, therapies, classes, or tests that are done in a qualified medical center without the need for an overnight stay.").

and without regard to whether the conditions arise from HIV." 42 U.S.C. § 300ff-88(2).[50] And gender dysphoria is a serious medical condition "that is characterized by debilitating distress and anxiety resulting from the incongruence between an individual's gender identity and birth-assigned sex." *Grimm*, 972 F.3d at 594–95. Gender-affirming medical care, more specifically, gender-affirming hormone therapy, falls squarely within these ordinary definitions.

Accordingly, Plaintiffs use Ryan White funding to maintain integrated care models that provide holistic care and "core medical services" to patients living with HIV, which includes not only HIV specialty care but also, *inter alia*, sexual healthcare, counseling, mental-health support, medication monitoring, and, when appropriate, gender-affirming medical care for the co-occurring condition of gender dysphoria.[51]

By forcing Plaintiffs to exclude gender-affirming medical care from these models, the Challenged Conditions "directly undermine" their efforts to provide *comprehensive* care and core medical services to patients living with HIV.[52] The Challenged Conditions will thus "fragment care, exclude necessary services for" transgender HIV patients, and "create gaps that [Plaintiffs'] [i]ntegrated [p]lans are specifically designed to prevent." Doe Decl. ¶ 48. This violates the Ryan White statute.

### 2. The Challenged Conditions Violate Section 1554 of the ACA.

Section 1554 of the ACA prohibits HHS from promulgating any regulation that, *inter alia*, "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care," "impedes timely access to health care services," "interferes with communications regarding a full

---

[50] A co-occurring condition, also known as a comorbid condition, refers to a condition "existing simultaneously with and usually independently of another medical condition." *Comorbid*, *Merriam-Webster.com Dictionary*, Merriam-Webster, https://tinyurl.com/33c2ajee (accessed June 9, 2026).

[51] *See* Doe Decl. ¶ 21; Collins-Ogle Decl. ¶ 22; Fox Decl. ¶¶ 15–17; Zuniga Decl. ¶ 34.

[52] Packett Decl. ¶ 46; Doe Decl. ¶ 32; Weddle Decl. ¶ 46; *see also* Zuniga Decl. ¶ 40 ("The restriction would also undermine our members' ability to treat their patients by erasing data on transgender people living with or at risk of HIV.").

range of treatment options between the patient and the provider," "restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions," "violates . . . the ethical standards of health care professionals," or "limits the availability of health care treatment for the full duration of a patient's medical needs." 42 U.S.C. § 18114. The Challenged Conditions offend Section 1554 in numerous ways.

*First*, the Challenged Conditions create unreasonable barriers to the ability of transgender patients living with HIV to obtain appropriate HIV medical care as well as gender-affirming medical care for their gender dysphoria and impede timely access to such care. At its essence, this case is "about placing limits on the ability to act" of providers participating in the Ryan White Program. *See Mayor of Baltimore v. Azar*, 973 F.3d 258, 288 (4th Cir. 2020). Pursuant to the Challenged Conditions, healthcare providers participating in the Ryan White Program must "abstain" from respecting their transgender patients' identities while providing HIV-related care and from providing gender-affirming medical care. *See Whitman-Walker.*, 485 F.Supp.3d at 53. In doing so, the Challenged Conditions "make[] it harder" for transgender patients living with HIV to access HIV care and gender-affirming medical care, thereby imposing an "unreasonable barrier" to medical care. *Planned Parenthood of Maryland, Inc. v. Azar*, No. 20-cv-00361-CCB, 2020 WL 3893241, at *9 (D. Md. July 10, 2020). In other words, they impose a "substantive barrier" to the ability of transgender patients living with HIV to obtain "appropriate medical care." *Whitman-Walker*, 485 F.Supp.3d at 53 (quoting *California ex rel. Becerra v. Azar*, 950 F.3d 1067, 1094–95 (9th Cir. 2020) (en banc)).

The Challenged Conditions erect myriad barriers to appropriate care. As to HIV care, the Challenged Conditions would prohibit HIV care providers from providing integrated health services that comprehensively attend to the primary healthcare needs of patients and have been

