**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN ACADEMY OF HIV MEDICINE; HIV MEDICINE ASSOCIATION, a division of the INFECTIOUS DISEASES SOCIETY OF AMERICA; INTERNATIONAL ASSOCIATION OF PROVIDERS OF AIDS CARE; JENNIFER K. BRODY, MD; and CHRISTOPHER B. FOX, NP,<br><br>*Plaintiffs*,<br><br>v.<br><br>HEALTH RESOURCES AND SERVICES ADMINISTRATION; THOMAS J. ENGELS, in his official capacity as the Administrator of the Health Resources and Services Administration; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the U.S. Department of Health and Human Services,<br><br>*Defendants*. | Case No. |

**DECLARATION OF JENNIFER K. BRODY, MD**

I, Jennifer K. Brody, MD, hereby declare and state as follows:

1. I am over 18 years of age, of sound mind, and in all respects competent to testify.

2. I have personal knowledge of the facts set forth in this declaration and would testify competently to those facts if called to do so.

3. I am a plaintiff in the above-captioned case, bringing claims on behalf of myself and on behalf of my transgender patients.

4. I submit this declaration in support of Plaintiffs' Motion for Preliminary Relief under 5 U.S.C. § 705 and for a Preliminary Injunction, which seeks to prevent Defendants from giving effect to certain conditions relating to transgender people and gender-affirming medical care set forth in Ryan White HIV/AIDS Program ("Ryan White Program") Notices of Funding Opportunity issued or forecasted to be issued in 2026 and the 2026 Updated HRSA General Terms and Conditions, issued on March 11, 2026 (collectively, "the Challenged Conditions").

5. I oversee a Ryan White-funded HIV program serving people experiencing homelessness and other significant barriers to care through an integrated model that combines HIV treatment, behavioral health services, case management, housing support, and gender-affirming medical care. Many of our patients rely on Ryan White-funded services as their consistent source of healthcare. Ryan White funding supports not only HIV treatment itself, but the integrated and wraparound services necessary to keep patients engaged in care and virally suppressed. For our transgender patients living with HIV, gender-affirming medical care and affirming treatment environments are crucial components of effective HIV care. Without that care, patients are more likely to disengage from treatment, lose trust in providers, and experience interruptions in care that jeopardize their health and increase the risk of HIV transmission. The Challenged Conditions would dismantle this integrated model of HIV care we have relied upon for years, force providers to withhold medical treatment from transgender patients, undermine patient trust, worsen health outcomes, and threaten the continued operation and staffing of essential Ryan White-funded programs.

**I. Background and Professional Role**

6. I am a physician and hold both an M.D. and Master of Public Health. I serve as the Director of HIV Services at Boston Health Care for the Homeless Program ("BHCHP"), where I

lead clinical programs focused on the treatment and care of people living with HIV who are experiencing homelessness and housing instability.

7. I am a resident of Boston.

8. I am a member of the American Academy of HIV Medicine, the HIV Medicine Association, and the International Association of Providers of AIDS Care.

9. I have been an attending physician providing HIV care since 2009 and have seventeen years of experience in this field. I am board-certified in Internal Medicine and Addiction Medicine and am an American Academy of HIV Medicine-certified HIV Specialist. My clinical and academic work has focused on HIV care, health equity, and improving outcomes for structurally marginalized populations, particularly individuals experiencing homelessness.

10. In my role, I oversee and provide comprehensive HIV primary care to approximately 350–400 patients living with HIV, many of whom are experiencing homelessness or unstable housing. My work includes delivering care in nontraditional settings such as shelters, street outreach programs, and specialized clinics designed to meet patients where they are, in addition to more traditional clinical environments.

11. My patient population is predominantly composed of individuals from marginalized communities who face overlapping structural barriers to care. Approximately three-quarters of my patients are Black or Latinx, and approximately 7% are transgender, which is significantly higher than the proportion of transgender individuals in the general population, reflecting the disproportionate impact of HIV and related barriers to care on transgender communities. Many of my patients also experience co-occurring conditions, including substance use disorders, mental health conditions, and chronic medical comorbidities, all of which complicate engagement in consistent HIV care.

12. The services I oversee and provide include comprehensive HIV treatment and primary care, addiction medicine, behavioral health services, specialized nursing care, case management, and support groups. Since 2011, I have also provided hormone therapy to my transgender patients who need it as treatment for their gender dysphoria (also known as "gender-affirming medical care" or "gender-affirming hormone therapy") as part of my clinical practice.

