**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

AMERICAN ACADEMY OF HIV MEDICINE; HIV MEDICINE ASSOCIATION, a division of the INFECTIOUS DISEASES SOCIETY OF AMERICA; INTERNATIONAL ASSOCIATION OF PROVIDERS OF AIDS CARE; JENNIFER K. BRODY, MD; and CHRISTOPHER B. FOX, NP,

*Plaintiffs*,

v.

HEALTH RESOURCES AND SERVICES ADMINISTRATION; THOMAS J. ENGELS, in his official capacity as the Administrator of the Health Resources and Services Administration; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the U.S. Department of Health and Human Services,

*Defendants*.

Case No.

**DECLARATION OF CHRISTOPHER B. FOX, NP**

I, Christopher B. Fox, NP, hereby declare and state as follows:

1. I am over 18 years of age, of sound mind, and in all respects competent to testify.

2. I have personal knowledge of the facts set forth in this declaration and would testify competently to those facts if called to do so.

3. I am a plaintiff in this case, and I bring claims on behalf of myself and my transgender patients.

4. I submit this declaration in support of Plaintiffs' Motion for Preliminary Relief under 5 U.S.C. § 705 and for a Preliminary Injunction, which seeks to prevent Defendants from

giving effect to certain conditions relating to transgender people and gender-affirming medical care set forth in Ryan White HIV/AIDS Program ("Ryan White Program") Notices of Funding Opportunity issued or forecasted to be issued in 2026 and the 2026 Updated HRSA General Terms and Conditions, issued on March 11, 2026 (collectively, "the Challenged Conditions").

5. In this declaration, I explain that integrated primary healthcare is an essential component of HIV care. I emphasize the significance of providing gender-affirming medical care to my patients with HIV, drawing on two specific patient examples. I then describe how my clinic and patients utilize Ryan White Program funding. I also highlight the impossibility of segregating gender-affirming medical care in a clinic that relies on these funds and discuss the potential consequences for myself, my clinic and colleagues, and my transgender patients if there were restrictions on the ability to acknowledge our transgender patients and the provision of gender-affirming medical care under the Ryan White Program.

## I. Background and Professional Role

6. I am a Nurse Practitioner and an Assistant Professor of Medicine in the Division of Internal Medicine and Geriatrics at Oregon Health and Science University ("OHSU"), where I provide patient care, teach, and conduct research. I am also a faculty member of the Oregon AIDS Education and Training Center/Oregon Primary Care Association.

7. Before joining OSHU in 2016, I was a Nurse Practitioner at the University of California San Francisco Medical Center and an Assistant Clinical Professor at the University of California San Francisco School of Nursing. I also worked as a volunteer clinician and clinical staff nurse for the San Francisco AIDS Foundation and as a Community Health Specialist for the San Francisco Department of Public Health.

8. I received my Master of Science in Nursing as an Adult Nurse Practitioner specializing in HIV/AIDS at the University of California San Francisco.

9. I am credentialed as an HIV Specialist by, and am a member of, the American Academy of HIV Medicine.

10. I serve as a clinician in the HIV clinic at OHSU. At the clinic, I provide primary care to patients with HIV. Although the majority of my patients live in Portland, I also use telemedicine to reach my HIV patients who live in rural Oregon to increase accessibility and reduce the frequency of trips they have to make to Portland for in-person clinical visits with me. For many of my rural patients, I provide the closest competent and accessible HIV care. I provide HIV primary care for approximately 300 patients, HIV treatment consultations for approximately 75 patients, and HIV prevention consultations for approximately 50 patients.

11. As part of my practice, I have several transgender patients to whom I provide not only HIV care but also hormone therapy as treatment for their gender dysphoria (also known as "gender-affirming medical care" or "gender-affirming hormone therapy").

12. In my faculty role with the Oregon AIDS Education and Training Center, my focus is on educating the HIV workforce. I provide regular educational presentations and individual mentoring on HIV prevention and treatment to healthcare providers statewide. And I founded and lead a monthly Community of Practice for Nurses who serve patients with HIV.

13. Likewise, my scholarship focuses on HIV prevention and treatment. My current research focuses on the implementation of long-acting antiretroviral therapy. I also wrote textbook chapters in Collins-Bride & Saxe's *Clinical Guidelines for Advanced Practice Nursing*, namely, the chapters titled *HIV Infection in Adolescents and Adults* and *Primary Care of HIV-Infected*

*Adults*. The Collins-Bride & Saxe's *Clinical Guidelines* also include chapters specific to the care of transgender patients with HIV.

14. From 2013 to 2016, I received a Human Resources & Services Administration grant called HIV/AIDS Primary Care Capacity in Nursing for curriculum development.

