**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

AMERICAN ACADEMY OF HIV MEDICINE; HIV MEDICINE ASSOCIATION a division of the INFECTIOUS DISEASES SOCIETY OF AMERICA; INTERNATIONAL ASSOCIATION OF PROVIDERS OF AIDS CARE; JENNIFER K. BRODY, MD; and CHRISTOPHER B. FOX, NP,

*Plaintiffs*,

v.

HEALTH RESOURCES AND SERVICES ADMINISTRATION; THOMAS J. ENGELS, in his official capacity as the Administrator of the Health Resources and Services Administration; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the U.S. Department of Health and Human Services,

*Defendants*.

Case No.

**DECLARATION OF DANIELLE DOE, NP**

I, Danielle Doe, NP, hereby declare and state as follows:

1. I am over 18 years of age, of sound mind, and in all respects competent to testify.

2. I have personal knowledge of the facts set forth in this declaration and would testify competently to those facts if called to do so.

3. I am offering this declaration as a member of the American Academy of HIV Medicine, which is bringing claims on behalf of their members, like me, and on behalf of the transgender patients of their members, like mine.

4. Danielle Doe is a pseudonym. I am submitting this declaration under a pseudonym to protect my privacy and to protect my family and me from harassment, violence, and retaliation.

5. I submit this declaration in support of Plaintiffs' Motion for Preliminary Relief under 5 U.S.C. § 705 and for a Preliminary Injunction, which seeks to prevent Defendants from giving effect to certain conditions relating to transgender people and gender-affirming medical care set forth in Ryan White HIV/AIDS Program ("Ryan White Program") Notices of Funding Opportunity issued or forecasted to be issued in 2026 and the 2026 Updated HRSA General Terms and Conditions, issued on March 11, 2026 (collectively, "the Challenged Conditions").

6. I also submit this declaration in support of Plaintiffs' Motion for Leave to Submit Pseudonymous Declarations and for a Protective Order.

7. In this declaration, I describe how my clinic and patients use Ryan White Program funding to provide comprehensive HIV care. I explain how gender-affirming medical care is integral for our transgender patients' primary care and essential for their HIV services, and that their lives and health are improved by the comprehensive care made possible by the Ryan White Program. Disruption to structured care coordination would cause disease progression, preventable mortality, and the loss of continuity of care. As a result, public health would be in danger.

## I. Background and Professional Experience

8. I am a Nurse Practitioner with full practice authority to practice advanced nursing in Massachusetts.

9. I work at a clinic in central Massachusetts.

10. I have provided HIV care and gender-affirming medical care since 2022. I also completed a community-based HIV fellowship funded in part by the Ryan White Program.

11. I am an HIV specialist credentialed through and a member of the American Academy of HIV Medicine ("the Academy").

12. I provide HIV care and gender-affirming medical care funded in part by the Ryan White Program.

13. My clinic provides comprehensive HIV treatment and primary care to approximately 400 patients living with HIV, many of whom are experiencing economic instability. The clinic provides gender-affirming medical care to all of our transgender patients with HIV. These services are delivered through an integrated, multidisciplinary model that addresses both medical needs and social determinants of health, such as housing instability, stigma, and access to basic resources, which are critical to achieving and maintaining viral suppression.

**II. Need for Pseudonymity**

14. I am submitting this declaration under a pseudonym because I reasonably fear professional and personal retaliation if my identity is publicly disclosed, as well as subject me, my family, and my patients to a substantial risk of harm, harassment, and retaliation.

15. Although Massachusetts generally supports access to HIV care and gender-affirming medical care, people in Massachusetts are not immune from the current national climate surrounding these issues, which is highly contentious. For example, I am aware of people making death threats against healthcare providers who provide gender-affirming medical care in

Massachusetts.[1] Similarly, just a few months ago, a member of the Massachusetts Commission on the Status of Women was subjected to harassment and death threats because she was transgender.[2]

16. Indeed, providers who serve transgender patients, particularly those relying on federal funding streams like the Ryan White Program, have increasingly been subject to harassment, targeted complaints, and threats to their employment and licensure.

17. Accordingly, I am concerned that public identification would endanger my safety as well as the safety of my family, my colleagues, and my patients.

18. I am also concerned that public identification could expose me to scrutiny or adverse action by federal agencies, jeopardize my institution's funding, and subject me to harassment that would interfere with my ability to provide care. Based on media reports, I am aware that the current federal administration has targeted those who support transgender care or oppose their priorities.

19. For these reasons, I believe it is necessary to proceed anonymously while still providing truthful and accurate information to the Court.

