**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

AMERICAN ACADEMY OF HIV MEDICINE; HIV MEDICINE ASSOCIATION of the INFECTIOUS DISEASES SOCIETY OF AMERICA; INTERNATIONAL ASSOCIATION OF PROVIDERS OF AIDS CARE; JENNIFER K. BRODY, MD; and CHRISTOPHER B. FOX, NP,

*Plaintiffs*,

v.

HEALTH RESOURCES AND SERVICES ADMINISTRATION; THOMAS J. ENGELS, in his official capacity as the Administrator of the Health Resources and Services Administration; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the U.S. Department of Health and Human Services,

*Defendants*.

Case No.

**DECLARATION OF MICHELLE COLLINS-OGLE, MD**

I, Michelle Collins-Ogle, MD, hereby declare and state as follows:

1. I am over 18 years of age, of sound mind, and in all respects competent to testify.

2. I have personal knowledge of the facts set forth in this declaration and would testify competently to those facts if called to do so.

3. I am offering this declaration as a member of the American Academy of HIV Medicine, the International Association of Providers of AIDS Care, and the HIV Medicine Association, which are bringing claims on behalf of their members, like me, and on behalf of the transgender patients of their members, like mine.

4. I submit this declaration in support of Plaintiffs' Motion for Preliminary Relief under 5 U.S.C. § 705 and for a Preliminary Injunction, which seeks to prevent Defendants from giving effect to certain conditions relating to transgender people and gender-affirming medical care set forth in Ryan White HIV/AIDS Program ("Ryan White Program" or "RWHAP") Notices of Funding Opportunity issued or forecasted to be issued in 2026 and the 2026 Updated HRSA General Terms and Conditions, issued on March 11, 2026 (collectively, "the Challenged Conditions").

5. I am a longtime HIV provider who directs a Ryan White-funded HIV clinic serving medically underserved rural communities in North Carolina. The clinic relies on Ryan White to provide integrated HIV care. I have been providing services under Ryan White since the program began in 1990. Ryan White has evolved into a comprehensive "wraparound" model designed to address co-occurring medical and social needs that affect HIV outcomes and retention in care, particularly for medically underserved populations. Integrated gender-affirming medical care and affirming treatment environments are critical to maintaining patient trust, adherence to antiretroviral therapy, retention in care, and sustained viral suppression among transgender patients living with HIV. Further, in rural communities like the ones my clinic serves, patients often have no realistic alternative source of affirming HIV care or gender-affirming medical care because of provider shortages, transportation barriers, poverty, stigma, and geographic isolation. The Challenged Conditions would disrupt this integrated care model, cause patients to disengage from care, increase reliance on unsafe or informal treatment sources, worsen health outcomes, undermine public health efforts to control HIV transmission, and threaten the continued operation of Ryan White-supported HIV programs in rural communities.

## I. Background

6. I am a physician specializing in infectious diseases and HIV care. I serve as the Medical Director of the Warren Vance Community Health Center, Inc. ("the Clinic") in rural North Carolina. I have held this position for approximately twenty-five years.

7. I also hold an administrative role in my clinic. I am the clinic's Ryan White Part C Principal Investigator. In this role, I oversee all administrative Ryan White grant responsibilities.

8. I split my time as Medical Director of the Warren Vance Community Health Center, Inc. with my role as the Director of the MAYS Specialty Care Clinic at The Children's Hospital at Montefiore in New York, where I provide care to infants, children and adolescents living with HIV/AIDS.

9. I have over thirty years of experience providing HIV care, beginning in the early years of the epidemic in the late 1980s, including treating infants and pediatric patients. Since 2008, I have also provided comprehensive gender-affirming medical care, including hormone therapy, to my transgender patients as part of my clinical practice.

10. The Warren Vance Community Health Center, Inc. was the first clinic in North Carolina to integrate gender-affirming healthcare services including hormone therapy into an HIV care program in 2008. Ryan White Part B funding was and is used to provide medically necessary gender-affirming treatment for transgender women with HIV. Transgender women, like all other patients receiving Ryan White Program services receive their primary care in our programs. This integration arose out of medical necessity and patient need.

11. The Clinic primarily serves communities that are medically underserved. We serve 241 individuals. 87% of my patients are Black, 13% are White and a significant portion are low-income with 2% being unhoused. Approximately 3% of my patients at the Clinic are transgender,

all of whom are Black women. At the Clinic, our patient population is largely composed of adults living with HIV, many of whom are over the age of twenty-four.

