**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN ACADEMY OF HIV MEDICINE; HIV MEDICINE ASSOCIATION, a division of the INFECTIOUS DISEASES SOCIETY OF AMERICA; INTERNATIONAL ASSOCIATION OF PROVIDERS OF AIDS CARE; JENNIFER K. BRODY, MD; and CHRISTOPHER B. FOX, NP,<br><br>*Plaintiffs*,<br><br>v.<br><br>HEALTH RESOURCES AND SERVICES ADMINISTRATION; THOMAS J. ENGELS, in his official capacity as the Administrator of the Health Resources and Services Administration; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the U.S. Department of Health and Human Services,<br><br>*Defendants*. | Case No. |

**DECLARATION OF RACHEL ROE, MD**

I, Rachel Roe, MD, hereby declare and state as follows:

1. I am over 18 years of age, of sound mind, and in all respects competent to testify.

2. I have personal knowledge of the facts set forth in this declaration and would testify competently to those facts if called to do so.

3. I am offering this declaration as a member of the HIV Medicine Association, which are bringing claims on behalf of their members like me and on behalf of the transgender patients of their members like mine.

4. Rachel Roe is a pseudonym. I am submitting this declaration under a pseudonym to protect my privacy and to protect my family and me from harassment, violence, and retaliation.

5. I submit this declaration in support of Plaintiffs' Motion for Preliminary Relief under 5 U.S.C. § 705 and for a Preliminary Injunction, which seeks to prevent Defendants from giving effect to certain conditions relating to transgender people and gender-affirming medical care set forth in Ryan White HIV/AIDS Program ("Ryan White Program") Notices of Funding Opportunity issued or forecasted to be issued in 2026 and the 2026 Updated HRSA General Terms and Conditions, issued on March 11, 2026 (collectively, "the Challenged Conditions").

6. I also submit this declaration in support of Plaintiffs' Motion for Leave to Submit Pseudonymous Declarations and for a Protective Order.

7. I am HIV physician practicing in Tennessee and my Ryan White funded clinic serves more than one thousand patients. The clinic relies on Ryan White funding to provide integrated HIV care, including clinical treatment, mental health services, case management, substance use services, and gender-affirming medical care. Integrated and affirming care is essential to maintaining trust, retention in care, treatment adherence, and viral suppression among transgender patients living with HIV. In Tennessee, a non-Medicaid expansion state, Ryan White often serves as the only realistic source of healthcare for low-income people living with HIV, making integrated care particularly critical. The challenged conditions would prevent me from offering affirming HIV care and gender-affirming medical care, causing our patients to disengage from treatment, lose viral suppression, experience worsening physical and mental health outcomes, and increase HIV transmission risk to the community. The challenged conditions would also create significant operational and financial harms for my clinic, undermine longstanding provider-patient

relationships, and threaten the viability of HIV care programs serving medically vulnerable communities.

**I. Background and Professional Experience**

8. I am a physician and clinical provider licensed to practice medicine in Tennessee. I have more than fifteen years of experience providing care for people living with HIV and providing gender-affirming medical care.

9. My clinic serves more than a thousand patients. Our patient population includes many low-income people, people of color, gay and bisexual men, cisgender women, transgender people, immigrants, and migrants. More than half of our patients rely on the Ryan White HIV/AIDS Program for some part of their care.

10. I am a member of the HIV Medicine Association.

11. My Ryan White clinic currently provides gender-affirming medical care to more than 50 patients.

**II. Need for Pseudonymity**

12. I am submitting this declaration under a pseudonym because I fear that disclosure of my identity would subject me and my patients to a substantial risk of harm, harassment, and retaliation.

13. I practice in Tennessee, where there is significant hostility toward transgender people as well as providers who offer affirming care to transgender individuals. In my experience, transgender people, including some of my patients, are subject to inordinate and disproportionate amounts of harassment and discrimination.[1] I am thus aware of the rise in anti-transgender violence

---

[1] James, S.E., Herman, J.L., Durso, L.E., & Heng-Lehtinen, R. (2024). Early Insights: A Report of the 2022 U.S. Transgender Survey. National Center for Transgender Equality, Washington, DC.

and harassment in the South.[2]

14. As a result, there has been a significant rise in harassment against those who care for and support transgender people, including in Tennessee. Based on media reports, I am aware of targeted online harassment, doxxing, and even bomb threats targeting gender-affirming care providers. Indeed, I am aware of media reports documenting how medical groups have urged the U.S. Department of Justice "to investigate the organizations, individuals, and entities coordinating, provoking, and carrying out bomb threats and threats of personal violence" against hospitals and physicians who provide gender-affirming care to transgender people and have been targeted as a result.[3]

15. Accordingly, I am concerned that public identification would endanger my safety as well as the safety of my family, my colleagues, and my patients.

