**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| AMERICAN ACADEMY OF HIV MEDICINE, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>HEALTH RESOURCES AND SERVICES ADMINISTRATION, *et al.*,<br><br>    Defendants. | Case No. 26-cv-12638-WGY |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND PRELIMINARY RELIEF UNDER 5 U.S.C. § 705**

**INTRODUCTION**

Plaintiffs—two health care providers and three membership organizations comprised of health care professionals—bring this action in an attempt to dictate the terms and conditions on which the Health Resources and Services Administration ("HRSA"), an agency within the U.S. Department of Health and Human Services ("HHS"), awards grants under Title XXVI of the Public Health Service Act, established by the Ryan White Comprehensive AIDS Resources Emergency Act of 1990 (the "Ryan White statute" or the "Ryan White program"). The Ryan White program provides medical care to low-income individuals with HIV/AIDS who otherwise might not have access to treatment. Plaintiffs seek a preliminary injunction and preliminary relief under 5 U.S.C. § 705 to prevent the government from enforcing certain terms and conditions that apply to recipients of federal funding under the Ryan White program. Specifically, Plaintiffs challenge 1) HRSA's fiscal year 2026 General Terms and Conditions (March 11, 2026 version), which apply to all funding administered by HRSA; and 2) certain terms included in Notices of Funding

1

Opportunities ("NOFOs") under the Ryan White program (collectively, the "challenged conditions").

To start, all of Plaintiffs' claims face a threshold barrier: this Court lacks subject matter jurisdiction over them. This case belongs, pursuant to the Tucker Act, 28 U.S.C. § 1491, in the Court of Federal Claims because the crux of Plaintiffs' claims is tethered to an express contract with the United States. Though Plaintiffs may contend that their claims turn on the "unlawfulness" of the challenged conditions and thus are rooted in alleged constitutional and statutory violations, including the Administrative Procedure Act ("APA"), no amount of artful pleading can hide that all of Plaintiffs' purported harms flow from grant agreements that are sufficient to satisfy the essential elements of a contract. To be sure, some sessions of this court have exercised jurisdiction in cases arising out of grant agreements.[1] But other courts have declined to circumvent the Tucker Act where, as here, the source of the rights for the plaintiffs' claims is the grant agreements themselves—a more reasoned view consistent with *Department of Education v. California*, 145 S. Ct. 966 (2025). *See*, *e.g.*, *Solutions in Hometown Connections v. Noem*, No. 25-cv-00885-LKG, 2025 WL 1530318 (D. Md. May 29, 2025). This Court should adopt that approach in this case.

Another threshold barrier to Plaintiffs' claims is their lack of ripeness for judicial adjudication. For purposes of determining standing, and as Supreme Court precedent teaches, the focus is properly on the status of the party pursuing the complaint and not on the merits of the case. Here, Plaintiffs have not alleged sufficiently that they have suffered an injury that is direct, distinct, and palpable, as opposed to simply conjectural, as their concerns pertain only to *future* grant awards and subsequent funding. Mere interest in an issue does not satisfy the injury-in-fact

---

[1] *See*, *e.g.*, *Association of Am. Universities v. Dep't of Energy*, 789 F. Supp. 3d 118 (D. Mass. 2025); *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277 (D. Mass. 2025).

requirement commanded by Article III, Section 2 of the United States Constitution and, for this reason alone, the Court should deny injunctive relief.

This Court lacks subject matter jurisdiction over Plaintiffs' APA claims for yet another reason: Plaintiffs seek to challenge non-final, non-discrete agency actions that are generally committed to agency discretion by law. The inclusion of terms and conditions in program administration documents does not constitute final agency action. Instead, Plaintiffs' claims are best understood as broad programmatic attacks on the government's priorities, which are impermissible under the APA.

Aside from these jurisdictional barriers, Plaintiffs' claims also fail on their merits. HRSA's actions were lawful because the agency has authority to impose appropriate conditions on its grants. And the conditions imposed here are not arbitrary and capricious. Instead, they are consistent with the plain language of the Ryan White program and are designed to ensure that federal funds are used only for the purpose intended by the statute, that is, to provide treatment to individuals suffering from HIV/AIDS who otherwise might not have access to care. The challenged conditions likewise do not violate the Affordable Care Act ("ACA"), as the Supreme Court has long recognized a distinction between regulations that impose burdens on health care providers and those that merely reflect Congress's choice not to subsidize certain activities. Only the latter is implicated here, as Plaintiffs may continue to provide gender affirming care to their patients—just not with federal funds from the Ryan White program.

Plaintiffs' constitutional claims fare no better. There is no equal protection component implicated here because the challenged conditions turn on medical uses, not protected classes. But even if the court were to conclude that the challenged conditions were based on transgender status, rational basis review applies, and the classifications easily pass muster because the government

3

has a rational interest in ensuring that federal funds are used only for authorized purposes under the Ryan White statute.

Nor are Plaintiffs likely to succeed in pressing their claim that the challenged conditions violate the separation of powers doctrine.  The caselaw is clear that the authority of the President of the United States to control and supervise executive policymaking is grounded in the Constitution.  Moreover, the Executive Branch may set the terms of federal spending.  Specifically, agencies have the authority to impose terms and conditions on grant agreements as long as they are consistent with the program statute. *See* 2 C.F.R. § 200.303(b) (Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards) (requiring all recipients of federal grants to "[c]omply with the U.S. Constitution, Federal statutes, regulations, and the terms and conditions of the Federal award").  *See also South Dakota v. Dole*, 483 U.S. 203 (1987) (holding that the Spending Clause provides Congress authority to "attach conditions on the receipt of federal funds," provided the conditions are unambiguous, related to the grant program, not otherwise unconstitutional, and not coercive)[2]. Within the Ryan White context, for example, the Secretary may require an application under Part C to be "made in such manner, and contains such  agreements, assurances, and information as the Secretary determines to be necessary to carry out this part." *See* 42 U.S.C. § 300ff–65.

Plaintiffs also fall short in establishing that they will be harmed irreparably by the absence of injunctive relief.  The "harms" claimed by Plaintiffs are borne of speculation and not fact, and Plaintiffs have failed to make a sufficiently specific showing that they will suffer an actual,

---

[2] And although there has not been an explicit Supreme Court holding on this point yet, by extension, Congress presumably also has the authority to delegate part of its Spending Clause authority to federal agencies that administer grant programs, which would provide agencies the authority to set the terms and conditions of grant agreements consistent with the grant program statute.

immediate harm if they are unable to use federal funds in contravention of the government's conditions. Moreover, the economic harm alleged by Plaintiffs is, by definition, not irreparable.

