**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

AMERICAN ACADEMY OF HIV MEDICINE; *et al.*,

*Plaintiffs*,

v.

HEALTH RESOURCES AND SERVICES ADMINISTRATION; *et al.*,

*Defendants*.

Case No. 1:26-cv-12638-WGY

**PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**DEFENDANTS' PRETRIAL BRIEF**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

ARGUMENT ..... 1

I. This Court Has Subject-Matter Jurisdiction. ..... 1

II. The Challenged Conditions Are Arbitrary and Capricious. ..... 2

III. The Challenged Conditions Are Not in Accordance with Law. ..... 4

A. The Challenged Conditions Violate the Ryan White Statute. ..... 5

B. The Challenged Conditions Violate Section 1554 of the Affordable Care Act. ..... 7

IV. The Challenged Conditions Exceed Defendants' Statutory Authority and Violate the Separation of Powers. ..... 8

V. Defendants' Fail to Contest the Merits of Plaintiffs' Discrimination Claims. ..... 12

VI. The Conditions Impose an Unconstitutional Viewpoint-Based Funding Condition. ..... 19

CONCLUSION ..... 20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Advocs. for Arts v. Thomson*,
532 F.2d 792 (1st Cir. 1976) ....................19

*Afr. Communities Together v. Mullin*,
No. 26-CV-11201, 2026 WL 2364398 (D. Mass. Aug. 14, 2026) ....................19

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ....................19, 20

*Am. Ass'n of Univ. Professors v. Rubio*,
802 F.Supp.3d 120 (D. Mass. 2025) ....................19

*Am. Pub. Health Ass'n v. Nat'l Institutes of Health*,
791 F.Supp.3d 119 (D. Mass. 2025) ....................16, 17

*Arroyo González v. Rosselló Nevares*,
305 F.Supp.3d 327 (D.P.R. 2018) ....................18

*Ass'n of Am. Univs. v. Dep't of Def.*,
792 F.Supp.3d 143 (D. Mass. 2025) ....................3, 4

*Biden v. Nebraska*,
600 U.S. 477 (2023) ....................9, 10

*Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of Health & Hum. Servs.*,
557 F.Supp.3d 224 (D. Mass. 2021) ....................19

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) ....................14

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ....................18

*City of Providence v. Barr*,
954 F.3d 23 (1st Cir. 2020) ....................10, 12

*Climate United Fund v. Citibank, N.A.*,
154 F.4th 809 (D.C. Cir. 2025) ....................11

*Climate United Fund v. Citibank, N.A.*,
184 F.4th 679 (D.C. Cir. 2026) ....................11

*Cnty. of King v. Turner*,
No. 25-3664, 2026 WL 2489361 (9th Cir. Aug. 25, 2026) ..........................................10, 14

*Craker v. Drug Enforcement Admin.*,
714 F.3d 17 (1st Cir. 2013)...........................................................................................3

*Dalton v. Specter*,
511 U.S. 462 (1994)........................................................................................................11

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 1 (2020)..........................................................................................1, 2, 3, 16

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016)..........................................................................................................2

*Endocrine Soc'y v. Fed. Trade Comm'n*,
832 F.Supp.3d 1 (D.D.C. 2026).......................................................................................14

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)..........................................................................................................2

*FCC v. League of Women Voters of Cal.*,
468 U.S. 364 (1984)........................................................................................................19

*F.V. v. Barron*,
286 F.Supp.3d 1131 (D. Idaho 2018) ...............................................................................18

*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*,
604 U.S. 542 (2025)......................................................................................................2, 4

*Illinois v. Noem*,
813 F.Supp.3d 282 (D.R.I. 2025) .......................................................................................9

*Int'l Union v. Johnson Controls*,
499 U.S. 187 (1991)........................................................................................................15

*Legal Servs. Corp. v. Velazquez*,
531 U.S. 533 (2001)........................................................................................................20

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)..........................................................................................................5

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.*,
682 F.3d 1 (1st Cir. 2012)...............................................................................................18

*Mayor of Baltimore v. Azar*,
973 F.3d 258 (4th Cir. 2020) .............................................................................................8

*McGuire v. Reilly*,
386 F.3d 45 (1st Cir. 2004)........................................19

*Melone v. Coit*,
100 F.4th 21 (1st Cir. 2024)........................................3

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
526 U.S. 172 (1999)........................................12

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)........................................2, 3

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998)........................................19, 20

*Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior*,
No. 1:26-cv-10877, 2026 WL 1706963 (D. Mass. June 12, 2026)........................................3

*National Alliance to End Homelessness v. Turner*,
827 F. Supp. 3d 281 (D.R.I. 2026)........................................10

*PFLAG, Inc. v. Trump*,
769 F.Supp.3d 405 (D. Md. 2025)........................................13, 14

*Planned Parenthood of Md., Inc. v. Azar*,
No. CCB-20-00361, 2020 WL 3893241 (D. Md. July 10, 2020)........................................8

*Planned Parenthood of Wisconsin v. Azar*,
316 F. Supp. 3d 291 (D.D.C. 2018)........................................7

*R.I. Coal. Against Domestic Violence v. Bondi*,
794 F.Supp.3d 58 (D.R.I. 2025)........................................4

*R.I. Coal. Against Domestic Violence v. Kennedy*,
No. 25-cv-00342, 2026 WL 2364298 (D.R.I. Aug. 14, 2026)........................................3, 4

*R.I. Latino Arts v. Nat'l Endowment for the Arts*,
800 F.Supp.3d 351 (D.R.I. 2025)........................................4

*Rhode Island v. Trump*,
810 F.Supp.3d 283 (D.R.I. 2025)........................................11

*Ridley v. Mass. Bay Transp. Auth.*,
390 F.3d 65 (1st Cir. 2004)........................................19

*Romer v. Evans*,
517 U.S. 620 (1996)........................................18

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995)....................19

*Rust v. Sullivan*,
500 U.S. 173 (1991)....................7, 9, 20

*San Francisco A.I.D.S. Found. v. Trump*,
786 F.Supp.3d 1184 (N.D. Cal. 2025)....................13, 14, 15

*Shilling v. United States*,
773 F.Supp.3d 1069 (W.D. Wash. 2025)....................16