shown to have positive impacts with regards to HIV treatment.[53] For example, this would prevent providers from addressing interactions between medications provided as part of HIV treatment and those provided as part of gender dysphoria treatment.[54] In addition, by prohibiting the acknowledgement and affirmation of transgender patients' identities and the provision of medically indicated gender-affirming medical care, the Challenged Conditions will cause transgender patients living with HIV who rely on Ryan White funding to disengage from HIV care.[55] This in turn will cause reduced antiretroviral therapy adherence and lower levels of viral suppression.[56] But as HHS's own guidelines regarding HIV care acknowledge, "HIV care services should be provided within a gender-affirmative care model to reduce potential barriers to ART [antiretroviral therapy] adherence and to maximize the likelihood of achieving sustained viral suppression." Weddle Decl., Ex. F at I-103. And the Ryan White Program is often the only means by which transgender patients may obtain gender-affirming medical care, so the Challenged Conditions would effectively cut off access to such care.[57] The Challenged Conditions thus "amount to direct government interference with health care by requiring providers or patients to perform or abstain from certain conduct." *See Whitman-Walker*, 485 F.Supp.3d at 53 (quoting *California ex rel. Becerra*, 950 F.3d at 1094) (citation modified).

*Second*, the Challenged Conditions interfere with communications between HIV care providers and their transgender patients living with HIV regarding the full range of treatment options and information they need to make informed and clinically appropriate healthcare decisions. Acknowledging a transgender patient's identity and gender incongruence would, in

---

[53] Weddle Decl. ¶ 30.
[54] Weddle Decl. ¶¶ 33, 34; Fox Decl. ¶ 20.
[55] Brody Decl. ¶¶ 26–27, 33–35; Fox Decl. ¶¶ 41, 41, 43; Collins-Ogle Decl. ¶ 33; Doe Decl. ¶ 45; *cf.* Doe Decl. ¶¶ 34-40 (providing patient example).
[56] Packett Decl. ¶ 42; Zuniga Decl. ¶ 38; Brody Decl. ¶ 55; Fox Decl. ¶ 43; Roe Decl. ¶¶ 32–34; Collins-Ogle Decl. ¶ 39.
[57] Zuniga Decl. ¶ 39; Collins-Ogle Decl. ¶¶ 40–42; Roe Decl. ¶¶ 38–40; Doe Decl. ¶ 59.

Defendants' view, "promote gender ideology" and "promote, encourage, . . . or facilitate . . . denial by the recipient of the sex binary in humans, or the belief that sex is a chosen or mutable characteristic." *E.g.*, Abrigo Decl. Ex. E (Gender Order), Ex. I (Part B Suppl. NOFO). HIV care providers, therefore, will be prohibited from discussing concerns about drug interactions between HIV treatment and gender-affirming hormone therapy, patient priorities regarding care, treatment options regarding gender dysphoria, and other issues related to a patient's particularized needs and circumstances.[58] As such, the Challenged Conditions "quite clearly 'interfere[] with communications' about medical options between a patient and her provider" and "require[] health care providers to hide the ball from their patients." *Mayor of Baltimore*, 973 F.3d at 288 (quoting 42 U.S.C. § 18114(3)).

*Third*, the Challenged Conditions require healthcare providers to violate the ethical standards of their professions by denying medical care they consider necessary and essential for the care of their patients and forcing them to discriminate against their patients. *See Mayor of Baltimore*, 973 F.3d at 288.[59]

In short, the Challenged Conditions are unlawful because they are contrary to the plain text and structure of the Ryan White statute and are contrary to Section 1554.

### D. The Challenged Conditions Violate the APA Because They Are in Excess of Statutory Authority and Violate the Separation of Powers.

The APA directs reviewing courts to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), or "contrary to constitutional right, power, privilege, or immunity," *id.* § 706(2)(B). To determine whether an agency has exceeded its authority, "the court looks to the scope of the

---

[58] Weddle Decl., Ex. F at I-102–03; Zuniga Decl. ¶¶ 38, 41; Brody Decl. ¶ 42; Fox Decl. ¶¶ 27, 29; Doe Decl. ¶ 56.
[59] *See also* Packett Decl. ¶ 36; Weddle Decl. ¶¶ 46–48; Brody Decl. ¶¶ 39–41; Fox Decl.¶ 45; Collins-Ogle Decl. ¶¶ 47–51.

agency's statutory authority and discretion and determines whether the agency's statutory authority encompasses the action taken." *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F.Supp.3d 149, 197 (D.N.H. 2025) (citation modified). "Phrased simply, the question is 'whether the agency has gone beyond what Congress has permitted it to do.'" *Id.* (quoting *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013)).

Here, nothing in the Ryan White statute authorizes Defendants to impose the Challenged Conditions on recipients of Ryan White funds. Absent such Congressional authorization, the Constitution bars Defendants from exercising that power unilaterally.

*First*, the Challenged Conditions violate the Appropriations Clause of the Constitution. "The Appropriations Clause . . . gives Congress exclusive power over federal spending." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F.Supp.3d 36, 55 (D.D.C. Feb. 3, 2025) (citation modified); *see also Biden v. Nebraska*, 600 U.S. 477, 505 (2023). Indeed, the Clause "was intended as a restriction upon the disbursing authority of the Executive [Branch]." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937).