13. The health services I provide are delivered through an integrated, multidisciplinary model that addresses both medical needs and the social determinants of health, such as housing instability, stigma, and access to basic resources, that are critical to achieving and maintaining HIV viral suppression.

**III. BHCHP's Use of Ryan White Funding**

14. The Ryan White Program is designed to provide comprehensive holistic clinical and support services to low-income people living with HIV.

15. In my experience, the Ryan White Program enables a model of care that is both clinically effective and humanizing. It recognizes patients as whole people and affirms their identities while addressing their medical and social needs.

16. As part of my practice through BHCHP, I rely on Ryan White funding under Parts A, B, and C.

17. BHCHP uses Part B funding provided through the Massachusetts Department of Public Health to fund a special outreach program for patients who struggle to stay engaged in care and take their HIV medications. This includes transgender patients with HIV who often feel stigmatized by healthcare providers or are less likely to adhere to their HIV care when their gender-affirming medical care needs are left unaddressed. BHCHP also used part B funds indirectly by

referring patients to our state AIDS Drug Assistant Program which supports access to medication coverage when needed.

18. BHCHP uses Part C funding to support critical staffing to the clinic, primarily nurses who provide intensive case management, counseling, and care navigation. It also supports portions of my administrative role, including quality improvement initiatives. Part C is used in case management, as well as medication education and adherence support with regards to our gender-affirming medical care services.

19. BHCHP uses Part A to fund medical case management, including for transgender patients, housing advocacy, rental assistance, and medical transportation.

20. Ryan White funding is deeply integrated into all aspects of care we provide. It supports both clinical services, including gender-affirming health services, and the wraparound services that enable patients to engage in and remain in care. Ryan White Funding is a majority of our grant-supported budget for the HIV program.

**IV. Importance of Gender-Affirming Medical Care for my Transgender Patients with HIV**

21. Gender-affirming care is an integral component of primary care for many of my transgender patients with HIV and is essential to effective HIV treatment.

22. Many of my transgender patients have experienced significant stigma and harm within the healthcare system. Providing gender-affirming medical care to these patients is often necessary to establish and maintain a therapeutic doctor/patient relationship. For many transgender people living with HIV, their primary health concern is access to the gender-affirming medical care that enables to them to live as themselves. Indeed, often, the only reason many of our transgender patients started coming to us for care is because they were seeking gender-affirming medical services.

23. Providing gender-affirming medical care also keeps people connected to HIV care and increases trust with the community. In my clinical experience, patients experiencing homelessness are particularly vulnerable to discontinuity in medication adherence. Without stable housing, safely storing medications and maintaining a daily regimen is already challenging. Removing gender-affirming medical care from the clinical setting would exacerbate these challenges by reducing patients' motivation to remain engaged in care, leading to missed medications, treatment interruptions, and increased risk of viral rebound.

24. Patients experiencing homelessness face significant structural barriers to maintaining consistent HIV care, including lack of stable transportation, limited access to communication (such as phones or internet), and competing priorities like securing food and shelter. These challenges make continuity of care difficult even under ideal circumstances. Gender-affirming medical care, when integrated into HIV services, helps stabilize engagement by addressing a core aspect of patients' identity and well-being, making it more likely that they will return for care and remain connected to treatment.

25. Every single one of our patients experiencing homelessness relies on Ryan White funded programs not only for HIV treatment, but also for wraparound services such as case management, mental health care, and referrals to housing and social services. These integrated services are critical to addressing the social determinants of health that directly impact HIV outcomes.

26. There are few, if any, alternative providers in Boston who can meet the complex needs of patients experiencing homelessness, particularly those who are transgender and living with HIV. As a result, if I am unable to provide my transgender patients with gender-affirming medical care within my practice, many of these transgender patients would have no realistic

pathway to obtain that care elsewhere. Although I could technically continue to provide HIV treatment alone, that is not how care functions in practice for this population. My patients often seek care from me precisely because I provide affirming, integrated services in a setting they trust. If I am unable to acknowledge and respect my transgender patients' identities within my practice, even if unconnected to the gender-affirming medical care, many of these transgender patients would feel discriminated against and be unlikely to remain in our care. Many of my transgender patients have experienced stigma or discrimination in traditional medical environments and are unwilling to engage with providers who lack the cultural competency to treat them holistically.