**II. Integrated Primary Healthcare for HIV Patients**

15. Fundamentally, HIV is a virus that attacks a person's immune system. Antiretroviral therapy, what people typically think of as HIV medication, reduces the amount of HIV in the blood, known as the viral load. When a patient with HIV has an undetectable viral load, they will not sexually transmit HIV to others.

16. Because HIV attacks the immune system, people with HIV are susceptible to many different infections and diseases throughout their lives. And because of the stigma and other social factors associated with people who have HIV, they are also likely to require healthcare associated with mental health challenges, substance use disorders, and other diseases prevalent in populations associated with HIV. Some who do not work within the field of HIV care believe that HIV care is focused solely on HIV medication management, but that could not be farther from the truth.

17. The field of HIV care has trended towards integrating HIV care with all primary care because this model has proven very effective for HIV patients. However, with many HIV patients, our visits focus on care for comorbidities—in particular, their chronic health conditions or mental health issues. A lot of our work is helping people navigate those other health conditions, such as management of diabetes, hypertension, cardiovascular disease, and other bread-and-butter issues of primary health care. This is important because it motivates our patients to show up and stay engaged with their HIV medication management.

18. If an HIV specialist takes care of the primary health needs of an HIV patient, the patient will have better outcomes. For instance, within HIV medicine, cardiovascular risks are an important part of patient care. People with HIV have heightened cardiovascular risks because of chronic inflammation, exposure to prior drug therapies with harmful cardiovascular effects, and lifestyle factors like smoking or substance use. Integrated care enables HIV providers to proactively monitor and treat these risks within the context of HIV treatment, leading to improved long-term health outcomes and reduced mortality. Therefore, HIV specialists typically focus on the cardiovascular aspects of their patients' primary health care.

19. Another benefit of integrated primary care is the providers' ability to monitor polypharmacy issues. People with HIV often take multiple medications for HIV and co-occurring conditions, increasing the risk of adverse drug interactions and side effects. The literature is clear that co-locating HIV care with primary care, including gender-affirming medical care, is beneficial for our patients. It allows a single clinical team to coordinate prescribing decisions, monitor for drug interactions, and adjust treatment in real time.

20. Restricting integrated primary care would undermine these clinical safeguards by fragmenting treatment, increasing the risk of harmful drug interactions, and undermining patients' engagement in their care. Further, this would disrupt the coordinated, patient-centered care that is essential to achieving optimal health outcomes for people living with HIV.

## III. Importance of Gender-Affirming Medical Care for Transgender Patients with HIV

21. The clinic operates under a care model that ensures we provide competent HIV care to underserved populations, as is mandated under the Ryan White Program.

22. Several of my patients are transgender. For most of my transgender patients, I am their primary care provider. At OHSU, we have strong values guiding how we take care of our

transgender patients. Our electronic records reflect those values, and we make sure to respectfully record and use a patient's name, gender identity, and pronouns.

23. Gender dysphoria is a serious medical condition characterized by the clinically significant distress that a transgender person may experience because of the incongruence between their gender identity and their birth-assigned sex. It is codified as a diagnosis in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders, 5th edition, Text Revision.*

24. Well-established, evidence-based clinical guidelines, such as those published by the World Professional Association for Transgender Health and the Endocrine Society, provide for the multidisciplinary care of transgender individuals and describes criteria for medical interventions to treat gender dysphoria, including gender-affirming hormone therapy. The goal of medical treatment for gender dysphoria is to eliminate clinically significant distress by helping a transgender person live in accordance with their gender identity. The provision of gender-affirming medical care is widely accepted within the medical community, including by the vast majority of major medical organizations in the United States.

25. If left untreated, gender dysphoria can result in debilitating anxiety, severe depression, self-harm, and even suicidality.

26. At our clinic, beyond hormone therapy and surgical referrals, our gender-affirming care provides support to the whole person. Their experience with gender and holistic support is an integral part of their experience as a patient.

27. For example, I care for a transgender woman in her 30s living with HIV who suffered a life-threatening portal vein blood clot—a clot in the vein carrying blood from the intestines to the liver. Her hematologist concluded the clot was likely related to estradiol and

advised that she should never use hormone therapy again. From a traditional medical standpoint, that recommendation was understandable: avoid estrogen permanently to reduce the risk of another potentially fatal clot. But that recommendation failed to account for another serious risk—the harm caused by abruptly ending gender-affirming medical care that was addressing the patient's gender dysphoria. For this patient, estradiol was not an optional treatment. It was medically necessary treatment to address the distress associated with her diagnosed gender dysphoria and central to the affirmation of her identity, emotional stability, and overall well-being. Removing it entirely carried its own profound mental and physical health consequences, which would have negatively affected her HIV care. Instead of treating the issue as a simple contraindication, the patient and I approached it through shared decision-making. We openly discussed both risks: recurrence of a dangerous clot versus the consequences of terminating gender-affirming medical treatment. Ultimately, we chose a safer compromise by switching her from oral estradiol to a low-dose transdermal patch, which is associated with a lower clotting risk. The patient was deeply grateful to work with a provider who understood all of her medical needs and who respected her priorities.