20. I am willing to disclose my identity to the Court as directed under a protective order.

## III. The Ryan White Program Funding

21. The Ryan White Program is designed to provide comprehensive clinical and support services to low-income people living with HIV.

22. The clinic receives Ryan White funding under Parts B, C, D, and F.

---

[1] *See* Leo Sands, *Man charged with threatening doctor caring for trans patients, LGBTQ kids*, The Washington Post (Dec. 4, 2022), https://tinyurl.com/4a8h7x8u [https://perma.cc/HF5P-CKPN]; Jessica Bartlett, *Boston Children's faced months death threats and hate mail. Here's how staff members are coping*, The Boston Globe (Dec. 3, 2022), https://tinyurl.com/ycxj2pwu [https://perma.cc/U9ZB-ZV25].

[2] *See* Sharman Sacchetti, Gov. Healey, Mass. Commission on the Status of Women back member amid transphobic attacks, WCVB (Nov. 17, 2025), https://tinyurl.com/bddvu8v7 [https://perma.cc/4C25-WQS7].

23. The clinic benefits from Ryan White Part C, which largely funds the case management team of nurses and staff. Our clinic's Ryan White-funded nurses are the bedrock of our HIV practice; they are deeply knowledgeable in HIV, administer vital HIV care, and have meaningful long-term relationships with our HIV patients. They provide comprehensive case management, which often includes going the extra mile. For example, our nurses call patients repeatedly to confirm appointments and labs, escort patients to pick up their medication from the hospital system's pharmacy, and sit with patients before they receive surgery.

24. The case management nurses and staff are vital to patients scared of engaging with the medical system—especially transgender patients who have historically experienced discrimination in medical settings—because they provide a sense of safety, making healthcare feel accessible. Our case managers are the foundation of the care we provide, and they are crucial for the health of our patients and my job as a provider.

25. The clinic also benefits from Ryan White Part B, which funds the Massachusetts HIV Drug Assistance Program.

26. Ryan White Part D, a funding stream that serves women of childbearing age and young people up to age 26, funds MassCARE, a system that supports our patients.

27. And the clinic benefits from Ryan White Part F funds, which contribute to our hospital system's HIV care education. Specifically, Part F funds supported my fellowship's focus on HIV education, and through that work, particularly in learning about populations disproportionately affected by HIV, it became essential to further engage with colleagues and external resources to deepen my understanding of gender-affirming medical care.

28. Ryan White funding is deeply integrated into all aspects of the care I provide. It supports both clinical services and the wraparound services that enable patients to engage in and remain in care.

**IV. Importance of Gender-affirming Medical Care for Transgender Patients with HIV**

29. At the clinic, we co-locate our services to help our patients live physically, mentally, and socially healthy lives. We provide a holistic, all-encompassing approach to medical care that covers the full spectrum of a patient's needs. When we co-locate services, we improve access to care and support engagement in treatment, which helps reduce HIV transmission and meet expected standards of care.

30. Gender-affirming medical care is an integral part of primary care for transgender patients and supports optimal HIV-related health outcomes. Transgender patients benefit from receiving both primary care and HIV care from a single competent and affirming provider.

31. If a component of this comprehensive approach were removed, it would force fragmentation of care and disproportionally impact patients with limited financial resources. It is imperative that patients stay engaged in care for both their health and the community's health.

32. In my experience, access to gender-affirming medical care as part of comprehensive healthcare motivates transgender patients to become engaged with and remain in HIV care. Providing gender-affirming medical care is necessary to establish the provider-patient relationship and begin building trust because many of our transgender patients, who frequently experience discrimination in healthcare settings, prioritize gender-affirming medical care over other areas of healthcare and may avoid healthcare settings altogether if it is not tied to supporting this care. When transgender people come to me to establish gender-affirming medical care, it is much easier to simultaneously provide them with HIV care.

33. My transgender patients who routinely attend appointments for gender-affirming medical care maintain viral suppression, which keeps them healthy and prevents HIV transmission.

## V. One of My Patients Exemplifies the Importance of Ryan White Funding for Gender-Affirming Medical Care

34. I am the primary care provider for a transgender woman in her early 40s whom I have followed for 2.5 years after she relocated to the area and re-engaged in HIV care following nearly eight years out of treatment. At the time of re-engagement, she had also been without gender-affirming hormone therapy, having lost access during relocation due to the scarcity of providers offering co-located HIV and gender-affirming care.