12. At present, the Clinic receives funds under Ryan White Parts B and C, as well Supplemental Part B.

## II. The Ryan White Program

12. I have specialized in HIV/AIDS care and have treated patients who received funding under Ryan White since the program's inception. The Ryan White Program was established in 1990 to provide services to individuals and families living with HIV, particularly those who lacked access to adequate care.

13. When the program was first created and I was providing services under it, effective HIV medications were limited and patients required extensive supportive services. In the early years of the epidemic—before the advent of effective antiretroviral therapy—care was often focused on hospice, palliative care, and supporting patients and their families through serious illness and death. The Ryan White CARE Act became a critical safety net, particularly for under-resourced communities, ensuring equitable access to care and helping communities and families cope with the devastating impact of the HIV/AIDS epidemic.

14. Over time, the program evolved to meet the needs of the epidemic. As effective antiretroviral therapy emerged in the mid-1990s, the focus of the program shifted from end-of-life care to long-term disease management, with an emphasis on helping patients access and adhere to life-saving medications. The program expanded to include prescription drug assistance, most notably through ADAP, and increasingly prioritized retention in care and viral suppression.

15. In the decades since and as HIV treatment advanced, the Ryan White Program further evolved to include a deliberate expansion beyond traditional medical care for HIV to a

holistic, “wraparound” model that addresses the full range of needs affecting health outcomes of patients with HIV. As such, the program now funds not only HIV treatment and medications, but also treatment for co-occurring conditions as well as a broad array of supportive services, including case management, mental health care, substance use treatment, housing support, and transportation, recognizing that social and structural factors directly affect a patient’s ability to access and remain in care, especially populations most disproportionately impacted by HIV.

16. Ryan White programs are the “Gold Standard” other healthcare programs use to provide chronic medical care. The Ryan White Program is the first model for the “Medical Home” which ensures patients receive comprehensive care related to their primary disease. Patients with HIV have other co-morbidities, some associated with the virus and others not, and experience side effects of the medications they take through their lifespan. Transgender people are no different. They too have complications from the medications we prescribe and co-morbidities. Providing transgender patients with HIV with gender-affirming hormone therapy when medically indicated ensures they remain in care and monitored closely as we do for all of our patients.

17. This integrated approach reflects the understanding that successful HIV treatment requires more than prescribing HIV-related medications. It depends on addressing the social determinants of health and maintaining sustained engagement in care, particularly for low-income and medically underserved populations.

18. The Ryan White Program is widely regarded in the medical community as a model for integrated healthcare delivery. Other areas of medicine, including oncology and community health center systems, have adopted aspects of its approach. In my view, the program has been nothing short of a success story. Having witnessed its evolution over the decades, I have seen firsthand how its effectiveness is rooted in core public health principles: prioritizing access,

continuity of care, and addressing the social determinants that shape health outcomes, which has enabled it to achieve remarkable success in improving the health and longevity of people living with HIV. HIV is no longer a death sentence but rather a manageable disease.

19. Today, the Ryan White Program serves as a payer of last resort, filling gaps for uninsured and underinsured patients and ensuring access to services that other payors do not cover.

## III. The Clinic's Use of Ryan White Funds

20. My clinic receives funding under Parts B, B Supplemental, and C of the Ryan White Program, which we use to provide holistic HIV care.

21. Part B and its supplemental funding provides access to medications and other critical services, including diagnostic testing and specialty care.

22. Part C funding supports the provision of comprehensive outpatient medical care for people living with HIV, including clinical services and support staff such as Physicians, Nurse Practitioners, Physician Assistants, Nurses, case managers, and behavioral health professionals.

23. Together, Parts B and C allow us to provide holistic, integrated care to all our HIV patients, including those who are transgender. For example, Part C supports clinical visits and mental health services, while Part B enables access to medications and additional services not otherwise covered.

24. In reliance on Ryan White's longstanding directives and funding structure prioritizing this integrated healthcare model, we have intentionally developed and structured our model of care to meet the needs of transgender and gender-diverse people living with HIV, including gender-affirming healthcare.

25. We carefully track and allocate staff time and services through established systems, including CAREWare, to ensure compliance with Ryan White requirements.

## IV. Importance of Affirming HIV Care and Gender-Affirming Treatment for Our Transgender Patients with HIV

26. Gender-affirming medical care is healthcare that is medically necessary for many our transgender patients and that is essential to ensuring adherence to effective HIV treatment as well as addressing the health needs and wellbeing of our transgender patients living with HIV.