16. Furthermore, I am concerned that public identification could expose me to retaliation that would disrupt my ability to provide care, including potential scrutiny from federal and state officials, loss of institutional support, or interference with my clinical practice. Based on media reports, I am aware that the current federal administration has targeted those who support transgender care or oppose their priorities. For example, media reports document efforts to

---

[2] *See*, *e.g.*, Christopher Wiggins, *Transgender people are being killed at an alarming rate, especially in the South*, The Advocate (Feb. 13, 2024), https://tinyurl.com/5n7dj5fv [https://perma.cc/ED6P-MJ3X]; Sydney Bauer, *In the Southeast, heightened danger and few protections for trans people*, NBC News (June 11, 2021), https://tinyurl.com/3ue2cfkm [https://perma.cc/A96B-3QYU].

[3] *See* Orion Rummler, *Medical groups ask Justice Department to investigate threats against hospitals over gender-affirming care*, The 19th (Oct. 3, 2022), https://tinyurl.com/4v5cn76y; *see also* Goldberg, A.E., Boskey, E.R., & Redfield, E. (2026). The experiences of transgender providers of gender-affirming care: Scrutiny, stress, and solidarity in sociopolitically turbulent times. *Psychology of Sexual Orientation and Gender Diversity.* Advance online publication. https://tinyurl.com/3kdxjh4p [https://doi.org/10.1037/sgd0000927]; Hughes, L.D., Gamarel, K.E., Restar, A.J., Sequeira, G.M., Dowshen, N., Regan, K., & Kidd, K.M. (2023). Adolescent providers' experiences of harassment related to delivering gender-affirming care. *Journal of Adolescent Health*, *73*(4), 672-678.

pressure medical organizations to change their positions on gender-affirming care and retaliation against those who have opposed the administration's priorities.[4]

17. It would also risk drawing unwanted attention to my patients, which, as noted, are already vulnerable and might potentially deter them from seeking care or further expose them to discrimination, stigmatization, and harm.

18. I am willing to disclose my identity to the Court as directed under a protective order.

## III. The Role of the Ryan White Program in Patient Care

19. The Ryan White Program is lifesaving for our patients. In Tennessee, which has not expanded Medicaid, many low-income adults living with HIV have no realistic alternative source of comprehensive care. For those patients, the Ryan White Program is not one option among many; it is often the last stop before no care at all.

20. My clinic receives Ryan White funding through Parts A, B, C, D, and F. That funding supports clinical care and the staffing infrastructure needed to provide comprehensive HIV services. In practice, Ryan White helps pay for the providers, case managers, social workers, mental-health providers, substance-use specialists, and other staff who make HIV care possible for patients who are uninsured, underinsured, poor, or medically vulnerable.

21. Ryan White funding allows us to provide holistic integrated care. Our patients do not come to us only for antiretroviral prescriptions; they come to us for primary care, HIV specialty care, sexual health care, counseling, mental-health support, medication monitoring, and assistance addressing social determinants of health such as transportation barriers, food insecurity, and

---

[4] *See*, *e.g.*, Peter Charalambous, et al., *Here's a list of the individuals, including James Comey, targeted by the Trump administration*, ABC News (Apr. 28, 2026), https://tinyurl.com/ynhp24th [https://perma.cc/K5TU-R8ZA]; Samantha Riedel, *Dr. Oz Tried to Pressure Medical Societies to Oppose Trans Youth Care*, Them (Mar. 16, 2026), https://tinyurl.com/338tt5d8.

housing instability. For our transgender adult patients, this also includes access to treatment for their gender dysphoria (also known as "gender-affirming medical care").

**IV. Integration of Gender-Affirming Medical Care and HIV Treatment**

22. Gender-affirming medical care is a critical part of that integrated model for transgender patients living with HIV in my practice. While the Ryan White formulary in my state does not include medications specifically for gender-affirming treatment, our clinic nonetheless provides essential gender-affirming medical care as part of comprehensive HIV services. In my practice, this includes counseling patients regarding gender identity and transition-related goals, conducting clinical assessments, providing referrals to appropriate specialists, coordinating care with outside providers, supporting medication management where available through other coverage, and ensuring that care is delivered in an affirming and culturally competent environment.