Lastly, the balance of equities and public interest weigh against granting a preliminary injunction because the government's interest in protecting taxpayer dollars is weighty and HRSA is unlikely to recover funds after grantees spend such funds. The loss of likely unrecoverable funds suffices to deny injunctive relief.

For the reasons enumerated above and described more fully below, Defendants submit that Plaintiffs' motion should be denied. However, should the Court disagree and grant injunctive relief, such relief should be narrowly tailored to address the direct harms suffered by the named plaintiff providers only and not extend to unidentified members of the organizational plaintiffs or other individuals who are not parties to this action. Further, any injunctive relief should be accompanied by more than a nominal bond.

## BACKGROUND

### I.      Factual Background

The Ryan White statute, codified as amended at 42 U.S.C. §§ 300ff-11 to 300ff-140, was enacted by Congress in 1990 to "provide emergency assistance to localities disproportionately affected by the HIV epidemic and to make financial assistance to States and other public and private nonprofit entities to provide for the development, organization, coordination, and operations of more effective and cost-efficient systems for the delivery of essential services to individuals and families with HIV disease." P.L. 101-318 § 2. Today, HRSA's Ryan White HIV/AIDS Program provides a comprehensive system of HIV primary medical care, medications, and essential support services for low-income people with HIV. Over half the people with diagnosed HIV in the United States—nearly 567,000 people in 2022— receive services through

the Ryan White program each year.  The Ryan White program funds grants to states, cities, counties, and local community-based organizations to provide care and treatment services to people with HIV to improve health outcomes and reduce HIV transmission.

The Ryan White program is administered by HRSA.  HRSA issues both discretionary and non-discretionary grants and cooperative agreements, as well as other types of awards that constitute federal financial assistance.  *See* 2 C.F.R. § 200.1 (Definitions).  When federal funds for grants and cooperative agreements are made available by Congress, HRSA prepares and publishes a Notice of Funding Opportunity (NOFO) on grants.gov to advertise the availability of award funds and to solicit applications for awards.  *See* 2 C.F.R. § 200.204 (Notices of Funding Opportunities).  Each NOFO is generally posted for at least 30 days.  *See id*.  To receive an award, Ryan White recipients must apply for an award under a published NOFO.  Reference to the terms and conditions of each award are identified in the NOFOs when published.  Once HRSA issues a final award under the NOFO, it generally incorporates any terms in the NOFO as a term and condition of the award.  HRSA's "General Terms and Conditions" are also incorporated into the terms of each award.

To align with the administration's goals and the President's executive orders, various HHS operating divisions, including HRSA, published updated priorities.  HRSA published its updated priorities on September 15, 2025.[3]  To implement these priorities, HRSA updated its General Terms and Conditions and the language in all subsequent NOFOs.  For example, the current version of HRSA's fiscal year 2026 terms and conditions, which apply to all awards issued by HRSA on or after March 11, 2026, provide that, "[a]s a condition of the award, you must ensure that all activities funded under this award are implemented in a manner consistent with HRSA's mission and

---

[3] https://www.hrsa.gov/about/priorities (last visited June 26, 2026).

strategic priorities as authorized by law." ECF No. 1-1, at p. 6. These priorities include "recogniz[ing] that a person's sex as either male or female is unchangeable and determined by objective biology, and to ensure its programs accurately reflect science, including the biological reality of sex." *See* FN3. These priorities also include ensuring that the government does not provide funding under the Ryan White program for purposes unrelated to the statute. *See id.*

Similarly, the challenged NOFOs published in connection with the Ryan White program include, for example, the following conditions:

- "if an [AIDS Drug Assistance Program] provides sex hormones, it may only allow such hormones to be dispensed to treat HIV/AIDS or prevent the serious deterioration of health arising from HIV/AIDS, rather than for non-statutory purposes such as specific sex-trait modification procedures." ECF No. 1-1, at p. 6.

- awards "shall not be used to fund, promote, encourage, subsidize, or facilitate . . . denial by the recipient of the sex binary in humans, or the belief that sex is a chosen or mutable characteristic," and warns that applications that do not align with those requirements "will not receive funding to the extent permitted by law and applicable court orders." ECF No. 1-2, at pp. 2-51.

These conditions were first reflected in a published NOFO beginning June 4, 2026 as a part of a broader effort to implement HRSA's updated priorities published in September 2025.

## II.    Procedural Background

Plaintiffs filed this action on June 10, 2026, claiming that HRSA's actions to ensure that funding under the Ryan White statute is limited to the scope prescribed by Congress violates the APA, the First and Fifth Amendments, and the Separation of Powers doctrine. Compl., ECF No. 1. The Complaint seeks, among other things, preliminary and permanent injunctive relief enjoining Defendants from "implementing, enforcing, effectuating, or giving effect to the Challenged Conditions[.]" *Id.* at pp. 69-70.

That same day, Plaintiffs filed a Motion for Preliminary Injunction and Preliminary Relief under 5 U.S.C. § 705, broadly asking the Court to enjoin the Challenged Conditions pending resolution of this case. Pl. Motion, ECF No. 9; Pl. Memo, ECF No. 10.

## LEGAL STANDARDS

### I. Subject matter jurisdiction

To proceed on their claims, Plaintiffs must first establish subject-matter jurisdiction in this Court—first, by meeting Article III's case-or-controversy requirement by establishing standing and ripeness, and second, by showing whether Congress has waived sovereign immunity and, if so, whether this Court may hear their claims. *See, e.g.*, *Hanley v. United States*, No. 94-1315, 1994 WL 723678, at *2 (1st Cir. Oct. 5, 1994) (per curiam) (affirming Fed. R. Civ. P. 12(b)(1) dismissal) ("A plaintiff has the burden of showing a waiver of sovereign immunity."). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *see also United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.").

Federal courts "presume [they] lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (cleaned up). The test for deciding whether sovereign immunity has been waived is "stringent," the waiver must be "unmistakably clear," and the Court must "indulge every reasonable presumption against" waiver. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675, 678, 682 (1999); *also FAA v. Cooper*, 566 U.S. 284, 290 (2012) ("[A] waiver of sovereign immunity must be unequivocally expressed in statutory text.") (cleaned up).