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023)....................15

*Tennessee v. Becerra*,
131 F.4th 350 (6th Cir. 2025)....................7

*Thakur v. Trump*,
176 F.4th 1187 (9th Cir.2026)....................20

*U.S. Dep't of Agric. v. Moreno*,
413 U.S. 528 (1973)....................18

*United States v. Skrmetti*,
605 U.S. 495 (2025)....................16, 17, 18

*United States v. Virginia*,
518 U.S. 515 (1996)....................16

*W. Virginia v. B.P.J.*,
146 S. Ct. 2356 (2026).................... *passim*

*Washington v. Trump*,
768 F.Supp.3d 1239 (W.D. Wash. 2025)....................13, 14

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
778 F.Supp.3d 440 (D.R.I. 2025)....................4

**STATUTES**

5 U.S.C. § 706(2)(A)-(C)....................1

5 U.S.C. § 706(2)(C)....................8, 9, 11

42 U.S.C. § 300a-6....................20

42 U.S.C. §§ 300ff–11 to 300ff–140....................9

42 U.S.C. § 300ff-14(3)(A)–(M) ........................................................................................5

42 U.S.C. §§ 300ff-14(b)(1) ........................................................................................12

42 U.S.C. §§ 300ff-14(c) ........................................................................................12

42 U.S.C. §§ 300ff-22(b)(1) ........................................................................................12

42 U.S.C. §§ 300ff-51(c) ........................................................................................12

42 U.S.C. § 300ff-65........................................................................................9

42 U.S.C. § 300ff-88(2) ........................................................................................5

42 U.S.C. § 11386(a)–(b)........................................................................................10

42 U.S.C. § 18114(1) ........................................................................................7

**OTHER AUTHORITIES**

H. REP. 109-695 (2006) ........................................................................................6

## INTRODUCTION

The Challenged Conditions unlawfully condition Ryan White funding on recipients discriminating against transgender people living with HIV by refusing to acknowledge, recognize, and respect them for who they are. Defendants offer little in defense other than "the government provided the reasons for its actions—changes in priorities." Dkt. 70 at 11. But the Administrative Procedure Act ("APA) requires more. It "requires agencies to engage in reasoned decisionmaking," *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020), and avoid actions that are "not in accordance with law," "contrary to constitutional right, [or] power," or "in excess of statutory … authority." 5 U.S.C. § 706(2)(A)-(C).

Notably, Defendants fail to engage or address the merits of most of Plaintiffs' APA, Affordable Care Act ("ACA"), and Constitutional claims. This includes not just Plaintiffs' claims that the Conditions are arbitrary and capricious and contrary to the Ryan White Act's text, purpose, and structure, but also how the Conditions are in excess of authority, unlawfully discriminate based on sex and transgender status in violation of the ACA and the Fifth Amendment, and discriminate based on viewpoint in violation of the First Amendment. Defendants' failure to engage with the merits of these arguments shows that the Conditions amount to nothing more than the reflexive operationalization of this Administration's animus-driven campaign against transgender people. Neither the law nor justice tolerates such illicit conduct. The Court should enter judgment for Plaintiffs on each of their claims.

## ARGUMENT

### I. This Court Has Subject-Matter Jurisdiction.

For the reasons set forth in Plaintiffs' Pretrial Brief (Dkt. 69 at 9-11) and Plaintiffs' simultaneously filed Opposition to Defendants' Motion to Dismiss, this Court has subject-matter jurisdiction over Plaintiffs' claims, and Plaintiffs' claims are justiciable.

## II. The Challenged Conditions Are Arbitrary and Capricious.

The Administrative Record ("A.R.") shows that Defendants did not engage in reasoned decision-making, let alone decision-making tailored to the Ryan White Program. Rather, Defendants imposed the Conditions as part of a mechanical top-down effort to conform the Program to the Gender Order. That is dispositive. Under the APA, Defendants were required to consider the purpose, goals, and structure of the Ryan White Program; their own prior policies; and the relevant aspects of the issue, reliance interests, and any consequences; and they needed to explain why these particular Conditions were appropriate for the program Congress enacted. The APA requires an agency to "examine the relevant data" and articulate a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 567 (2025) (reaffirming this "well-worn" arbitrary-and-capricious standard). A directive from above may explain why Defendants changed their policies; it does not constitute a reasoned explanation for the policy Defendants chose.

Defendants' reliance on "changed priorities" underscores this APA defect. Dkt. 70 at 11. By characterizing the Conditions as merely the product of changed priorities, Defendants necessarily acknowledge that they changed course. The APA makes clear that an agency changing position must "display awareness that it is changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). Where, as here, the prior policy engendered serious reliance interests, the agency must provide a "more detailed justification" that accounts for them. *Id.*; *see also Dep't of Homeland Sec.*, 591 U.S. at 30–33; *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016). Nowhere in the A.R. do Defendants identify any such explanation or even acknowledge that they were changing policies. More fundamentally, they do not engage with the specific defects Plaintiffs identified: no

consideration of reliance interests created by their prior policies; no consideration of important aspects of the problem, including the consequences for HIV care, the populations Ryan White serves, or the national goal to end the HIV epidemic; and no analysis of how imposing the Conditions would interact with the purpose, goals, and structure of the program Congress enacted. Those are hallmark defects that render an agency policy arbitrary and capricious. *See State Farm*, 463 U.S. at 43; *Craker v. Drug Enforcement Admin.*, 714 F.3d 17, 26 (1st Cir. 2013); *Ass'n of Am. Univs. v. Dep't of Def.*, 792 F.Supp.3d 143, 170-74 (D. Mass. 2025).

Defendants' vague mention of a "systematic review" does not supply the missing required analysis. Dkt. 70 at 11. The record material they cite states only that "all NOFOs must comply with Executive Orders signed by the President to the extent permitted by law." HRSA 0003–0004. At most, the A.R. shows that Defendants reviewed which grants existed to determine where to implement the Administration's priorities. It does not show that Defendants considered whether or how those directives should apply to the Ryan White Program in light of the statute, the agency's prior policies, or the operation of the program itself. And Defendants cannot supply that missing reasoning through counsel's *post hoc* characterization of the record. *See Melone v. Coit*, 100 F.4th 21, 31 (1st Cir. 2024); *Dep't of Homeland Sec.*, 591 U.S. at 20, 22–23.