Consistent with those principles, Congress, not Defendants, "may impose appropriate conditions on the use of federal property or privileges," including federal grants. *Massachusetts v. United States*, 435 U.S. 444, 461 (1978). And when Congress intends to place conditions on federal funds, "it has proved capable of saying so explicitly." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17–18 (1981); *see*, *e.g.*, 42 U.S.C. § 300ff-1 (proscribing use of Ryan White funds to provide "individuals with hypodermic needles or syringes so that such individuals may use illegal drugs"); Further Consolidated Appropriations Act, Pub. L. No. 118-47, § 526 (2024) (grant conditions regarding provision of sterile needles); *id.* § 202 (grant condition regarding salary caps). But the Executive Branch "does not have the power to place conditions on federal funds" that run

counter to the will of Congress. *Cnty. of Santa Clara v. Trump*, 250 F.Supp.3d 497, 531 (N.D. Cal. 2017); *cf. Fed. Elec. Comm'n v. Cruz*, 596 U.S. 289, 301 (2022) (An agency "'literally has no power to act'—including under its regulations—unless and until Congress authorizes it to do so by statute." (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).

The Ryan White Program is no exception to these rules. Congress did not condition the issuance of Ryan White grants on whether the recipient promotes "gender ideology," denies the "sex binary" in humans, expresses the belief that sex is a "chosen or mutable characteristic," or provides gender-affirming medical care. To the contrary: Congress explicitly directed the Executive Branch to *refrain* from taking actions that burden access to and communications regarding appropriate healthcare, or that discriminate based on sex. *See* 42 U.S.C. §§ 18114(1)–(5), 18116. And it expressly structured the Ryan White Program so that entities and individuals like Plaintiffs would be able to provide care to *all* individuals living with HIV, especially historically underserved communities "experiencing rapid increases" in HIV case counts, like the transgender population. S. Rep. No. 106-294, at 12 (2000).

Here, the Challenged Conditions "run[] headlong into the Ryan White Program's statutory mandate" to provide for the provision of outpatient services for the co-occurring conditions of patients living with HIV. *SFAF*, 786 F.Supp.3d at 1230. What's more, the Challenged Conditions "contravene the antidiscrimination requirements within the ACA." *Id.* at 1231; *see* Section II.E, *infra*. In so doing, the Challenged Conditions unconstitutionally intrude upon the Congressional prerogative to control the public fisc. *See California v. Trump*, 786 F.Supp.3d 359, 388–89 (D. Mass. 2025) (holding that Election Assistance Commission acted outside statutory authority in attempting to "impose an extra-statutory condition on the disbursement" of Congressionally approved funding); *New York v. Trump*, 764 F.Supp.3d 46, 51 (D.R.I. 2025); *City of Chicago v.*

*Noem*, No. 25 C 12765, 2025 WL 3251222, at *7 (N.D. Ill. Nov. 21, 2025).

*Second*, the Challenged Conditions also contravene Articles I and II of the Constitution. Article I requires that every bill pass both the House of Representatives and the Senate before it is presented to the President. U.S. Const. art. I, § 7, cl. 2. These procedural "steps" are non-negotiable: They were designed to "erect enduring checks on each Branch and to protect the people from the improvident exercise of power by mandating certain prescribed steps." *INS v. Chadha*, 462 U.S. 919, 957 (1983). And Article II requires the Executive Branch to "take Care that the Laws be faithfully executed[.]" U.S. Const. art. II, § 3. This means that the Executive Branch has an "'affirmative[]'" duty to execute duly enacted law, *PFLAG, Inc. v. Trump*, 769 F.Supp.3d 405, 432 (D. Md. 2025), irrespective of what "policy reasons" it might have "for wanting to spend less than the full amount appropriated by Congress for a particular project or program," *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.).

Neither Article I nor Article II authorizes Defendants to effectively amend the Ryan White statute by issuing the Challenged Conditions. Instead of abiding by the "single, finely wrought and exhaustively considered procedure" for adding substantive grant conditions to Ryan White, *Chadha*, 462 U.S. at 951, Defendants have attempted to "impose by brute force [such] conditions" through the grant application process, *City of Providence v. Barr*, 954 F.3d 23, 30, 34 (1st Cir. 2020) (holding DOJ imposed unlawful conditions on grantees of the Byrne JAG Grant Program when it attempted to "superimpose its policy views on [the recipients'] law enforcement efforts"). That brute force approach defies Articles I and II. *See New York*, 764 F.Supp.3d at 51 (stating that should the Executive "believe[] that appropriations are inconsistent with the President's priorities—it must ask Congress, not act unilaterally.").