27. If I am unable to acknowledge and respect my transgender patients' identities and to provide them with gender-affirming medical care when they need it, my patients may lose trust in me and in the healthcare system more broadly, and they may disengage from care altogether.

**V. Gender-Affirming Medical Care and the Ryan White Program**

28. Because Ryan White funding has long supported comprehensive, patient-centered HIV care, including services necessary to meet the needs of HIV patients' co-occurring conditions, including for transgender patients, and realizing the clinical importance of gender-affirming medical care for this population, I obtained specialized clinical training in gender-affirming medical care, including the provision and management of hormone therapy, and incorporated these services into my practice in 2011.

29. In reliance on the Ryan White Program's longstanding directives and funding structure prioritizing medically underserved populations and populations disproportionately affected by HIV, we have intentionally developed and structured our model of care to meet the needs of transgender and gender-diverse people living with HIV. Consistent with Ryan White Program requirements, guidance, local planning priorities, and identified community needs, we

integrated gender-affirming healthcare and related supportive services into our HIV care delivery model.

30. In our practice, Ryan White funding enhances our ability to deliver integrated care by supporting the services and infrastructure necessary to provide gender-affirming medical care for those transgender patients with HIV who need it through Parts A, B, and C.

31. The Ryan White Program funds most of the clinical and support systems that make HIV care possible for our clinic, including case management, behavioral health services, and care coordination. All of the patients who receive gender-affirming medical care in our program do so as part of concomitant, fully integrated, Ryan White-funded services.

32. In many cases, gender-affirming medical care serves as an entry point into HIV care. Patients may initially seek care for gender-affirming medical services, and through that relationship, engage in HIV treatment. If gender-affirming medical care is restricted within these programs, it would disrupt this comprehensive model of care and further marginalize patients who already have limited alternatives.

**VI. Impact of the Challenged Conditions on HIV Care**

33. The Challenged Conditions, including prohibitions on acknowledging and respecting transgender people's identities and on the provision of gender-affirming medical care in connection with Ryan White-funded services, would have severe consequences for my patients.

34. Many of my HIV patients, particularly those experiencing homelessness, prioritize their most immediate and pressing needs. If gender-affirming medical care is their primary need and if I cannot provide it, they are unlikely to return for HIV care.

35. Similarly, transgender patients with HIV seek and need access to care, even if unrelated to gender-affirming medical care, that is affirming and respectful of their identities. If

am prohibited from acknowledging and respecting my transgender patients' identities, such as by using pronouns consistent with their identities, they are likewise unlikely to return for HIV care.

36. The Challenged Conditions would thus lead to disengagement from care; loss of viral suppression; increased risk of HIV transmission; and significant deterioration in mental health, including increased depression and suicidality.

37. In my experience, patients who lose access to routine HIV care and instead rely on emergency services experience worse health outcomes, causing increased strain on the healthcare system and other social impacts. This dynamic is particularly pronounced among patients experiencing homelessness, who already face significant barriers to accessing consistent outpatient care. Without stable access to HIV services, these patients are more likely to show up at emergency rooms with advanced or preventable conditions, including complications related to untreated HIV or interruptions in antiretroviral therapy, which are significantly more difficult to treat once they have progressed to that stage.

38. Emergency care settings are not equipped to provide the continuity, trust, or comprehensive services required for effective HIV management or gender-affirming medical care, resulting in fragmented treatment and poorer health outcomes. This shift not only undermines individual patient health but also increases overall healthcare costs and places additional burden on already strained emergency systems. Intermittent access to HIV medications through acute and emergency care settings also can contribute to viral resistance to medications which can make HIV more difficult to treat over time both at the individual and community level. Viral resistance can be transmitted to others, making treatment more complex and challenging at the time of diagnosis (often requiring more medications with more side effects and drug interactions) which can impact chances of viral suppression over the life course.

**VII. Impact of the Challenged Conditions on My Ability to Provide Care**

39. A prohibition on using Ryan White funding for gender-affirming medical care would force me to deny medically necessary care to my transgender patients, thereby denying the comprehensive care that Ryan White seeks to provide, and override my clinical judgment in ways that conflict with accepted standards of care. For my patients experiencing homelessness, this conflict is especially acute because they often have no alternative source of care; my clinic may be the only place where they can access both HIV treatment and gender-affirming health services in a coordinated, low-barrier setting. Denying this care would mean not only withholding necessary treatment but also removing a critical point of engagement that allows these patients to remain connected to the healthcare system at all.