28. This example demonstrates that gender-affirming medical care is not ancillary medicine. HIV care and gender-affirming medical care are medically necessary care that must be provided considering the whole person and their needs and priorities. Providers who understand this can help patients safely navigate complex risks, while providers who do not may unintentionally cause serious harm by ignoring what is at stake. In this case, the patient was at risk of losing trust in the medical system if she were required to end her gender-affirming care. Because I took care of my transgender patient's medical needs, she trusts me and has continued to show up for her HIV care.

29. I also care for a transgender woman in her 20s living with HIV, whom I first met shortly after she was diagnosed with HIV. Soon after we met, she disengaged from care. She missed follow-up visits and became unreachable for nearly a year. During that time, clinic staff funded through the Ryan White Program, including our nurse and medical case manager, continued persistent outreach rather than allowing her to fall through the cracks. When we finally reconnected, the underlying reasons became clear: the patient had been struggling with depression and methamphetamine use, both related to stigma from her HIV diagnosis. She had recently stopped using meth and wanted to re-engage in care. I managed her gender-affirming hormone therapy as part of her HIV care, reducing barriers by consolidating healthcare treatment in one place. Our social worker helped her qualify for breast augmentation surgery. Importantly, our nurse was able to connect her gender-affirming goals with her medical care, explaining that HIV viral suppression would likely be necessary for surgery. That goal became a powerful motivator. Over the past eight months, the patient has re-engaged successfully. She started long-acting injectable HIV treatment, is consistently attending medical appointments, and has an undetectable viral load. She obtained her mental health support letter, remains adherent to hormone therapy, and has completed her surgery consultation with surgery anticipated in the coming months.

30. This example illustrates that gender-affirming medical care can be a critical pathway to engagement in life-saving HIV treatment. For some patients, access to care that is affirming and respectful of their identities and to transition-related care is not separate from HIV care—it is the reason they return, stay connected, and achieve stability. When providers understand that, being respectful and affirming of a transgender patient's identity and providing gender-affirming medical care become tools for improving adherence, viral suppression, mental health, and long-term outcomes.

## IV. Role of the Ryan White Program in Supporting Gender-Affirming Care

31. Working at an HIV clinic means that funding from the Ryan White Program is embedded in the infrastructure of our clinic. At our clinic, we rely on Ryan White Part A to fund the salary of our HIV clinic nurse. Without this funding, I'm not sure how we could keep her. She is the hub of our clinic, and she is the person that our patients work with to receive care. She is credentialed through the Association of Nurses and AIDS Care, and she understands the complexities of the medical therapies our patients receive. Our nurse knows our patients personally, communicates with them through the patient portal for me, and her presence makes a concrete difference in whether they show up for their appointments and how they follow their medical regimens. Our patients, including our transgender patients, must interact with her to receive expert care at our clinic. Our HIV clinic nurse teaches them about their hormone therapy and helps with referrals for surgery. She also monitors for medication side effects, provides counseling on self-management strategies, teaches self-injection techniques, provides counseling to support treatment adherence, flags abnormal test results, discloses laboratory and other test results to patients and counsels on their meaning, schedules follow up appointments and provides reminders, follows up when patients miss appointments to get them rescheduled or trouble-shoot attendance barriers like lack of transportation, coordinates care across the complicated health system, including advocating for the patient to providers at OHSU and in the community, and builds patient trust in the healthcare system by approaching patient care with an expert understanding of the specific issues and challenges that transgender people with HIV experience on a daily basis. I would not be able to provide primary care, including gender-affirming care, to our transgender patients without the support of our clinic nurse.

32. At OSHU, we also receive Ryan White Parts A and B funds through Partnership Project, which is our medical case management program. This program helps people stay connected to care, provides insurance assistance, and helps manage referrals to mental health and substance use treatment, housing, and more. It specifically helps support people in accessing hormone therapy and becoming appropriate surgical candidates, such as ensuring that patients have access to housing while recovering from gender-affirming surgery. This medical case management program is required to keep transgender patients connected to their HIV and gender-affirming care treatments. And I rely on it to provide primary care, including gender-affirming care, to my patients.

33. Ryan White Part B also funds the state program "Care Assist." Some of our patients use Care Assist funding to cover what is not covered by other forms of health insurance.

34. Providers at our clinic, including myself, also benefit from the use of Ryan White Part F funds to support workforce development.