35. She re-presented with advanced HIV following hospitalization for Pneumocystis jirovecii pneumonia, an AIDS-defining opportunistic infection reflecting severe immunosuppression. She had already sustained significant end-organ damage, including bilateral avascular necrosis of the hips and retinal detachment resulting in partial blindness. Despite restarting antiretroviral therapy and improving adherence, she later developed additional HIV-associated complications, including Kaposi sarcoma and multicentric Castleman disease, reflecting the long-term consequences of advanced untreated HIV.

36. Her care is among the most complex I manage. She follows with oncology, palliative care, orthopedics, and ophthalmology, and coordination across these services would not be manageable without strong system-level support, particularly given her blindness, chronic pain, significant mobility limitations, and inability to drive.

37. Ryan White–funded case management is central to her care. Her case manager coordinates across specialties, helps manage insurance and medication issues, facilitates communication between providers, and arranges transportation through a community-based

transport system. Without this level of support, she would be at high risk of disengaging from care, as has happened previously.

38. Her engagement is not driven by antiretroviral therapy alone. It is built on trust, specifically the ability to receive HIV care, behavioral health services, social support, and gender-affirming hormone therapy within a single affirming clinical environment. After spending years outside the medical system due to a lack of safe and competent care, that integration has been key to her re-engagement and stability.

39. Policies that restrict the ability to provide care that is affirming to our transgender patients or to provide gender-affirming medical care within Ryan White–supported settings would disrupt this model. For patients like her, the impact would not just be loss of hormone therapy and HIV care that is respectful of her identity, but fragmentation of care into separate systems. That would mean additional providers, more administrative burden, possible insurance issues, and loss of established clinical trust. For someone with her level of medical complexity, each added barrier increases the risk of falling out of care.

40. The Ryan White Program infrastructure that supports her transportation, case management, adherence, and specialty coordination also enables this integrated care model. These supports are not separate from her medical care. For this patient, with advanced HIV and significant dependence on structured care coordination, disruption of this system risks more than inconvenience. It risks treatment interruption, disease progression, preventable mortality, and loss of continuity with a provider who knows her full story.

## VI. Impacts of Prohibiting Gender-affirming Medical Care

41. If I lose the ability to provide affirming care that is respectful of my transgender patients who rely on the Ryan White Program and/or to provide gender-affirming medical care

through the Ryan White Program, the impact on my patients and the broader public health would be catastrophic.

42. Building trust is essential to keep a patient in care—especially for transgender patients and those living with HIV who experience higher rates of discrimination in healthcare settings. In fact, transgender patients' viral suppression is associated with supportive clinical relationships. In my experience, when a provider is hostile or disrespectful to a transgender person's identity, the patient is less likely to return for care. This means that they may not get the additional medical treatment they need, which can lead to worsening health outcomes, including symptomology and ultimately higher viral loads.

43. My clinic works very hard to maintain patient trust and signal to new patients that we respect transgender identity. For example, staff members wear pronoun pins, we display gender-inclusive flyers in our clinical space, and we ask for sexual orientation and gender identity data on medical intake forms. Our staff is also trained in transgender identity competency, and our case managers have developed long-term relationships with transgender patients.

44. If the Challenged Conditions' prohibitions on respecting transgender patients' identities and the provision of gender-affirming medical care go into effect, they will obliterate the trust my clinic works so hard to build with transgender patients. For example, we have one nurse case manager who has been doing HIV work for over 30 years. This longevity has earned deep trust with our patients. I anticipate that the sudden loss of a key part of their healthcare will lead transgender patients feeling betrayed by their providers and to disengage care with us altogether. As a result, they will experience a disruption of their HIV care.

45. Disruptions in HIV care can cause serious health consequences. When patients fall out of HIV care, our hospital system sees an increase in them not adhering to their prescribed HIV

medication, which can lead to opportunistic infections, higher rates of emergency department utilization, and hospitalization. It can also lead to higher rates of community HIV transmission**.**

**VII. Impact on Massachusetts**

46. Massachusetts has developed a comprehensive, data-driven HIV response that depends on the Ryan White Program to provide integrated care to people living with HIV, particularly those who are low-income, uninsured, or underinsured. In the Boston Eligible Metropolitan Area ("EMA"), which includes Bristol, Essex, Middlesex, Norfolk, Plymouth, Suffolk, and Worcester counties, Ryan White funding supports a coordinated system of care designed to meet the needs of the populations most affected by HIV through an Integrated Care Plan. A copy of Massachusetts and Boston's EMA integrated HIV/AIDS prevention and care plan is attached hereto as **Exhibit A**.