27. In my experience, providing comprehensive gender-affirming medical care improves patient retention in care, treatment of co-morbidities, and adherence to HIV medications. Similarly, being able to acknowledge, affirm, and respect the identity of a transgender patient is crucial to patient retention in care, treatment of co-morbidities, and adherence to HIV medications. This builds trust between patients and providers and reduces mental health barriers, including depression, dysphoria, and suicidality.

28. My experience integrating comprehensive gender-affirming medical care into HIV treatment arose from clinical and medical necessity. I first began treating transgender women with HIV who presented with advanced disease and had delayed seeking care due to lack of access to affirming providers. Before the Ryan White Program covered gender-affirming medical care and medication, many of my patients faced significant barriers to obtaining such care through the formal healthcare system, including lack of insurance coverage, cost, lack of understanding how to provide medical care for transgender people, and discrimination.

29. In my professional experience, when patients are unable to access gender-affirming medical care through licensed providers, some turn to non-prescribed or informal sources of hormones, including online or underground markets, in order to meet their basic healthcare needs. These alternatives are often medically unsupervised and can carry significant health risks, but patients may nonetheless pursue them because the alternative is going without care altogether.

These underground markets had limited access to medical supplies, which lead to needle sharing, thus increasing the risk of HIV transmission.

30. In my professional experience, prohibiting access to gender-affirming medical care as well as prohibiting acknowledgement, affirmation, and respect of the identities of transgender patients are not neutral actions; they each actively drive patients away from the healthcare system or into unsafe pathways, further delaying engagement in HIV care and worsening clinical outcomes requiring hospitalization which increase financial burden on the healthcare system which is already strained.

31. By affirming and respecting my transgender patients and providing gender-affirming medical care within the HIV treatment setting, I built trust, reduced unsafe practices, and improved health outcomes of patients, including achieving sustained viral suppression. In my clinical experience, patients explicitly linked their willingness to engage in HIV care to whether they feel seen, respected, and affirmed in their gender identity. For example, patients told me that they avoided or delayed care in the past because providers dismissed or stigmatized their gender identity, but that they felt safe returning to our clinic once they could receive gender-affirming medical services in the same setting.

32. Our Clinic tracks engagement in care, including appointment adherence, retention in treatment, and viral suppression rates. Consistent with broader clinical experience, I observed that patients who begin receiving gender-affirming medical care alongside HIV treatment are more likely to attend appointments, adhere to their medications, and remain engaged in care over time. In our clinical practice, all our transgender patients remain consistently engaged in their care, sustain viral suppression, reduced unsafe practices which would put them at risk for other types of infections and co-morbidities like Hepatitis C.

33. Conversely, when gender-affirming medical care is unavailable or disrupted, patients are more likely to miss appointments, disengage from care, or seek services outside the healthcare system. Integrating these services is therefore not ancillary; it is a critical component of effective HIV treatment for many transgender patients.

34. In my opinion, as informed by my clinical experience, treating the "whole person," including providing gender-affirming medical care, is essential to effective HIV care as it is for all people receiving Ryan White services.

## V. Impact of the Challenged Conditions on Our Transgender Patients

35. By prohibiting acknowledgement, affirmation, and respect of the identities of our transgender patients as well as prohibiting provision of gender-affirming medical care using Ryan White-supported services, the Challenged Conditions will have severe consequences for our Clinic and our patients.

36. As noted, it is likely that many transgender patients will disengage from HIV care if they cannot receive HIV care that is affirming and cannot access gender-affirming medical care as part of their care. Many of our transgender patients come regularly as needed to treat their HIV only because they receive comprehensive care for all their medical needs, including gender-affirming hormone therapy and treatment for other co-morbidities, at our Clinic. For many patients, even a short disruption can result in missed appointments, loss of trust, medication non-adherence, and lack of follow-up. Once that occurs, it can be difficult to reverse.

37. This disengagement will—likely result in reduced adherence to HIV medications, which leads to increased viremia which over time progresses to AIDS. It also leads to worsening mental health, including depression and suicidality.

38. All people with HIV are at increased risk for cardiovascular disease, diabetes, and kidney disease which result from not only living with a chronic viral infection but results from the medications they must take through out their lifespan. Transgender people are no different. For transgender people with HIV, managing their medical treatment may actually decrease their risks for some of these diseases. For example, providing appropriate medical treatment allows for better monitoring of heart disease, and for some transgender women less likelihood of early cardiovascular complications.