23. Ryan White supports the clinical infrastructure, including provider time and care coordination, through which this care is delivered. Ryan White pays both for the care our patients receive and pays a significant percentage of the salary for my staff.

24. For my transgender patients living with HIV, gender-affirming medical care is not separate from HIV care. It is a core part of how I am able to provide effective medical treatment. In my experience, patients often come to my clinic precisely because they know they can receive both affirming HIV care and gender-affirming medical care in a single, trusted setting. Without that integration, many would not seek care at all.

25. Providing gender-affirming medical care, as well as being able to acknowledge and affirm my transgender patients' identities, is essential to building trust with transgender patients, many of whom have experienced stigma, discrimination, or mistreatment in healthcare settings. When I am able to affirm a patient's gender identity and provide care that recognizes them as a

whole person, it creates the foundation for an ongoing therapeutic relationship. That trust is what allows me to engage patients in conversations about HIV treatment, adherence, and long-term health.

26. That trust directly affects whether my patients remain in care. When patients feel safe and respected, they are far more likely to attend appointments, follow up regularly, and remain engaged in treatment over time. Conversely, when care is not affirming and gender-affirming medical care is withheld or denied, transgender patients are likely to disengage, miss appointments, or stop seeking care altogether.

27. Many of my transgender patients face profound and overlapping barriers to care, including poverty, lack of reliable transportation, unstable housing, inflexible or low-wage employment, caregiving responsibilities, and prior experiences of stigma or discrimination in healthcare settings. For example, I regularly treat patients who have issues affording even a $2.00 bus fare to attend an appointment, who must choose between missing work and seeking care, or who rely on inconsistent public transit systems that make traveling across a metropolitan area difficult or impossible.

28. Because of these constraints, it is not feasible to require my patients to obtain different aspects of their care from multiple providers across different locations and at different times. Each additional appointment creates another logistical hurdle, another day off work, another transportation cost, another opportunity for something to go wrong. For many of my patients, even one missed bus, one unexpected expense, or one scheduling conflict can mean that an appointment is missed and not rescheduled.

29. In my experience, requiring my low-income patients to navigate multiple, disconnected systems of care effectively denies them access to care altogether. Many of my

patients do not have the time, financial resources, or stability to coordinate visits across different providers for HIV care, primary care, mental health services, and gender-affirming medical care. When HIV care is not centralized and coordinated by one clinic, patients are often forced to prioritize one need over another or to forgo care entirely.

30. Integrated care in a single, trusted setting is essential. By providing multiple services in one place, during the same visit or within the same care team, we reduce the number of barriers a patient must overcome to receive care. Patients are able to address multiple health needs in one trip, with providers who understand their medical history and social circumstances. This model is particularly critical for low-income patients, for whom even small logistical burdens can become insurmountable.

31. For transgender patients in particular, access to affirming, integrated care is often the reason they remain engaged in treatment. When patients are able to receive HIV care and gender-affirming care from providers they trust, in a single setting, they are far more likely to stay in care, attend appointments, and adhere to treatment. When that integration is disrupted, patients may disengage entirely, with serious consequences for their health and for public health.

## V. The Challenged Conditions' Harms to My Patients

32. If the restrictions set forth in the Challenged Conditions take effect, in my clinical experience, many transgender patients will disengage from HIV care. This disengagement will lead to missed appointments, interruptions in HIV treatment, loss of viral suppression, and worsening health outcomes.

33. My patients who fall out of care will face increased risk of opportunistic infections, hospitalization, and long-term health complications. They may also develop drug resistance if treatment is interrupted.

34. Loss of viral suppression has serious public health consequences. When patients are not virally suppressed, the risk of HIV transmission increases, including transmission of drug resistant virus strains to the community.

35. The restrictions would also undermine my patients' mental health and the trust that is essential to effective medical care. Many of my transgender patients have spent years building trust with me and with our clinic, often after prior experiences of stigma, discrimination, or mistreatment in healthcare settings. That trust is not easily earned. In some cases, it has taken years before a patient felt safe enough to fully engage in care, accept examinations, or consistently follow treatment recommendations.

36. If I am forced to discriminate against my patients or to withdraw gender-affirming medical care they need, patients are likely to experience that change as a profound betrayal. From their perspective, it communicates that their identity is not respected and that their care is conditional. That perception can be deeply destabilizing, particularly for patients who already face high rates of depression, anxiety, trauma, and social marginalization.