Plaintiffs have the burden of alleging facts sufficient to establish the Court's subject-matter

jurisdiction. *See Aversa v. United States*, 99 F.3d 1200, 1209 (1st Cir. 1996); *see also Padilla-Mangual v. Pavía Hosp.*, 516 F.3d 29, 31 (1st Cir. 2008) (once challenged, "the party invoking subject[-]matter jurisdiction . . . has the burden of proving by a preponderance of the evidence the facts supporting jurisdiction").

## II.      Preliminary injunction[4]

A preliminary injunction "is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012). A movant may be awarded such an extraordinary remedy only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Counsel, Inc.*, 555 U.S. 7, 22 (2008). To establish entitlement, Plaintiffs bear the burden of establishing (1) a likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3) the balance of the equities favor the movant, and (4) an injunction is in the public interest. *Allscripts Healthcare, LLC v. DR/Decision Resources, LLC*, 592 F. Supp. 3d 1, 3 (D. Mass. 2022). The last two factors "merge when the Government is the party opposing the preliminary injunction." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Irreparable harm "constitutes a necessary threshold showing for an award of preliminary injunctive relief," *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009), and is "the basis for injunctive relief." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011). Of course, as a threshold matter, a court must have jurisdiction to enter a temporary restraining order. *Lowenthal v. Massachusetts*, No. 14–13631–GAO, 2014 WL 5285615 at *2 (D. Mass. Oct. 14, 2014).

---

[4] The same standard that governs the issuance of a preliminary injunction governs the issuance of a stay under 5 U.S.C. § 705. *See California v. Kennedy*, No. 25-cv-12019-NMG, 2025 WL 2807729, at *3 (D. Mass. Oct. 1, 2025).

**ARGUMENT**

**I.      This Court Lacks Jurisdiction Over Plaintiff's Claims.**

Before addressing the merits of Plaintiffs' motion for preliminary injunction, the Court must assess whether it has subject matter jurisdiction. *See Acosta Ramirez v. Banco Popular de P.R.*, 712 F.3d 14, 18 (1st Cir. 2013) ("Federal courts are obligated to resolve questions pertaining to subject-matter jurisdiction before addressing the merits of a case"); *see also Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (recognizing that complaint must be dismissed in its entirety if subject matter jurisdiction is lacking). Plaintiffs bear the burden of demonstrating subject-matter jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs have not met their burden.

**A.      The Court of Federal Claims has exclusive jurisdiction over Plaintiffs' claims.**

In this action, Plaintiffs challenge the terms and conditions of (future) grant agreements. Indeed, all of Plaintiffs' purported harms flow from the potential inclusion of the challenged conditions in their grant agreements. Pl. Memo, ECF No. 10, at p. 21 ("The Challenged Conditions force providers to choose between continuing to provide affirming healthcare…[or] risk losing critical Ryan White funding").

The Tucker Act confers exclusive jurisdiction on the Court of Federal Claims to hear cases involving express or implied contracts with the United States which exceed $10,000. 28 U.S.C. § 1491(a)(1). Therefore, "the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court" under the APA. *Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004); *see also Glaskin v. Klass*, 996 F. Supp. 67, 72 (D. Mass. 1998). Moreover, Congress has explicitly forbidden district court jurisdiction for such contractual claims. 28 U.S.C. § 1346(a)(2) ("the district courts shall not

have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States…").  This jurisdictional divide ensures that contract claims against the government are channeled to the court that has "unique expertise" in that area. *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985).  The prohibition on district court jurisdiction over contract claims extends to claims founded on grants, like those at issue here, that are implemented through "contracts to set the terms of and receive commitments from recipients." *Boaz Housing Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021). [5]

Determining whether a claim "is 'at its essence' contractual"—and therefore falls outside of the APA's waiver of sovereign immunity—"depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Crowley Gov't Srvc., Inc. v. General Services Administration*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)).  Applying this two-pronged test here confirms that Plaintiffs' claims amount to the very sort of contractual claims against the federal government over which this Court lacks jurisdiction: (1) Plaintiffs challenge specific terms under their contracts with the government; and (2) as relief, Plaintiffs seek to enjoin HRSA from enforcing those terms.

Where claims asserted are based on a contract, seek a declaration of contractual rights, or do not exist independent of a contract, they are barred by the Tucker Act.  *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 646–47 (9th Cir.1998).  Here, Plaintiffs' claims do not exist

---

[5] Though Plaintiffs style their claims as APA claims or constitutional claims, the First Circuit has held that where "the essence of the [Plaintiffs'] action is in contract," a plaintiff may not evade the Tucker Act's exclusive grant of jurisdiction "by the mystique of a different form of complaint," such as a suit under the APA or constitution. *American Sci. & Eng'g Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978); *see also Diaz v. Johnson, No. 19-1501,* 2020 U.S. App. LEXIS 42196, at *5 (1st Cir. Nov. 12, 2020) (holding that plaintiff "cannot manufacture an APA claim by asking the court to declare that the failure to fund his proposal was an arbitrary or capricious act").

11

independent of a contract.  Plaintiffs are all healthcare providers[6] who claim injuries to their medical practices and professional obligations because the challenged conditions in their grant agreements "force" them to "choose between continuing to provide affirming healthcare" and "losing critical Ryan White funding".  Pl. Memo, ECF No. 10, at p. 11.  These exchanges of promises constitute government contracts for Tucker Act purposes.  *See Massie v. United States*, 166 F.3d 1184, 1188 (Fed. Cir. 1999) ("[A]ny agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government.") (cleaned up).  Although Plaintiffs frame their request as seeking to enjoin grant conditions applicable only to future awards, the practical effect—securing future grant funding on terms they prefer—is a contractual remedy.

Over the past eighteen months there has been a flood of lawsuits challenging agency decisions to freeze or terminate federal grants across a range of industries and agencies.  On April 4, 2025, the Supreme Court addressed the question in a challenge to the Government's decision to freeze the funding for certain grants to teachers awarded through programs authorized by a federal statute.  *California*, 145 S. Ct. at 968.  In that case, the Supreme Court stayed the district court's temporary restraining order pending appeal, because, among other things, the Supreme Court found that "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA."  *Id.*

---

[6] Plaintiffs acknowledge that the organizational plaintiffs have standing because their members possess standing "for the same reasons Provider Plaintiffs have standing"—that is, because they are or would be subject to the challenged conditions in their grant agreements.  Pl. Memo, ECF No. 10, p. 11.