The cases addressing mechanical implementation of executive orders illustrate how the Conditions are arbitrary and capricious. An executive order may prompt an agency to reconsider policy, but it does not substitute for the agency's own reasoned analysis of the program it administers. *See*, *e.g.*, *R.I. Coal. Against Domestic Violence v. Kennedy*, No. 25-cv-00342, 2026 WL 2364298 (D.R.I. Aug. 14, 2026) (setting aside grant conditions where agency failed to supply reasoned explanation beyond compliance with executive orders); *Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior*, No. 1:26-cv-10877, 2026 WL 1706963 (D. Mass. June 12, 2026)

(finding that agency implemented executive order without analysis grounded in relevant facts or statutory mandates), *stay granted on other grounds*, 180 F.4th 348 (1st Cir. 2026); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F.Supp.3d 440, 471 (D.R.I. 2025) (agency cannot "avert" arbitrary-and-capricious review simply by deferring to executive order), *aff'd in part and vacated in part on other grounds*, 2026 WL 2279789 (1st Cir. Aug. 7, 2026); *R.I. Latino Arts v. Nat'l Endowment for the Arts*, 800 F.Supp.3d 351, 372–73 (D.R.I. 2025) (setting aside grant restriction where agency invoked Gender Order without reasoned policy analysis); *R.I. Coal. Against Domestic Violence v. Bondi*, 794 F.Supp.3d 58, 70 (D.R.I. 2025).

That is a critical defect here. The A.R. documents Defendants' efforts to implement the Administration's priorities, namely, the Gender Order, but it does not show that HRSA exercised reasoned judgment in applying those directives to the Ryan White Program. Defendants identify no analysis connecting the Conditions to Ryan White's statutory purposes, prior policies, affected reliance interests, or the practical consequences for the Program. The A.R. therefore contains no "rational connection between the facts found and the choice made." *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 567 (2025); *see also RICADV v. Kennedy*, 2026 WL 2364298, at *4; *Ass'n of Am. Univs. v. Dep't of Def.*, 792 F.Supp.3d 143, 171 (D. Mass. 2025).

## III. The Challenged Conditions Are Not in Accordance with Law.

Plaintiffs' opening brief established that the Challenged Conditions are contrary to law on three fronts: (i) under the Ryan White Act because the Conditions prohibit core medical services authorized by Congress; (ii) under Section 1554 of the Affordable Care Act because the Conditions impose unreasonable barriers to the provision of health care; and (iii) under Section 1557 of the ACA because the Conditions discriminate based on sex. Dkt. 69 at 23–28, 32–34. Defendants fail to refute any of these arguments. (Plaintiffs address Section 1557 in Section V, *infra*.)

### A. The Challenged Conditions Violate the Ryan White Statute.

Defendants offer cursory and unpersuasive arguments in their attempts to establish that the Conditions comply with the Ryan White statute. *See* Dkt. 70 at 12–13. None of them have merit.

*First*, Defendants contend that Congress has not provided any guidance "with respect to what constitutes 'core medical services,'" Dkt. 70 at 9, arguing that specific forms of gender-affirming care "fall outside the statutory text" and "do not relate to the treatment of HIV/AIDS." *Id.* at 14. As explained in Plaintiffs' Pretrial Brief (at 24-26), that assertion is flatly wrong. The Ryan White statute explicitly defines the term "core medical services." *See*, *e.g.*, 42 U.S.C. § 300ff-14(3)(A)–(M). That definition sets forth thirteen different *categories* of covered care—not a closed list of diagnoses, therapies, medications, or procedures that may qualify as core medical services. *See id.* The relevant question therefore is whether particular care falls within a statutory category—not whether the statute expressly recites specific terms like "gender-affirming care," "puberty blockers," or "cross-sex hormones." *See* Dkt. 70 at 14 (fashioning terms Defendants believe must be listed verbatim in statute).

Congress separately confirmed the breadth of the Ryan White scheme by expressly providing for treatment of "co-occurring conditions." 42 U.S.C. § 300ff-88(2). Nothing in that definition requires the co-occurring condition to be caused by HIV. To the contrary, the statute specifically defines "co-occurring conditions" to mean "health conditions in an individual with HIV/AIDS, … *without regard to whether the conditions arise from HIV*." *Id.* (emphasis added). Defendants therefore cannot manufacture an "HIV-relatedness" limitation that is directly contrary to what Congress enacted. Under ordinary principles of statutory interpretation, the Court must apply the statutory categories Congress chose, not additional restrictions supplied by the agency. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400–01 (2024); *id.* at 413 ("[C]ourts need

not and under the APA may not defer to an agency interpretation of the law").

Gender-affirming care, namely, hormone therapy, plainly falls within the "*core medical services*" category of *outpatient services*. *See* Dkt. 12-10. Defendants do not and cannot contest that *outpatient services* refers to *all* services performed without an overnight stay that treat the health conditions of an individual with HIV—even those not directly arising from HIV. *See* Dkt. 69 at 24–26. That indisputably includes gender-affirming care, which treats a co-occurring condition of transgender individuals living with HIV: gender dysphoria. *See id.* at 25–26. These treatments are also typically delivered without the need for an overnight stay in a facility. *See id.* The Ryan White statute thus authorizes recipients to use funding to provide gender-affirming care to transgender people who need it.

*Second*, Defendants suggest that the provision of gender-affirming care to transgender individuals living with HIV does not further the purposes of the Ryan White Program. *See* Dkt. 70 at 12–13. They are incorrect. The purpose of the Ryan White Program is to provide "*comprehensive* system[s] of medical care, support, and medications for low-income people with HIV." HRSA 0037–HRSA 0038 (emphasis added). Those systems must "improve the quality of life for those infected or affected" by the HIV epidemic by strengthening care retention rates, increasing viral suppression, and bettering overall health outcomes. H. REP. 109-695, at 2 (2006). As Plaintiffs have explained, administering gender-affirming care to transgender individuals living with HIV does improve the quality of life of people affected by HIV in myriad ways, including by fostering retention in care and improving viral suppression. This, in turn, has had precisely the positive impact on public health that Congress intended. *See* Brody Decl. ¶¶ 5, 17; Fox Decl. ¶ 5, 16–18; Collins-Ogle Decl. ¶ 5; Roe Decl. ¶ 7. Defendants' own prior policies, guidance, and reports document this very point. *See*, *e.g.*, Dkt. 12-6 at I-102 (noting that "integrating HIV care with

gender care facilitates treatment and is associated with higher rates of viral suppression"); Dkt. 12-10 at 2; Dkt. 67-11 at 6–9.