Plaintiffs are likely to succeed in showing that the Challenged Conditions are "in excess of

statutory . . . authority," and are "contrary to constitutional right, power, privilege, or immunity" because they violate the separation of powers. 5 U.S.C. § 706(2)(B)–(C). Plaintiffs are therefore likely to succeed on Counts III and IV.

E. **The Challenged Conditions Unlawfully Discriminate Based on Transgender Status and Sex.**

The Challenged Conditions impermissibly discriminate based on transgender status and sex, in violation of the ACA and the Fifth Amendment, such that Plaintiffs are likely to prevail on Counts II, IV, V, and VI. Effectively, the Challenged Conditions seek to prohibit transgender people from accessing federally funded healthcare if it is provided in a way that respects their identities. However, the federal government cannot engage in discrimination, either directly or by forcing grantees to engage in discrimination, that is directly prohibited by federal law or the Constitution.

Section 1557 of the ACA provides that an individual shall not, on the basis of, *inter alia*, any ground prohibited by Title IX of the Education Amendments of 1972, "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). To succeed on a Section 1557 claim asserting discrimination on the basis of sex, a plaintiff must show: (1) the defendant is a health program or activity, any part of which is receiving Federal financial assistance; (2) the plaintiff was excluded from participation in, denied the benefits of, or subjected to discrimination on the basis of sex; and (3) the plaintiff's claim is enforceable under Title IX. *See* 42 U.S.C. § 18116(a).

Plaintiffs easily meet this standard. *First*, Defendants HHS and HRSA are covered entities that fall within the scope of Section 1557. *See* 45 C.F.R. § 92.4 (defining "covered entity" to include "The Department;" defining "Department" to mean "U.S. Department of Health and Human Services;" and defining "health program or activity" to include projects that "[p]rovide or

30

administer health-related services" or "[p]rovide clinical, pharmaceutical, or medical care").

*Second*, Plaintiffs allege that they and their patients will be excluded from participation in, denied the benefits of, and subjected to discrimination under the Ryan White program. As a condition of receiving Ryan White funding, the Challenged Conditions require that grantees stop respecting their transgender patients' identities and stop providing gender-affirming medical care. However, as Plaintiffs have asserted, providing integrated care is the norm and developing a relationship of trust is crucial both to engaging and maintaining patients in HIV care and to treating their conditions effectively.[60] The Challenged Conditions put Plaintiffs in an untenable position: They and their members can either continue to acknowledge their transgender patients' identities and provide necessary gender-affirming medical care but be excluded from the Ryan White Program, or they can stop providing affirming care and exclude their transgender patients.

*Third*, discrimination based on transgender status constitutes discrimination on the basis of sex in violation of Title IX. In *Bostock v. Clayton County*, the Supreme Court held that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." 590 U.S. 644, 660 (2020). While the First Circuit has not directly addressed the applicability of *Bostock* to Title IX claims, the First Circuit generally interprets Title IX's protections consistently with Title VII. *See, e.g.*, *Ing v. Tufts Univ.*, 81 F.4th 77, 82 (1st Cir. 2023) ("[T]he standards governing claims arising under Title VII and Title IX are the same."). And numerous courts of appeal, as well as district courts in the First Circuit, have applied *Bostock* to Title IX claims. *See, e.g.*, *Grimm*, 972 F.3d at 616-17; *Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022); *Tirrell v. Edelblut*, 748 F.Supp.3d 19, 42-43 (D.N.H. 2024); *Carlan v. Fenway Cmty. Health Ctr., Inc.*, No. CV 23-12361-MJJ, 2025 WL 1000478, at *5 (D. Mass. Mar.

---

[60] *E.g.*, Fox Decl. ¶¶ 5, 17–19, 40; Brody Decl. ¶¶ 23–24, 35.

28, 2025), *appeal pending*, No. 25-1315 (1st Cir.).

Other courts have preliminarily enjoined policies with virtually identical language to the Challenged Conditions or involving the Gender Order, which the Challenged Conditions implement, because they facially discriminated on the basis of transgender status and therefore sex. *See*, *e.g.*, *GLMA*, 795 F.Supp.3d at 695; *SFAF*, 786 F.Supp.3d at 1231; *PFLAG*, 769 F.Supp.3d at 444. In finding that the Gender Order's prohibition on using grant money to "promote gender ideology" and its statement that "[i]t is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable" discriminated based on sex, likely violating Section 1557 (and the Fifth Amendment), one court stated: "The Court cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist." *PFLAG*, 769 F.Supp.3d at 443–44. The same is true here.