40. This would cause significant moral and ethical distress to me. As a physician, I understand gender-affirming medical care to be medically necessary for many patients, and being unable to provide it would cause moral and ethical injury. This distress is compounded in the context of homelessness, where I routinely care for patients with profound unmet needs and limited options. Being forced to withhold care from patients who already face extreme marginalization and barriers to access would directly conflict with my professional obligation to provide equitable, evidence-based, patient-centered care.

41. Such a prohibition, along with any prohibition on my acknowledging and respecting the identities of my transgender patients, would also harm my ability to provide effective HIV care by damaging the trust and therapeutic relationships I have built with my patients. Among patients experiencing homelessness, trust is often fragile and must be built over time through consistent, respectful, and affirming care. Being able to access care that is affirming and inclusive of gender-affirming medical care is frequently a cornerstone of that trust. If patients

perceive that I am unable or unwilling to meet their basic healthcare needs, they may disengage entirely, leading to missed appointments, interruptions in antiretroviral therapy, and increased risk of viral rebound and forward transmission.

42. Even uncertainty or perceived restrictions on the ability to affirm patients and to provide them with gender-affirming medical care would be harmful. Providers avoid assessing, documenting, or addressing gender-related needs, which could compromise patient safety and continuity of care. For patients experiencing homelessness, who often receive care across multiple settings, including shelters, street outreach, emergency departments and acute care hospitals, accurate and complete assessments and documentation of any conditions is essential to maintaining continuity. Any reluctance to provide care that is needed, or to document conditions experienced and the need for such care, would exacerbate fragmentation, increase the risk of medical errors, and further destabilize already tenuous care relationships.

43. Operationally, such a policy would create confusion and disruption. Compliance with the Challenged Conditions would be difficult to implement without fundamentally altering core aspects of patient care, including standard assessments and treatment planning. In programs serving patients experiencing homelessness, where care is often delivered in flexible, non-traditional settings and must be responsive to complex, co-occurring needs, such restrictions would be particularly unworkable. They would interfere with integrated care models, strain limited clinical resources, and undermine the ability of providers to deliver comprehensive, coordinated services that are essential for both HIV treatment and overall patient stability.

**VIII. Financial and Programmatic Impact of the Challenged Conditions**

44. Ryan White funding is essential to the operation of my program. If we were found non-compliant with funding conditions, we could lose critical funding, particularly under Parts A, B and C. The majority of the grant funding for my clinic comes from Ryan White.

45. The Ryan White Program is a "payer of last resort," designed specifically to fill gaps for patients who have no other source of coverage or whose insurance is insufficient to meet their medical needs. Many of my patients have inconsistent access to health insurance and rely on the Ryan White Program to access core HIV treatment, medications, and support services that are not otherwise available to them through Medicaid, Medicare, or private insurance.

46. There is no comparable funding source that could replace these services if our Ryan White funding was lost. My transgender patients would have no other source of coverage outside of Ryan White to receive affirming HIV care and gender-affirming medical care. Even where patients have some form of insurance, Ryan White funding remains necessary to cover gaps such as cost-sharing, coverage limitations, and essential support services that enable patients to remain in care and achieve viral suppression. Without Ryan White-supported services, many patients would face reduced or interrupted access to care, as other parts of the healthcare system are not structured to absorb or replace this safety-net function.

47. Loss of such funding would jeopardize staffing, including nursing and case management positions, and could cause the program to collapse or be absorbed into less comprehensive primary care services.

48. This would significantly reduce access to specialized HIV care and support services for an already extremely vulnerable population.

**IX. Public Health Impact of the Challenged Conditions**

49. Prohibiting HIV care providers from acknowledging, affirming, and respecting their transgender patients and limiting access to gender-affirming medical care for transgender patients with HIV would undermine efforts to achieve viral suppression and control the HIV epidemic. In my clinical experience serving patients experiencing homelessness, affirming transgender patients' identities and gender-affirming medical care are often critical components of engagement in HIV treatment. When patients feel respected and affirmed, they are more likely to attend appointments, adhere to antiretroviral therapy, and remain in care - each of which is essential to achieving and sustaining viral suppression.

50. Limiting access to such care would harm not only transgender individuals. This impact would be especially severe for transgender patients experiencing homelessness, who already face intersecting barriers related to stigma, poverty, housing instability, and limited access to healthcare. These patients often rely on a small number of safety-net providers, such as BHCHP, for comprehensive and affirming care. Restricting gender-affirming medical care in these settings would further isolate an already underserved population.