**V. Impact of Prohibiting Gender-Affirming Care**

35. Logistically, I do not know how it would work to lose our Ryan White program funding for gender-affirming medical care or how to operationalize a policy that prohibits us from acknowledging, affirming, or respecting the identities of my transgender patients. This would be the first time we would need to discriminate based on the person who is receiving care, which is something our institution would not do.

36. I do not know how I would advise my clinic nurse and medical case management program staff. For example, can our nurse still teach our transgender patients how to do injections for hormonal therapy? And if we somehow found funding for these functions, although I am not aware that any such funding exists, to fund a non-Ryan White nurse to take care of just our

transgender patients, our patients would be at risk of harm without the special HIV expertise of Ryan White nurses. It seems impossible to provide my patients with appropriate gender-affirming care and HIV care without Ryan White-funded personnel.

37. There is already an HIV workforce shortage. We need to increase the number of doctors, nurse practitioners, physician associates, nurses, social workers, case managers, pharmacists, and others who know how to care for people with HIV.

38. Traditionally, co-location of gender-affirming medical care and HIV care has been the standard of care because it improves HIV outcomes. Co-location of care requires providers who are trained in both HIV and gender-affirming medical care. If the gender-affirming medical care part is removed, a generation of providers may never get the experience of managing hormone therapy, counseling patients about surgical procedures, or offering transgender-specific health screenings. This will degrade the HIV specialty profession for all healthcare disciplines and lead to a profound loss of professional knowledge over time. A generation of new providers may lose the ability to provide what is now considered the standard of care.

39. I also do not know how my colleagues at our clinic and I can comply with the Challenged Conditions' prohibition while acknowledging, affirming, and respecting the identities of our transgender patients. If we cannot continue to respectfully record and use a patient's name, gender identity, and pronouns, it is likely that our transgender patients would stop coming and would drop off from all care, including HIV care. But if we do, we risk losing all Ryan White funding.

40. The restrictions created by the Challenged Conditions will erode trust in the healthcare system. Exclusion of gender-affirming medical care and forbidding affirmation of their identities will cause many transgender patients to lose trust in their healthcare providers and the

clinic in general, leading to a lack of engagement in healthcare and avoidance of dealing with acute or chronic illness, including the cessation of HIV treatment. When patients do show up for care, they may not feel like they can be open and honest with their healthcare providers about symptoms, behaviors, and healthcare needs. Lack of honest communication leads to misdiagnosis, missed diagnosis, not being offered preventative health services like screenings, and other adverse health outcomes.

41. These restrictions will cause increased emotional distress and decreased self-esteem. Although all transgender people have unique life experiences, most of my patients have experienced discrimination and prejudice related to their gender at some point. Many have experienced physical or emotional violence, and, commonly, they have experienced rejection by family and friends. The combined toll of these experiences, along with the stigma associated with an HIV diagnosis, contributes to frequent mental health struggles like depression, suicidality, feelings of low self-worth, and low self-efficacy. If I had to stop providing gender-affirming medical care, or even stop respecting my patients' dignity by using pronouns that cause them harm, that would only make it more likely for them to drop out of care.

42. Without access to our Ryan White nurse and case managers, my transgender patients who become disengaged in care may not return to care until they have experienced a life-threatening complication of their HIV infection. When a patient disengages from care, too often they show up in the hospital with an AIDS-related illness from which they may not recover or could lead to severe disability.

43. And if all HIV clinics that are funded by Ryan White funding stop providing gender-affirming care to their transgender patients, some or many of those patients will likely stop receiving HIV care. Besides the adverse effects on the health of those individual patients, it will

increase the viral load population-wide and increase transmission rates. It will affect our clinic and our ability to provide the same level of care to each of our patients because we do not close our doors; we respond to the need. It would mean that I would have to work more hours, our patients would have decreased access, there would be delays in care, and my colleagues and I would all feel the increased stress. And we would all face an increased potential for burnout. We already do not have enough HIV providers due to losses from retirement and COVID. And a malfunctioning HIV system would require more funding. A restriction on gender-affirming care would disrupt the whole HIV care system.

44. The restrictions created by the Challenged Conditions, including prohibiting the use of Ryan White funds for gender-affirming medical care for my HIV patients, would cause me to question my ability to do the work that I am doing. I spend the vast majority of my work hours providing primary care. And there is a huge emotional stress to not being able to provide proper care to my patients. It is distressing for us as providers. But if I burned out and left HIV care, I would feel stress and guilt for abandoning the people who need me most. I really dread the emotional challenges that this ban would bring to my daily life.

45. I believe it is my ethical responsibility to continue providing the same integrated care to my patients that takes into account all their health needs as I have done to that and to be affirming and respectful of my patients. The restrictions created by the Challenged Conditions are contrary to my ethical responsibilities and my oath as a healthcare professional.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June __, 2026

______________________________
Christopher B. Fox, NP

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 8, 2026

Christopher B. Fox, NP