47. In Massachusetts, HIV care for transgender patients is not delivered in isolation. Rather, it is provided through integrated care models that combine HIV treatment with behavioral health services, case management, housing support, and, where appropriate, gender-affirming medical care. A copy of Boston's EMA Ryan White Part A prevention and care plan is attached hereto as **Exhibit B**.

48. A federal restriction prohibiting providers from respecting transgender patients' identities as well as the use of Ryan White funds for gender-affirming medical care would directly undermine this integrated system. The Integrated Plans are premised on coordination across funding streams and service categories to eliminate gaps in care. The restrictions would force providers to fragment care, exclude necessary services for a defined population, and create gaps that the Integrated Plans are specifically designed to prevent.

49. The disruption would be particularly acute where the clinic is located because the majority of people living with HIV in Massachusetts reside in or near this area and receive services through Ryan White–supported providers.

50. Moreover, because Ryan White is a payer of last resort, many patients in Massachusetts who rely on this program have no meaningful alternative source of care. The Integrated Plans assume the continued availability of Ryan White–funded services to fill gaps in coverage and ensure continuity of care across systems. Removing a critical component of care from that system would leave many patients without viable options.

**VIII. Impact on Our Ability to Provide Care**

51. This restriction puts our medical institution in the impossible position to decide which medical care to cut, but this decision is heartbreaking. Transgender patients' lives and health are no less important than non-transgender plaintiffs.

52. If these restrictions go into effect, our clinic will be forced to discontinue providing gender-affirming medical care for Ryan White patients in order to continue participating in the Ryan White Program.

53. Personally, it would be devastating if I could not provide gender-affirming medical care for the patients who need it. I believe that patients should receive the proper care—including gender-affirming medical care—to live healthy lives. It would be horrible to discontinue this care for no justified medical reason. I would feel that the medical system had completely failed our patients, and with a finality that would make me feel discouraged about my job too.

54. One of my colleagues shared that she will leave her job if this restriction goes into effect. She said that she staked her profession on providing gender-affirming medical care and could not practice ethically as a medical practitioner with this restriction in place because it would

be a betrayal of both her own conscience and patients. She does not know what she would do next, but she said that staying in her job is not an option because doing so would be an abandonment of her personal and professional values.

55. Moreover, the restriction prohibiting providers from respecting transgender patients' identities is so unclear that our clinic is unsure how to implement it. We do not know if our nurse case managers could even call transgender patients regarding their HIV care. We do not know the boundaries of this restriction and our hospital system is likely to take a conservative approach, which will ultimately push transgender people further out of care.

56. This restriction would also accelerate a chilling effect on talking about gender-affirming medical care in our medical system. Our clinic is already operating in an environment of heightened concern about potential scrutiny related to recognizing transgender patients for who they are. As a result, providers may be hesitant to speak openly about gender-affirming medical care due to possible political or legal implications. No other class of patients faces this level of caution or indirect pressure around discussion of basic medical care.

57. This chilling effect is not limited to my hospital system. For example, a colleague shared that at a conference panel focused on HIV care and related to the Ryan White Program, panelists refused to answer a question about drug interactions with gender-affirming hormone therapy due to fear of backlash. After informing the audience that the panel could not say anything, the panelists turned over the question and answer to the audience to crowd source an accurate medical answer to the important question. Questions of drug interactions are not political; they are vital for our understanding as medical providers to administer competent care.

**IX. Harms Caused by the Challenged Conditions**

58. The harm caused by the Challenged Conditions' restriction would be difficult or impossible to reverse. It would destroy patient trust carefully and diligently built by our team over the course of many years. In my experience, once trust is lost, it becomes significantly more challenging to re-engage patients in any kind of care.

59. As a result, patients would experience a disruption in their gender-affirming medical care and HIV care. Many would no longer be able to receive gender-affirming medical care from a non-Ryan White provider due to their economic instability and would cease HIV care entirely. The result would be a patient population who experiences worse health outcomes and a potential community-wide increase in HIV transmission.

60. As a medical provider, I have tried to make contingency plans if my ability to provide gender-affirming medical care suddenly stopped. But none of these plans could circumvent the immediate harm caused by the loss of trust from patients, or the heartbreaking reality that they can no longer receive gender-affirming medical care from me.

**X. Conclusion**

61. Based on my experience and clinical judgment, gender-affirming medical care is an essential component of effective HIV management for many patients.

62. Prohibiting Ryan White funding recipients from respecting their transgender patients' identities and from using Ryan White funds for gender-affirming medical care would harm my patients, undermine public health, and prevent me from fulfilling my obligations as a medical provider.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 9, 2026

Danielle Doe

Danielle Doe, NP