39. Disengagement with care is particularly dangerous in the context of HIV care because interruptions in antiretroviral therapy can lead to viral rebound, immune decline, and clinical progression to AIDS. Federal HIV treatment guidelines recognize that stopping or interrupting antiretroviral therapy may result in viral rebound, immune decompensation, and clinical progression to AIDS, and studies show that viral rebound often occurs within weeks after treatment interruption.

40. This issue is particularly acute for rural areas. Patients in our practice have extremely limited, and often nonexistent, alternatives for obtaining gender-affirming medical care if it is not available through my clinic. In rural areas, providers with experience delivering gender-affirming medical care are scarce. In states such as North Carolina, most providers offering gender-affirming medical care are concentrated in large metropolitan areas, leaving rural patients with HIV without meaningful local access.

41. For our patients, there are no metropolitan areas within a 60-mile radius of the Clinic's location. Many lack reliable transportation, cannot afford the cost of travel, or are unable to take time away from work or caregiving responsibilities. In our rural community, there is no public transportation coupled with a paucity of providers with the clinical skills to provide gender

affirming medical care for transgender people with HIV. Others face housing instability or live in circumstances that make long-distance travel logistically impossible. In addition, the stigma and discrimination that transgender patients frequently encounter in unfamiliar healthcare settings create further barriers to seeking care outside of a trusted provider-patient relationship.

42. As a result, if gender-affirming medical care is not available within our Clinic for transgender people with HIV who require Ryan White medical services, many of our patients will not be able to obtain care at all. In my clinical judgment, this lack of access would lead to delays in care, reliance on unsafe or informal alternatives, or complete disengagement from the healthcare system altogether.

43. Such a policy would set comprehensive HIV care back decades, undoing progress made in engaging and retaining vulnerable populations in care and in turn reducing the human, social, and financial impact of HIV on the larger community.

44. Patients who cannot access medically necessary gender-affirming hormone therapy may again turn to informal and unsafe sources, including shared needle networks, increasing the risk of HIV and other infections, namely endocarditis.

45. Gender-affirming medical care is grounded in established medical science. Removing access to this care destabilizes the entire treatment framework for transgender patients with HIV who rely on Ryan White funding.

## VI. The Challenged Conditions' Impact on Our Ability to Provide Comprehensive Care for People with HIV

46. Prohibitions on acknowledgement, affirmation, and respect for the identities of our transgender patients and the provision of gender-affirming medical care using Ryan White funds would place me and colleagues at the Clinic in an untenable position as physicians and healthcare providers.

47. We would be forced to deny medically necessary care to our patients and go against our clinical judgment in ways that conflict with accepted standards of care, including the ethical obligations of the medical profession and the clinical guidance set forth by the American Academy of HIV Medicine.

48. This would create a profound ethical conflict, as we would be unable to fulfill our duty to provide appropriate medical treatment.

49. Our relationships with patients are built on trust developed over many years. Being forced to deny care or to refuse to acknowledge and respect our patients' identities would undermine that trust and permanently damage those relationships. It would also have concrete consequences for patient engagement and retention into medical care. Many of our transgender patients seek care at the Clinic specifically because they trust that their identities and medical needs, including gender-affirming hormone therapy, will be respected and treated as legitimate. If we are no longer able to provide such care, some patients will reasonably perceive that we are unwilling to meet their full medical needs, which will erode that trust.

50. As a result, I expect that some patients would reduce or altogether stop coming to the Clinic, including for HIV treatment. Others may delay care, miss appointments, or become less adherent to HIV treatment. In my experience, once that trust is damaged, particularly for patients who have previously experienced stigma or discrimination in healthcare settings, it is difficult to rebuild, and patients may disengage from care entirely rather than seek services in settings they do not perceive as affirming or safe.

51. As a provider, I have a professional and ethical obligation to treat all aspects of my patients' health. Being prohibited from doing so would be deeply distressing and inconsistent with my oath as a physician.

## VII. Financial and Programmatic Impact of the Challenged Conditions on the Clinic

52. The Clinic relies heavily on Ryan White funding to sustain its HIV care program and the broader services that support our patients. A substantial portion of our patients are uninsured or underinsured, and Ryan White funding allows us to provide care that would otherwise not be reimbursed, including medications, clinical services, and critical support services such as case management, outreach, and care coordination. Without this funding, we would not be able to maintain the current scope of services we provide.