37. The resulting harms are both immediate and long-term. Patients who disengage from care may experience worsening mental health, including increased depression, anxiety, and suicidality. At the same time, they may interrupt or stop HIV treatment, leading to loss of viral suppression and deterioration in their physical health. These harms reinforce each other, making it more difficult for patients to re-engage in care in the future.

## VI. Unique Harms in Non-Medicaid Expansion States

38. Tennessee has not expanded Medicaid, which means that there is no coverage pathway for most low-income adults. For those who do qualify, eligibility is extremely limited. For example, adults with dependent children generally must have incomes at or below

approximately 100–105% of the federal poverty level, about $15,650 annually (or roughly $1,300 per month). For adults without dependent children, there is effectively no Medicaid eligibility category at all unless they meet strict disability criteria. Even for those qualifying under disability-based programs, income limits can be as low as approximately $994 per month for an individual.

39. As a result, many of my patients fall into a "coverage gap"—they earn too much to qualify under Tennessee's extremely restrictive Medicaid categories, but far too little to afford private insurance or out of pocket care. For these patients, the Ryan White Program is their only reliable source of HIV care and, indeed, any healthcare at all.

40. In this context, restricting gender-affirming care within the Ryan White Program effectively eliminates access to that care altogether. It forces my patients to choose between receiving HIV care without affirmation or disengaging from care entirely. In my experience I believe many of my patients will choose the latter.

## VII. The Challenged Conditions' Harms to Providers and Public Health

41. The restrictions set forth in the Challenged Conditions would harm me as a physician by preventing me from providing medically necessary care consistent with my clinical judgment and ethical obligations. I would be placed in the untenable position of knowing what care my patients need that is integral to their overall health while being prohibited from providing it. This is directly contrary to the standards of care I am trained to follow and to my ethical duty to do no harm.

42. The restrictions would also create significant operational disruptions within my clinic. Our model of care is built around integration: providing HIV care, primary care, behavioral health, and gender-affirming medical care in a coordinated, patient-centered way. If the restrictions take effect, we may be forced to restructure how care is delivered. This could include revising

clinical protocols, retraining staff, determining which services can be provided under which funding streams, and attempting to separate services that are currently delivered together in a single visit. That process would be complex, time-consuming, and disruptive to both providers and patients.

43. My clinic relies on Ryan White funding for a substantial portion of its operating budget, including provider salaries, clinical services, and the infrastructure necessary to deliver comprehensive HIV care. In Tennessee, there is no meaningful alternative funding stream that could replace Ryan White.

44. If my clinic were found to be out of compliance with Ryan White restrictions, we could face loss of funding. The loss of that funding would be devastating. It would require reductions in staffing, elimination of services, and potentially limiting the number of patients we are able to serve.

45. Even if funding is not immediately terminated, a restriction on gender-affirming care using Ryan White funds or being able to provide affirming HIV care by prohibiting us from acknowledging, affirming, or respecting our transgender patients would itself have financial consequences. If transgender patients disengage from care because they can no longer receive integrated services, the clinic would lose the associated Ryan White-supported encounters and programmatic funding tied to patient care. At the same time, we would face increased costs associated with attempting to retain patients, redesign care systems, and manage the fallout from disrupted care.

46. If my patients disengage from care, the clinic will face increased uncompensated care and greater strain on limited resources. Patients who fall out of routine care often return only when they are acutely ill, requiring more intensive, complex, and expensive interventions. These

episodes of care are significantly more resource-intensive than routine outpatient management and are often not fully reimbursed.

47. At a broader level, the restriction would undermine efforts to control the HIV epidemic. By disrupting engagement in care and reducing viral suppression rates, the policy would increase the likelihood of HIV transmission in the community. This reverses decades of progress made through sustained investment in evidence-based, integrated HIV care models like Ryan White.

48. The harms described above are immediate and irreparable. Loss of patient trust cannot easily be restored, and the disruption of longstanding provider-patient relationships has lasting consequences. Interruptions in HIV treatment can lead to viral rebound, drug resistance, and permanent deterioration in a patient's health.

49. Patients who disengage from care may not return. In my experience, once patients fall out of care it can take years for them to re-engage, if they return at all. During that time, their health will significantly decline, and the risk of transmission to others increases. These are harms that cannot be undone through later intervention.

**VIII. Conclusion**

50. If the restrictions set forth in the Challenged Conditions are enjoined, I will be able to continue providing integrated, medically appropriate affirming care to my patients. If they are not enjoined, my patients in Tennessee and those in other non-Medicaid expansion states will suffer severe and irreparable harm.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 8, 2026

Rachel Roe

Rachel Roe, MD