To be sure, several district courts have minimized the precedential value of *California*, for a variety of reasons. But the holdings in those cases are undercut—if not entirely foreclosed—by the Fourth Circuit's decision in *Sustainability Inst. v. Trump*, 165 F.4th 817 (4th Cir. January 21, 2026). In *Sustainability*, plaintiffs argued that the government's termination or suspension of 38 grants administered by multiple government agencies violated, inter alia, the APA and the Constitution. *Sustainability*, 165 F.4th at 821-23. Like the plaintiffs in *California*, the *Sustainability* plaintiffs argued, and the United States District Court of South Carolina agreed, that based on *Bowen v. Massachusetts*, 487 U.S. 879 (1988), the Tucker Act did not apply to the plaintiffs' grant termination claims because the claims did "not turn on the terms of a contract between the parties" and the plaintiffs sought "equitable, not monetary, relief." *See id.* at 823. The government anticipates Plaintiffs will make a similar argument here. The United States District Court for the District of South Carolina agreed that it had jurisdiction, *i.e.*, that the Tucker Act did *not* apply, and entered injunctions—a permanent one on the APA claims and a preliminary one on the Constitutional claims—requiring the Government "to restore Plaintiffs' access to grant funds immediately." *Id.* at 821 (quoting *Sustainability Inst. v. Trump*, 784 F. Supp. 3d 861, 871 (D.S.C. 2025).

Upon appeal of the District Court's injunction to the Fourth Circuit, the Fourth Circuit determined that "the source of the rights upon which the plaintiff[s] base[ ] [their] claims" was fundamentally contractual and vacated the District Court's injunction. *See id.* at 827-28 (quoting *Megapulse, Inc. v Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). In reaching its decision, the Fourth Circuit noted that there was "no meaningful difference between the district court's order here and the district court's order in *California*," and therefore, that *California*, rather than *Bowen*, should control. *Id.* at 828-829.

13

Defendants urge this Court to follow the precedent of the Supreme Court and Fourth Circuit. Plaintiffs cannot ask this Court to conclude they have standing based on their grant agreements with the government and then ask this court to ignore those same grant agreements when determining whether their claims are governed by the Tucker Act. At bottom, because Plaintiffs have no claims without the grant agreements (whether existing or future), their claims are quintessentially contract claims and belong in the Court of Federal Claims pursuant to the Tucker Act.

### B.    Plaintiffs Lack Standing to Seek Prospective Relief.

The Constitution limits the exercise of judicial power to 'cases' and 'controversies.'" *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 239 (1937) (citing U.S. Const. art. III, § 2). For a "case or controversy" to exist, a litigant must have standing to bring the claim. *Lujan*, 504 U.S. at 560. To establish Article III standing, a plaintiff must demonstrate that it (1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *See id.* at 560–61. "The injury-in-fact requirement ensures that plaintiffs have a 'personal stake in the outcome of the controversy.'" *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "Injury in fact is 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Id. (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016)).

Moreover, "when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367381 (2024). Specifically, "[w]hen a plaintiff seeks redress for a prospective harm, the plaintiff can demonstrate that an alleged injury is sufficiently imminent for standing purposes

by showing that the harm is 'certainly impending' or that the plaintiff faces a 'substantial risk' of its occurrence." *North Carolina State Conference of NAACP v. North Carolina State Bd. of Elections*, 283 F. Supp. 3d 393, 399 (M.D.N.C., 2017) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).  "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Lujan*, 504, U.S. at 564 n.2).

Here, all Plaintiffs have failed to establish standing to assert claims for prospective relief regarding future funding opportunities and future grant applications.  Plaintiffs cannot identify future grant awards that do not yet exist, and they can therefore only speculate as to the future harm that might befall them or others absent injunctive relief.  Accordingly, Plaintiffs' "theory of future injury is too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending.'"  *Clapper*, 568 U.S. at 401 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Moreover, the organizational plaintiffs in this case rely on a theory of "associational standing."  Under that theory, an association has standing to bring suit on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  As shown by the number of declarations submitted by the organizational plaintiffs in an attempt to show irreparable harm, the organizational plaintiffs fail the third requirement:  individual members must participate to show entitlement to relief—particularly if this Court follows the proper practice of limiting any

injunction to those individuals who have shown that the challenged conditions will cause them irreparable harm.

More fundamentally, the theory of associational standing is misguided:  It (1) improperly "relaxes both the injury and redressability requirements for Article III standing" by allowing the association to assert and obtain relief for someone else's injury (even in the absence of an injury of its own); (2) "subverts the class action mechanism" by allowing what amounts to classwide relief outside the strictures of Rule 23; and (3) creates the "possibility of asymmetrical preclusion," where the members might not be bound by the association's loss in litigation.  *See FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 399-403 (2024) (Thomas, J., concurring).  Thus, while Defendants acknowledge that the Supreme Court has recognized the theory of associational standing, they preserve their challenge to the theory of associational standing for further review.

### C.    APA review is unavailable because the challenged actions are committed to agency discretion by law.

While the APA establishes a waiver of sovereign immunity, 5 U.S.C. §§ 702, 706(1)–(2), the waiver of sovereign immunity is limited.  It does not apply in circumstances where "agency action is committed to agency discretion by law."  *Id.* § 701(a)(2).  Courts have explained that agency action is "committed to agency discretion by law" when a "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," rendering "meaningful judicial review . . . impossible."  *Steenholdt v. FAA*, 314 F.3d 33, 638 (D.C. Cir. 2003) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).  This is true "even where Congress has not affirmatively precluded review."  *Heckler*, 470 U.S. at 830.

"Congress may limit an agency's exercise of enforcement power if it wishes," but only when "it has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion," is there "law to apply" under §

16

701(a)(2). *Id.* at 833–34. Decisions are "general[ly] unsuitabl[e]" for judicial review when they require "a complicated balancing of a number of factors which are peculiarly within [agency] expertise" or involve how best to spend "agency resources," including whether the agency "is likely to succeed if it acts" and "whether the particular enforcement action requested best fits the agency's overall policies." *Id.* at 831. "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831–32. Hallmarks of a decision committed to agency discretion include a statute that puts the onus on the agency, not the courts, to apply a standard, *see Webster v. Doe*, 486 U.S. 592, 600 (1988), and general criteria that make it difficult for courts to meaningfully second-guess an agency determination, *see id.*

An agency's determination of how best to allocate and condition appropriated funds to fulfill its legal and policy mandates is discretionary agency action. *See Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). In *Lincoln*, the Court explained that there is no waiver of sovereign immunity where agency action requires "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including whether "resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all." *Id.* (citations omitted). An "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.*

The challenged conditions here are committed to agency discretion by law. The statute contemplates broadly drawn topics and guidelines that would not provide a meaningful rubric for judicial review. Congress has not provided any "law to apply" with respect to what constitutes "core medical services" and "support services" for individuals living with HIV, 42 U.S.C. §§ 300ff-14(a), 300ff-22, 300ff-51, which is the statutory language that Plaintiffs claim requires the federal

government to fund gender affirming care under the program. Consequently, the government's determination of what programming to fund requires a "complicated balancing of a number of factors peculiarly within the agency's expertise." *Heckler*, 470 U.S. at 831. Accordingly, the challenged conditions are within the agency's discretion under *Lincoln*.