*Finally*, Defendants cite *Planned Parenthood of Wisconsin v. Azar*, 316 F. Supp. 3d 291 (D.D.C. 2018), and *Tennessee v. Becerra*, 131 F.4th 350 (6th Cir. 2025), to justify the imposition of grant restrictions. *See* Dkt. 70 at 13. Neither case helps Defendants. In those Title X cases, the agency implemented restrictions rooted in *Congress's* own statutory choices concerning the use of federal funds. Here, Congress enacted no comparable exclusion of gender-affirming care from the Ryan White Program. To the contrary, Congress authorized categories of medical care broad enough to encompass that care. Defendants cannot rely on cases implementing a congressional exclusion to justify a limitation crafted out of whole cloth by a federal agency.

### B. The Challenged Conditions Violate Section 1554 of the Affordable Care Act.

Defendants argue that the Conditions do not violate Section 1554 of the ACA. *See* Dkt. 70 at 13–14. They cite *Rust v. Sullivan*, 500 U.S. 173 (1991), again relying on a case about abortion, to support a supposed distinction between "regulations that impose burdens on health care providers and their clients and those that merely reflect Congress's choice not to subsidize certain activities." *Id.* at 13–14. Defendants' reliance on *Rust* rests on a false premise. Unlike in *Rust*, where the regulations were based on a limitation *set by Congress*, here, Congress did not decide to exclude gender-affirming medical care from the Ryan White Program, and the Conditions do far more than decline to reimburse a particular procedure. They burden healthcare that Congress authorized, *including HIV care*, despite Section 1554 of the ACA, which was enacted decades after *Rust*, which forbids HHS from adopting any rule that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care." 42 U.S.C. § 18114(1).

The Conditions create such barriers not just by prohibiting specific types of care, but by

more broadly erecting "barriers to full disclosure in . . . health care setting[s]" and disrupting "private and plenary consultation[s] between a patient and her health care provider." *Mayor of Baltimore v. Azar*, 973 F.3d 258, 289 (4th Cir. 2020) (*en banc*) (holding HHS regulation prohibiting physicians from referring patients for abortion, even if that was the patient's wish, violated the ACA's noninterference mandate). The Conditions, for example, require the mistreatment of transgender patients by prohibiting providers from recognizing patients' identities. *See, e.g.*, Brody Decl. ¶¶ 26, 33–35; Fox Decl. ¶¶ 39–40; Weddle Decl. ¶ 47. And they obstruct referrals, care coordination, and communications concerning all types of treatment—including drug-drug interactions that are essential to the safe management of HIV. *See* Dkt. 69 at 26–29. In short, the Conditions do more than limit reimbursement. They are the precise types of barriers that Section 1554 was enacted to prevent. *See Planned Parenthood of Md., Inc. v. Azar*, No. CCB-20-00361, 2020 WL 3893241, at *10 (D. Md. July 10, 2020) ("[T]he most natural reading of § 1554 is that Congress intended to ensure that HHS, in implementing the broad authority provided by the ACA, does not improperly impose regulatory burdens on doctors and patients.").

## IV. The Challenged Conditions Exceed Defendants' Statutory Authority and Violate the Separation of Powers.

The Conditions violate both the Appropriations Clause (by imposing extra-statutory conditions inconsistent with the Ryan White Act's mandate) and the Separation of Powers (by effectively amending the Act). *See* Dkt. 69 at 29–32. Defendants acknowledge that the Executive must administer a funding statute "in accordance with its text, purpose, and limitations," Dkt. 70 at 14, and consistent with *Congress's* "policy judgments," *id.* at 16. Yet Defendants attempt to arrogate for themselves the ability to impose substantive restrictions Congress did not enact and effectively rewrite the Ryan White Act, based mainly on the assertion that the Act does not expressly require provision of gender-affirming medical care (*id.* at 14-16).

An agency's general authority to administer a statute does not answer the § 706(2)(C) question: whether the agency acted "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). The Secretary's administrative discretion under 42 U.S.C. § 300ff-65 does not permit HHS and HRSA to rewrite the substance of the program Congress created. Indeed, it is "a wafer-thin reed on which to rest" such power. *Biden v. Nebraska*, 600 U.S. 477, 499 (2023) (citation omitted). Defendants do not seriously argue to the contrary; instead, they puzzlingly contend that the Conditions somehow *vindicate* Congressional intent by narrowly limiting Ryan White funding to medical care directly related to treating HIV. *See* Dkt. 70 at 15 ("HSRA simply enforces the statute's limitations and declines to fund activities and services that Congress never authorized"); *id*. at 16 (ban on gender-affirming medical care "reflects adherence to Congressional intent and statutory boundaries"). Defendants even argue that this case is "similar[]" to *Rust*, which upheld regulations applying a ban on the use of federal funds for abortions *that had been directly ordered by Congress*. But that argument depends on an "HIV-relatedness" restriction that does not appear in the statutory categories Congress created and in fact is *contrary* to the statutory language that Congress enacted expressly authorizing care for co-occurring conditions not related to HIV. *See* Section III.A, *supra*. As noted, Congress crafted the Ryan White Act to provide *comprehensive* health care to persons living with HIV. Dkt. 69 at 14-15, 24-26. And it specified, *inter alia*, categories of care to be provided. *See generally* 42 U.S.C. §§ 300ff–11 to 300ff–140. Gender-affirming care falls within these categories. *See* Section III.A, *supra*; Dkt. 69 at 24.