For similar reasons, the Challenged Conditions violate the Equal Protection Component of the Fifth Amendment because they discriminate based on sex and transgender status and because they are motivated by animus towards an unpopular minority. Classifications based on sex or gender are subject to intermediate scrutiny and must be "substantially related to achieving an important governmental objective." *Massachusetts v. U.S. Dep't of Health & Hum. Servs.* (*Massachusetts v. HHS*), 682 F.3d 1, 9 (1st Cir. 2012). The burden of justification "is demanding and it rests entirely on the State." *Tirrell*, 748 F.Supp.3d at 30 (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). The government's justification for the policy "must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Virginia*, 518 U.S. at 533.

Classifications based on transgender status are classifications based on sex and so warrant intermediate scrutiny. *See*, *e.g.*, *Doe v. Horne*, 115 F.4th 1083, 1107 (9th Cir. 2024); *Grimm*, 972 F.3d at 608-09; *Tirrell*, 748 F.Supp.3d at 33–36; *Doe v. Austin*, 755 F.Supp.3d 51, 68-69 (D. Me.

2024); *Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v. United States Dep't of Health & Hum. Servs.*, 557 F.Supp.3d 224, 244 (D. Mass. 2021) (citing *Bostock*, 590 U.S. at 669). Further, discrimination based on the failure of transgender people to conform to sex stereotypes is sex discrimination and subject to heightened scrutiny. *See, e.g., Tirrell*, 748 F.Supp.3d at 37–38; *Evancho v. Pine-Richland Sch. Dist.*, 237 F.Supp.3d 267, 285–86, 296–97 (W.D. Pa. 2017).[61]

By prohibiting Plaintiffs from acknowledging, affirming, and respecting transgender patients' identities or providing outpatient services to transgender patients (and only transgender patients) for a co-occurring condition, the Challenged Conditions classify based on transgender status and therefore sex, and are thus subject to heightened scrutiny. However, there is no important governmental interest that is served by and could justify excluding Plaintiffs and their patients from the Ryan White Program. The wholesale exclusion of healthcare that supports transgender people conflicts with Congress's directive to support minority populations under the Ryan White Statute, and with HRSA's past practice of funding these services, and does not constitute an important state interest. *See GLMA*, 795 F.Supp.3d at 697–98.

Finally, even if the Challenged Conditions were not subject to heightened scrutiny based on transgender status and sex, under First Circuit precedent, the Court must apply a more searching review than ordinary rational basis scrutiny for policies targeting groups that have "long been the subject of discrimination." *Massachusetts v. HHS*, 682 F.3d at 11. As other courts have acknowledged, "transgender people have been the subject of a long history of discrimination that continues to this day." *F.V.*, 286 F.Supp.3d at 1145. In fact, just the disclosure of a person's transgender status may "expose[] transgender individuals to a substantial risk of stigma,

---

[61] Courts have also held that classifications based on transgender status independently warrant heightened scrutiny, which warrants applying heightened scrutiny here. *See, e.g., Grimm*, 972 F.3d at 608; *Karnoski v. Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019); *Talbott*, 775 F.Supp.3d at 319–22; *F.V. v. Barron*, 286 F.Supp.3d 1131, 1144–45 (D. Idaho 2018); *Evancho*, 237 F.Supp.3d at 288; *Adkins v. City of New York*, 143 F.Supp.3d 134, 140 (S.D.N.Y. 2015).

discrimination, intimidation, violence, and danger." *Arroyo González v. Rosselló Nevares*, 305 F.Supp.3d 327, 333 (D.P.R. 2018).

The Supreme Court has recognized that "a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest." *Romer v. Evans*, 517 U.S. 620, 634-35 (1996) (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)) (emphasis in original). Yet, this is exactly what is occurring here. The Challenged Conditions are just one piece of the Administration's sustained campaign against transgender people. *See* Background Section D, *supra*; *see also Orr*, 778 F.Supp.3d at 417–18 (discussing the Gender Order among the Administration's other executive actions that "are built on a foundation of irrational prejudice" toward transgender Americans and finding that "such targeting of a politically unpopular group" violates equal protection). So, "[i]n addition to facially discriminating based on transgender status," the Challenged Conditions "purposefully discriminate based on transgender status." *SFAF*, 786 F.Supp.3d at 1216. This purposeful targeting violates *Romer* regardless of what level of scrutiny would otherwise apply.

For all these reasons, Plaintiffs are likely to succeed on their claims that the Challenged Conditions violate Section 1557 of the ACA and the Constitution's guarantee of Equal Protection.