51. The resulting disengagement from care would likely lead to increased HIV transmission, as well as worsening outcomes for other communicable and chronic conditions. Especially among patients experiencing homelessness, even short disruptions in care can result in loss of follow-up, treatment interruptions, and rapid clinical decline. In addition to HIV, many of my patients have co-occurring conditions - including hepatitis C, substance use disorders and treated or untreated mental illness - that require consistent management. Disengagement from care would therefore have cascading effects across multiple health conditions, increasing both individual and public health risks.

52. Broader impacts would include increased emergency room utilization, declining mental health, loss of employment, housing instability, and overall community harm. For patients experiencing homelessness, the healthcare system often serves as a primary point of stability and support. When access to comprehensive, affirming care is disrupted, patients are more likely to cycle through emergency departments and inpatient settings, rather than receiving preventive and ongoing care. This not only increases healthcare costs but also exacerbates mental health crises, undermines efforts to secure and maintain housing, and destabilizes already vulnerable communities.

**X. Additional Harms Caused by the Challenged Conditions**

53. The harms caused by the Challenged Conditions would be difficult or impossible to reverse. In my experience caring for patients experiencing homelessness, disruptions in care often have lasting consequences because re-engagement is extremely challenging once patients are lost to follow-up. When patients disengage due to a loss of affirming and comprehensive care, there is often no reliable way to reconnect them to services, particularly given the instability of their living situations and the limited availability of outreach resources.

54. Trust between patients and providers is hard-won and easily lost. Once patients disengage from care, they may not return. This is especially true for patients experiencing homelessness, many of whom have had repeated negative or stigmatizing encounters within the healthcare system. Establishing trust requires consistent, respectful, and affirming interactions over time. If that trust is broken, particularly by prohibiting acknowledgement and affirmation of a transgender patient's identity or by denying medically necessary gender-affirming medical care, patients may avoid not only my care but healthcare systems more broadly, making future engagement significantly more difficult.

55. Interruptions in HIV treatment can result in lasting health consequences, including disease progression and increased transmission risk. For patients experiencing homelessness, maintaining consistent access to antiretroviral therapy is already challenging due to factors such as unstable housing, lack of medication storage, and competing survival needs. Any disruption in care increases the risk of viral rebound, development of drug resistance, and progression of HIV-related illness.

56. In practical terms, when a patient stops or misses their HIV medications, the virus can quickly begin to multiply again, increasing the amount of the virus in their body. As the virus replicates, it can mutate and become resistant to the medications that were previously effective, making the disease harder to control and limiting future treatment options. At the same time, a rising viral load weakens the immune system, leaving the patient more vulnerable to serious infections and chronic complications that are more difficult to treat once they occur. These interruptions also undermine public health efforts to reduce transmission, as patients who are not virally suppressed are more likely to transmit HIV.

57. Patients may also experience severe psychological harm, including trauma, depression, and suicidality. Among patients experiencing homelessness, particularly those who are transgender, the burden of mental health conditions is already high due to chronic stress, stigma, and exposure to violence and discrimination. Access to care that is respectful and affirming and gender-affirming medical care are critical components of psychological stability and well-being for these patients. Removing access to this care would exacerbate existing mental health conditions, increase feelings of isolation and hopelessness, and heighten the risk of self-harm and suicidality, with consequences that may be immediate and enduring.

**XI. Conclusion**

58. Based on my experience, providing care that is affirming and respectful of the identities of transgender patients with HIV as well as gender-affirming medical care are essential components of effective HIV treatment for my transgender patients with HIV. Conditioning Ryan White funds on not doing so would have immediate and harmful consequences for my patients.

59. Many of my transgender patients rely on integrated care, where HIV treatment and gender-affirming services are provided together in a trusted and affirming clinical setting. If that care is disrupted, I expect that some patients will disengage from treatment altogether. This not only harms the individual patient but also increases the risk of HIV transmission in the community. In my opinion, these disruptions will lead to preventable complications, and in some cases, could result in patient deaths.

60. Prohibiting Ryan White funding recipients from affirming and respecting the identities of transgender patients with HIV or the use of Ryan White funds for gender-affirming medical care would harm my transgender patients, undermine public health, and prevent me from fulfilling my obligations as a physician.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June _8_, 2026

Jennifer K. Brody, MD