53. Our clinic and our transgender patients also rely on Ryan White to continue to cover gender-affirming medical care as it has done for years.

54. Combined, Ryan White Parts B and C provide over 70% of our Clinic's HIV directed funding. The combined funding streams allows us to provide medical care for all people with HIV including those with co-morbidities that are a result of taking medications for decades like cardiovascular disease, renal dysfunction as well as infections like Hepatitis C. Medications used to treat these chronic diseases are provided with funding through Ryan White Part B. Transgender people with HIV suffer from these same chronic diseases making it germane to the integration of their gender-affirming medical care.

55. If Ryan White funding were reduced or lost, the impact on our Clinic would be immediate and severe and impact patients who rely on us to treat other co-morbidities as well. We would be forced to scale back services, reduce staffing, and limit the number of patients we are able to serve. In a rural setting like mine, there are no alternative funding sources or providers that could absorb this loss. As a result, all patients would lose access to care, and the Clinic's ability to continue operating its HIV program would be significantly threatened.

56. The loss of transgender patients from care would reduce patient volume and negatively impact funding tied to Ryan White program participation. Ryan White funding is distributed through federal grants to states, local jurisdictions, and clinics based in part on the number of people living with HIV who are served and retained in care, as well as demonstrated service needs. As a result, reductions in patient engagement and retention can directly affect the level of funding a clinic or jurisdiction receives or is able to sustain over time.

57. This would result in reduced funding, staff layoffs, and cuts to essential services. Ryan White funds support not only medical care, but also the staffing, infrastructure, and support services necessary to maintain patient engagement and achieve viral suppression. If patient volume declines, our Clinic would lose financial capacity to maintain these services, leading to reductions in clinical staff, case management, and other critical programs that are necessary to keep patients in care.

58. These impacts would be particularly severe in rural communities like mine, where Ryan White programs often serve as the primary, and sometimes only, source of HIV care. For the Clinic, based in North Carolina, there are limited alternative funding streams to replace lost Ryan White resources, and clinics like ours operate with thin margins, making them especially vulnerable to reductions in patient volume and associated funding.

59. In North Carolina, a significant portion of people living with HIV reside in rural areas – including all of our patients – making the Ryan White Program a critical lifeline.

**VIII. The Public Health Impact of the Challenged Conditions**

60. Limiting access to gender-affirming medical care and prohibiting affirming HIV care would have particularly severe public health consequences in rural areas like the communities

we serve. In these settings, HIV care infrastructure is limited, and a small number of providers and clinics are responsible for treating large geographic regions.

61. Because of this limited infrastructure, maintaining consistent patient engagement is essential. When patients disengage from care in rural areas, there are often no alternative providers or systems to bring them back into treatment. As a result, even small disruptions in care can have outsized and lasting effects on population health.

62. Based on my experience leading the American Academy of HIV Medicine's Southeast Region committee and working extensively with rural clinics, these harms would be especially acute in rural communities, where HIV providers are limited and often serve as the sole source of comprehensive care.

63. Integrated care models supported by the Ryan White Program are especially critical in rural settings, where patients face significant barriers including transportation challenges, provider shortages, and stigma. These models are designed to keep patients connected to care over time. Disrupting one component of that model, such as access to gender-affirming hormone therapy, can destabilize the entire system of care for this vulnerable population.

64. At the population level, reduced engagement in care leads to lower rates of viral suppression, which in turn increases the likelihood of HIV transmission within the community. In rural areas, where healthcare resources are already constrained, increases in untreated or poorly managed HIV place additional strain on limited medical infrastructure and public health systems.

65. Over time, these effects would undermine efforts to control the HIV epidemic in rural regions and reverse progress made through decades of targeted public health interventions. In my clinical judgment, the loss of integrated, accessible care in rural communities would have

immediate and compounding consequences for both individual patients and the broader public health system.

## IX. Conclusion

66. Based on my decades of clinical experience in providing comprehensive HIV care, as well as my training and familiarity with the research and medical literature pertaining to HIV care, being able to care for my transgender patients with HIV in an affirming manner and to provide them with gender-affirming medical care when so indicated is essential to my ability to effectively treat patients living with HIV.

67. Prohibiting such care would harm my patients, undermine public health, and prevent me from fulfilling my obligations as a physician.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 9, 2026

Michelle Collins-Ogle

Michelle Collins-Ogle, MD