### C.     APA review is unavailable because HRSA's actions are not discrete, final agency actions.

APA review is available in most cases only for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. District court review is "inappropriate [where] 'final agency action,' a prerequisite for judicial review, had not yet occurred." *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 781 (9th Cir. 2000) (citing *O'Brien, Inc. v. Sec. & Exch. Comm'n*, 704 F.2d 1065, 1067 n.6 (9th Cir. 1983), rev'd on other grounds (further citation omitted)); *see also Ctr. for Food Safety v. Perdue*, 320 F. Supp. 3d 1101, 1104 (N.D. Cal. 2018) ("Final agency action is a prerequisite to judicial review under the APA."). In addition, agency action requires a specific "rule, order, license, sanction, relief, or the equivalent." 5 U.S.C. § 551(13). This is because the agency action must be a "discrete" act, and a plaintiff may not bring a "broad programmatic attack." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

Under the test first laid out in *Bennett v. Spear*, an agency action is considered "final" if two conditions are met: first, it marks the "consummation" of the agency's decision making process; and second, the action determines rights or obligations or creates legal consequences. *See Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2025) (citing *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). On *Bennett*'s second prong, courts follow a "pragmatic" approach and determine whether an action is final "based on the concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it." *California Communities Against Toxics v. Env't Prot. Agency*, 934 F.3d 627, 637 (D.C. Cir. 2019) (interpreting *U.S. Army*

18

*Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016)). The challenged conditions satisfy neither requirement.

The issuance of documents relevant to the administration of a grant does not "mark the consummation of the agency's decision making process." None of the terms or conditions here have the hallmarks of a discrete and final decision of the agency. The challenged conditions are, at most, expressions of agency policy and program administration—they reflect the government's interpretation of programmatic parameters under the Ryan White program. None of the challenged conditions in and of themselves terminates a grant, imposes penalties, or determines legal rights or obligations.

Further, in bringing this challenge on behalf of many health care providers and broadly challenging the terms and conditions writ large, Plaintiffs' claims amount to a broad programmatic attack. But this type of challenge is impermissible under the APA. "Because an on-going program or policy is not, in itself, a "final agency action" under the APA, our jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (cleaned up).

## II.    Plaintiffs Have No Likelihood of Success on the Merits of their Claims.

Even if this Court concludes that it has jurisdiction, Plaintiffs' claims still fail on their merits.

### A.    Defendants' Actions Were Not "Contrary to Law"

The Executive has a constitutional duty to enforce Congressional mandates and does so through its officers and agents. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492 (2010). Federal agencies must limit grant expenditures to costs that are authorized under a program statute because unauthorized expenses violate the Appropriations Clause of the

19

Constitution, Art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law"). Also, the Purpose Statute provides that appropriations are only available for the specific purposes for which they were made. *See* 31 U.S.C. § 1301.[7] The Supreme Court also recognizes the fundamental principle that "[t]he established rule is that the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress." *See United States v. MacCollom*, 426 U.S. 317, 321 (1976); *see also Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (recognizing that payments from the federal treasury are limited to those authorized by statute).

To implement this principle, executive branch agencies, such as HHS, have the authority to impose terms on the grants they administer. Indeed, Congress has not only authorized HHS to impose conditions on grant programs but it afforded discretion to the agency to establish the terms of federal award conditions. That is what HHS did here. *See*, *e.g., Planned Parenthood of Wisconsin v. Alex Azar*, 316 F. Supp. 3d 291 (D.D.C. 2018) (upholding HHS-imposed funding priority criteria in a Notice of Funding Opportunity for the Title X grant program, as falling sufficiently within the authority of the Title X statute); *see also Tennessee v. Becerra*, 131 F.4th 350, 360 (6th Cir. 2025) (vacated later by the Supreme Court as moot) (upholding an HHS-imposed grant condition to require Title X grant recipients to provide counseling referrals, due to language in the state providing that "Grants ... made under this subchapter shall be made in accordance with such regulations as the Secretary may promulgate" and "shall be payable ... subject to such conditions as the Secretary may determine to be appropriate").

---

[7] As the Government Accountability Office has indicated: "The starting point in applying the purpose statute is that, absent a clear indication to the contrary, the common meaning of the words in the appropriation act and the program legislation it funds governs the purposes to which the appropriation may be applied." GAO, Principles of Federal Appropriations Law, Chapter 3, Fourth Ed. p. 3–11.

Contrary to Plaintiffs' allegations, the challenged conditions do not violate the Affordable Care Act. Plaintiffs argue that the challenged conditions create "unreasonable barriers" to the ability of transgender people living with HIV to receive gender-affirming medical care, upset patient/provider communications, and require providers to violate their ethical standards. Pl. Memo. ECF No. 10, pp. 34-36. But the Supreme Court has long made a distinction between regulations that impose burdens on health care providers and their clients and those that merely reflect Congress's choice not to subsidize certain activities. *See Rust v. Sullivan*, 500 U.S. 173, 192 (1991). The *Rust* court applied this principle in the Title X context, rejecting arguments that a rule's limitations on counseling and referrals for abortion impermissibly burdened the doctor-patient relationship by placing restrictions on the patient-doctor dialogue and impeding access to abortion services, *id.* at 202—similar arguments to what Plaintiffs advance here. The Supreme Court underscored that a government restriction on funding certain activities "is not denying a benefit to anyone, but is instead simply insisting that public funds be spent for the purposes for which they were authorized." *Id.* at 196. So too here.