Defendants simply lack the power to append conditions that materially *narrow* the broad care that Congress mandated. *See Illinois v. Noem*, 813 F.Supp.3d 282, 305 (D.R.I. 2025) (finding that Defendants do not have "unbridled discretion" to reallocate hundreds of millions of dollars in anticipated grant awards from recipients due to their status as "sanctuary jurisdictions"). And

agency actions that effectively curtail, hollow out, or replace congressionally mandated programs based on executive policy directives violate Separation of Powers principles. *See City of Providence v. Barr*, 954 F.3d 23, 30, 34 (1st Cir. 2020) (holding that DOJ imposed unlawful conditions when it attempted to "superimpose its policy views on [the recipients'] law enforcement efforts"). Underlying these conclusions are bedrock principles that define the constitutional relationship between Congress and executive agencies.[1]

A recent decision illuminates these principles. In *National Alliance to End Homelessness v. Turner*, 827 F. Supp. 3d 281, 290 (D.R.I. 2026), the court held that a residual clause permitting consideration of "such other factors as the Secretary determines to be appropriate" cannot be read as "surrendering unbridled discretion" to an agency in grant administration. In *Turner*, Congress had established mandatory selection criteria for Continuum of Care grants under 42 U.S.C. § 11386(a)–(b), and the court found that the Department of Housing and Urban Development's attempt to rely on the residual clause to impose new, conflicting criteria exceeded its statutory authority. 827 F.Supp.3d at 291. The court emphasized that where the existing statutory framework forecloses the adjustments an agency seeks to make, the remedy is to engage Congress for clear legal authorization through amendments to that framework—not to impose new criteria unilaterally as a "slapdash imposition of political whims." *Id*. at 294. As the Ninth Circuit explained in a case involving similar conditions, "funding conditions are . . . without statutory authorization to the extent that they impose obligations that are not already prohibited by law." *Cnty. of King v. Turner*, No. 25-3664, 2026 WL 2489361, at *13 (9th Cir. Aug. 25, 2026).

Here, Plaintiffs do not ask the Court to allocate individual grants or choose among permissible priorities within the scope Congress's general mandate. They ask the Court to enforce

---

[1] Given the lack of "clear congressional authorization," the Conditions thus raise "concerns over the exercise of administrative power." *Biden v. Nebraska*, 600 U.S. 477, 501, 506 (2023).

the statutory boundaries that Congress itself established – in Defendants' own words, to require the agency to act "in accordance with statutory authorization and not in defiance of it" (Dkt. 70 at 16). This is precisely the kind of review contemplated by APA Section 706(C)(2).

Defendants invoke *Dalton v. Specter*, 511 U.S. 462 (1994), to argue that an allegation that Executive Branch officials exceeded statutory authority presents only a statutory claim, not a constitutional one. Dkt. 70 at 17. But *Dalton* does not answer Plaintiffs' § 706(2)(C) claim. The authorities Defendants cite address the limits of *statutory* authority Congress granted to the Executive, not blanket invasions of Congress's *constitutional* powers. *See Dalton*, 511 U.S. at 471 (regarding "President's [exercise of] statutory authority to close and realign bases"), and *Climate United Fund v. Citibank, N.A.*, 154 F.4th 809 (D.C. Cir. 2025) (regarding potential breach of terms of executed grant agreements). At most, *Dalton* limits when an asserted statutory violation may independently be recast as a constitutional claim; it does not insulate agency action from APA review for exceeding statutory authority. Thus, even if Defendants were correct about the characterization of Plaintiffs' standalone separation-of-powers theory, the Court must still decide whether HRSA imposed Conditions Congress did not authorize.[2]

Nor does *Dalton* defeat Plaintiffs' independent structural claim. *Dalton* involved presidential action under a statute that expressly granted the President authority to accept or reject recommendations concerning military-base closures. 511 U.S. at 464–66, 471. Here, by contrast, "no statute entrusts the Executive with discretion to unilaterally" impose new substantive funding conditions; thus *Dalton* "is a grossly inapt comparison." *See Rhode Island v. Trump*, 810 F.Supp.3d

[2] Indeed, an *en banc* panel of the DC Circuit recently held that the EPA's attempt to terminate grants and claw back disbursed funds likely violated the mandatory appropriation provision of the Inflation Reduction Act—which could raise a constitutional, and not merely statutory, issue. *See Climate United Fund v. Citibank, N.A*., 184 F.4th 679, 680 (D.C. Cir. 2026) (granting preliminary injunction). This confirms that the separation of powers doctrine is implicated when the executive acts wholly without statutory authorization.

283, 310 (D.R.I. 2025). In other words, Defendants here do not merely *exceed* a delegation of authority; they act *without* one in usurping Congress's power to engraft conditions on funds authorized for enumerated purposes. *See City of Providence v. Barr*, 954 F.3d 23, 45 (1st Cir. 2020) (holding that agency failed to identify any delegation of spending clause authority to impose conditions on grants). Because Defendants "have pointed to no colorable source of authority for" their actions, they have violated the separation of powers doctrine. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 190 (1999). Thus, the distinction is between an alleged defect in the exercise of delegated authority and the exercise of power Congress never delegated.

## V. Defendants' Fail to Contest the Merits of Plaintiffs' Discrimination Claims.

Defendants fail to even acknowledge – let alone address – Plaintiffs' discrimination claims. As a condition of receiving Ryan White funding, the Conditions require that Plaintiffs not acknowledge or respect the identities of their transgender patients living with HIV as part of *any* care or services provided using Ryan White funds. This includes HIV care, case management, or any primary care, regardless of whether it is for a medical condition related to gender identity. In addition, the Conditions require that Ryan White funding recipients not provide gender-affirming medical care because, *a fortiori*, it involves the acknowledgement and recognition of the identities of their transgender patients living with HIV. This is so notwithstanding that the Ryan White Statute *specifically* provides that such funds "shall" be used to provide "core medical services," which encompasses "outpatient and ambulatory health services" like hormone therapy and includes treatments for "co-occurring conditions" of individuals living with HIV such as gender dysphoria. *See* Dkt. 69 at 24–26; Section III.A, *supra*.[3] As set forth in Plaintiffs' Pretrial Brief, this violates Section 1557 of the ACA, the Fifth Amendment, and the APA. *See* Dkt. 69 at 32–37.[4]

---

[3] 42 U.S.C. §§ 300ff-14(b)(1); *id.* § 300ff-14(c); *id.* § 300ff-22(b)(1); *id.* § 300ff-51(c).