**F.      The Challenged Conditions Violate the Right to Free Speech.**

The First Amendment prohibits the government from abridging the freedom of speech. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); U.S. Const. amend. I. Ordinarily, "the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. Va.*, 515 U.S. 819, 828 (1995). In the context of federal funding, the government may attach certain conditions to eligibility for that funding, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213–15 (2013) ("*AID*"); however, there are limitations on the types of conditions that the government may attach to federal funds without

violating the First Amendment. Funding conditions "can result in an unconstitutional burden on First Amendment rights" if the conditions "seek to leverage funding to regulate speech outside the contours of the program itself," *AID*, 570 U.S. at 214–15, or if the conditions seek to achieve a censorious purpose and suppress a recipient's dangerous ideas independent of any objective of the federally funded program, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998).

The Challenged Conditions express a disparaging and unscientific view of gender identity, repudiate the existence of transgender people, deem their identities to be false, order their exclusion from government recognition and protection, and seek to coerce others to do the same by threatening termination of federal funding and other penalties. This violates the First Amendment in two distinct ways.

*First*, the Challenged Conditions create a funding condition that does not further the objectives of the Ryan White Program and thus place an unconstitutional burden on the First Amendment rights of Provider Plaintiffs and Associational Plaintiffs' members. While the government is permitted to impose conditions on funding that are "relevant to the objectives of the program" itself, placing such conditions is impermissible where, as here, "the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service." *AID*, 570 U.S. at 214, 218–19 (quoting *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)) (emphasis in original). Indeed, the Ryan White statute, which establishes a program to provide HIV care, has "no programmatic message" that allows the government to regulate speech concerning *gender* as "deemed necessary" for the Ryan White Program's "legitimate objectives." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548 (2001). Rather, the Challenged Conditions seek to coerce and penalize federal funding recipients, including Provider Plaintiffs and Associational Plaintiffs' members, whose speech, trainings, research, and services acknowledge the existence of

35

transgender people and advocate for their equality and respect. *Cf. Thakur v. Trump*, No. 25-4249, 2026 WL 1466303, at \*7-11 (9th Cir. May 26, 2026) (per curiam) (applying same First Amendment analysis to hold that policies implementing executive orders, including the Gender Order, that require the termination of funding for research that is DEI-related constitute unlawful viewpoint discrimination).

*Second*, "even in the provision of subsidies, the government may not 'ai[m] at the suppression of dangerous ideas.'" *Nat'l Endowment for the Arts*, 524 U.S. at 587 (quoting *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 550 (1983)). Through the Challenged Conditions, the government unlawfully violates the First Amendment by administering subsidy programs with a censorious purpose. *See Student Gov't Ass'n v. Bd. of Tr. of Univ. of Massachusetts*, 868 F.2d 473, 479 (1st Cir. 1989) (acknowledging such government conditions on subsidies or benefits based on viewpoint may violate both free speech and equal protection rights); *see also Koala v. Khosla*, 931 F.3d 887, 898 (9th Cir. 2019) (recognizing the Supreme Court's continued cautionary admonition that First Amendment will not tolerate the administration of subsidy programs with a censorious purpose).

The Challenged Conditions are designed and intended to silence, defund, and otherwise penalize Plaintiffs for acknowledging that transgender people exist and providing them with healthcare services under the Ryan White Program in a manner that affirms who they are. As another court stated in preliminarily enjoining grant terms and conditions that incorporated the Gender Order: "The categorial and expansive nature of the Challenged Conditions telegraph that the Defendants will deny federal funding to a whole class of programs based on viewpoint alone. It cannot be mistaken that in this case federal funding is being employed as a carrot to impose a "disproportionate burden calculated to drive 'certain ideas or viewpoints from the marketplace.'"

*R.I. Coalition*, 812 F.Supp.3d at 195 (quoting *Nat'l Endowment for the Arts*, 524 U.S. at 587). Provider Plaintiffs and Associational Plaintiffs' members, as well as the transgender patients they serve under the Ryan White Program, suffer irreparable harm as a direct result of the unlawful imposition of the Challenged Conditions. Accordingly, Plaintiffs are likely to succeed on their First Amendment claims (Counts IV and VII).

### III. Provider Plaintiffs, Associational Plaintiffs' Members, and Their Transgender Patients Will Suffer Irreparable Harm Absent a Preliminary Injunction.

It is well-established that acts that "diminish[] access to high-quality health care" cause irreparable harm. *PFLAG*, 769 F.Supp.3d at 449; *see also Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 707 (4th Cir. 2019); *GLMA*, 795 F.Supp.3d at 699; *SFAF*, 786 F.Supp.3d at 1233 ("Without an injunction against those provisions, Plaintiffs' patients and clients will suffer irreparable harm in being deprived [of] vital healthcare services."). As such, courts within this district have held that "threats to patients' lives represent[] a dire risk of a quintessentially irreparable nature." *Massachusetts v. NIH*, 770 F.Supp.3d at 320. Unless enjoined, Defendants' actions will cause Plaintiffs and their transgender patients to suffer irreparable harm, including threats to patients' lives, loss of healthcare, loss of provider trust, harm to careers and income, loss of human capital and talent, psychological distress, and the deprivation of constitutional rights. *See* Background Section E, *supra*.