**B.    Defendants' actions were not arbitrary and capricious.**

The plaintiffs are unlikely to succeed on their claim that HRSA acted arbitrarily and capriciously with respect to the challenged conditions. Judicial review under the arbitrary and capricious standard is "deferential," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), and a court must "uphold [even] a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (citation omitted). In *FCC v. Fox*, the Supreme Court upheld an agency action that represented a complete policy shift, even though the agency lacked objective evidence in support of its shift but instead relied on its own discretion and experience. *Id.* at 517-20. Moreover, where Congress

21

shows intent to give an agency discretion to define applicable terms, the agency does not run afoul of the APA when it produces a definition that differs from previous proposals. *See Vanda Pharms., Inc. v. Ctrs. for Medicare & Medicaid Servs.*, 98 F.4th 483, 494, 498 (4th Cir. 2024).

Here, the government provided the reasons for its actions—changes in priorities. *See* ECF. Doc. No. 1-1. Though Plaintiffs disagree with the government's reasons, that does not convert HRSA's actions into those that are arbitrary and capricious. The Plaintiffs, like this court, may not substitute their judgment for that of the agency's. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The updated fiscal year 2026 General Terms and Conditions establish that HRSA undertook a systematic review of the grant awards and the agency's priorities—*i.e.*, the relevant data—to determine whether funding under the Ryan White program comported with statutory requirements and administrative priorities. The APA does not require exhaustive explanation for every action. *Cf. Fox*, 556 U.S. at 514 (no heightened standard); *Ren v. USCIS*, 60 F.4th 89, 93 (4th Cir. 2023) (deferential review). The record shows reasoned consideration prior to imposing the challenged conditions in accordance with the applicable law—which satisfies the APA.

### C.    Plaintiffs' Separation of Powers Claim fails.

The inclusion of the challenged conditions does not violate the Separation of Powers principle. The Constitution grants Congress the power to allocate funds (U.S. Const. art. I, § 8, cl. 1), while simultaneously entrusting the Executive Branch with the responsibility to faithfully execute the laws (U.S. Const. art. II, § 3). Once Congress enacts a funding statute, the Executive's duty is to administer that statute in accordance with its text, purpose, and limitations. Agencies naturally exercise interpretive discretion in determining whether activities fall within or outside a program's scope. *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013). When a statute authorizes

funding for programs with specific educational or health objectives, such as providing treatment for HIV/AIDS, the Executive may appropriately interpret those objectives to exclude activities or content that are not aligned with the statutory purpose, including topics not authorized by Congress. The exclusion of gender affirming care like puberty blockers, cross-sex hormones, surgeries, etc. which do not relate to the treatment of HIV/AIDS and fall outside the statutory text constitutes lawful program administration and does not constitute an unconstitutional usurpation of legislative authority.

By excluding non-statutory treatments from receiving funding under the Ryan White program, HRSA upholds, rather than contradicts, Congressional intent. The crux of the separation of powers doctrine lies in determining whether the Executive has acted within the bounds of statutory authority. In *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952), for example, the Supreme Court ruled that the Executive's seizure of property without statutory authorization was unconstitutional. In this case, unlike *Youngstown*, the agency's exclusion of providing funding for gender affirming care as outlined above constitutes an interpretive act consistent with adhering to the statutory text. Congress did not explicitly include gender affirming care or related treatments within the authorizing language of the Ryan White statute, which is aimed at providing comprehensive treatment for HIV/AIDS to individuals who might otherwise not have access to care. By excluding funding unrelated to this objective, HRSA simply enforces the statute's limitations and declines to fund activities and services that Congress never authorized. This approach respects, and does not violate, the separation of powers.

Plaintiffs have not presented any evidence that the Ryan White statute authorizes funding for gender affirming care or related treatment. In the absence of such statutory authorization, HRSA's decision not to fund such treatments does not constitute the imposition of unauthorized

23

conditions. Rather, it reflects adherence to Congressional intent and statutory boundaries. The cases cited by Plaintiffs therefore are inapposite; they address executive actions that add new requirements, not the enforcement of existing statutory limitations.

As the agency responsible for administering these grants, HRSA has the authority to enforce funding standards that align with statutory objectives. HRSA can establish programmatic guidance to ensure that grantees comply with legislative intent. In *Rust*, the Supreme Court upheld agency regulations prohibiting federally funded family planning programs from providing counseling on abortion. 500 U.S. at 192–200. Similarly, HRSA can decline to fund programming that advances gender affirming care if it determines that such content deviates from the statutory objective of providing treatment for HIV/AIDS. These content-based distinctions do not constitute novel "funding conditions"; rather, they represent programmatic enforcement decisions within the existing statutory framework.

The doctrine of the separation of powers prohibits judicial interference in the Executive's administration of these grants. Ironically, it is the Plaintiffs' theory that would disrupt the constitutional balance. By requesting judicial invalidation of HRSA's discretionary authority, they ask the court to micromanage agency implementation of congressionally enacted programs. However, once Congress grants authority to administer a funding statute, the Executive retains discretion to implement those programs in accordance with statutory boundaries and policy judgments. *Lincoln*, 508 U.S. at 192. Courts have consistently recognized that not every exercise of administrative discretion implicates separation of powers concerns. So long as the agency acts in accordance with statutory authorization and not in defiance of it, the action is constitutionally valid. Excluding non-statutory uses of funds falls within HRSA's permissible administrative action.

24

**D.    The challenged conditions do not discriminate based on transgender status and sex**

Plaintiffs claim the challenged conditions are discriminatory in violation of Section 1557 of the ACA and the equal protection clause of the Fifth Amendment.  These claims fail.

Section 1557 precludes discrimination in health programs or activities, any part of which receives federal funding, based on race, color, national origin, sex, age, or disability.  42 U.S.C. § 18116(a).  Section 1557 does not protect against selective or discretionary grant funding and it does not mandate that covered entities affirmatively fund or seek to benefit any particular group regardless of that group's minority status—even if that group was subject to discrimination historically.  The text of the statute does not suggest otherwise.