[4] The arguments set forth in Plaintiffs' Pretrial Brief apply with equal force regardless of whether Plaintiffs'

As explained in Plaintiffs' Pretrial Brief, the Conditions *facially* classify based on and turn on sex. Dkt. 69 at 33. Defendants do not contest this obvious fact. The Conditions implement the Gender Order, which defines sex to "not include the concept of gender identity," Gender Order § 2(a); defines the terms "male," "female," "man," and "woman" in ways that exclude transgender men and women, *id.* §§ (b)-(e); and asserts that transgender identities are "false" identities that "[do] not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." *Id.* §§ 2(f)-(g). The Conditions implement and mirror this language. They require compliance with the Gender Order. *See* Dkt. 59-9 at 21; HRSA 0003. They require recipients to use "sex-based definitions" purportedly "grounded in biological reality," consistent with the Gender Order. Dkt.1-1 at 5; *see also* Dkt. 19-3 at 3. And they prohibit "denial by the recipient of the sex binary in humans, or the belief that sex is a chosen or mutable characteristic." *E.g.*, Dkt. 1-2 at 5. The laws at issue in *B.P.J.* similarly drew lines based on a person's birth-assigned sex, and the Supreme Court found that "the laws make a sex-based classification that triggers intermediate scrutiny." *W. Virginia v. B.P.J.*, 146 S. Ct. 2356, 2374 (2026).

Similarly, as set forth in Plaintiffs' Pretrial Brief, the Conditions discriminate based on transgender status, and therefore based on sex. *See* Dkt. 69 at 33–34, 35; *San Francisco A.I.D.S. Found. v. Trump*, 786 F.Supp.3d 1184, 1215 (N.D. Cal. 2025) ("*SFAF*"); *PFLAG, Inc. v. Trump*, 769 F.Supp.3d 405, 446 (D. Md. 2025); *Washington v. Trump*, 768 F.Supp.3d 1239, 1266-67 (W.D. Wash. 2025). And as the Supreme Court has repeatedly reiterated, "discriminating against a person for being … transgender necessarily entails discriminating against that person at least in part because of his biological sex." *B.P.J.*, 146 S. Ct. at 2383 (Gorsuch, J., concurring); *see also*

---

discrimination claims are considered under the APA rubric (*see* Count II – Not in Accordance with Law (Dkt. 1, Compl. at ¶¶ 218–19, 231–32) and Count IV – Contrary to Constitutional Right (*id.* at ¶¶ 239–41)) or as standalone claims (*see* Count V – Section 1557 (*id.* at ¶¶ 247–61) and Count VI – Equal Protection (*id.* at ¶¶ 262–83)).

*Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020).

Here, the Conditions seek to *wholly* exclude transgender people from the Ryan White Program by requiring that Ryan White-funded providers not acknowledge or respect their identities, because doing so would promote so-called "gender ideology." *Cf. B.P.J.*, 146 S. Ct. at 2378 ("[I]f a school had a co-ed sports team but prohibited all transgender individuals from participating on the team, that would be a distinct transgender classification[.]"). Indeed, they implement the Gender Order, the "stated purpose" of which "is to deny the existence of transgender persons entirely." *SFAF*, 786 F.Supp.3d at 1216; *see also id.* at 1227 ("[T]he Gender Order stands in opposition to the principle that persons can identify as other than strictly male or female, or that persons may have a gender identity different from their biological sex as classified at birth."); *Endocrine Soc'y v. Fed. Trade Comm'n*, 832 F.Supp.3d 1, 5 (D.D.C. 2026) (noting that Gender Order seeks "to put a stop to any acknowledgment of gender dysphoria or that some individuals are transgender"); *PFLAG*, 769 F.Supp.3d at 443 ("The Gender Identity Order, appears, however, to deny the existence of transgender persons altogether."); *Washington*, 768 F.Supp.3d at 1277 ("[T]he Order aims to erase [transgender people], precluding them from accessing care for gender dysphoria from federally funded providers and eviscerating from the federal vocabulary any recognition of gender identity.").

For example, if during a medical appointment, a Ryan White-funded provider uses a transgender patient's chosen name or pronouns, discusses drug-to-drug interactions between their antiretroviral therapy and gender-affirming hormone therapy (even if the latter is not provided through Ryan White funds), or coordinates access to affirming counseling, this "might constitute 'promoting gender ideology'" and violate the Conditions, notwithstanding that such "course of action would be permissible" under the Ryan White Statute. *Cnty. of King*, 2026 WL 2489361, at

*11; *see also SFAF*, 786 F.Supp.3d at 1219 (in challenge to Gender Order, noting that "an organization receiving federal funds to provide public health services—as many of Plaintiffs do—would not be able to refer to the clients they serve under that project by any pronoun that would 'promote gender ideology'").

That the Conditions discriminate based on sex and transgender status is sufficient to demonstrate a violation of Section 1557. Defendants' motives are irrelevant in the context of a statutory discrimination claim. As the Supreme Court has explained, "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect." *Int'l Union, United Auto. Aerospace & Agric. Implement Workers of AM. v. Johnson Controls*, 499 U.S. 187, 199 (1991); *see also Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 301 (2023) (Gorsuch, J., concurring) (noting that Title VI "does not scrutinize a recipient's reasons or motives for discriminating"). And even if Defendants could come up with a purported nondiscriminatory reason for their exclusion of transgender people from the Ryan White Program – difficult here, given the context and history of the Conditions and Gender Order, the thinness of the A.R., and the Administration's myriad animus-laden public statements and policies against transgender people – the presence of a nondiscriminatory reason for the Conditions would not justify the facial discrimination. *See Johnson Controls*, 499 U.S. at 199; *see also B.P.J.*, 146 S. Ct. at 2383, 2384 (Gorsuch, J., concurring) (applying *Bostock* and explaining that the phrases "because of" and "on the basis of" in Title VII and Title IX, respectively, "do[] not require biological sex to be the sole cause of discrimination" but rather "merely require[] biological sex to be *one* such cause").