Transgender patients are less likely to remain engaged in HIV care if providers cannot acknowledge their identities or provide medically indicated gender-affirming care as part of integrated care programs.[62] Disruptions in care risk missed appointments, reduced medication adherence, viral rebound, drug resistance, and increased HIV transmission.[63]

---

[62] Brody Decl. ¶ 17; Fox Decl. ¶¶ 30, 41.
[63] Brody Decl. ¶¶ 5, 17; Collins-Ogle Decl. ¶¶ 5, 15–16; Fox Decl. ¶ 42–43; Doe Decl. ¶ 45; Packett Decl. ¶ 42; Weddle Decl. ¶ 53; Zuniga Decl. ¶ 38.

Moreover, given the nature of the Ryan White Program, the program is often the only means by which patients may be able to access healthcare services, so the restrictions created by the Challenged Conditions would result in the loss of access to healthcare for many transgender patients living with HIV.[64]

Beyond these quintessentially irreparable harms to patients, the Challenged Conditions will cause irreparable harm to Plaintiff healthcare providers by threatening their ability to comply and follow established medical standards of care, their ethical duties and responsibilities, and state and federal anti-discrimination laws.[65] *Cf. Oregon v. Kennedy*, No. 6:25-CV-02409-MTK, 2026 WL 1048354, at *19 n.3 (D. Or. Apr. 18, 2026) ("A policy categorically superseding professionally recognized standards of care as to gender-affirming care causes irreparable harm to Plaintiffs' interests and obligations under state law to ensure access to gender-affirming care[.]"). Further, the First Circuit has acknowledged that the nonpecuniary effects from a loss of federal funding may constitute irreparable harm warranting a preliminary injunction. *New York v. Trump*, 171 F.4th 1, 24 (1st Cir. 2026) (discussing "possible layoffs, reductions in service, and closures of childcare programs; and significant impediments to the delivery of basic health care services to vulnerable populations") (citation modified).[66]

In addition, even temporary deprivation of individual constitutional rights in and of itself constitutes irreparable injury supporting preliminary injunctive relief. *See, e.g.*, *Talbott v. United States*, No. 25-5087, 2026 WL 1532205, at *18 (D.C. Cir. June 1, 2026) (equal protection); *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 15 (1st Cir. 2012) (free speech);

---

[64] Zuniga Decl. ¶ 39; Doe Decl. ¶ 59; Roe Decl. ¶¶ 39–40; Collins-Ogle Decl. ¶¶ 60–63.
[65] Packett Decl. ¶ 36; Weddle Decl. ¶ 47; Doe Decl. ¶ 54; Roe Decl. ¶ 41; Brody Decl. ¶ 40; Fox Decl. ¶ 45.
[66] Packett Decl. ¶ 35; *see also* Zuniga Decl. ¶ 29 (discussing operational disruptions from prior Trump Administration actions, including "closure of programs, reduction in ability to provide services, and adjustment of staffing, including staff layoffs.").

*Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019) (equal protection); *SFAF*, 786 F.Supp.3d at 1232–33 (free speech and equal protection).

Finally, even if the showing of harm were not so clear-cut—although it is here—where, as here, "the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief." *E.E.O.C. v. Astra U.S.A., Inc.*, 94 F.3d 738, 743 (1st Cir. 1996).

## IV. The Remaining Factors Favor Preliminary Relief.

The balance of equities and the public interest merge when the government is the party opposing the preliminary injunction, *Nken*, 556 U.S. at 435, and also strongly favor relief here.

"There is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *New York v. McMahon*, 784 F.Supp.3d 311, 372 (D. Mass. 2025) (quotation omitted). Where, as here, Plaintiffs have "demonstrated a high likelihood of success" on the merits, that "is a strong indicator that a preliminary injunction would serve the public interest." *Id.* (citation modified).