"[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976).  This guarantee "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).  To analyze governmental action under the equal protection guarantee, courts "apply different levels of scrutiny to different types of classifications." *Clark v. Jeter*, 486 U.S. 456, 461 (1988).  Typically, governmental classifications must be merely "rationally related to a legitimate governmental purpose." *Id.*  "Classifications based on race or national origin," on the other hand, are suspect and receive "the most exacting scrutiny." *Id.* "Between these extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy." *Id.*

The government submits that the classifications at issue here are not based on sex at all.  Instead, the classifications at issue turn on medical use—they prohibit federal funds from being

used for certain treatment purposes—and for that reason, they are subject to rational basis review. *See United States v. Skrmetti*, 605 U.S. 495, 511 (2025) ("Classifications that turn on age or medical use are subject to only rational basis review"). The challenged conditions do not prohibit healthcare providers from administering sex hormones to transgender individuals (or to any individual based on their sex) if such treatment is necessary to treat HIV/AIDS or a condition related to HIV/AIDS. Instead, the challenged conditions prohibit healthcare providers from administering sex hormones to treat gender dysphoria or other non-statutory purposes such as sex modification procedures. The application of that prohibition does not turn on sex, *see Skrmetti*, 605 U.S. at 514, and is rationally related to the government's purpose of ensuring that federal funds are used only for those purposes authorized by statute.

Plaintiffs claim that heightened scrutiny applies because classifications based on transgender status are classifications based on sex. Pl. Memo., ECF No. 10, at 42. Even assuming the challenged conditions here were classifications based on transgender status, which the government disputes, while some courts have found that individuals who assert a gender identity inconsistent with their sex "constitute a quasi-suspect class", *see, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607 (4h Cir. 2020), *as amended* (Aug. 28, 2020), the Supreme Court has never so held. *See Skrmetti*, 83 F.4th at 486 (noting that the "Supreme Court" has not "recognized transgender status as a suspect class"). Nor has the Supreme Court recognized any new constitutionally protected class and instead has repeatedly declined to do so. *See e.g.*, *Craig v. Boren*, 429 U.S. 190 (1976) (recognizing sex as a quasi-suspect class); *see also Obergefell v. Hodges*, 576 U.S. 644 (2015) (declining to address whether gay individuals are quasi-suspect class). Defendants submit that because the Supreme Court has not identified transgender people as a quasi-suspect class, rational basis review is appropriate.

Rational basis review "is a paradigm of judicial restraint." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993). Under rational basis of review, the challenged law enjoys "a strong presumption of validity," even if the classification is "both underinclusive and overinclusive." *Id.* at 314-15. The focus is entirely on the government's reason for enacting the law. *See Just Puppies, Inc. v. Frosh*, 565 F. Supp. 3d 665, 727 (D. Md. 2021) (so long as the classification "rationally advances a reasonable and identifiable government objective, [judges] must disregard the existence of other methods of allocation that we, as individuals, perhaps would have preferred").

Under the rationale basis standard, which is largely deferential to the agency, HRSA has not violated any equal protection guarantees. Instead, the challenged conditions are a legitimate exercise of the government's discretion to award grants that are consistent with its objectives and the Ryan White program, and ensure that funding is used for the treatment it was intended.

### E.     The challenged conditions do not violate the right to Free Speech

Plaintiffs attempt to shoehorn their contractual claims into a purported violation of the First Amendment. Their attempt to do so fails.

It is well established that the Government's spending is not subject to traditional First-Amendment scrutiny. "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest. . . . In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Rust*, 500 U.S. at 193. Thus, "[a]s a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (collecting cases) ("Open Society").

Consistent with the First Amendment, the Government may "specify the activities [it] wants to subsidize," but it cannot "leverage funding to regulate speech outside the contours of the programs itself." *Id.* at 214-15 (emphasis added).  For example, limiting the use of federal funds for a specific purpose—such as prohibiting the "promot[ion] or advoca[cy] [of] the legalization or practice of prostitution or sex trafficking"—is constitutionally permissible, *id.* at 217-18 (citation omitted), but the outright conditioning of federal funds on the recipient's adoption of a policy "explicitly opposing prostitution or sex trafficking" is not, *id.* at 210 (citation omitted).  The latter amounts to an unconstitutional condition because it regulates speech even on the recipients' "own time and dime." *Id.* at 218-19.

None of HRSA's challenged conditions impose an unconstitutional condition on Plaintiffs' speech.  Rather, as permitted under *Rust* and *Open Society*, the provisions align the Government's sponsorship of activities with its policy priorities.  HRSA's challenged conditions do not prohibit grant recipients from engaging in protected speech on their "own time and dime." *Open Society*, 570 U.S. at 218.  As the Supreme Court has repeatedly held, the Government does not penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it.  *See*, *e.g.*, *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (explaining that Government "is not required to assist others in funding the expression of particular ideas"); *United States v. Am. Libr. Ass'n*, 539 U.S. 194, 212 (2003) (plurality opinion) (a "decision not to subsidize the exercise of a fundamental right does not infringe the right") (quoting *Rust*, 500 U.S. at 193); *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) (the Government "is not required to subsidize First Amendment rights").  Simply put, the Government is permitted to have policy priorities, and the Government does not violate the First Amendment by declining to fund programs that do not align with those policies.

28

**III.      Plaintiffs fail to demonstrate a likelihood of irreparable harm or that the balance of equities or public interest tips in their favor**

Plaintiffs' motion should be denied on the basis that they have failed to demonstrate irreparable harm, typically "a necessary threshold showing for an award of preliminary injunctive relief." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). "Preliminary injunctions are strong medicine" and "should not issue except to prevent a real threat of harm." *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004). Further, "[a] finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity*, 370 F.3d at 162; *see also Narragansett Indian Tribe*, 934 F.2d at 6-7 ("[S]peculative injury does not constitute a showing of irreparable harm.") (quoting *Pub. Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 383 (1st Cir. 1987)). Plaintiffs' sweeping assertions of harm fails to address a fundamental problem: when distilled, the relief they seek is economic, which is a classic example of reparable harm.

Plaintiffs ultimately seek to control the terms and conditions which govern their grant awards. To that end, Plaintiffs' claims are essentially economic ones—they may lose federal funding if they elect not to abide by the terms and conditions of their grant awards. It is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also, e.g., Akebia Therapeutics, Inc. v. Azar*, 443 F. Supp. 3d 219, 230 (D. Mass.) ("[E]conomic loss alone does not usually rise to the level of irreparable harm which a party must establish to obtain a preliminary injunction") (citation omitted), aff'd, 976 F.3d 86 (1st Cir. 2020); *Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*, No. 22-cv-11091, 2023 WL 3660689, at *7 (D. Mass. May 25, 2023) ("Plaintiffs have not demonstrated 'irreparable harm,' but at most, economic loss") (citation omitted); *see also,*

*e.g.*, *Weinberger*, 456 U.S. at 312 (1982) ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies.").