As to Plaintiffs' equal protection claims, Defendants' Pretrial brief does not contest that the Conditions are subject to heightened scrutiny because they facially classify based on sex and

discriminate based on transgender status. What is more, Defendants fail to provide any justification for the Conditions that would satisfy any level of judicial review, let alone the heightened scrutiny that is applicable here. Indeed, the A.R. is devoid of any justification for the Conditions other than that they implement the Gender Order. But new administrative priorities are not a legitimate justification. "Equal Protection scrutiny does not fluctuate depending on what political party is in administration." *Shilling v. United States*, 773 F.Supp.3d 1069, 1098 (W.D. Wash. 2025) (finding that military ban "fails any level of Equal Protection scrutiny"), *appeal pending*, No. 25-2039 (9th Cir.). Defendants' failure to provide justifications for the Conditions is outcome determinative. In the context of heightened scrutiny, any "justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996). And in the context of the APA, "courts assess agency action based on the official explanations of the agency decisionmakers, and not based on after-the-fact explanations advanced *by agency lawyers during litigation* (or by judges)." *Dep't of Homeland Sec.*, 591 U.S. at 67.[5]

Neither *United States v. Skrmetti*, 605 U.S. 495 (2025), nor *B.P.J.* alter or foreclose the analysis above.[6] First, unlike the Conditions at issue here, the laws at issue in *B.P.J.* and *Skrmetti* "d[id] not classify based on gender identity or transgender status." *B.P.J.*, 146 S. Ct. at 2378; *see also Skrmetti*, 605 U.S. at 517. Second, in *B.P.J.*, the laws classified based on sex and the Court applied intermediate scrutiny, while in *Skrmetti*, the laws at issue classified "on the basis of age" and "medical use." 605 U.S. at 511. Here, by contrast, as explained, *supra* (*see also* Dkt. 69 at 33–

[5] In this sense, even if the court were to apply rational basis review to Plaintiffs' equal protection claim (although as explained, a higher level of review is warranted), in assessing Plaintiffs' contrary to constitutional right claim under the APA (Claim IV), Defendants are limited to the justifications provided within the A.R. and cannot rely on speculation to justify the Conditions.

[6] Plaintiffs are mindful of the Court's statement in a different case regarding the impact of *Skrmetti* and that "not all discrimination is pejorative." *Am. Pub. Health Ass'n v. Nat'l Institutes of Health*, 791 F.Supp.3d 119, 128 n.5 (D. Mass. 2025). Plaintiffs respectfully disagree and submit that for the reasons explained herein, the discrimination based on transgender status at issue here is indeed illicit and pejorative.

35), the Conditions explicitly classify based on sex and discriminate based on transgender status (and therefore sex), such that they must satisfy heightened scrutiny.

In *Skrmetti*, the Supreme Court was careful to emphasize that the law at issue regulated treatments and conditions and that the references to sex contained within the law were *incidental* to describing the treatments and conditions at issue. 605 U.S. at 511. The Court, however, expressly distinguished the law at issue in that case from laws that "regulates a class of *persons* identified on the basis of a specified characteristic." *Id.* at 519 n.3 (emphasis in original). The Conditions at issue here do the latter. They constitute a much broader attack on transgender people by denying transgender people's existence and prohibiting Ryan White Program participants from providing affirming and respectful healthcare to transgender people.[7]

Furthermore, classifications based on transgender status independently warrant heightened scrutiny. *See* Dkt. 69 at 35 n.62 (citing cases). In *B.P.J.* and *Skrmetti*, the Court merely observed that the Court had not previously addressed the question and did not need to because the laws in those cases did not classify based on transgender status. *See B.P.J.*, 146 S. Ct. at 2379; *Skrmetti*, 605 U.S. at 517.[8] While this Court need not reach this question for Plaintiffs to prevail, Plaintiffs submit that should the Court deem it necessary to do so, the proper course is to find that the Conditions warrant heightened scrutiny because they discriminate based on transgender status.

Even if the Conditions did not classify based on sex or transgender status, they would still violate the Fifth Amendment's Equal Protection Component. Under First Circuit precedent, the

[7] Only one NOFO, the ADAP NOFO from November 2025, mentions medical procedures at all. *See* Dkt. 19-4 at 41. But as the A.R. makes clear, such condition was added not by the subject matter experts at HRSA's HIV/AIDS Bureau, but rather by political appointees to implement the Administration's priorities. *See* HRSA 0031–0032. Moreover, and notably, *Skrmetti* dealt with specific concerns relating to the provision of care *for minors*. Such concerns are wholly inapposite here, as the Conditions affect care for *adults* living with HIV.

[8] While three justices have expressed skepticism on this question, *see APHA*, 791 F.Supp.3d at 128 n.5, three other justices have expressed the opposite opinion, *see Skrmetti*, 605 U.S. at 599–603 (Sotomayor, J., dissenting, with Kagan and Jackson, JJ.), and the three other members of the Court have expressed no opinion on the matter.

Court must apply a more searching review than ordinary rational basis scrutiny for policies targeting groups that have "long been the subject of discrimination." *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d 1, 11 (1st Cir. 2012). Transgender people have faced such a "long history of discrimination that continues to this day." *F.V. v. Barron*, 286 F.Supp.3d 1131, 1145 (D. Idaho 2018) (subsequent history omitted). And a person's transgender status may expose them "to a substantial risk of stigma, discrimination, intimidation, violence, and danger." *Arroyo González v. Rosselló Nevares*, 305 F.Supp.3d 327, 333 (D.P.R. 2018).

Finally, under Supreme Court precedent, government actions that are "motivated by an invidious discriminatory purpose" are subject to heightened review. *Skrmetti*, 605 U.S. at 516. The refusal to recognize a class as "suspect" or "quasi-suspect" "does not leave them entirely unprotected from invidious discrimination." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985). Indeed, "a bare . . . desire to harm a politically unpopular group [is] not [a] legitimate state interest[]." *Id.* at 446–47. As the First Circuit has observed, "the Supreme Court has now several times struck down state or local enactments without invoking any suspect classification." *Massachusetts*, 682 F.3d at 10 (citing *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973); *City of Cleburne*, 473 U.S. 432; *Romer v. Evans*, 517 U.S. 620 (1996)). In each of these cases, as with transgender people in this case, "the protesting group was historically disadvantaged or unpopular, and the statutory justification seemed thin, unsupported or impermissible." *Id.*

Plaintiffs have presented ample evidence of invidious discrimination, both based on what is contained within the A.R. (*see* Trial Exhs. 1–11, 28–34), and through additional governmental statements, policies, and reports issued by this Administration (*see* Trial Exhs. 77–86, 88–91). This case is thus unlike *Skrmetti*, where invidious discrimination was not alleged. 605 U.S. at 517. It is appropriate for the Court to consider all this evidence of animus, as to both Plaintiffs' APA

claim and their standalone equal protection claim. *See* Dkt. 72 at 6–7 (citing, *inter alia*, *Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of Health & Hum. Servs.*, 557 F.Supp.3d 224, 245 (D. Mass. 2021); *Afr. Communities Together v. Mullin*, No. 26-CV-11201, 2026 WL 2364398, at *8–9 (D. Mass. Aug. 14, 2026)). This is particularly so because this Administration operates as a "unitary" executive. *See Am. Ass'n of Univ. Professors v. Rubio*, 802 F.Supp.3d 120, 194–95 (D. Mass. 2025).