There is also "a strong public interest in health and safety." *Massachusetts v. NIH*, 770 F.Supp.3d at 326. Besides the adverse effects on the health of the transgender patients who depend on the Ryan White Program, the Challenged Conditions "will increase the viral load population-wide and increase transmission rates" because of diminished HIV care adherence. Fox Decl. ¶ 43.[67] The impact of the Challenged Conditions in destabilizing the country's HIV service system "will necessarily cause long-term public health crises." Packett Dec. ¶ 42. In addition, the Challenged Conditions are likely to create an increased financial and workforce burden on the

---

[67] *See also* Brody Decl. ¶ 49; Zuniga Decl. ¶ 38; Doe Decl. ¶ 45.

healthcare system.[68]

By contrast, Defendants will suffer no harm if the Court grants Plaintiffs a preliminary injunction. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Defendants have not articulated any public health goals consistent with Congress's mandate that would be frustrated by preliminarily enjoining the Challenged Conditions. Because an injunction would merely delay implementation of Defendants' likely illegal actions and would protect Plaintiffs' proven treatment models and further public health and safety, the balance of the equities and the public interest strongly weigh in favor of Plaintiffs' requested relief.

## V. The Court Should Require No Bond.

The Court should exercise its discretion to forgo a bond because Defendants will not suffer any harm from the absence of one. *See Pineda v. Skinner Servs., Inc.*, 22 F.4th 47, 57 (1st Cir. 2021) (courts have substantial discretion to dictate terms of injunction bonds). A bond is additionally inappropriate because "[t]he First Circuit has recognized an exception to the bond requirement in suits to enforce important federal rights or public interests, as is precisely the case here." *McMahon*, 784 F.Supp.3d at 373 (internal citation omitted).

### CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion preliminary relief under 5 U.S.C. § 705 and for a preliminary injunction and enter the attached proposed order.

---

[68] *See*, *e.g.*, Weddle Decl. ¶ 56 (noting the Challenged Conditions will contribute to "undue workforce strain and attrition"); *id.* at ¶ 54 (stating that the Challenged Conditions will cause exponential costs as each new infection requires lifetime treatment ranging from $500,000 to $1.2 million per person); Brody Decl. ¶ 38 (noting overall health costs increase as patients turn to emergency care settings); Fox Decl. ¶ 38 (noting that if clinicians no longer provided HIV care and gender-affirming medical care together, a "generation of providers" will lose knowledge and experience, degrading the HIV specialty profession); Doe Decl. ¶ 54 (describing likelihood that a colleague will leave her job if the restriction goes into effect).

Dated this 10th day of June 2026.

Respectfully submitted,

 */s/ Omar Gonzalez-Pagan*

Jeffrey S. Trachtman*
Jason M. Moff*
Stephen P. Ferguson*
Hannah Kanter*
**Herbert Smith Freehills Kramer (US) LLP**
1177 Avenue of the Americas
New York, New York 10036
Telephone: 212-715-9100
Jeffrey.Trachtman@hsfkramer.com
Jason.Moff@hsfkramer.com
Stephen.Ferguson@hsfkramer.com
Hannah.Kanter@hsfkramer.com

Ryan P. Trumbauer*
**Herbert Smith Freehills Kramer (US) LLP**
2000 K Street NW 4th Floor
Washington, DC 20006
Telephone: 202-775-4500
Ryan.Trumbauer@hsfkramer.com

* Motions for admission *pro hac vice* pending or forthcoming.

José I. Abrigo*
Omar Gonzalez-Pagan (BBO No. 678517)
Jessica Polansky*
Charlie Ferguson*
**Lambda Legal Defense
and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: 212-809-8585
Facsimile: 855-535-2236
jabrigo@lambdalegal.org
ogonzalez-pagan@lambdalegal.org
jpolansky@lambdalegal.org
cferguson@lambdalegal.org

Kenneth D. Upton, Jr.*
**Lambda Legal Defense
and Education Fund, Inc.**
3656 North Halsted Street
Chicago, Illinois 60613
Telephone: 312-663-4413
Facsimile: 855-535-2236
kupton@lambdalegal.org

Pelecanos*
**Lambda Legal Defense
and Education Fund, Inc.**
800 South Figueroa St., Suite 1260[†]
Los Angeles, California 90017
Telephone: 213-382-7600
Facsimile: 855-535-2236
pelecanos@lambdalegal.org

[†] Mailing address only

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that, on June 10, 2026, counsel for Plaintiffs provided a copy of the forgoing motion and any attachments thereto to the following attorneys at the U.S. Department of Justice by electronic mail:

Abraham George
Chief, Civil Division
U.S. Attorney's Office for the District of Massachusetts
abraham.george@usdoj.gov

Rayford Farquhar
Chief, Defensive Litigation, Civil Division
U.S. Attorney's Office for the District of Massachusetts
rayford.farquhar@usdoj.gov

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan (BBO No. 678517)
**Lambda Legal Defense
and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: 212-809-8585
Facsimile: 855-535-2236
ogonzalez-pagan@lambdalegal.org