According to Plaintiffs themselves, their purported inability to continue certain programs if they decline to agree to the challenged conditions results solely from the loss of grant funding. That is quintessentially an economic loss. HRSA is not taking any action that impedes Plaintiffs' ability to carry out their programming initiatives or depriving Plaintiffs of any opportunity to apply for funding to which it may be entitled. The only thing that HRSA has done is set terms for what this funding may be used for and, consequentially, such funding may be lost if the Plaintiffs fail to comply. Were it otherwise, one could always convert the relevant harm for purposes of a preliminary injunction from an economic loss to the inability to do things that cost money. Such an approach would completely engulf the general rule that "[e]conomic loss alone does not usually rise to the level of irreparable harm." *Akebia*, 443 F. Supp. 3d at 230.

Finally, even if the Court were to find that Defendants failed to comply with the APA, the appropriate remedy is to remand to the agencies for further consideration or explanation, not, as Plaintiffs seem to suggest, to set aside the challenged conditions entirely and require the Government to provide money without relevant strings attached. *See* Pl. Memo, ECF No. 10, at 37-39. If that is the relief Plaintiffs would theoretically be entitled to, it is not appropriate at this preliminary stage of the case to grant the broader relief of requiring the agencies to continue payment under the grants. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."); *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 60 (D.C. Cir. 2015) ("'[B]edrock principles of administrative law preclude us from declaring definitively that [the

30

Secretary's] decision was arbitrary and capricious without first affording her an opportunity to articulate, if possible, a better explanation.'") (citation omitted); *Town of Weymouth v. Mass. Dep't of Env't Prot.*, 961 F.3d 34, 38 (1st Cir. 2020) ("Because we find that DEP did not follow its own established procedures . . . we vacate the air permit and remand to the agency to redo that analysis."), *modified on other grounds*, 973 F.3d 143 (1st Cir. 2020) (per curiam).

Ultimately, even if Plaintiffs forecast some threat of harm, there is no reason why they cannot vindicate that alleged harm through individualized, specific lawsuits challenging particular funding denials for specific grants. Plaintiffs have not established the need for the broad prospective injunctive relief they seek.

Even if Plaintiffs could establish irreparable harm, however, they have not shown that "the balance of equities and consideration of the public interest" favor a preliminary injunction. *Winter*, 555 U.S. at 32. Traditionally, a court first determines whether the movant's likely harm "will outweigh the harm which granting the injunction would inflict on [the defendant]." *7-Eleven, Inc. v. Grewal*, 60 F. Supp. 3d 272, 283 (D. Mass. 2014). Plaintiffs must demonstrate that their claimed injury outweighs any harm that granting the injunctive relief would inflict upon Defendants. *Lancor v. Lebanon Hous. Auth.*, 760 F.2d 361, 362 (1st Cir. 1985).[8] If the Court does not issue a preliminary injunction, HRSA may retain the grant money at issue during the pendency of the case, and Plaintiffs can obtain money damages at the end of the case if they are successful. But the opposite is not true—if the grantees are given access now and draw down the funds throughout the litigation, Defendants will be left with no meaningful recourse to recover the expended funds even if they prevail. Accordingly, if the Court enters a preliminary injunction, the federal agencies will

---

[8] In the next step of the analysis, courts consider whether "the public interest will not be adversely affected by the granting of the injunction." *Lancor*, 760 F.2d at 362. But where, as here, the Government is the defendant, these factors simply "merge." *Nken*, 556 U.S. at 435.

bear all the risk.  The Supreme Court recognized precisely that dynamic in *California* when it stayed the temporary restraining order granted by the district court in that case.  145 S. Ct. at 969.

## IV.    The Court Should Limit the Scope of any Injunctive Relief to Provider Plaintiffs' Specific Grants

Injunctive relief under the APA is limited.  Courts may either "compel agency action unlawfully withheld or unreasonably delayed," or "hold unlawful and set aside agency action."  5 U.S.C. § 706; *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004) (explaining how the "principal purpose" of the APA's limits on relief is to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements").

Injunctive relief should not provide "a remedy beyond what [is] necessary to provide relief" to injured parties.  *Lewis v. Casey*, 518 U.S. 343, 360 (1996).  Accordingly, to the extent the Court is inclined to grant Plaintiffs' request for a preliminary injunction, any such relief should be narrowly tailored to apply only to the grants of specific named provider Plaintiffs.  *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."); *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025) (Congress has not conferred upon federal courts the power to issue universal injunctions).  As the Supreme Court cautioned in *CASA*, "complete relief" between the parties "is a narrower concept" than "universal relief."  *CASA*, 145 S. Ct. at 2557.

## V.    Any Injunctive Relief Should Be Stayed Pending Appeal And Be Accompanied By A Bond.

If the Court grants Plaintiffs' Motion for a Preliminary Injunction, it should stay any such order pending any appeal because Defendants are likely to succeed on appeal and will face irreparable harm  in the form of unrecoverable lost monies absent a stay.  *Hilton v. Braunskill*, 481

U.S. 770, 776 (1987) (setting forth the factors "regulating the issuance of a stay"). On the whole, as argued above, a stay is warranted. At a minimum, the Court should administratively stay any injunctive relief it intends to order for a period of seven days to allow Defendants to seek an emergency, expedited stay from the First Circuit if an appeal is authorized.

Defendants also respectfully request that any injunctive relief accompany a reasonable bond, which the Court has discretion to require. *See* Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.") (emphasis added). A non-nominal bond is appropriate here given that any preliminary relief would potentially mandate that Defendants disburse funds that may not be recouped after distribution.

## CONCLUSION

For the reasons set forth above, the Court should deny Plaintiffs' motion for preliminary injunction. Moreover, if the Court is inclined to grant any injunctive relief, it should be narrowly tailored. Defendants also request that any order be secured by a bond and stayed pending a decision on whether to appeal and, if appeal is authorized, stayed pending appeal.

Respectfully submitted:

LEAH B. FOLEY
United States Attorney

By:    */s/ draft*
Nicole M. O'Connor
Assistant United States Attorney
United States Attorney's Office
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210

(617) 748-3112
Nicole.O'Connor@usdoj.gov

Dated June 26, 2026

## CERTIFICATE OF SERVICE

I, Nicole M. O'Connor, hereby certify that a true copy of the above document was served upon all parties of record via this court's electronic filing system and upon any non-registered parties via regular mail.

Dated:  June 26, 2026

*/s/ Nicole M. O'Connor*
Nicole M. O'Connor
Assistant U.S. Attorney