## VI. The Conditions Impose an Unconstitutional Viewpoint-Based Funding Condition.

Defendants' Pretrial Brief does not specifically challenge, or even address, Plaintiffs' First Amendment speech claim. To the extent, however, that any of Defendants' misguided arguments concerning "agency discretion" are intended also to justify the government's unconstitutional viewpoint-based funding condition, they would fail.

Even in selective subsidy programs, the Government may not leverage discretionary funding criteria into a penalty on disfavored viewpoints or aim at the suppression of dangerous ideas. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998); *see also Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013) ("*AID*"); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995) ("[I]deologically driven attempts to suppress a particular point of view are presumptively unconstitutional in funding, as in other contexts."); *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 380–81, 398–99 (1984); *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004) ("The essence of a viewpoint discrimination claim is that the government has preferred the message of one speaker over another."); *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 82, 95 (1st Cir. 2004) ("The bedrock principle of viewpoint neutrality demands that the state not suppress speech where the real rationale for the restriction is disagreement with the underlying ideology or perspective that the speech expresses."); *Advocs. for Arts v. Thomson*, 532 F.2d 792, 798 (1st Cir. 1976). "Where private speech is involved, even

Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548 548–49 (2001). Nor may the Government "leverage funding to regulate speech outside the contours of the program itself." *AID*, 570 U.S. at 214–15; *see also Thakur v. Trump*, 176 F.4th 1187, 1199-1204 (9th Cir.2026) (per curiam).

In short, the Government may not convert a discretionary funding program into a one-way penalty on a single disfavored viewpoint—here, speech that affirms transgender identities—and then attempt to immunize that penalty from First Amendment scrutiny by relabeling it "agency discretion." The Conditions do not operate as discretionary guidance, but rather as a one-way ratchet: an applicant who would provide Ryan White services in a manner that affirms and respects transgender identities is always disqualified from receiving funding, while another applicant who would embrace the Government's viewpoint is not. That asymmetry is not an accident of drafting; it is a purposeful, textbook structure of viewpoint discrimination: a one-way, negative weighting of a single contested viewpoint. And because the Ryan White Program, which pertains to HIV care, has "no programmatic message" that allows the government to regulate speech concerning gender as "deemed necessary" for the program's "legitimate objectives," *Velazquez*, 531 U.S. at 548,[9] the asymmetry only confirms the constitutional defect. Indeed, this is the precise subsidy-as-penalty scenario the Supreme Court reserved in *Finley*. *See* Dkt. 69 at 37-39.

**CONCLUSION**

The Court should enter judgment for Plaintiffs on each of their claims.

[9] This point is fatal to Defendants' attempts to invoke *Rust*, 500 U.S. 173, to justify the barrier imposed by the Conditions. Dkt. 70 at 13, 16. Unlike the Ryan White statute, the relevant statute in *Rust*, 42 U.S.C. § 300a-6, *explicitly* states that "[n]one of the funds appropriated … shall be used in programs where abortion is a method of family planning." Congress's programmatic message for Title X funding of family planning couldn't have been more evident in *Rust*–and Congress's approach in the Ryan White Program could not be more diametrically opposed. *Rust* is instructive only because it highlights the vast difference between the two Congressional approaches.

Dated this 15th day of September 2026.

Respectfully submitted,

/s/ Omar Gonzalez-Pagan

Omar Gonzalez-Pagan (BBO No. 678517)
José I. Abrigo*
Jessica Polansky (BBO No. 663750)
Charlie Ferguson*
**Lambda Legal Defense**
**and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: 212-809-8585
Facsimile: 855-535-2236
ogonzalez-pagan@lambdalegal.org
jabrigo@lambdalegal.org
jpolansky@lambdalegal.org
cferguson@lambdalegal.org

Kenneth D. Upton, Jr.*
**Lambda Legal Defense**
**and Education Fund, Inc.**
3656 North Halsted Street
Chicago, Illinois 60613
Telephone: 312-663-4413
Facsimile: 855-535-2236
kupton@lambdalegal.org

Pelecanos*
**Lambda Legal Defense**
**and Education Fund, Inc.**
800 South Figueroa Street, Suite 1260†
Los Angeles, California 90017
Telephone: 213-382-7600
Facsimile: 855-535-2236
pelecanos@lambdalegal.org

† Mailing address only

Jeffrey S. Trachtman*
Jason M. Moff*
Stephen P. Ferguson*
Hannah Kanter*
**Herbert Smith Freehills Kramer (US) LLP**
1177 Avenue of the Americas
New York, New York 10036
Telephone: 212-715-9100
Jeffrey.Trachtman@hsfkramer.com
Jason.Moff@hsfkramer.com
Stephen.Ferguson@hsfkramer.com
Hannah.Kanter@hsfkramer.com

Ryan P. Trumbauer*
**Herbert Smith Freehills Kramer (US) LLP**
2000 K Street NW, 4th Floor
Washington, DC 20006
Telephone: 202-775-4500
Ryan.Trumbauer@hsfkramer.com

* Admitted *pro hac vice*.

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that, on September 15, 2026, I filed the foregoing document electronically with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to the registered participants as identified in the Notice of Electronic Filing (NEF), including the following counsel:

Peter R. ("P.R.") Goldstone
Trial Attorney, Federal Programs Branch, Civil Division
Department of Justice
1100 L Street NW, 11th Floor
Washington, DC 20530
Peter.R.Goldstone@usdoj.gov

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan (BBO No. 678517)
**Lambda Legal Defense**
**and Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, New York 10005
Telephone: 212-809-8585
Facsimile: 855-535-2236
ogonzalez-pagan@lambdalegal.org