March 11, 2026

# FY 2026 HRSA General Terms and Conditions

**These terms and conditions apply to all discretionary awards with funds and award modifications with funds made on or after March 11, 2026.**

Compliance with Court Orders: Any term or condition in this Notice of Award (NOA), including those incorporated by reference, that HHS is enjoined by court order from imposing or enforcing shall not apply or be enforced as to any recipient or subrecipient to which that court order applies and while that court order is in effect.

## 1. Administrative Requirements

You must comply with the laws, policies, and terms and conditions included in your Notice of Award (NOA).

This includes:

- Requirements of the authorizing statutes and implementing regulations for the programs under which your award is funded.
- Appropriations acts provisions.
- Terms and conditions included in the HHS Grants Policy Statement (HHS GPS), which HHS revised with an effective date of October 01, 2025.This includes the requirements of applicable HHS regulations and the Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards codified at 2 CFR 200 and any successor regulations, policies and requirements.
    - The HHS GPS applies to monetary actions only, including non-competing continuation awards and award modifications that add funding made on or after October 01, 2025. This includes supplements to awards, competing and non-competing continuations. The GPS applies to all HRSA discretionary awards and the requirements flow down to subrecipients.
    - Until a monetary action is processed, the July 24, 2025 GPS applies to your award.
- The HHS Administrative and National Policy Requirements (Appendix D, revised to ensure consistency with all administration policies.
- Requirements included in the Notice of Funding Opportunity (NOFO); and
- Policies specific to the award.

**Applicable Regulatory Provisions**. This award is subject to any applicable provisions of 2 CFR 200 and 2 CFR 300.

In case of conflicting or inconsistent requirements, follow the order of precedence indicated in the HHS Administrative and National Policy Requirements. This document provides statutory, regulatory, and executive requirements that apply to HHS awards.

We may list exceptions to individual requirements stated above in the NOA.

Use of the terms “federal award,” “award,” and “grant” refers collectively and separately to federal assistance awards, grants, and cooperative agreements, unless otherwise indicated.

Per 2 CFR 25, SAM.gov and Unique Entity Identifier (UEI) registration are required throughout the lifecycle of all HRSA awards.

**a. Termination**

This award is subject to the termination provisions at 2 CFR 200.340. Pursuant to 2 CFR 200.340, the recipient agrees by accepting this award that continued funding for the award is contingent upon the availability of appropriated funds, recipient satisfactory performance, compliance with the Terms and Conditions of the award, and to the extent authorized by law, a decision by the agency that the award continues to effectuate program goals or agency priorities.

**b. Appeals**

HRSA affords appeal rights for remedies for non-compliance, including terminations for compliance reasons. See 2 CFR 200.342 for opportunities to object, hearings, and appeals.

**c. Subrecipients and Recipients (Pass-Through Entities) Responsibilities**

The recipient is the entity that receives a federal award directly from HRSA.

The recipient can give a portion of the direct award to other organizations, called subrecipients, to accomplish the goals and objectives of the award.

In this case, the recipient becomes a pass-through entity and the subrecipient's award is called a subaward.

As a recipient, you must ensure the applicable general terms and conditions stated in this document flow down to subrecipients. See the HHS Administrative and National Policy Requirements.

**d. Prior Approval**

You must get prior approval for certain items, as stated in 2 CFR 200.308 and 2 CFR 200.407. Examples of items requiring prior approval include:

- Significant rebudgeting of project costs. Significant budget changes require prior approval when:
  - The award exceeds the simplified acquisition threshold (currently $350,000), and
  - The cumulative amount of the transfer exceeds 25 percent of the total budget, including cost share, of the most recent approved award (budget period).
    - Due to programmatic need, HRSA is using the 25 percent threshold for prior approval, instead of the 10 percent threshold cited in the HHS GPS Section 3.1.2.2 (Significant Budget Changes)
- Change of scope. A change in scope can occur when a recipient makes a budget change that cause a project to change substantially.
  - If you are not sure your budget change is beyond the scope, contact your Grants Management Specialist (GMS).
- Rebudgeting funding into a direct cost category not previously requested.

We do not automatically authorize prior approvals under 2 CFR 200.308(g) or 2 CFR 200.308(h):

- We do not waive cost-related or administrative prior approvals unless specifically stated in your NOA. You must submit these as a Prior Approval action via HRSA Electronic Handbooks (EHBs) or GrantSolutions (when HRSA transitions to GrantSolutions).
- Only responses to prior approval requests signed by the Grants Management Officer (GMO) are valid.

If you act based on responses from other officials, you do so at your own risk. We do not consider these responses binding.

#### f. Funding Restrictions

See your NOA and the HHS Administrative and National Policy Requirements for funding restrictions such as:

- Salary Cap (also see Salary Rate Limitation)
- Gun control
- Anti-lobbying
- Restrictions on abortion
- Ban on funding embryo research
- Limitation on use of funds for promotion of legalization of controlled substances
- Restriction of pornography on computer networks
- Restriction on the purchase of sterile needles
- Prohibition on certain telecommunications and video surveillance services or equipment.

#### g. Roles and Responsibilities.

To see the roles and responsibilities of the GMS and the Program Official (PO) for your award, visit Manage Your Grant - Administrative Management.

#### i. Antidiscrimination Laws and Requirements Compliance Certification

By applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal funding streams. Recipients are responsible for ensuring subrecipients, contractors, and partners also comply.

### 2. Policy Requirements

The HHS Administrative and National Policy Requirements provide a list of requirements applicable to HHS awards.

#### a. Conflict of Interest

See the HRSA Federal Financial Assistance Conflict of Interest Policy (COI Policy)

### 3. Financial Requirements

#### a. Salary rate limitation (SRL)

See the Salary Cap Summary Table for the latest salary rate limitation.

The HHS salary rate limitation applies to both direct and indirect costs for all applicable HHS awards.

#### b. Payments

Grant funds must be drawn and Federal Financial Reports (FFR) filed using the HHS Payment Management System (PMS).

The Division of Payment Management, Financial Management Services, Program Support Center, manages PMS and has instructions for obtaining payments.

Submit direct inquiries about payments:
ONE-DHHS Help Desk for PMS Support at 1-877-614-5533 or PMSSupport@psc.hhs.gov.

If you do not have access, complete a PMS Access Form (PMS/FFR Form). If you have any questions about accessing PMS, contact the PMS Liaison Accountant.

**c. Program income**

Per 2 CFR 200.307, HRSA awards use the additive method for program income earned from your award.

Program income requirements for for-profit recipients are governed by 2 CFR 300.318.

## 4. Reporting Requirements

Review your NOA, HHS Administrative and National Policy Requirements, and HRSA Manage Your Grant for required reports and method of submission.

**a. General Reports may include:**

- Federal Financial Reports (FFR)
- Noncompeting Continuation (NCC) Progress Reports
- Tangible Personal Property Report (SF-428) for Equipment and Supplies
- Real Property Report (SF-429)
- Subaward Reporting under the Federal Funding Accountability and Transparency Act (FFATA) reporting at SAM.gov.
- Recipient integrity and performance

**b. Audit Reports**

- If your organization is a nonprofit organization and is required to have audits in accordance with 2 CFR 200, Subpart F (See 2 CFR 200.501) because it spends $1,000,000 or more in federal funds in one fiscal year, submit the audit reports to the Federal Audit Clearinghouse.
- For-profit organizations required to have audits should submit the audit reports directly to HRSA.

**c. Reporting Fraud, Waste, Abuse, and Mismanagement**

- The HHS Office of the Inspector General (OIG) maintains a toll-free number (1-800- HHS-TIPS [1-800-447-8477]; TTY: 1-800-377-4950) and website for receiving information concerning fraud, waste, abuse, and mismanagement under HHS programs.

  Additionally, information may be submitted by mail to:

  Office of the Inspector General
  Department of Health and Human Services
  Attn: HOTLINE
  330 Independence Ave., SW
  Washington DC 20201

- Such reports are treated as sensitive material. You can decline to give your name if you choose to remain anonymous.

## 5. Alignment with HRSA funding priorities

### a. General Alignment with HRSA Mission and Strategic Priorities

As a condition of this award, you must ensure that all activities funded under this award are implemented in a manner consistent with HRSA's mission and strategic priorities as authorized by law.

Funded activities must advance HRSA's mission of protecting and improving the health and well-being of Americans. The particular focus is on those who are underserved, medically vulnerable, or live in areas with limited access to care. HRSA's duty is to serve wisely, effectively, and with measurable results that justify every taxpayer dollar invested.

Consistent with HRSA's priorities, in carrying out any funded project, the recipient must adhere to the following principles, where they are consistent with the authority and scope of the award and its activities:

- **Gold Standard Science:** Design and deliver services using gold standard evidence-based and evidence-informed approaches, establish measurable performance goals, and use data to monitor outcomes and drive continuous improvement.
- **Program Integrity and Fiscal Stewardship:** Administer all funds in accordance with applicable federal statutes, regulations, and award conditions. You must maintain strong internal controls to prevent waste, fraud, abuse, and mismanagement of taxpayer dollars.
- **Partnership and Local Leadership:** Coordinate with state, tribal, territorial, local, and community partners to ensure services are tailored to community-identified needs while respecting local decision-making authority.

### b. Alignment with Administration Objectives

Recipients must manage any awarded project in accordance with the following objectives in programs authorized to advance them:

**Make America Healthy Again (MAHA):** HRSA prioritizes the health and well-being of all Americans by supporting common-sense, evidence-based health policies that promote:

- Personal responsibility.
- Strong families and communities.
- Proper nutrition.
- The prevention and management of chronic disease, while ensuring access to high-quality, affordable physical and mental health care.

**Child protections, biological integrity, parental rights, and lawful use of funds:** HRSA prioritizes safeguarding children's health and safety by:

- Not supporting medical interventions for gender dysphoria in minors that lack a strong evidence base.
- Applying sex-based definitions grounded in biological reality.
- Supporting parental authority, transparency, and choice in education, including school-based health centers that respect parental rights and religious upbringing.
- Ensuring taxpayer funds are not used to promote or support elective abortions, consistent with federal law and the Hyde Amendment.

**Advancing evidence-based, merit-driven, and ethically grounded health care**: HRSA will prioritize unbiased, transparent science; merit-based workforce opportunities; and programs that demonstrate measurable outcomes, while deprioritizing organizations with:

- Conflicts of interest.
- Ineffective “harm reduction” models.
- Housing-first approaches lacking accountability.
- Activities that facilitate illegal drug use or unsafe medical practices.

**Promoting public safety, lawful use of federal funds, and national health priorities:** To the extent permitted by law, HRSA will align funding with administration priorities by:

- Supporting ending the HIV epidemic through authorized, evidence-based care.
- Reserving benefits for eligible individuals.
- Discouraging illegal immigration and unsafe community practices.
- Prioritizing recipients that enforce public safety, address serious mental illness and substance use through treatment and recovery, and reduce homelessness responsibly.

**c. Enforcement Standards**

To the extent permitted by law, HRSA gives priority to states and municipalities for programs to:

- Enforce prohibitions on open illicit drug use.
- Enforce prohibitions on urban camping and loitering.
- Enforce prohibitions on urban squatting.
- Enforce, and where necessary, adopt, standards that address individuals who are a danger to themselves or others and suffer from serious mental illness or substance use disorder, or who are living on the streets and cannot care for themselves. The approach must be through assisted outpatient treatment or by moving them into treatment centers or other appropriate facilities through civil commitment or other available means, to the maximum extent permitted by law.

**d. Compliance, Monitoring, and Termination**

HRSA will implement these priorities consistent with applicable laws, regulations, court orders, and any required procedures.

- **Ongoing Compliance:** You must demonstrate continuous alignment with these priorities through program design, implementation, reporting, and evaluation throughout the period of performance.
- **Corrective Action:** Failure to meaningfully align funded activities with these requirements may result in the imposition of specific award conditions, additional reporting requirements, or corrective action plans.
- **Termination:** In accordance with 2 CFR § 200.340(a)(4), HRSA may terminate this award in whole or in part, to the extent permitted by law, if it determines that the award no longer effectuates the program goals or agency priorities outlined in these terms.

An official website of the United States government Here's how you know

Health Resources & Services Administration

Call, Text, or Chat the Maternal Mental Health Hotline

MENU

Home » About HRSA » Advancing HRSA's Mission Through Focused, Accountable Action

# Advancing HRSA's Mission Through Focused, Accountable Action

As stewards of federal resources, the Health Resources and Services Administration (HRSA) remains firmly committed to protecting and improving the health and well-being of Americans, particularly those who are medically vulnerable, or live in areas where access to care is limited. Our duty is not just to serve, but to serve wisely, effectively, and with measurable results that justify every taxpayer dollar invested.

In alignment with the current administration's focus on outcomes-driven governance and responsible spending, HRSA is emphasizing targeted investments that strengthen the nation's core healthcare infrastructure, address pressing health challenges, and deliver real results for communities across the country.

HRSA is committed to prioritizing gold-standard science and the mission outlined in the *Make America Healthy Again Commission Report* to deliver better health outcomes. Through its critical public health and workforce programs, HRSA intends to address the nation's most pressing health challenges, including the chronic disease epidemic, the mental health crisis, obesity, nutritional deficiencies, exposure to chemical and environmental toxins, and overreliance on medical interventions.

HRSA is committed to supporting programs and initiatives that will focus on the underlying causes of disease, including lifestyle modifications and other modalities that are shown to be effective in improving health outcomes. HRSA will preference programs, partnerships, grants, cooperative agreements, contracts, and other funding mechanisms that prioritize these objectives.

By narrowing our focus to high-impact, data-supported interventions, HRSA is reinforcing the programs that work, cutting inefficiencies, and directing resources to areas of greatest need. From rural towns to tribal nations, and from health centers to home visiting programs, our goal is clear: improve health outcomes while honoring the trust placed in us by the American people.

Our strategy is rooted in time-tested principles: responsible governance, fiscal restraint, local empowerment, and accountability. Through stronger oversight, partnerships with community-based providers, and support for innovation in care delivery, HRSA is advancing its mission while ensuring that federal dollars are not wasted, misdirected, or overextended.

We understand that taxpayer dollars are not unlimited. Every investment must be justified by results. By focusing on measurable outcomes, emphasizing efficiency, and ensuring transparency at every level of operations, HRSA is fulfilling its charge not only to improve healthcare access, but to do so in a way that reflects respect for American taxpayers and the limits of federal responsibility.

This commitment to focused, accountable action drives every policy we craft, every program we fund, and every r
we implement. We are proud to serve the American people and equally proud to do so with discipline, integrity, a

impact.

**Thomas J. Engels**
Administrator, HRSA

## About the Health Resources and Services Administration

HRSA, an agency of the U.S. Department of Health and Human Services, plays a vital role in improving access to care for Americans who are uninsured, isolated, or medically underserved. With a focus on strengthening local healthcare capacity, HRSA funds community health centers, supports health workforce development, invests in maternal and child health programs, sustains HIV/AIDS care, and promotes rural and telehealth services.

HRSA's goal is to support and empower existing healthcare systems, helping communities serve their own people with long-term, cost-effective solutions. Our programs are designed not to expand bureaucracy but to reinforce self-sufficiency, resilience, and responsible stewardship of public health resources. To learn more, visit www.hrsa.gov.

## HRSA's Strategic Priority Areas

This document has been prepared in furtherance of the HRSA Administrator's responsibility to provide the overall direction of HRSA, to establish and implement general policies respecting the management and operation of programs and activities, and to coordinate and oversee the operation of the agency's bureaus and offices. Several HRSA's authorities permit HRSA to exercise a certain level of discretion and judgment in making federal financial assistance awards. This document is intended to clarify HRSA's Strategic Priority Areas in areas subject to HRSA's discretion.

HRSA is prioritizing the following areas:

- We believe the health and safety of children must be the highest priority. HHS released a comprehensive review (PDF) of the evidence and best practices for promoting the health of children and adolescents with gender dysphoria. This review, informed by an evidence-based medicine approach, found medical interventions, such as puberty blockers, cross-sex hormones, and surgeries, that attempt to transition minors away from their sex are supported by extremely weak evidence base and have an unfavorable risk/benefit profile. It is a HRSA priority to protect children from these practices, and, to the extent allowable by law. HRSA programs will deprioritize programs that engage in these practices. HRSA funds will also not support the costs of such practices where not required by law or relevant court order. On March 6, 2025, a letter was issued (PDF - 285 KB) outlining that HRSA may begin taking steps to update its policies in order to strengthen protections for children against harmful chemical and surgical interventions.
- HHS released guidance (PDF - 232 KB) promulgating sex-based definitions rooted in biological truth. It is a HRSA priority to recognize that a person's sex as either male or female is unchangeable and determined by objective biology, and to ensure its programs accurately reflect science, including the biological reality of sex.
- Where permitted by law, HRSA will deprioritize unlawful diversity, equity, and inclusion initiatives, which prioritize group identity over individual merit. We believe opportunities should be based on character, effort, and ability, not race or other group identity. HRSA is committed to restoring merit-based opportunities and removing unlawful discriminatory practices (including unlawful proxies for racial discrimination), including in HRSA's health care workforce programs.

HRSA believes parents are the primary decision-makers in their children's education and should have full authority over what their children are taught. School policies should include transparency and choice, and curricula should emphasize knowledge, critical thinking, and civic responsibility, without imposing ideas that may conflict with parents' political,

religious, or social beliefs. To the extent allowable by law, HRSA will also prioritize School Based Health Centers that respect parental rights and authority to direct the religious upbringing of their children.

Make America Healthy Again is a call to prioritize the well-being of all Americans through common-sense health policies, personal responsibility, and strong community support. HRSA believes in empowering individuals and families to take charge of their physical and mental health, with a focus on proper nutrition and the prevention and management of chronic diseases, while ensuring access to high-quality, affordable care.

The public must know that unbiased science—evaluated through a transparent process and insulated from conflicts of interest—guides the recommendations of our health agencies, and HRSA-funded programs and activities carried out by HRSA's partners. HRSA will deprioritize organizations which present conflicts of interest or otherwise compromise their objectivity or integrity in carrying out HRSA-funded programs.

HRSA supports the President's Ending the HIV Epidemic in the US initiative and will not provide funding under the Ryan-White HIV/AIDS Program (RWHAP) for purposes unrelated to the statute, including for medications that are used without proper authorization or outside of approved medical guidelines. Public resources should support safe, evidence-based care, ensuring that treatments are used appropriately and responsibly to protect patient health and public trust. In a letter dated April 7, 2025, the Trump Administration reaffirmed its commitment to 'Make America Healthy Again (PDF - 322 KB),' calling on RWHAP recipients and subrecipients to align with this vision while emphasizing training, technical assistance, and culturally competent care to strengthen antiretroviral adherence and viral suppression in the fight to end HIV.

Federal law prohibits the use of HHS funds for elective abortions. Accordingly, HRSA programs will not use taxpayer funds to promote elective abortions. Taxpayer dollars should be used to protect life and support alternatives to abortion that honor the dignity of every mother and unborn child. Our commitment is to uphold the values of life and, consistent with the Hyde Amendment, ensure public funds are not used for elective abortions.

It is a priority of HRSA to ensure that federal public benefits are reserved for American citizens and qualified aliens, in compliance with the Personal Responsibility and Work Opportunity Reconciliation Act and other federal laws. Consistent with applicable law, Federal funds should not be used to encourage or support illegal immigration. HRSA will prioritize programs that further the administration's priority to end illegal immigration.

HRSA grants will prioritize evidence-based programs and not fund programs that fail to achieve adequate outcomes, including so-called "harm reduction" or "safe consumption" efforts that only facilitate illegal drug use and its attendant harm. HRSA funds will not be used to support poorly defined so-called "harm reduction" activities, consistent with guidance on July 29, 2025 published by the Substance Abuse and Mental Health Services Administration (SAMHSA) (PDF - 272 KB).

It is a priority of HRSA to end support for "housing first" policies that deprioritize accountability and fail to promote treatment, recovery, and self-sufficiency. Where applicable, HRSA will increase competition among grantees through broadening the applicant pool and hold grantees to higher standards of effectiveness in reducing homelessness and increasing public safety. HRSA will ensure that Federal funds for Federally Qualified Health Centers reduce rather than promote homelessness by supporting, to the maximum extent permitted by law, comprehensive services for individuals with serious mental illness and substance use disorder, including crisis intervention services.

It is a priority of HRSA not to support programs that subsidize drug injection sites for illegal drugs or so-called "safe consumption sites," knowingly distribute drug paraphernalia, or permit use or distribution of illegal drugs on property under their control.

To the extent allowable by law, HRSA will give priority to grantees in States and municipalities that actively meet the below criteria: (i) enforce prohibitions on open illicit drug use; (ii) enforce prohibitions on urban camping and loitering;

(iii) enforce prohibitions on urban squatting; (iv) enforce, and where necessary, adopt, standards that address individuals who are a danger to themselves or others and suffer from serious mental illness or substance use disorder, or who are living on the streets and cannot care for themselves, through assisted outpatient treatment or by moving them into treatment centers or other appropriate facilities via civil commitment or other available means, to the maximum extent permitted by law; or (v) substantially implement and comply with, to the extent required, the registration and notification obligations of the Sex Offender Registry and Notification Act, particularly in the case of registered sex offenders with no fixed address, including by adequately mapping and checking the location of homeless sex offenders.

HRSA will implement these priorities consistent with applicable laws, regulations, court orders, and any required procedures.

**Date Last Reviewed:** May 2026

Return to top

**Sign up for email updates.** Subscribe

**Find a Medically Underserved Area**

**Search the data**

Bureaus & Offices
Newsroom
Budget
EEO
Working at HRSA
About HRSA

Contact Us

Accessibility | Disclaimers | Freedom of Information Act | Health and Human Services | No FEAR Act | Privacy Policy | USA.gov | Viewers & Players | Vulnerability Disclosure Policy | WhiteHouse.gov

**DEPARTMENT OF HEALTH & HUMAN SERVICES** **Office of the Secretary**

**Washington, D.C. 20201**

# MEMORANDUM

**DATE:** February 20, 2026

**TO:** Leaders, Deputy Leaders, and Chiefs of Staff

**FROM:** Gustav Chiarello, Assistant Secretary for Financial Resources

**SUBJECT:** Clarification on Departmental Review of Grants and Contracts

Dear Division Leadership:

Thank you for your hard work in the last year as we developed systems to ensure that all grants and contracts are reviewed and approved by Department of Health and Human Services (HHS) leadership. This process ensures alignment with Agency priorities and goals and avoids duplication of activities across the Department. As we synthesize what we have learned in the process and hone these systems, this memo provides clarification on processes to review new and continuing awards for grants and contracts.

First, ***each mechanism has a distinct process*** which is detailed below. Department grants proceed under Notice of Funding Opportunity (NOFO) Review and Notice of Award (NOA) Review. Contracts review is established through the rules of acquisitions. For acquisitions, the Department has established a Departmental Efficiency Review (DER) process to identify contracts that are duplicative, excessive, inconsistent with administrative priorities, or otherwise wasteful.

Contract officers working on acquisitions do not prepare NOFOs or NOAs, and teams working on NOAs and NOFOs do not work on acquisitions. It bears repeating that NOAs and NOFOs are *not* subject to the DER process because the DER process is exclusively reserved for acquisition review.

## POLICY IMPLICATIONS

The purpose of the NOFO and NOA reviews is to ensure that Divisions, to the extent permitted by law, are funding only activities that align with Agency priorities and, where appropriate, ensure efficiency of programming throughout HHS. Given the volume of grants, it is critical that HHS Divisions allow adequate time for review in advance of funding deadlines (detailed below). Grants and contracts must be provided for approval in compliance with the relevant approval window to ensure timely award decisions.

The purpose of the DER review is to ensure that the Department realizes efficiencies in its procurement programs. Programs such as the Procurement and Alignment Collaboration Taskforce (PACT) will help ensure that HHS avoids wasteful acquisition spending through a centralized process that can detect duplications and excessive fees that would not otherwise be observable at the Division level.

In both grants and contracts, review of appropriate activities and organizations should start at the program level and ultimately be cleared by HHS Division leadership (also known as Presidential appointee approval (PAA)). The PAA review should ensure that, to the extent permitted by law, all workplans and program deliverables are in alignment with Agency priorities and relevant Grants Policy Statements, while also

providing a check to ensure the Department's efficiency goals are being met. If the PAA review at the division level is adequate and effective, review at the HHS level will proceed much more smoothly and quickly.

Below is a detail of the processes for both grant and acquisition approval.

***Grants Review Process***:

HHS is the largest grantmaking entity in the world. As such, it is critical that grant funding streams flowing from the Department are thoroughly reviewed, and that taxpayer resources are only funding activities that are legally available and in the best interest of the American people. Below you will find processes for grant awards at both the NOFO and NOA stages. These are distinct review processes throughout the grants cycle.

Notice of Funding Opportunity Review**:**

HHS awarding agencies must send **all NOFOs** through HHS review. Once your agency goes through the internal NOFO approval process and receives PAA clearance, all NOFOs must then be sent (as a Word document only) to your assigned ASFR Office of Budget (OB) point of contact. The ASFR/OB will facilitate the next steps of the HHS NOFO review process to include: ASFR, the appropriate Immediate Office of the Secretary (IOS) Counselor, and senior-level IOS staff. Once IOS provides final clearance, the ASFR/OB point of contact will facilitate OMB review and clearance of NOFOs.

Notice of Award Review:

The NOA review guidance first issued to HHS Divisions on May 20, 2025, is updated in this memorandum (see *Updated HHS NOA Review Guidance and Procedures*), and provides more details. Specifically, after merit review of applications by the HHS Division, this guidance requires a separate review first by the awarding HHS Division's designated leadership with PAA and then by IOS officials for all discretionary NOAs that establish new obligations, including new awards, competing continuations, non-competing continuations, and supplements. After the PAA process, agencies should send NOAs to their respective Division's grant inbox for IOS counselor review. Following IOS counselor clearance, NOAs should be sent to awardreview@hhs.gov for a final review. Both IOS steps are mandatory before final system approval by the authorized grants management officer, congressional notification, and any obligation of funds. Reviews result in either approval to proceed or elevation to agency leaders for further adjudication. Divisions must document their review outcomes in their systems and maintain all related records.

See Attachment 1 for additional details about the NOA and NOFO review processes. Updated detailed guidance will be released to agencies soon.

***Contract/Acquisition Approval Process***

HHS awards nearly $30 billion in contracts each year, making us among the highest purchasers in the federal government. Again, it is essential that all contracts and acquisitions are reviewed for efficiency, ensuring that the American people receive the highest possible value and federal tax dollars support only products and services that are necessary. Below you will find information on the PAA and DER process for contract reviews.

DER Process:

HHS Acquisition Manual (HHSAM) Note 2025-05 was issued to HHS Divisions on May 20, 2025; it provided instructions and requirements to the HHS contracts community on new review processes, including the requirement for PAA for *all* contract actions and DER for all *funded* contract actions. As it relates to DER, this guidance requires an efficiency review by Departmental leadership for all *funded* contract actions, including new awards and modifications where funding will be obligated. In addition to PAA, which confirms PAA leadership visibility and agreement on the mission need for the contract action, the DER review is mandatory prior to obligation of funds and is separate from the PAA. To operationalize the DER requirement, HHS established a centralized review process using a designated shared mailbox and standardized spreadsheet template. The Department is actively in the process of refining the DER process to include the policy and process. On January 28, 2026, ASFR issued an interim policy deviation (Acquisition Alert 2026-04) that established a $3M+ DER threshold for all submission requests after the date of the interim policy (i.e., contract actions below $3M no longer require DER while the Department refines the process). DER results in (1) approval to proceed, (2) request(s) for additional information, or (3) a recommendation to either de-scope or cancel the contract services/supplies. Agencies must document review outcomes in their contract files and maintain all related records.

Specific DER processes are fully outlined in the following:

- Original/permanent HHSAM policy (issued May 2025): HHSAM _Note_2025-05_05212025_Signed.pdf
- Interim policy (issued January 2026: AA 2026-04 Interim DER Process Deviation_FINAL_SPE Signed (002).pdf

Thank you again for your attention to this memorandum. Note, funding decisions may be subject to current court orders. If you have questions about whether a court order applies to a specific funding decision (e.g., mandating compliance with current Executive Orders, decisions to deny an award), contact your Office of the General Counsel representative. Should you have any general process questions related to the information provided in this memo or the related attachments, please do not hesitate to contact my office directly.

Sincerely,

GUSTAV P. CHIARELLO III -S
Digitally signed by GUSTAV P. CHIARELLO III -S
Date: 2026.02.24 16:56:28 -05'00'

Gustav Chiarello
Assistant Secretary for Financial Resources

Federal Register / Vol. 90, No. 19 / Thursday, January 30, 2025 / Presidential Documents 8615

# Presidential Documents

**Executive Order 14168 of January 20, 2025**

## Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 7301 of title 5, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Across the country, ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers. This is wrong. Efforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being. The erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system. Basing Federal policy on truth is critical to scientific inquiry, public safety, morale, and trust in government itself.

This unhealthy road is paved by an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms, replacing the immutable biological reality of sex with an internal, fluid, and subjective sense of self unmoored from biological facts. Invalidating the true and biological category of ''woman'' improperly transforms laws and policies designed to protect sex-based opportunities into laws and policies that undermine them, replacing longstanding, cherished legal rights and values with an identity-based, inchoate social concept.

Accordingly, my Administration will defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male.

**Sec. 2**. *Policy and Definitions.* It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality. Under my direction, the Executive Branch will enforce all sex-protective laws to promote this reality, and the following definitions shall govern all Executive interpretation of and application of Federal law and administration policy:

(a) ''Sex'' shall refer to an individual's immutable biological classification as either male or female. ''Sex'' is not a synonym for and does not include the concept of ''gender identity.''

(b) ''Women'' or ''woman'' and ''girls'' or ''girl'' shall mean adult and juvenile human females, respectively.

(c) ''Men'' or ''man'' and ''boys'' or ''boy'' shall mean adult and juvenile human males, respectively.

(d) ''Female'' means a person belonging, at conception, to the sex that produces the large reproductive cell.

(e) ''Male'' means a person belonging, at conception, to the sex that produces the small reproductive cell.

(f) ''Gender ideology'' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true.

Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

(g) ''Gender identity'' reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

**Sec. 3**. *Recognizing Women Are Biologically Distinct From Men.* (a) Within 30 days of the date of this order, the Secretary of Health and Human Services shall provide to the U.S. Government, external partners, and the public clear guidance expanding on the sex-based definitions set forth in this order.

(b) Each agency and all Federal employees shall enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes. Each agency should therefore give the terms ''sex'', ''male'', ''female'', ''men'', ''women'', ''boys'' and ''girls'' the meanings set forth in section 2 of this order when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications.

(c) When administering or enforcing sex-based distinctions, every agency and all Federal employees acting in an official capacity on behalf of their agency shall use the term ''sex'' and not ''gender'' in all applicable Federal policies and documents.

(d) The Secretaries of State and Homeland Security, and the Director of the Office of Personnel Management, shall implement changes to require that government-issued identification documents, including passports, visas, and Global Entry cards, accurately reflect the holder's sex, as defined under section 2 of this order; and the Director of the Office of Personnel Management shall ensure that applicable personnel records accurately report Federal employees' sex, as defined by section 2 of this order.

(e) Agencies shall remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages. Agency forms that require an individual's sex shall list male or female, and shall not request gender identity. Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology.

(f) The prior Administration argued that the Supreme Court's decision in *Bostock* v. *Clayton County* (2020), which addressed Title VII of the Civil Rights Act of 1964, requires gender identity-based access to single-sex spaces under, for example, Title IX of the Educational Amendments Act. This position is legally untenable and has harmed women. The Attorney General shall therefore immediately issue guidance to agencies to correct the misapplication of the Supreme Court's decision in *Bostock* v. *Clayton County* (2020) to sex-based distinctions in agency activities. In addition, the Attorney General shall issue guidance and assist agencies in protecting sex-based distinctions, which are explicitly permitted under Constitutional and statutory precedent.

(g) Federal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology.

**Sec. 4**. *Privacy in Intimate Spaces.* (a) The Attorney General and Secretary of Homeland Security shall ensure that males are not detained in women's prisons or housed in women's detention centers, including through amendment, as necessary, of Part 115.41 of title 28, Code of Federal Regulations and interpretation guidance regarding the Americans with Disabilities Act.

(b) The Secretary of Housing and Urban Development shall prepare and submit for notice and comment rulemaking a policy to rescind the final rule entitled ''Equal Access in Accordance with an Individual's Gender Identity in Community Planning and Development Programs'' of September 21, 2016, 81 FR 64763, and shall submit for public comment a policy protecting women seeking single-sex rape shelters.

(c) The Attorney General shall ensure that the Bureau of Prisons revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex.

(d) Agencies shall effectuate this policy by taking appropriate action to ensure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity.

**Sec. 5**. *Protecting Rights.* The Attorney General shall issue guidance to ensure the freedom to express the binary nature of sex and the right to single-sex spaces in workplaces and federally funded entities covered by the Civil Rights Act of 1964. In accordance with that guidance, the Attorney General, the Secretary of Labor, the General Counsel and Chair of the Equal Employment Opportunity Commission, and each other agency head with enforcement responsibilities under the Civil Rights Act shall prioritize investigations and litigation to enforce the rights and freedoms identified.

**Sec. 6**. *Bill Text.* Within 30 days of the date of this order, the Assistant to the President for Legislative Affairs shall present to the President proposed bill text to codify the definitions in this order.

**Sec. 7**. *Agency Implementation and Reporting.* (a) Within 120 days of the date of this order, each agency head shall submit an update on implementation of this order to the President, through the Director of the Office of Management and Budget. That update shall address:

(i) changes to agency documents, including regulations, guidance, forms, and communications, made to comply with this order; and

(ii) agency-imposed requirements on federally funded entities, including contractors, to achieve the policy of this order.

(b) The requirements of this order supersede conflicting provisions in any previous Executive Orders or Presidential Memoranda, including but not limited to Executive Orders 13988 of January 20, 2021, 14004 of January 25, 2021, 14020 and 14021 of March 8, 2021, and 14075 of June 15, 2022. These Executive Orders are hereby rescinded, and the White House Gender Policy Council established by Executive Order 14020 is dissolved.

(c) Each agency head shall promptly rescind all guidance documents inconsistent with the requirements of this order or the Attorney General's guidance issued pursuant to this order, or rescind such parts of such documents that are inconsistent in such manner. Such documents include, but are not limited to:

(i) ''The White House Toolkit on Transgender Equality'';

(ii) the Department of Education's guidance documents including:

(A) ''2024 Title IX Regulations: Pointers for Implementation'' (July 2024);

(B) ''U.S. Department of Education Toolkit: Creating Inclusive and Nondiscriminatory School Environments for LGBTQI+ Students'';

(C) ''U.S. Department of Education Supporting LGBTQI+ Youth and Families in School'' (June 21, 2023);

(D) ''Departamento de Educación de EE.UU. Apoyar a los jóvenes y familias LGBTQI+ en la escuela'' (June 21, 2023);

(E) ''Supporting Intersex Students: A Resource for Students, Families, and Educators'' (October 2021);

(F) ''Supporting Transgender Youth in School'' (June 2021);

(G) ''Letter to Educators on Title IX's 49th Anniversary'' (June 23, 2021);

(H) ''Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families'' (June 2021);

(I) ''Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County'' (June 22, 2021);

(J) ''Education in a Pandemic: The Disparate Impacts of COVID–19 on America's Students'' (June 9, 2021); and

(K) ''Back-to-School Message for Transgender Students from the U.S. Depts of Justice, Education, and HHS'' (Aug. 17, 2021);

(iii) the Attorney General's Memorandum of March 26, 2021 entitled ''Application of *Bostock* v. *Clayton County* to Title IX of the Education Amendments of 1972''; and

(iv) the Equal Employment Opportunity Commission's ''Enforcement Guidance on Harassment in the Workplace'' (April 29, 2024).

**Sec. 8**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.



THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02090
Filed 1–29–25; 11:15 am]
Billing code 3395–F4–P

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

Federal Register / Vol. 90, No. 153 / Tuesday, August 12, 2025 / Presidential Documents 38929

# Presidential Documents

Executive Order 14332 of August 7, 2025

## Improving Oversight of Federal Grantmaking

By the authority vested in me as President by the Constitution and the laws of the United States of America, and to improve the process of Federal grantmaking while ending offensive waste of tax dollars, it is hereby ordered:

**Section 1**. *Purpose.* Every tax dollar the Government spends should improve American lives or advance American interests. This often does not happen. Federal grants have funded drag shows in Ecuador, trained doctoral candidates in critical race theory, and developed transgender-sexual-education programs. In 2024, one study claimed that more than one-quarter of new National Science Foundation (NSF) grants went to diversity, equity, and inclusion and other far-left initiatives. These NSF grants included those to educators that promoted Marxism, class warfare propaganda, and other anti-American ideologies in the classroom, masked as rigorous and thoughtful investigation.

The harm imposed by problematic Federal grants does not stop at propagating absurd ideologies. An unsafe lab in Wuhan, China—likely the source of the COVID–19 pandemic—engaged in gain-of-function research funded by the National Institutes of Health. The NSF gave millions to develop AI-powered social media censorship tools—a direct assault on free speech. Taxpayer-funded grants have also gone to non-governmental organizations that provided free services to illegal immigrants, worsening the border crisis and compromising our safety, and to organizations that actively worked against American interests abroad.

Even for projects receiving Federal funds that serve an ostensibly beneficial purpose, the Government has paid insufficient attention to their efficacy. For example, a significant proportion of the results of federally funded scientific research projects cannot be reproduced by external researchers. Even at Harvard and Stanford, once considered among America's most prestigious universities, senior researchers have resigned following accusations of data falsification. A substantial portion of many Federal grants for university-led research goes not to scientific project applicants or groundbreaking research, but to university facilities and administrative costs.

The grant review process itself also undermines the interests of American taxpayers. Writing effective grant applications is notoriously complex, and grant applicants that can afford legal and technical experts are more likely to receive funds—which can then further support these non-mission functions. In addition, there is insufficient interagency coordination and review by relevant subject matter experts to reduce duplication. As a result, the best proposals do not always receive funding, and there is too much unfocused research of marginal social utility.

In short, there is a strong need to strengthen oversight and coordination of, and to streamline, agency grantmaking to address these problems, prevent them from recurring, and ensure greater accountability for use of public funds more broadly. The Government holds tax revenue in trust for the American people, and agencies should treat it accordingly.

**Sec. 2**. *Definitions.* For purposes of this order:

(a) The term "agency" has the meaning given to it in section 551 of title 5, United States Code, except that such term includes only agencies that have the statutory authority to award, offer, or manage Federal grants

and does not include the Executive Office of the President or any components thereof.

(b) The term ''agency head'' means the highest-ranking official or officials of an agency, such as the Secretary, Administrator, Chairman, Director, Commissioners, or Board of Directors, unless otherwise specified in this order.

(c) The term ''Director'' means the Director of the Office of Management and Budget (OMB).

(d) The term ''discretionary award'' or ''discretionary grant'' means a grant that is a ''discretionary award'' as that term is defined in 2 CFR 200.1. It does not include programs where legislation establishes an entitlement to the funds on the part of the recipient, such as block grants; those awarded based on a statutory formula; or disaster recovery grants.

(e) The term ''funding opportunity announcement'' means a ''notice of funding opportunity'' as defined in 2 CFR 200.1, as it pertains to a discretionary award.

(f) The term ''grant'' means any ''grant agreement or grant'' as defined in 2 CFR 200.1, ''cooperative agreement'' as defined in 2 CFR 200.1, or similar award of financial assistance, including foreign assistance awards.

(g) The term ''regulation'' means an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the procedure or practice requirements of an agency, including, without limitation, regulations, interpretative rules, and statements of policy.

(h) The term ''senior appointee'' means an individual appointed by the President, a non-career member of the Senior Executive Service, or an employee encumbering a Senior Level, Scientific and Professional, or Grade 15 position in Schedule C of the excepted service.

**Sec. 3**. *Strengthening Accountability for Agency Grantmaking.* (a) Each agency head shall promptly designate a senior appointee who shall be responsible for creating a process to review new funding opportunity announcements and to review discretionary grants to ensure that they are consistent with agency priorities and the national interest. For the avoidance of doubt, this process shall not guarantee any particular level of review or consideration to funding applicants except as consistent with applicable law. As consistent with applicable law, this review process shall incorporate, at a minimum:

(i) review and approval of agency funding opportunity announcements by one or more senior appointees or their designees;

(ii) continuation of existing coordination with OMB;

(iii) to the extent appropriate to the subject matter of the announcements, review by designated subject-matter experts as identified by the agency head or the agency head's designee;

(iv) review of funding opportunity announcements and related forms to ensure that they include only such requirements as are necessary for an adequate evaluation of the application and are written in plain language with a goal of minimizing the need for legal or technical expertise in drafting an application;

(v) interagency coordination to determine whether the subject matter of a particular funding opportunity announcement has already been addressed by another agency announcement and, if so, whether one of the announcements should be modified or withdrawn to promote consistency and eliminate redundancy;

(vi) for scientific research discretionary grants, review by at least one subject matter expert in the field of the application, who may be a member of the grant review panel, the program officer, or an outside expert; and

(vii) pre-issuance review of discretionary awards to ensure that the awards are consistent with applicable law, agency priorities, and the national

interest, which shall involve in-person or virtual discussion of applications by grant review panels or program offices with a senior appointee or that appointee's designee.

(b) Agency heads shall designate one or more senior appointees to review discretionary awards on an annual basis for consistency with agency priorities and substantial progress. Such review shall include an accountability mechanism for officials responsible for selection and granting of the awards.

(c) Until such time as the process specified in subsection (a) of this section is in place, agencies shall not issue any new funding opportunity announcements without prior approval from the senior appointee designated under subsection (a) of this section, except as required by law.

**Sec. 4**. *Considerations for Discretionary Awards.* (a) Senior appointees and their designees shall not ministerially ratify or routinely defer to the recommendations of others in reviewing funding opportunity announcements or discretionary awards, but shall instead use their independent judgment.

(b) In reviewing and approving funding opportunity announcements and discretionary awards, as well as in designing the review process described in section 3(a) of this order, senior appointees and their designees shall, as relevant and to the extent consistent with applicable law, apply the following principles, including in any scoring rubrics used to assess grant proposals:

(i) Discretionary awards must, where applicable, demonstrably advance the President's policy priorities.

(ii) Discretionary awards shall not be used to fund, promote, encourage, subsidize, or facilitate:

(A) racial preferences or other forms of racial discrimination by the grant recipient, including activities where race or intentional proxies for race will be used as a selection criterion for employment or program participation;

(B) denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic;

(C) illegal immigration; or

(D) any other initiatives that compromise public safety or promote anti-American values.

(iii) All else being equal, preference for discretionary awards should be given to institutions with lower indirect cost rates.

(iv) Discretionary grants should be given to a broad range of recipients rather than to a select group of repeat players. Research grants should be awarded to a mix of recipients likely to produce immediately demonstrable results and recipients with the potential for potentially longer-term, breakthrough results, in a manner consistent with the funding opportunity announcement.

(v) Applicants should commit to complying with administration policies, procedures, and guidance respecting Gold Standard Science.

(vi) Discretionary awards should include clear benchmarks for measuring success and progress towards relevant goals and, as relevant for awards pertaining to scientific research, a commitment to achieving Gold Standard Science.

(vii) To the extent institutional affiliation is considered in making discretionary awards, agencies should prioritize an institution's commitment to rigorous, reproducible scholarship over its historical reputation or perceived prestige. As to science grants, agencies should prioritize institutions that have demonstrated success in implementing Gold Standard Science.

(c) Nothing in this order shall be construed to discourage or prevent the use of peer review methods to evaluate proposals for discretionary awards or otherwise inform agency decision making, provided that peer review recommendations remain advisory and are not ministerially ratified,

routinely deferred to, or otherwise treated as de facto binding by senior appointees or their designees. Further, nothing in this order shall be construed to create any rights to any particular level of review or consideration for any funding applicant except as consistent with applicable law.

**Sec. 5**. *Revisions to the Uniform Guidance.* (a) The Director shall revise the Uniform Guidance and other relevant guidance to streamline application requirements and to further clarify and require all discretionary grants to permit termination for convenience, including when the award no longer advances agency priorities or the national interest, but subject to appropriate exceptions, including agreements entered into in furtherance of international trade agreements or those awarded by the Department of Commerce under title XCIX of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283), the CHIPS Act of 2022 (Public Law 117–167), or division F of the Infrastructure Investment and Jobs Act (Public Law 117–58).

(b) The Director shall further revise the Uniform Guidance and other relevant guidance to appropriately limit the use of discretionary grant funds for costs related to facilities and administration.

**Sec. 6**. *Implementation and Termination Clauses.* (a) Within 30 days of the date of this order, each agency head shall review the agency's standard grant terms and conditions and submit a report to the Director detailing:

(i) whether the agency's standard terms and conditions for discretionary awards permit termination for convenience and include the termination provisions described in 2 CFR 200.340(a), including the provisions that an award may be terminated by the agency ''if an award no longer effectuates the program goals or agency priorities'' or, in the case of a partial termination by the recipient, if the agency ''determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made'';

(ii) whether the agency's standard terms and conditions for discretionary foreign assistance awards permit termination based on the national interest; and

(iii) the approximate number of active discretionary awards at the agency, as well as the approximate percentage of funding obligated under those awards that contains termination provisions allowing for termination under the circumstances described in subsection (i) of this section.

(b) Each agency head shall, to the maximum extent permitted by law and consistent with relevant Executive Orders or other Presidential directives, take steps to revise the terms and conditions of existing discretionary grants to permit immediate termination for convenience, or clarify that such termination is permitted, including if the award no longer advances agency priorities or the national interest. Each agency head shall ensure that such terms are included in all future discretionary grants and likewise shall take steps to revise all applicable regulations binding on or incorporated in discretionary grant terms and conditions to require such terms. Agency heads shall take action to incorporate these new terms and conditions into all future amendments to grant awards.

(c) To the extent practicable and consistent with applicable law, agency heads shall insert in future discretionary grant agreements terms and conditions that:

(i) prohibit recipients from directly drawing down general grant funds for specific projects without the affirmative authorization of the agency; and

(ii) require grantees to provide written explanations or support, with specificity, for requests for each drawdown.

**Sec. 7**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

(e) The costs for publication of this order shall be borne by the Office of Management and Budget.



THE WHITE HOUSE,
*August 7, 2025.*

[FR Doc. 2025–15344
Filed 8–11–25; 11:15 am]
Billing code 3110–01–P

Federal Register / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents 8443

# Presidential Documents

**Executive Order 14159 of January 20, 2025**

## Protecting the American People Against Invasion

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 *et seq.*) and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Over the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States. Millions of illegal aliens crossed our borders or were permitted to fly directly into the United States on commercial flights and allowed to settle in American communities, in violation of longstanding Federal laws.

Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans. Others are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities. Many have abused the generosity of the American people, and their presence in the United States has cost taxpayers billions of dollars at the Federal, State, and local levels.

Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. The American people deserve a Federal Government that puts their interests first and a Government that understands its sacred obligation to prioritize the safety, security, and financial and economic well-being of Americans.

This order ensures that the Federal Government protects the American people by faithfully executing the immigration laws of the United States.

**Sec. 2**. *Policy.* It is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people. Further, it is the policy of the United States to achieve the total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.

**Sec. 3**. *Faithful Execution of the Immigration Laws.* In furtherance of the policies described in section 2 of this order:

(a) Executive Order 13993 of January 20, 2021 (Revision of Civil Immigration Enforcement Policies and Priorities), Executive Order 14010 of February 2, 2021 (Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border), Executive Order 14011 of February 2, 2021 (Establishment of Interagency Task Force on the Reunification of Families), and Executive Order 14012 of February 2, 2021 (Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans) are hereby revoked; and

(b) Executive departments and agencies (agencies) shall take all appropriate action to promptly revoke all memoranda, guidance, or other policies based on the Executive Orders revoked in section 3(a) of this order and shall employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all inadmissible and removable aliens.

**Sec. 4**. *Civil Enforcement Priorities.* The Secretary of Homeland Security shall take all appropriate action to enable the Director of U.S. Immigration and Customs Enforcement, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Citizenship and Immigration Services to set priorities for their agencies that protect the public safety and national security interests of the American people, including by ensuring the successful enforcement of final orders of removal. Further, the Secretary of Homeland Security shall ensure that the primary mission of U.S. Immigration and Customs Enforcement's Homeland Security Investigations division is the enforcement of the provisions of the INA and other Federal laws related to the illegal entry and unlawful presence of aliens in the United States and the enforcement of the purposes of this order.

**Sec. 5**. *Criminal Enforcement Priorities.* The Attorney General, in coordination with the Secretary of State and the Secretary of Homeland Security, shall take all appropriate action to prioritize the prosecution of criminal offenses related to the unauthorized entry or continued unauthorized presence of aliens in the United States.

**Sec. 6**. *Federal Homeland Security Task Forces.* (a) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to jointly establish Homeland Security Task Forces (HSTFs) in all States nationwide.

(b) The composition of each HSTF shall be subject to the direction of the Attorney General and the Secretary of Homeland Security, but shall include representation from any other Federal agencies with law enforcement officers, or agencies with the ability to provide logistics, intelligence, and operational support to the HSTFs, and shall also include representation from relevant State and local law enforcement agencies. The heads of all Federal agencies shall take all appropriate action to provide support to the Attorney General and the Secretary of Homeland Security to ensure that the HSTFs fulfill the objectives in subsection (c) of this section, and any other lawful purpose that fulfills the policy objectives of this order.

(c) The objective of each HSTF is to end the presence of criminal cartels, foreign gangs, and transnational criminal organizations throughout the United States, dismantle cross-border human smuggling and trafficking networks, end the scourge of human smuggling and trafficking, with a particular focus on such offenses involving children, and ensure the use of all available law enforcement tools to faithfully execute the immigration laws of the United States.

(d) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to provide an operational command center to coordinate the activities of the HSTFs and provide such support as they may require, and shall also take all appropriate action to provide supervisory direction to their activities as may be required.

**Sec. 7**. *Identification of Unregistered Illegal Aliens.* The Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to:

(a) Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code;

(b) Ensure that all previously unregistered aliens in the United States comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code; and

(c) Ensure that failure to comply with the legal obligations of part VII of subchapter II of chapter 12 of title 8, United States Code, is treated as a civil and criminal enforcement priority.

**Sec. 8**. *Civil Fines and Penalties.* (a) The Secretary of Homeland Security, in coordination with the Secretary of Treasury, shall take all appropriate action to ensure the assessment and collection of all fines and penalties

that the Secretary of Homeland Security is authorized by law to assess and collect from aliens unlawfully present in the United States, including aliens who unlawfully entered or unlawfully attempted to enter the United States, and from those who facilitate such aliens' presence in the United States.

(b) Within 90 days of the date of this order, the Secretary of the Treasury and the Secretary of Homeland Security shall submit a report to the President regarding their progress implementing the requirements of this section and recommending any additional actions that may need to be taken to achieve its objectives.

**Sec. 9**. *Efficient Removals of Recent Entrants and Other Aliens.* The Secretary of Homeland Security shall take all appropriate action, pursuant to section 235(b)(1)(A)(iii)(I) of the INA (8 U.S.C. 1225(b)(1)(A)(iii)(I)), to apply, in her sole and unreviewable discretion, the provisions of section 235(b)(1)(A)(i) and (ii) of the INA to the aliens designated under section 235(b)(1)(A)(iii)(II). Further, the Secretary of Homeland Security shall promptly take appropriate action to use all other provisions of the immigration laws or any other Federal law, including, but not limited to sections 238 and 240(d) of the INA (8 U.S.C. 1228 and 1229a(d)), to ensure the efficient and expedited removal of aliens from the United States.

**Sec. 10**. *Detention Facilities.* The Secretary of Homeland Security shall promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens. The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law.

**Sec. 11**. *Federal-State Agreements.* To ensure State and local law enforcement agencies across the United States can assist with the protection of the American people, the Secretary of Homeland Security shall, to the maximum extent permitted by law, and with the consent of State or local officials as appropriate, take appropriate action, through agreements under section 287(g) of the INA (8 U.S.C. 1357(g)) or otherwise, to authorize State and local law enforcement officials, as the Secretary of Homeland Security determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary of Homeland Security. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties. To the extent permitted by law, the Secretary of Homeland Security may structure each agreement under section 287(g) of the INA (8 U.S.C. 1357(g)) in the manner that provides the most effective model for enforcing Federal immigration laws in that jurisdiction.

**Sec. 12**. *Encouraging Voluntary Compliance with the Law.* The Secretary of Homeland Security shall take all appropriate action, in coordination with the Secretary of State and the Attorney General, and subject to adequate safeguards, assurances, bonds, and any other lawful measure, to adopt policies and procedures to encourage aliens unlawfully in the United States to voluntarily depart as soon as possible, including through enhanced usage of the provisions of section 240B of the INA (8 U.S.C. 1229c), international agreements or assistance, or any other measures that encourage aliens unlawfully in the United States to depart as promptly as possible, including through removals of aliens as provided by section 250 of the INA (8 U.S.C. 1260).

**Sec. 13**. *Recalcitrant Countries.* The Secretary of State and the Secretary of Homeland Security shall take all appropriate action to:

(a) Cooperate and effectively implement, as appropriate, the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), with the Secretary of State, to the maximum extent permitted by law, ensuring that diplomatic

efforts and negotiations with foreign states include the foreign states' acceptance of their nationals who are subject to removal from the United States; and

(b) Eliminate all documentary barriers, dilatory tactics, or other restrictions that prevent the prompt repatriation of aliens to any foreign state. Any failure or delay by a foreign state to verify the identity of a national of that state shall be considered in carrying out subsection (a) this section, and shall also be considered regarding the issuance of any other sanctions that may be available to the United States.

**Sec. 14**. *Visa Bonds.* The Secretary of Treasury shall take all appropriate action, in coordination with the Secretary of State and the Secretary of Homeland Security, to establish a system to facilitate the administration of all bonds that the Secretary of State or the Secretary of Homeland Security may lawfully require to administer the provisions of the INA.

**Sec. 15**. *Reestablishment of the VOICE Office and Addressing Victims of Crimes Committed by Removable Aliens.* The Secretary of Homeland Security shall direct the Director of U.S. Immigration and Customs Enforcement (ICE) to take all appropriate and lawful action to reestablish within ICE an office to provide proactive, timely, adequate, and professional services to victims of crimes committed by removable aliens, and those victims' family members. The Attorney General shall also ensure that the provisions of 18 U.S.C. 3771 are followed in all Federal prosecutions involving crimes committed by removable aliens.

**Sec. 16**. *Addressing Actions by the Previous Administration.* The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws. Such action should include, but is not limited to:

(a) ensuring that the parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised on only a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole;

(b) ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute; and

(c) ensuring that employment authorization is provided in a manner consistent with section 274A of the INA (8 U.S.C. 1324a), and that employment authorization is not provided to any unauthorized alien in the United States.

**Sec. 17**. *Sanctuary Jurisdictions.* The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called ''sanctuary'' jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law.

**Sec. 18**. *Information Sharing.* (a) The Secretary of Homeland Security shall promptly issue guidance to ensure maximum compliance by Department of Homeland Security personnel with the provisions of 8 U.S.C. 1373 and 8 U.S.C. 1644 and ensure that State and local governments are provided with the information necessary to fulfill law enforcement, citizenship, or immigration status verification requirements authorized by law; and

(b) The Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall take all appropriate action to stop the trafficking and smuggling of alien children into the United States, including through the sharing of any information necessary to assist in the achievement of that objective.

**Sec. 19**. *Funding Review.* The Attorney General and the Secretary of Homeland Security shall:

(a) Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws;

(b) Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a) of this section;

(c) Terminate all such agreements determined to be in violation of law or to be sources of waste, fraud, or abuse and prohibit any such future agreements;

(d) Coordinate with the Director of the Office of Management and Budget to ensure that no funding for agreements described in subsection (c) of this section is included in any appropriations request for the Department of Justice or the Department of Homeland Security; and

(e) Initiate clawback or recoupment procedures, if appropriate, for any agreements described in subsection (c) of this section.

**Sec. 20**. *Denial of Public Benefits to Illegal Aliens.* The Director of the Office of Management and Budget shall take all appropriate action to ensure that all agencies identify and stop the provision of any public benefits to any illegal alien not authorized to receive them under the provisions of the INA or other relevant statutory provisions.

**Sec. 21**. *Hiring More Agents and Officers.* Subject to available appropriations, the Secretary of Homeland Security, through the Commissioner of U.S. Customs and Border Protection and the Director of U.S. Immigration and Customs Enforcement, shall take all appropriate action to significantly increase the number of agents and officers available to perform the duties of immigration officers.

**Sec. 22**. *Severability.* It is the policy of the United States to enforce this order to the maximum extent possible to advance the interests of the United States. Accordingly:

(a) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid because of the failure to follow certain procedures, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 23**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party

against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02006
Filed 1–28–25; 11:15 am]
Billing code 3395–F4–P

Federal Register / Vol. 90, No. 19 / Thursday, January 30, 2025 / Presidential Documents 8619

## Presidential Documents

**Executive Order 14169 of January 20, 2025**

# Reevaluating and Realigning United States Foreign Aid

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Purpose.* The United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values. They serve to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries.

**Sec. 2.** *Policy.* It is the policy of United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States.

**Sec. 3.** (a) *90-day pause in United States foreign development assistance for assessment of programmatic efficiencies and consistency with United States foreign policy.* All department and agency heads with responsibility for United States foreign development assistance programs shall immediately pause new obligations and disbursements of development assistance funds to foreign countries and implementing non-governmental organizations, international organizations, and contractors pending reviews of such programs for programmatic efficiency and consistency with United States foreign policy, to be conducted within 90 days of this order. The Office of Management and Budget (OMB) shall enforce this pause through its apportionment authority.

(b) *Reviews of United States foreign assistance programs.* Reviews of each foreign assistance program shall be ordered by the responsible department and agency heads under guidelines provided by the Secretary of State, in consultation with the Director of OMB.

(c) *Determinations.* The responsible department and agency heads, in consultation with the Director of OMB, will make determinations within 90 days of this order on whether to continue, modify, or cease each foreign assistance program based upon the review recommendations, with the concurrence of the Secretary of State.

(d) *Resumption of paused development assistance funding.* New obligations and disbursements of foreign development assistance funds may resume for a program prior to the end of the 90-day period if a review is conducted, and the Secretary of State or his designee, in consultation with the Director of OMB, decide to continue the program in the same or modified form. Additionally, any other new foreign assistance programs and obligations must be approved by the Secretary of State or his designee, in consultation with the Director of OMB.

(e) *Waiver.* The Secretary of State may waive the pause in Section 3(a) for specific programs.

**Sec. 4.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02091
Filed 1–29–25; 11:15 am]
Billing code 3395–F4–P

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



# Presidential Documents

**Executive Order 14162 of January 20, 2025**

## Putting America First in International Environmental Agreements

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1.** *Purpose.* The United States must grow its economy and maintain jobs for its citizens while playing a leadership role in global efforts to protect the environment. Over decades, with the help of sensible policies that do not encumber private-sector activity, the United States has simultaneously grown its economy, raised worker wages, increased energy production, reduced air and water pollution, and reduced greenhouse gas emissions. The United States' successful track record of advancing both economic and environmental objectives should be a model for other countries.

In recent years, the United States has purported to join international agreements and initiatives that do not reflect our country's values or our contributions to the pursuit of economic and environmental objectives. Moreover, these agreements steer American taxpayer dollars to countries that do not require, or merit, financial assistance in the interests of the American people.

**Sec. 2.** *Policy.* It is the policy of my Administration to put the interests of the United States and the American people first in the development and negotiation of any international agreements with the potential to damage or stifle the American economy. These agreements must not unduly or unfairly burden the United States.

**Sec. 3.** *Implementation.* (a) The United States Ambassador to the United Nations shall immediately submit formal written notification of the United States' withdrawal from the Paris Agreement under the United Nations Framework Convention on Climate Change. The notice shall be submitted to the Secretary-General of the United Nations, the Depositary of the Agreement, attached as Appendix A. The United States will consider its withdrawal from the Agreement and any attendant obligations to be effective immediately upon this provision of notification.

(b) The United States Ambassador to the United Nations shall immediately submit written formal notification to the Secretary-General of the United Nations, or any relevant party, of the United States' withdrawal from any agreement, pact, accord, or similar commitment made under the United Nations Framework Convention on Climate Change.

(c) The United States Ambassador to the United Nations, in collaboration with the Secretary of State and Secretary of the Treasury, shall immediately cease or revoke any purported financial commitment made by the United States under the United Nations Framework Convention on Climate Change.

(d) Immediately upon completion of the tasks listed in subsections (a), (b), and (c), the United States Ambassador to the United Nations, in collaboration with the Secretary of State and Secretary of the Treasury shall certify a report to the Assistant to the President for Economic Policy and Assistant to the President for National Security Affairs that describes in detail any further action required to achieve the policy objectives set forth in section 2 of this order.

(e) The U.S. International Climate Finance Plan is revoked and rescinded immediately. The Director of the Office of Management and Budget shall,

within 10 days of this order, issue guidance for the rescission of all frozen funds.

(f) Within 30 days of this order, the Secretary of State, Secretary of the Treasury, Secretary of Commerce, Secretary of Health and Human Services, Secretary of Energy, Secretary of Agriculture, Administrator of the Environmental Protection Agency, Administrator of the U.S. Agency for International Development, Chief Executive Officer of the International Development Finance Corporation, Chief Executive Officer of the Millennium Challenge Corporation, Director of the U.S. Trade and Development Agency, President of the Export-Import Bank, and head of any other relevant department or agency shall submit a report to the Assistant to the President for Economic Policy and the Assistant to the President for National Security Affairs that details their actions to revoke or rescind policies that were implemented to advance the International Climate Finance Plan.

(g) The Secretary of State, Secretary of Commerce, and the head of any department or agency that plans or coordinates international energy agreements shall henceforth prioritize economic efficiency, the promotion of American prosperity, consumer choice, and fiscal restraint in all foreign engagements that concern energy policy.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or any other persons.



THE WHITE HOUSE,

*January 20, 2025.*

Billing code 3395–F4–P

APPENDIX A

NOTIFICATION OF WITHDRAWAL ON BEHALF OF
THE UNITED STATES OF AMERICA

NOTIFICATION OF WITHDRAWAL ON BEHALF OF
THE UNITED STATES OF AMERICA

His Excellency António Guterres
Secretary-General of the United Nations

I, Donald J. Trump, President of the United States of America, provide notification of withdrawal from the Paris Agreement, done at Paris, France, on December 12, 2015, on behalf of the United States of America, based on the authorities vested in me by the Constitution of the United States.

Done at Washington, D.C., this 20th day of January, 2025.

[FR Doc. 2025–02010
Filed 1–29–25; 8:45 am]
Billing code 3395–F4–C

Federal Register / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents 8353

# Presidential Documents

**Executive Order 14154 of January 20, 2025**

## Unleashing American Energy

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Background.* America is blessed with an abundance of energy and natural resources that have historically powered our Nation's economic prosperity. In recent years, burdensome and ideologically motivated regulations have impeded the development of these resources, limited the generation of reliable and affordable electricity, reduced job creation, and inflicted high energy costs upon our citizens. These high energy costs devastate American consumers by driving up the cost of transportation, heating, utilities, farming, and manufacturing, while weakening our national security.

It is thus in the national interest to unleash America's affordable and reliable energy and natural resources. This will restore American prosperity—including for those men and women who have been forgotten by our economy in recent years. It will also rebuild our Nation's economic and military security, which will deliver peace through strength.

**Sec. 2.** *Policy.* It is the policy of the United States:

(a) to encourage energy exploration and production on Federal lands and waters, including on the Outer Continental Shelf, in order to meet the needs of our citizens and solidify the United States as a global energy leader long into the future;

(b) to establish our position as the leading producer and processor of non-fuel minerals, including rare earth minerals, which will create jobs and prosperity at home, strengthen supply chains for the United States and its allies, and reduce the global influence of malign and adversarial states;

(c) to protect the United States's economic and national security and military preparedness by ensuring that an abundant supply of reliable energy is readily accessible in every State and territory of the Nation;

(d) to ensure that all regulatory requirements related to energy are grounded in clearly applicable law;

(e) to eliminate the "electric vehicle (EV) mandate" and promote true consumer choice, which is essential for economic growth and innovation, by removing regulatory barriers to motor vehicle access; by ensuring a level regulatory playing field for consumer choice in vehicles; by terminating, where appropriate, state emissions waivers that function to limit sales of gasoline-powered automobiles; and by considering the elimination of unfair subsidies and other ill-conceived government-imposed market distortions that favor EVs over other technologies and effectively mandate their purchase by individuals, private businesses, and government entities alike by rendering other types of vehicles unaffordable;

(f) to safeguard the American people's freedom to choose from a variety of goods and appliances, including but not limited to lightbulbs, dishwashers, washing machines, gas stoves, water heaters, toilets, and shower heads, and to promote market competition and innovation within the manufacturing and appliance industries;

(g) to ensure that the global effects of a rule, regulation, or action shall, whenever evaluated, be reported separately from its domestic costs and

benefits, in order to promote sound regulatory decision making and prioritize the interests of the American people;

(h) to guarantee that all executive departments and agencies (agencies) provide opportunity for public comment and rigorous, peer-reviewed scientific analysis; and

(i) to ensure that no Federal funding be employed in a manner contrary to the principles outlined in this section, unless required by law.

**Sec. 3**. *Immediate Review of All Agency Actions that Potentially Burden the Development of Domestic Energy Resources.* (a) The heads of all agencies shall review all existing regulations, orders, guidance documents, policies, settlements, consent orders, and any other agency actions (collectively, agency actions) to identify those agency actions that impose an undue burden on the identification, development, or use of domestic energy resources—with particular attention to oil, natural gas, coal, hydropower, biofuels, critical mineral, and nuclear energy resources—or that are otherwise inconsistent with the policy set forth in section 2 of this order, including restrictions on consumer choice of vehicles and appliances.

(b) Within 30 days of the date of this order, the head of each agency shall, in consultation with the director of the Office of Management and Budget (OMB) and the National Economic Council (NEC), develop and begin implementing action plans to suspend, revise, or rescind all agency actions identified as unduly burdensome under subsection (a) of this section, as expeditiously as possible and consistent with applicable law. The head of any agency who determines that such agency does not have agency actions described in subsection (a) of this section shall submit to the Director of OMB a written statement to that effect and, absent a determination by the Director of OMB that such agency does have agency actions described in this subsection, shall have no further responsibilities under this section.

(c) Agencies shall promptly notify the Attorney General of any steps taken pursuant to subsection (a) of this section so that the Attorney General may, as appropriate:

(i) provide notice of this Executive Order and any such actions to any court with jurisdiction over pending litigation in which such actions may be relevant; and

(ii) request that such court stay or otherwise delay further litigation, or seek other appropriate relief consistent with this order, pending the completion of the administrative actions described in this order.

(d) Pursuant to the policy outlined in section 2 of this order, the Attorney General shall consider whether pending litigation against illegal, dangerous, or harmful policies should be resolved through stays or other relief.

**Sec. 4**. *Revocation of and Revisions to Certain Presidential and Regulatory Actions.* (a) The following are revoked and any offices established therein are abolished:

(i) Executive Order 13990 of January 20, 2021 (Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis);

(ii) Executive Order 13992 of January 20, 2021 (Revocation of Certain Executive Orders Concerning Federal Regulation);

(iii) Executive Order 14008 of January 27, 2021 (Tackling the Climate Crisis at Home and Abroad);

(iv) Executive Order 14007 of January 27, 2021 (President's Council of Advisors on Science and Technology);

(v) Executive Order 14013 of February 4, 2021 (Rebuilding and Enhancing Programs to Resettle Refugees and Planning for the Impact of Climate Change on Migration);

(vi) Executive Order 14027 of May 7, 2021 (Establishment of the Climate Change Support Office);

(vii) Executive Order 14030 of May 20, 2021 (Climate-Related Financial Risk);

(viii) Executive Order 14037 of August 5, 2021 (Strengthening American Leadership in Clean Cars and Trucks);

(ix) Executive Order 14057 of December 8, 2021 (Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability);

(x) Executive Order 14072 of April 22, 2022 (Strengthening the Nation's Forests, Communities, and Local Economies);

(xi) Executive Order 14082 of September 12, 2022 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022); and

(xii) Executive Order 14096 of April 21, 2023 (Revitalizing Our Nation's Commitment to Environmental Justice for All).

(b) All activities, programs, and operations associated with the American Climate Corps, including actions taken by any agency shall be terminated immediately. Within one day of the date of this order, the Secretary of the Interior shall submit a letter to all parties to the ''American Climate Corps Memorandum of Understanding'' dated December 2023 to terminate the memorandum, and the head of each party to the memorandum shall agree to the termination in writing.

(c) Any assets, funds, or resources allocated to an entity or program abolished by subsection (a) of this section shall be redirected or disposed of in accordance with applicable law.

(d) The head of any agency that has taken action respecting offices and programs in subsection (a) shall take all necessary steps to ensure that all such actions are terminated or, if necessary, appropriate, or required by law, that such activities are transitioned to other agencies or entities.

(e) Any contract or agreement between the United States and any third party on behalf of the entities or programs abolished in subsection (a) of this section, or in furtherance of them, shall be terminated for convenience, or otherwise, as quickly as permissible under the law.

**Sec. 5**. *Unleashing Energy Dominance through Efficient Permitting.* (a) Executive Order 11991 of May 24, 1977 (Relating to protection and enhancement of environmental quality) is hereby revoked.

(b) To expedite and simplify the permitting process, within 30 days of the date of this order, the Chairman of the Council on Environmental Quality (CEQ) shall provide guidance on implementing the National Environmental Policy Act (NEPA), 42 U.S.C. 4321 *et seq.,* and propose rescinding CEQ's NEPA regulations found at 40 CFR 1500 *et seq.*

(c) Following the provision of the guidance, the Chairman of CEQ shall convene a working group to coordinate the revision of agency-level implementing regulations for consistency. The guidance in subsection (b) and any resulting implementing regulations must expedite permitting approvals and meet deadlines established in the Fiscal Responsibility Act of 2023 (Public Law 118–5). Consistent with applicable law, all agencies must prioritize efficiency and certainty over any other objectives, including those of activist groups, that do not align with the policy goals set forth in section 2 of this order or that could otherwise add delays and ambiguity to the permitting process.

(d) The Secretaries of Defense, Interior, Agriculture, Commerce, Housing and Urban Development, Transportation, Energy, Homeland Security, the Administrator of the Environmental Protection Agency (EPA), the Chairman of CEQ, and the heads of any other relevant agencies shall undertake all available efforts to eliminate all delays within their respective permitting processes, including through, but not limited to, the use of general permitting and permit by rule. For any project an agency head deems essential for the Nation's economy or national security, agencies shall use all possible

authorities, including emergency authorities, to expedite the adjudication of Federal permits. Agencies shall work closely with project sponsors to realize the ultimate construction or development of permitted projects.

(e) The Director of the NEC and the Director of the Office of Legislative Affairs shall jointly prepare recommendations to Congress, which shall:

(i) facilitate the permitting and construction of interstate energy transportation and other critical energy infrastructure, including, but not limited to, pipelines, particularly in regions of the Nation that have lacked such development in recent years; and

(ii) provide greater certainty in the Federal permitting process, including, but not limited to, streamlining the judicial review of the application of NEPA.

**Sec. 6**. *Prioritizing Accuracy in Environmental Analyses.* (a) In all Federal permitting adjudications or regulatory processes, all agencies shall adhere to only the relevant legislated requirements for environmental considerations and any considerations beyond these requirements are eliminated. In fulfilling all such requirements, agencies shall strictly use the most robust methodologies of assessment at their disposal and shall not use methodologies that are arbitrary or ideologically motivated.

(b) The Interagency Working Group on the Social Cost of Greenhouse Gases (IWG), which was established pursuant to Executive Order 13990, is hereby disbanded, and any guidance, instruction, recommendation, or document issued by the IWG is withdrawn as no longer representative of governmental policy including:

(i) the Presidential Memorandum of January 27, 2021 (Restoring Trust in Government Through Scientific Integrity and Evidence-Based Policymaking);

(ii) the Report of the Greenhouse Gas Monitoring and Measurement Interagency Working Group of November 2023 (National Strategy to Advance an Integrated U.S. Greenhouse Gas Measurement, Monitoring, and Information System);

(iii) the Technical Support Document of February 2021 (Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990); and

(iv) estimates of the social cost of greenhouse gases, including the estimates for the social cost of carbon, the social cost of methane, or the social cost of nitrous oxide based, in whole or in part, on the IWG's work or guidance.

(c) The calculation of the ''social cost of carbon'' is marked by logical deficiencies, a poor basis in empirical science, politicization, and the absence of a foundation in legislation. Its abuse arbitrarily slows regulatory decisions and, by rendering the United States economy internationally uncompetitive, encourages a greater human impact on the environment by affording less efficient foreign energy producers a greater share of the global energy and natural resource market. Consequently, within 60 days of the date of this order, the Administrator of the EPA shall issue guidance to address these harmful and detrimental inadequacies, including consideration of eliminating the ''social cost of carbon'' calculation from any Federal permitting or regulatory decision.

(d) Prior to the guidance issued pursuant to subsection (c) of this section, agencies shall ensure estimates to assess the value of changes in greenhouse gas emissions resulting from agency actions, including with respect to the consideration of domestic versus international effects and evaluating appropriate discount rates, are, to the extent permitted by law, consistent with the guidance contained in OMB Circular A–4 of September 17, 2003 (Regulatory Analysis).

(e) Furthermore, the head of each agency shall, as appropriate and consistent with applicable law, initiate a process to make such changes to

any rule, regulation, policy or action as may be necessary to ensure consistency with the Regulatory Analysis.

(f) Within 30 days of the date of this order, the Administrator of the EPA, in collaboration with the heads of any other relevant agencies, shall submit joint recommendations to the Director of OMB on the legality and continuing applicability of the Administrator's findings, ''Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act,'' Final Rule, 74 FR 66496 (December 15, 2009).

**Sec. 7**. *Terminating the Green New Deal.* (a) All agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117–169) or the Infrastructure Investment and Jobs Act (Public Law 117–58), including but not limited to funds for electric vehicle charging stations made available through the National Electric Vehicle Infrastructure Formula Program and the Charging and Fueling Infrastructure Discretionary Grant Program, and shall review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds for consistency with the law and the policy outlined in section 2 of this order. Within 90 days of the date of this order, all agency heads shall submit a report to the Director of the NEC and Director of OMB that details the findings of this review, including recommendations to enhance their alignment with the policy set forth in section 2. No funds identified in this subsection (a) shall be disbursed by a given agency until the Director of OMB and Assistant to the President for Economic Policy have determined that such disbursements are consistent with any review recommendations they have chosen to adopt.

(b) When procuring goods and services, making decisions about leases, and making other arrangements that result in disbursements of Federal funds, agencies shall prioritize cost-effectiveness, American workers and businesses, and the sensible use of taxpayer money, to the greatest extent. The Director of OMB shall finalize and circulate guidelines to further implement this subsection.

(c) All agencies shall assess whether enforcement discretion of authorities and regulations can be utilized to advance the policy outlined in section 2 of this order. Within 30 days of the date of this order, each agency shall submit a report to the Director of OMB identifying any such instances.

**Sec. 8**. *Protecting America's National Security.* (a) The Secretary of Energy is directed restart reviews of applications for approvals of liquified natural gas export projects as expeditiously as possible, consistent with applicable law. In assessing the ''Public Interest'' to be advanced by any particular application, the Secretary of Energy shall consider the economic and employment impacts to the United States and the impact to the security of allies and partners that would result from granting the application.

(b) With respect to any proposed deepwater port for the export of liquefied natural gas (project) for which a favorable record of decision (ROD) has previously been issued pursuant to the Deepwater Port Act of 1974 (DWPA), 33 U.S.C. 1501 *et seq.,* the Administrator of the Maritime Administration (MARAD) shall, within 30 days of the date of this order and consistent with applicable law, determine whether any refinements to the project proposed subsequent to the ROD are likely to result in adverse environmental consequences that substantially differ from those associated with the originally-evaluated project so as to present a seriously different picture of the foreseeable adverse environmental consequences (seriously different consequences). In making this determination, MARAD shall qualitatively assess any difference in adverse environmental consequences between the project with and without the proposed refinements, including any potential consequences not addressed in the final Environmental Impact Statement (EIS), which shall be considered adequate under NEPA notwithstanding any revisions to NEPA that may have been enacted following the final EIS. MARAD shall submit this determination, together with a detailed justification, to the Secretary of Transportation and to the President.

(c) Pursuant to subsection (b) of this section, if MARAD determines that such refinements are not likely to result in seriously different consequences, it shall include in that determination a description of the refinements to supplement and update the ROD, if necessary and then no later than 30 additional days, he shall issue a DWPA license.

(d) If MARAD determines, with concurrence from the Secretary of Transportation, that such proposed refinements are likely to result in seriously different consequences, it shall, within 60 days after submitting such determination, issue an Environmental Assessment (EA) examining such consequences and, with respect to all other environmental consequences not changed due to project refinements, shall reaffirm the conclusions of the final EIS. Within 30 days after issuing the EA, MARAD shall issue an addendum to the ROD, if necessary, and shall, within 30 additional days, issue a DWPA license consistent with the ROD.

**Sec. 9**. *Restoring America's Mineral Dominance.* (a) The Secretary of the Interior, Secretary of Agriculture, Administrator of the EPA, Chairman of CEQ, and the heads of any other relevant agencies, as appropriate, shall identify all agency actions that impose undue burdens on the domestic mining and processing of non-fuel minerals and undertake steps to revise or rescind such actions.

(b) The Secretaries of the Interior and Agriculture shall reassess any public lands withdrawals for potential revision.

(c) The Secretary of the Interior shall instruct the Director of the U.S. Geological Survey to consider updating the Survey's list of critical minerals, including for the potential of including uranium.

(d) The Secretary of the Interior shall prioritize efforts to accelerate the ongoing, detailed geologic mapping of the United States, with a focus on locating previously unknown deposits of critical minerals.

(e) The Secretary of Energy shall ensure that critical mineral projects, including the processing of critical minerals, receive consideration for Federal support, contingent on the availability of appropriated funds.

(f) The United States Trade Representative shall assess whether exploitative practices and state-assisted mineral projects abroad are unlawful or unduly burden or restrict United States commerce.

(g) The Secretary of Commerce shall assess the national security implications of the Nation's mineral reliance and the potential for trade action.

(h) The Secretary of Homeland Security shall assess the quantity and inflow of minerals that are likely the product of forced labor into the United States and whether such inflows pose a threat to national security and, within 90 days of the date of this order, shall provide this assessment to the Director of the NEC.

(i) The Secretary of Defense shall consider the needs of the United States in supplying and maintaining the National Defense Stockpile, review the legal authorities and obligations in managing the National Defense Stockpile, and take all appropriate steps to ensure that the National Defense Stockpile will provide a robust supply of critical minerals in event of future shortfall.

(j) Within 60 days of the date of this order, the Secretary of State, Secretary of Commerce, Secretary of Labor, the United States Trade Representative, and the heads of any other relevant agencies, shall submit a report to the Assistant to the President for Economic Policy that includes policy recommendations to enhance the competitiveness of American mining and refining companies in other mineral-wealthy nations.

(k) The Secretary of State shall consider opportunities to advance the mining and processing of minerals within the United States through the Quadrilateral Security Dialogue.

**Sec. 10**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of OMB relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–01956
Filed 1–28–25; 8:45 am]
Billing code 3395–F4–P

Federal Register / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents 8339

# Presidential Documents

**Executive Order 14151 of January 20, 2025**

## Ending Radical and Wasteful Government DEI Programs and Preferencing

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Purpose and Policy.* The Biden Administration forced illegal and immoral discrimination programs, going by the name ''diversity, equity, and inclusion'' (DEI), into virtually all aspects of the Federal Government, in areas ranging from airline safety to the military. This was a concerted effort stemming from President Biden's first day in office, when he issued Executive Order 13985, ''Advancing Racial Equity and Support for Underserved Communities Through the Federal Government.''

Pursuant to Executive Order 13985 and follow-on orders, nearly every Federal agency and entity submitted ''Equity Action Plans'' to detail the ways that they have furthered DEIs infiltration of the Federal Government. The public release of these plans demonstrated immense public waste and shameful discrimination. That ends today. Americans deserve a government committed to serving every person with equal dignity and respect, and to expending precious taxpayer resources only on making America great.

**Sec. 2.** *Implementation.* (a) The Director of the Office of Management and Budget (OMB), assisted by the Attorney General and the Director of the Office of Personnel Management (OPM), shall coordinate the termination of all discriminatory programs, including illegal DEI and ''diversity, equity, inclusion, and accessibility'' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear. To carry out this directive, the Director of OPM, with the assistance of the Attorney General as requested, shall review and revise, as appropriate, all existing Federal employment practices, union contracts, and training policies or programs to comply with this order. Federal employment practices, including Federal employee performance reviews, shall reward individual initiative, skills, performance, and hard work and shall not under any circumstances consider DEI or DEIA factors, goals, policies, mandates, or requirements.

(b) Each agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM, as appropriate, shall take the following actions within sixty days of this order:

(i) terminate, to the maximum extent allowed by law, all DEI, DEIA, and ''environmental justice'' offices and positions (including but not limited to ''Chief Diversity Officer'' positions); all ''equity action plans,'' ''equity'' actions, initiatives, or programs, ''equity-related'' grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees.

(ii) provide the Director of the OMB with a list of all:

(A) agency or department DEI, DEIA, or ''environmental justice'' positions, committees, programs, services, activities, budgets, and expenditures in existence on November 4, 2024, and an assessment of whether these positions, committees, programs, services, activities, budgets, and expenditures have been misleadingly relabeled in an attempt to preserve their pre-November 4, 2024 function;

(B) Federal contractors who have provided DEI training or DEI training materials to agency or department employees; and

(C) Federal grantees who received Federal funding to provide or advance DEI, DEIA, or ''environmental justice'' programs, services, or activities since January 20, 2021.

(iii) direct the deputy agency or department head to:

(A) assess the operational impact (e.g., the number of new DEI hires) and cost of the prior administration's DEI, DEIA, and ''environmental justice'' programs and policies; and

(B) recommend actions, such as Congressional notifications under 28 U.S.C. 530D, to align agency or department programs, activities, policies, regulations, guidance, employment practices, enforcement activities, contracts (including set-asides), grants, consent orders, and litigating positions with the policy of equal dignity and respect identified in section 1 of this order. The agency or department head and the Director of OMB shall jointly ensure that the deputy agency or department head has the authority and resources needed to carry out this directive.

(c) To inform and advise the President, so that he may formulate appropriate and effective civil-rights policies for the Executive Branch, the Assistant to the President for Domestic Policy shall convene a monthly meeting attended by the Director of OMB, the Director of OPM, and each deputy agency or department head to:

(i) hear reports on the prevalence and the economic and social costs of DEI, DEIA, and ''environmental justice'' in agency or department programs, activities, policies, regulations, guidance, employment practices, enforcement activities, contracts (including set-asides), grants, consent orders, and litigating positions;

(ii) discuss any barriers to measures to comply with this order; and

(iii) monitor and track agency and department progress and identify potential areas for additional Presidential or legislative action to advance the policy of equal dignity and respect.

**Sec. 3**. *Severability.* If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–01953
Filed 1–28–25; 8:45 am]
Billing code 3395–F4–P

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



# Presidential Documents

**Executive Order 14182 of January 24, 2025**

## Enforcing the Hyde Amendment

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Purpose and Policy.* For nearly five decades, the Congress has annually enacted the Hyde Amendment and similar laws that prevent Federal funding of elective abortion, reflecting a longstanding consensus that American taxpayers should not be forced to pay for that practice. However, the previous administration disregarded this established, commonsense policy by embedding forced taxpayer funding of elective abortions in a wide variety of Federal programs.

It is the policy of the United States, consistent with the Hyde Amendment, to end the forced use of Federal taxpayer dollars to fund or promote elective abortion.

**Sec. 2.** *Revocation of Orders and Actions.* The following Executive Orders are hereby revoked:

(a) Executive Order 14076 of July 8, 2022; and

(b) Executive Order 14079 of August 3, 2022.

**Sec. 3.** *Implementation.* The Director of the Office of Management and Budget shall promulgate guidance to the heads of executive departments and agencies related to implementation of sections 1 and 2 of this order.

**Sec. 4.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*January 24, 2025.*

[FR Doc. 2025–02175
Filed 1–30–25; 11:15 am]
Billing code 3395–F4–P

Federal Register / Vol. 90, No. 21 / Monday, February 3, 2025 / Presidential Documents 8757

# Presidential Documents

**Executive Order 14183 of January 27, 2025**

## Prioritizing Military Excellence and Readiness

By the authority vested in me as President by the Constitution and the laws of the United States of America, and as Commander in Chief of the Armed Forces of the United States, and to ensure the readiness and effectiveness of our Armed Forces, it is hereby ordered:

**Section 1.** *Purpose.* The United States military has a clear mission: to protect the American people and our homeland as the world's most lethal and effective fighting force. Success in this existential mission requires a singular focus on developing the requisite warrior ethos, and the pursuit of military excellence cannot be diluted to accommodate political agendas or other ideologies harmful to unit cohesion.

Recently, however, the Armed Forces have been afflicted with radical gender ideology to appease activists unconcerned with the requirements of military service like physical and mental health, selflessness, and unit cohesion. Longstanding Department of Defense (DoD) policy (DoD Instruction (DoDI) 6130.03) provides that it is the policy of the DoD to ensure that service members are ''[f]ree of medical conditions or physical defects that may reasonably be expected to require excessive time lost from duty for necessary treatment or hospitalization.'' As a result, many mental and physical health conditions are incompatible with active duty, from conditions that require substantial medication or medical treatment to bipolar and related disorders, eating disorders, suicidality, and prior psychiatric hospitalization.

Consistent with the military mission and longstanding DoD policy, expressing a false ''gender identity'' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service. Beyond the hormonal and surgical medical interventions involved, adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life. A man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member.

For the sake of our Nation and the patriotic Americans who volunteer to serve it, military service must be reserved for those mentally and physically fit for duty. The Armed Forces must adhere to high mental and physical health standards to ensure our military can deploy, fight, and win, including in austere conditions and without the benefit of routine medical treatment or special provisions.

**Sec. 2.** *Policy.* It is the policy of the United States Government to establish high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity. This policy is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria. This policy is also inconsistent with shifting pronoun usage or use of pronouns that inaccurately reflect an individual's sex.

**Sec. 3.** *Definitions.* The definitions in the Executive Order of January 20, 2025 (Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government) shall apply to this order.

**Sec. 4.** *Implementation.* (a) Within 60 days of the date of this order, the Secretary of Defense (Secretary) shall update DoDI 6130.03 Volume 1 (Medical Standards for Military Service: Appointment, Enlistment, or Induction

(May 6, 2018), Incorporating Change 5 of May 28, 2024) and DoDI 6130.03 Volume 2 (Medical Standards for Military Service: Retention (September 4, 2020), Incorporating Change 1 of June 6, 2022) to reflect the purpose and policy of this Order.

(b) The Secretary shall promptly issue directives for DoD to end invented and identification-based pronoun usage to best achieve the policy outlined in section 2 of this order.

(c) Within 30 days of the date of this order, the Secretary shall:

(i) identify all additional steps and issue guidance necessary to fully implement this order; and

(ii) submit to the President through the Assistant to the President for National Security Affairs a report that summarizes these steps.

(d) Absent extraordinary operational necessity, the Armed Forces shall neither allow males to use or share sleeping, changing, or bathing facilities designated for females, nor allow females to use or share sleeping, changing, or bathing facilities designated for males.

(e) Within 30 days of the issuance of the respective updates, directives, and guidance under subsections (a), (b), and (c) of this section, the Secretary of Homeland Security shall, with respect to the Coast Guard, issue updates, directives, and guidance consistent with the updates, directives, and guidance issued under subsections (a), (b), and (c) of this section.

**Sec. 5**. *Implementing the Revocation of Executive Order 14004.* (a) Pursuant to the Executive Order of January 20, 2025 (Initial Rescissions of Harmful Executive Orders and Actions), Executive Order 14004 of January 25, 2021 (Enabling All Qualified Americans To Serve Their Country in Uniform), has been revoked. Accordingly, all policies, directives, and guidance issued pursuant to Executive Order 14004 shall be rescinded to the extent inconsistent with the provisions of this order.

(b) The Secretary and, with respect to the Coast Guard, the Secretary of Homeland Security, shall take all necessary steps to implement the revocations described in subsection (a) of this section and ensure that all military departments and services fully comply with the provisions of this order.

**Sec. 6**. *Severability.* If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 7**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*January 27, 2025.*

[FR Doc. 2025–02178
Filed 1–31–25; 8:45 am]
Billing code 3395–F4–P

Federal Register / Vol. 90, No. 21 / Monday, February 3, 2025 / Presidential Documents 8771

## Presidential Documents

**Executive Order 14187 of January 28, 2025**

### Protecting Children From Chemical and Surgical Mutilation

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Policy and Purpose.* Across the country today, medical professionals are maiming and sterilizing a growing number of impressionable children under the radical and false claim that adults can change a child's sex through a series of irreversible medical interventions. This dangerous trend will be a stain on our Nation's history, and it must end.

Countless children soon regret that they have been mutilated and begin to grasp the horrifying tragedy that they will never be able to conceive children of their own or nurture their children through breastfeeding. Moreover, these vulnerable youths' medical bills may rise throughout their lifetimes, as they are often trapped with lifelong medical complications, a losing war with their own bodies, and, tragically, sterilization.

Accordingly, it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called "transition" of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures.

**Sec. 2.** *Definitions.* For the purposes of this order:

(a) The term "child" or "children" means an individual or individuals under 19 years of age.

(b) The term "pediatric" means relating to the medical care of a child.

(c) The phrase "chemical and surgical mutilation" means the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex; and surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions. This phrase sometimes is referred to as "gender affirming care."

**Sec. 3.** *Ending Reliance on Junk Science.* (a) The blatant harm done to children by chemical and surgical mutilation cloaks itself in medical necessity, spurred by guidance from the World Professional Association for Transgender Health (WPATH), which lacks scientific integrity. In light of the scientific concerns with the WPATH guidance:

(i) agencies shall rescind or amend all policies that rely on WPATH guidance, including WPATH's "Standards of Care Version 8"; and

(ii) within 90 days of the date of this order, the Secretary of Health and Human Services (HHS) shall publish a review of the existing literature on best practices for promoting the health of children who assert gender dysphoria, rapid-onset gender dysphoria, or other identity-based confusion.

(b) The Secretary of HHS, as appropriate and consistent with applicable law, shall use all available methods to increase the quality of data to guide practices for improving the health of minors with gender dysphoria, rapid-onset gender dysphoria, or other identity-based confusion, or who otherwise seek chemical or surgical mutilation.

**Sec. 4**. *Defunding Chemical and Surgical Mutilation.* The head of each executive department or agency (agency) that provides research or education grants to medical institutions, including medical schools and hospitals, shall, consistent with applicable law and in coordination with the Director of the Office of Management and Budget, immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children.

**Sec. 5**. *Additional Directives to the Secretary of HHS.* (a) The Secretary of HHS shall, consistent with applicable law, take all appropriate actions to end the chemical and surgical mutilation of children, including regulatory and sub-regulatory actions, which may involve the following laws, programs, issues, or documents:

(i) Medicare or Medicaid conditions of participation or conditions for coverage;

(ii) clinical-abuse or inappropriate-use assessments relevant to State Medicaid programs;

(iii) mandatory drug use reviews;

(iv) section 1557 of the Patient Protection and Affordable Care Act;

(v) quality, safety, and oversight memoranda;

(vi) essential health benefits requirements; and

(vii) the Eleventh Revision of the International Classification of Diseases and other federally funded manuals, including the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition.

(b) The Secretary of HHS shall promptly withdraw HHS's March 2, 2022, guidance document titled ''HHS Notice and Guidance on Gender Affirming Care, Civil Rights and Patient Privacy'' and, in consultation with the Attorney General, issue new guidance protecting whistleblowers who take action related to ensuring compliance with this order.

**Sec. 6**. *TRICARE.* The Department of Defense provides health insurance, through TRICARE, to nearly 2 million individuals under the age of 18. As appropriate and consistent with applicable law, the Secretary of Defense shall commence a rulemaking or sub-regulatory action to exclude chemical and surgical mutilation of children from TRICARE coverage and amend the TRICARE provider handbook to exclude chemical and surgical mutilation of children.

**Sec. 7**. *Requirements for Insurance Carriers.* The Director of the Office of Personnel Management, as appropriate and consistent with applicable law, shall:

(a) include provisions in the Federal Employee Health Benefits (FEHB) and Postal Service Health Benefits (PSHB) programs call letter for the 2026 Plan Year specifying that eligible carriers, including the Foreign Service Benefit Plan, will exclude coverage for pediatric transgender surgeries or hormone treatments; and

(b) negotiate to obtain appropriate corresponding reductions in FEHB and PSHB premiums.

**Sec. 8**. *Directives to the Department of Justice.* The Attorney General shall:

(a) review Department of Justice enforcement of section 116 of title 18, United States Code, and prioritize enforcement of protections against female genital mutilation;

(b) convene States' Attorneys General and other law enforcement officers to coordinate the enforcement of laws against female genital mutilation across all American States and Territories;

(c) prioritize investigations and take appropriate action to end deception of consumers, fraud, and violations of the Food, Drug, and Cosmetic Act by any entity that may be misleading the public about long-term side effects of chemical and surgical mutilation;

(d) in consultation with the Congress, work to draft, propose, and promote legislation to enact a private right of action for children and the parents of children whose healthy body parts have been damaged by medical professionals practicing chemical and surgical mutilation, which should include a lengthy statute of limitations; and

(e) prioritize investigations and take appropriate action to end child-abusive practices by so-called sanctuary States that facilitate stripping custody from parents who support the healthy development of their own children, including by considering the application of the Parental Kidnaping Prevention Act and recognized constitutional rights.

**Sec. 9**. *Enforcing Adequate Progress.* Within 60 days of the date of this order, the heads of agencies with responsibilities under this order shall submit a single, combined report to the Assistant to the President for Domestic Policy, detailing progress in implementing this order and a timeline for future action. The Assistant to the President for Domestic Policy shall regularly convene the heads of agencies with responsibilities under this order (or their designees) to coordinate and prepare for this submission.

**Sec. 10**. *Severability.* If any provision of this order, or the application of any provision to any person or circumstances, is held to be invalid, the remainder of this order and the application of any of its other provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 11**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*January 28, 2025.*

[FR Doc. 2025–02194
Filed 1–31–25; 8:45 am]
Billing code 3395–F4–P

Federal Register / Vol. 90, No. 21 / Monday, February 3, 2025 / Presidential Documents 8853

# Presidential Documents

**Executive Order 14190 of January 29, 2025**

## Ending Radical Indoctrination in K–12 Schooling

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Purpose and Policy.* Parents trust America's schools to provide their children with a rigorous education and to instill a patriotic admiration for our incredible Nation and the values for which we stand.

In recent years, however, parents have witnessed schools indoctrinate their children in radical, anti-American ideologies while deliberately blocking parental oversight. Such an environment operates as an echo chamber, in which students are forced to accept these ideologies without question or critical examination. In many cases, innocent children are compelled to adopt identities as either victims or oppressors solely based on their skin color and other immutable characteristics. In other instances, young men and women are made to question whether they were born in the wrong body and whether to view their parents and their reality as enemies to be blamed. These practices not only erode critical thinking but also sow division, confusion, and distrust, which undermine the very foundations of personal identity and family unity.

Imprinting anti-American, subversive, harmful, and false ideologies on our Nation's children not only violates longstanding anti-discrimination civil rights law in many cases, but usurps basic parental authority. For example, steering students toward surgical and chemical mutilation without parental consent or involvement or allowing males access to private spaces designated for females may contravene Federal laws that protect parental rights, including the Family Educational Rights and Privacy Act (FERPA) and the Protection of Pupil Rights Amendment (PPRA), and sex-based equality and opportunity, including Title IX of the Education Amendments of 1972 (Title IX). Similarly, demanding acquiescence to "White Privilege" or "unconscious bias," actually promotes racial discrimination and undermines national unity.

My Administration will enforce the law to ensure that recipients of Federal funds providing K–12 education comply with all applicable laws prohibiting discrimination in various contexts and protecting parental rights, including Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. 2000d *et seq.;* Title IX, 20 U.S.C. 1681 *et seq.;* FERPA, 20 U.S.C. 1232g; and the PPRA, 20 U.S.C. 1232h.

**Sec. 2.** *Definitions.* As used herein:

(a) The definitions in the Executive Order "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (January 20, 2025) shall apply to this order.

(b) "Discriminatory equity ideology" means an ideology that treats individuals as members of preferred or disfavored groups, rather than as individuals, and minimizes agency, merit, and capability in favor of immoral generalizations, including that:

(i) Members of one race, color, sex, or national origin are morally or inherently superior to members of another race, color, sex, or national origin;

(ii) An individual, by virtue of the individual's race, color, sex, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(iii) An individual's moral character or status as privileged, oppressing, or oppressed is primarily determined by the individual's race, color, sex, or national origin;

(iv) Members of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to their race, color, sex, or national origin;

(v) An individual, by virtue of the individual's race, color, sex, or national origin, bears responsibility for, should feel guilt, anguish, or other forms of psychological distress because of, should be discriminated against, blamed, or stereotyped for, or should receive adverse treatment because of actions committed in the past by other members of the same race, color, sex, or national origin, in which the individual played no part;

(vi) An individual, by virtue of the individual's race, color, sex, or national origin, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion;

(vii) Virtues such as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist or were created by members of a particular race, color, sex, or national origin to oppress members of another race, color, sex, or national origin; or

(viii) the United States is fundamentally racist, sexist, or otherwise discriminatory.

(c) ''Educational service agency'' (ESA) has the meaning given in 20 U.S.C. 1401(5), and the terms ''elementary school,'' ''local educational agency'' (LEA), ''secondary school,'' and ''state educational agency'' (SEA) have the meanings given in 34 CFR 77.1(c).

(d) ''Patriotic education'' means a presentation of the history of America grounded in:

(i) an accurate, honest, unifying, inspiring, and ennobling characterization of America's founding and foundational principles;

(ii) a clear examination of how the United States has admirably grown closer to its noble principles throughout its history;

(iii) the concept that commitment to America's aspirations is beneficial and justified; and

(iv) the concept that celebration of America's greatness and history is proper.

(e) ''Social transition'' means the process of adopting a ''gender identity'' or ''gender marker'' that differs from a person's sex. This process can include psychological or psychiatric counseling or treatment by a school counselor or other provider; modifying a person's name (e.g., ''Jane'' to ''James'') or pronouns (e.g., ''him'' to ''her''); calling a child ''nonbinary''; use of intimate facilities and accommodations such as bathrooms or locker rooms specifically designated for persons of the opposite sex; and participating in school athletic competitions or other extracurricular activities specifically designated for persons of the opposite sex. ''Social transition'' does not include chemical or surgical mutilation.

**Sec. 3**. *Ending Indoctrination Strategy.* (a) Within 90 days of the date of this order, to advise the President in formulating future policy, the Secretary of Education, the Secretary of Defense, and the Secretary of Health and Human Services, in consultation with the Attorney General, shall provide an Ending Indoctrination Strategy to the President, through the Assistant to the President for Domestic Policy, containing recommendations and a plan for:

(i) eliminating Federal funding or support for illegal and discriminatory treatment and indoctrination in K–12 schools, including based on gender ideology and discriminatory equity ideology; and

(ii) protecting parental rights, pursuant to FERPA, 20 U.S.C. 1232g, and the PPRA, 20 U.S.C. 1232h, with respect to any K–12 policies or conduct implicated by the purpose and policy of this order.

(b) The Ending Indoctrination Strategy submitted under subsection (a) of this section shall contain a summary and analysis of the following:

(i) All Federal funding sources and streams, including grants or contracts, that directly or indirectly support or subsidize the instruction, advancement, or promotion of gender ideology or discriminatory equity ideology:

(A) in K–12 curriculum, instruction, programs, or activities; or

(B) in K–12 teacher education, certification, licensing, employment, or training;

(ii) Each agency's process to prevent or rescind Federal funds, to the maximum extent consistent with applicable law, from being used by an ESA, SEA, LEA, elementary school, or secondary school to directly or indirectly support or subsidize the instruction, advancement, or promotion of gender ideology or discriminatory equity ideology in:

(A) K–12 curriculum, instruction, programs, or activities; or

(B) K–12 teacher certification, licensing, employment, or training;

(iii) Each agency's process to prevent or rescind Federal funds, to the maximum extent consistent with applicable law, from being used by an ESA, SEA, LEA, elementary school, or secondary school to directly or indirectly support or subsidize the social transition of a minor student, including through school staff or teachers or through deliberately concealing the minor's social transition from the minor's parents.

(iv) Each agency's process to prevent or rescind Federal funds, to the maximum extent consistent with applicable law, from being used by an ESA, SEA, LEA, elementary school, or secondary school to directly or indirectly support or subsidize:

(A) interference with a parent's Federal statutory right to information regarding school curriculum, records, physical examinations, surveys, and other matters under the PPRA or FERPA; or

(B) a violation of Title VI or Title IX; and

(v) A summary and analysis of all relevant agency enforcement tools to advance the policies of this order.

(c) The Attorney General shall coordinate with State attorneys general and local district attorneys in their efforts to enforce the law and file appropriate actions against K–12 teachers and school officials who violate the law by:

(i) sexually exploiting minors;

(ii) unlawfully practicing medicine by offering diagnoses and treatment without the requisite license; or

(iii) otherwise unlawfully facilitating the social transition of a minor student.

(d) The Assistant to the President for Domestic Policy shall regularly convene the heads of the agencies tasked with submitting the Ending Indoctrination Strategy under subsection (a) of this section to confer regarding their findings, areas for additional investigation, the modification or implementation of their respective recommendations, and such other policy initiatives or matters as the President may direct.

**Sec. 4**. *Reestablishing the President's Advisory 1776 Commission and Promoting Patriotic Education.* (a) The President's Advisory 1776 Commission (''1776 Commission''), which was created by Executive Order 13958 of November 2, 2020, to promote patriotic education, but was terminated by President Biden in Executive Order 13985 of January 20, 2021, is hereby reestablished. The purpose of the 1776 Commission is to promote patriotic education and advance the purposes stated in section 1 of Executive Order 13958, as well as to advise and promote the work of the White House Task Force on Celebrating America's 250th Birthday (''Task Force 250'') and the United States Semiquincentennial Commission in their efforts to

provide a grand celebration worthy of the momentous occasion of the 250th anniversary of American Independence on July 4, 2026.

(b) Within 120 days of the date of this order, the Secretary of Education shall establish the 1776 Commission in the Department of Education.

(c) The 1776 Commission shall be composed of not more than 20 members, who shall be appointed by the President for a term of 2 years. The 1776 Commission shall be made up of individuals from outside the Federal Government with relevant experience or subject-matter expertise.

(d) The 1776 Commission shall have a Chair or Co-Chairs, at the President's discretion, and a Vice Chair, who shall be designated by the President from among the Commission's members. An Executive Director, designated by the Secretary of Education in consultation with the Assistant to the President for Domestic Policy, shall coordinate the work of the 1776 Commission. The Chair (or Co-Chairs) and Vice Chair shall work with the Executive Director to convene regular meetings of the 1776 Commission, determine its agenda, and direct its work, consistent with this order.

(e) The 1776 Commission shall:

(i) facilitate the development and implementation of a ''Presidential 1776 Award'' to recognize student knowledge of the American founding, including knowledge about the Founders, the Declaration of Independence, the Constitutional Convention, and the great soldiers and battles of the American Revolutionary War;

(ii) in coordination with the White House Office of Public Liaison, coordinate bi-weekly lectures regarding the 250th anniversary of American Independence that are grounded in patriotic education principles, which shall be broadcast to the Nation throughout calendar year 2026;

(iii) upon request, advise executive departments and agencies regarding their efforts to ensure patriotic education is appropriately provided to the public at national parks, battlefields, monuments, museums, installations, landmarks, cemeteries, and other places important to the American founding and American history, as appropriate and consistent with applicable law;

(iv) upon request, offer advice and recommendations to, and support the work of Task Force 250 and the United States Semiquincentennial Commission regarding their plans to celebrate the 250th anniversary of American Independence; and

(v) facilitate, advise upon, and promote private and civic activities nationwide to increase public knowledge of and support patriotic education surrounding the 250th anniversary of American Independence, as appropriate and consistent with applicable law.

(f) The Department of Education shall provide funding and administrative support for the 1776 Commission, to the extent permitted by law and subject to the availability of appropriations.

(g) Members of the 1776 Commission shall serve without compensation but, as approved by the Department of Education, shall be reimbursed for travel expenses, including per diem in lieu of subsistence, as authorized by law for persons serving intermittently in the Government service (5 U.S.C. 5701–5707).

(h) Insofar as chapter 10 of title 5, United States Code (commonly known as the Federal Advisory Committee Act), may apply to the 1776 Commission, any functions of the President under that Act, except that of reporting to the Congress, shall be performed by the Secretary of Education, in accordance with the guidelines issued by the Administrator of General Services.

(i) The 1776 Commission shall terminate 2 years from the date of this order, unless extended by the President.

**Sec. 5**. *Additional Patriotic Education Measures.* (a) All relevant agencies shall monitor compliance with section 111(b) of title I of Division J of

Public Law 108–447, which provides that ''[e]ach educational institution that receives Federal funds for a fiscal year shall hold an educational program on the United States Constitution on September 17 of such year for the students served by the educational institution,'' including by verifying compliance with each educational institution that receives Federal funds. All relevant agencies shall take action, as appropriate, to enhance compliance with that law.

(b) All relevant agencies shall prioritize Federal resources, consistent with applicable law, to promote patriotic education, including through the following programs:

(i) the Department of Education's American History and Civics Academies and American History and Civics Education-National Activities programs;

(ii) the Department of Defense's National Defense Education Program and Pilot Program on Enhanced Civics Education; and

(iii) the Department of State's Bureau of Educational and Cultural Affairs and Fulbright, U.S. Speaker, and International Visitor Leadership programs, as well as the American Spaces network.

**Sec. 6**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*January 29, 2025.*

[FR Doc. 2025–02232
Filed 1–31–25; 11:15 am]
Billing code 3395–F4–P

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

Federal Register / Vol. 90, No. 27 / Tuesday, February 11, 2025 / Presidential Documents 9279

# Presidential Documents

Executive Order 14201 of February 5, 2025

## Keeping Men Out of Women's Sports

By the authority vested in me as President by the Constitution and the laws of the United States of America, and to protect opportunities for women and girls to compete in safe and fair sports, it is hereby ordered:

**Section 1**. *Policy and Purpose.* In recent years, many educational institutions and athletic associations have allowed men to compete in women's sports. This is demeaning, unfair, and dangerous to women and girls, and denies women and girls the equal opportunity to participate and excel in competitive sports.

Moreover, under Title IX of the Education Amendments Act of 1972 (Title IX), educational institutions receiving Federal funds cannot deny women an equal opportunity to participate in sports. As some Federal courts have recognized, ''ignoring fundamental biological truths between the two sexes deprives women and girls of meaningful access to educational facilities.'' *Tennessee* v. *Cardona,* 24–cv–00072 at 73 (E.D. Ky. 2024). See also *Kansas* v. *U.S. Dept. of Education,* 24–cv–04041 at 23 (D. Kan. 2024) (highlighting ''Congress' goals of protecting biological women in education'').

Therefore, it is the policy of the United States to rescind all funds from educational programs that deprive women and girls of fair athletic opportunities, which results in the endangerment, humiliation, and silencing of women and girls and deprives them of privacy. It shall also be the policy of the United States to oppose male competitive participation in women's sports more broadly, as a matter of safety, fairness, dignity, and truth.

**Sec. 2**. *Definitions.* The definitions in Executive Order 14168 of January 20, 2025 (Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government), shall apply to this order.

**Sec. 3**. *Preserving Women's Sports in Education.* (a) In furtherance of the purposes of Title IX, the Secretary of Education shall promptly:

(i) in coordination with the Attorney General, continue to comply with the vacatur of the rule entitled ''Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance'' of April 29, 2024, 89 FR 33474, see *Tennessee* v. *Cardona,* 24–cv–00072 at 13–15 (E.D. Ky. 2025), and take other appropriate action to ensure this regulation does not have effect;

(ii) take all appropriate action to affirmatively protect all-female athletic opportunities and all-female locker rooms and thereby provide the equal opportunity guaranteed by Title IX of the Education Amendments Act of 1972, including enforcement actions described in subsection (iii); to bring regulations and policy guidance into line with the Congress' existing demand for ''equal athletic opportunity for members of both sexes'' by clearly specifying and clarifying that women's sports are reserved for women; and the resolution of pending litigation consistent with this policy; and

(iii) prioritize Title IX enforcement actions against educational institutions (including athletic associations composed of or governed by such institutions) that deny female students an equal opportunity to participate in sports and athletic events by requiring them, in the women's category, to compete with or against or to appear unclothed before males.

(b) All executive departments and agencies (agencies) shall review grants to educational programs and, where appropriate, rescind funding to programs that fail to comply with the policy established in this order.

(c) The Department of Justice shall provide all necessary resources, in accordance with law, to relevant agencies to ensure expeditious enforcement of the policy established in this order.

**Sec. 4**. *Preserving Fairness and Safety in Women's Sports.* Many sport-specific governing bodies have no official position or requirements regarding trans-identifying athletes. Others allow men to compete in women's categories if these men reduce the testosterone in their bodies below certain levels or provide documentation of ''sincerely held'' gender identity. These policies are unfair to female athletes and do not protect female safety. To address these concerns, it is hereby ordered:

(a) The Assistant to the President for Domestic Policy shall, within 60 days of the date of this order:

(i) convene representatives of major athletic organizations and governing bodies, and female athletes harmed by such policies, to promote policies that are fair and safe, in the best interests of female athletes, and consistent with the requirements of Title IX, as applicable; and

(ii) convene State Attorneys General to identify best practices in defining and enforcing equal opportunities for women to participate in sports and educate them about stories of women and girls who have been harmed by male participation in women's sports.

(b) The Secretary of State, including through the Bureau of Educational and Cultural Affairs' Sports Diplomacy Division and the Representative of the United States of America to the United Nations, shall:

(i) rescind support for and participation in people-to-people sports exchanges or other sports programs within which the relevant female sports category is based on identity and not sex; and

(ii) promote, including at the United Nations, international rules and norms governing sports competition to protect a sex-based female sports category, and, at the discretion of the Secretary of State, convene international athletic organizations and governing bodies, and female athletes harmed by policies that allow male participation in women's sports, to promote sporting policies that are fair, safe, and in furtherance of the best interests of female athletes.

(c) The Secretary of State and the Secretary of Homeland Security shall review and adjust, as needed, policies permitting admission to the United States of males seeking to participate in women's sports, and shall issue guidance with an objective of preventing such entry to the extent permitted by law, including pursuant to section 212(a)(6)(C)(i) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(6)(C)(i)).

(d) The Secretary of State shall use all appropriate and available measures to see that the International Olympic Committee amends the standards governing Olympic sporting events to promote fairness, safety, and the best interests of female athletes by ensuring that eligibility for participation in women's sporting events is determined according to sex and not gender identity or testosterone reduction.

**Sec. 5**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party

against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.



THE WHITE HOUSE,
*February 5, 2025.*

[FR Doc. 2025–02513
Filed 2–10–25; 8:45 am]
Billing code 3395–F4–P

X
Home
Explore
15 Notifications
Chat
Grok
History
Creator Studio
Premium
Profile
More
Post

HRSA
@HRSAgov

Post

HRSA
@HRSAgov

ICYMI #HRSA's #RyanWhite HIV/AIDS Program released a letter reaffirming the importance of providing gender affirming #HIV care & treatment services to transgender people w/HIV to reduce barriers, ensure access to medication & improve health outcomes. bit.ly/35reCDX




3:41 PM · Jan 28, 2022

3 8

Post your reply
Reply

Search

Relevant people

HRSA
@HRSAgov
The official government account of the Health Resources and Services Administration, an agency of @HHSgov. Authentication: hhs.gov/web/social-med...

What's happening

The Bigger Play
Sports uplift communities
Promoted by J.P. Morgan

Trending
#PublicHealth

UK national news · Trending
Harry and Meghan

Sports · Trending
Gonzo

Show more

Terms · Privacy · Cookies · Accessibility · US TIDA · Ads Info · More ··· © 2026 X Corp.

X
Home
Explore
15 Notifications
Chat
Grok
History
Creator Studio
Premium
Profile
More
Post

Post

HRSA
@HRSAgov

ICYMI - #HRSA's #RyanWhite HIV/AIDS Program released a letter reaffirming the importance of providing gender affirming #HIV care & treatment services to transgender people w/HIV to reduce barriers, ensure access to medication & improve health outcomes: bit.ly/3DdwY88




11:13 AM · Mar 25, 2022

5 4

Post your reply
Reply

Search

Relevant people
HRSA
@HRSAgov
The official government account of the Health Resources and Services Administration, an agency of @HHSgov. Authentication: hhs.gov/web/social-med...

What's happening
The Bigger Play
Sports uplift communities
Promoted by J.P. Morgan
Trending
#PublicHealth
UK national news · Trending
Harry and Meghan
Sports · Trending
Gonzo
Show more

Terms · Privacy · Cookies · Accessibility · US TIDA · Ads Info · More ··· © 2026 X Corp.

HRSA
@HRSAgov

Home
Explore
Notifications
Chat
Grok
History
Creator Studio
Premium
Profile
More
Post

**Post**

**HHS** @HHSGov

We delivered a clear message: federal funds must be used responsibly. California's Personal Responsibility Education Program grant was revoked today because it failed to remove delusional gender ideology that isn't part of the program's mission. We stand firm on doing the right thing for children.

5:48 PM · Aug 21, 2025 · **12.5K** Views

30 61 355 7

Relevant View quotes

Post your reply Reply

**HHS** @HHSGov · Aug 21, 2025
Read more about what we did ⬇️
acf.gov/media/press/20...
4 11 62 7.2K

**Julie Bockey-Autism Ohana** @JulieBockey · Aug 21, 2025
I voted for this. 👍
1 9 201

**LTrayP** @ltrayp · Aug 21, 2025
You don't care about the health and welfare of anybody. This is a dick move and you know it. This administration is hellbent on hurting Americans.
6 5 143

**Liana** @LianaNew62 · Aug 21, 2025
Now do Illinois ... PLEASE.
1 137

**Abraham Lynksys** @TorySnyc · Aug 21, 2025
Literally nothing coming out of HHS is credible to any serious person. Your tweets sound like they were written by a teenager.
1 3 66

**John Carroll** 🌎 @Gizmocarroll69 · Aug 21, 2025
Epstein distraction tweet #4356
3 100

**Ginkgo Active** @HealthGinkgo · Aug 22, 2025
The most responsible health plan is prevention, and Ginkgo Active makes it easy and cost-efficient with smart, AI-powered workout plans tailored to keep you out of the hospital. #GinkgoActive
3

**: Mary** 🔻 @maryjoy_2022 · Aug 21, 2025
@BillMelugin_ 👍👏
123

**Dennis O'Sullivan** @DennisO13430082 · Aug 21, 2025
So, there are no trans children? I think there are.
3 1 101

**Tracking Hope** @StacyBo10751067 · Aug 21, 2025
Oregon and Washington are still doing the same too.
1 1 115

**Filomenamiller Miller** @fscarati1952 · Aug 22, 2025
New York is violating my first amendment rights of freedom of religion. I do not consent to having aborted fetal tissues injected into myself or my children . Rectify this government overreach , immediately.
1 26

**twenty** @csubb20 · Aug 21, 2025
Oh you fucked around, and are about to find out. GCN will stop subsidizing the federal government and red states. 🤦‍♂️
2 99

**Lisa Oshima** @lisawhelan · Aug 21, 2025
"We stand firm on doing the right thing for children." This also you? 👇
x.com/lisawhelan/sta... cc @PTF.org @GovPressOffice
1 138

**Burevestnik** @Burevestnik2025 · Aug 22, 2025
excellent
3

**John Van Dammit** @DammitJean · Aug 22, 2025
HHS:

Our message is clear:
rfk jr is a bigot

And we have a marketing department that is prepared to say we are giving clear instructions even though the marketing people writing agency copy have no clue what the words effectively mean (orders from the boss mean turn brain off)
27

**Gayle M. Montgomery** @Indigo_Nights · Aug 22, 2025
And all you with penises and wannabe penises think you are bad. You are useless slobs.
25

**J** @QunBee · Aug 22, 2025
XX! XY! 🇺🇸
17

**💥It's the Fall of Rome, people** @sparrowninja22 · Aug 22, 2025
Thank you!
32

**Karen Linnea** @linneakar69 · Aug 22, 2025
Awesome 👍
31

Search

**Relevant people**

**HHS** @HHSGov Follows you Following
Official account of the U.S. Department of Health & Human Services | Follow @SecKennedy | For latest news follow @HHSResponse | MAHA 🇺🇸

**What's happening**

**The Bigger Play**
Sports uplift communities
Promoted by J.P. Morgan

Trending
**#PublicHealth**

UK national news · Trending
**Harry and Meghan**

Trending in United States
**Gonzo**

Show more

Terms · Privacy · Cookies · Accessibi ity · US T DA · Ads nfo · More ··· © 2026 X Corp.

HRSA
@HRSAgov

Home
Explore
15 Notifications
Chat
Grok
History
Creator Studio
Premium
Profile
More
Post

Post

**HHS** @HHSGov

At the United Nations General Assembly, on behalf of @POTUS and the United States, @SecKennedy:

• Reaffirmed the Trump Administration's commitment to exit the World Health Organization

• Rejected the divisive and controversial Political Declaration on Non-Communicable Diseases

• Asserted that there is no constitutional or international right to abortion

• Opposed destructive gender ideology

The United States will walk away from the WHO, but we will never walk away from the world—or our commitment to end chronic disease.

We stand ready to lead, to partner, and to innovate with every nation committed to a healthier future.



9:00 AM · Sep 27, 2025 · **92.8K** Views

68 222 851 41

Relevant View quotes

Post your reply Reply

**P.J.** 🇺🇸 @tutua_kai · Sep 27, 2025
Thank you for your bravery and for fighting for a hea thy America and wor d.
1 10 426

**Dexter the Dog** @dexter_doggie · Sep 27, 2025
This is what the rest of the wor d thinks of you.



7 267

**tjefferson76** @tjefferson76308 · Sep 27, 2025
🇺🇸 is back.

@RobertKennedyJr is the first honest po itician in decades - fighting for a cause and not for bribes.
6 553

**Alex Cross** @Alex_tweetbot12 · Sep 27, 2025
By b atant y choosing to ignore not on y medicine, but science as a who e & just basic facts & history, the Fascist Regime S wa king away from the wor d & showing that they have NO interest if fighting ANY disease or i ness. They want you dumb, angry, & sick! @UN @who
1 1 5 105

**Pendejo Naranja.** 🌊🎸 🇺🇸🇺🇦 @PendejoNaranja · Sep 27, 2025




1 5 197

**MagicMark** @MagicMark9 · Sep 27, 2025
x.com/glenn_tunes/st...
2 3 60

**Brat** @Shark0194 · Sep 27, 2025
Like a things becomes way too po itica . t has ost its goa s.
1 5 808

**LA** @SkepticJaneGalt · Sep 27, 2025
👏👏👏
4 341

**BobbieRose** @PepperLove215 · Sep 27, 2025
You rea y want as many Americans to die as possib e don t you
1 4 114

Search

**Relevant people**

**HHS** @HHSGov Follows you Following
Officia account of the U.S. Department of Hea th & Human Services Fo ow @SecKennedy For atest news fo ow @HHSResponse MAHA 🇺🇸

**What's happening**

**The Bigger Play**
Sports up ift communities
Promoted by J.P. Morgan

Trending
**#PublicHealth**

Sports · Trending
**Gonzo**

UK nationa news · Trending
**Harry and Meghan**

Show more

Terms · Privacy · Cookies · Accessibility · US T DA · Ads nfo · More ... © 2026 X Corp.

HRSA @HRSAgov

An official website of the United States government Here's how you know



## Who We Are

The **HIV/AIDS Bureau** provides a comprehensive system of HIV primary medical care, medications, and essential support service for low-income people with HIV.

Through the Ryan White HIV/AIDS Program:

- We fund cities, counties, states, and local community-based organizations to provide HIV care, treatment, and essential services to more than 600,000 people over half of the people diagnosed with HIV in the United States.
- 91.4% of clients receiving HIV medical care were virally suppressed in 2024, which means they can live longer and healthier lives and cannot sexually transmit HIV.

Learn More

## Featured



### Find HIV Care and Treatment

Get connected to HIV care, treatment, and support through the Ryan White HIV/AIDS Program.



### New 2024 Ryan White HIV/AIDS Program Data

Read the latest RWHAP Annual Data Report.

Return to top

**Sign up for email updates.** Subscribe

**Find a Ryan White HIV/AIDS Program Medical Provider**

Enter a city name, ZIP code (such as "20002"), or address.

English | Español

## More About the Program

Who Was Ryan White?

State Hotlines

Find Funding

TargetHIV*

Contact Us

*Per a court order, HHS is required to restore this website as of 11:59 p.m., February 14, 2025. Any information on this page promoting gender ideology is extremely inaccurate and disconnected from the immutable biological reality that there are two sexes, male and female. The Trump Administration rejects gender ideology and condemns the harms it causes to children, by promoting their chemical and surgical mutilation, and to women, by depriving them of their dignity, safety, well-being, and opportunities. This page does not reflect biological reality and therefore the Administration and this Department rejects it.*

Accessibility | Disclaimers | Freedom of Information Act | Health and Human Services | No FEAR Act | Privacy Policy | USA.gov | Viewers & Players | Vulnerability Disclosure Policy | WhiteHouse.gov

An official website of the United States government Here's how you know



# Part B: Grants to States and Territories

The Ryan White HIV/AIDS Program (RWHAP) Part B provides grants to states and territories. This funding helps them improve HIV medical and support services. The improvements focus on making these services better, easier to access, and more organized.

## What grants are available under Part B?

The Ryan White HIV/AIDS Program (RWHAP) Part B grants include:

- Base grant - This covers core medical services and support services
- Supplemental grant -This grant gives additional money to states and territories that can show they need more help
- AIDS Drug Assistance Program (ADAP) - This grant helps low-income people with HIV get the medications they need. There are three kinds of ADAP:
  - Regular ADAP grants: this provides money for medications
  - Supplemental ADAP grants: some states receive extra money if they have a greater need
  - Emergency relief funds: some states receive money to help people waiting for ADAP medicine
- Minority AIDS Initiative grants - These grants focus on educating and helping minority communities to access ADAP and other medication assistance programs
- Emerging Communities grants - These grants provide additional money to states that have a growing number of people with AIDS (also known as "emerging communities."). These are communities that have between 500 and 999 AIDS cases in the past five years

## Who are Part B grant recipients?

Part B grant funding goes to the chief elected official (CEO) of a state or territory. The CEO then chooses an agency, like the department of health, to manage the grant.

View the list of FY 2025 Part B grant awards.

## Who is eligible for Part B grants?

RWHAP Part B grants are available to all states and territories in the United States. This includes:

- The Commonwealth of Puerto Rico
- Northern Mariana Islands
- American Samoa

- Guam
- U.S. Virgin Islands
- Federated States of Micronesia
- Republic of the Marshall Islands
- Republic of Palau

RWHAP Part B is also available to states or territories with emerging communities.

## How do you decide base grants?

The amount of funding each state or territory gets in a base grant depends on how many people are living with HIV. We use a formula and data from the most recent calendar year. This decides Part B and ADAP base grants.

Learn more about ADAP base and supplemental grants, and emergency relief funding.

## What services do Part B grant recipients fund and provide?

Part B grant recipients fund medications, core medical services, and support services. Each state or territory decides which services to offer based on their jurisdiction's needs assessment and available funding.

All Part B recipients and subrecipients must help eligible clients find health care coverage.

### Core medical services

- Outpatient and ambulatory health services
- AIDS Drug Assistance Program
- AIDS pharmaceutical assistance
- Oral health care
- Early intervention services
- Health insurance premium and cost-sharing assistance
- Home health care
- Medical nutrition therapy
- Hospice services
- Home and community-based health services
- Mental health services
- Outpatient substance abuse care
- Medical case management, including treatment-adherence services

### Support services

- Outreach
- Medical transportation
- Linguistic services

- Respite care for caregivers of people with HIV/AIDS
- Referrals for health care and other support services
- Non-medical case management
- Residential substance abuse treatment services

## What percent of funding goes to core medical services and support services?

Part B grant recipients must spend:

- At least 75% on core medical services
- No more than 25% on support services

Part B grant recipients can get a waiver for the 75% core medical services if:

- There are no waiting lists for ADAP
- Core medical services are available to people identified and eligible in an applicant's service area

**Date Last Reviewed:** February 2026

Return to top

**Sign up for email updates.** Subscribe

**Find a Ryan White HIV/AIDS Program Medical Provider**

Enter a city name, ZIP code (such as "20002"), or address.

English | Español

## More About the Program

Who Was Ryan White?

State Hotlines

Find Funding

TargetHIV*

Contact Us

*Per a court order, HHS is required to restore this website as of 11:59 p.m., February 14, 2025. Any information on this page promoting gender ideology is extremely inaccurate and disconnected from the immutable biological reality that there are two sexes, male and female. The Trump Administration rejects gender ideology and condemns the harms it causes to children, by promoting their chemical and surgical mutilation, and to women, by depriving them of their dignity, safety, well being, and opportunities. This page does not reflect biological reality and therefore the Administration and this Department rejects it.*

An official website of the United States government Here's how you know



# Part C: Early Intervention Services (EIS) and Capacity Development Grants

The Ryan White HIV/AIDS Program (RWHAP) Part C provides grants to community based organizations. These grants include:

- EIS Grants
- Capacity Development Grants

## What services do EIS grants fund?

Part C EIS grants fund primary health care and support services in outpatient settings for people with HIV.

## Who can apply for an EIS grant?

- Federally Qualified Health Centers
- Family planning grantees (other than states)
- Comprehensive Hemophilia Diagnostic and Treatment Centers
- Rural health clinics
- Health facilities operated or contracted by the Indian Health Service
- Community-based organizations, clinics, hospitals, and other facilities that provide early intervention services to people with HIV
- Nonprofit private entities that provide complete primary care to groups of people at risk of HIV, including faith-based and community-based organizations

View the list of FY25 Part C EIS grant awards.

## What services do capacity development grants fund?

Part C Capacity Development grants help organizations strengthen their infrastructure. This helps grant recipients improve their ability to develop, enhance, or expand access to high-quality HIV primary health care services for people with HIV in low-income or rural communities.

## Who can apply for a capacity development grant?

- Public or private nonprofits that provide (or plan to provide) HIV primary care
- Current RWHAP grant recipients
- Faith-based organizations
- Community-based organizations
- Tribes and tribal organizations

View the list of FY25 Part C Capacity Development grant awards.

**Date Last Reviewed:** February 2026

Return to top

**Sign up for email updates.** Subscribe

**Find a Ryan White HIV/AIDS Program Medical Provider**
Enter a city name, ZIP code (such as "20002"), or address.

English | Español

**More About the Program**

Who Was Ryan White?
State Hotlines
Find Funding
TargetHIV*

Contact Us

*Per a court order, HHS is required to restore this website as of 11:59 p.m., February 14, 2025. Any information on this page promoting gender ideology is extremely inaccurate and disconnected from the immutable biological reality that there are two sexes, male and female. The Trump Administration rejects gender ideology and condemns the harms it causes to children, by promoting their chemical and surgical mutilation, and to women, by depriving them of their dignity, safety, well-being, and opportunities. This page does not reflect biological reality and therefore the Administration and this Department rejects it.*

An official website of the United States government Here's how you know



# Part F: Special Projects of National Significance (SPNS) Program

The Ryan White HIV/AIDS Program (RWHAP) Part F Special Projects of National Significance (SPNS) Program supports the development of innovative models of HIV care and treatment to quickly respond to emerging needs of RWHAP clients. Through its demonstration, implementation, and IT projects, SPNS uses implementation science to evaluate the design, implementation, utilization, cost, and health-related outcomes of treatment strategies while promoting the dissemination and replication of successful interventions. This unique program advances knowledge and skills in the delivery of health care, support services and data integration to support underserved populations. Through these special projects, RWHAP SPNS recipients implement a variety of interventions, which contribute to the advancement of public health knowledge and the goal of ending the HIV epidemic in the United States.

View the FY25 Part F Special Projects of National Significance Program grant awards.

**Date Last Reviewed:** October 2024



*Per a court order, HHS is required to restore this website as of 11:59 p.m., February 14, 2025. Any information on this page promoting gender ideology is extremely inaccurate and disconnected from the immutable biological reality that there are two sexes, male and female. The Trump Administration rejects gender ideology and condemns the harms it causes to children, by promoting their chemical and surgical mutilation,*

*and to women, by depriving them of their dignity, safety, well-being, and opportunities. This page does not reflect biological reality and therefore the Administration and this Department rejects it.*

An official website of the United States government

Freedom 250 Join HHS in Celebrating Freedom 250 →

U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES



# PROTECTING THE RIGHTS OF LESBIAN, GAY, BISEXUAL, TRANSGENDER, QUEER, AND INTERSEX (LGBTQI+) PEOPLE

## Welcome

We are glad you found us. The Department of Health and Human Services' Office for Civil Rights (OCR) understands that many people, family members, friends, and health care providers are facing fear and concerns about efforts by some state and local governments to prevent people from accessing health care and human services on the basis of their sexual orientation or gender identity.

## Understanding Your Rights

Civil rights are personal rights guaranteed and protected by the U.S. Constitution and federal laws. Civil rights include protection from unlawful discrimination.

OCR is the law enforcement agency within HHS that is responsible for guaranteeing that people are free from discrimination based on race, color, national origin (including primary language), disability, age, religion, and sex (including pregnancy, sexual orientation, and gender identity) by certain health care and human services. OCR also enforces a range of civil rights and health information privacy laws. For more information about these laws, see our Civil Rights page and our HIPAA page.

> **"The Supreme Court has made clear that people have a right not to be discriminated against on the basis of sex and receive equal treatment under the law, no matter their gender identity or sexual orientation. Fear of discrimination can lead individuals to forgo care, which can have serious negative health consequences. It is the position of the Department of Health and Human Services that everyone – including LGBTQ people - should be able to access health care, free from discrimination or interference, period." -- HHS Secretary Xavier Becerra.**

# Discrimination on the Basis of Sexual Orientation and Gender Identity

OCR is responsible for enforcing Section 1557 of the Affordable Care Act (Section 1557), which prohibits discrimination against individuals on the basis of race, color, national origin, sex, age, and disability in covered health programs or activities.

Section 1557 's prohibitions of discrimination on the basis of sex to includes: (1) discrimination on the basis of sexual orientation; and (2) discrimination on the basis of gender identity. The update was made in light of the U.S. Supreme Court's decision in *Bostock v. Clayton County* and subsequent court decisions.

OCR recognizes that discrimination in health care impacts health outcomes. Research shows that one quarter of LGBTQ people who faced discrimination postponed or avoided receiving needed medical care for fear of further discrimination. OCR's mission is to protect people from all forms of discrimination. OCR will follow Supreme Court precedent and federal law, and ensure that the law's protections extend to those individuals who are discriminated against based on sexual orientation and gender identity.

On June 15, 2020, the U.S. Supreme Court held that Title VII of the Civil Rights Act of 1964 (Title VII)'s prohibition on employment discrimination based on sex encompasses discrimination based on sexual orientation and gender identity. *Bostock v. Clayton County, GA*, 140 S. Ct. 1731 (2020). The *Bostock* majority concluded that the plain meaning of "because of sex" in Title VII necessarily included discrimination because of sexual orientation and gender identity. *Id.* at 1753-54. Consistent with the Supreme Court's decision in *Bostock* and Title IX, beginning today OCR will interpret Section 1557's prohibition on discrimination on the basis of sex to include: (1) discrimination on the basis of sexual orientation; and (2) discrimination on the basis of gender identity. This interpretation will guide OCR in processing complaints and conducting investigations, but does not itself determine the outcome in any particular case or set of facts.

In enforcing Section 1557 as stated above, OCR will comply with the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq*., and all other legal requirements. Additionally, OCR will comply with all applicable court orders that have been issued in litigation involving the Section 1557 regulations, including *Franciscan Alliance, Inc. v. Azar*, 414 F. Supp. 3d 928 (N.D. Tex. 2019); *Whitman Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1 (D.D.C. 2020); *Asapansa-Johnson Walker v. Azar*, No. 20-CV-2834, 2020 WL 6363970 (E.D.N.Y. Oct. 29, 2020); and *Religious Sisters of Mercy v. Azar*, No. 3:16-CV-00386, 2021 WL 191009 (D.N.D. Jan. 19, 2021).

OCR applies the enforcement mechanisms provided for and available under Title IX when enforcing Section 1557's prohibition on sex discrimination. 45 C.F.R. § 92.5(a). Title IX's enforcement procedures can be found at 45 C.F.R. § 86.71 (adopting the procedures at 45 C.F.R. §§ 80.6 through 80.11 and 45 C.F.R. Part 81).

# Gender Affirming Care

HHS stands with transgender and gender nonconforming youth and their families—and the significant majority of expert medical associations—in unequivocally stating that gender affirming care for minors, when medically appropriate and necessary, improves their physical and mental health. Attempts to restrict, challenge, or falsely characterize this potentially lifesaving care as abuse is dangerous. Such attempts block parents from making critical

health care decisions for their children, create a chilling effect on health care providers who are necessary to provide care for these youth, and ultimately negatively impact the health and well-being of transgender and gender nonconforming youth.

- View OCR's guidance on gender affirming care, civil rights, and patient privacy [PDF] March 2, 2022
- Read the Statement by HHS Secretary Xavier Becerra Reaffirming HHS Support and Protection for LGBTQI+ Children and Youth - March 2, 2022
- On October 1, 2022, the District Court for the Northern District of Texas issued a judgment vacating this document. HHS is evaluating its next steps in light of that judgment but is complying with it.
- Read the Statement by HHS Secretary Xavier Becerra on Missouri's Emergency Regulation Restricting Access to Gender Affirming Care – April 25, 2023

As a law enforcement agency, OCR is investigating and, where appropriate, enforcing Section 1557 of the Affordable Care Act cases involving discrimination on the basis of sexual orientation or gender identity in accordance with all applicable law. This means that if people believe they have been discriminated against in a health program or activity that receives financial assistance from HHS, they can file a complaint.

Parents or caregivers who believe their child has been denied health care, including gender affirming care, on the basis of that child's gender identity, may file a complaint with OCR.

Health care providers who believe that they are or have been unlawfully restricted from providing health care to a patient on the basis of that patient's gender identity may file a complaint with OCR.

# HIPAA and Marriage: Understanding Spouse, Family Member, Marriage, and Personal Representatives in

# the Privacy Rule

The HIPAA Privacy Rule contains several provisions that recognize the integral role that family members, such as spouses, often play in a patient's health care. For example, the Privacy Rule allows covered entities to share information about the patient's care with family members in various circumstances. It also generally requires covered entities to treat an individual's personal representative, who may be a spouse, as the individual, for purposes such as exercising the individual's rights under the Privacy Rule, including the right to access the individual's health information. In addition, the Privacy Rule provides protections against the use of genetic information about an individual, which also includes certain information about family members of the individual, for underwriting purposes.

OCR has issued guidance that makes clear the terms marriage, spouse, and family member include, respectively, all lawful marriages, lawfully married spouses, and both the lawful spouses and the dependents of all lawful marriages, and clarifies certain rights of individuals under the Privacy Rule. You may find OCR's guidance on HIPAA and marriage here: https://www.hhs.gov/sites/default/files/hipaa-and-marriage.pdf [PDF, 66 KB].

# Resources for LGBTQI+ People

Below are United States Government resources that may be of interest to LGBTQI+ people and allies. Additional resources will be added as they are issued.

**Resources from the Department of Health and Human Services**

- LGBTQI+ Older Adults – Know Your Rights Resource Guide [PDF, 223 KB]: The Biden-Harris Administration has taken important steps to improve Federal protections for LGBTQI+ older adults and reinforce their rights to be free from discrimination in health care. **En español:** Adultos mayores LGBTQI: conozca sus derechos [PDF, 254 KB]
- Access to Healthcare: The Affordable Care Act is greatly improving access to health coverage for LGBTQ+ Americans.
- LGBTQ Youth Resources | Lesbian, Gay, Bisexual, and Transgender Health | CDC: Find resources from the CDC, other government agencies, and community organizations for LGBT Youth, their friends, educators, parents, and family members to support positive environments.
- Read the LGBTQI+ Youth – Like All Americans, They Deserve Evidence-Based Care blog from Miriam E. Deplhin-Rittmon, PhD, SAMHSA's Assistant Secretary for Mental Health and Substance Use.
- Learn about gender affirming care [PDF] and how it improves the mental health and overall well being of gender diverse youth (OASH's Office of Population Affairs).
- Representation matters! Meet Admiral Rachel L. Levine, MD, Assistant Secretary for Health, where she fights every day to improve the health and well-being of all Americans. She's working to help our nation overcome the COVID-19 pandemic and build a stronger foundation for a healthier future - one in which every American can attain their full health potential. ADM Levine also is the head of the U.S. Public Health Service Commissioned Corps, one of the eight uniformed services.
- Read the Ryan White HIV/AIDS Program letter [PDF] about the importance of gender-affirming care to effectively meet the health and medical needs of transgender people with HIV (HRSA's HIV/AIDS Bureau).
- Find technical assistance and trainings on how to build inclusive and supportive health care spaces for LGBTQI+ individuals and families (HRSA).

- Create a Safe Environment for LGBTQI+ Youth from StopBullying.gov provides resources on how to build a safe environment for all LGBTQI+ youth. Parents, schools, and communities can all play a role in preventing bullying and helping LGBTQI+ youth feel physically and emotionally safe.
- Find mental health and behavioral health resources for the LGBTQI+ community.
- The Indian Health Service (IHS) works to ensure that Lesbian, Gay, Bisexual, Transgender, Questioning and Two-Spirit (LGBTQ-2S) American Indian and Alaska Native (AI/AN) individuals and their families receive equal access to health services in the communities where they live.
- Learn about research opportunities at the National Institutes of Health's Sexual & Gender Minority Research Office (SGMRO), which coordinates sexual and gender minority (SGM)–related research and activities by working directly with the NIH Institutes, Centers, and Offices.

## Resources from the White House

- FACT SHEET: Biden-Harris Administration Advances Equality for Transgender Americans (March 31, 2022)
- White House Toolkit on Transgender Equality [PDF, 0 KB] (June 30, 2021)
- Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation (Jan. 21, 2021)
- Executive Order 14021 on Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity (March 11, 2021)
- Memorandum on Advancing the Human Rights of Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex Persons Around the World (February 4, 2021)
- FACT SHEET: U.S. Agencies Are Advancing the Human Rights of LGBTQI+ Persons Around the World (April 28, 2022)

## Resources from the Department of Justice

- LGBTQI+ Working Group
- Memorandum on Application of Bostock v. Clayton County to Title IX (March 26, 2021)
- Letter to State Attorneys General: Federal Nondiscrimination Protections for Transgender Youth (March 31, 2022)

## Resources from the Department of Education

- Resources for LGBTQI+ Students
- Notice of Interpretation [PDF] - Enforcement of Title IX with Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County* (June 22, 2021)

## Resources from the Interagency Working Group on Youth Programs (IWGYP)

- Youth.gov

# If You Are, or You Know Someone Who is, in Crisis

Call the National Suicide Prevention Lifeline (Lifeline) at **1-800-273-TALK (8255),** or text the Crisis Text Line (**text HELLO to 741741**). Both services are free and available 24 hours a day, seven days a week. All calls are confidential. Contact social media outlets directly if you are concerned about a friend's social media updates. **Dial 911 in an emergency**. Learn more on the Lifeline's website or the Crisis Text Line's website .

---

*Per a court order, HHS is required to restore this website as of [February 11, 2025 at 11:59 p.m]. Any information on this page promoting gender ideology is extremely inaccurate and disconnected from the immutable biological reality that there are two sexes, male and female. The Trump Administration rejects gender ideology and condemns the harms it causes to children, by promoting their chemical and surgical mutilation, and to women, by depriving them of their dignity, safety, well-being, and opportunities. This page does not reflect biological reality and therefore the Administration and this Department rejects it.*

---

Content last reviewed February 18, 2025

# Treatment for Pediatric Gender Dysphoria
## Review of Evidence and Best Practices



**Department of Health and Human Services**

November 19, 2025

# Treatment for Pediatric Gender Dysphoria

## Review of Evidence and Best Practices

**Department of Health and Human Services**

November 19, 2025

Minor corrections to May 1 document made May 15, 2025; see Errata.

Minor corrections and revisions made November 19, 2025: see Errata and Supplement, which contains peer reviews and replies.

**Foreword** 9

**Executive Summary** 12

**Part I: Background** 12

**Part II: Evidence Review** 13

**Part III: Clinical Realities** 14

**Part IV: Ethical Considerations** 15

**Part V: Psychotherapy** 16

**Contributors** 17

**PART I: BACKGROUND** 19

**Chapter 1 Introduction** 20

**1.1 Exceptionalism** 23

**1.2 Evidence** 24

1.2.1 Evidence-based medicine 26

1.2.2 History lessons 27

**1.3 Ethics** 28

**Chapter 2 Terminology in Pediatric Gender Medicine** 31

**2.1 Terminology in pediatric gender medicine** 31

**2.2 Terminology in this Review** 39

**Chapter 3 History and Evolution of Adult and Pediatric Gender Medicine** 42

**3.1 *The Transsexual Phenomenon*** 42

**3.2 From George to Christine** 44

**3.3 "Dear Dr. Hamburger"** 46

**3.4 Outcomes of adult transitions** 48

**3.5 The rationale for youth gender transition** 51

**3.6 The spread of the Dutch Protocol and the rise of "gender-affirming care"** 53

**Chapter 4 International Retreat from the "Gender-Affirming" Model** 59

**4.1 The rise of the affirmative care model** 59

**4.2 The international practice reversals** **63**
4.2.1 The Cass Review and its reception 66

**4.3 Rationale for international reversals** **67**
4.3.1 Changes in the patient population 67
4.3.1.1 Epidemiological shifts 67
4.3.1.2 Mental illness and neurodevelopmental diagnoses 68
4.3.1.3 Nonbinary identities 69
4.3.1.4 Social influence 69
4.3.2 Unclear natural history and prognostic uncertainty 71
4.3.2.1 New evidence about the natural history of gender dysphoria 71
4.3.2.2 Concerns about identity development 72
4.3.3 Concerns about treatment-associated risks and harms 73
4.3.4 More appropriate understanding of suicide 74
4.3.5 Collapse of clinical rationale 78
4.3.6 Lack of reliable evidence of benefit 79

**PART II: EVIDENCE REVIEW** **81**

**Chapter 5 Overview of Systematic Reviews** **82**

**5.1 Methodology** **82**

**5.2 Outcomes of social transition** **89**

**5.3 Outcomes of puberty blockers** **89**

**5.4 Outcomes of cross-sex hormones** **91**

**5.5 Outcomes of surgery** **92**

**5.6 Outcomes of psychotherapy** **93**

**5.7 Discussion** **94**
5.7.1 Findings of this overview 94
5.7.2 Sources of uncertainty in evidence 95
5.7.3 Robustness of this overview's conclusion 96
5.7.4 Limitations and strengths of this overview 98
5.7.5 Conclusion 100

**Chapter 6 Limitations of Systematic Reviews** **101**

**6.1 Insufficient elapsed time** **102**

**6.2 Short-term observational studies** **103**

6.2.1 de Vries et al., 2011, 2014 104
6.2.2 Tordoff et al., 2022 105
6.2.3 Chen et al., 2023 107

**6.3 Publication bias 110**

**6.4 Summary 112**

**Chapter 7 Evidence from Basic Science and Physiology 113**

**7.1 Puberty 113**
7.1.1 Overview of normal pubertal development 114
7.1.2 Tanner Stages of puberty 114
7.1.3 Neuroendocrine regulation of puberty 115

**7.2 Puberty blockers and central precocious puberty 115**

**7.3 Puberty blockers and gender dysphoria 116**
7.3.1 Developmental risks of blocking normal puberty 117
7.3.2 Bone mineral density and skeletal development 117
7.3.3 Neurocognitive and psychosocial development 118
7.3.4 Reproductive maturation 119
7.3.5 Risks of sexual dysfunction 121

**7.4 Cross-sex hormones and gender dysphoria 123**
7.4.1 Physical effects of cross-sex hormones 123
7.4.2 Dosing of cross-sex hormones 124
7.4.3 Hyperandrogenism in females 124
7.4.4 Hyperestrogenemia in males 124
7.4.5 Effects of testosterone on the female reproductive system 125
7.4.6 Effects of estrogen on the male reproductive system 126
7.4.7 Cardiovascular and metabolic risks 126
7.4.8 Other risks associated with cross-sex hormones 127

**7.5 Surgery and gender dysphoria 128**
7.5.1 Surgical problems related to early pubertal blockade 128

**7.6 Other risks associated with hormonal interventions or surgeries 129**
7.6.1 Adverse psychiatric effects 129
7.6.2 Detransition and regret 131

**7.7 Mortality risk 132**

**Chapter 8 Summary and Implications of Evidence Review 134**

**PART III: CLINICAL REALITIES** **137**

**Chapter 9 Review of International Guidelines** **138**

**9.1 The role and process of clinical practice guidelines** **138**

**9.2 Summary of systematic appraisal of clinical guidelines and guidance documents** **140**

9.2.1 Methodological quality of existing guidelines and guidance documents 141

9.2.2 Interdependence of the existing guidelines and guidance documents 144

9.2.3 WPATH, Endocrine Society, and the American Academy of Pediatrics (AAP) guidelines and practice statements 146

9.2.4 More recent international guidelines 149

**9.3 Overview of recommendations in the high-quality guidelines** **151**

9.3.1 Finland 151

9.3.2 Sweden 152

9.3.3 United Kingdom 154

**9.4 Conclusion** **155**

**Chapter 10 WPATH's *Standards of Care* 8** **157**

**10.1 Influence of WPATH in the United States** **157**

10.1.1 WPATH's role in clinical practice 158

10.1.2 WPATH's role in medical education and training 159

10.1.3 WPATH's role in insurance reimbursement 160

**10.2 The development of SOC-8 and the Adolescent chapter** **161**

10.2.1 Hope for evidence of effectiveness 162

10.2.2 Adolescent capacity to consent 164

10.2.3 Treatment effects 165

**10.3 The process of creating SOC-8** **166**

10.3.1 Conflicts of interest management 166

10.3.2 Suppression of evidence 171

10.3.3 Redefinition of medical necessity 178

10.3.4 Legal and political considerations 181

**10.4 Elimination of age minimums** **184**

**10.5 Continued reliance on SOC-8** **186**

**Chapter 11 Collapse of Medical Safeguarding** **188**

**11.1 The Dutch Protocol and the relaxation of its criteria in the U.S.** **188**

11.1.1 U.S. gender clinics' departure from the Dutch Protocol 189

**11.2 Is pediatric medical transition "rare"? 190**

**11.3 Shift in objectives and the new meaning of "assessment" 192**

11.3.1 Ambiguity in SOC-8 194

11.3.2 SOC-8 guardrails abandoned 196

11.3.3 Collapse of assessment times 198

11.3.3.1 Boston Children's Hospital 198

11.3.3.2 Children's Hospital Los Angeles 199

11.3.3.3 Lurie Children's Hospital 199

11.3.3.4 Seattle Children's Hospital 200

11.3.3.5 UCSF Benioff 201

11.3.3.6 Planned Parenthood 201

**11.4 The whistleblowers 202**

11.4.1 Laura Edwards-Leeper and Erica Anderson 203

11.4.2 Jamie Reed 204

11.4.3 Tamara Pietzke 206

11.4.4 Eithan Haim 207

**Chapter 12 Medical Association Response 210**

**12.1 The role of major medical and mental health associations 210**

**12.2 Factors contributing to neglect of evidence and open debate 213**

**12.3 Conclusion 217**

**PART IV: ETHICS REVIEW 218**

**Chapter 13 Ethical Considerations 219**

**13.1 Consent 220**

**13.2 From paternalism to shared decision-making and patient-centered care 222**

13.2.1 Respect for autonomy vs *caveat emptor* 223

13.2.2 Nonmaleficence, beneficence, and autonomy in pediatrics 225

13.2.3 Risk/benefit in pediatric medical transition 226

13.2.4 Justice 232

**13.3 Alternative clinical rationales 235**

**13.4 Regret 240**

**13.5 Research Ethics 242**

**PART V: PSYCHOTHERAPY** 247

**Chapter 14 Psychotherapy** 248

**14.1 Youth mental health** 248
14.1.1 Trends in youth mental health 249

**14.2 Diagnostic and social labels** 250

**14.3 Controversies regarding assessment and the role of the psychotherapist** 253

**14.4 Psychotherapy for GD: Re-emergence in Europe** 255

**14.5 Psychotherapy and its application to gender dysphoria** 256
14.5.1 Psychotherapy for conditions frequently co-occurring with gender dysphoria 257
14.5.2 Psychotherapy for gender dysphoria 260
14.5.2.1 The charge of "conversion therapy" 261
14.5.2.2 Psychotherapeutic approaches 263
14.5.2.3 Evidence for benefit 268

**Limitations, Strengths, and Conclusion** 270

**APPENDICES** 273

**Appendix 1. Abbreviations** 274

**Appendix 2. Diagnostic Criteria** 278

**Appendix 3. Systematic Reviews and Evidence-Based Medicine** 284

**Appendix 4. Overview of Systematic Reviews: Methodology, Evidence Synthesis, Tables** 294

**BIBLIOGRAPHY** 295

Suggested Citation:

U.S. Department of Health and Human Services (HHS), *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*. Washington, DC: HHS, November 2025.

## Foreword

Over the past decade, the number of children and adolescents who question their sex and identify as transgender or nonbinary has grown significantly. Many have been diagnosed with a condition known as "gender dysphoria" and offered a treatment approach known as "gender-affirming care." This approach emphasizes social affirmation of a child's self-reported identity; puberty suppressing drugs to prevent the onset of puberty; cross-sex hormones to spur the secondary sex characteristics of the opposite sex; and surgeries including mastectomy and (in rare cases) vaginoplasty. Thousands of American children and adolescents have received these interventions.

While sex-role nonconformity itself is not pathological and does not require treatment, the use of pharmacological and surgical interventions as treatments for pediatric gender dysphoria has been called "medically necessary" and even "lifesaving." Motivated by a desire to ensure their children's health and well-being, parents of transgender-identified children and adolescents often struggle with how best to support them. Many of these children and adolescents have co-occurring psychiatric or neurodevelopmental conditions, rendering them especially vulnerable. When they seek professional help, they and their families should receive compassionate, evidence-based care tailored to their specific needs.

Society has a special responsibility to safeguard the well-being of children. Given that the challenges faced by these patients intersect with deeply contested issues of moral and social significance—including social identity, sex and reproduction, bodily integrity, and sex-based norms of expression and behavior—the medical practices that have recently emerged to address their needs have become a focus of significant controversy.

This Review is published against the backdrop of growing international concern about pediatric medical transition. Having recognized the experimental nature of these medical interventions and their potential for harm (which has been inadequately studied, especially with respect to long-term outcomes), health authorities in a number of countries have imposed restrictions. For example, the U.K. has banned the routine use of puberty blockers as an intervention for pediatric gender dysphoria.

Health authorities have also recognized the exceptional nature of this area of medicine. That exceptionalism is due to a convergence of factors. One is that the diagnosis of gender dysphoria is based entirely on subjective self-reports and behavioral observations, without any objective physical, imaging, or laboratory markers. The diagnosis centers on attitudes, feelings, and behaviors that are known to fluctuate during adolescence.

Additionally, the natural history of pediatric gender dysphoria is poorly understood, though existing research suggests it will remit without intervention in most cases. Medical professionals have no way to know which patients may continue to experience gender dysphoria and which will come to terms with their bodies.

Nevertheless, the “gender-affirming” model of care includes irreversible endocrine and surgical interventions on minors with no physical pathology. These interventions carry risk of significant harms including infertility/sterility, sexual dysfunction, impaired bone density accrual, adverse cognitive impacts, cardiovascular disease and metabolic disorders, psychiatric disorders, surgical complications, and regret, and there has been inadequate research into the frequency and severity of these harms. Meanwhile, systematic reviews of the evidence have revealed deep uncertainty about the purported benefits of these interventions.

The controversies surrounding the medical transition of minors extend beyond scientific debate; they are deeply cultural and political. Public discourse is dominated by intensely polarizing narratives. Some view the medical transition of minors as a pressing civil rights issue, while others regard it as a profound medical failure and a sobering reminder that even modern medicine is vulnerable to serious error. In the midst of this highly charged debate, children and adolescents, and their families—who seek only to support their flourishing—have found themselves caught between competing perspectives. They require, and are entitled to, accurate, evidence-based information to guide their decisions.

This Review of evidence and best practices was commissioned pursuant to Executive Order 14187, signed on January 28, 2025. It is not a clinical practice guideline, and it does not issue legislative or policy recommendations. Rather, it seeks to provide the

most accurate and current information available regarding the evidence base for the treatment of gender dysphoria in this population, the state of the relevant medical field in the United States, and the ethical considerations associated with the treatments offered.

The Review is intended for policymakers, clinicians, therapists, medical organizations and, importantly, patients and their families. It summarizes, synthesizes, and critically evaluates the existing literature on best practices for promoting the health and well-being of children and adolescents with distress related to their sex or to social expectations associated with their sex. Treatment of adults constitutes a separate topic and is not addressed in this Review. A summary of the Review's main findings is presented below.

# Executive Summary

## Part I: Background

- Gender dysphoria is a condition that involves distress regarding one's sexed body and/or associated social expectations. Increasing numbers of children and adolescents in the U.S. and other countries are diagnosed with gender dysphoria. Internationally, there is intense disagreement about how best to help them.
- The term "rapid onset gender dysphoria" (ROGD) has been suggested to describe a new clinical presentation of gender dysphoria. Despite sharp disagreement about the concept's validity, symptoms consistent with ROGD have been recorded in clinics in the U.S. and other countries.
- In the U.S., the current approach to treating pediatric gender dysphoria aligns with the "gender-affirming" model of care recommended by the World Professional Association for Transgender Health (WPATH). This model emphasizes the use of puberty blockers and cross-sex hormones, as well as surgeries, and casts suspicion on psychotherapeutic approaches for management of gender dysphoria.
- The understandable desire to avoid language that may cause discomfort to patients has, in some cases, given rise to modes of communication that lack scientific grounding, that presuppose answers to unresolved ethical controversies, and that risk misleading patients and families. This Review uses scientifically accurate and neutral terminology throughout.
- In many areas of medicine, treatments are first established as safe and effective in adults before being extended to pediatric populations. In this case, however, the opposite occurred: clinician-researchers developed the pediatric medical transition protocol in response to disappointing psychosocial outcomes in adults who underwent medical transition.
- The protocols were adopted internationally before the publication of the first outcome studies. In recent years, in response to dramatic shifts in the number

and clinical profiles of minor patients, as well as to multiple systematic reviews of evidence, health authorities in an increasing number of countries have restricted access to puberty blockers and cross-sex hormones, and, in the rare cases where they were offered, surgeries for minors. These authorities now recommend psychosocial approaches, rather than hormonal or surgical interventions, as the primary treatment, and in some cases have restricted the latter to nationally-overseen research protocols.

- There is currently no international consensus about best practices for the care of children and adolescents with gender dysphoria.

## Part II: Evidence Review

- Evidence-based medicine is widely recognized by health authorities worldwide as the foundation of high-quality care. Consistent with its principles, this Review undertook a methodologically rigorous assessment of the evidence underpinning pediatric gender medicine.
- Specifically, this Review conducted an overview of systematic reviews—also known as an "umbrella review"—to evaluate the direct evidence regarding the benefits and harms of treatment for children and adolescents with gender dysphoria. Existing systematic reviews of evidence, including several that have informed health authorities in Europe, were assessed for methodological quality. The umbrella review found that the overall quality of evidence concerning the effects of any intervention on psychological outcomes, quality of life, regret, or long-term health, is very low. This indicates that the beneficial effects reported in the literature are likely to differ substantially from the true effects of the interventions.
- Evidence for harms associated with pediatric medical transition in systematic reviews is also sparse, but this finding should be interpreted with caution. Inadequate harm detection in pediatric gender medicine may reflect the relatively short period of time since the widespread adoption of the medical/surgical treatment model; the failure of existing studies to systematically track and report harms; and publication bias. Despite the lack of robust evidence from population

level studies, important insights can be drawn from established knowledge about human physiology and the effects and mechanisms of the pharmacological agents used.

- The risks of pediatric medical transition include infertility/sterility, sexual dysfunction, impaired bone density accrual, adverse cognitive impacts, cardiovascular disease and metabolic disorders, psychiatric disorders, surgical complications, and regret.

## Part III: Clinical Realities

- In the U.S., the most influential clinical guidelines for the treatment of pediatric gender dysphoria are published by WPATH and the Endocrine Society. A recent systematic review of international guideline quality did not recommend either guideline for clinical use after determining they "lack developmental rigour and transparency."[1]
- Problems with the development of WPATH's *Standards of Care*, Version 8 (SOC-8) extend beyond those identified in the systematic review of international guidelines. In the process of developing SOC-8, WPATH suppressed systematic reviews its leaders believed would undermine its favored treatment approach. SOC-8 developers also violated conflict of interest management requirements and eliminated nearly all recommended age minimums for medical and surgical interventions in response to political pressures.
- Although SOC-8 relaxed the eligibility criteria for access to puberty blockers, cross-sex hormones, and surgeries, there is compelling evidence that U.S. gender clinics are not adhering even to those more permissive criteria.
- The "gender-affirming" model of care, as practiced in U.S. clinics, is characterized by a child-led process in which comprehensive mental health assessments are often minimized or omitted, and the patient's "embodiment goals" serve as the primary guide for treatment decisions. In some of the nation's

[1] Taylor, Hall, Heathcote et al. (2024a, p. 7).

leading pediatric gender clinics, assessments are conducted in a single session lasting two hours.

- The voices of whistleblowers and detransitioners have played a critical role in drawing public attention to the risks and harms associated with pediatric medical transition. Their concerns have been discounted, dismissed, or ignored by prominent advocates and practitioners of pediatric medical transition.
- U.S. medical associations played a key role in creating a perception that there is professional consensus in support of pediatric medical transition. This apparent consensus, however, is driven primarily by a small number of specialized committees, influenced by WPATH. It is not clear that the official views of these associations are shared by the wider medical community, or even by most of their members. There is evidence that some medical and mental health associations have suppressed dissent and stifled debate about this issue among their members.

## Part IV: Ethical Considerations

- The principle of autonomy in medicine establishes a moral and legal right of competent patients to refuse any medical intervention. However, there is no corollary right to receive interventions that are not beneficial. Respect for patient autonomy does not negate clinicians' professional and ethical obligation to protect and promote their patients' health.
- The evidence for benefit of pediatric medical transition is very uncertain, while the evidence for harm is less uncertain. When medical interventions pose unnecessary, disproportionate risks of harm, healthcare providers should refuse to offer them even when they are preferred, requested, or demanded by patients. Failure to do so increases the risk of iatrogenic harm and reduces medicine to consumerism, threatening the integrity of the profession and undermining trust in medical authority.
- Proponents of pediatric medical transition claim that regret is vanishingly rare, while critics assert that regret is increasingly common. The true rate of regret is

not known and better data collection is needed. That some patients report profound regret after undergoing invasive, life-changing medical interventions is clearly of importance. However, regret alone (just like satisfaction alone) is not a valid indicator of whether an intervention is medically justified. Patients may regret medically justified treatments or feel satisfied with unjustified ones.

- A natural response to the absence of credible evidence is to call for more and better research. Even if high quality research such as randomized controlled trials on pubertal suppression or hormone therapy were feasible, however, conducting it may conflict with well-established ethical standards for human subjects research.

## Part V: Psychotherapy

- The rise in youth gender dysphoria and the corresponding demand for medical interventions have occurred against the backdrop of a broader mental health crisis affecting adolescents. The relationship between these two phenomena remains a subject of scientific controversy.
- Suicidal ideation and behavior are independently associated with comorbidities common among children and adolescents diagnosed with gender dysphoria. Suicidal ideation and behavior have known psychotherapeutic management strategies. No independent association between gender dysphoria and suicidality has been found, and there is no evidence that pediatric medical transition reduces the incidence of suicide, which remains, fortunately, very low.
- There is a dearth of research on psychotherapeutic approaches to managing gender dysphoria in children and adolescents. This is due in part to the mischaracterization of such approaches as “conversion therapy.” A more robust evidence base supports psychotherapeutic approaches to managing common comorbid mental health conditions. Psychotherapy is a noninvasive alternative to endocrine and surgical interventions for the treatment of pediatric gender dysphoria. Systematic reviews of evidence have found no evidence of adverse effects of psychotherapy in this context.

# Contributors[2]

Evgenia Abbruzzese, Society for Evidence-Based Gender Medicine

Alex Byrne, PhD, Massachusetts Institute of Technology

Farr Curlin, MD, Duke University

Moti Gorin, PhD, MBE, Colorado State University

Kristopher Kaliebe, MD, DFAACAP, University of South Florida

Michael K. Laidlaw, MD, Michael K. Laidlaw MD, Inc.

Kathleen McDeavitt, MD, Baylor College of Medicine

Leor Sapir, PhD, Manhattan Institute for Policy Research

Yuan Zhang, PhD, Evidence Bridge

### Contributor biographies

Evgenia Abbruzzese is a healthcare researcher. She has led analytics efforts for a major insurer to identify low-value care and overuse of invasive and non-beneficial interventions, and also led a venture-backed healthcare startup to help patients with medically unexplained symptoms and health anxiety. Abbruzzese has published on topics in pediatric gender medicine, including the original Dutch research underpinning the practice of pediatric medical transition.

Alex Byrne is a professor in the Department of Linguistics and Philosophy at the Massachusetts Institute of Technology. He holds a PhD in philosophy from Princeton University. Byrne has published on gender identity and related topics and is on the editorial board of the *Archives of Sexual Behavior*.

Farr Curlin is an internist and professor at Duke University School of Medicine. He holds an MD from the University of North Carolina at Chapel Hill and completed residency at the University of Chicago, including a MacLean Center Fellowship in Clinical Medical Ethics. He is board-certified in internal medicine. Curlin has published and lectured on medical ethics and the practice of medicine, and is Co-Director of the Theology, Medicine and Culture Initiative at Duke.

Moti Gorin is an associate professor in the Department of Philosophy at Colorado State University. He holds a PhD in philosophy from Rice University and was a post-doctoral Fellow in Advanced Biomedical Ethics at the University of Pennsylvania. Gorin has published on topics at the intersection of pediatric gender medicine and medical ethics.

[2] Contributor affiliations are listed for identification purposes only.

Kristopher Kaliebe is a psychiatrist and professor at the University of South Florida Morsani College of Medicine. He holds an MD from St. George's University School of Medicine and is board-certified in general psychiatry, forensic psychiatry, and child and adolescent psychiatry. Kaliebe treats young people with gender-related distress and is a distinguished fellow of the American Academy of Child and Adolescent Psychiatry.

Michael K. Laidlaw is an endocrinologist in private practice. He holds an MD from the University of California Keck School of Medicine where he went on to complete his residency and fellowship training and was involved in medical research. Laidlaw is board-certified in endocrinology, diabetes, and metabolism, and has published on gender dysphoria and related topics.

Kathleen McDeavitt is a psychiatrist and associate professor at Baylor College of Medicine. She holds an MD from the University of North Carolina at Chapel Hill and completed psychiatry residency at Baylor College of Medicine. McDeavitt is board-certified in general psychiatry and has published on topics related to the evidence base and clinical guidelines in pediatric gender medicine.

Leor Sapir is a senior fellow at the Manhattan Institute for Policy Research. He holds a PhD in political science from Boston College and was post-doctoral fellow at the Program on Constitutional Government at Harvard University. Sapir has published on pediatric gender medicine, public policy, and related topics.

Yuan Zhang is a Canadian researcher and the founder of Evidence Bridge, which supports evidence-based health policy and decision making. He holds a PhD in health research methodology from McMaster University. Zhang has published on evidence-based medicine, guideline development, patient values and preferences, and health economics.

**Disclosures of Interest (as of November 14, 2025)**

Evgenia Abbruzzese has received payments for legal consultations related to pediatric gender medicine.

Farr Curlin has received payments for expert testimony and honoraria for speaking engagements related to pediatric gender medicine.

Kristopher Kaliebe has received payment for expert testimony related to pediatric gender medicine as well as an honorarium to attend a conference related to pediatric gender medicine.

Michael Laidlaw has received payment for expert testimony related to gender dysphoria as well as an honorarium to attend a conference related to pediatric gender medicine.

Leor Sapir has received payments for legal consultations and honoraria for speaking engagements related to pediatric gender medicine.

No other disclosures were reported.

PART 1

# BACKGROUND

# Chapter 1 Introduction

Currently, an estimated 3.3% of adolescents in the United States identify as transgender, and an additional 2.2% question whether they might be.[1] Many have received hormonal or surgical treatment for accompanying distress. A 2023 study published in the *Journal of the American Medical Association* found that between 2016 and 2020, 3,215 patients between the ages of 12 and 18 received surgical "breast or chest procedures" relating to their transgender identity.[2] A more recent study reported that approximately 0.1% of American 17-year-olds, or one in 1,000, was receiving cross-sex hormones between 2018 and 2022.[3] A national estimate of clinics offering pediatric medical transition interventions found at least 271 such institutions in the U.S. as of March 2023.[4]

This Review assesses the existing literature on best practices for promoting the health of children and adolescents with gender dysphoria (GD; serious distress at one's sexed body and associated social expectations[5]) or milder forms of such distress. Treatment of GD in adults is a separate topic and is not covered here.

In the United States, a number of institutions follow the guidelines of the World Professional Association for Transgender Health (WPATH) and the Endocrine Society (ES) for treating gender-dysphoric children and adolescents. This approach is usually called "gender-affirming care." Diane Ehrensaft, Director of Mental Health at UCSF's Child & Adolescent Gender Center, is a leading proponent. As Ehrensaft explains,

---

[1] Suarez et al. (2024, Table 2).
[2] Wright et al. (2023).
[3] Hughes et al. (2025).
[4] Borah et al. (2023, p. 375-376). Some of these clinics were closed due to state age restriction laws.
[5] As an American Psychological Association report put it, quoting the American Psychiatric Association, gender dysphoria is an "aversion to some or all of those physical characteristics or social roles that connote one's own biological sex" (Schneider et al., 2009, p. 28). As explained in Zucker et al. (2016), "gender dysphoria" is a "technical term" that refers to symptoms of distress, but is also, as of the fifth edition of the *Diagnostic and Statistical Manual of Mental Disorders* (2013), a "diagnostic term" (p. 218). Gender Dysphoria is a formal diagnosis in the current (text revision) version of the DSM-5, the DSM-5-TR (American Psychiatric Association, 2022). For the relevant diagnostic criteria for children, adolescents, and adults in the DSM-III, IV, and 5, and in the current *International Classification of Diseases* (ICD-11), see Appendix 2 of this Review. The term "gender dysphoria" is used throughout this Review to refer to sex-related distress or discomfort, unless the context makes clear that the formal diagnosis is the topic.

> [gender-affirming care] is defined as a method of therapeutic care that includes allowing children to speak for themselves about their self-experienced gender identity and expressions and providing support for them to evolve into their authentic gender selves, no matter at what age. Interventions include social transition from one gender to another and/or evolving gender nonconforming expressions and presentations, as well as later gender-affirming medical interventions (puberty blockers, cross-sex hormones, surgeries).[6]

This Review is needed because—as later chapters will detail—the emphasis on medicalization makes the field of pediatric gender medicine (PGM) highly controversial. WPATH and ES guidelines recommend commencement of puberty blockers (PBs; drugs that halt pubertal development) at the earliest signs of puberty (Tanner Stage 2), which may begin as early as age 8 in girls and 9 in boys. According to these guidelines,[7] cross-sex hormones (CSH; estrogen for boys and testosterone for girls) are started sometime thereafter; surgeries (e.g., breast removal for girls) are also recommended for some adolescents.[8] All these interventions are associated with significant risks, and most cause irreversible physical or physiological effects.[9]

Do PBs, CSH, and surgeries constitute best practice for this population? Guidelines and policies promulgated by professional medical societies in the U.S. differ from some European guidelines that recommend psychotherapy, *not* hormones or surgeries, for children and adolescents with GD. This Review, then, is written against a backdrop of intense disagreement in the international medical community. The number of young people with GD has surged, and many are suffering, as are their families. The question of how to best help these patients hinges on a comprehensive assessment of the evidence base for different treatment approaches, together with ethical considerations. Bringing ethical principles to bear on the evidence is one goal of this Review. While the need for respect and compassion resonates with all reasonable Americans, an invasive

---

[6] Ehrensaft (2017a, p. 62). The gender-affirming approach can be applied to adults too; this Review is entirely focused on the pediatric variety.
[7] Coleman et al. (2022); Hembree et al. (2017).
[8] The latest version of WPATH's clinical practice guideline has no recommended age limits for surgical procedures, with the exception of 18 years old for phalloplasty (the construction of a neophallus in females with skin taken from the patient's arm or leg).
[9] See Chapter 7.

treatment with lifelong ramifications deserves the highest level of dispassionate scrutiny.[10]

The diagnostic description of GD has changed since the condition appeared in the third edition (1980) of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM), as has the terminology used to name it. But one thing has not changed. The DSM-III was clear that “Gender Identity Disorder of Childhood” was “not merely the rejection of stereotypical sex role behavior as, for example, in ‘tomboyishness’ in girls or ‘sissyish’ behavior in boys”[11]; the current DSM has a similar emphasis: “The diagnosis is not meant to merely describe nonconformity to stereotypical gender role behavior (e.g., “tomboyism” in girls, “girly-boy” behavior in boys, occasional cross-dressing in adult men).”[12] Non-conformity to sex-role stereotypes is as old as history, and present to some degree in every known culture.[13] This feature of the human experience is not pathological and needs no treatment. What may require treatment is the suffering experienced by those alienated from their sexed bodies.

PGM is a complex topic. This Review, therefore, will cover the field’s history and evolution in some detail, from the inception of the medicalized approach in the Netherlands (Chapter 3)[14] to current treatment practices in the U.S. and other countries (Chapter 4, Chapter 9). The Review describes an international trend of retreat from the present “gender affirming” approach and reviews the reasons underlying it.

This Review finds that clinical practice in this field of medicine is exceptional and concerning (Chapter 11). The influential PGM guidelines followed in the U.S. are especially problematic. They were developed in ways that contravene best practices for

---

[10] The U.K.’s Cass Review pointed out that although some conceptualize controversies about pediatric gender medicine primarily from political/social standpoints, healthcare guidance should “[work] in an evidence-based way” (Cass, 2024a, p. 20).
[11] American Psychiatric Association (1980, p. 264).
[12] American Psychiatric Association (2013, p. 458).
[13] See Chapter 3, footnote 1.
[14] The general treatment paradigm of puberty blockers, cross-sex hormones, and surgeries originated in the Netherlands in the 1990s as an experimental research protocol, and, based on one small study that claimed to demonstrate significant benefits to mental health, was rapidly incorporated internationally into standard practice. As described in the Cass Review’s interim report, the “affirmative model” is a “model of gender healthcare that originated in the USA which affirms a young person’s subjective gender experience while remaining open to fluidity … This approach is used in some key child and adolescent clinics across the Western world” (Cass, 2022a, p. 78).

guideline development (Chapter 9, Chapter 10). This Review also finds evidence of extreme toxicity and polarization surrounding this field of medicine. ("There are few other areas of healthcare where professionals are so afraid to openly discuss their views … where name-calling echoes the worst bullying behaviour."[15]) Additionally, this Review describes the inadequate response of professional medical and mental health associations to new evidence and controversies (Chapter 12).

Section 1.1 of this opening chapter emphasizes the exceptional nature of PGM. Section 1.2 outlines the role that evidence-based medicine (EBM) plays in the Review; Section 1.3 does the same for medical ethics.

## 1.1 Exceptionalism

The field of PGM is exceptional due to the convergence of several distinct features.

First, the *diagnostic criteria* for GD are based solely on subjective reports and behavioral observations in patients with no objective physical pathology; there are no verifiable physiological or biochemical markers–such as abnormal imaging, lab, or clinical findings–to confirm the GD diagnosis.[16]

Second, the condition's *natural course* (also known as "natural history")—i.e., what happens when the condition remains untreated—appears to tend toward resolution absent medical and/or social transition interventions for a significant number of affected youths (Chapter 4). While the condition will persist in some affected adolescents into adulthood, the Cass Review, commissioned by England's National Health Service (NHS), found that while "a diagnosis of gender dysphoria has been the basis for initiating medical treatment … this is not predictive that the individual will go on to have longstanding trans identity."[17]

Third, the treatments recommended by the medicalized approach are invasive, usually irreversible, and their purported benefits are based on poor quality evidence. In addition

[15] Cass (2024a, p. 13).
[16] Laidlaw et al. (2019). The same goes for the ICD's diagnosis of "gender incongruence": for discussion, see Section 13.4.
[17] Cass (2024a, p. 146).

to infertility and impairment of sexual function, the anticipated harms include adverse effects on bone health, cardiovascular function, and possible negative impacts on brain development (Chapter 7).

When taken separately, *none* of these features is unique in medicine. Nearly all mental health and some physical health diagnoses are made on the basis of self-reports and behavioral observations. Also, there are other pediatric conditions such as mild ear infections and strep throat that are self-limiting but still treated to reduce discomfort, promote faster recovery, or prevent complications. Lastly, there are instances in which patients are offered treatments even if the benefits of those treatments are profoundly uncertain and harms are expected. For example, craniotomies are performed to remove certain malignant brain tumors, even though these interventions carry a high risk of permanent adverse effects and the overall prognosis remains poor even with treatment. (In such cases, however, the alternative to intervention is a significantly shorter life expectancy.) What makes PGM exceptional is not any one of these features, but their combination.

Is the fundamental goal of treatment to manage gender dysphoria, a condition recognized in the DSM's catalogue of mental disorders? Or is it to manage common comorbidities such as depression, anxiety, and suicidal ideation? Or, alternatively, is it to help individuals realize their "embodiment goals" (cosmetic desires)? The stated rationales for these interventions have shifted over time, following decades of research that failed to provide credible evidence of benefit (Chapter 5). This unclarity surrounding the treatments' fundamental aims is yet another way in which PGM is exceptional. In contrast, there is broad consensus about the purpose of medical intervention for conditions like appendicitis, diabetes, or severe depression.

## 1.2 Evidence

When assessing a medical intervention, one of the most important questions is: Is it safe and effective? Does drug X reduce all-cause mortality for cancer patients? Does talk therapy alleviate depression? Does knee surgery relieve arthritis pain with few postoperative complications? Even if the treatment is effective, it may not be safe, and there may be better alternatives.

In the case of invasive treatments for GD, medical authorities in the United States have issued statements indicating that the matter is settled. According to the American Medical Association (AMA):

> Improving access to gender-affirming care is an important means of improving health outcomes for the transgender population. Receipt of gender-affirming care has been linked to dramatically reduced rates of suicide attempts, decreased rates of depression and anxiety, decreased substance use, improved HIV medication adherence and reduced rates of harmful self-prescribed hormone use.[18]

In 2022, the then Assistant Secretary for Health at the U.S. Department of Health and Human Services, Admiral Rachel Levine, gave an even more unqualified endorsement:

> Gender-affirming care is medical care. It is mental health care. It is suicide prevention care. It improves quality of life, and it saves lives. It is based on decades of study. It is a well-established medical practice.[19]

However, according to the U.K.'s April 2024 Cass Review, the most comprehensive assessment of PGM to date:

> This is an area of remarkably weak evidence, and yet results of studies are exaggerated or misrepresented by people on all sides of the debate to support their viewpoint. The reality is that we have no good evidence on the long-term outcomes of interventions to manage gender-related distress.[20]

Whether the approach endorsed by the AMA is based on adequate evidence is the subject of intense controversy. What is considerably less controversial is the best framework for assessing the efficacy of treatments. That framework is EBM, adopted by this Review.

---

[18] American Medical Association (2022).
[19] Levine (2022).
[20] Cass (2024a, p. 13).

### 1.2.1 Evidence-based medicine

The physician and researcher Gordon Guyatt—who coined the term "evidence-based medicine" in 1991—describes EBM as follows:

> Evidence-based medicine de-emphasizes intuition, unsystematic clinical experience, and pathophysiologic rationale as sufficient grounds for clinical decision making and stresses the examination of evidence from clinical research. Evidence-based medicine requires new skills of the physician, including efficient literature searching and the application of formal rules of evidence evaluating the clinical literature.[21]

EBM sees carefully controlled clinical trials as especially important, along with "systematic reviews" (SRs), methodical syntheses and evaluations of all relevant available evidence. Various "hierarchies of evidence" have been proposed, with SRs at the top and the opinions of individual clinicians, which, although usually valuable, are subject to a variety of biases, at the bottom. EBM has been widely accepted by health authorities around the world.[22]

In keeping with EBM principles, this Review is informed by a methodologically rigorous assessment of the evidence underpinning PGM. An overview of SRs was conducted, and its findings are presented in Chapter 5 and in Appendix 4. In brief, the overview independently confirms Cass's observation that "this is an area of remarkably weak evidence."

Given its emphasis on clinical trials, EBM is less sensitive to evidence about known mechanisms of drug action or relevant biology more broadly. This limits the ability of SRs to uncover potential causal pathways or to understand observed associations or their absence (Chapter 6). Accordingly, Chapter 7 supplements the overview of SRs with evidence from basic science, including physiology. As detailed in that chapter, the risk of harm from the medicalized approach to treating pediatric GD is serious.

---

[21] Guyatt et al. (1992, p. 2420). See also Akobeng (2005).
[22] E.g. Darzi (2008); Margolis (2018); Carande-Kulis (2022).

It is important to recognize that evaluating the evidence for a treatment's efficacy does not, on its own, determine whether the treatment ought to be offered. SRs or other sources of high-quality evidence are not rigid formulas for making medical decisions; rather, they are essential components of the decision-making process. The principle is explicitly acknowledged in EBM. Medical evidence is not sufficient to justify clinical recommendations or decisions; other considerations—such as patient values and preferences—also play a critical role.[23] However, as emphasized below, these preferences do not override physicians' ethical and professional duties.

### 1.2.2 History lessons

An unreasonable skepticism toward medical expertise can lead to patient harm and even death.[24] On the other hand, while physicians are often capable of remarkable healing, they are not immune to human error or bias. However well-intentioned, doctors are not infallible. Even the consensus of professional medical associations can, at times, be mistaken.

Peanut allergies are a recent example. In 2000, the American Academy of Pediatrics (AAP) advised that infants deemed "high risk" should avoid peanuts—and that breastfeeding mothers do the same. In practice, this guidance was widely interpreted as a recommendation for all infants to avoid peanuts as a precaution. Peanut allergies increased dramatically, and in 2017 the AAP reversed course, recommending early *introduction* of peanuts for the highest-risk infants.[25]

This is just one of many examples.[26] Medical error is more prevalent than many Americans realize. Consensus does not guarantee correctness—in fact, it can sometimes entrench error. Nor should it be assumed that all treatment recommendations are motivated by altruism, as the opioid overprescription crisis has starkly demonstrated. This is not to suggest that medical consensus is inherently untrustworthy, but rather that it should be approached with critical scrutiny, not

[23] Djulbegovic & Guyatt (2017, p. 416); see also Guyatt et al. (2000).
[24] Centers for Disease Control (2025).
[25] Makary (2024, Chapter 1).
[26] Apart from Makary (cited above), see Prasad & Cifu (2019, Chapters 1, 2) and Patashnik et al. (2017, Chapter 2).

unquestioning acceptance. The physicians and researchers Vinay Prasad and Adam Cifu succinctly make this point:

> We expect that medical therapy will change and evolve with time. Good treatments will replace bad ones, and then better ones will replace those. Antibiotics have replaced arsenic, and anesthesia has replaced a bullet held bracingly between the teeth. Recently, however, change has occurred in surprising ways. If you have followed the news about prostate cancer screening, mammography for women in their forties, hormone replacement, cholesterol-lowering medications, and stents for coronary-artery disease, you might think doctors cannot get anything straight. These common practices were not replaced by better therapies; they were found to be ineffective. In some cases, they did more harm than good. You might be worried that some medical practices are nothing more than fads. In some cases, you would be right.[27]

## 1.3 Ethics

Finding safe and effective treatments is only part of medicine's mission. Questions of ethics—and the complex theoretical issues they raise—emerge immediately alongside clinical decision-making. What if a treatment is effective but the patient doesn't want it? When is informed consent needed before starting treatment? Should doctors ever lie to their patients? What is the difference between cosmetic procedures and those that alleviate a medical problem? What should we do when clinicians disagree with pediatric patients or their parents about the best medical course of action? These and numerous similar questions are the topic of the academic field known as *medical ethics*.[28]

EBM is only decades old, but medical ethics is as old as medicine itself. The Hippocratic Oath, originating in the fourth century BCE, and attributed to the ancient Greek physician Hippocrates, is a pledge to uphold ethical principles in medicine. The Hippocratic writings include: "I will use treatment to help the sick according to my ability

[27] Prasad & Cifu (2019, p. 11).
[28] An alternative name is *biomedical ethics*. *Bioethics* is a broader field encompassing ethical issues in the life sciences beyond healthcare. Although medical ethics is an academic discipline, medical ethicists often work in clinics and hospitals, supporting patients and their families, and assisting clinicians in developing policies.

and judgment, but I will never use it to injure or wrong them."[29] This commitment laid the foundation for the medical maxim *Primum non nocere*: First, do no harm.[30] Together with the duty of non-maleficence (avoiding harm), the duty of beneficence (promoting the patient's well-being) "undergirds all medical and health care professions and their institutional settings."[31] These duties have been continually affirmed by professional medical societies. For example, the World Medical Association's Declaration of Geneva, first published in 1948 and last revised in 2017, requires physicians to respect the "autonomy and dignity" of patients but recognizes the primacy of non-maleficence and beneficence: "The health and well-being of my patient will be my first consideration."[32]

Importantly, the physician's duties of non-maleficence and beneficence are not overridden by the patient's desire for a particular course of treatment. In 2002, the American Board of Internal Medicine Foundation, the American College of Physicians Foundation, and the European Federation of Internal Medicine articulated this point in a "Physician Charter." Among the three "fundamental principles" of the charter is the "Principle of patient autonomy," defined as follows:

> Physicians must have respect for patient autonomy. Physicians must be honest with their patients and empower them to make informed decisions about their treatment. Patients' decisions about their care must be paramount, *as long as those decisions are in keeping with ethical practice and do not lead to demands for inappropriate care*.[33]

One central question this Review attempts to answer is whether pediatric medical transition—and in particular the provision of hormonal or surgical interventions to children and adolescents—is consistent with widely-accepted principles of medical ethics. This is examined in Chapter 13. Another treatment approach—psychotherapy (talk therapy)—is examined in Chapter 14.

---

[29] Beauchamp & Childress (2019, p. 155). Graduating medical students today recite a variety of oaths, sometimes composing them themselves (Weiner, 2018).
[30] The Latin phrase does not trace back to ancient times: it may have been devised by the seventeenth century English physician Thomas Sydenham (1624-1689), the "English Hippocrates" (Smith, 2005).
[31] Beauchamp & Childress (2019, p. 155).
[32] Parsa-Parsi (2017, p. 1971).
[33] American Board of Internal Medicine Foundation (2002, emphasis added).

The innovation and responsiveness of the U.S. medical system has made it the envy of the world. However, errors are unavoidable in healthcare. The test of a medical system is not its ability to avoid mistakes, but rather how it responds once mistakes become apparent.

# Chapter 2 Terminology in Pediatric Gender Medicine

The choice of words can affect medical decision-making. Medical providers have a professional duty to apprise their patients of their conditions and the treatment options in language that is accurate, ethically neutral, and in no way misleading.[1] In the case of pediatric gender medicine (PGM), language has distorted the clinical picture, obscuring important distinctions. This chapter addresses that issue. Section 2.1 examines commonly used terminology, while Section 2.2 clarifies the specific terms adopted in this Review.

## 2.1 Terminology in pediatric gender medicine

Concerns about proper terminology and disclosure of all relevant information are common in medicine generally, particularly in the context of physician-patient interactions.[2] PGM, however, presents unique challenges. In this context, the understandable desire to avoid exclusionary or pathologizing language—combined with beliefs firmly embedded in the field—has led to a vocabulary and a mode of communicating that is scientifically ungrounded, that presupposes answers to ethical controversies, and that is in other ways misleading.[3]

Nearly all the core terms used in PGM exhibit these kinds of issues. As mentioned in Chapter 1, the preferred label for the treatment approach endorsed by the World Professional Association for Transgender Health (WPATH), the Endocrine Society (ES), the American Academy of Pediatrics (AAP) and the American Medical Association (AMA) is "gender-affirming care." The surgical removal of breasts (mastectomy) in physically healthy females is called "gender-affirming chest surgery" or "top surgery."[4] "Affirming" has a positive connotation, and someone who objects to "gender-affirming

---

[1] Importantly, accuracy and neutrality are not enough. "80% of patients given drug A recovered" is ethically bland; suppose it is also true. Absent further context that statement is misleading if 80% of patients *not* given drug A also recovered. Another example: if a physician truthfully tells a patient, "You either have cancer or a harmless cyst," knowing that the patient has cancer, the patient has been misled.
[2] Shaw et al. (2022).
[3] For related examples in the field of women's health, see Gribble (2025). See also Bartick et al. (2025); the authors make the point that "transgender and gender-diverse people need clear and unambiguous health communications, including those related to sex-based needs, conditions, and symptoms, as much as any other group" (p. 5).
[4] E.g. Coleman et al. (2022, p. S130).

surgery" sounds lacking in compassion. The euphemisms "chest surgery" and "top surgery" gloss over the relevant fact that breasts are removed.

Word choices can obscure patients' young ages. Terms such as "people" or "folks" are sometimes used by proponents of medicalized interventions instead of "children" or "adolescents." It is frequently emphasized that prepubertal children are not prescribed hormones or surgeries. That is true. However, clinical guidelines recommend initiating puberty blockers (PBs) at pubertal onset, which can occur at 8 or 9 years old—meaning that such interventions may be started during childhood. In discussions of this recommendation, "young people" or "adolescents" are sometimes substituted for "children."[5] Again, this helps camouflage the fact that sometimes serious medical interventions are performed on children's healthy bodies.[6]

Some adolescents transition and later detransition, reverting to living as their sex, changing their name back and making other necessary social adjustments. If the adolescent has undergone some degree of medical transition, the process of detransitioning can present significant challenges.[7] These difficulties are sometimes downplayed through the use of "retransitioning"[8] instead of "detransitioning," or writing

---

[5] E.g., from a National Association of Social Workers fact sheet: "MYTH: Gender-affirming hormones, or hormone replacement therapy (HRT), are given to *children*," and: "During and after puberty, some medical treatments may be available [for] the *youth*" (National Association of Social Workers, n.d., emphasis added). According to the AAP, childhood spans ages 2-12 (Hardin et al., 2017).

"Adolescent" is often used for children in the early stages of puberty, when a layperson would use "child." As a member of WPATH put it in an email: "I would avoid children and hormones, and stick to medical definitions: when a young person reaches … puberty, [they are] therefore classed as adolescents (whether they are 9 or 12)," quoted in Boe v. Marshall*,* No. 2:22-cv-00184: 557-9/700-2 (2024, p. 16). See also Ryan (2025): "Dr. Olson-Kennedy generally avoids using the words 'child,' 'children' or 'kids'"; and Levine et al. (2022b, p. 117). The Endocrine Society made a simple factual error when it stated that "medical intervention is reserved for older adolescents and adults" (Endocrine Society, 2023).

[6] Another phrase is "wrong puberty": e.g., "pubertal blockers … block the progression of puberty so the young person doesn't go through the wrong puberty" (Jacoby, 2022). Apart from presupposing the correct treatment, it is misleading to suggest that the "right puberty" induced by estrogen in males or testosterone in females amounts to a cross-sex version of puberty, because puberty centrally and definitionally involves maturation of the capacity for reproduction. The Endocrine Society guideline adopts this language, writing of the "induction of female puberty" in males (Hembree et al., 2017, Table 8); see also Section 7.4.1.

[7] MacKinnon, Expósito-Campos et al. (2023).

[8] Olson et al. (2022). "Retransitioning" does have a legitimate use, to describe the process of transitioning again, going from detransitioning to living as the other sex (MacKinnon, Expósito-Campos et al., 2023, p. 1).

of "dynamic desires for gender-affirming medical interventions."[9] This conceptualizes an experience that can be profoundly distressing for the patient as simply another stop along their "gender journey."[10]

The lead author of the AAP's 2018 policy statement (reaffirmed in 2023), "Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents," has even described detransition as part of the "gender affirming" approach itself, thus making treatment failure impossible to conceive.[11]

The problems go deeper. The terminology of "sex," "male," and "female" is indispensable if the medical and ethical issues are to be discussed responsibly. And yet proponents of medicalization go to extraordinary lengths to avoid the plain use of these words, and related words such as "boy" and "girl." When "sex" is defined, the definition is rarely correct,[12] and in any case the preferred phrase is "sex assigned at birth." According to the ES's "Clinical Practice Guideline for the treatment of Gender-Dysphoric/Gender-Incongruent Persons," "the terms biological sex and biological male or female are imprecise and should be avoided."[13] Pediatric female patients are not "girls" or "young women," but rather "AFAB individuals" (people "assigned female at

---

[9] Turban, Brady et al. (2022).
[10] Jorgensen (2023b): "we should be cautious about adopting euphemisms that might mask iatrogenic harm" (p. 2180).
[11] "Rafferty [the lead author of the AAP 2018 policy statement] told me patients who live with harms or regrets do not signal a failure of the affirmative care model. If a child or patient doesn't like the effects of an intervention, or begins to feel different in their identity, then the provider continues to affirm by discontinuing treatment. 'They're not treatment failures if that's what's affirming' he said" (Block, 2023d).
[12] E.g. the entry for "sex" in Hembree et al. (2017, Table 1) conflates sex with characteristics highly correlated with sex in humans ("sex chromosomes," "sex hormones," etc.); the entry in Rafferty et al. (2018, Table 2) erroneously says that sex is "an assignment that is made at birth." For the orthodox conception of sex in biology, see, e.g., Dawkins (1976, pp. 183–184); Parker (2011); Futuyama & Kirkpatrick (2017, p. 249). The orthodox conception is in an Endocrine Society "Scientific Statement" (Bhargava et al., 2021), and in a Health and Human Services document (Health and Human Services, 2025).
[13] Hembree et al. (2017, Table 1). Hembree et al. don't take their own recommendation completely to heart, writing at one point that "in females [i.e. "biological females"] … the effect of prolonged treatment with exogenous testosterone on ovarian function is uncertain" (p. 3880). This ES guideline is an update of "Endocrine treatment of transsexual persons: An Endocrine Society clinical practice guideline," published in 2009. In that earlier guideline the conventional meaning of sex is used, and the authors use the allegedly imprecise phrase "biological females" (Hembree et al., 2009, p. 3139). The AMA also claims that "sex assigned at birth" is "more precise" than "sex" (American Medical Association, 2021, p. 14).

birth"). Some authorities in PGM say that the patients wanting mastectomies are in fact "young men."[14]

"Assigned sex at birth" is not a harmless euphemism. It suggests an arbitrary decision—not unlike "assigned seating"—rather than the observation of a characteristic present long before birth, namely the child's sex. Moreover, if the phrase "assigned sex" were intended merely as a gentler way of referring to sex in conversations with patients and families, one would expect more direct language to be used in the specialty medical literature. In professional contexts, where clarity is paramount, euphemisms are generally avoided. Yet "assigned sex" is ubiquitous in clinical and academic publications. Not only that: use of such terminology is now *mandated* by certain medical journals.[15] The American Psychological Association (APA) style guide, for example, classifies "birth sex" and "natal sex" as "disparaging terms" which problematically "imply that sex is an immutable characteristic."[16] As law professor Jessica Clarke observes, "'Sex assigned at birth' is not a euphemism for 'biological sex' but a critique of the very concept."[17]

The term "gender identity" is an especially important example of how words can sow confusion. When first introduced in the 1960s, it meant "the sense of knowing to which sex one belongs, that is, the awareness 'I am a male' or 'I am a female'."[18] Almost

---

[14] "I don't advocate removal [of] breast tissue from young women. I advocate for chest reconstruction in young men" (Olson-Kennedy, 2019, p. 38); this use of language has the effect of making mastectomies for adolescent girls sound unalarming. See also Ehrensaft (2017b, p. 7): "transgender boys are boys and transgender girls are girls."

[15] *The Lancet*'s "Information for Authors" mandates the use of "sex assigned at birth," instead of "biological sex," "birth sex," or "natal sex" because "it is more accurate and inclusive." The same document also incorrectly states that sex is not "binary," that it exists "along a spectrum," and that a person's sex can change (The Lancet, 2025).

[16] American Psychological Association (2024a). The APA has the "problematic implication" backwards: terminology that suggests a person's sex is a *mutable* characteristic is misleading to patients and should be avoided.

[17] Clarke (2022, p. 1828). The language of "assigned sex" was used in the 1950s for exceedingly rare cases of disorders of sex development (DSDs), where a baby with ambiguous genitalia could be raised as either a boy or a girl (Money, 1955).

[18] Stoller (1964, p. 220); see also Greenson (1964, p. 217). For discussion see Byrne (2023b, 2023a); Haig (2023); D. F. Janssen (2023).

everyone has a gender identity in this sense, and moreover one that is congruent with their sex: males know that they are male, and females know that they are female.[19]

However, today the phrase "gender identity" is used in a significantly different way. For example, WPATH defines "gender identity" in the glossary to their current clinical practice guideline (SOC-8) as:

> A person's deeply felt, internal, intrinsic sense of their own gender.[20]

This new definition is unclear. For instance, what does "gender" mean in this context? The glossary in SOC-8 offers little clarification—though it does correctly acknowledge that the word is highly ambiguous. One meaning of "gender" given in the glossary is "gender identity." But "gender" in the definition above cannot mean "gender identity," otherwise the definition would be circular. Another meaning provided is "gender expression," but this too leads to circularity, because "gender expression" is itself defined in the same glossary in terms of "gender."[21]

---

[19] Some children distressed about their sexed bodies are mistaken about whether they are male or female, but some are not. Accordingly, being mistaken about one's sex is not required for a diagnosis of Gender Dysphoria in Childhood in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM): "A strong *desire* to be of the other gender" is enough. Although the diagnostic criteria for children also mention "an insistence that one *is* the other gender," this is not a necessary criterion, and is altogether absent from the DSM criteria for Gender Dysphoria in Adolescents and Adults (American Psychiatric Association, 2022, pp. 512–513, emphasis added).

[20] Coleman et al. (2022, p. S252). Along the same lines: "On one level, gender identity is something deeply felt and can be difficult to put into words. I often refer to this as one's *transcendent* sense of gender. You simply *feel* a certain gender" (Turban, 2024, p. 38); "Gender identity is a person's inner sense of belonging to a particular gender, such as male or female" (Ehrensaft, 2017b, p. 7). This latter definition would sound strange if "particular gender" was replaced by "particular sex": the implication would then be that there are more sexes beyond male and female.

[21] Another definition of "gender" given in SOC-8 is "social gender role, including understandings and expectations culturally tied to people who were assigned male or female at birth" (Coleman et al., 2022, p. S252). Consider the suggestion that this is the intended sense of "gender" in WPATH's definition of "gender identity." That is, "gender identity" is defined as: "a person's deeply felt, internal, intrinsic sense of their own social gender role." Now it is true that a person might have a sense of their "social gender role." A woman, say, might be aware that in her culture certain expectations apply to women. However, here the language of "deeply felt/internal/intrinsic" is quite inappropriate, which is one piece of evidence that the present suggestion is wrong. More importantly, there is no room for any "mismatch" between a person's sex and their social gender role. A woman may (perhaps rightly) disapprove of the expectations that her culture imposes on females; that is, she may disapprove of her social gender role. Since she has this gender role because she was "assigned female" at birth, her "gender" in this sense will *always* match her sex. But evidently WPATH wishes to define "gender identity" in such a way as to allow for *mismatches* with a person's sex. Hence, the "gender role" sense of "gender" is of no help in defining "gender identity" either. [Note continued on next page.]

In short, "gender identity" as it appears in SOC-8 and related literature is ill-defined.[22] It may be true that a person's gender identity is subjective, or undetectable by blood tests or neuroimaging,[23] or otherwise beyond the reach of science, but the more critical point is that no tolerably clear definition of "gender identity" has been offered in the first place.[24] This is a serious problem, because the term figures centrally in the justification for medical intervention.

The term "transgender" is typically explained in terms of gender identity. Transgender people are those whose gender identities do not "align with" or "match" their sex (or "sex assigned at birth").[25] Since "each of us has a gender identity, though many of us never give it much thought,"[26] the rest of humanity have gender identities that match their sex; these people are said to be "cisgender." It is important to realize that "transgender" is

---

Another way of explaining "gender" is to give a list of representative "genders" with the expectation or hope that the reader will see the pattern. In principle, this sort of explanation can be satisfactory. However, WPATH's previous guideline offered the following examples: "male (a boy or a man), female (a girl or woman) … boygirl, girlboy, transgender, genderqueer, eunuch" (Coleman et al., 2012, p. 221). Notice that the list includes the category *transgender*, which is itself explained in terms of gender identity and hence gender, introducing a circularity. Another point is that if *eunuch* is a (contemporary) gender, then "gender" as it figures in WPATH's definition of "gender identity" cannot possibly be explained in terms of "social gender role" (see the first paragraph of this note). Eunuchs had a special social role in Imperial China; they have no such role today. WPATH's current guideline has an entire chapter on eunuchs, so clearly WPATH thinks the gender *eunuch* is not an anachronism.

[22] Here are two other examples. First, the AAP's 2018 policy statement defines gender identity as "[a] person's deep internal sense of being female, male, a combination of both, somewhere in between, or neither" (Rafferty et al., 2018, Table 1). The policy statement also says that a "transgender" person is someone "whose gender identity does not match their assigned sex." Clearly "gender identity" as the AAP defines it cannot mean what it originally did, because a transgender man, for instance, might not be mistaken about being female. How to interpret "female" and "male" in the AAP's definition is far from clear. Second, the philosopher Rach Cosker-Rowland explains gender identity as "our sense of ourself as a particular gender, as a woman, as a man, as non-binary, or as *another gender*" (Cosker-Rowland, 2025, p. 3, emphasis changed); Cosker-Rowland leaves "gender" unexplained.

[23] See, e.g. Baldinger-Melich et al. (2020); Levin et al. (2023); Bakker (2024).

[24] The original 1960s explanation of gender identity (see above) was perfectly clear, but that is not the contemporary conception in gender medicine.

[25] Boe v. Marshall, No. 2:22-cv-00184: 558-16 (2024); Ehrensaft (2017b); Olson-Kennedy (2022). According to the previous WPATH guideline (SOC-7): "The gender identity of transgender people differs to varying degrees from the sex they were assigned at birth" (Coleman et al., 2012, p. 221). Remarkably, sometimes "transgender" is defined to include commonplace gender non-conformity, *regardless* of any "mismatched" gender identity. For instance, according to SOC-8, if a person's "gender expressions are not what is typically expected for the sex to which they were assigned at birth," they are transgender (Coleman et al., 2022, p. S252).

[26] Forcier et al. (2020, p. 2). Similarly: "Gender identity … is a core and *universal* component of human identity" (Boe v. Marshall, No. 2:22-cv-00184: 592-12, 2024, p. 6, emphasis added).

not a clinical term and does not correspond to a medical diagnosis.[27] Indeed, proponents of the medicalized approach emphasize that some transgender people neither desire nor need medical or surgical interventions of any sort.

It is often claimed that gender identity is "innate or fixed at a young age," and so "cannot be changed."[28,29] Putting that idea together with the definition of "transgender," the result is that being transgender is a close-to-immutable trait. (The same goes for being cisgender.) A "transgender child," in this framework, is a child whose unalterable gender identity does not align with their sex, while cisgender children are the other kind.[30] Once this binary paradigm of "trans kids" and "cis kids" is accepted, therapeutic exploration of the underlying causes of a child's discomfort with his or her sexed body is readily dismissed as "conversion therapy," an unethical attempt to interfere with the development of the child's authentic self.[31,32]

According to many authorities in PGM, there is a test to determine whether a child is transgender or cisgender. This is because children "know who they are." Specifically, they know their "gender."[33] If a child's "gender" matches their "assigned sex," they are

---

[27] Thus a recent article on assessing "transgender and gender diverse adolescents" for puberty suppression recommends reassuring patients that the goal is not to determine whether they "are actually transgender" (Turban et al., 2025, p. 14). But see Section 13.3.

[28] Adkins (2016, p. 4); Ehrensaft (2017b, p. 7); Olson-Kennedy (2022, p. 9). However, an earlier paper on the PMT approach, which has Ehrensaft and Olson-Kennedy as co-authors, states that it is a "myth" that gender identity is "immutable" (Hidalgo et al., 2013, p. 288), indicating at least some confusion about key terms.

[29] In his expert witness report for *Boe v. Marshall*, Aron Janssen, a gender clinician and vice chair of clinical affairs at Lurie's Pritzker Department of Child and Adolescent Psychiatry, wrote that gender identity, "a person's innate sense of their gender," "cannot be altered through medical or psychological interventions" (Boe v. Marshall*,* No. 2:22-cv-00184: 592-12, 2024, p. 6).

[30] Some PMT authorities would dispute this characterization and claim that a transgender child's gender identity *does* match their sex—what it *doesn't* match is their "birth-assigned sex" (Ehrensaft, 2017b, p. 9).

[31] "Psychotherapy may be beneficial but should not be a requirement for gender-affirming treatment, and conversion treatment should not be offered" Coleman et al. (2022, p. S10). On "conversion therapy," see Section 14.5.2.1.

[32] Two books that discuss the "transgender child" are Gill-Peterson (2018) and Meadow (2018). On Gill-Peterson, see Byrne (2024b, pp. 243–244). For an early expression of skepticism, see Brunskell-Evans & Moore (2018).

[33] [R]esearch substantiates that children who are prepubertal and assert an identity of TGD [transgender and gender-diverse] *know their gender* as clearly and as consistently as their developmentally equivalent peers who identify as cisgender and benefit from the same level of social acceptance" (Rafferty et al., 2018, emphasis added). Also: "Individuals whose sex assigned at birth is opposite to the gender they *know themselves to be* are often referred to as *transgender*" (Turban & Ehrensaft, 2018, p. 1, first emphasis added); "studies show that trans children and adolescents know themselves and their gender" (Ashley, 2022b, p. 15).

cisgender; if not, they are transgender. So, to determine whether a child is transgender or cisgender, one only need ask.

An immediate problem is posed by the undeniable phenomenon of temporary youthful transgender identification. (See Section 4.3.1.4.) Attempting to address this difficulty, Aron Janssen, vice chair of clinical affairs at the Pritzker Department of Child and Adolescent Psychiatry at Lurie Children's Hospital in Chicago, and chair of the American Academy of Child and Adolescent Psychiatry's Sexual Orientation and Gender Identity Issues Committee, stated in a deposition that although gender identity is "static" and "fixed," "one's understanding of it can evolve over time."[34]

Dysphoric children and socially transitioned children are routinely referred to as "transgender children." In some cases, this is for convenience or as a gesture of respect.[35] However, its use may subtly influence clinical reasoning. The label "transgender" implies a mismatch between gender identity and the person's sexed body, and that mismatch can supposedly cause gender dysphoria (GD).[36] Since an adolescent's gender identity cannot be changed, the obvious solution to relieve the distress is to change their body.[37]

---

[34] Boe v. Marshall*,* No. 2:22-cv-00184: 558-16 (2024, pp. 104–110). Some PMT clinicians maintain that such change in understanding is not likely: "there is [a] small but non-zero possibility of one's understanding of their gender identity evolving over time" (Turban et al., 2025, p. 2). According to UCSF's Diane Ehrensaft, "My own clinical experience told me that you could discern one group of children from the other prior to adolescence, not with 100% accuracy, but not far from it" (Ehrensaft, 2014, p. 578). As Ehrensaft puts it in her book *The Gender Creative Child*, "we can tell the apples (the transgender children) from the oranges (the gender-nonconforming but not trans kids), sometimes as early as when they are three years old. So, why hold the apples back if they already know who they are?" (Ehrensaft, 2016, p. 55). Put without the framing of "trans kids," the clinical issue is whether one can discriminate between gender dysphoric children whose dysphoria will resolve without any medical intervention, and those whose dysphoria will persist into adulthood (see Section 4.3.2).
[35] E.g. Olson et al. (2022).
[36] According to WPATH, gender dysphoria is "distress that is *caused by* a discrepancy between a person's gender identity and that person's sex assigned at birth" Coleman et al. (2012, p. 221, emphasis added). The quotation continues, "(and the associated gender role and/or primary and secondary sex characteristics)"; so at least in theory, one way of relieving gender dysphoria would be to change the "associated gender role."
[37] The AAP policy statement includes more young people as candidates for medicalization than just those with mismatched or incongruent gender identities. The title of the policy statement is "Ensuring Comprehensive Care and Support for Transgender *and Gender-Diverse* Children and Adolescents" (Rafferty et al., 2018, emphasis added). Transgender youth, the policy statement says, are "a subset of gender-diverse youth." The policy statement explicitly equates "gender diverse" with "gender nonconforming" (the latter term being deprecated only because of its allegedly pejorative connotation).

## 2.2 Terminology in this Review

While communication with patients and families must always be sensitive and compassionate, describing sex as a matter of "assignment" is, at best, confusing and accordingly not truly respectful. Patients and their legal caregivers are entitled to the facts regarding their medical situation; this is essential for informed participation in the medical decision-making process. Just as importantly, evidence assessments must use accurate and precise language when referring to sex, in order to maintain scientific integrity and support sound clinical judgment.

Treatment of children and adolescents with GD presents an especially complex case of doctor-patient communication because doctors understandably do not want to alienate their patients; trust is the bedrock of shared decision-making.

There is growing international awareness of the importance of using accurate sex-based language. As the recent U.K.'s *Review of Data, Statistics and Research on Sex and Gender* (RSG) asserts:

> Analysts must be able to use clear and familiar language in reporting findings on sex. Terms such as women, men, boys and girls are synonymous with (respectively) adult human females and males and children of each sex. Similar considerations apply to terms such as mothers and fathers, sons and daughters.[38]

The RSG also recommends against using the phrase "sex assigned at birth," remarking that it is "misleading."[39]

The RSG notes that the word "gender" has "multiple distinct meanings, including: a synonym for sex; social structures and stereotypes associated with sex; and gender

---

Thus, gender-nonconforming youth *in general* are singled out as potential recipients of sex-related hormone therapy and surgery. The same points apply to WPATH's SOC-8, *Standards of Care for the Health of Transgender and* Gender Diverse *People*, which also deprecates the use of "gender-nonconforming" (Coleman et al., 2022, p. S11, emphasis added); SOC-7 (Coleman et al., 2012) has "gender-nonconforming" in its title.

[38] Sullivan (2025, p. 11). The Review was commissioned by the previous Conservative government and welcomed by the present Labour Secretary of State for Health and Social Care (Scott, 2025).

[39] Sullivan (2025, p. 7).

identity."[40] For this reason, the RSG cautions against using the word when misunderstandings could arise. A prime example is WPATH's definition of "gender identity" discussed above, which uses the word "gender" without an adequate explanation. Because of its unclarity and ambiguity, "gender" will generally be avoided in this Review. "Gender identity" inherits the obscurity of "gender" and will not be used either.[41] As discussed, the term "transgender child" suggests that medical intervention is the default or primary course of action. For this reason, it will be avoided.[42]

The Review will use "social transition" for the process of changing one's sex-associated name, presenting oneself as a member of the other sex, being referred to with third-person pronouns for the other sex,[43] and so on.

"Gender dysphoria" is in the DSM and at present has no accepted alternative; therefore, it will be used despite problems with the word "gender." "Gender nonconformity" is a familiar and well-understood phrase, so it will also be used (although some may prefer "sex-stereotype nonconformity"). As already indicated, "pediatric gender medicine" (PGM) will be used for the clinical field that treats children and adolescents with GD, sometimes with medical interventions. Instead of the term "gender-affirming care" this Review will use "PMT" (pediatric medical transition), as in phrases such as "the PMT approach." This is more accurate and carries no positive or negative connotation. The PMT approach does not always involve hormones or surgeries, but some of its proponents do tend to view even social transition as an initial step toward medical transition. The older term "cross-sex hormones" (CSH)[44] is more neutral and informative than "gender-affirming hormone therapy." Surgeries to alter sex characteristics[45] for

---

[40] Sullivan (2025, p. 5).
[41] It should be emphasized that not everyone accepts that they have a gender identity. As the RSG puts it: "Questions on gender identity should recognize that the concept of gender identity as such will be unfamiliar, unclear or irrelevant to some respondents, and that many respondents may not perceive themselves as having a gender identity. Questions should not assume that respondents will agree that they have a gender identity" (Sullivan, 2025, p. 9). The RSG illustrates how "gender identity" is now firmly embedded, not just in gender medicine, but also in social statistics (and, it could be added, pedagogy). For an illuminating discussion of the history, see Brubaker (2025).
[42] Needless to say, terminology that makes other treatment pathways prominent is equally undesirable.
[43] Or *they* or neo-pronouns (*xe*/*xem* and the like).
[44] Even this terminology is not perfect: estrogens are normally present in males, although at lower levels than in females; vice versa for androgens (including testosterone).
[45] Sex characteristics are either *primary* (the external and internal reproductive organs), or *secondary* (characteristics that emerge at puberty, such as breasts in females and facial hair in males).

adolescents will be given medically standard, clinical, neutral descriptions—e.g. "mastectomy." Finally, the older term "sex reassignment surgery" (SRS) will be used rather than the more recent "gender confirmation surgery."

# Chapter 3 History and Evolution of Adult and Pediatric Gender Medicine

Medical transition for gender dysphoric youth is a comparatively recent practice and grew out of the clinical experience of transitioning mature adults. It is common in medicine to extend medical treatments to children once they have been proven safe and effective in adults. In this case, however, the opposite occurred. The rationale for transitioning adolescents emerged from the observation that medical transition in adults often failed to produce the desired positive outcomes. This chapter explains how this came about and provides additional historical context.

Sections 3.1, 3.2, and 3.3 briefly review the history of medicalized transitions, which are barely a century old. Sections 3.4 and 3.5 explain how the observed failure of medical transition to produce positive psychosocial outcomes for adults led clinicians in the Netherlands to propose an early intervention model, resulting in the "Dutch Protocol." The final section describes how the Dutch Protocol evolved into the "gender affirming care" approach to pediatric medical transition (PMT), a shift that was accompanied by significant changes in the pediatric patient population presenting with gender dysphoria (GD)—both in terms of size and demographic composition.

## 3.1 *The Transsexual Phenomenon*

Extremely gender-nonconforming people, including those who live their lives either as members of the other sex, or as a so-called "third gender," have been documented throughout human history.[1] One famous example is the French diplomat and spy Chevalière d'Eon (1728-1810), who dressed and "passed" as a woman during the final 32 years of his life. Everyone was convinced, including the last king of France, Louis XVI.[2] In the early 20th century, the English physician and sexologist Henry Havelock Ellis coined *eonism*, after the Chevalière, for "people who took pleasure in behaving and

[1] See, e.g., Bullough et al. (1997); R. Green (1966); Herdt (1996); Peled (2016); Vasey & VanderLaan (2014). Many earlier cultures and some contemporary ones have "third genders": some people of one sex (typically feminine same-sex attracted males) occupy social roles (somewhat) similar to those of the other sex. It is a mistake to take this phenomenon to be akin to the contemporary Western "transgender moment"—see Vasey (2022).
[2] Kates (2001, p. 218).

dressing like the opposite sex and yet were not sexually inverted; that is, their sexual feelings were not directed towards persons of their own sex."[3] "Eonism" later came to label a broader category, including individuals with strong cross-sex wishes who were same-sex attracted.[4] In 1949, an American physician, David Cauldwell, used the term "transexual" to label "individuals who are physically of one sex and apparently psychologically of the opposite sex."[5]

"Transsexualism" was popularized by Harry Benjamin, a German-American endocrinologist and the father of transgender medicine. Benjamin's 1966 book, *The Transsexual Phenomenon*, was the first comprehensive English-language discussion of medicalized treatment for people who "want to undergo corrective surgery … so that their bodies would at least resemble those of the sex to which they feel they belong and to which they ardently want to belong."[6] Cross-sex hormones (CSH) followed by surgery, Benjamin thought, could "change a miserable and maladjusted person of one sex into a happier and more adequate, although by no means neurosis-free, personality of the opposite sex."[7]

In the first half of the 20th century, there were few recorded instances of transsexuals. One of the first people to undergo sex-reassignment surgery (SRS) was Einar Wegener, a Danish artist who modeled while cross-dressed for his wife Gerda Gottlieb, a talented painter. In pursuit of the body modifications he so desperately desired, Wegener sought help from the sexologist Magnus Hirschfeld, a long-time friend of Harry Benjamin's and founder of the Institute for Sexual Science in Berlin.[8] Castration, penectomy, and ovarian implantation were performed on Wegener in Berlin and Dresden in 1930, with

---

[3] Havelock Ellis (1937, p. 1, Part Two); quoted in Byrne (2024b, pp. 113–114). According to d'Eon's biographer, the historian Gary Kates, "d'Eon was neither a transvestite nor a transsexual … there is simply no indication that d'Eon hated his own body or that he wanted, or even imagined he would be better off with, the body of a woman" (Kates, 2001, p. xxii); quoted in Byrne (2024b, p. 229).
[4] See, e.g., Hamburger et al. (1953) (a report on Christine Jorgensen's case; see the following section). See also Benjamin (1967b, p. 107) and Blanchard (1989, p. 240).
[5] Quoted in Meyerowitz (2009, p. 44). This quotation is from Cauldwell's 1950 *Questions and Answers on the Sex Life and Sexual Problems of Trans-Sexuals*, which hyphenates "transsexual." Cauldwell used "psychopathic transexual" (one "s") in 1949 (Cauldwell, 2006, p. 41).
[6] Benjamin (1966, p. 14)
[7] Benjamin (1966, p. 164).
[8] Li (2023a, 2023b, pp. 113–114).

additional procedures the following year. These were unsuccessful. Einar Wegener, transformed into Lili Elbe, died in September 1931, after an “abyss of suffering.”[9]

## 3.2 From George to Christine

Transsexualism was not then a phenomenon. That changed in 1952, when the news broke that George Jorgensen, a 24-year-old American of Danish descent had undergone sex reassignment surgery (SRS) in Denmark:

> [H]er celebrity began December 1, 1952, when a banner headline screaming “EX-GI BECOMES BLONDE BEAUTY: OPERATIONS TRANSFORM BRONX YOUTH” greeted readers of the *New York Daily News*. Hearst Publications’ popular Sunday newspaper supplement, *American Weekly*, subsequently paid twenty thousand dollars for an exclusive interview with Jorgensen that brought her story to millions of American homes, and whetted the appetite of the world press. When she returned to the United States in 1953, an unprecedented three hundred reporters were on hand to meet her plane at New York International Airport … Her “sex-change” was viewed by many as a miracle of God in which not Christ, but Christine—Man reborn as Woman—heralded a new dispensation of human history.[10]

Jorgensen met Harry Benjamin in New York that year, and they enjoyed a long friendship. In a 1965 letter, just before the publication of *The Transsexual Phenomenon*, Benjamin wrote: “Without you, Christine, none of this would have happened.”[11]

Growing up in the Bronx, the young George was teased for his “girlish qualities,” and was greatly conflicted by his homosexuality:

> One question was especially troubling for George: He had learned at church and from his school friends that homosexual relationships were considered sinful and immoral. In the Jorgensen household, the word was never spoken. Among his

---

[9] Elbe et al. (2020, p. 203); quoted in Joyce (2021, p. 17). Lili apparently had no regrets, writing in June 1931, “The price which I have paid seems to me very small” (Elbe et al., 2020, p. 198). On regret, see Section 13.4. The 2015 movie *The Danish Girl*, starring Eddie Redmayne, is loosely based on Einar/Lili’s story.
[10] Stryker (2000, pp. v–vi). See also Li (2023b, pp. 152–153).
[11] Jorgensen (1967, p. xi).

> neighbors, "homos" or "queers" were thought to be unacceptable, even dangerous people. Hence, a series of romantic attractions to other young men became his greatest teenage conflict. Try as he might to avoid these crushes, George persistently fell in love with other male youths of his age. This conflict would contribute to episodes of depression, low self-esteem, low aspiration for success, and much personal unhappiness.[12]

George himself fixated on a hormonal explanation for his femininity and same-sex attraction—a "glandular imbalance"[13]—and was also (wrongly) convinced that his genitals were "underdeveloped."[14] It is a plausible conjecture that George found an English translation of Lili Elbe's autobiography while hunting in New York City libraries, "hoping to find other keys to my dilemma."[15] In any event, in search of the hormonal and surgical treatment he felt he needed, George went to Denmark on a one-way ticket in 1950. There the "Bronx youth" became a patient of Christian Hamburger, a Copenhagen endocrinologist:[16]

> Perhaps Hamburger felt a special compassion for homosexuals because his sister was a lesbian. Despite Denmark's comparatively liberal national policies, Hamburger surely knew from his sister's experience how discrimination against gays and lesbians could be profoundly troubling for a homosexual. He could offer no medical intervention to help his sister, but he believed there might be some steps he could take to help George Jorgensen, and he was willing to try.[17]

---

[12] Docter (2013, pp. 25–26).
[13] Docter (2013, p. 63).
[14] Docter (2013, p. 46).
[15] Jorgensen (1967, p. 80); for the conjecture, see Docter (2013, p. 38).
[16] Hamburger had a distinguished career (Pedersen-Bjergaar, 1964). Contrasting with Hamburger's academic record, before Benjamin became interested in transsexuality he was a prominent proponent of endocrine "rejuvenation therapy," a medical fad. In 1931 he filed a lawsuit against the editor of the *Journal of the American Medical Association* (*JAMA*) "for calling his treatment quackery," and lost (Pettit, 2013, p. 1070). See also Li (2023b).
[17] According to Hertoft & Sørensen (1979), a "sex change" was not the original plan: "the Danish team regarded Chris Jorgensen as a homosexual man suffering from his homosexuality and since he himself asked for castration, they would not deny him this operation. Not until afterwards, when the press published the case, did the team behind the procedure accept it as a sex change. The rest of the story is well known" (p. 168). Hamburger is said to have denied that Jorgensen was a homosexual in Christine's autobiography (Jorgensen, 1967, p. 101). See also Docter (2013, p. 81).

In a case report he later wrote for the *Journal of the American Medical Association* (*JAMA*) Hamburger described George's desire "with medical assistance to be able to obtain permission to live on 'as nearly a woman as possible.'"[18] Hamburger prescribed estrogen, and George's application for castration to the Danish Ministry of Justice was approved in 1951.[19] Castration was followed by penectomy and a later unsatisfactory attempt at creating an artificial vagina. "As a nationally recognized personality, Christine Jorgensen's flame burned with exceptional brilliance for about thirty years,"[20] dimming in the 1980s. A heavy drinker and smoker, Christine died of cancer in 1989, at the age of 62.

## 3.3 "Dear Dr. Hamburger"

After the "sensational publicity" over George Jorgensen's metamorphosis into Christine, Hamburger received "a unique collection of letters from a considerable number of men and women who desire to change their sex."[21] He analyzed all 756 of them, from 465 people, and published the results in a European endocrinology journal, *Acta Endocrinologica*. His correspondents wrote from all over the world. Over three quarters were men, and some of the letter writers were young teenagers. Not everyone mentioned their sexual orientation, but the women were the most forthcoming, with 71% offering at least some information. Fewer than half the men gave "any information about their sexual impulses."[22] Homosexuality predominated[23] among the men and was universal among the women:

> It is remarkable that not one single woman admits to heterosexuality, which is the case in 22 per cent of all male letter writers … Not a single woman mentions attraction to men; on the contrary. Women who have experienced shorter or longer periods of married life, felt the physical part of matrimony to be intolerable. Completely different are the transvestic men: they do not appear to have felt any

[18] Hamburger et al. (1953, p. 393).
[19] Jorgensen (1967, pp. 114–116).
[20] Docter (2013, p. 255).
[21] Hamburger (1953, p. 361).
[22] Hamburger (1953, p. 368).
[23] Of the 45% of men who disclosed information about their sexual orientation, Hamburger classified 65% as homosexual (Hamburger, 1953, Table 3).

> aversion to the female body, although the erotic attraction, if any, is stated to have declined with passing years, or to have led to impotence.[24]

A 16-year-old American girl wrote:

> I've always acted like a boy and did the things they did. When I was smaller I used to wear my brothers [sic] clothes and I even do now sometimes when no one is home. This isn't the worst of it though, ever since I've been in High School I've been in love with a girl! and as much as I try to forget this love the more I realize I don't want to forget it. - - - I've also read about transvestites who only wanted to dress like the opposite sex but that's not how I feel. I want to dress like a boy yes, but it's not so bad that I can't control it.[25]

Childhood gender-nonconformity is strongly associated with later homosexuality.[26] Because childhood- or early-onset GD[27] involves extreme gender-nonconformity, young children distressed by their sexed bodies will likely grow up to be same-sex attracted. As the current *Diagnostic and Statistical Manual* (DSM-V-TR) puts it, "Studies have shown a high incidence of sexual attraction to those of the individual's birth-assigned gender, regardless of the trajectory of the prepubescent child's gender dysphoria."[28] Harry Benjamin put his own spin on George Jorgensen's homosexuality: "since the psychological status of a transsexual male is that of a female, it is natural that sex attraction centers on a male."[29]

Despite the sensational publicity, in the 1960s the "transsexual phenomenon" was still in its infancy. By 1965, Benjamin had seen 307 cases of which he deemed 220 "true transsexuals," the remainder being classed as "transvestites." Almost 90% of the transsexuals were male. Only 62 males and 11 females had had surgery.[30] Reflecting

---

[24] Hamburger (1953, p. 369).
[25] Hamburger (1953, p. 370).
[26] Bailey & Zucker (1995); R. Green et al. (1987); Steensma et al. (2013).
[27] Ristori & Steensma (2016); Singh et al. (2021). For other forms of GD, see Bailey & Blanchard (2017); Zucker et al. (2016). See also Section 4.3.1.
[28] American Psychiatric Association (2022, p. 516).
[29] Benjamin (1967a, p. ix).
[30] Benjamin (1966, p. 163).

this imbalance, *The Transsexual Phenomenon* had only one slim chapter on “the female transsexual.”

By 1979, the demand for “sex change” became significant enough for clinicians caring for this patient population to form a professional association, the Harry Benjamin International Gender Dysphoria Association (HBIGDA), which published the first *Standards of Care* in 1979. In that short typewritten document, “Principle 2” of 32 was: “Hormonal and surgical sex reassignment are procedures requiring medical justification and are not of such minor consequence as to be performed on an elective basis.”[31]

In the third edition of the DSM in 1980, the disorder of “transsexualism” was said to be “apparently rare.”[32] In 1994 DSM-IV reported: “Data from smaller countries in Europe with access to total population statistics and referrals suggest that roughly 1 per 30,000 adult males and 1 per 100,000 adult females seek sex-reassignment surgery.”[33] The “transgender tipping point”[34] had not yet arrived.

## 3.4 Outcomes of adult transitions

Pediatric medical transition began in the Netherlands, which had offered adult treatment in an academic hospital starting in the 1970s, with the costs of a medical transition reimbursed through the Dutch national health insurance system.[35] The availability of comprehensive and reliable medical records gave clinicians the opportunity to study how patients fared, and a paper detailing the results was published in 1988: “Sex reassignment surgery: A study of 141 Dutch transsexuals.” The research was led by the psychologist Peggy Cohen-Kettenis, who had worked earlier with adult transsexuals at the Department of Sexology at Utrecht University. In 1987, she moved to the

---

[31] Harry Benjamin International Gender Dysphoria Association (1979).
[32] For the diagnostic criteria, see Appendix 2. The first two versions of the DSM fleetingly included “transvestism” (American Psychiatric Association (1952, p. 39) and “transvestitism” (American Psychiatric Association (1968, p. 44). See also Drescher & Yarbrough (2024).
[33] American Psychiatric Association (1994, p. 535). See also Dhejne et al. (2014). According to the first *Standards of Care*, “As of the beginning of 1979, an undocumentable estimate of the number of adult Americans hormonally and surgically sex-reassigned ranges from 3,000 to 6,000” (Harry Benjamin International Gender Dysphoria Association, 1979).
[34] The title of a *Time* cover story in 2014 (Steinmetz, 2014).
[35] Bakker (2021, p. 29).

Department of Child and Youth Psychiatry at the Academic Hospital Utrecht (now UMC Utrecht), where she began to see children and adolescents with GD.[36]

Cohen-Kettenis and her co-author and student Bram Kuiper sent recruitment letters to all 229 patients diagnosed by the Netherlands Gender Care Foundation (NGCF) as “transsexuals and who … had at least started hormone therapy.” The 141 who agreed to participate were “36 FMs (female-to-male transsexuals) and 105 MFs (male-to-female transsexuals).”[37] They were at varying stages of medical transition. Some had completed surgery, while others had just started on CSH; follow-up time from the start of treatment ranged from one month to more than 10 years. The patients’ average ages were late-20s (the FMs) and mid-30s (the MFs). They were assessed by interview, and all but three were interviewed in their homes.

On the positive side, 65% reported feeling happy or very happy, while 11% said they were unhappy or very unhappy. Almost all the FMs and nearly 80% of the MFs described their ability to “pass as a member of the newly assumed gender” as good or very good. None of those who had had surgery “felt any significant doubts about the decision to get rid of their own primary and secondary sex characteristics and to have the body surgically adjusted to the characteristics of the opposite sex,” except for one FM who nonetheless had no regrets about living as a man.[38]

On the other hand, while the self-reported subjective outcomes were good, objective measures told a different story. One in seven MFs and one in 36 FMs had attempted suicide after treatment began. (Of the total number of patients seen at the NGCF in the previous 10 years, three had committed suicide after treatment.) 60% of the MFs and 37% of the FMs were unemployed and 59% of the MFs and 33% of the FMs had no romantic partners.[39] Commenting on previous studies of SRS, the researchers noted: “it is possible to discern a trend in these reports that the subjective well-being of the

[36] Bakker (2021, p. 113).
[37] Kuiper & Cohen-Kettenis (1988, p. 442).
[38] Kuiper & Cohen-Kettenis (1988, p. 450).
[39] Kuiper & Cohen-Kettenis (1988, p. 447).

transsexuals has increased, whereas an 'improvement' in their actual life situation is not always observed."[40]

Did medical transition at least alleviate gender dysphoria? Interestingly, there was no relationship between reported happiness and stage of transition:

> Although a fair number of persons attribute their feelings of happiness to SRS, there appears to be no direct relation between the subjective well-being and the phase of therapy. Those who have completed SRS are not happier or less happy than those who are still in the initial phase of therapy. In other words, a person's positive evaluation of his/her life-in-its-totality is not directly related to his/her progress in physical adjustment to the opposite sex.[41]

The researchers speculated that this might be due to an expectation effect:

> However, it does not seem justifiable to conclude that it is irrelevant to a person's happiness whether physical adjustment has or has not taken place and that the operations could therefore just as well have been omitted. One has to bear in mind that in general the [FMs and MFs who had not completed treatment] are happy in the knowledge that the operations will be performed within a reasonable time. They are taking a loan on the future.[42]

Although the researchers claimed that "there is no reason to doubt the therapeutic effect of sex reassignment surgery," they were clear that there were significant costs:

> SRS is no panacea. Alleviation of the gender problems does not automatically lead to a happy and lighthearted life. On the contrary, SRS can lead to new problems.[43]

Why were the MFs, in particular, doing so poorly? Three possible explanations were floated. One was that "passing" is easier for FMs, because of the power of

---

[40] Kuiper & Cohen-Kettenis (1988, p. 440). Dhejne et al. (2011) examined the long-term outcomes of 324 people in Sweden receiving sex-reassignment surgery (SRS) over the period 1973-2003 (191 MFs, 133 FMs). Dhejne et al. concluded: "Persons with transsexualism, after sex reassignment, have considerably higher risks for mortality, suicidal behaviour, and psychiatric morbidity than the general population."
[41] Kuiper & Cohen-Kettenis (1988, p. 454).
[42] Kuiper & Cohen-Kettenis (1988, p. 454).
[43] Kuiper & Cohen-Kettenis (1988, p. 455).

testosterone.[44] Second, "society in general is inclined to take a milder view of women who dress and/or behave like men."[45] Finally, the MFs had transitioned later and were more likely to have married and to have children, with a consequent "heavier burden of a past life as a person of the original gender."[46,47]

One possibility that the Dutch researchers did not consider was that the FMs were doing better because their romantic relationships were easier to preserve after transition. As Hamburger reported from his correspondence in 1953, "No less than 10 women say, in so many words, that they want their sex changed in order to be able to marry their female friend or to have the relationship legalized."[48] Also apparently ignored was the related possibility that transition may appeal to young gay men and lesbians suffering from social disapproval of their homosexuality.[49]

## 3.5 The rationale for youth gender transition

Medically transitioning earlier gave patients a better chance to "pass" and reduced the "burden of a past life," so perhaps intervening at younger ages would improve transsexuals' quality of life. Cohen-Kettenis thought so. As sociologist Michael Biggs explains,

> Cohen-Kettenis believed that transsexuals would experience better outcomes if they started treatment before adulthood. By the mid-1990s, she was referring some patients aged 16 and 17 to the Amsterdam clinic for endocrinological intervention prior to cross-sex hormones … Johanna, for example, "fulfilled all necessary requirements for early treatment": she did not favor girly things (though neither did her sisters), she was fond of soccer, she never dated in school (perhaps not surprising given that she was homosexual), and her parents discovered her wearing a tight t-shirt to conceal her breasts … Brought to the clinic at 17, she was prescribed progestin for four months and then testosterone.

[44] This works both ways. First, testosterone can dramatically transform the female body; second, the effects of pubertal testosterone on the male body are hard or impossible to undo. See Section 7.4.
[45] Kuiper & Cohen-Kettenis (1988, p. 455).
[46] Kuiper & Cohen-Kettenis (1988, p. 456).
[47] See also Smith et al. (2005, p. 97).
[48] Hamburger (1953, p. 370).
[49] See Barnes (2023, pp. 159–164).

> Within two years Jaap (as Johanna had become) underwent mastectomy, hysterectomy, and oophorectomy, and obtained a new birth certificate.[50]

In 1991 Cohen-Kettenis and her colleague Louis Gooren lowered the eligible age for CSH to 16, but Cohen-Kettenis was not yet recommending puberty blockers (PBs).[51] The Dutch pediatric endocrinologist Henriette Delemarre-van de Waal had treated the first patient with blockers some years earlier, in 1987. "FG" was a girl with early-onset gender dysphoria:

> From the age of 5, FG "had made it very clear that I was supposed to be a boy." It later transpired that FG was sexually attracted to women. FG's father, an Italian with traditional views on gender, disapproved of his daughter's masculinity, and serious conflict ensued. Extensive psychotherapy did not improve matters; FG wrote a suicide note at the age of 12.[52]

At age 13, FG was prescribed puberty blockers and remained on them until age 18, after which many surgeries followed, including mastectomy and hysterectomy.

FG had come to the Utrecht gender clinic three years after starting PBs; as Cohen-Kettenis recounts:

> I'll never forget that first boy treated with Decapeptyl[53] by Henriette Delemarre. He made an impression with his boyish appearance at 16—naturally, because he hadn't entered puberty. Henriette and I embarked upon the adventure. No one knew what the long-term effects of administering puberty blockers would be. Yes, I was nervous: suppose you've got it wrong with an adolescent like that and you have to reverse it![54]

With the collaboration of Cohen-Kettenis and Delemarre-van de Waal, the "Dutch Protocol" for youth medical transition was born.[55] As of 1997, for carefully selected

[50] Biggs (2023b, p. 350).
[51] Bakker (2021, p. 118).
[52] Biggs (2023b, p. 350).
[53] The brand name of triporelin, a gonadotropin releasing hormone agonist (GnRHa); triptorelin acts on the pituitary gland, blocking puberty in adolescents. See Section 7.3.
[54] Bakker (2021, p. 115).
[55] Delemarre-van de Waal & Cohen-Kettenis (2006).

"juvenile transsexuals," with early-onset GD worsening at puberty, PBs could be given as early as 12.[56] Cross-sex hormones could be administered at 16, with surgeries at 18.[57] Patients were required to be otherwise mentally healthy and have family support.

FG was followed up 22 years later at age 35:[58]

> FG did not regret transition, but scored high on the measure for depression. Owing to "shame about his genital appearance and his feelings of inadequacy in sexual matters," he could not sustain a romantic relationship with a girlfriend. Ironically, a "strong dislike of one's sexual anatomy" is one of the diagnostic criteria for gender dysphoria in children (according to DSM-5), and so in this respect it is not clear how the dysphoria had been resolved … Now aged 48, FG has given two recent interviews. FG's situation seems to have improved, and he now has a serious girlfriend. He describes puberty suppression as "life-saving" in his case … but also recommends that it should require a significant assessment process.[59]

## 3.6 The spread of the Dutch Protocol and the rise of "gender-affirming care"

In the United States, HBIGDA endorsed puberty blockers in their sixth version of their clinical guideline, the *Standards of Care* (SOC-6, 2001):

> Two goals justify this intervention: a) to gain time to further explore the gender identity and other developmental issues in psychotherapy; and b) to make passing easier if the adolescent continues to pursue sex and gender change. In order to provide puberty delaying hormones to an adolescent, the following criteria must be met:

[56] Bakker (2021, p. 121).
[57] In fact, surgery was mandatory until 2014 (Gregory, 2021).
[58] Cohen-Kettenis et al. (2011).
[59] Biggs (2023b, p. 355).

> 1. throughout childhood the adolescent has demonstrated an intense pattern of cross-sex and cross-gender identity and aversion to expected gender role behaviors;
>
> 2. sex and gender discomfort has significantly increased with the onset of puberty;
>
> 3. the family consents and participates in the therapy.[60]

SOC-6 also erroneously characterized PBs as “fully reversible” (see Chapter 7). As Biggs points out, “the published evidence for the benefits of puberty suppression then comprised a single case study of one patient—FG—awaiting final surgery.”[61]

In the U.S., PBs were first prescribed for GD at Boston Children’s Gender Management Service (GeMS, now Gender Multispeciality Service) around 2007, with the U.K.’s Gender Identity Development Service (GIDS) following four years later.[62] GeMs did not set a minimum age limit, and in 2015 neither did the U.K.’s National Health Service.[63] The relatively strict gatekeeping of the Dutch Protocol soon gave way to a more patient-led approach (see Section 4.1. and Chapter 11). This occurred not just in the U.S. but other countries, including the U.K.:

> From 2014, puberty blockers moved from a research-only protocol to being available through routine clinical practice … In addition, the strict inclusion criteria of the Dutch protocol were no longer followed, and puberty blockers were given to a wider range of adolescents … These included patients with no history of gender incongruence prior to puberty, as well as those with neurodiversity and complex mental health presentations.[64]

HBIGDA became the World Professional Association of Transgender Health (WPATH) in 2007. Reflecting in 2009 on the “new paradigms [that] have emerged about the nature

---

[60] Harry Benjamin International Gender Dysphoria Association (2001, p. 10).
[61] Biggs (2023b, p. 353).
[62] GIDS was closed in March 2024; see also Barnes (2023).
[63] Biggs (2023b, p. 354).
[64] Cass (2024a, p. 73).

of transgender identity and experience," Lin Fraser, then President-elect of WPATH, wrote:

> The new model views gender as a continuum rather than a male/female dichotomy and calls for individualized gender trajectories, which may or may not include hormonal therapy and sex reassignment surgery.[65]

The seventh version of the *Standards of Care* (SOC-7) was published in 2012 and was a significant departure from SOC-6, moving away from medical gatekeeping and towards the "gender-affirming" model. For example, SOC-6 recommended that CSH be given only to patients aged 18 or older, who either had "real-life experience" ("living in the desired gender") or had been in psychotherapy for at least three months. SOC-7 had no age limit for CSH, only requiring that the adolescent give "informed consent" and that the parents or guardians have also "consented to the treatment and are involved in supporting the adolescent." Recommendations for psychotherapy or real-life experience were absent. SOC-7 effectively relegated the role of mental health professionals to provide assessments needed by insurance companies for reimbursement.

Another change was apparent from SOC-7's title. SOC-6 was the standards of care "for Gender Identity Disorders," but SOC-7 was "for the Health of Transsexual, Transgender, and Gender Nonconforming People." "Non-binary" would have to wait its turn, appearing for the first time in the current guideline, SOC-8 (2022), with a chapter dedicated to it.[66] The first version of the *Standards of Care* was authored by just six people and comprised slightly over 3,000 words; SOC-8 has more than 100 contributors and more than 100,000 words.

In 2011, Cohen-Kettenis and colleagues published a follow-up study of 70 adolescent patients who received PBs in the Netherlands between 2000 and 2008. The results

[65] Fraser (2009, pp. 113–114, citations omitted). One of the citations omitted from the quotation is *The Apartheid of Sex: A Manifesto on the Freedom of Gender*, by Martine Rothblatt. Chapter 1 of that book is called "Five Billion Sexes," and begins: "There are two sexes, male and female, right? Wrong! In fact, there is a continuum of sex types, ranging from very male to very female, with countless variations in between" (Rothblatt, 1995, p. 1).

[66] A 2020 survey of U.S. youth aged 13-24 who identified as LGBTQ found that, of the 11,914 who identified as transgender or non-binary, more than 60% identified as the latter (A. E. Green et al., 2022, p. 645).

were interpreted as encouraging: “Behavioral and emotional problems and depressive symptoms decreased, while general functioning improved significantly during puberty suppression.”[67] A 2014 study of the same patient cohort after sex reassignment surgery—but with just 55 of the original 70 subjects—contained a similarly positive conclusion: “After gender reassignment, in young adulthood, the GD was alleviated and psychological functioning had steadily improved.”[68] These two studies form the foundational evidence base of the Dutch Protocol, and are widely cited to support it. (As subsequent analysis revealed, they do not: see Section 4.3.6.)

The previously observed tendency for early-onset GD patients to be gay continued with the Dutch cohort. Of the initial group of 70, only one reported heterosexuality; the other 69 reported either homosexuality (62), bisexuality (six), or “don’t know yet” (one).[69] (See also Section 13.3.1.)

Around the time Cohen-Kettenis and colleagues published their first study, clinicians started to observe a rapid increase in the pediatric patient population. More notably, the demographic profile of these patients was shifting, with adolescent females emerging as the predominant group. This trend is illustrated in Figure 3.1, which charts referrals to GIDS from 2009 to 2016.

[67] de Vries et al. (2011, p. 2276).
[68] de Vries et al. (2014, p. 696).
[69] de Vries et al. (2011, Table 1).

**Figure 3.1: Sex ratio in children and adolescents referred to GIDS in the U.K. (2009-16)[70]**




| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|
| Adolescent F | 15 | 48 | 78 | 141 | 221 | 314 | 689 | 1071 |
| Adolescent M | 24 | 44 | 41 | 77 | 120 | 185 | 293 | 426 |
| Children F | 2 | 7 | 12 | 17 | 22 | 36 | 77 | 138 |
| Children M | 10 | 19 | 29 | 30 | 31 | 55 | 103 | 131 |

In a related trend, Western countries began reporting a growing number of adolescents who, often unexpectedly, disclosed a transgender identity—frequently to the surprise of their parents.[71] The number of pediatric patients seeking medical transition can only be roughly estimated,[72] but the demand in European countries has outstripped supply, with waitlists approaching 2 years or longer. In response to the growing demand, the U.S.—characterized by its decentralized and privatized healthcare system—saw the

[70] Reproduced from Cass (2024a, p. 70); original in de Graaf et al. (2018, Figure 1).
[71] See Section 4.3.1.4.
[72] According to the Human Rights Campaign (HRC), "there are more than 300,000 high school-aged (ages 13-17) transgender youth in the United States today, *many of whom need gender-affirming care*" (Human Rights Campaign, n.d.), emphasis added). See also Williams Institute (2024).

emergence of many new specialty gender clinics, along with a proliferation of independently practicing clinicians.[73] According to a recent conservative estimate, as of March 2023 there were 271 clinics offering PMT in the U.S., though 70 were inactive due to legislative restrictions.[74]

As clinical experience with treating youth with GD across the world has grown, concerns about the PMT model have become increasingly apparent. In response, public health authorities in several European countries have launched formal investigations into the practice. The most comprehensive is the U.K.'s 2024 Cass Review, mentioned in Chapter 1. As a result of such inquiries, some European health authorities are now restricting eligibility for medical transition and implementing new research requirements and safeguards. In the U.S., where government health authorities play a more limited role, and medical practice is primarily regulated at the state level, many states have turned to legislative measures to restrict or prohibit pediatric medical transition.[75]

As Hilary Cass observed in 2022, "it is not helpful to exceptionalise gender identity issues."[76] The consensus in pediatric gender medicine (PGM) of 10 years ago was driven by that exceptionalization, which has now begun to change. The following chapter explains why this change is underway.

[73] Levine et al. (2022a, p. 708).
[74] Borah et al. (2023, pp. 375–376).
[75] Harmon (2024).
[76] Cass (2022b).

# Chapter 4 International Retreat from the "Gender-Affirming" Model

Since the publication of the Dutch Protocol in 2006, the practice of "gender-affirming" (or "affirmative" care) has rapidly expanded. Now, a global reversal is underway. Several national health authorities have restricted hormonal and surgical interventions for minors. Section 4.1 provides a brief overview of the rise of pediatric medical transition (PMT) as the primary response to childhood and adolescent gender dysphoria (GD). Section 4.2 summarizes the ongoing practice reversal that is now taking place in an increasing number of countries. Section 4.3 explores the reasons behind these reversals.

## 4.1 The rise of the affirmative care model

Following the publication of the Dutch Protocol in 2006,[1] puberty blockers (PBs) and cross-sex hormones (CSH) were incorporated into the Endocrine Society's 2009 clinical practice guideline (CPG),[2] which recommended that hormonal interventions should be used for certain pediatric patients with GD. This approach was also recommended by the World Professional Association for Transgender Health's (WPATH) guidelines in 2012.[3] Notably, these endorsements occurred before the final analysis of psychological outcomes from the original Dutch cohort was published in 2014[4]—and several years before the first systematic reviews of evidence (SRs) commissioned by public health authorities began to appear in 2019 and 2020.[5] During this same period, the number of children and adolescents reporting symptoms of GD and seeking medical intervention surged—a trend that has since become widespread across Western countries. At the same time, the epidemiological profile of patients changed markedly: while earlier

[1] Delemarre-van de Waal & Cohen-Kettenis (2006). Outcomes from the first patient cohort treated according to the protocol were published in 2011 and 2014 (de Vries et al., 2011, 2014).
[2] Hembree et al. (2009).
[3] The 2012 guidelines were the organization's seventh CPG (Coleman et al., 2012). The fifth and sixth CPGs, published in 1998 and 2001, briefly mentioned the potential use of "LHRH agonists" (Levine et al., 1998; Harry Benjamin International Gender Dysphoria Association, 2001), but the use of PBs as the central part of the treatment for adolescents did not emerge until the seventh version.
[4] de Vries et al. (2014).
[5] National Institute for Health and Care Excellence (2020b, 2020a); Pasternack et al. (2019).

cohorts consisted mainly of prepubertal boys, more recent referrals have been dominated by teenage girls (see Figure 4.1 below).

**Figure 4.1: Child and adolescent referrals for GD (U.K., left; Sweden, right)[6]**




*Referral activity to GIDS/Tavistock was sharply limited in 2020-2021 due to COVID-19.
[a]Beginning in 2018-19, increasing numbers of referrals are not reported by sex.
[b]Beginning July 2021, referrals made directly to GIDS are reported separately from those handled by the Arden & GEM referral management service. The Tavistock reports that Arden & GEM handled over 1500 additional referrals in 2021-22 (age and sex not reported separately).

Incidence data for 2001-2018 from the Swedish National Board of Health and Welfare[a] were applied to population counts by age/sex/year from Statistics Sweden[b] to produce estimated GD diagnosis counts. Incidence data for 2019-2021 were drawn from an update of "God vård av barn och ungdomar med könsdysfori, 2015" (Socialstyrelsen, 2022, unpublished).
[a]Socialstyrelsen, Utvecklingen av diagnosen könsdysfori - förekomst, samtidiga psykiatriska diagnoser och dödlighet i suicid, 2020.
[b]https://www.statistikdatabasen.scb.se/pxweb/en/ssd/START__BE__BE0101__BE0101A/BefolkningR1860N/

The scientific foundation for the rapid expansion of PMT was largely underpinned by two Dutch studies, published in 2011 and 2014,[7] which followed the same patient cohort. The first study, which focused on the use of PBs,[8] reported psychological outcomes in 70 adolescents who had completed the PB phase and were beginning CSH. The findings suggested modest "pre-post" improvements in some mental health measures following PB treatment—but notably, no improvement in GD itself, as assessed by the newly developed Utrecht Gender Dysphoria Scale (UGDS).

For more than a decade, many of the study's methodological flaws remained largely overlooked. One of the study's limitations was its retrospective selection of 70 subjects from a larger "intent-to-treat" group of 111 using non-randomized methods. This selection process inadvertently biased the sample toward cases with the most favorable prognoses, thereby limiting the generalizability of the study's findings.[9]

[6] Source: Society for Evidence-Based Gender Medicine (SEGM).
[7] de Vries et al. (2011, 2014).
[8] de Vries et al. (2011).
[9] The study's inclusion criteria defined eligibility for analyzing the effects of puberty blockers (PBs) based on the start date of the subsequent phase—CSH. This approach introduced significant bias by excluding,

In 2014, a follow-up study was published assessing the participants' functioning after CSH and surgery.[10] The sample size was further reduced to just 55 participants, and critical measures of psychological health—such as depression, anxiety, and overall functioning—were assessed in as few as 32 participants. Moreover, although the reported improvements reached statistical significance, their clinical relevance was limited (see the depression scores plotted in Figure 4.2: the orange line indicates the *threshold* for "mild depression," with 63 being the maximum score; mean scores remained below the mild depression threshold at baseline and throughout treatment).

**Figure 4.2: Depression scores in Dutch cohort**[11]




Noting the high-functioning status of the adolescent/young adult cohort at the end of the study, the authors concluded that the Dutch Protocol provided patients with "the

from the outset, any subjects who discontinued treatment, underrepresenting psychologically complex cases who remained in the "diagnostic" PB phase for longer periods, and skewing the sample toward older subjects. Because eligibility hinged on starting CSH at 16, only those who reached this threshold were included—potentially explaining why the average age for initiating PBs in the study was 15, despite the protocol recommending initiation around age 12 (Abbruzzese et al., 2023).

[10] de Vries et al. (2014).

[11] Graph of data contained in de Vries et al. (2011) and de Vries et al. (2014); 95% confidence intervals added.

opportunity to develop into well-functioning adults."[12] The study failed to consider that the subjects were already high-functioning at baseline—comparable to Dutch peers without GD.[13] This was likely attributable, at least in part, to the original Dutch Protocol's stringent selection criteria.

Moreover, the study failed to account for or appropriately consider potential signals of harm. One participant died due to post-surgical treatment complications associated with early pubertal suppression,[14] at least three were diagnosed with uncontrolled diabetes or morbid obesity while on hormones, and at least one subject discontinued treatment.

These and other serious limitations—including subject selection bias and methodological flaws (such as the post-treatment reversal of the UGDS[15])—remained largely unacknowledged, even as the study became the foundational pillar[16] of PMT protocols worldwide. Attempts to replicate the Dutch findings regarding PBs in the U.K. were unsuccessful[17]—and the publication of those unfavorable results was delayed for several years.[18] It has also been reported that the attempts to replicate the benefits of PBs in a National Institutes of Health (NIH)-funded study in the U.S. yielded less-than-favorable results.[19]

---

[12] de Vries et al. (2014, p. 696).
[13] As explained in Abbruzzese et al. (2023), the requirement of psychological stability was built into the protocol, and earlier research from the same clinic had stated that "when both pre- and posttest group means were compared with Dutch normative data, all scores turned out to be within the average range" (Smith et al., 2001, p. 277).
[14] de Vries et al. (2014) noted that "1 transfemale died after her vaginoplasty owing to a postsurgical necrotizing fasciitis" (p. 697). A 2023 analysis of the original Dutch papers found that the researchers "did not mention the fact that this death was a consequence of puberty suppression: the patient's penis, prevented from developing normally, was too small for the regular vaginoplasty and so surgery was attempted with a portion of the intestine, which became infected" (Biggs, 2023b, p. 8). See also Negenborn et al. (2017).
[15] The reversal of the GD scale post-surgery may have entirely invalidated the study's key finding of the resolution of GD post-treatment (Abbruzzese et al., 2023). Of note, another clinical research study in this field (López de Lara et al., 2020) also switched GD and body image scales.
[16] One of the authors of the original Dutch research noted, in 2022, that those papers are "still used as main evidence for provision of early medical intervention including puberty blockers in transgender youth" (de Vries, 2022, p. 109). The Cass Review's final report described that instead of the usual, slow evolution of clinical practice over "many years before strongly positive research findings are incorporated … the reverse happened in the field of gender care for children. Based on a single Dutch study … the practice spread at pace to other countries …" (Cass, 2024a, p. 13).
[17] Carmichael et al. (2021).
[18] See Chapter 6.
[19] Ghorayshi (2024c).

Spurred on by the belief in the success of the Dutch Protocol and its central premise—reliance on PBs —the expanding availability of PMT services was met by a surge in demand: “first gradually, then suddenly.”[20] By 2015, nearly every European country was reporting a dramatic increase in the number of gender-dysphoric youth seeking hormonal interventions at pediatric gender medicine (PGM) clinics—a trend whose underlying cause remains the subject of ongoing debate. The endorsement of PMT was further solidified by the publication of the 2017 Endocrine Society (ES) guidelines,[21] co-authored by psychologist Peggy Cohen-Kettenis—the pioneer of the original Dutch Protocol—who had first introduced the recommendations for PMT into the 2009 ES guidelines, and later reinforced them in the 2012 WPATH *Standards of Care 7* guidelines (SOC-7).[22]

One striking characteristic of the surge of adolescents presenting with a wish to undergo medical transition is the disproportionate number of female adolescents without prior childhood history of GD who present with high rates of comorbid mental health conditions. This pattern drew the attention of Finnish researchers, who were the first to publish on these changing demographics and to raise concerns that the Dutch Protocol might not be helping—and might even be harming—patients.[23] Finland subsequently became the first country to revise its national guidelines,[24] sharply limiting medical interventions based on the findings of an SR.[25] In the years that followed, other countries began conducting their own evaluations of the evidence and arrived at similar conclusions. A global trend has since emerged, away from use of PBs, CSH, and surgeries in youth with GD. This ongoing reversal is explored in greater detail in the following section.

## 4.2 The international practice reversals

Starting in 2020, PMT began to face growing scrutiny from public health authorities worldwide, resulting in substantial reversals of clinical protocols in an increasing number

[20] Abbruzzese et al. (2023, p. 12).
[21] Hembree et al. (2017).
[22] Coleman et al. (2012); Hembree et al. (2009).
[23] Kaltiala et al. (2020); Kaltiala-Heino et al. (2015).
[24] Council for Choices in Health Care Finland (2020a, 2020b, 2020c).
[25] Pasternack et al. (2019).

of countries. The most influential effort to date has been the Cass Review—a four-year independent evaluation of PGM that was published in April 2024.[26] The findings of the Cass Review led to the closure of the U.K.'s PGM clinic, the Gender Identity Development Service (GIDS), which had been given a rating of "inadequate" by the Care Quality Commission in 2021.[27] The Cass Review recommended a restructuring of the care delivery model—away from the centralized "gender clinic" model of care toward a more holistic framework centering psychosocial support, to be delivered through regional hubs. The Cass Review's findings also led the U.K. to ban the use of PBs outside clinical trials,[28] and to significantly restrict CSH.[29] While CSH are still officially an available treatment, the National Health Service (NHS) recently revealed that since the Cass Review was published, no minor has been found eligible to receive CSH according to the updated policy.[30] In the U.K., minors have never received GD-related surgery through the NHS.

Finland was the first country to curtail PMT, issuing revised national guidelines in 2020.[31] In 2022, Sweden's National Board of Health and Welfare concluded that, for most young people, the potential harms of hormonal interventions outweigh the benefits, and subsequently restricted both to research settings or exceptional cases.[32] Denmark followed Sweden's lead in 2023, restricting the use of endocrine intervention in minors,[33] and Norway's public health agency (the Norwegian Healthcare Investigation Board) advised that PBs and CSH should be considered experimental treatments.[34] Most recently, hormonal interventions have been restricted in Brazil,[35] Chile,[36] the province of Alberta in Canada,[37] and the state of Queensland in Australia.[38]

---

[26] Cass (2024a).
[27] Care Quality Commission (2021).
[28] Department of Health and Social Care (2024).
[29] National Health Service England (2024c).
[30] Spencer (2025).
[31] Council for Choices in Health Care Finland (2020a, 2020b, 2020c).
[32] Socialstyrelsen (2022a, 2022b, 2022c).
[33] Hansen et al. (2023). See also Society for Evidence-Based Gender Medicine (2023b).
[34] Block (2023b).
[35] AFP (2025).
[36] Lane (2024).
[37] Government of Alberta (2024).
[38] Australian Associated Press (2025).

At the same time, several other countries are in the process of determining how best to care for youth with GD. In Australia, following Queensland's statewide pause in January 2025 on initiating PBs and CSH for new patients under 18, the Australian Government commissioned the National Health and Medical Research Council with developing new clinical practice guidelines for youth with GD. The guidelines are expected to be completed within three years, with interim recommendations on PBs available in 2026.[39] In Italy, the Italian Bioethics Committee updated its position on the use of PBs for GD,[40] and a formal guideline development process is underway.[41] France is expected to release new national guidelines in 2025, which are expected to spark considerable debate due to anticipated endorsement of PMT[42]—a position previously criticized by the French National Academy of Medicine.[43]

Germany recently published guidelines[44] that continue to generate considerable debate in German-speaking countries, including Austria and Switzerland. The controversy stems from concerns about the non-evidence-based nature of the recommendations, their a priori reliance on WPATH positions, and deep divisions in the professional community[45] regarding the appropriate approach to caring for youth with GD. Even the Netherlands—the birthplace of the Dutch Protocol—has not been immune to debate.[46] In May 2024, the Dutch Minister for Medical Care formally requested that the Health Council of the Netherlands produce an independent scientific advisory report on healthcare for minors with GD. This ongoing review will include an evaluation of the Dutch Protocol and a comparison with other countries' guidelines.[47]

---

[39] Australian Government National Health and Medical Research Council (2025).
[40] Italian National Bioethics Committee (2024). See also Society for Evidence-Based Gender Medicine (2024d).
[41] Curridori (2024).
[42] Sugy (2024).
[43] Society for Evidence-Based Gender Medicine (2022a).
[44] German Society for Child and Adolescent Psychiatry, Psychosomatics and Psychotherapy (DGKJP) (2025).
[45] Zepf, Buchmann, et al. (2024).
[46] Society for Evidence-Based Gender Medicine (2023c).
[47] Health Council of the Netherlands (2024).

### 4.2.1 The Cass Review and its reception

The Cass Review has had a profound influence on international debates. Commissioned by NHS England, the Cass Review assessed the safety, efficacy, and delivery of PGM services for children and adolescents. Conducted over four years under the leadership of Hilary Cass, pediatrician and a past president of the Royal College of Paediatrics and Child Health, the review engaged a broad range of stakeholders and relied on SRs from the National Institute for Health and Care Excellence (NICE)[48] and the University of York,[49] as well as additional research. The Cass Review identified significant limitations in the evidence base for PBs and CSH. It recommended that PBs be offered only as part of a clinical trial until further data are available, and that all potential interventions should be tested within a research context.[50] The review emphasized a multidisciplinary, developmentally-informed model of care for youth with GD that prioritizes psychological support and the development of "an explicit clinical pathway … for non-medical interventions."[51]

Recent criticisms of the Cass Review—particularly claims that it fails to meet CPG standards—reflect a misunderstanding of the Cass Review's purpose and scope. The Cass Review was not a CPG; it was an "independent review." This is a U.K.-specific process of conducting a service-level evaluation intended to inform policy, not prescriptive clinical decisions. Such processes are invoked when an area of clinical care begins to operate in ways that compromise care quality and threaten patient safety.[52]

Criticism of the Cass Review appears to stem largely from a U.S.-based group of motivated advocates for the continued legality of PMT.[53] The critiques are ridden with

---

[48] National Institute for Health and Care Excellence (2020a, 2020b).
[49] Hall et al. (2024); Heathcote et al. (2024); Taylor, Hall, Heathcote et al. (2024a, 2024b); Taylor, Hall, Langton et al. (2024a, 2024b); Taylor, Mitchell, Hall, Heathcote et al. (2024); Taylor, Mitchell, Hall, Langton et al. (2024).
[50] "The overarching conclusion from the evidence presented in this Review is that the puberty blocker trial, which is already in development, needs to be one part of a much broader research programme that seeks to build the evidence on all potential interventions, and to determine the most effective way of supporting these children and young people" (Cass, 2024a, p. 197). See "Recommendation 6" (Cass, 2024a, p. 35).
[51] Cass (2024a, p. 157).
[52] Cheung et al. (2025).
[53] Of these, the white paper McNamara et al. (2024), produced by the Yale Integrity Project, has been most influential.

misrepresentations of the Cass Review and contain multiple factual errors.[54] In the U.K., the Cass Review has been widely accepted as a foundational document for realigning pediatric gender medicine (PGM) with the principles of evidence-based medicine (EBM) and child safeguarding.[55] It has been welcomed by both major political parties in the U.K., and was fully accepted by the NHS for implementation, which is well underway.[56]

## 4.3 Rationale for international reversals

A defining feature of these global reversals has been the rejection of the "gender clinic" model, which typically promotes PMT. Internationally, this model is increasingly being supplanted by more traditional, holistic approaches to adolescent distress. Rather than referring youth with GD to specialty clinics oriented toward transition, emerging models emphasize standard mental health services, where young people receive comprehensive psychosocial and psychotherapeutic support—and, when indicated, psychiatric care.

The global reversals away from PMT can be attributed to six main factors: a significant shift in the patient population; uncertainty surrounding the natural history and prognosis of GD; increasing recognition of the risks associated with medical interventions; a more accurate understanding of the suicide risk; the collapse of the original treatment rationale; and a weak underlying evidence base. The following subsections (1-6) examine each of these factors in turn.

### 4.3.1 Changes in the patient population

The population of young people for whom the Dutch Protocol was originally developed differs significantly from those presenting for care today.

#### 4.3.1.1 Epidemiological shifts

Over the past decade, the population presenting to PGM clinics has changed in two key ways: a rapid increase in numbers and a significant shift in demographic composition. Before hormonal interventions became widely available, pediatric referrals for GD were

[54] Cheung et al. (2025); McDeavitt et al. (2025).
[55] Abbasi (2024).
[56] National Health Service England (2024a).

relatively rare,[57] and the majority were prepubertal boys with early-onset GD.[58] Over the past decade, the increase in patients has been described as exponential,[59] a trend driven primarily by adolescent females who typically have no childhood history of GD.[60]

#### 4.3.1.2 Mental illness and neurodevelopmental diagnoses

The current patient population has a high rate (relative to the general population) of comorbid mental health problems, including depression, anxiety, suicidality, self-harm, and eating disorders; as well as neurodevelopmental conditions like autism spectrum disorder (ASD).[61] Importantly, register-based research conducted in Finland, which has national databases, found that 75% of patients presenting to PGM clinics in the mid-2010s had severe mental health problems that appeared to have *predated* the emergence of GD.[62] High rates of comorbid mental illness have been documented in the U.S. and other countries.[63]

The high prevalence of ASD among youth presenting with GD has been recognized for some time.[64] At the U.K.'s clinic, ~35% of patients had comorbid moderate-to-severe autistic traits (compared to <2% of the general population).[65] Although some researchers have postulated that the social difficulties in youth with these co-occurring conditions may not result from ASD but instead from GD and may be ameliorated by targeting this distress,[66] limited research thus far has not supported this hypothesis.[67] In

---

[57] For example, the U.K.'s clinic had 12 total referrals in 1994 and 24 in 1996; the number of referrals between its opening in 1989 and the year 2000 was 150 (Barnes, 2023, pp. 15–16).
[58] Steensma et al. (2018).
[59] E.g. Coleman et al. (2022, p. S9, S43); Baker & Restar (2022); de Vries et al. (2021); Olson-Kennedy, Okonta et al. (2018). The figure in McDeavitt et al. (2025) shows that the rate of increase in referrals to the U.K.'s clinic (for example) is well-approximated by an exponential. A Reuters investigation did not describe exponential growth but did find that referrals to PGM clinics have sharply increased in the U.S. (Respaut & Terhune, 2022).
[60] See Kaltiala-Heino et al. (2015, 2018); Taylor, Hall, Langton et al. (2024b); Thompson et al. (2022a); Wagner et al. (2021); Wood et al. (2013); Zhang et al. (2021). One study in this field claimed that there was no disproportionate increase in female adolescents (Turban, Dolotina et al., 2022). However, this finding was based on a survey in which there was "uncertainty as to whether transgender students responded to the sex question with their sex or gender identity" (Johns et al., 2019).
[61] See Becerra-Culqui et al. (2018); Kaltiala-Heino et al. (2015), (2018); Kozlowska et al. (2021); Taylor, Hall, Langton, Fraser, et al. (2024b); Thompson et al. (2022b).
[62] Kaltiala-Heino et al. (2015).
[63] E.g., Becerra-Culqui et al. (2018); Kozlowska et al. (2021).
[64] E.g. de Vries et al. (2010); Strang et al. (2018).
[65] Barnes (2023, p. 156).
[66] E.g., Ehrensaft (2016); Edwards-Leeper & Spack (2012); J. L. Turban (2018).
[67] Russell et al. (2021).

2018, recognizing the clinical entity of co-occurring GD and ASD traits, researchers published preliminary guidelines for this specific population of children and adolescents,[68] recommending that "due to differences in social communication, insight and flexible thinking … extended diagnostic periods should be considered in cases where [ASD] is suspected or diagnosed."[69]

#### 4.3.1.3 Nonbinary identities

The original Dutch research did not study patients with nonbinary identities; such patients were not deemed to be appropriate candidates for medical transition.[70] However, nonbinary identities now feature prominently in contemporary clinical settings and research populations. In a 2020 research project funded by the Trevor Project, for example, 63% of the 11,914 survey respondents identified as nonbinary.[71] In a study of youth who received mastectomies, 11% identified as nonbinary or "other."[72] This creates a new set of ethical challenges, as patients seek interventions that have never before been contemplated, including keeping patients in puberty-suppressed states for extended periods of time to allow them to maintain a sex-ambiguous appearance. The risks of such interventions may be considerable.[73]

#### 4.3.1.4 Social influence

The role of social influence is a likely factor in these epidemiological changes. In 2018, physician and researcher Lisa Littman popularized the phrase "rapid onset gender dysphoria," or ROGD, in the peer-reviewed literature, describing the clinical picture of

---

[68] Strang et al. (2018).
[69] See description in Russell et al. (2021, p. 2074). In contrast to the 2018 Dutch guidelines that recommended more caution for patients with co-occurring ASD, leading specialists in the United States have criticized parents who are reluctant to consent to PMT for their autistic children. They have proposed clinicians "depend on drawings" for severely autistic, nonverbal adolescents who cannot speak but are able to draw pictures (Transparency Podcast, n.d.). See also: whistleblower account of therapist Tamara Pietzke (Section 11.4.3).
[70] de Vries et al. (2006, p. 88): "Adolescents whose wish for sex reassignment seems to originate from factors other than a genuine and complete cross-gender identity are served best by psychological interventions."
[71] A. E. Green et al. (2022).
[72] Ascha et al. (2022).
[73] In 2020, researchers published a case report in which clinicians considered the possibility of keeping an "agender" patient with low bone density on PBs for at least seven years in order to provide affirmation for this identity (Pang, Notini, et al., 2020). Contemporary WPATH guidelines have eliminated barriers to hormonal interventions and surgeries for minors with nonbinary and other identities.

"adolescent-onset or late-onset gender dysphoria where the development of gender dysphoria is observed to begin suddenly during or after puberty in an adolescent or young adult who would not have met criteria for gender dysphoria in childhood."[74] This phenomenon has also been described in research from the U.K.,[75] the Netherlands,[76] Finland,[77] and Canada.[78] Other terms have been used—e.g. "adolescent onset gender dysphoria," "postpuberty adolescent-onset transgender histories"[79]—for pubertal-onset gender dysphoria disproportionately affecting female adolescents.

Research into experiences of detransition and regret (detransition refers to stopping or reversing transition after having received medical and/or surgical interventions; it can overlap with but is not synonymous with regret) have suggested social influence or pressure have played a role in the transient transgender identifications of some patients.[80] Concerns about the possible role of social influence underlying epidemiological shifts in presentations have been articulated elsewhere in the literature,[81] including by some proponents of PMT.[82] WPATH's guidelines note that "susceptibility to social influence impacting gender may be an important differential to consider" for some adolescents; the guidelines also acknowledge "situations in which a young person experiences very recent or sudden self-awareness of gender diversity and a corresponding gender treatment request, or when there is concern for possible excessive peer and social media influence on a young person's current self-gender concept."[83]

---

[74] Littman (2018, p. 2). This research surveyed 256 parents of children with adolescent-onset GD, finding that in roughly half the cases, the rapid onset of GD appeared to have coincided with the onset of similar distress within the children's friend groups, and with an increase in social media/Internet use. "Rapid onset gender dysphoria" appeared in scholarly work a year earlier, in a poster abstract by Littman in the *Journal of Adolescent Health* and (following Littman's research) also in Marchiano (2017).
[75] de Graaf et al. (2018); Hutchinson et al. (2020).
[76] de Vries (2020).
[77] Kaltiala-Heino et al. (2018); Kaltiala-Heino & Lindberg (2019).
[78] Zucker (2019).
[79] Kaltiala-Heino & Lindberg (2019); de Vries (2020).
[80] Littman (2021); Littman et al. (2024).
[81] Bailey & Diaz (2023); Wood et al. (2013).
[82] Edwards-Leeper & Anderson (2021); Shrier (2021b).
[83] Coleman et al. (2022, p. S45, S58).

### 4.3.2 Unclear natural history and prognostic uncertainty

Prior to the widespread availability of hormonal interventions, most cases of childhood GD resolved naturally by the end of puberty, with the majority of patients having a homosexual sexual orientation in adulthood.[84] The Dutch Protocol was developed on the assumption that only GD that persisted into adolescence would likely be permanent.[85] As referrals shifted toward patients with adolescent-onset distress, this assumption of permanence was generalized to all adolescent GD regardless of whether it *intensified* in adolescence or *appeared for the first time* in adolescence. The belief that any GD in adolescence is likely permanent and warrants medical treatment remains "central to the rationale for medical intervention" in adolescents.[86]

#### 4.3.2.1 New evidence about the natural history of gender dysphoria

Recent close examination of the literature has called into question the assumptions regarding the permanence of adolescent GD.[87] Although the natural history of GD—i.e., its course absent medical interventions—is currently impossible to measure given the wide availability of interventions, new evidence tentatively suggests that GD has a low diagnostic stability. For example, a German longitudinal analysis of an insurance claims database showed that over 70% of adolescent females aged 15-19 no longer had the

---

[84] The largest such study was Singh et al. (2021), which included a comprehensive overview of prior research on persistence of childhood GD (pp. 2–4). Some have argued that changes to diagnostic criteria—from the older "Gender Identity Disorder" (for which dysphoria, described as "discomfort," was a criterion) to the contemporary "Gender Dysphoria" diagnosis—render findings of older studies irrelevant (Temple Newhook et al., 2018). These arguments have been effectively countered (Zucker, 2018). (For the diagnostic criteria, see Appendix 2.) Low persistence rate of childhood GD has been recognized in the literature: e.g. "gender variant children, even those who meet the criteria for GID prior to puberty, for the most part are not gender dysphoric at a later age" (de Vries & Cohen-Kettenis, 2012, p. 306); also see Ristori & Steensma (2016, p. 6); Cohen-Kettenis & Gooren (1999).

[85] E.g. Cohen-Kettenis & Pfäfflin (2003); de Vries et al. (2006); de Vries & Cohen-Kettenis (2012); de Vries et al. (2014).

[86] Rosenthal (2021a, p. 585): "Longitudinal studies have indicated that the emergence or worsening of gender dysphoria with pubertal onset is associated with a very high likelihood of being a transgender adult. This observation is central to the rationale for medical intervention in eligible transgender adolescents."

[87] Byrne (2024a).

diagnosis five years later.[88] Another recent study from the Netherlands found that "gender non-contentedness" continues to decline steadily into the early twenties.[89]

#### 4.3.2.2 Concerns about identity development

There is considerable concern that "pubertal suppression may alter the course of gender identity development, essentially 'locking in' a gender identity that may have reconciled with biological sex during the natural course of puberty."[90] This concern is not new. Some early critics of the Dutch approach pointed out that initiation of hormonal interventions in early to mid-puberty "might affect the further development of gender identity, or … even iatrogenically induce persistence [of GD]."[91] In 2024, the European Academy of Pediatrics cautioned that puberty suppression may undermine long-term autonomy by creating a path dependency that leads to cross-sex hormones and surgery.[92] Several studies have suggested continuation rates from PBs to CSH exceed 90%.[93] The perception of PBs has shifted—from being seen as a reversible "pause button" to more like a "gas pedal" that accelerates medical transition.

---

[88] Bachmann et al. (2024) was an insurance claims study looking at the International Classification of Diseases, tenth version (ICD-10) code F64 ("Gender Identity Disorder"), which was the billing code used in Germany over the course of the study period (Society for Evidence-Based Gender Medicine, 2024c). A recent *BMJ* analysis of claims data and medical records concluded that for some groups, including young people, "GD is not a permanent diagnosis" (Sun et al., 2023).
[89] Rawee et al. (2024, p. 1813). "Gender non-contentedness" was defined based on endorsement of item 110 in the Youth Self Report/Adult Self Report (YSR/ASR), "Wishes to be the opposite sex." Although item 110 is not synonymous with the diagnosis of GD, it is frequently used as a rough proxy for the clinical diagnosis as it captures the primary criterion of the desire to be the opposite sex. See Zucker (2005).
[90] Jorgensen et al. (2022, p. 1005). See also the Cass Review's final report: "Blocking [puberty] means that young people have to understand their identity and sexuality based only on their discomfort about puberty and a sense of their gender identity developed at an early stage of the pubertal process. Therefore, there is no way of knowing whether the normal trajectory of the sexual and gender identity may be permanently altered" (Cass, 2024a, p. 178).
[91] Korte et al. (2008, p. 839).
[92] Brierley et al. (2024).
[93] E.g., Brik et al. (2020); Carmichael et al. (2021); Karakılıç Özturan et al. (2023a); van der Loos, Klink et al. (2023); Wiepjes et al. (2018). Some have claimed that "the most likely explanation for why most youth who receive early, supportive interventions [i.e., puberty blockers] continue onto gender-affirming hormone therapy [is] that they are indeed transgender. It is not ... puberty-pausing medications that drive a persistent transgender identity" (McNamara et al., 2024, pp. 20–21). However, the very research studies that comprise the evidence base in this area recognized the possibility that the intervention may induce persistence; e.g., "Due to the observational character of the study, it is not possible to say if [puberty blocker] treatment itself influenced the outcome" (Brik et al., 2020, p. 2611); "[there is] the potential that treatment could influence the continuation of their GD" (Carmichael et al., 2021).

Social transition in childhood may have similar effects, with some low-quality studies suggesting the majority of children who socially transition[94] before puberty progress to medical interventions.[95] These patients "are likely [to] seek blockers or hormones."[96] Prepubertal transition was not recommended in the original Dutch approach (the researchers actually recommended *against* the practice),[97] but was originally championed by American clinicians.[98]

Prepubertal social transition is now recommended for certain patients, including in the Netherlands.[99] However, there are no reliable methods to distinguish which patients will experience long-term GD.[100] There is growing concern about administering irreversible treatments that may lead to lifelong medical dependency for a condition that, in many cases, may naturally resolve.

### 4.3.3 Concerns about treatment-associated risks and harms

Awareness of the risks and potential harms of PMT is growing.[101] Concern has been raised about the unknown or potentially harmful effects of suppressing normally timed puberty on adolescent physical and mental health, especially with regard to bone mineralization and brain development.[102] Hormonal interventions can lead to infertility and impaired sexual function, and in some cases, if the patient proceeds to genital

[94] In this context, social transition refers to "a 'complete' binary social transition ... including changing their pronouns to the binary gender pronouns that differed from those used at their births" (Olson et al., 2022, p. 2), not to changes in hairstyle, clothing, etc.
[95] Olson et al. (2022, 2024). See also Society for Evidence-Based Gender Medicine (2022b).
[96] Olson et al. (2022, p. 4).
[97] E.g., "In a qualitative follow-up study, several youths indicated how difficult it was for them to realize that they no longer wanted to live in the role of the other gender and to make this clear to the people around them… Another reason we recommend against early transitions is that some children who have done so (sometimes as preschoolers) barely realize that they are of the other natal sex. They develop a sense of reality so different from their physical reality that acceptance of the multiple and protracted treatments they will later need is made unnecessarily difficult. Parents, too, who go along with this, often do not realize that they contribute to their child's lack of awareness of these consequences" (de Vries and Cohen-Kettenis, 2012, p. 308).
[98] E.g. Ehrensaft (2016); Olson et al. (2016).
[99] Bazelon (2022a).
[100] Cass (2024a, pp. 22, 134, emphasis added). "… clinicians have told us *they are unable to determine with any certainty* which children and young people will go on to have an enduring trans identity … Many clinicians, both nationally and internationally, have [acknowledged] that there is *no reliable way to accurately predict* which young people might benefit from a medical transition and which might benefit from alterative pathway(s) or interventions(s)."
[101] See Chapter 7 for detailed discussion.
[102] E.g., Baxendale (2024); Biggs (2021).

procedures, riskier operations.[103] Surgical procedures themselves carry the risk of complications.

The emergence of detransitioners has brought renewed attention to a risk acknowledged in the original Dutch Protocol, which is that initiating medical transition while a young person's identity is still developing carries the risk of "false positives"—patients who undergo irreversible hormonal and/or surgical interventions but ultimately do not continue to identify as transgender.[104] In the past five years, a growing body of research and peer-reviewed literature has examined the phenomena of detransition and regret.[105] Personal accounts from detransitioned patients who report having been harmed by PMT have played a significant role in drawing public and regulatory attention to these issues.[106]

### 4.3.4 More appropriate understanding of suicide

Proponents of PMT often describe it as lifesaving.[107] Some physicians recommending PMT have urged anxious parents to consent to irreversible interventions for their distressed children, warning that not doing so may increase the risk of suicide.[108] Such claims are not supported by the evidence and have been criticized as unethical.[109]

---

[103] See Lee et al. (2023), for example.
[104] Delemarre-van de Waal & Cohen-Kettenis (2006, p. S132). "It is conceivable that lowering the age limit increases the incidence of 'false positives.'"
[105] E.g. Entwistle (2020); Littman (2021); MacKinnon, Expósito-Campos et al. (2023); Roberts et al. (2022).
[106] According to a Reuters investigation, a patient told her gender clinic at age 16 that she was "sure of my identity … I thought nothing would change my mind." After starting CSH she experienced worsening mental health and had several suicide attempts and psychiatric hospitalizations. She detransitioned at age 20 and identifies as a lesbian: "I do wish my doctors had said to me, 'It's OK to feel disconnected from your body. It's OK to like girls. It's OK to be gender non-conforming'" (Respaut et al., 2022). For an overview of the role of detransitioner Keira Bell in drawing regulatory attention to pediatric gender medicine in the U.K., see Cass (2024a, pp. 78–80).
[107] E.g., ACLU (2021); Boerner (2022, 3/31/2025 update); Georges et al. (2024); Lee & Rosenthal (2023); Sandhu et al. (2025); Szilagyi (2022b); The Lancet Child & Adolescent Health (2021). See also Section 1.2.
[108] In 2011, Johanna Olson-Kennedy, pediatrician and leader in the field of pediatric gender medicine, told ABC News that "We often ask parents, would you rather have a dead son than a live daughter?" (ABC News, 2011). See also Singal (2018).
[109] E.g., Clayton (2023); Levine et al. (2022a).

Adolescents and adults with GD do exhibit higher rates of suicidality—including suicidal thoughts, self-harm, and suicide attempts—compared to the general public.[110] However, completed suicide among adolescents with GD remains rare.[111] Moreover, there is no evidence that elevated suicidality can be attributed solely to GD, as it frequently co-occurs with other mental health conditions. A 2020 report by the Swedish National Board of Health and Welfare (Socialstyrelsen) concluded that “people with gender dysphoria who commit suicide have a very high rate of co-occurring serious psychiatric diagnoses, which in themselves sharply increase risks of suicide … it is not possible to ascertain to what extent GD alone contributes to suicide.”[112]

Table 4.1 reports suicide rates from four PGM clinics and notes whether the suicides were in patients who had received hormonal interventions.

[110] E.g., Biggs (2022); Erlangsen et al. (2023); Heino et al. (2023); Marconi et al. (2023); Van Cauwenberg et al. (2021); Wiepjes et al. (2020).
[111] Biggs (2022); Ruuska et al. (2024); Society for Evidence-Based Gender Medicine (2023a).
[112] Socialstyrelsen (2020); see also Ruuska et al. (2024). Additionally, de Graaf et al. (2022) found that adolescents with GD or transgender identification had similar self-reported suicidality measures to comparator adolescents without GD who were receiving specialized mental healthcare for other psychiatric diagnoses.

### Table 4.1: Suicide mortality in youth referred to pediatric gender medicine clinics (with estimated per 1,000 patient-years rates)

| Study; Country | Age range | Years | Referred youths | Suicides | % | Per 1K patient-years | Were patients who died by suicide taking PBs and/or CSH? |
|---|---|---|---|---|---|---|---|
| **Van Cauwenberg et al. (2021); Belgium** | 12–18 | 2007–2016 | 148 | 5 | 3.38 | 11.26 | All suicides among patients taking CSH |
| **Chen et al. (2023); U.S.** | 12–20 | 2016–2021 | 315 | 2 | 0.63 | 3.17 | All suicides among patients taking CSH |
| **Ruuska et al. (2024); Finland** | <23 | 1996–2019 | 2,083 | 7 | 0.34 | 0.51 | Unknown (38% of cohort treated with PBs and/or CSH) |
| **Biggs (2022); U.K.** | <18 | 2010–2020 | 15,032 | 4 | 0.03 | 0.13 | Unknown (59% of cohort treated with PBs and/or CSH) |

*Table adapted from Society for Evidence-Based Gender Medicine (2024a).*

Further, the evidence for whether PMT reduces *suicidality*-related outcomes in adolescents—such as self-reported frequency of suicidal thoughts, or healthcare utilization for self-harm or suicide attempts—is inconsistent.[113] When the focus turns to preventing *suicide mortality*, there is no evidence that hormonal interventions are effective. A large, register-based study from Finland found that overall suicide mortality in patients with GD was rare and that when mental health comorbidities were controlled for, the rate did not differ from that of the general population. The study authors concluded that hormonal interventions did not appear to have impacted suicide risk.[114]

[113] Small to medium-size studies have reported improvement over time in self-report scores related to suicidality (Achille et al., 2020; Allen et al., 2019) or decrease in healthcare utilization for suicidal or self-harm behavior (Kaltiala et al., 2020; Khatchadourian et al., 2014); other larger studies found the percent of patients with suicidal thoughts/behaviors increased after initiating PBs/CSH (Kuper et al., 2020) and increases in healthcare utilization related to suicidality (Hisle-Gorman et al., 2021). Kuper et al.'s before-after comparison is compromised by the unequal time periods over which suicidality was measured.
[114] Ruuska et al. (2024).

An SR of suicide prevention for youth with GD rated the evidence as low quality,[115] and WPATH's own SR of mental health outcomes, which focused on adult populations, acknowledged that "It was impossible to draw conclusions about the effects of hormone therapy on death by suicide."[116] As summarized in the Cass Review's final report, "it has been suggested that hormone treatment reduces the elevated risk of death by suicide in this population, but the evidence found [does] not support this conclusion."[117] Consequently, claims that PMT is "lifesaving" appear to be unsupported by the evidence.

These findings also have been confirmed by the Appleby Report, commissioned by the U.K. government, which reviewed suicides among young people with GD. The report strongly criticized the way suicide and GD have been discussed on social media, characterizing it as insensitive, distressing, dangerous, and in violation of established guidance on the safe reporting of suicide. Appleby emphasized that many of the public claims made about suicide do not meet basic standards for statistical evidence. The report also urged a shift away from viewing PBs as the primary marker of supportive care, warning that such a narrow focus oversimplifies complex clinical needs.[118]

[115] Christensen et al. (2025). Similar findings were also reported in a recent narrative review focused on adults (Jackson, 2023). With respect to surgeries, evidence is limited. A recent systematic review of mastectomies in young females found very low certainty evidence with respect to effect on death by suicide (Miroshnychenko et al., 2024).
[116] Baker et al. (2021, p. 12). Another more recent systematic review also found very low certainty evidence for the effect of CSH on death by suicide (Miroshnychenko, Ibrahim et al., 2025).
[117] Cass (2024a, p. 33). An example of commonly cited evidence—e.g., American Psychological Association (2024b); The Lancet Child & Adolescent Health (2021), via reference to Rew et al., (2021); Turban (2020)—in support of this suggestion is Turban, King et al. (2020), a cross-sectional analysis of Internet-based survey data that found that respondents who had accessed PBs had lower lifetime suicidal ideation when compared to those who had wanted PBs but not accessed them. The online survey, the 2015 U.S. Transgender Survey (USTS) (James et al., 2015), had multiple methodological weaknesses. For example, it was a convenience sample, likely not representative of transgender adults in the U.S, and respondents may have confused PBs for CSH (Biggs, 2020; Clayton et al., 2021). Additionally, the survey relied on adult respondents' retrospective recall of childhood and adolescence, and such memories "are subject to confabulation, modification, bias, and simply forgetting;" for example, "31% of respondents recalled realizing they were transgender by age 5, including some who recalled they were transgender at the age of 1 and 2—long before autobiographical memories begin" (Kulatunga Moruzi & Lawler, 2024, pp. 11, 4). The Turban et al. study has also been criticized for its inaccurate assumption that PBs for GD were available in the U.S. starting in 1998, and it has been pointed out that on multivariate analysis, there were no statistically significant between-group differences on five other measures of suicidality, including history of suicide attempts (Biggs, 2020; Clayton et al., 2021).
[118] Appleby (2024).

### 4.3.5 Collapse of clinical rationale

An original rationale for prescribing PBs, as outlined in the Dutch Protocol, was to provide adolescents with "time to think" by pausing puberty, thereby allowing for the exploration of identity without the added distress of physical development.[119] However, as noted earlier, data suggest that the vast majority of adolescents who start PBs go on to take CSH.[120] This means that PBs may not function as a neutral pause, but rather the first step on the path to medical transition. This has prompted many experts to abandon the "time to think" rationale, a reversal reflected in more recent WPATH guidelines and professional statements.[121] PBs and CSH are now understood to be a continuous treatment pathway.[122]

Given the risk profile of PBs as outlined in Chapter 7, and the possibility that their use may lead to lifelong medical dependency carrying additional long-term risks, their role in the current treatment paradigm is unclear. In male patients, testosterone suppression can be achieved with anti-androgens alongside estrogen for feminization. In female patients, testosterone alone effectively suppresses estrogen, while also inducing masculinization. Therefore, if PBs are not being used to provide time to think, their rationale in this context remains uncertain.[123]

[119] Delemarre-van de Waal & Cohen-Kettenis (2006).
[120] See Section 4.3.2.2.
[121] Although WPATH's 2012 guidelines stated (consistent with the original Dutch research) that PBs would "[give] adolescents more time to explore their gender nonconformity and other developmental issues," (see Coleman et al., 2012, p. 177), this clinical rationale is absent in the latest version of the organization's guidelines, Coleman et al. (2022). A recent article by leaders in the field about eligibility and screening evaluations for patients interested in PBs made no mention of the "time to think" rationale (Turban et al., 2025). See also amicus brief acknowledging that PBs and CSH should not be considered separate treatment pathways because they constitute a "care continuum" and "the vast majority of adolescents with gender dysphoria who receive puberty blockers progress to cross-sex hormone therapy" (U.S. v. Skrmetti (No. 23-477)*,* Expert Researchers and Physicians*,* Amicus curiae brief*,* 2024).
[122] There are exceptions to this understanding; some research papers and organizations still claim PBs provide time to think (e.g. Fisher et al., 2024; U.S. v. Skrmetti (No. 23-477)*,* American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations*,* Amicus curiae brief*,* 2024, p. 13).
[123] The Cass Review found that although there may be "a very narrow indication for the use of puberty blockers in birth-registered males as the start of a medical transition pathway in order to stop irreversible pubertal changes," there were no other reasonable, proven rationales for use of PBs, and, notably, no indication for use of PBs in females (Cass, 2024a, p. 180). Experts have questioned "the rationale for depriving an adolescent of sex hormones for years during puberty and risking the effects on bones and brains" (Ryan, 2024b).

### 4.3.6 Lack of reliable evidence of benefit

The original intent behind the use of hormonal interventions in pediatrics was to improve mental health outcomes[124] by preventing sexual development and causing the development of physical characteristics typical of the other sex. This approach was based on the hypothesis that avoiding "an unfavorable physical appearance"[125] would "improve the ability to 'pass' as the desired gender."[126] While these interventions do alter physical appearance, SRs have not found credible evidence that they lead to meaningful improvement in mental health.[127] Multiple SRs have concluded that the evidence supporting the benefits of pediatric transition interventions—from PBs to CSH and surgery—is of "very low certainty." (See Chapter 5.) This means that findings from studies reporting mental health improvements[128] are not considered reliable. In contrast, all medical interventions carry the potential for harm.

Ultimately, medical interventions should be used when the balance of benefits clearly outweighs the risks. Every public health authority that has conducted a systematic

---

[124] Researchers were originally motivated to initiate hormonal interventions in children and adolescents because they were concerned about poor mental health in adult patients and hoped to mitigate this by preventing development of sex characteristics that were distressing for these adults (discussed in more detail in Chapter 3).
[125] Delemarre-van de Waal & Cohen-Kettenis (2006).
[126] Costa et al. (2015).
[127] The other original clinical rationale was decreasing need for future surgeries. One study has reported that female patients who started PBs early in puberty were less likely to receive mastectomies than patients who started PBs later, suggesting relative lack of breast tissue precluded need for mastectomy. However, this study also found greatly increased odds of intestinal vaginoplasty in male patients who received PBs in early puberty (van de Grift et al., 2020). One adolescent mastectomy study suggested chest-related dysphoria increased after testosterone use (Olson-Kennedy, Warus, et al., 2018). Theoretically, increasing chest dysphoria could lead to pursual of mastectomy. In the adult literature there have been reports of females undergoing hysterectomy due to pelvic pain caused by reproductive organ atrophy (e.g., Zwickl et al., 2023).
[128] Across the studies looking at mental health outcomes, statistically significant improvements have been inconsistently reported. Of longitudinal mental health outcome studies in this field, some reported improvements in one or more mental health outcomes (Achille et al., 2020; Allen et al., 2019; Chelliah et al., 2024; Chen et al., 2023; de Vries et al., 2011, de Vries et al., 2014; Fisher et al., 2024; Kaltiala et al., 2020; Kuper et al., 2020; Lavender et al., 2023; López de Lara et al., 2020; Olson-Kennedy et al., 2025); the largest study found worsening in mental health outcomes (Hisle-Gorman et al., 2021), while others reported no change (Becker-Hebly et al., 2020; Cantu et al.. 2020; Carmichael et al., 2021; Eisenberg et al., 2024; Khatchadourian et al., 2014; Russell et al., 2021; Tordoff et al., 2022). One study reported similar improvement in a group treated with PBs and a group treated with psychotherapy only (Costa et al., 2015).

review of the evidence has concluded that the benefit/risk profile of PMT is either unknown or unfavorable.

PART 2

# EVIDENCE REVIEW

# Chapter 5 Overview of Systematic Reviews

This chapter reviews the best available information regarding the risks, benefits, and uncertainties of interventions commonly used to address gender dysphoria (GD) in youth. It summarizes the findings of the overview of systematic reviews (SRs) (also known as an "umbrella review") conducted for this Review. Section 5.1 defines some terminology and describes the methodology used to produce the overview of SRs. Sections 5.2-5.6 summarize the overview's findings for the following interventions: social transition; puberty blockers (PBs); cross-sex hormones (CSH); surgery; and psychotherapy. The chapter concludes with a discussion section (5.7).

Chapter 6 explains the limitations of SRs and the need—especially in the context of pediatric gender medicine (PGM)—to consider other types of scientific evidence. Chapter 7 is an overview of those other types of evidence, including evidence from basic science, from known mechanisms of drug action, and from endocrinological disorders that approximate the effects of medical transition. This broader base of evidence allows for a more comprehensive assessment of potential harms. Chapter 8 briefly summarizes the implications of these findings for decision-makers.

## 5.1 Methodology

A fundamental principle of evidence-based medicine (EBM) is that optimal decision-making "requires awareness of the best available evidence, which ideally will come from systematic summaries of that evidence."[1] The cornerstone of EBM is the *systematic review*,

> [which] attempts to collate all empirical evidence that meet prespecified eligibility criteria in order to answer a specific research question. It uses explicit, systematic methods that are selected with a view to minimizing bias, thus providing more reliable findings from which conclusions can be drawn and decisions made.[2]

---

[1] Guyatt et al. (2015, p. 10).
[2] Higgins et al. (2019, p. xxiii).

The conclusions of any individual study will be limited by study design and other factors. Collating, synthesizing, and assessing all relevant studies on the topic of interest, using systematic and reproducible methods to minimize biases and mistakes, makes more reliable conclusions possible.

SRs sit atop of the "hierarchy of evidence."[3] However, not all literature reviews are SRs, even when titled as such, so it is important to evaluate the process used in the production and reporting of any evidence review that claims to be an SR. For example, the "Cornell Review" has been extensively cited in the field of PGM to support a claim of low regret, but that review's findings are undermined by poor methodology.[4] Similarly, a recent review commissioned by lawmakers in Utah has been cited as showing the safety of PBs and CSH, but this review lacks a methodologically valid evidence appraisal, among other problems.[5]

An overview of SRs essentially applies the methodology of SRs to SRs themselves, making the SRs the unit of analysis, rather than individual primary studies. In the present case, an overview of SRs was prepared because the field is already saturated with SRs, many of which evaluate the same studies. By assessing the quality of these SRs, an overview allows for a clearer understanding of the overall strength, consistency, and gaps in the evidence base.

The methodology of the overview followed the recommendations for overviews of SRs in the *Cochrane Handbook for Systematic Reviews of Interventions*.[6,7] Medline, Embase, and the psychological database PsycINFO were searched for SRs on the effects of social transition, PBs, CSH, surgeries, and psychotherapy for youth with GD

---

[3] See Appendix 3.
[4] Cornell University & What We Know Project (2017). The relevance of the Cornell Review to PMT is anyway slight, because the target population was mature adults, and thus is not clearly applicable to children and adolescents with GD (see Section 4.3.1.1). The Cornell Review was not included in the present overview for this reason. The review claimed that "regrets are most likely to result from a lack of social support after transition or poor surgical outcomes using older techniques." But evidence from included studies was not properly synthesized, nor was evidence quality assessed. The findings should therefore be interpreted with caution.
[5] University of Utah College of Pharmacy, Drug Regimen Review Center (2025); cited by Dowshen et al. (2025). See Section 5.7.3 and Appendix 4, Section 2.4.
[6] Higgins et al. (2019).
[7] See Appendix 4 for the detailed methodology and results of this overview.

up to age 26 years.[8] A complementary literature search was also conducted for "grey literature"[9] and reference lists of eligible SRs. Two reviewers independently screened titles and abstracts, and then full texts, to determine study eligibility. Reviewers resolved disagreement by discussion. The Risk of Bias Assessment Tool for Systematic Reviews (ROBIS) was used to assess the included SRs.[10] Data extraction and risk of bias assessment were completed by one reviewer and checked by a second. ROBIS assesses the quality of the SR in four domains: (1) study eligibility criteria; (2) identification and selection of studies; (3) data collection and study appraisal; and (4) synthesis of findings. Additionally, ROBIS assesses the overall risk of bias in an SR's process. SRs with concerns identified in the four domains can still be assessed at low risk of bias if the SRs have properly addressed those concerns in the evidence interpretation.

The following five sections of this chapter summarize the outcome data across SRs published in English and classified at low risk of bias. The evidence synthesis was organized by the outcomes of interest for each treatment strategy. These outcomes included GD, mental health and well-being, physiologic effects (e.g., suppression of sex hormones for PBs), need for or progression to further treatment, safety outcomes including side effects and adverse outcomes, and regret. For each outcome, this overview summarized the effect estimates and the quality of evidence (the confidence in the effect estimates), following the Grading of Recommendations Assessment, Development, and Evaluation (GRADE) methodology.

In GRADE, quality of evidence is equivalent to certainty of evidence.[11] Quality of evidence can be downgraded for various reasons: risk of bias (study limitations), inconsistency (unexplained variation in results), indirectness (evidence not directly

---

[8] SRs in this area have usually involved patients under 18 or under 26. To encompass the inclusion of those aged 18, the Review made the decision to search for SRs for patient populations below the age of 26. This balances the comprehensiveness and the directness (applicability) of evidence review. Though there is concern regarding the directness of evidence, the evidence for <18 and patients who are older than 18 years did not identify any significant differences in outcomes.
[9] "Gray literature" refers to research and information produced outside of traditional academic publishing channels and therefore may not be formally peer-reviewed or indexed in major databases.
[10] Whiting et al. (2016).
[11] "The quality of evidence is very low" is equivalent to "the certainty of evidence is very low" (Balshem et al., 2011; Guyatt et al., 2008).

applicable), imprecision (wide confidence intervals or small samples), and publication bias (selective reporting).[12] Conversely, quality may be upgraded if there is a large effect size, a clear dose-response relationship, or if confounding factors would likely reduce the observed effect but the effect was nonetheless observed.[13]

Evidence is then classified into four categories by level of quality: high, moderate, low, or very low.[14] High quality evidence means that "we are very confident that the true effect lies close to that of the estimate of the effect." Very low quality evidence indicates that "we have very little confidence in the effect estimate: the true effect is likely to be substantially different from the estimate of effect." This overview summarizes the GRADE ratings from the original SRs for the respective outcome wherever it is available. Nevertheless, two modifications were made:

1. Where a formal GRADE appraisal had not been performed by the SR, but expressions such as "we are very uncertain" or "no conclusions could be drawn" were used in the SR's conclusions, these were considered equivalent to a "very low quality" GRADE assessment.[15]

2. Where SRs disagreed on GRADE assessment for the same outcome, this overview resolved the disagreement with *de novo* assessment following the GRADE methodology and reported the rationale.

After screening, 17 SRs met the inclusion criteria. These examined the effects of social transition (n = 2),[16] PBs (n = 9),[17] CSH (n = 8),[18] surgery (n = 3),[19] and psychotherapy (n

[12] Balshem et al. (2011); Guyatt et al. (2008); Guyatt, Oxman, Kunz, Brozek et al. (2011); Guyatt, Oxman, Kunz, Woodcock, Brozek, Helfand, Alonso-Coello, Falck-Ytter et al. (2011); Guyatt, Oxman, Kunz, Woodcock, Brozek, Helfand, Alonso-Coello, Glasziou et al. (2011); Guyatt, Oxman, Montori, et al. (2011); Guyatt, Oxman, Vist et al. (2011).
[13] Guyatt, Oxman, Sultan et al. (2011).
[14] Balshem et al. (2011). See also Appendix 3.
[15] Balshem et al. (2011); Santesso et al. (2020).
[16] Dopp et al. (2024); Hall et al. (2024).
[17] Chew et al. (2018); Dopp et al. (2024); Ludvigsson et al. (2023); Miroshnychenko, Roldan et al. (2025); Ramos et al. (2021); Rew et al. (2021); Taylor, Mitchell, Hall, Heathcote et al. (2024); Thompson et al. (2023); Zepf, König et al. (2024).
[18] Chew et al. (2018); Dopp et al. (2024); Karalexi et al. (2020); Ludvigsson et al. (2023); Miroshnychenko, Ibrahim et al. (2025); Taylor, Mitchell, Hall, Langton et al. (2024); Thompson et al. (2023); Zepf, König et al. (2024).
[19] Dopp et al. (2024); Miroshnychenko et al. (2024); Thompson et al. (2023).

= 5)[20] among children or adolescents with GD. Of the 17 included SRs, 10 were rated as having a low risk of bias overall.[21] SRs rated as a "low risk of bias" nevertheless may still have limitations in one or more domains. Seven SRs were rated as having a high risk of bias overall,[22] often due to limited or poorly defined research questions and eligibility criteria, lack assessment for risk of bias, and inadequate synthesis of findings. The variation in methodological rigor highlights the need for cautious interpretation of findings, especially from reviews rated at high risk of bias.

Of note, this overview excluded two SRs performed by the National Institute for Health and Care Excellence (NICE) in October 2020 to inform the Cass Review.[23] These were excluded because several subsequent SRs commissioned from the University of York to inform the Cass Review were published. The latter SRs are more comprehensive and updated the findings of the two NICE SRs.

This overview also excluded the 2021 SR by Baker et al.,[24] because participants in most of the included studies for that SR were mature adults. Notably, the Baker et al. review was cited to support Statement 2.1 in the World Professional Association for Transgender Health's *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8 (WPATH SOC-8).[25] That statement—"We recommend health care systems should provide medically necessary gender-affirming health care for transgender and gender diverse people"—was then cited in support of the recommendations in SOC-8's Adolescent chapter. Because of the way this SR has been relied on in the field of PMT, Baker et al. was subjected to a separate ROBIS analysis which found it to be at high risk of bias due to limitations in ROBIS domains of "data collection and study appraisal" and "synthesis and findings." The ROBIS assessment of

---

[20] Dopp et al. (2024); Expósito-Campos et al. (2023); Heathcote et al. (2024); Malpas et al. (2022); Thompson et al. (2023).
[21] Dopp et al. (2024); Hall et al. (2024); Heathcote et al. (2024); Ludvigsson et al. (2023); Miroshnychenko et al. (2024); Miroshnychenko, Ibrahim et al. (2025); Miroshnychenko, Roldan et al. (2025); Taylor, Mitchell, Hall, Heathcote et al. (2024); Taylor, Mitchell, Hall, Langton et al. (2024); Zepf, König et al. (2024). SRs conducted by the same research group generally followed the same methodology approach.
[22] Chew et al. (2018); Expósito-Campos et al. (2023); Karalexi et al. (2020); Malpas et al. (2022); Ramos et al. (2021); Rew et al. (2021); Thompson et al. (2023).
[23] National Institute for Health and Care Excellence (2020b, 2020a).
[24] Baker et al. (2021).
[25] Coleman et al. (2022).

Baker et al. is included in Section 2.3 of Appendix 4, while Appendix 3 provides an introduction to SRs and EBM. Figure 5.1 below provides a flow diagram for the searching, screening, and inclusion process.

**Figure 5.1 Searching, screening, and inclusion process**



## 5.2 Outcomes of social transition

Social transition involves changing one or more aspects of one's presentation or expression, such as name, appearance, or behavior, with the goal of being perceived and treated as a member of the other sex, or to avoid being perceived and treated as a member of one's own sex. As noted in the Cass Review, even though social transition is undertaken outside healthcare settings, "it is important to view [social transition] as an active intervention because it may have significant effects on the child or young person in terms of their psychological functioning and longer-term outcomes."[26]

This overview identified two SRs evaluating the impact of social transition. Both are assessed at low risk of bias.[27] The results suggest that the impact of social transition on long-term GD, psychological outcomes and well-being, and future treatment decisions such as hormones or surgeries remains poorly understood. Evidence on regret associated with social transition is extremely limited. The certainty of evidence for these outcomes is very low.

Significant evidence gaps remain in the evaluation of social transition as an intervention for children and adolescents with GD. Most available studies are cross-sectional and there are no prospective longitudinal studies with appropriate comparison groups, making it unclear whether observed associations reflect the effects of social transition or other underlying factors. Additionally, published studies often do not disentangle the effects of social transition from concurrent interventions such as psychotherapy or medical treatments, further complicating interpretation.

## 5.3 Outcomes of puberty blockers

Gonadotropin-releasing hormone agonists (GnRHa), known as "puberty blockers" (PBs), are used to prevent or arrest the development of sex characteristics in

---

[26] Cass (2024, p. 158). Social transition may also involve breast binding for females or "tucking" (moving the testes into the inguinal canals and positioning the penis and scrotum in the perineal region) for males. This is a (non-medical) physical intervention with potentially adverse health effects, unlike haircuts or clothing changes. As a recent review puts it, "For chest binding, a significant number of negative health implications have been reported, with rates as high as 97.2%" (Bumphenkiatikul, 2025, p. 5). This review did not attempt to synthesize the quality of the evidence for either harms or benefits, however.
[27] Dopp et al. (2024); Hall et al. (2024).

peripubertal and pubertal children and adolescents with GD. This overview identified nine SRs that assessed the treatment effects of PBs. Among these four were English-language SRs[28] assessed at low risk of bias. The eligibility criteria and number of included studies varied in these four SRs, and the certainty of evidence is very low regarding the effect of PBs on GD (or gender incongruence), improvement in mental health, and safety. There is high certainty evidence that PBs exert physiological effects (such as sex hormone suppression) and often cause infertility when followed by CSH, depending on the patient's pubertal stage and sex.[29] Low certainty evidence suggests that PBs may compromise bone health.[30] A high proportion of youth proceed to CSH after PBs, though the certainty of evidence regarding any causal role PBs play in this progression is very low.

Important gaps remain in both the range and quality of outcomes assessed across the existing literature. Many primary studies were not adequately designed for measuring or reporting on the outcomes related to PBs. For example, few primary studies included in the SRs assessed the impact of PBs on outcomes such as GD or mental health. Although PBs are frequently described as a "pause button,"[31] no studies have systematically examined their role in the decision-making process or the outcomes of those who discontinue treatment.

When outcomes were assessed, the focus was largely on short-term psychological or physiological changes, or surrogate outcomes—such as suicidal ideation or bone mineral density, rather than on endpoints like suicides or fractures. The evidence is particularly limited regarding long-term outcomes related to fertility, growth, and neurocognitive development.

[28] Dopp et al. (2024); Ludvigsson et al. (2023); Miroshnychenko, Roldan et al. (2025); Taylor, Mitchell, Hall, Heathcote et al. (2024).
[29] See subsequent discussion of fertility in Chapter 7.
[30] See subsequent discussion of physiologic mechanisms whereby induced hypogonadotropic hypogonadism negatively impacts bone development.
[31] See, for example, a puberty blocker fact sheet from Cambridge Health Alliance/Harvard Medical School Teaching Hospital (Cambridge Health Alliance, n.d.).

While studies suggest a high proportion of youth proceed to CSH after puberty suppression,[32] there is minimal evidence on the impact of this combined pathway compared to CSH alone, or on how this pathway affects longer-term outcomes such as undergoing surgery. Furthermore, no studies have clearly examined the physical or psychosocial trajectories of the small minority of those who undergo PBs but do not proceed to CSH. As a result, there is little data on what happens after treatment ends, and the assumption that the effects of PBs are reversible remains largely untested. Another important limitation is that most of the primary studies have not distinguished the effects of PBs on females versus males. Overall, the absence of long-term, high-certainty evidence on these critical outcomes (including suicides, fractures, fertility, growth, and neurocognitive development) leaves substantial uncertainty about the effects of PBs.

## 5.4 Outcomes of cross-sex hormones

Estrogen for males and testosterone for females are used off-label to induce physical changes in the sex characteristics of youth with GD. This overview identified eight SRs on the treatment effects of CSH, among which four were in English language and assessed at low risk of bias.[33] The certainty of evidence is very low regarding the effect on GD or incongruence, improvement in mental health, and safety metrics including fertility and bone health. There is high certainty evidence that CSH exert physiological effects.

As with PBs, important evidence gaps exist for CSH. Many studies were not specifically designed to capture the full range of long-term outcomes and have primarily concentrated on short-term psychological or physiological changes. Key outcomes such as effects on GD, other mental health outcomes, and quality of life have been inconsistently measured and, when reported, often are derived from small,

[32] In the systematic reviews that were assessed at low risk of bias, only two studies (Carmichael et al., 2021; Karakılıç Özturan et al., 2023a) reported data on this outcome, each reporting progression rates from PBs to CSH of >95%. Other studies not captured by this overview, cited elsewhere in this Review, also reported >90% progression rate from PBs to CSH: Brik et al. (2020); van der Loos, Klink et al. (2023); Wiepjes et al. (2018).
[33] Dopp et al. (2024); Ludvigsson et al. (2023); Miroshnychenko, Ibrahim et al. (2025); Taylor, Mitchell, Hall, Langton et al. (2024).

observational studies with limited follow-up. Critically important long-term outcomes remain poorly understood. Sexual dysfunction, despite being highly relevant to long-term well-being, has been infrequently assessed. Although a few studies have reported cardiovascular event rates, long-term follow-up is needed to evaluate cumulative risk.[34]

Evidence on fertility is sparse, with little data on whether reproductive effects vary by age at treatment initiation or whether these effects are reversible. Furthermore, the compounded effects of sequential (and sometimes concurrent, especially among males) treatment with PBs followed by CSH—such as their impact on bone health recovery, final adult height, or the likelihood of requiring surgical interventions—have not been adequately investigated. As with PBs, the lack of methodologically rigorous, long-term studies significantly limits researchers' understanding of the broader health implications of CSH use during adolescence. A lack of primary studies that separately evaluate the effects of estrogen in males and testosterone in females is a significant limitation, as hormone-sex interactions may meaningfully influence outcomes.

## 5.5 Outcomes of surgery

Masculinizing mastectomy for adolescent females is the most frequently performed surgery in the context of youth with GD. This overview identified three SRs on surgeries for children or adolescents with GD, with most primary studies considering mastectomy only.[35] Two SRs were assessed at low risk of bias.[36] There is high certainty evidence that mastectomy is associated with predictable surgical complications such as necrosis and scarring. The certainty of evidence is very low regarding the effect of surgery on GD or incongruence, improvement in mental health including suicidality and depression, and long-term outcomes such as sexual function, quality of life, and regret.

There are substantial gaps in the evidence on surgeries for adolescents with GD. Most studies are case series or small observational designs, with limited or no comparator

[34] This is particularly true for pediatric medical transition (due to starting CSH in adolescence, the duration of treatment will be longer than for previously studied populations of adults).
[35] Dopp et al. (2024) included 18 studies; more than half of the included studies were on mastectomy. Miroshnychenko et al. (2024) included 39 studies and only assessed the effects of mastectomy. The other SR included 25 participants receiving surgeries, of which 24 received mastectomy. See Dopp et al. (2024); Miroshnychenko et al. (2024); Thompson et al. (2023).
[36] Dopp et al. (2024); Miroshnychenko et al. (2024).

groups, and thus are unable to isolate the effects of surgery from prior medical or psychosocial interventions. Outcomes such as effects on GD, mental health, and quality of life are inconsistently reported and often lack validated measures. Long-term outcomes, including the durability of psychological benefits, sexual function, need for revision surgeries, as well as satisfaction and well-being into adulthood, remain poorly characterized. Furthermore, while regret is a frequent topic of public discussion, existing studies do not provide robust data on the factors influencing regret. There are also knowledge gaps for other types of surgeries, including genital surgeries.

## 5.6 Outcomes of psychotherapy

Discussions about the role of psychotherapy in the treatment of youth with GD suffer from internal inconsistencies in the field of gender medicine, whereby psychotherapy is both recognized as an important tool but is also stigmatized if its aim is the resolution of GD (see Chapter 14). The overview identified a total of five SRs assessing psychotherapy among children or adolescents with GD. Only two were assessed at low risk of bias.[37]

The evidence on the effects of psychotherapy is limited. A 2024 review conducted by Dopp et al. included one randomized controlled trial (RCT) evaluating the effects of "coping-oriented brief videos" on suicidality, which did not provide direct evidence about the effect of psychotherapy in youth with GD. There are no other RCTs. Both SRs found that psychotherapy interventions were delivered through a range of formats, highlighting considerable heterogeneity in delivery. Formats for both face-to-face and online interventions varied widely, including individual, group, family-based, and combined approaches. Face-to-face interventions took place in diverse settings, such as specialist gender services, community programs, community mental health clinics, a weekend retreat, and an acute residential treatment program. These heterogeneities limit the generalizability of evidence. For mental health outcomes, the certainty of evidence was very low. However, no harms were reported.

---

[37] Dopp et al. (2024); Heathcote et al. (2024).

The overview found no evidence on the effect of psychotherapy on GD itself. This evidence gap may be due to a conflation of psychotherapy with "conversion therapy." As noted by the Cass Review, "[the] role of psychological therapies in supporting children and young people with gender incongruence or distress has been overshadowed by an unhelpfully polarised debate around conversion practices."[38] There has been very limited evidence on the role of psychotherapy in treating mental health problems co-occurring with childhood or adolescent GD,[39] including depression, anxiety, eating disorders, self-harm, and suicidality. Early reports often did not isolate the effects of psychotherapy from those of other concurrent interventions such as social transition, PBs, or CSH, making it difficult to attribute observed outcomes to psychotherapy alone. There is little understanding of which therapeutic approaches may be more or less effective for specific subgroups. The lack of robust research was acknowledged by the Cass Review, which noted that "there has been a failure to systematically consider how psychosocial interventions should be used and to research their efficacy."[40]

Of note, although the direct evidence for psychotherapy in children and adolescents with GD is limited, there is available evidence to support the role of psychotherapy in treating children and adolescents with other mental health problems, including depression, anxiety, eating disorders, self-harm, and suicidality (See Section 14.5.1).

## 5.7 Discussion

### 5.7.1 Findings of this overview

This overview of SRs includes 17 SRs evaluating the effects of interventions for children or adolescents with GD. For social transition, the certainty of benefits and harms is very low due to problems in the study designs. While studies suggest that early social transition is associated with a high rate of persistence of GD and a >90% rate of continuation to PBs and CSH,[41] from a methodological perspective there is uncertainty due to very low-quality evidence about causal explanations/pathways. Specific to medical transition, this overview highlights a consistent pattern across interventions for

[38] Cass (2024a, p. 150).
[39] See Chapter 14.
[40] Cass (2024a, p. 155).
[41] Hall et al. (2024).

children or adolescents with GD: while PBs, CSH, and surgeries reliably produce expected physiological changes, there remains substantial uncertainty about their psychological and long-term health impacts. High-quality evidence confirms that PBs suppress pubertal development and CSH induce changes to sex characteristics. There is low quality evidence suggesting that PBs compromise bone health.[42] However, the quality of evidence for outcomes such as GD, mental health, quality of life, and regret remains very low across all intervention types. The interpretation of many of the SRs' findings should be approached with caution, particularly given the sources of uncertainty, the robustness of this overview's conclusion, and the methodological limitations inherent in the evidence reviews.

### 5.7.2 Sources of uncertainty in evidence

Across the included SRs, the quality (certainty) of evidence is predominantly limited by lack of methodologically rigorous studies. For instance, across all primary studies included in the nine SRs on PBs, there were no eligible randomized controlled trials.

The lack of proper controls is another common methodological limitation in the studies. This overview found that across all primary studies in the nine SRs on PBs, only six were observational studies with parallel control groups that compared PBs with no PBs among children or adolescents with GD.[43] However, the overall certainty of evidence was influenced not only by methodological shortcomings, but also by factors such as small sample size and small or no effects, which signify imprecision in GRADE terminology. For instance, the sample sizes of the six comparative observational studies addressing PBs were small, with three studies which each included fewer than 100 participants. One SR downgraded the quality of evidence on the effect of PBs on global function for imprecision, noting that the evidence "suggests both a possibility of a benefit or a harm in the outcome."[44]

Inconsistent study findings are another frequently cited concern that lowers the quality of evidence. For instance, one SR of CSH found "limited or inconsistent evidence

[42] Physiological mechanism for PBs' effect on bone mineralization is discussed in Chapter 7.
[43] Becker-Hebly et al. (2021); Costa et al. (2015); Grimstad et al. (2021); Jensen et al. (2019); McGregor et al. (2024); Tordoff et al. (2022).
[44] Miroshnychenko, Roldan et al. (2025).

regarding GD, body satisfaction, psychosocial and neurocognitive outcomes, fertility, height/growth, bone health and cardiometabolic effects."[45] Similar limitations were observed across studies evaluating other medical and surgical interventions for youth with GD.

Thus, it is important to clarify that the absence of high- or even moderate-quality evidence is not only due to a lack of randomized controlled trials (RCTs). The quality of evidence could have been improved through well-conducted observational studies,[46] which can provide moderate and even high-quality evidence when effects are large, consistent, and clearly attributable to the intervention.

### 5.7.3 Robustness of this overview's conclusion

Although this overview focused on English-language SRs assessed at low risk of bias, another low risk of bias SR, published in German, reached similar conclusions, reinforcing the overall patterns identified here.[47] As stated earlier, this overview did not include the NHS-commissioned SRs on PBs and CSH in 2020, as they were superseded by the SRs published in 2024 to inform the Cass Review. However, these two earlier SRs also concluded that the evidence was of very low quality,[48] and their inclusion would not have altered the conclusions of this overview.

A report commissioned by lawmakers in Utah was publicly released at the end of May 2025.[49] Assessment of the "Utah Review" with ROBIS[50] demonstrates that it would not have met the criteria for inclusion in the evidence synthesis (which only included SRs with low risk of bias). The Utah Review's review of primary studies did not properly define the research question, conduct a comprehensive literature search, or critically appraise all included studies. Most critically, it failed to perform two key aspects of a systematic review, a formal evidence synthesis and an assessment of evidence certainty, and therefore does not qualify as a systematic evidence review. It concluded,

---

[45] Taylor, Mitchell, Hall, Langton et al. (2024).
[46] See the checklist for ways to improve observational research in this field in Ludvigsson et al. (2023).
[47] Zepf, König et al. (2024).
[48] National Institute for Health and Care Excellence (2020b, 2020a).
[49] University of Utah College of Pharmacy, Drug Regimen Review Center (2025). This report postdated the initial publication of the present Review.
[50] See Appendix 4, Section 2.4, and Whiting et al. (2016).

without sound methodological basis, that “the consensus of the evidence supports that the treatments are effective.”[51] The Utah Review also contained a review of clinical guidelines and SRs; these both had significant limitations. For example, the guideline review retrieved only four guidelines, and the SR review omitted recently published SRs.

It is also important to note that while the current overview focused on SRs assessed at low risk of bias, this designation does not imply that these SRs were without methodological limitations. The “low risk of bias in the systematic review” in ROBIS allows for some flexibility. The included SRs still had shortcomings, such as limited search strategies, outdated literature searches,[52] or lack of precision in evidence assessments. In contrast, SRs assessed at high risk of bias consistently exhibited serious methodological flaws, including poorly defined eligibility criteria, absence of risk of bias assessments for included studies, and unsystematic synthesis approaches. These SRs were judged to be too biased to inform reliable conclusions. The findings presented in this overview, therefore, reflect a deliberately cautious approach, drawing only from the most trustworthy sources currently available.

Finally, rather than extending beyond what the evidence can support, this overview is confined to summarizing the conclusions of SRs. As a result, it may not include some of the most recently published studies (due to the timing of the SRs’ literature searches). However, a targeted search[53] of recently published studies did not reveal any published or ongoing studies that would significantly change the conclusions, especially those pertaining to benefits. This is due to ongoing problems such as an absence of comparison groups, inadequate sample sizes, and limited follow-up. Should the contemplated U.K. RCT trial of PBs[54] receive ethics approval, it might improve the

---

[51] University of Utah College of Pharmacy, Drug Regimen Review Center (2025, p. 90).
[52] According to the Cochrane Handbook, reviews should be as up-to-date as possible. However, as recency is not the sole consideration, SRs with outdated search strategies can still be considered at low risk of bias overall (Higgins et al., 2019).
[53] A targeted search in this field identified recent publications based on observational studies from the U.S. (Hidalgo et al., 2024; Olson-Kennedy et al., 2025; Wittlin et al., 2025), Canada (Lawson et al., 2024), the Netherlands (van der Meulen et al. 2025), and the U.K. (Morandini et al., 2023). These studies have similar limitations (including study design, small sample size, short-term follow up, etc.) to the primary studies included in the SRs.
[54] National Institute for Health and Care Research (2024).

evidence base for short-term (24 month) effects of PBs on certain outcome measures. However, based on the elements of the study design publicly disclosed to date, it might not provide information about the effect of treatment when PBs are followed by CSH—a clinical trajectory which appears to occur more than 90% of the time.[55] Such combination use would have a different risk/benefit profile than the use of PBs alone, both in terms of possible benefits and possible harms. Finally, the anticipated short-term follow-up will not adequately address the key question of long-term outcomes.

Without a meaningful shift toward more robust research designs—such as RCTs that test each intervention as it is currently provided (sequential treatment of PBs followed by CSH), prospective cohorts with suitable comparators, or natural experiments—the quality of evidence likely will remain low.[56] Conducting new SRs to answer the same research questions in the near future is unlikely to yield novel insights. This dearth of robust research and evidence has direct implications for clinical guidance and policy development, where expectations of benefit must be weighed against the persistent uncertainty of the evidence documented in the literature.

### 5.7.4 Limitations and strengths of this overview

All SRs and overviews of SRs have limitations. SRs aim to capture all relevant research that meets predefined eligibility criteria. However, this objective may be undermined by reporting (or non-reporting) bias—a form of bias that arises when the decision to publish, delay, or selectively report study results is influenced by the statistical significance, size, or direction of the findings.[57]

As discussed in Chapter 6 of this Review, research in the field of PGM suffers from significant publication and reporting bias. The extent of the problem is difficult to quantify due to widespread poor methodology and a lack of consistency in reporting effect

[55] Brik et al. (2020); Carmichael et al. (2021); van der Loos, Klink, et al. (2023); Wiepjes et al. (2018).
[56] There is debate about whether high-quality research on effects of PBs/CSH in minors should be pursued. Ethical deliberations factor into this debate. Some have argued that research should focus on patients who already received PBs, CSH or surgery (Ryan, 2024b). The Cass Review called for more robust research into psychotherapeutic approaches to GD, which is a promising treatment approach so-far neglected by research (Cass, 2024a).
[57] Guyatt, Oxman, Montori, Vist et al. (2011).

sizes.[58] Notably, publication bias has not been considered as a reason for downgrading the certainty of evidence in the included SRs.

Another limitation is that SRs serve to answer well-defined research questions which have prespecified outcomes, but cannot detect signals or generate hypotheses. Many studies in PGM focus on psychological outcomes but only inconsistently track other outcomes that may be signals of the intervention's adverse effects. When outcomes are not reported using rigorous methodological standards—such as being clearly listed in a dedicated outcomes table—but instead are only mentioned in the discussion section, SR methodologies are unlikely to flag the study as relevant to that outcome during the screening process. As a result, important adverse effects may go unnoticed. This issue is discussed at some length in the next chapter.

A key characteristic of SRs and overviews of SRs is their emphasis on population-level epidemiological data,[59] often with limited integration of mechanistic evidence or considerations of biological plausibility. This narrow scope limits the ability of this overview to elucidate potential causal pathways or to fully interpret observed associations—or their absence.

This overview of SRs has other limitations. Like all overviews, it is constrained to synthesizing published SRs and does not reanalyze primary studies. The scope of this overview was intentionally narrow, focusing on young patients and excluding indirect evidence from adult populations that may provide insight into long-term effects.

Strengths included systematic evaluation of the risk of bias across SRs using the ROBIS tool. Thus, this overview offers a transparent assessment of the reliability of each SR's conclusions. It also allows for comparison across SRs with overlapping but differently scoped studies, helping to identify consistent findings, methodological gaps, and areas of agreement or divergence.

[58] Publication bias is notoriously hard to measure, and the existing statistical tools have significant limitations (Afonso et al., 2024).
[59] Guyatt et al. (1992, 2015).

### 5.7.5 Conclusion

This overview synthesizes the best available clinical evidence from population-level data, highlighting a consistent pattern across interventions for children and adolescents with GD. The benefits and harms of social transition remain unknown; PBs, CSH, and surgeries consistently produce certain physical and physiological effects; and there is considerable uncertainty regarding their psychological and long-term health outcomes. Likewise, there is uncertainty regarding the effects of psychotherapy for GD.

# Chapter 6 Limitations of Systematic Reviews

As reported in the overview of systematic reviews (SRs), the quality of evidence for benefits of the interventions used in pediatric medical transition (PMT) is very low. Nevertheless, the practice has continued to expand rapidly. The “very low” quality of evidence for benefits demands additional scrutiny of the potential harms in order to arrive at a proper understanding of the risk/benefit ratio.

It is well-established that SRs are better at detecting benefits than harms.[1] As Guyatt and colleagues remark, “Many, if not most, systematic reviews fail to address some key outcomes, particularly harms, associated with an intervention.”[2] Consequently, the absence of evidence of harms in published studies is not equivalent to evidence of absence of harms. In pediatric gender medicine (PGM), inadequate harm detection is amplified by the following factors:

- Insufficient time has elapsed since the widespread adoption of PMT;
- Short-term before-and-after observational studies that comprise the bulk of the evidence often have high ‘loss to follow up’ rates and do not systematically look for, track, or completely report harms;
- Publication bias impedes the recognition of harms.

The first three sections of this chapter (6.1–6.3) consider how these factors affect the ability of SRs to detect harms, with a summary in Section 6.4.

A comprehensive examination of harms associated with PMT is necessary to inform clinical practice. Harms associated with surgeries that remove healthy body parts are easy to recognize, as are some of the adverse effects of hormonal interventions. The latter are noted both in the Food and Drug Administration (FDA) drug labels[3] and on informed consent or assent forms parents and children sign prior to initiating treatment.[4]

---

[1] Loke et al. (2007); Mayo-Wilson et al. (2023); Qureshi et al. (2022).
[2] Guyatt, Oxman, Kunz, Atkins et al. (2011, p. 397).
[3] Testosterone is one of the most widely used drugs in the field and is classified as a Schedule III controlled substance due to the risk of psychological dependence and abuse.
[4] E.g. Cornell Health (n.d); Fenway Health (2024a, 2024b, 2025).

Use of these drugs off-label in PGM may add additional risk. It is well-established in adults that for the same drug, off-label uses are associated with considerably higher rates of adverse effects, especially when strong scientific evidence is lacking.[5] Clinical trials have never been conducted for using puberty blockers (PBs) to stop normally-timed puberty; such use will have a different risk profile than the use of PBs to temporarily stop abnormally early (precocious) puberty.

Additional uncertainty arises from the fact that, in studies, PBs are followed by cross-sex hormones (CSH) over 90% of the time;[6] this de facto combination therapy introduces new and potentially serious risks (e.g., concerning fertility) and has never been subjected to any FDA-regulated clinical trial for any population. Further, research shows that when the evidence supporting a particular off-label use is of very low certainty—as is the case for PMT—the already elevated risk of adverse effects associated with off-label use is increased even further.[7]

## 6.1 Insufficient elapsed time

Although the Dutch Protocol was first published 20 years ago,[8] it was not until the late 2010s to early 2020s that there were sufficient numbers of patients to allow for studies that can estimate rates of harms and benefits.[9] In addition, because the emergence of harms may be delayed by a decade or longer, SRs conducted relatively early in the field's tenure are more likely to understate these outcomes.[10] The average patient is still quite young—typically in their teens or early twenties—at the time of follow-up. This compounds problems with risk detection, since the effect of hormones on health may be cumulative (e.g., effects of hormones on cardiometabolic disease or malignancies) and may not fully manifest until later in life.

---

[5] Eguale et al. (2016).
[6] E.g., Brik et al. (2020); Carmichael et al. (2021); Karakılıç Özturan et al. (2023a); van der Loos, Klink et al. (2023); Wiepjes et al. (2018).
[7] Eguale et al. (2016).
[8] de Vries et al. (2006); Delemarre-van de Waal & Cohen-Kettenis (2006). See Chapter 3.
[9] Respaut & Terhune (2022).
[10] A study in gender medicine with longer-term follow up found "poorer outcome[s] … [which] might also be explained by longer follow-up period (median 10 years) compared to previous studies. In support of this notion, the survival curve (Figure 1) suggests increased mortality from 10 years after sex reassignment and onwards" (Dhejne et al., 2011).

## 6.2 Short-term observational studies

The Cass Review recognized continued reliance on poorly-designed observational studies as a "key limitation to identifying … safety of gender-affirming hormones for children and adolescents."[11] A key problem that disadvantages SRs in their detection of harms is the fact that the entire body of evidence in PGM is largely composed of short-term "before and after" observational studies that are particularly prone to bias. Such studies focus on demonstrating benefits while inconsistently reporting harms.[12] Unlike the intended benefits of an intervention, which are hypothesized before the study begins and investigated as primary outcomes,[13] harms are not always expected, surveilled, or reported. Therefore, SRs are limited by being able to identify only those outcomes reported by primary studies.[14]

An example of the difficulty in identifying harms pertains to whether PBs represent a harmless "pause button" providing "time to think"[15] or a powerful intervention that promotes iatrogenic persistence of GD and promotes continuation to CSH. At least five studies indicate >90% rate of progression from PBs to CSH.[16] As the Cass Review noted, "These data suggest that puberty blockers are not buying time to think, given that the vast majority of those who start puberty suppression continue to masculinizing/feminising hormones, particularly if they start earlier in puberty."[17] Because the high rate of persistence from PBs to CSH is often mentioned only in the text of a study (and not delineated in outcome tables or abstracts), SRs may overlook this information at the screening stage. Only one low risk of bias SR assessed the proportion of CSH use after PBs, identifying only two studies.[18]

---

[11] Cass (2024a, p. 76).
[12] Loke et al. (2007); Mayo-Wilson et al. (2023); Qureshi et al. (2022).
[13] In the case of prospective studies.
[14] Researchers may want their intervention to lead to beneficial outcomes, and may be reluctant to look for or focus on harms.
[15] See Chapter 4 for discussion of the "time to think" rationale.
[16] Brik et al. (2020); Carmichael et al. (2021); Karakılıç Özturan et al. (2023a); van der Loos, Klink et al. (2023); Wiepjes et al. (2018). See also Section 4.3.2.2.
[17] Cass (2024a, p. 176).
[18] Miroshnychenko, Roldan et al. (2025) was the SR that identified Carmichael et al. (2021) and Karakılıç Özturan et al. (2023a).

There are other examples of inappropriate reporting of adverse effects.[19] Three notable ones are profiled below.

### 6.2.1 de Vries et al., 2011, 2014[20]

The pair of seminal Dutch studies that launched PMT worldwide can serve as an example of how harms can go unreported. The 2014 study's conclusion that treatment with PBs, CSH and surgery "leads to improved psychological functioning"[21] did not comment on the finding that at least four of the original 70 young patients experienced adverse effects during treatment. Three adolescents were diagnosed with obesity and diabetes, which disqualified them from continuing to surgery, and one patient died from complications following surgery after early pubertal suppression.[22] These serious adverse events were not reported as formal outcomes,[23] precluding any discussion of whether they were caused by the experimental intervention or occurred incidentally. More recently published evidence suggests that the postsurgical death was likely directly related to the practice of early pubertal suppression.[24] Further, because these adverse effects were noted only in the context of accounting for the reduced postsurgical sample size, the study may not have attempted to detect and report less severe adverse effects that were not disqualifying for further participation.

Inadequate reporting of harms in the Dutch study was compounded when SRs excluded this study due to its unreliable design (e.g. the study comingled the CSH and surgery phases, making it impossible to determine which outcomes were associated with which

---

[19] This is not atypical in medicine. Researchers who invent innovative treatments are likely to focus on the apparent benefits.
[20] de Vries et al. (2011); de Vries et al. (2014).
[21] de Vries et al. (2014, p. 703).
[22] See Chapter 4 for discussion of the weaknesses in the original Dutch Protocol research.
[23] These outcomes were only discussed in the "methods" section (de Vries et al., 2014).
[24] de Vries et al. (2014) had 15 missing cases from the original cohort of 70 participants. Of these 15 participants, three were disqualified from the study because they developed obesity and/or diabetes. One dropped out of treatment, and one died from a surgical complication that was a likely consequence of pubertal suppression (Biggs, 2023b; Negenborn et al., 2017). Several others failed to return postsurgical questionnaires for unknown reasons.

intervention).[25] Thus, the serious harms reported incidentally by the study authors were entirely omitted from the SRs due to the study's poor design.

### 6.2.2 Tordoff et al., 2022[26]

Inadequate reporting of harm is also evident in more recent research. A highly influential 2022 study from Seattle Children's Gender Clinic by Tordoff et al. focused exclusively on psychological outcomes, where benefits had been hypothesized. It did not study or report physical health outcomes, where harms would have been more likely to occur.

The study by Tordoff et al. reported mental health outcome data for adolescents and young adults aged 13-20 years who were treated with PBs or CSH for up to one year. The study claimed to provide "quantitative evidence" of mental health improvements; however, the rates of depression in youth who started PBs or CSH remained unchanged—about 6 in 10 youth were moderately-to-severely depressed both pre- and post-intervention.[27] These data were reported in a supplement which was available only online. The study finding of improved mental health was derived from the odds ratios: 60% lower odds of depression and 73% lower odds of suicidality in patients treated with PBs or CSH as compared to those who were not. However, major methodological issues, including potential selection bias and confounding,[28] inappropriate statistical

---

[25] de Vries et al. (2014) was excluded from the systematic review of CSH by the SR conducted by the U.K.'s National Institute for Health and Care Excellence (NICE). The stated reason for exclusion was: "Exclude on intervention – all participants had surgery after gender-affirming hormones. Unable to determine whether changes were due to hormones or surgery. Complete data only available for 40 patients. Details of gender-affirming hormones are poorly reported" (National Institute for Health and Care Excellence, 2020a, p. 72). This study was also excluded from the SR by Miroshnychenko, Ibrahim et al. (2025) on CSH. Though it was included in the SR by Taylor, Mitchell, Hall, Langton et al. (2024) on CSH, it was classified as a low-quality study and not included in the evidence synthesis.
[26] Tordoff et al. (2022). This research was conducted in the U.S. at Seattle Children's Hospital/Washington State University.
[27] Raw Patient Health Questionnaire (PHQ-9) and Generalized Anxiety Disorder-7 (GAD-7) data was not reported, even in the online-only supplement.
[28] Of 104 youth aged 13-20, 62 initiated treatment with PBs or CSH during the 12-month study, and 7 were already on treatment at baseline. Participants who initiated treatment during the study contributed to both "treated" and "untreated" groups at different times, complicating interpretation.

modeling,[29] missing participant data,[30] and selective reporting[31]—raise serious concerns about the reliability of the reported findings.

The impressive-sounding odds ratios were thus calculated by relying on progressively smaller denominators in the untreated "comparator" group. The supplementary online-only data revealed that only seven cases from the "comparator group" of patients not treated with PBs or CSH remained enrolled in the study by its end.[32] It was also unclear if or to what extent this "comparator" group could be considered representative of all untreated patients. It appears that the "untreated" group comprised youth whose mental health problems and GD issues resolved who dropped out from the gender clinic and the study (representing 80% of the total "untreated group"); the patients who were about to cross-over to the treated group after a short assessment; and the eight patients (seven of whom provided follow-up data) who continued to attend the gender clinic 12 months later, but for an unknown reason were not starting hormonal interventions.[33]

Two recent systematic reviews have assessed Tordoff et al. for risk of bias, using two different tools (the Newcastle Ottawa Scale and ROBINS-I).[34] While both analyses identified some methodological weaknesses (e.g., short follow-up, high attrition rate), the study's inclusion of untreated youth as a comparison group somewhat boosted its

---

[29] Rather than analyzing individual mental health trajectories before and after treatment, the study performed cross-sectional comparisons at various time points, leading to potential bias.
[30] At 12 months, data are missing for 17% of medicalized youth (12 of 69) and an astounding 80% of non-medicalized youth (28 of 35). It is likely that non-medicalized participants without mental health distress, including those whose gender distress resolved, would be least likely to return to the clinic
[31] The authors performed analyses following multiple strategies, reporting in the abstract only the version of the analysis that produced the most dramatic results (strongest aOR [adjusted odds ratio] and smallest p-values), raising concerns about data-dredging.
[32] Based on eTable 3 in the supplementary material, the estimated prevalence of depression in the control group was 59% at baseline, 76% at month 3, 58% at month 6, and 86% at month 12. The substantial fluctuation across time points indicates that the estimates for the control group were unstable and likely influenced by random error.
[33] There was incomplete data for 80% of patients in the untreated group. It is possible that patients whose GD resolved stopped attending appointments. Additionally, the 7 untreated patients with follow-up data at one year may not have been approved for medical transition because they did not have sufficient capacity for consent—the only scenario under which this pediatric gender clinic would not recommend medical transition if desired by the patient, according to the study's lead author ("In practice, the only instances when it would have been appropriate to delay initiation of PB/GAH is if there was a concern that a patient did not have the capacity to provide informed consent … which is exceedingly rare in adolescence" (Tordoff, 2022). Barriers to provision of informed consent can include active psychosis or mania and profound intellectual disability.
[34] Miroshnychenko, Ibrahim et al. (2025); Taylor, Mitchell, Hall, Langton et al. (2024). ROBIS: Risk of bias in non-randomized studies - of interventions.

quality ratings. Systematic reviews are not always able to capture serious problems with comparison groups of this type.

This study's misrepresentation of its own results, serious confounding, and the exceptionally high loss-to-follow-up for untreated youth have been highlighted by science journalists and discussed in peer-reviewed articles.[35] Despite these well-demonstrated problems, this study, published in the *Journal of the American Medical Association* (JAMA) Open Network, continues to be uncritically described, by authoritative sources, as evidence that PBs and CSH are beneficial to mental health, medically necessary, and lifesaving.[36]

### 6.2.3 Chen et al., 2023[37]

This study, published in the *New England Journal of Medicine* (NEJM), reported mental health outcome data for 315 adolescents and young adults aged 12-20 (65% female) who were treated with CSH for a period of 24 months. Following the study protocol, there was no control group. Chen et al. (2023) cast its results in a positive light: "our findings showed improvements in psychosocial functioning ... which supports the use of [CSH] as effective treatment for transgender and nonbinary youth."[38] The study's observational, uncontrolled methodology does not justify the authors' use of explicitly causal language when reporting their results (CSH "improved appearance congruence and psychosocial functioning"). The lack of a parallel control group is this study's biggest limitation.[39]

In contrast to the authors' positive description of the outcomes, two of the study subjects died by suicide within one year of initiating hormones, representing an annualized

[35] E.g., Abbruzzese et al. (2023); Biggs (2023b); Singal (2022a). The university that conducted the research was made aware of the study's problems but chose not to disrupt the very positive medical narrative that misrepresented the authors' findings (Singal, 2022b).
[36] E.g., American Psychiatric Association (2023); Boerner (2022); Stringer (2023); U.S. v. Skrmetti (No. 23-477)*,* American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations*,* Amicus curiae brief (2024). To date, this study has been cited over 300 times in other peer-reviewed publications and viewed nearly half a million times.
[37] Chen et al. (2023). This was an NIH-funded multi-site study which recruited patients from four pediatric gender clinics: Benioff Children's Hospital, Boston Children's Hospital, Children's Hospital Los Angeles, and Lurie's Children's Hospital of Chicago. The original 2016 protocol and the final 2021 protocol can be found in the study's supplementary material.
[38] Chen et al. (2023, p. 249).
[39] Miroshnychenko, Ibrahim et al. (2025).

suicide rate of 317 per 100,000 patients. The suicide rate in Chen et al. was higher than rates that have been reported by PGM clinics in the U.K. and Finland (13 per 100,000 and 51 per 100,000).[40] One Belgian study[41] has also reported a comparatively high annual suicide rate (1,126 per 100,000); like in Chen et al., all patient suicides in that study were among patients taking CSH.[42]

Chen et al. reported only four out of more than 19 mental health outcomes described in the study's pre-registered protocol.[43,44] In particular, outcomes of GD, self-harm, and suicidality were not reported, and no explanation was provided for omitting these critical data. The only statistically significant improvement in both sexes was in "appearance congruence" as measured by the "transgender congruence scale," which has not been validated in minors.[45] The authors also reported that there were statistically significant improvements in depression, anxiety and life satisfaction.[46] However, these improvements were small[47] and of questionable clinical significance.[48] The statistically significant improvements were observed only in females, whereas males experienced

[40] Society for Evidence-Based Gender Medicine (2023a, 2024a).
[41] Van Cauwenberg et al. (2021).
[42] Society for Evidence-Based Gender Medicine (2024a). See also Section 4.3.4.
[43] The four reported outcomes were the Transgender Congruence Scale, the Revised Children's Manifest Anxiety Scale, the Beck Depression Inventory II, and the Life Satisfaction/Positive Affect scale from the NIH Toolbox Emotion Battery. A recent paper describing this same patient cohort published more information on the life satisfaction/positive affect results along with information on additional measures from the NIH Toolbox Emotion Battery (Olson-Kennedy et al., 2025), but it did not report the gender dysphoria, self-harm, or suicidality outcomes, nor did it reference the two patient suicides.
[44] See pp. 24–28 of the pre-registered final protocol (2021) for a description of all outcome measures.
[45] Strauss et al. (2024).
[46] In the case of positive affect, there was no statistically significant difference between the mean baseline measure and the endpoint at 24 months. See Table S5 (Corrected) of Chen et al. (2023). The authors chose instead to focus on the fact that the slope of the regression line for the data collected at all time points was statistically significant: "positive affect … increased significantly" (p. 243)."
[47] The mean Beck Depression Inventory score improved from 16.01 to 13.85 (63-point scale); the mean Revised Children's Manifest Anxiety Scale improved from 59.84 to 57.32 (T-score, where 50 is the population average and 10 is one standard deviation); and the mean life satisfaction score improved from 40.03 to 44.68 (T-score). For all these improvements, the reported Cohen's *d* effect sizes were small.
[48] For the Beck Depression Inventory, for example, researchers have suggested a 17.5% decrease from baseline score may represent a "minimal clinically important difference" (Button et al., 2015). The mean decrease of 2.16 points on this (63-point) scale in Chen et al. (2023) does not, according to this criterion, meet the threshold of clinical importance (McDeavitt, 2024). It is unclear whether improvements for females meet this threshold: see Figure S3 in the supplementary appendix to Chen et al. (2023).

no significant improvement in these measures. Additionally, follow-up data for these measures were unavailable for 31–34% of participants, introducing bias.[49]

According to the study's pre-registered protocol, the authors' original hypothesis was that after starting CSH, patients would exhibit "decreased symptoms of … gender dysphoria, self-injury, trauma symptoms, and suicidality" (among other changes) over time.[50] The hypothesis articulated in the published paper[51] instead focused on "appearance congruence," a phrase that did not appear in the original hypothesis. Chen et al. (2023) did not report important measures central to its protocol's hypothesis (e.g. GD, self-injury, trauma symptoms, suicidality), and these measures remain unreported even a decade after the research initiative was launched. As mentioned above, two young patients died by suicide within one year of initiating treatment, and the most frequently occurring adverse event during hormonal treatment was "suicidal ideation."[52] These latter findings, reported as adverse events, do not support the original hypothesis of reductions in self-injury and suicidality.

Although a recent systematic review was able to capture issues like study attrition in its risk of bias assessment for Chen et al.,[53] such reviews are unable to capture serious concerns that may be more related to research ethics than to methodology (e.g., the altering of hypotheses between the protocol and the published article raises the possibility of "HARKing"[54]). Peer-reviewed critiques addressing the issues with Chen et al. were eventually published in NEJM, but not until nearly a year after the article first appeared.[55]

---

[49] Out of the total number of patients (315), these two-year follow-up data were recorded from a little over 200 (208–217). See Table S5 (Corrected) in the supplementary appendix to Chen et al. (2023).
[50] See p. 36 of the study's final protocol (2021).
[51] "We hypothesized that appearance congruence, positive affect, and life satisfaction would increase and that depression and anxiety symptoms would decrease" (Chen et al., 2023, p. 241).
[52] Chen et al. (2023, p. 241). Chen et al. do not explain how "suicidal ideation" was measured.
[53] Miroshnychenko, Ibrahim et al. (2025).
[54] "Hypothesizing after the results are known" (Kerr, 1998).
[55] E.g., Biggs (2023a); Hare (2023); Jorgensen (2023c); Dutch PMT researchers also published a commentary on Chen et al., which acknowledged the study's many problems (de Vries & Hannema, 2023).

The study continues to be widely cited and uncritically described as providing evidence of benefit for hormonal transition of minors.[56]

## 6.3 Publication bias

It is a well-documented problem in biomedical research that positive findings confirming an original hypothesis are much more likely to be published or published expeditiously, as compared to studies with inconclusive or negative results. “Publication bias” is not unique to this field. The U.K.’s national PGM clinic, the Gender Identity Development Service (GIDS), tried to replicate the seminal 2011 Dutch study, launching its own “early intervention” study of PBs in 2011. Although the results were available in 2016-2017, they were only released in 2021 following a complaint to the U.K. Health Research Authority.[57] Once published, the study acknowledged that the outcomes reported by the Dutch were not replicated.[58] The study also found that puberty blockade was associated with impaired bone density accumulation. Subsequent reanalysis of the same data showed that up to one-third of participants experienced a deterioration in mental health while on PBs.[59]

A similar pattern may be unfolding in the United States. The lead investigator of a NIH-funded PB study acknowledged delaying the publication of results—apparently due to fear that the unimpressive findings would undermine the field.[60]

A similar reluctance to report on disappointing findings is evident in other places, too. According to court disclosures, the World Professional Association for Transgender Health (WPATH) suppressed publication of SRs on at least 10 of 13 topics relating to endocrine treatment of adolescents with GD.[61] The unpublished SRs evaluated harms, including the effects of PBs on “clinical outcomes and harms”; the effects of estrogen on the risk of pulmonary embolism, deep-vein thrombosis, stroke, and myocardial

---

[56] E.g., U.S. v. Skrmetti (No. 23-477*),* Expert Researchers and Physicians*,* Amicus curiae brief (2024).
[57] Biggs (2023b).
[58] Carmichael et al. (2021).
[59] McPherson & Freedman (2023).
[60] As reported in *The New York Times* (Ghorayshi, 2024c). Of note, the investigator, Johanna Olson-Kennedy, denied having said this in a later deposition (Deposition of J. Olson-Kennedy in LB v Premera Blue Cross NO. 2:23:Cv-00953-TSZ, 2024).
[61] See Chapter 10.

infarction; the effects of testosterone on uterine, ovarian, cervical, vaginal, and breast pathology; and the effects of hormone therapy on fertility and metabolic syndrome.[62]

There also are instances of SRs arriving at conclusions that contradict the underlying evidence. One SR commissioned by WPATH found only "low" and "insufficient"[63] strength of evidence regarding the effects of hormonal interventions on mental health. Nevertheless, the SR's authors came to the unsupported conclusion that this treatment pathway "is likely associated with improvements" in quality of life, depression, and anxiety. The authors also asserted that "[t]hese benefits make hormone therapy an essential component of care that promotes ... health and well-being." Notably, there was no attempt to evaluate hormone effects on physical health.[64] The content of this SR was influenced by WPATH leadership, including approving the conclusion as a condition for eventual publication. This may explain the discrepancy between the SR's optimistic conclusion and its more problematic findings. Section 10.3.2 discusses evidence suppression by WPATH in detail.

Another 2021 SR, conducted by Bustos et al., examined postsurgical regret rates.[65] This SR is often cited as evidence that the regret rate after transition-related surgery is very low, about 1%.[66] But of the 27 studies included in Bustos et al., 23 were rated as "poor" or "fair" in quality. The few higher-rated studies suffered from substantial loss to follow-up and the reported results included deaths from suicide and complications. One included study contributed nearly half the total participants but reported a 36% loss to follow-up. The study authors acknowledged that the short follow-up period was a key limitation. However, the authors failed to address the most serious criticism, namely that their central conclusion of "extremely low regret" was unsupported.[67]

---

[62] Sharma et al. (2018). See also Society for Evidence-Based Gender Medicine (2024b).
[63] Baker et al. (2021, p. 13).
[64] Appendix 4 includes a ROBIS assessment of Baker et al. (2021).
[65] Bustos et al. (2021) reported regret rates of around 1%. This SR was not included in this Review's overview of SRs as most of the included studies did not focus on the adolescent population.
[66] See examples of such statements in Cohn (2023).
[67] For the criticism, see Expósito-Campos & D'Angelo (2021). The authors provided a reply to the critique (Escandón et al., 2021), which addressed some but not all of the key concerns. See also footnote 109 in Section 7.6.2.

## 6.4 Summary

The quality of SRs in the field of gender medicine varies widely, but even the highest quality SRs typically find only "low certainty" evidence for most harms. However, there are familiar and plausible explanations for why evidence of harms may not have been sought, detected or reported. Reflecting on the state of evidence in PGM, the Cass Review noted, "it has been evident that there has been a failure to reliably collect even the most basic data and information in a consistent and comprehensive manner; data have often not been shared or have been unavailable."[68]

Unless SRs specifically search for harms (and with the provisos above), they are not well-suited to detect complications or adverse effects. This is due to the relatively recent debut and rapid growth of the field of PGM, the tendency of the predominantly short-term observational studies to focus on benefits and underreport harms, and publication bias. EBM emphasizes the role of best available evidence. To address SRs' limited ability to detect harms, decision-makers must consider other sources of scientific information. That is the topic of the following chapter.

[68] Cass (2024a, p. 39).

# Chapter 7 Evidence from Basic Science and Physiology

When clinical studies provide insufficient information about harms, and therefore systematic reviews (SRs) are unable to reliably collate information about harms, other types of evidence should be integrated. Trustworthy evidence from other sources, including basic sciences, should be considered to arrive at a more informed understanding of the plausible effects of interventions.[1] In the case of pediatric medical transition (PMT), this involves consideration of human physiology, development, and the well-established mechanisms of action of the drugs used. The consideration of such evidence aligns with the core requirement of evidence-based medicine (EBM): the judicious use of the “best available” evidence.

The following sections explain: normal pubertal development and the mechanisms of action of PMT interventions (Section 7.1); treatment of central precocious puberty with puberty blockers (PBs) (Section 7.2); biologically plausible implications of using PBs to arrest normally timed puberty and cross-sex hormones (CSH) (Sections 7.3 and 7.4); surgical implications, particularly when pubertal development has been arrested (Section 7.5); and psychological risks of undergoing PMT interventions given what is known about child and adolescent development (Section 7.6). Mortality is discussed in Section 7.7.

## 7.1 Puberty

This section overviews physiology and the implications of disrupting normally-timed puberty. Of note, there are three distinct waves of hypothalamic-pituitary-gonadal (HPG) axis activity over an individual’s lifespan: in utero, during the first month after birth, and in late childhood-early adolescence.[2] Only the latter is referred to as “puberty.”[3] Medications can be given to suppress the HPG axis.

---

[1] Sackett et al. (1996).
[2] Rohayem et al. (2024).
[3] The discussion in this section focuses on normal pubertal development. Individuals with disorders (differences) of sex development (DSDs) are not a focus of this chapter because the vast majority of adolescents with gender dysphoria do not have a DSD. Among those with DSDs, approximately 5% experience identity changes (Kreukels et al., 2018). As noted in the Cass Review, “Studies of children with DSD suggest that a complex interplay between testosterone levels, external genitalia, sex of rearing and socio-cultural environment all play a part in eventual gender identity” (Cass, 2024a, p. 102).

### 7.1.1 Overview of normal pubertal development

In mammals, puberty is defined as the period of time during which immature juveniles reach adult sexual maturity and become capable of reproduction. It is a transitional phase between childhood and adulthood. In humans, pubertal onset typically occurs between ages eight and 13 in females and nine and 14 in males. It is driven by increasing levels of sex steroid hormones—primarily estrogen and progesterone in females, and testosterone in males.[4]

During puberty, sex steroid hormones promote skeletal growth, muscular development, and neurologic development. In females, estrogen initiates breast development, menarche, ovulation, and changes in body composition and skeletal morphology.[5] In males, the androgenic surge results in testicular enlargement, penile growth, spermatogenesis, deepening of the voice, and the emergence of secondary sexual characteristics such as facial and body hair. Spermatogenesis in males and ovulatory cycles in females mark the attainment of fertility.

### 7.1.2 Tanner Stages of puberty

Physicians use a system known as Tanner Staging to document the physical progression of puberty based on a physical examination.[6] This framework delineates five stages of maturation, from a prepubertal baseline (Stage 1) to full adult development (Stage 5). Intermediate stages capture transitional morphological and physiological characteristics.

In females, Tanner Stage 2 commences with the growth of breast tissue (thelarche), followed by hair growth (pubarche), and then the first period (menarche), typically by Tanner Stage 3 or 4. Menarche typically occurs one to two years after thelarche, at an average age of 12-13 years. The first egg release (ovulation) generally occurs within the first year following menarche, typically at Tanner Stage 4. Ovulatory function stabilizes approximately one year after menarche. Female pubertal development is accompanied by bone growth, body hair growth, widening of the hips, redistribution of fat to the hips

[4] Breehl & Caban (2025).
[5] Kuohung & Hornstein (2024).
[6] Tanner (1962).

and breasts, and enlargement of both internal reproductive organs (uterus, ovaries) and external genitalia (labia, clitoris).[7]

In males, the initiation of Tanner Stage 2 is typically identified by increased testicular volume, followed by growth of the penis, emergence of pubic and later facial hair, and a rapid increase in lean body mass and skeletal size driven by androgens. There are significant increases in bone and muscle mass and thickening and elongation of the vocal cords results in voice deepening. First ejaculations (spermarche) generally occur about one year after the onset of puberty, with full gamete maturation following approximately one year later.[8] Spermatogenesis generally occurs during Tanner Stage 4.[9]

### 7.1.3 Neuroendocrine regulation of puberty

Puberty is initiated and sustained by complex endocrine signaling. In the brain, the anterior pituitary, in response to pulsatile gonadotropin-releasing hormone (GnRH) release from the hypothalamus, secretes luteinizing hormone (LH) and follicle-stimulating hormone (FSH). Collectively termed gonadotropins, LH and FSH act on the gonads (ovaries and testes) to stimulate the synthesis of sex steroids and promote gametogenesis.[10]

## 7.2 Puberty blockers and central precocious puberty

In central precocious puberty (CPP)—a condition occurring in one out of 5,000 to one out of 10,000 children, more often in girls[11]—the pituitary gland is activated prematurely, sometimes even during infancy or early childhood.[12] This leads to early-onset, or precocious, pubertal development. CPP is associated with several potential negative

[7] Breehl & Caban (2025).
[8] Breehl & Caban (2025); Kota & Ejaz (2023).
[9] Emmanuel & Bokor (2022).
[10] In males, LH stimulates Leydig cells to produce testosterone while FSH targets Sertoli cells to facilitate spermatogenesis. In females, LH and FSH coordinate estrogen production and follicular development in the ovaries.
[11] Eugster (2019). Although there are some genetic causes of CPP, it is usually idiopathic, meaning the cause is unclear. Females are generally treated for CPP with PBs if puberty occurs at age six or younger, males are generally treated if puberty occurs at age eight or younger (Ergun-Longmire et al., 2023).
[12] E.g., Nienaber & Van Der Walt (1991); Yoon & Kim (2016).

health outcomes, including decreased adult height due to early presence of sex hormones causing premature epiphyseal fusion.

GnRHa (puberty blockers or PBs) have been approved by the Food and Drug Administration (FDA) for use in the treatment of CPP. The evidence to date comparing large populations of untreated patients to treated patients suggests that, at least for appropriately chosen female patients, treatment of CPP with PBs is associated with increased height attainment and lower body mass index (BMI).[13]

When PBs are used for CPP, the medication is discontinued when the child reaches a more typical age for pubertal onset, allowing normal puberty to resume. The goals include facilitating normal timing of puberty, so that the patient goes through puberty alongside peers (as opposed to significantly before). Although FDA-approved for this indication, PBs—like all medications—are associated with risks and side effects, even when used for CPP.

## 7.3 Puberty blockers and gender dysphoria

The use of PBs to arrest normally timed puberty is the central element and original contribution of the Dutch Protocol. PBs act directly on the pituitary gland to significantly reduce the release of LH and FSH. Continuous administration of these agents desensitizes GnRH receptors, suppressing LH and FSH secretion, and consequently arresting the production of endogenous sex steroid hormones. In females, this causes the cessation of normal menstrual function, if it has begun. In males, sperm production is halted or forestalled. PBs have not been approved by the FDA for the indication of gender dysphoria (GD); they are used “off-label” in pediatric gender medicine (PGM).[14] Unlike in CPP, use of PBs for PMT is not FDA-approved and safety data are lacking.

Using PBs to stop normally timed puberty effectively induces hypogonadotropic hypogonadism (HH), a condition characterized by the failure of the pituitary to

---

[13] Luo et al. (2021).

[14] GnRHas have been approved by the U.S. Food and Drug Administration (FDA) for various indications, with effects that can differ significantly depending on their application. For instance, the GnRHa leuprolide (commonly marketed as Lupron) is FDA-approved for androgen deprivation therapy in adult males with prostate cancer and for estrogen deprivation in adult females with endometriosis. It has also been FDA-approved to treat central precocious puberty (CPP).

appropriately release gonadotropins. As a result, the gonads are unable to produce the sex-specific hormones testosterone or estrogen. Pubertal development is disrupted, halting the progression of physical and reproductive maturity. Left untreated, clinical research shows HH is associated with a range of risks including infertility and decreased bone mineral density, elevating the risk of osteoporosis and fractures.[15]

Although PBs for GD are typically indicated for short-term use (about two years), this time range may be considerably longer for some patients.[16] The reasons for the apparent deviation from the original Dutch Protocol in regard to the length of PB use remain unstudied, but may include increasingly younger social transition ages which 'necessitate' pubertal blockade at increasingly younger ages to allow young patients to continue living in "stealth,"[17] as well as the medical treatment of youth who identify as nonbinary and wish to maintain a sex-ambiguous appearance for an extended period of time.[18]

### 7.3.1 Developmental risks of blocking normal puberty

One of the key rationales for using PBs in CPP is to allow the child to experience normative psychosocial development alongside same-age peers. By contrast, in PMT, patients are maintained in a prepubertal or early pubertal stage while their peers developmentally progress. This has potential sequelae for the adolescent's psychosocial development.[19]

### 7.3.2 Bone mineral density and skeletal development

Puberty is recognized as providing a critical window for the accrual of peak bone mass. Sex steroid hormones play an essential role in the mineralization of the skeleton.[20] Failure to reach peak bone density may lead to increased risk of osteopenia,

[15] Zhu & Chan (2015).
[16] A Cambridge Health Alliance fact sheet, for example, discusses using puberty blockers for up to four years (Cambridge Health Alliance, n.d.).
[17] The Cass Review's qualitative research program found that for prepubertal children who underwent full social transition "living in stealth appears to increase a child's level of stress and anxiety with resultant behaviour and mental health problems. These included social withdrawal, with children becoming increasingly isolated, including resorting to home-schooling or tutoring and even rarely leaving their house" (Cass, 2024a, p.159).
[18] Notini et al. (2020).
[19] This is noted in Vrouenraets et al. (2022), for example.
[20] Elhakeem et al. (2019).

osteoporosis, and fractures later in life, including debilitating fractures of the spine and hip. In older adults, hip fractures are particularly concerning, as they significantly elevate the risks of morbidity and mortality.[21]

Because of the known physiological role of sex steroid hormones in skeletal development, the original Dutch research acknowledged the possibility of negative effect on bone mineralization. Researchers measured ‘Z-scores,’ a measure comparing individual bone density to age- and sex-matched population norms, and these scores decreased after PBs in the original Dutch cohort.[22] Since then, multiple longitudinal, observational studies on pediatric patients undergoing medical transition have consistently demonstrated decreases in Z-scores with PB use.[23] In addition to decreases in the *average* scores, a re-analysis of the United Kingdom (U.K.) data found that one third of the puberty-blocked patients had a Z-score of below -2 (indicating osteoporosis) for hip, and more than one quarter of patients had low Z-scores for spine.[24] Fracture rates have not been reported alongside Z-scores in this literature.[25]

When PBs are followed by CSH, as has occurred in studies over 90% of the time, bone mineralization will increase, but a critical developmental window for bone density accrual during adolescence may have been missed or foreshortened, as bone density accrual slows during the 20s and then begins to decline. These patients may never reach the peak bone density they otherwise would have achieved. Research on medium and long-term outcomes is limited.[26] Due to the novel nature of PMT, no studies have yet followed patients into middle age or late adulthood.

### 7.3.3 Neurocognitive and psychosocial development

The human brain undergoes substantial reorganization during adolescence, including synaptic pruning and myelination, processes that are influenced by sex steroid

[21] Bentler et al. (2009).
[22] Delemarre-van de Waal & Cohen-Kettenis (2006).
[23] E.g., Boogers et al. (2023); Carmichael et al. (2021); Ciancia et al. (2024); Delemarre-van de Waal & Cohen-Kettenis (2006); Joseph et al. (2019); Klink et al. (2015); Navabi et al. (2021); Schagen et al. (2020); Stoffers et al. (2019); Van der Loos, Vlot et al. (2023); Vlot et al. (2017).
[24] Biggs (2021).
[25] E.g., Roy et al. (2024).
[26] Two longer-term studies (Schagen et al., 2020; van der Loos, Vlot et al., 2023) found Z-scores returned to pre-treatment baseline after 3-11 years of subsequent CSH treatment in females, but not in males.

hormones. Research suggests that sex steroid hormones impact brain regions associated with executive function, emotion regulation, and social cognition.[27] The precise neurocognitive effects of puberty suppression remain understudied,[28] and researchers in this field have recognized the limitations of the evidence in this area.[29] A recent literature review concluded that the effect of PBs on neurocognitive development is unknown, but that "there is some evidence of a detrimental impact of pubertal suppression on IQ [intelligence quotient] in children."[30] However, a 2022 Dutch study found that in patients treated with PBs the associations between pretreatment IQ and eventual education achievement were similar to population norms (the study did not longitudinally measure IQ).[31] The Cass Review has raised concern over the potential harm and unknown effects of pubertal suppression on the developing brain,[32] noting that "[t]here is increasing evidence that the changes in brain maturation described above are driven by a combination of chronological age and sex hormones released through puberty."[33]

### 7.3.4 Reproductive maturation

By halting the development of sex characteristics, PBs interrupt the maturation of reproductive anatomy and function. Suppression of the HPG axis can impair gametogenesis, potentially resulting in permanent infertility if CSH are started thereafter, particularly when gonadal maturation is not completed prior to the interruption of normally-timed puberty.

In adult males initiating estrogen for medical transition, testicular atrophy results, leading to impaired fertility or infertility that may be irreversible (even if estrogen were to

---

[27] Cservenka et al. (2015); Gonnabathula & Yakubu (2023); Macoveanu et al. (2016); Pillerová et al. (2022).
[28] One cross-sectional study (which cannot methodologically suggest causation) found poor executive functioning in patients taking PBs >1 year, but their baseline functioning before PBs was unknown (Strang et al., 2022). Another cross-sectional study reported similar executive functioning between patients on PBs and patients not on PBs (Staphorsius et al., 2015). Arnoldussen et al. (2022), another study, is discussed in the text.
[29] Chen et al. (2020).
[30] Baxendale (2024).
[31] Arnoldussen et al. (2022).
[32] Cass (2024a, p. 115).
[33] Cass (2024b, p. 104).

be discontinued).[34] However, adult males may choose to cryopreserve sperm prior to initiation of estrogen. This is not the case with children or early adolescents.[35] Spermatogenesis generally occurs in Tanner Stage 4 of puberty.[36] In PMT, if PBs are started in Tanner Stage 2, prior to gamete maturation, and estrogen is started thereafter (as is likely), cryopreservation of sperm cannot be completed beforehand.[37] Additionally, fertility may be affected in females initiated on PBs who proceed to take testosterone.[38] Effect of testosterone on the reproductive tract makes the likelihood of conception, pregnancy, and birth uncertain.[39] Maternal and fetal outcomes under these circumstances are also poorly studied.

It is possible that CSH use after pubertal arrest could permanently damage the immature gonadal tissues, leading to sterilization.[40] If the gonads are arrested in an immature state due to prolonged use of PBs, and this is followed by administration of CSH, there is no proven physiological mechanism by which fertility can reliably be re-established. The likelihood of permanent infertility will be substantially increased.[41,42]

With respect to fertility preservation (FP), techniques can range from relatively simple to technically challenging to not currently viable, depending on the patient's sex and Tanner Stage of development. For example, males who have undergone spermarche can produce a semen sample for long-term storage. However, males who have puberty

---

[34] Cheng et al. (2019); Deutsch (2020a).
[35] Fertility preservation for natal males in early puberty remains a theoretical and experimental undertaking, with no clinically validated protocol currently available (Laidlaw et al., 2025).
[36] See above, Section 7.1.2.
[37] The original Dutch research acknowledged that infertility would result for males initiated on PBs in Tanner Stage 2 and on estrogen thereafter: "In early pubertal boys, the hypogonadotrophic state will block the development of fertility" (Delemarre van de Waal & Cohen-Kettenis, 2006, p. S134).
[38] Cheng et al. (2019). Although pregnancies can occur in adult females taking testosterone, less is known about pregnancy in females who underwent PMT in childhood/adolescence.
[39] Laidlaw et al. (2025).
[40] See the subsequent section for specific effects of CSH.
[41] It should be noted that PBs for CPP does not negatively impact fertility. In pediatric medical transition, because PBs are generally the first part of a continuum including CSH, infertility is a likely result of treatment (depending on sex and Tanner Stage of patient).
[42] There is controversy regarding minors' capacity to provide informed consent to potential loss of fertility with respect to PMT. E.g., "Can these minors make adequately autonomous decisions in the present that may impact their opportunities in the future? This is less a question of decision-making capacity…than a matter of sufficient life experience to know their future desires … How to maintain an "open future" for transgender youth is a common concern of parents and healthcare professionals" (Harris et al., 2020, p. 2459). See also Jorgensen & Masson (2024). In a study of patients in their early 30's who had begun hormonal interventions at age 15, 23% expressed regret about infertility (de Nie et al., 2024).

blocked at Tanner Stage 2 will have immature testicles; FP necessitates testicular tissue cryopreservation, which currently remains entirely experimental.[43] For the mature female patient, oocyte preservation involves an invasive procedure (and is costly). For females in early Tanner Stages, techniques such as ovarian tissue cryopreservation, although technically possible,[44] have yet to be shown to result in viable pregnancies in patients who have undergone PMT.

Most studies on fertility preservation in adolescents with GD undergoing PMT have shown very low rates of FP, between 0% and 4.7% of patients.[45] One study in which male patients were able to access fertility preservation via testicular biopsy reported that 10 out of 23 patients (43%) were able to have gametes cryopreserved prior to PB initiation (Tanner Stages were not reported).[46]

### 7.3.5 Risks of sexual dysfunction

Concerns have been raised about the potential consequences of PMT on sexual function, particularly with respect to development of the capacity for sexual desire, arousal, and orgasm (phases of the sexual response cycle). The Tanner Stage (see Section 7.1.2) in which PBs are initiated is an important consideration:

> ... the extent to which individuals have experienced endogenous puberty could influence later sexual functioning. [PBs] inhibit sex steroid exposure of genitalia, which are highly sensitive to androgens during the typical pubertal timeframe ... Interference through [PBs] affects genital growth and development during a possibly critical period, with potential effects on subsequent sexual function.[47]

In females undergoing PMT, suppression of sex hormones with PBs may impede growth of genitalia,[48] and may also result in decreased blood flow to the clitoris and decreased sensation (as occurs in post-menopausal women).[49] In males undergoing PMT, suppression of sex hormones with PBs arrests genital development. As most males

[43] Klipstein et al. (2020).
[44] Practice Committee of the American Society for Reproductive Medicine (2019).
[45] Chen et al. (2017); Chiniara et al. (2019); de Nie et al. (2024); Nahata et al. (2017).
[46] Pang, Peri et al. (2020).
[47] van der Meulen, Arnoldussen et al. (2025, p. 1494).
[48] van der Meulen, Arnoldussen et al. (2025).
[49] See Section 7.5.1.

proceed to estrogen after PBs, the ongoing androgen deprivation (which is expected to be lifelong) may have ramifications for development of sensation in the genitals, as well as for capacity to experience sexual desire and/or arousal.

In 2021, Marci Bowers—a leading vaginoplasty surgeon and then-president-elect of the World Professional Association for Transgender Health (WPATH)—voiced concerns that male patients who commenced PBs at Tanner Stage 2 and subsequently received CSH were physiologically anorgasmic, prior to and following vaginoplasty surgery.

Many of these patients reported no history of genital sexual sensation before undergoing vaginoplasty. After vaginoplasty, the constructed clitoris provided no meaningful tactile or erogenous response. Bowers suggested that this issue had not been adequately addressed in discussions of informed consent for youth undergoing puberty suppression.[50]

Despite these concerning clinical observations, there is a striking paucity of research on sexual function outcomes in this population.[51] The potential for anorgasmia and sensory

---

[50] Shrier (2021b). It has been questioned "whether even highly intelligent children who have not had sexual experiences can meaningfully comprehend the loss of future sexual function and reproductive abilities" (Levine et al., 2022a, p. 720).

[51] Two Dutch studies have published data from one small patient cohort: Bungener et al. (2020); van der Meulen, Bungener et al. (2025). Although the researchers found that for the males, sexual function outcomes after vaginoplasty were similar regardless of which Tanner Stage of puberty PBs had been started in, experts pointed out that the small study was methodologically limited due to sample size (therefore unable to reliably compare different subgroups) and that the patients frequently reported serious sexual difficulties/dysfunction (orgasm difficulties, pain, shame about genitalia) (Clayton et al., 2025). A subsequent article (van der Meulen, Arnoldussen et al., 2025) assessed an overlapping cohort from the Amsterdam clinic at an older age (around 29). Although the claimed findings were positive—the timing of puberty suppression did not affect sexual function—the sample included only 20 males, for whom the nonresponse rate was 68%. The study had many other methodological limitations (e.g. related to small sample size and lack of statistical power, absence of separate analysis of subgroup blocked at Tanner Stage 2, misleading comparisons to population-level sexual dysfunction rates) (Society for Evidence-Based Gender Medicine, 2025). These three studies of overlapping patient cohorts comprise the entirety of the peer-reviewed longitudinal clinical research on sexual function outcomes after PMT. Although van der Meulen, Arnoldussen et al. (2025) hypothesized, based on evidence from physiology of sexual development, that "[patients] treated with [PBs] in early puberty will report lower rates of sexual satisfaction and more sexual dysfunctions than those treated with [PBs later in puberty] or started [on CSH] in adulthood," the authors then *rejected* this hypothesis ("... in contrast to what is hypothesized ... suppressing endogenous puberty early does not seem to result in an increased risk of sexual dysfunctions") even though the study was underpowered and the between-group comparisons did not meet the threshold for statistical significance. Hypothesis rejection in this setting is inconsistent with research norms.

dysfunction merits serious consideration, especially given the irreversible nature of some interventions and the centrality of sexual health to overall quality of life.

There is also a lack of published research regarding sexual function outcomes in females who underwent PMT with PBs followed by CSH.[52]

## 7.4 Cross-sex hormones and gender dysphoria

Testosterone for females and estrogen for males are routinely used in PGM to induce changes in the secondary sex characteristics that resemble those typical of the opposite sex. In males, estrogen is frequently used alongside a testosterone blocker or PB to enhance estrogen's effects.

### 7.4.1 Physical effects of cross-sex hormones

As described above, puberty involves the maturation of primary sex characteristics—the male and female genitalia—and the entire reproductive system, enabling the production of mature gametes: sperm in males and ova in females. The ES guidelines for PMT describe titration of testosterone for females and estrogen for males as the "Induction of Puberty," a term that is misleading.[53] Under the influence of high doses of testosterone, females may develop facial and body hair, cystic acne, male pattern scalp hair distribution, clitoral growth, changes in musculature, thickening of vocal cords leading to voice deepening, and alterations in fat deposition. Similarly, males receiving high doses of estrogen may experience significant breast tissue growth (gynecomastia), reduced muscle mass, change in skin texture, and may develop a more typically female pattern of fat distribution. These physical changes reflect the body's response to unusually high levels of sex steroids, not actual opposite-sex pubertal development. In fact, development of reproductive capacity—definitionally, the purpose of puberty—may be hindered. The physiological end point of puberty—sexual maturation that makes possible reproduction—is not and cannot be obtained via PMT.

[52] Two of the above-cited methodologically limited studies (Bungener et al., 2020; van der Meulen, Arnoldussen et al., 2025) also reported outcomes for female patients.
[53] Hembree et al. (2017, p. 3884), for example. See also Coleman et al. (2022, p. S115), and Chapter 2.

### 7.4.2 Dosing of cross-sex hormones

In WPATH and ES guidelines, the principal goal of CSH administration is to induce physical characteristics typical of the opposite sex. When hormone levels rise beyond the typical reference range for a person's sex, they are considered supraphysiologic. ES guidelines suggest that the sex an individual identifies as—as opposed to their biological sex—should determine the target reference range for hormonal concentrations.[54] Critics have argued that perceived identity does not alter physiological processes and that such a belief can result in inappropriate and potentially dangerous hormone dosing.[55]

### 7.4.3 Hyperandrogenism in females

Hyperandrogenism refers to the condition of abnormally elevated androgen levels—most commonly testosterone—in the bloodstream. Among adult females, typical serum testosterone levels range between 10–55 ng/dL.[56] In certain pathological conditions, testosterone may rise well above this range.

ES guidelines for cross-sex hormone administration in females recommend testosterone between 320–1000 ng/dL, comparable to, or exceeding levels found in endocrine disorders.[57] These concentrations represent a six to 100-fold increase above physiologic norms for females, inducing hyperandrogenism. Hyperandrogenism is also associated with health risks, discussed below.

### 7.4.4 Hyperestrogenemia in males

Hyperestrogenemia is defined as elevated blood levels of estrogens, such as estradiol, above the normal physiological range. In males, a standard reference range for total estrogen is approximately 56–213 pg/mL.[58] Certain disease states are known to cause

---

[54] Rosenthal et al. (2019).
[55] Laidlaw et al. (2021).
[56] Labcorp (2025b). There is variability in laboratory reference ranges for testosterone (as well as for estrogen; see Section 7.4.4 below).
[57] Hembree et al. (2017).
[58] Labcorp (2024).

excess estrogen. For instance, some adrenal tumors can elevate estrogen levels by a factor of three to ten.[59]

In PMT, supraphysiologic estrogen levels are intentionally induced through the off-label use of high doses of estrogen. ES guidelines advise titration of estradiol to levels between three and 25 times higher than the typical male range to induce the development of female-typical secondary sex characteristics such as breast tissue.[60]

### 7.4.5 Effects of testosterone on the female reproductive system

Testosterone use causes histopathological changes in the female reproductive tract.[61] Given the potential—though not well-defined—risk of cancer in the female reproductive tract, ES guidelines recommend that "health care providers should determine the medical necessity of a laparoscopic total hysterectomy as part of a gender-affirming surgery to prevent reproductive tract cancer."[62] WPATH's clinical practice guideline[63] has not adopted the same recommendation, but there is limited reliable evidence regarding the long-term cancer risks associated with testosterone use in the female reproductive tract. Testosterone can cause reproductive organ atrophy, including thinning and atrophy of vaginal epithelium,[64] persistent pelvic pain and discomfort,[65] and pelvic floor dysfunction.[66]

---

[59] Cavlan et al. (2010).
[60] Based on adult male estradiol reference range 8-35 pg/mL (Labcorp, 2025a). ES guidelines: Hembree et al. (2017).
[61] A review of 11 histopathologic studies of resected ovaries found that 34.9% exhibited polycystic-appearing ovaries, and 0.7% had benign ovarian neoplasms (Toland et al., 2023). In another study of females aged 18-56, 57% of 35 ovariectomy cases showed multiple bilateral cystic follicles, and 80% of 40 uterine resections displayed endometrial stromal fibrosis. Abnormal tissue growth was also noted in the vagina and cervix following hysterectomy and vaginectomy. The most common findings included transitional cell metaplasia and the development of prostatic-type glands (Lin et al., 2022). A separate study found that 100% of vaginectomy specimens contained abnormal prostatic tissue growth (Xu et al., 2022).
[62] Hembree et al. (2017).
[63] Coleman et al. (2022).
[64] In 2020, a whistleblower from Washington University in St. Louis clinic described a case in which a female minor taking testosterone called the clinic due to vaginal bleeding: "In less than an hour she had soaked through an extra heavy pad, her jeans, and a towel she had wrapped around her waist … We found out later this girl had had intercourse, and because testosterone thins the vaginal tissues, her vaginal canal had ripped open. She had to be sedated and given surgery to repair the damage" (Reed, 2023a). Reportedly, multiple patients at this clinic had problems with vaginal lacerations.
[65] Patients have sought hysterectomies due to these symptoms; e.g., Zwickl et al. (2023).
[66] Da Silva et al. (2024); Tordoff et al. (2023); Zwickl et al. (2023).

### 7.4.6 Effects of estrogen on the male reproductive system

Testicles have two primary functions: producing testosterone and generating sperm capable of fertilizing an ovum. The use of estrogen in accordance with the ES and WPATH guidelines results in impairment of normal testosterone production and significant abnormal histologic changes to the male reproductive system.[67] These findings point to widespread structural reconfiguration of testicular tissue in response to prolonged exposure to the high levels of estrogen used in medical transition.

### 7.4.7 Cardiovascular and metabolic risks

Among the most significant long-term risks associated with CSH is an increase in cardiovascular risk factors. A 2018 review found that patients taking CSH had an elevated risk of heart attack and CV mortality compared to controls.[68]

Several studies and reviews have found increased risk of CV events like heart attacks and strokes in females taking testosterone.[69] This is thought to result from testosterone's effects on underlying metabolic factors related to CV risk. In females, testosterone can cause elevated blood pressure, polycythemia, and atherogenic

---

[67] In one study of 99 testicle specimens, Leydig cells (crucial for producing testosterone) were completely absent or extremely diminished in 80% of cases. There was a significant average decrease in the diameter of the seminiferous tubules (site of spermatogenesis) when compared with controls, with 82% showing peritubular fibrosis, which interferes with tubular function (Matoso et al., 2018). In another study, 74% of specimens had abnormal basement membrane thickening (Riva-Morales et al., 2025). This mimics findings seen in conditions like cryptorchidism (undescended testes), which are associated with infertility (Mittal et al., 2017). In one of the abovementioned studies, all 125 testicular specimens showed atrophic changes and decreased spermatogenesis, with 71.2% having no sperm production at all (Riva-Morales et al., 2025). In another study, 80% of testicular tissue samples from males on estrogen showed maturation arrest, meaning that although the early stages of the sperm development may have begun, maturation to fully functioning spermatozoan did not occur (Matoso et al., 2018). These findings point to widespread structural reconfiguration of testicular tissue in response to prolonged exposure to high levels of estrogen used in medical transition. Other structures affected by estrogen (and/or androgen deprivation) include the epididymis, rete testes, and prostate (Crowley et al., 2023; Matoso et al., 2018). A long-term analysis involving 86 patients who underwent orchiectomies after a median duration of 7.5 years on estrogen therapy found a clear correlation between the length of hormonal treatment and the degree of tissue abnormality (Marins et al., 2024). This study discussed "[c]ompromise in integrity of blood-testis-barrier with *increased vulnerability to cytotoxic and immune damage*; impaired adhesion with premature detachment of spermatids from Sertoli cells, causing altered shaping in spermatids; germ cells phagocitation" as theoretical mechanisms of impaired spermatogenesis (emphasis added).
[68] Irwig (2018).
[69] E.g., Nota et al. (2019), van Zijverden et al. (2025). A systematic review found moderate and high certainty evidence of some incidence of cardiovascular events in young females under 26 years old (Miroshnychenko, Ibrahim et al., 2025).

changes in the lipid profile.[70] Longitudinal studies of PMT have reported increases in BMI (and/or fat mass) after initiation of CSH[71] and PBs.[72] Atherogenic changes to the lipid profile have also been reported.[73]

With respect to polycythemia, elevated hematocrit levels are known to increase blood viscosity, raising the risk of thromboembolic and CV complications. Among females, even modest elevations in hematocrit levels have been independently associated with heightened risks of CV disease, coronary events, and CV-related mortality.[74]

In males taking estrogen, studies have shown increased risk of CV events like venous thromboembolism and stroke.[75] One recent study found that, after adjusting for socioeconomic status, there was a decreased risk of heart attacks, although the risk of venous thromboembolism remained elevated.[76]

### 7.4.8 Other risks associated with cross-sex hormones

In both sexes, CSH use may be associated with early mortality.[77] In females taking testosterone, breast tissue undergoes structural remodeling, often with increased fibrous connective tissue and decreased glandular volume.[78] There is also some concern about possible increased risk of breast and ovarian cancer.[79] In males, some studies suggest that estrogen may increase risk of developing multiple sclerosis[80] and

---

[70] Glintborg et al. (2024); Safer & Tangpricha (2019).
[71] Boogers et al. (2024); Jarin et al. (2017); Klaver et al. (2018, 2020).
[72] Carmichael et al. (2021); Ciancia et al. (2024); Delemarre-van de Waal & Cohen-Kettenis (2006); Fisher et al. (2024).
[73] Klaver et al. (2020); Olson-Kennedy, Okonta, et al. (2018). Millington et al. (2021) found atherogenic changes only in females, not in males.
[74] Gagnon et al. (1994). In a longitudinal cohort study of 1,073 adult females taking testosterone (Madsen et al., 2021), approximately 24% of participants developed hematocrit values ≥50%, a threshold commonly used to define severe erythrocytosis. While the study did not report prevalence in the intermediate range (hematocrit levels between 45% and 50%) it is reasonable to infer that a similar or greater proportion of individuals would fall within this bracket.
[75] Nota et al. (2019) reported a nearly five-fold (4.6x) elevation in risk of venous thromboembolism, and Getahun et al. (2018) reported a nearly ten-fold (9.9x) elevation in risk of stroke. van Zijverden et al. (2025) reported that after adjusting for socioeconomic status (estimated by education, employment, and income) there was a nearly two-fold (1.8x) elevation in risk of venous thromboembolism, but (in contrast to the other studies) no elevation in risk of stroke.
[76] van Zijverden et al. (2025) reported a two-fold decrease (1.5x) in risk of heart attacks after adjusting for socioeconomic status.
[77] C. J. de Blok et al. (2021).
[78] Grynberg et al. (2010).
[79] Hembree et al. (2017).
[80] Papkoor et al. (2016); White et al. (2022).

thyroid cancer,[81] and that it may lead to a decrease in brain volume.[82] However, research in these areas is still preliminary. While breast cancer is uncommon in natal males, data suggest that high-dose estrogen therapy increases this risk.[83] Other effects of estrogen may include diminished libido, erectile dysfunction, and loss of spontaneous erections.[84]

## 7.5 Surgery and gender dysphoria

WPATH provides an extensive list of surgeries it considers appropriate treatments for GD.[85] All surgeries carry risks,[86] some of which are amplified when surgery follows PBs and CSH. Further, surgeries to remove healthy and functioning organs introduce a unique set of iatrogenic harms not encountered in other areas of medicine. An example is mastectomy performed as part of PMT, which results in an inability to breastfeed and potential loss of nipple sensation.[87]

### 7.5.1 Surgical problems related to early pubertal blockade

Males who initiate PBs at Tanner Stage 2 and then proceed to estrogen have narrowed options for future genital surgery, should this be desired. PBs arrest development of male genitalia. If PBs are started in Tanner Stage 2 and estrogen is started some time thereafter, the male genitalia will never develop beyond the prepubertal or early-pubertal state. For patients who proceed with vaginoplasty later in life, this may foreclose the

[81] Derwahl & Nicula (2014).
[82] Pol et al. (2006); Seiger et al. (2016); Zubiaurre-Elorza et al. (2014).
[83] C. J. M. de Blok et al. (2019).
[84] Hembree et al. (2017). Of note, some or all of these effects on sexual function (diminished erections, for example) may be desired by certain patients.
[85] According to WPATH's SOC-8, even highly unusual surgeries such as non-binary mastectomies (where female breasts are reshaped to resemble gynecomastia in males), penis-preserving vaginoplasty, and vagina-preserving phalloplasty (to provide patients with both sets of genitals), and genital nullification procedures (involving genital removal) are considered medically-necessary procedures for some patients. Only phalloplasty for females has a minimum recommended age of 18 (Coleman et al., 2022). In 2024, a Canadian patient successfully sued a provincial health insurer, who had declined to cover "penile-preserving vaginoplasty" surgery, considering it experimental. Media coverage noted that "…the court decided that [this] procedure…[was] consistent with the World Professional Association for Transgender Health (WPATH) Standards of Care, the leading authority on gender-affirming medical and surgical care, especially as it recommends individualized treatment plans" (Arsenych, 2024).
[86] E.g., bleeding, infection, scarring, and risks related to anesthesia.
[87] A mastectomy removes the mammary glands together with the ducts that transfer milk from them to the nipple. Loss of nipple sensation is invariably mentioned by surgeons performing "top surgery" as a potential side effect, although there is very low certainty evidence about the magnitude of the risk in adolescents and young adults (Miroshnychenko et al., 2025).

surgical option of penile inversion vaginoplasty due to lack of sufficient genital tissue for this procedure. This issue was recognized in the original Dutch papers,[88] but over subsequent decades almost no research has been published on this topic. A single Dutch study found greatly increased odds of receiving intestinal vaginoplasty (compared to penile inversion) in male patients with history of pubertal blockade.[89] Intestinal vaginoplasty is a more technically complex and risky procedure.[90] One notable and tragic case involved a member of the original Dutch Protocol research cohort who died from necrotizing fasciitis at age 18 following an intestinal vaginoplasty conducted because of inadequate genital tissue.[91]

## 7.6 Other risks associated with hormonal interventions or surgeries

The use of endocrine interventions affects multiple organ systems beyond the reproductive tract. In addition, there are psychological risks associated with PMT.

### 7.6.1 Adverse psychiatric effects

The FDA-mandated labeling for testosterone cautions about abuse potential, noting: "Testosterone has been subject to abuse, typically at doses higher than recommended for the approved indication ... Anabolic androgenic steroid abuse can lead to serious cardiovascular and psychiatric adverse reactions."[92] These effects have been reported in males and females, including adolescents.

Research on anabolic steroid misuse has demonstrated associations with severe psychiatric problems, including mood instability, psychosis,[93] and dependence.[94] The most frequently observed symptoms include irritability, aggression, euphoria, inflated self-perception, impulsivity, and risk-taking behaviors. Additional manifestations may include acute psychotic episodes, worsening of tic disorders or depression, and

[88] Delemarre-van de Waal & Cohen-Kettenis (2006).
[89] van de Grift et al. (2020).
[90] Lee et al. (2023).
[91] Negenborn et al. (2017).
[92] Actavis Pharma, Inc. (2018).
[93] R. C. W. Hall et al. (2005).
[94] Skauen et al. (2023).

delirium-like states. One study assessing medium (300–1000 mg/week) and high (>1000 mg/week) anabolic steroid use in men found that 23% of users met diagnostic criteria for a major mood disorder, including mania, hypomania, or depression, while 3.4-12% developed psychotic features.[95]

In an analysis of the FDA's Event Reporting System (FAERS) database for people using CSH for medical transition, 88% of adverse drug reactions were classified as serious.[96] Without an idea of denominators, individual risks are not possible to quantify. Among the 83 reports regarding females using testosterone, 87.8% of the events were deemed serious, with two reported deaths (2.4%) and 25 hospitalizations (30.5%).[97] Reported psychological harms included anxiety, depression, mood swings, suicidal ideation and behavior, aggression, dissociation, and self-harm. More extreme symptoms, such as antisocial behavior and homicidal ideation, were also documented.[98] It is unknown whether these patients had testosterone levels between 320 to 1000 ng/dL (the range recommended by the Endocrine Society for females undergoing medical transition), or levels outside of this range. What is known is that the patients were female, were categorized as having a "transgender" related treatment indication, presented with psychiatric problems, and were on testosterone.[99] Although it is not possible to determine causation from FAERS data, this underscores the importance of considering adverse psychiatric events as a potential risk in female patients initiating testosterone for medical transition.

A separate study from Sweden found an elevated rate of criminal convictions in natal females who had taken testosterone and undergone gender-transition surgery, compared to age-matched controls. This study also found that adults who had undergone medical and surgical transition had 19 times the rate of suicide deaths and nearly three times the rate of all-cause mortality and inpatient psychiatric care compared to age and sex-matched controls.[100] Elevated suicide rates (compared to the

---

[95] R. C. W. Hall et al. (2005).
[96] Gomez-Lumbreras & Villa-Zapata (2024).
[97] Laidlaw & Jorgensen (2024).
[98] Laidlaw & Jorgensen (2024).
[99] See Gomez-Lumbreras & Villa-Zapata (2024), Table 2.
[100] Dhejne et al. (2011).

general population) have also been reported in other studies.[101] As with FAERS data, it is impossible to determine causation, in part due to presence of confounders such as co-occurring mental health conditions.

#### 7.6.2 Detransition and regret

In males, estrogen causes breast growth and infertility that may be irreversible even with cessation of CSH.[102] In females, irreversible virilizing effects of testosterone include face and body hair growth, deepening of the voice, clitoral growth, and male-pattern baldness.[103] Patients of any age may experience regret regarding the permanent physical and physiologic effects of CSH, regardless of how they identify. For example, stably transgender-identified patients may regret loss of fertility. Developing baldness, or chafing/discomfort caused by clitoromegaly, may lead a patient who identifies as a transgender man to regret taking testosterone. Such a patient, or (especially) a detransitioned female, may regret having had a mastectomy with the consequent loss of the ability to breastfeed.

If patients do detransition,[104] they may experience regret,[105] but some patients may integrate the physical changes into their self-concept and not experience regret.[106] Even

[101] C. J. de Blok et al. (2021) found that the standardized mortality ratio for suicide among transgender adults was 3.1 compared to the general population of the Netherlands. In Van Cauwenberg et al. (2021), five out of 177 adolescent patients died by suicide. All suicide deaths were in patients who had been started on CSH (Society for Evidence-Based Gender Medicine, 2024a). Biggs (2022) reported that four out of 15,032 patients referred to the U.K.'s pediatric gender medicine (PGM) clinic died by suicide over a ten-year period. Two of the suicides were in waitlisted patients (so probably not taking CSH). A recent U.S. study reported a suicide rate of two out of 315 patients taking CSH over a two-year period (Chen et al. 2023). See Section 4.3.4.
[102] Cheng et al. (2019); Deutsch (2020a).
[103] Deutsch (2020b).
[104] Detransition refers to reverting back to living as one's sex after having medically and/or surgically transitioned. For discussion of detransition as a phenomenon see Butler & Hutchinson (2020); Irwig (2022); MacKinnon, Expósito-Campos et al. (2023). For research based on survey data from detransitioners or their parents, see Bailey & Diaz (2023); Littman (2018), (2021); Vandenbussche (2022).
[105] Some detransitioners have described adverse experiences with CSH as well as regret; e.g., in a recent court case (DH v. Snyder Case: 21-15668, 07/07/2021, ID: 12164749, DktEntry: 22, n.d.) one patient described that testosterone "exacerbated her anxiety and depression" in addition to prompting increased aggression, risk-taking, and suicidal ideation (p. 22); another patient experiencing depression after several months of euphoria, (p. 24) and another described ongoing regret and distress due to a permanently deepened voice from testosterone and numb scars and absent breasts from mastectomy surgery (p. 18).
[106] MacKinnon et al. (2022).

proponents of PMT acknowledge that regret is a risk (e.g., the phrase “Some adolescents may regret the steps they have taken” in WPATH’s guidelines).[107]

This serious issue has been minimized with the claim that detransition and regret rates are vanishingly low. In fact, the detransition rate is unknown.[108] The ubiquitous claim that the detransition and regret rates are vanishingly low is unsupported by the evidence.[109] A U.K. population-based study not focused on minors found that about one-fifth of patients discontinued hormonal interventions within five years, with more than half of them reporting experiences of detransition and/or regret.[110] Reasons for detransition are complex[111] and can be related to external[112] or internal[113] factors. With respect to clinical research studies of children and adolescents, one study reported a 7.1% regret rate,[114] two found low rates of CSH discontinuation or reidentification with birth sex (<5%),[115] and one found a higher rate of CSH discontinuation (25%).[116]

## 7.7 Mortality risk

Four population-based cohort studies have found that transgender individuals appear to have higher mortality risk when compared to members of the general population of

[107] Coleman et al. (2022, p. S47).
[108] Cohn (2023).
[109] The detransition rate after PBs and CSH has been described as very low, but this is backed by little evidence. A few sources are frequently cited. One is an SR of surgery studies with limited (if any) relevance to PMT, which reported a regret rate of around 1% (Bustos et al., 2021). This SR had methodological problems, calculation errors, and included mostly studies of poor or moderate quality, many with follow-up times that were inadequate for capturing regret (Cohn, 2023; Expósito-Campos & D’Angelo, 2021). Additionally, there were issues with the ways included studies defined regret; in Wiepjes et al. (2018), for example, patients needed to report regret to their clinician and ask to start natal sex hormones. Another study was based on survey research of individuals who identified as transgender *at the time of survey completion*. Some respondents had detransitioned in the past (usually due to factors like stigma or other external difficulty) before re-identifying as transgender (Turban et al., 2021). A survey of surgeons found respondents had rarely been asked to perform reversals (Narayan et al., 2021); Cohn (2023) noted that these findings were hard to interpret because of “unclear follow-up time, loss to follow-up, and even measurement instrument (Were questions about regret routinely asked and was there a consistent definition of regret in use?)” (p. 1944). Another study of surgical regret partly quantified regret via request for surgical reversals (Jedrzejewski et al., 2023), which Cohn pointed out would have excluded patients who do not return to their surgeons.
[110] Boyd et al. (2022).
[111] MacKinnon, Gould et al. (2023).
[112] Turban et al. (2021).
[113] Littman (2021); Littman et al. (2024).
[114] Crabtree et al. (2024).
[115] Cavve et al. (2024); van der Loos et al. (2022).
[116] Roberts et al. (2022).

similar age and sex. In the U.S., private insurance data from 2011 to 2019 indicated that transgender persons were nearly twice as likely to die as age- and sex-matched controls.[117] A Dutch cohort study that included five decades of data found that compared to their natal sex peers, transgender people had an elevated standardized mortality ratio (higher risk of death).[118] A 2023 cohort study from the U.K. found that compared to their natal sex peers, transgender people had higher risk of mortality (34 % higher for females, 60% higher for males).[119] Finally, a Swedish study that included three decades of data found that the mortality risk for transgender persons was 2.8 times that of age and natal sex matched population controls.[120]

This Review does not assess the methodological quality of these epidemiological studies or quantitatively synthesize their findings. The magnitude of the mortality risk for maintaining a transgender identity remains uncertain, as do the underlying causal factors (causes of death found to be elevated among transgender persons included suicide, cardiovascular disease, and HIV[121]). Moreover, in light of ongoing epidemiological shifts (see Section 4.3.1.1), it is unclear whether these findings extend to children and adolescents with GD. These studies further support a cautionary stance toward PMT, however, especially insofar as the Dutch cohort study found that despite changes in care of the transgender population over five decades, the elevated mortality risk has persisted, not declined.[122]

[117] Hughes et al. (2022).
[118] de Blok et al. (2021).
[119] Jackson et al. (2023).
[120] Dhejne et al. (2011).
[121] See de Blok et al., 2021; Dhejne et al., 2011; Hughes et al., 2022; Jackson et al. 2023.
[122] de Blok et al. (2021).

# Chapter 8 Summary and Implications of Evidence Review

Medical and surgical interventions for children and adolescents with gender dysphoria (GD) are widely promoted as essential and even lifesaving, yet the evidence base does not support strong conclusions about their effectiveness in improving mental health or reducing GD. Analysis of the biological plausibility of harms is necessary, and suggests that some short- and long-term harms are likely (in some cases expected) sequelae of treatment.

The Food and Drug Administration (FDA) also looks at risks in this manner when making a risk/benefit determination:

> Benefit-risk planning is most valuable in cases where a challenging benefit-risk assessment can be reasonably anticipated, either because the extent of benefit is expected to be modest or is highly uncertain, or when serious adverse events of the drug can be anticipated (e.g., based on a suspected class effect, understanding of the mechanism of action, and/or early-phase or non-clinical safety findings).[1]

The FDA states that with respect to risks, it is important to understand suspected class effects, meaning the types of predicted effects that are known to occur within the same class of medications. For example, the class of diuretics called thiazides are known to cause hypokalemia (low potassium), and so this potential adverse effect must be taken into account when making a risk/benefit determination regarding thiazides.

The FDA also emphasizes the importance of understanding the physiological mechanism of action, meaning the known way in which a drug affects the body. For example, medications called beta blockers affect the beta-adrenergic receptor and by their known mechanism of action cause effects such as slowed heart rate and decreased cardiac contractility. These physiological mechanisms—and the potential adverse effects of bradycardia (slow heart rate) and reduced cardiac output (amount of

[1] Center for Biologics Evaluation and Research (CBER) and Center for Drug Evaluation and Research (CDER) (2023).

blood pumped by the heart)—must be taken into account when making a risk/benefit determination regarding beta blockers.

Similarly, risk/benefit determinations regarding PMT must take into account both class effects and known mechanism of action for these interventions. Moreover, as the FDA also emphasizes, when the risks of a treatment are serious, anticipated effects must be proportionate:

> In cases where serious risks are anticipated, it is important to consider whether the risk can be outweighed by a benefit of sufficient certainty, magnitude, and clinical relevance to patients.[2]

Some of the plausible harms of PMT are serious. The likelihood of infertility when puberty blockers (PBs) are provided at the early stage of puberty and followed by cross-sex hormones (CSH) does not have to be demonstrated in a clinical trial. This is because the mechanism is well-understood and conducting a trial would amount to an unethical "parachute test."[3]

Analysis of all available data described in this section of the Review suggests that the risk/benefit profile of medical and surgical interventions for children and adolescents with GD is unfavorable.

This has implications for decision-makers—ranging from individual clinical care to guideline development, health policy, and regulation.[4] The findings of this evidence review also underscore the importance of clearly distinguishing how values and preferences are incorporated at different levels of decision-making.

At the individual level, shared decision-making must be grounded in transparency. This means that patients and their families need to be fully informed—not just about available interventions, but also about their potential benefits, harms, alternative

---

[2] Center for Biologics Evaluation and Research (CBER) and Center for Drug Evaluation and Research (CDER) (2023). See Chapter 13 for discussion of ethical implications.
[3] Smith & Pell (2003). The paper highlights the limitations of "gold-standard" research designs such as randomized controlled trials (RCTs) by pointing out that no RCTs have been done on the effects of jumping from a plane without a parachute. Narrow (mis)application of EBM would conclude that there is "very low certainty evidence" of death, given the dearth of high quality studies.
[4] Zeng et al. (2023); Zhang et al. (2017).

options, and the certainty or uncertainty of the supporting evidence. When this information is missing or inaccurate, the values and preferences people express may be influenced by incomplete understandings.[5]

At the level of clinical practice guidelines and health policy, values and preferences should reflect those of a population well-informed about the strength of evidence. Weak or uncertain evidence for benefits requires greater caution and flexibility, not stronger recommendations.[6]

At the regulatory level, because decisions must prioritize public health and safety, the strength of the evidence is especially important. When evidence for benefit is lacking or of very low certainty, regulatory frameworks should focus on ongoing evaluation, risk mitigation, and the collection of more robust data before allowing broad implementation. At all levels, responsible decision-making requires a clear grasp of what is known, what remains uncertain, and how this understanding informs ethical obligations of clinicians. Several of the other chapters in this Review explore these issues in greater depth.

---

[5] Zhang, Alonso-Coello, et al. (2019); Zhang, Coello, et al. (2019).
[6] Guyatt et al. (2008).

PART 3

# CLINICAL REALITIES

# Chapter 9 Review of International Guidelines

Like in other areas of medicine, clinical care for gender dysphoric (GD) youth is typically guided by clinical practice guidelines (CPGs). The aim of such guidelines is to promote practices that are proven to improve patient outcomes and reduce unwarranted variation in care. Although guidelines are not mandates and clinicians must still exercise professional judgment, they serve as important reference points that influence treatment decisions, institutional protocols, insurance coverage policies, and broader standards of medical practice.

This chapter provides an overview of CPGs that address care for youth with GD. Section 9.1 is a primer on the purpose and characteristics of trustworthy evidence-based guidelines. Section 9.2 provides an overview of the quality of the existing guidelines in pediatric gender medicine as assessed by a systematic guideline appraisal. It also discusses the newest guidelines not included in this appraisal. Section 9.3 profiles the clinical recommendations set out in the only two guidelines rated as trustworthy (both from Nordic countries).

## 9.1 The role and process of clinical practice guidelines

Clinical practice guidelines are a set of clinical care recommendations intended to optimize patient care.[1] While used primarily by healthcare providers, CPGs also guide hospitals in standardizing care, informing insurance coverage decisions, shaping health policy, and supporting medical education. Researchers use them to identify knowledge gaps, and legal professionals may cite them in malpractice cases. Informed patients and caregivers may also rely on CPGs to participate in shared decision-making and advocate for appropriate care.

The field of evidence-based medicine (EBM) provides several sources describing the characteristics of a trustworthy guideline.[2] According to the National Academy of Medicine (NAM),[3] trustworthy CPGs:

[1] Brignardello-Petersen et al. (2021).
[2] Brignardello-Petersen et al. (2021); Brouwers et al. (2010); Lima, Mirza et al. (2023).
[3] Formerly the Institute of Medicine.

> should be *based on a systematic review of the existing evidence*; be developed by a knowledgeable, multidisciplinary panel of experts and representatives from key affected groups; consider important patient subgroups and patient preferences, as appropriate; be based on an explicit and transparent process that *minimizes distortions, biases, and conflicts of interest*; provide a clear explanation of the logical relationships between *alternative care options* and health outcomes, *provide ratings of both the quality [certainty] of evidence and the strength of the recommendations*; and be reconsidered and revised as appropriate when important new evidence warrants modifications of recommendations.[4]

Most guideline users will focus on two core elements of guidelines: the content of the recommendations, and their strength. One of the most widely accepted approaches to rating the strength of recommendations is the Grading of Recommendations Assessment, Development, and Evaluation (GRADE) approach. GRADE classifies recommendations according to their direction and strength into four categories: (1) strong recommendation for an intervention; (2) conditional or weak recommendation for an intervention; (3) conditional recommendation against an intervention; and (4) strong recommendation against an intervention.[5]

In addition, there is a GRADE recommendation known as "only in research."[6] It is used sparingly in situations in which an intervention may be promising but lacks sufficient evidence to support its general use. The "only-in-research" recommendation is appropriate when three conditions are met: (1) the available evidence is of low or very low certainty, making it unclear whether the intervention provides meaningful benefit; (2) further research has a large potential to reduce this uncertainty and produce more definitive evidence; and (3) conducting such research is deemed valuable given anticipated costs and risks. This recommendation may be accompanied by a second strong recommendation not to use the intervention outside the research context.[7]

---

[4] Graham et al. (2011, p. 5, emphasis added).
[5] Andrews, Schünemann et al. (2013).
[6] Agarwal et al. (2020).
[7] Andrews, Guyatt et al. (2013, p. 724); Guyatt, Oxman, Kunz et al. (2008, p. 1051).

In addition to interpreting evidence of benefits and harms, guideline panels that develop CPGs also must "trade off the benefits and risks, burden, and costs associated with alternative management strategies and, in doing so, consider their patients' unique predicament and values and preferences" to make their final recommendations and GRADE them for strength.[8] Guideline development groups must be free from or carefully manage financial, intellectual, and personal conflicts of interest, and should represent diverse and balanced views.

The credibility of guidelines should be assessed before their recommendations are accepted as trustworthy. A guideline's trustworthiness and authority depend on how closely the development group adhered to best practices for guideline development.[9] The Appraisal of Guidelines for Research and Evaluation (AGREE II) instrument is one of the most well-established validated tools for assessing the quality and methodological rigor of CPGs. The AGREE II instrument evaluates guidelines across six domains: scope and purpose, stakeholder involvement, rigor of development, clarity of presentation, applicability, and editorial independence. Each domain is rated on a standardized 7-point scale, with higher scores indicating greater methodological quality and trustworthiness. AGREE II further provides two overall assessments, one summarizing the guideline's overall quality and another evaluating whether the guideline should be recommended for implementation in clinical practice. By promoting transparency and consistency in guideline appraisal, AGREE II helps healthcare providers, policymakers, and patients identify guidelines most likely to improve patient outcomes and quality of clinical decision-making. Other approaches for evaluating the trustworthiness of CPGs emphasize related but distinct dimensions.[10]

## 9.2 Summary of systematic appraisal of clinical guidelines and guidance documents

At least two systematic reviews (SRs) have evaluated the quality (trustworthiness) of CPGs addressing the care of patients with GD. One focused on guidelines applying to

[8] Guyatt et al. (2015).
[9] Graham et al. (2011).
[10] Brignardello-Petersen et al. (2021); Lima, Mirza et al. (2023).

all age groups,[11] and the other on guidelines devoted specifically to the care of youth.[12] Both relied on AGREE II.[13] This section focuses on the SR that assessed guidelines for pediatric GD, which was conducted by researchers at the University of York to inform the development of the Cass Review.[14]

The York analysis identified 23 and appraised 21 clinical guidelines and clinical guidance documents for their methodological rigor and quality. York's analysis revealed three main findings: (1) all the guidelines, with the exception of two (from Sweden and Finland), were found to be untrustworthy due to serious deviations from the methodological standards for trustworthy guideline development; (2) most international guidance documents have relied heavily on the World Professional Association for Transgender Health (WPATH) and Endocrine Society (ES) guidelines,[15] which were themselves closely linked through overlapping authors and with WPATH acting as a sponsor for the development of ES guidelines; and (3) none of the three guidance documents that have shaped the United States's approach to pediatric GD are trustworthy due to serious problems in their development methodology.[16]

### 9.2.1 Methodological quality of existing guidelines and guidance documents

All guidelines and guidance documents assessed by the York appraisal were evaluated across AGREE II's six domains. The researchers also provided two assessments, one on quality of the guideline overall, and the other on whether the guideline can be recommended for clinical implementation.

The reviewers noted that while generally most guidelines scored well in the domain of "clarity of scope and purpose," most scored poorly in the domains of "rigour of

[11] Dahlen et al. (2021).
[12] Taylor, Hall, Heathcote et al. (2024a, 2024b).
[13] Brouwers et al. (2010).
[14] Taylor, Hall, Heathcote et al. (2024a, 2024b). In this chapter, as in this two-part systematic review (SR), the word "guidelines" will be used to refer to the various documents that were appraised, some of which were not formal clinical practice guidelines (CPGs). The reviewers included "published articles or documents that [provided] at least one specific recommendation for the assessment and/or care of children and/or adolescents (age 0–18) experiencing gender dysphoria/incongruence, and which were developed by or for a professional, healthcare or government organisation or from a research study" (Taylor, Hall, Heathcote et al., 2024a, p. s66).
[15] Coleman et al. (2012); Hembree et al. (2009); Hembree et al. (2017).
[16] See Taylor, Hall, Heathcote et al. (2024a).

development," "editorial independence," and "applicability" (see Figure 9.1 below). These are the domains that tend to most strongly influence the overall rating and the recommendation for use in clinical practice.[17]

Only the Swedish and the Finnish guidelines were rated as "recommended for implementation" by all reviewers; they also received the highest overall quality score, with Sweden rated as six and Finland rated as five (out of seven) (see Figure 9.2 below). The Swedish and Finnish guidelines were the only guidelines that described how the evidence base was reviewed and that linked the evidence to clinical recommendations. All other guidelines and guidance documents scored between two and four and were not recommended for implementation by one or more reviewers.[18]

Overall, the researchers described existing guidance documents that recommend pediatric medical transition (PMT) as "[lacking] an independent and evidence-based approach," noting that it was difficult to detect what evidence had been reviewed and how this informed development of recommendations. Moreover, they reported that the links between specific recommendations and evidence were often unclear or missing. See Figure 9.2 below.

[17] Hoffmann-Eßer et al. (2018).
[18] Taylor, Hall, Heathcote et al. (2024a, p. s65).

**Figure 9.1**[19]

**Table 1** Critical appraisal domain scores

| Guideline ID | Scope and purpose | Stakeholder involvement | Rigour of development | Clarity of presentation | Applicability | Editorial independence |
|---|---|---|---|---|---|---|
| AACAP 2012 | 65 | 39 | 44 | 63 | 7 | 31 |
| American Academy of Paediatrics 2018 | 70 | 26 | 12 | 30 | 6 | 69 |
| American Psychological Association 2015 | 74 | 74 | 24 | 50 | 18 | 14 |
| Council for Choices in Healthcare Finland 2020 | 91 | 69 | 51 | 72 | 56 | 0 |
| de Vries 2006 | 63 | 31 | 10 | 74 | 17 | 6 |
| Endocrine Society 2009 | 65 | 33 | 44 | 70 | 22 | 31 |
| Endocrine Society 2017 | 63 | 33 | 42 | 72 | 21 | 92 |
| European Society for Sexual Medicine 2020 | 63 | 52 | 39 | 70 | 7 | 58 |
| Fisher 2014 | 65 | 20 | 12 | 35 | 17 | 44 |
| Health Policy Project 2015 | 63 | 63 | 16 | 24 | 33 | 6 |
| Norwegian Directorate of Health 2020 | 76 | 81 | 30 | 57 | 47 | 17 |
| Oliphant 2018 | 44 | 39 | 12 | 33 | 21 | 0 |
| Pan American Health Organisation 2014 | 52 | 44 | 13 | 31 | 21 | 0 |
| Royal Children's Hospital Melbourne 2018 | 81 | 59 | 19 | 41 | 19 | 14 |
| Society for Adolescent Health and Medicine 2020 | 41 | 24 | 17 | 41 | 7 | 0 |
| South African HIV Clinicians Society 2021 | 59 | 59 | 21 | 43 | 24 | 69 |
| Strang 2018 | 87 | 31 | 18 | 37 | 15 | 19 |
| Swedish National Board of Health & Welfare 2022 | 91 | 87 | 71 | 83 | 25 | 36 |
| UCSF 2016 | 70 | 41 | 23 | 37 | 26 | 0 |
| WPATH 2012 | 85 | 61 | 26 | 56 | 17 | 17 |
| WPATH 2022 | 83 | 63 | 35 | 56 | 24 | 39 |

≥70%, 31%–69%, ≤30%.
AACAP, American Academy of Child & Adolescent Psychiatry; UCSF, University of California, San Francisco; WPATH, World Professional Association for Transgender Health.

[19] Taylor, Hall, Heathcote et al. (2024a, Table 1).

**Figure 9.2**[20]

| Guideline ID | OQA1 | R1 | OQA2 | R2 | OQA3 | R3 |
|---|---|---|---|---|---|---|
| AACAP 2012 | 3 | No | 3 | No | 4 | Yes (mod) |
| American Academy of Paediatrics 2018 | 2 | No | 3 | No | 1 | No |
| American Psychological Association 2015 | 3 | No | 2 | No | 3 | No |
| Council for Choices in Healthcare Finland 2020 | 5 | Yes (mod) | 5 | Yes | 5 | Yes (mod) |
| de Vries 2006 | 2 | No | 3 | No | 2 | No |
| Endocrine Society 2009 | 3 | No | 4 | No | 4 | Yes (mod) |
| Endocrine Society 2017 | 4 | Yes (mod) | 4 | No | 4 | Yes (mod) |
| European Society for Sexual Medicine 2020 | 3 | Yes (mod) | 2 | No | 3 | No |
| Fisher 2014 | 2 | No | 3 | No | 1 | No |
| Health Policy Project 2015 | 2 | No | 1 | No | 2 | No |
| Norwegian Directorate of Health 2020 | 3 | No | 3 | Yes (mod) | 4 | Yes (mod) |
| Oliphant 2018 | 2 | No | 3 | No | 1 | No |
| Pan American Health Organisation 2014 | 2 | No | 2 | No | 1 | No |
| Royal Children's Hospital Melbourne 2018 | 3 | No | 3 | No | 2 | No |
| Society for Adolescent Health and Medicine 2020 | 2 | No | 2 | No | 1 | No |
| South African HIV Clinicians Society 2021 | 3 | No | 3 | No | 2 | No |
| Strang 2018 | 3 | Yes (mod) | 2 | No | 2 | No |
| Swedish National Board of Health & Welfare 2022 | 6 | Yes (mod) | 6 | Yes | 6 | Yes |
| University California San Francisco 2016 | 3 | No | 2 | No | 3 | No |
| WPATH 2012 | 3 | Yes (mod) | 3 | No | 2 | No |
| WPATH 2022 | 3 | Yes (mod) | 3 | No | 3 | No |

OQA: Overall quality assessment - 1-7 where 1 is lowest possible score and 7 is the highest possible score

R: Recommend guideline for use - Possible responses are Yes, Yes with modifications (Yes (mod)), No

The numbers 1-3 refer to the three reviewers who appraised the guidelines

Abbreviations
AACAP – American Academy of Child & Adolescent Psychiatry
WPATH – World Professional Association for Transgender Health

### 9.2.2 Interdependence of the existing guidelines and guidance documents

The guideline appraisal noted an unusual interdependence between much of the published guidance supporting the management of children and adolescents with GD (see Figure 9.3).[21] There was a marked pattern of "circular referencing and mutual endorsements"[22] between guidelines recommending PMT for routine care, with WPATH and the ES guidelines influencing all other guidelines and guidance documents.

The pattern of "links and influences between guidelines"[23] had been established early in the field's tenure with the ES 2009 and WPATH 2012 guideline versions.[24] The pattern persisted as both ES and WPATH updated their guidelines in 2017 and 2022

[20] Supplementary Table S3 in Taylor, Hall, Heathcote et al. (2024a).
[21] Taylor, Hall, Heathcote et al. (2024a, pp. s69–s70).
[22] Donkin et al. (2025, p. 3).
[23] Taylor, Hall, Heathcote et al. (2024a, p. s69).
[24] Coleman et al. (2012); Hembree et al. (2009).

respectively.[25] Moreover, the 2009 and 2017 ES guidelines state that WPATH was a guideline sponsor.[26] The University of York researchers noted that this represents problematic circularity, "with WPATH adopting Endocrine Society recommendations in its own guideline and acting as a cosponsor for and providing input on drafts of the Endocrine Society guideline."[27]

**Figure 9.3**[28]




The Cass Review emphasized the interdependence and circularity of the guidance documents:

> The circularity of this approach may explain why there has been an apparent consensus on key areas of practice despite the evidence being poor … the guideline appraisal raises serious questions about the reliability of current guidelines.[29]

[25] Coleman et al. (2022); Hembree et al. (2017).
[26] Hembree et al. (2009); Hembree et al. (2017).
[27] Taylor, Hall, Heathcote et al. (2024a, p. s69).
[28] Taylor, Hall, Heathcote et al. (2024a, p. s69).
[29] Cass (2024a, pp. 129–130).

### 9.2.3 WPATH, Endocrine Society, and the American Academy of Pediatrics (AAP) guidelines and practice statements

The most influential sources of clinical guidance for treating pediatric GD in the U.S. are the WPATH and ES CPGs and the American Academy of Pediatrics' (AAP) guidance document.[30] The York appraisal assessed all three documents as very low quality and did not recommend them for implementation.

Figure 9.4 plots the overall rating of the quality of these three guidance documents relative to the only two guidelines that have been recommended for implementation by the York appraisal.[31]

**Figure 9.4**[32]




Legend: AAP: American Academy of Pediatrics; WPATH: World Professional Association for Transgender Health; ES: The Endocrine Society

[30] The American Academy of Pediatrics' (AAP) 2018 Policy Statement was reaffirmed in 2023 (Rafferty et al., 2018); the Endocrine Society's (ES) published in 2017 represents the most recent published version (Hembree et al., 2017); the World Professional Association for Transgender Health's (WPATH) most recent clinical practice guideline is *Standards of Care*, Version 8 (SOC-8) (Coleman et al., 2022).
[31] Taylor, Hall, Heathcote et al. (2024a).
[32] Figure 9.4 plots data from Supplementary Table S3 in Taylor, Hall, Heathcote et al. (2024a).

The York appraisal found that WPATH's guideline, *Standards of Care*, Version 8 (SOC-8) and the ES guidelines were both "[lacking] in developmental rigour." SOC-8 was given an overall score of three out of seven; the ES guideline scored four out of seven. The extensive problems in the SOC-8 development process, which included the failure to base recommendations on SRs and numerous other serious limitations in the process, ultimately led to this low rating and the status of "not recommended for implementation." These problems are discussed in more detail in Chapter 10.

The ES 2017 guideline, which used the GRADE framework, has been criticized for making strong recommendations for hormonal interventions in the setting of a weak evidence base.[33] Notably, none of the systematic reviews that supported the ES guidelines were based on outcomes for children or adolescents.[34] The ES recommendation to initiate puberty blockade using gonadotropin-releasing hormone agonists was derived by putting a higher value on achieving a "satisfactory physical appearance" while putting the lowest value on avoiding physical harms.[35] The ES recommendation for the initiation of cross-sex hormones no earlier than age 16 was justified by placing a higher value on adolescent's purported ability to meaningfully consent to cross-sex hormones (CSH) and placing a lower value on avoiding harm from potentially prolonged pubertal suppression.[36]

[33] E.g. Block (2023c). If such recommendations are made, which the GRADE framework allows in specific circumstances, the reasoning for this must be clear. The ES guidelines did not do this.
[34] Maraka et al. (2017); Singh-Ospina et al. (2017); Of note, the only study of adolescents included in these systematic reviews, Klink et al. (2015), concluded that puberty blockers impede the development of bone mass density (BMD) and cross-sex hormones fail to bring up BMD to its pretreatment potential: "Between the start of GnRHa and age 22 years the lumbar areal BMD z score (for natal sex) in transwomen decreased significantly from 0.8 to 1.4 and in transmen there was a trend for decrease from 0.2 to 0.3. This suggests that the BMD was below their pretreatment potential and either attainment of peak bone mass has been delayed or peak bone mass itself is attenuated" (Klink et al., 2015, p. E270).
[35] Full quotation: "These recommendations place a high value on avoiding an unsatisfactory physical outcome when secondary sex characteristics have become manifest and irreversible, a higher value on psychological well-being, and a lower value on avoiding potential harm from early pubertal suppression" (Hembree et al., 2017, p. 13). Published gender-affirming care literature has also described a prioritization of aesthetic outcomes, e.g., a research paper noted gender-affirming care can be beneficial because (among other reasons) "The combination of pubertal suppression and cross-sex hormones] may … increase the concordance of youths' appearance with cisgender norms …" (McGregor et al., 2024, p. 5).
[36] Full quotation: ""The recommendation to initiate pubertal induction [cross-sex hormones] only when the individual has sufficient mental capacity (roughly age 16 years) to give informed consent for this partly irreversible treatment places a higher value on the ability of the adolescent to fully understand and oversee the partially irreversible consequences of sex hormone treatment and to give informed consent. It

"Panel stacking" refers to the practice of populating clinical practice guideline development groups with individuals who share a similar position regarding the treatment under consideration, often due to having financial or non-financial conflicts of interest. Because of its tendency to perpetuate groupthink, panel stacking represents a threat to the trustworthiness of any CPG, especially in the absence of systematic reviews of evidence.[37] Managing conflicts of interest is essential in CPG development because CPGs make recommendations factoring in not only the evidence, but a range of other considerations, such as "values and preferences" (see Section 10.3.1).

ES guidelines for this area of medicine have been heavily influenced by the Dutch clinician-researchers who pioneered the practice of PMT. Three of the eight authors of the 2009 ES guidelines, which first introduced PMT into clinical practice, were the founders of the Dutch protocol: Peggy Cohen-Kettenis, Henriette A. Delemarre-van de Waal, and Louis J. Gooren.[38] The group also included Norman Spack, who co-founded the first U.S. pediatric gender clinic. Most of the authors were also prominent WPATH members and leaders. The 2017 update to the ES guidelines continued to maintain a strong link with the Dutch clinical team and further cemented the relationship with WPATH through common authorship.

The intellectual commitments of ES guideline panel members find expression in the fact ES recommended PMT despite not having conducted SRs of evidence for benefits and most risks—a strong departure from norms governing how CPGs should be drafted—and the unusual "values and preference" statements mentioned above.

The AAP 2018 policy statement is not technically a CPG but has been widely cited in the U.S. as influential in establishing how pediatricians respond to children and adolescents with GD.[39] Because the document offers extensive clinical recommendations regarding every step of PMT—from social transition to PBs, CSH,

places a lower value on the possible negative effects of delayed puberty. We may not currently have the means to weigh adequately the potential benefits of waiting until around age 16 years to initiate sex hormones vs the potential risks/ harm to BMD and the sense of social isolation from having the timing of puberty be so out of sync with peers" (Hembree et al., 2017, p. 3885).

[37] Kepp et al. (2024).

[38] Hembree et al. (2009).

[39] Rafferty et al. (2018).

and surgery—the York team assessed the trustworthiness of the AAP guidance using the same criteria they applied to CPGs. Using the AGREE II criteria, the AAP policy statement received the second-lowest average score among all international guidelines: 2 out of 7.

As noted in Chapter 2, the AAP's policy statement's use of "gender diverse" casts a very wide net regarding which patients the organization considers eligible for medical intervention. The statement has been heavily criticized in peer-reviewed articles, which have pointed out that it is rife with referencing errors and inaccurate citations.[40] Despite persistent advocacy among its members, who have petitioned the organization to release updated, evidence-based guidance for treating pediatric GD,[41] the organization chose to reaffirm their policy statement in 2023.[42]

### 9.2.4 More recent international guidelines

Since the publication of the York reviews, several new European guidelines have been issued in final or draft form, including those from the German AWMF, the French Society of Pediatric Endocrinology and Diabetology, the Polish Sexological Association, the European Society for Paediatric Endocrinology (ESPE), and the forthcoming final version of the French National Authority for Health (HAS) guidelines.[43] These reviews have been developed amid growing international awareness of the weaknesses of WPATH's SOC-8 and the outdated nature of the Endocrine Society's guidelines, reflecting the need to have defensible, localized, up-to-date guidelines that set the standards of care for youth with GD.

---

[40] E.g., Cantor (2020); McDeavitt (2025).
[41] See description of efforts led by pediatrician Julia Mason in Block (2023c).
[42] Block (2023c).
[43] The AWMF German guidelines (German Society for Child and Adolescent Psychiatry, Psychosomatics and Psychotherapy [DGKJP], 2025) are comprehensive; the guidelines by the French Society of Pediatric Endocrinology and Diabetology (SFEDP; Brezin et al., 2024) are limited to hormonal interventions and is currently available only as a preprint; the Polish guidelines, supported by the Polish Sexological Association, the Polish Psychiatric Association, and the Polish Society of Paediatric Endocrinology and Diabetology cover most aspects of PMT but are almost entirely derivative (Gawlik-Starzyk et al., 2025); the ESPE guidelines (Hannema et al., 2024) primarily focus on endocrine (medical/hormonal) interventions; the draft French national HAS guidelines became publicly available when a French newspaper published a draft in November 2024 (Sugy, 2024); the final version has not yet been released.

Unfortunately, these recently-published (or as yet to be finalized) guidelines suffer from the same or similar methodological weaknesses that have rendered the WPATH and the Endocrine Society's guidelines not trustworthy and not recommended for implementation. All suffer from non-evidence-based approaches to guideline development and exhibit one or more of the following problems: (1) guideline development groups are composed of individuals with unmanaged conflicts of interest relating to the provision of pediatric gender transition services; (2) the guideline takes an a priori WPATH-aligned position that medicalized pathway of hormones (and surgery) is the recommended treatment approach;[44] (3) the recommendations are not based on rigorously-conducted systematic reviews of evidence;[45] (4) individual studies that drive treatment recommendations are not appraised for quality, and their conclusions are accepted at face value; (5) the recommendations are not graded for strength, resulting in ambiguity in clinical decision-making.

While some guidelines, in response to criticism of the draft version, have added references to systematic reviews of evidence, it is apparent that SRs were not utilized to make treatment recommendations, with apparent and unreconciled contradictions between the findings of the SRs and the treatment recommendations.[46] Alternatives such as psychological support are in nearly all cases marginalized or even entirely absent. Ongoing reliance on the "consensus-based" non-evidence-based process underlines the trustworthiness of these guidelines, raising questions about the rigor of guideline development in pediatric gender medicine not just in the U.S., but worldwide.

[44] For example, the German AWMF guidelines state that the members of the guideline development group adhere to the WPATH positions (Society for Evidence-Based Gender Medicine, 2025).The Polish guideline explicitly bases itself on WPATH SOC-8, without independent review, stating, "This document is based on the Standards of Care for the Health of Transgender and Gender Diverse People, Version 8 (2022) [1] and an Endocrine Society Clinical Practice Guideline … The person conducting psychological or sexological assessment and care should be familiar with the content of the current standards of care of the World Professional Association for Transgender Health and comply with them" (Gawlik-Starzyk et al., 2025, pp. 4, 8).

[45] The German guidelines methodological report explicitly states that no evidence-based recommendations were developed (German Society for Child and Adolescent Psychiatry, Psychosomatics and Psychotherapy (DGKJP), 2025, p. 6).

[46] Society for Evidence-Based Gender Medicine (2025).

## 9.3 Overview of recommendations in the high-quality guidelines

Of the 23 guidelines that were appraised in the systematic evidence review, only two were recommended for practice by all three reviewers: the guidelines from Finland (which were scored five out of seven), and those from Sweden[47] (which were scored six out of seven). Both guidelines recommend that psychotherapy—not hormones or surgeries—should be the standard of care for youth with GD, and that any use of hormones should be limited to nationally overseen research or exceptional circumstances. As described in the systematic review, the two Scandinavian guidelines were the only ones that based their treatment recommendations on systematic evidence reviews, a key element of trustworthy clinical practice guidelines.

### 9.3.1 Finland

In 2020, Finland's Council for Choices in Health Care (PALKO/COHERE) issued national guidelines for treating gender dysphoria in minors, representing a major shift away from the model endorsed by WPATH's *Standards of Care* Version 7.[48] Finland's guidelines emphasize that the first-line treatment for adolescents experiencing gender distress should be psychosocial support and psychotherapy, not early medical intervention.[49]

Based on a commissioned SR, Finnish authorities concluded that the body of evidence supporting puberty blockers and cross-sex hormones for youth is inconclusive. Importantly, the guidelines explicitly state that "in light of available evidence, gender reassignment of minors is an experimental practice."[50] While medical transition remains possible, it is restricted to highly select cases—specifically, adolescents with persistent, childhood-onset gender dysphoria, no major psychiatric comorbidities, and stable identity development through adolescence.

---

[47] In 2022, Sweden's healthcare authority, Socialstyrelsen, issued guidelines recommending that "Psychosocial support that helps adolescents deal with natal puberty without medication needs to be the first option when choosing care measures" (Socialstyrelsen, 2022b, p. 45).
[48] Council for Choices in Health Care Finland (2020a). There is an official English-language summary (Council for Choices in Health Care Finland, 2020c), as well as an unofficial English translation of the complete guideline document (Council for Choices in Healthcare Finland, 2020b).
[49] Council for Choices in Healthcare Finland (2020a).
[50] Council for Choices in Healthcare Finland (2020b, p. 8).

Surgery is not offered to minors in Finland. Furthermore, the guidelines stress that psychiatric conditions must be treated and stabilized before considering hormonal interventions. Special caution is placed on the use of puberty blockers, given emerging evidence about their potential impact on brain maturation and long-term decision-making capacity.

Adherence to this strict protocol is assured because Finland has only two centers that provide assessments and approve treatment indications for youth with GD, with highly coordinated clinical teams that adhere to the strict Finnish protocol.

Since the publication of the Finnish guidelines, two major register studies have provided additional support for their cautious approach. One explored psychiatric needs among gender clinic-referred patients, finding high rates of psychiatric comorbidities and suggesting that the rising number of referrals includes increasingly complex clinical cases.[51] The second examined suicide mortality among individuals under 23 and found that, after adjusting for psychiatric needs, there was no statistically significant difference in suicide rates between gender-referred youth and matched controls from the general population.[52]

Finland's cautious, evidence-focused guidelines stand in stark contrast to the WPATH model. Rather than expanding access amid uncertain outcomes, Finland has re-centered pediatric care around rigorous assessment, psychotherapeutic exploration, and prioritizing long-term health.

### 9.3.2 Sweden

In 2022, Sweden's National Board of Health and Welfare (Socialstyrelsen) issued an update to its national guidelines for the treatment of children and adolescents with gender dysphoria.[53] This update was motivated in part by shifts in epidemiology and uncertainty about the recent rise in cases, and limited data regarding rates of detransition or regret among young adults. Grounded in a systematic review of the

[51] Kaltiala et al. (2023).
[52] Ruuska et al. (2024).
[53] The official Swedish-language guidelines are Socialstyrelsen (2022c). Page numbers in this section refer to a certified, complete, unofficial translation that was submitted as evidence in a U.S. court case (Socialstyrelsen, 2022b). There is also an official English-language summary (Socialstyrelsen, 2022a).

evidence,[54] the new framework departs sharply from the SOC-8. Unlike WPATH's affirmation-based model, Sweden's guidelines conclude that the risks associated with puberty blockers and cross-sex hormones likely outweigh the expected benefits for young people. As with Finland, such interventions are now restricted to research settings, with exceptions permitted under strict clinical oversight.

The Swedish guidelines prioritize a comprehensive psychosocial evaluation and support. Clinicians are instructed to conduct thorough assessments of psychological, psychosocial, and psychiatric factors, utilizing validated instruments, investigative interviews, and detailed life histories from both the young person and their guardians.[55] Rather than presuming a fixed outcome, the guidelines emphasize the importance of supporting the open-ended exploration of gender identity.[56] Systematic screening for neurodevelopmental conditions, including autism spectrum disorder (ASD) and attention deficit hyperactivity disorder (ADHD), is required early in the evaluation process, with full neuropsychiatric assessments initiated when indicated.[57] Moreover, concurrent psychiatric conditions must be identified and addressed as early as possible, ensuring that psychosocial support and psychiatric interventions are available to bolster overall mental health throughout the evaluation.

Medical and surgical interventions are subject to equally rigorous restrictions. Treatment with puberty blockers is confined to the context of clinical research. Until such research protocols receive ethics board approval, puberty blockers may be administered only in exceptional cases under the updated guidelines.[58] Similarly, the use of cross-sex hormones is permitted solely within research studies, with narrowly defined exceptional cases allowed.[59] Only adolescents who meet stringent eligibility criteria may be considered for surgery, again under exceptional circumstances.[60] Across all

[54] Swedish Agency for Health Technology Assessment and Assessment of Social Services (2022).
[55] Socialstyrelsen (2022b, p. 63).
[56] Socialstyrelsen (2022b, p. 66).
[57] Socialstyrelsen (2022b, p. 69).
[58] Socialstyrelsen (2022b, p. 85).
[59] Socialstyrelsen (2022b, p. 90).
[60] Socialstyrelsen (2022b, p. 95).

interventions, the emphasis is on minimizing risk and ensuring that treatment decisions are based on the best available evidence.

Sweden's 2022 guidelines represent a marked shift away from the PMT model. Anchored in a systematic review of the literature, they embody a precautionary approach grounded in the principles of evidence-based medicine. Sweden's approach signals an important recalibration in gender medicine, reinforcing that interventions involving youth must be guided by systematic evidence appraisal, ethical responsibility, and a focus on long-term health trajectories.

### 9.3.3 United Kingdom

Currently, there is no finalized clinical practice guideline for pediatric gender medicine available from the National Institute for Health and Care Excellence (NICE) for England and Wales, or the Scottish Intercollegiate Guidelines Network (SIGN) for Scotland.[61]

NICE was commissioned by NHS (National Health Service) England[62] to perform a systematic evidence review evaluating treatments for gender dysphoria among children and adolescents. NICE's evidence reviews identified significant limitations in existing research, concluding that the available evidence was of very low quality (as assessed by the GRADE methodology)[63] and therefore insufficient to support the development of a formal clinical guideline.

These two SRs were cited as part of the Terms of Reference for an independent review that NHS England commissioned, led by Dr. Hilary Cass.[64] Released in 2024, the Cass Review aimed to thoroughly evaluate pediatric gender medicine services in the U.K. and provide clear recommendations on clinical practices and service delivery. Rather than providing explicit clinical guidelines, the Cass Review is a detailed, independent, investigative assessment based on multiple commissioned peer-reviewed systematic reviews.[65]

---

[61] Silver et al. (2025, p. 2).
[62] On March 13, 2025 it was announced that NHS England would be merged with the Department of Health and Social Care (DHSC).
[63] National Institute for Health and Care Excellence (2020b, 2020a).
[64] Cass (2024a, Appendix 1).
[65] Archives of Disease in Childhood (2024).

The Cass Review identified critical issues within the existing pediatric gender services, such as inadequate clinical assessments, insufficient long-term outcome data, and significant concerns over rapidly increasing referrals of young people with gender incongruence. Overall, it identified a significant gap between the available evidence and the clinical justifications for medical interventions for gender dysphoria in young people[66] and emphasized the necessity for comprehensive psychological support and thorough, individualized assessments.

In response to the Cass Review, NHS England introduced major policy changes. Puberty blockers are no longer routinely commissioned due to insufficient evidence regarding their long-term safety and effectiveness. Instead, they will only be accessible through structured clinical research trial, which is currently being designed. Additionally, cross-sex hormones are available to young people around the age of 16, contingent upon strict eligibility criteria and detailed assessment protocols by specialist multi-disciplinary teams and a new national Multi-Disciplinary Team (MDT) review process.[67] The NHS recently revealed that since the Cass Review was published, no minor has been found eligible to receive CSH according to the updated policy.[68]

Without a finalized clinical practice guideline, clinicians must follow the current policies directly informed by the Cass Review. These interim standards prioritize patient safety, rigorous clinical evaluation, ongoing research, and holistic care approaches, significantly revising the clinical pathways for young individuals experiencing gender incongruence.

## 9.4 Conclusion

The current landscape of CPGs for treating youth with GD underscores significant variability in methodological rigor and trustworthiness. A rigorous guideline appraisal demonstrates that only a select few guidelines, notably those from Finland and Sweden, meet high standards for evidence-based clinical decision-making. These Scandinavian

[66] Cass (2024a, pp. 22, 29, 32–35).
[67] National Health Service England (2024a); a review of adult services was also announced (National Health Service England, 2024b).
[68] Spencer (2025).

guidelines emphasize cautious approaches grounded firmly in systematic evidence reviews, advocating psychotherapy and psychosocial interventions as first-line treatments, and restricting medical interventions to carefully monitored research settings or exceptional circumstances.

In contrast, many internationally influential guidelines, including those from WPATH, the Endocrine Society, and the American Academy of Pediatrics, have been criticized for substantial methodological shortcomings and inadequately managed conflicts of interest, resulting in recommendations not reliably supported by rigorous evidence. This pattern of circular referencing and mutual endorsement among these guidelines further compromises their credibility and has likely perpetuated a perceived consensus in pediatric gender medicine that belies the actual paucity of high-quality evidence.

Given the ethical implications and lifelong consequences of medical interventions in youth, it is imperative that future guidelines in pediatric gender medicine adhere strictly to established standards of evidence-based medicine. Guideline developers must prioritize transparency, methodological rigor, independence from vested interests, and systematic evidence appraisal. Only through such disciplined approaches can clinical practice guidelines fulfill their intended role of safeguarding the health and well-being of youth with GD, promoting informed decision-making among clinicians, families, and policymakers alike.

# Chapter 10 WPATH's *Standards of Care* 8

As shown in Chapter 9, the guidelines issued by the World Professional Association for Transgender Health (WPATH) have been rated among the lowest in quality and have not been recommended for implementation by systematic reviews (SRs) of guidelines. Despite their lack of trustworthiness, for more than a decade WPATH guidelines have served as the foundation of the healthcare infrastructure for gender dysphoric (GD) youth in the United States. The WPATH *Standards of Care* guidelines are embedded in nearly all aspects of healthcare including clinical education, delivery of care, and reimbursement decisions by private and public insurers.

This chapter focuses on the current Version 8 of the WPATH *Standards of Care* guidelines (SOC-8),[1] published in 2022.[2] Section 10.1 describes WPATH's central role in shaping the treatment of youth with GD in U.S. healthcare settings. Section 10.2 provides a brief overview of the rationale for the development of SOC-8, highlighting how it differs significantly from earlier guideline versions with particular emphasis on the new Adolescent chapter. Section 10.3 examines the development process of SOC-8, considering both internal dynamics and external pressures, and analyzes its multipurpose role as a clinical guideline, a tool to secure insurance coverage, and a legal instrument aimed at promoting broad access to pediatric medical transition (PMT). Section 10.4 highlights one critical downstream consequence of the guideline's flawed development process: the elimination of all minimum age requirements for endocrine and surgical interventions (except phalloplasty) in minors. Section 10.5 discusses the implications of continued reliance on WPATH.

## 10.1 Influence of WPATH in the United States

There is no accredited subspecialty in "gender medicine" in the U.S. Instead, the practice of PMT typically involves a series of handoffs among different providers: a pediatrician or an adolescent medicine specialist[3] first assesses whether PMT may be

[1] Coleman et al. (2022).
[2] Portions of this evaluation necessarily rely on internal WPATH communications made publicly available through subpoena. See Boe v. Marshall, No. 2:22-cv-00184, (M.D. Ala.). Some material from Boe v. Marshall was previously released in Voe v. Mansfield, No. 1:23-Cv-00864: 100-1 (M.D.N.C.).
[3] American Board of Pediatrics (2024).

warranted; mental health professionals diagnose GD or a related condition and recommend PMT; endocrinologists prescribe hormonal interventions (puberty blockers and cross-sex hormones); and various surgical specialties including plastic surgeons, urologists, and gynecologists perform a range of surgical procedures to alter the adolescent's sex-specific physical characteristics.

The multidisciplinary nature of PMT combined with the absence of a single medical specialty responsible for overseeing patient care has resulted in an oversight gap WPATH has filled. WPATH has successfully positioned itself as the leading authority in the field of gender medicine, including pediatric gender medicine. The first version of WPATH's Standards of Care was published in 1979. Subsequent updates followed in 1980, 1981, 1990, 1998, 2001, and 2012.[4] The most recent version, SOC-8, was published in 2022.[5] Chapter 3 provides a brief history of gender medicine and the role of WPATH, which was originally formed (under a different name, the "Harry Benjamin International Gender Dysphoria Association") to focus on the gender transition wishes of mature adults, but after pediatric transitions were pioneered in the Netherlands, increasingly shifted its attention to children and adolescents.

### 10.1.1 WPATH's role in clinical practice

Although some medical societies involved in providing PMT have issued guidance documents on specific aspects of care for youth with GD,[6] no professional society has published a comprehensive, up-to-date, evidence-based clinical guideline covering the full PMT pathway. Instead, medical societies have largely deferred to WPATH, adapting their own clinical positions to WPATH's most recent recommendations.[7] Unlike the U.K., Sweden, Finland, and other countries with centralized medical policymaking bodies that

[4] SOC-7 was released in 2011 and published in 2012.
[5] Coleman et al. (2022).
[6] The most notable documents are discussed in Chapter 9 and include the Endocrine Society's guidelines (Hembree et al., 2017) and the American Academy of Pediatrics position statement (Rafferty et al., 2018). Both are significantly outdated.
[7] In August 2024, WPATH was presented in a court case as "the leading association of medical professionals treating transgender individuals." It was further asserted that "[t]he Nation's leading medical and mental health organizations recognize [SOC-8] as reflecting the accepted standard of care for treating gender dysphoria." See U.S. v. Skrmetti (No. 23-477), Brief for the petitioner (2024, p. 3).

issue independent, authoritative clinical care guidelines,[8] in the United States, WPATH's influence has been outsized and largely uncontested—primarily due to the fragmented healthcare system and the complexity of the U.S. regulatory environment.[9] WPATH's influence on clinical protocols for the care of youth with GD is pervasive within U.S. medicine. Its *Standards of Care* have become the primary framework embedded in clinical protocols and hospital operating procedures for the diagnosis and treatment of youth with GD.[10]

### 10.1.2 WPATH's role in medical education and training

WPATH has become the dominant influence shaping the education and training of U.S. healthcare providers who treat youth with GD. Indeed, it is virtually coterminous with the field itself. Because there is no officially accredited medical subspecialty in gender medicine in the U.S., and no formal board certification process as exists in fields like adolescent medicine, endocrinology, or psychiatry, training in PMT remains informal, variable, and largely organized through WPATH-affiliated medical education efforts.

WPATH's Global Education Initiative (GEI) offers certified courses that serve as the core curriculum for clinical training in the U.S. and worldwide. WPATH GEI's official collaborators include pediatric gender clinics and hospitals, the American Medical Student Association, and the World Health Organization (WHO).[11] Major U.S. hospitals and medical schools have embedded WPATH-aligned standards into their residency, fellowship, and continuing medical education programs.[12] Gender clinics reference

[8] When NHS England moved to remove puberty blockers for GD from clinical practice, it received complaints that the decision was "not consistent … with the WPATH standards of care for trans children." NHS England responded: "The policy proposition has been developed following a review of peer reviewed published evidence as per NHS England Policy Development Methods. NHS England does not commission based upon guidelines or treatment protocols e.g. WPATH 8.0 [SOC-8] or practices in other countries. The not for routine commissioning position has been concluded based on 'insufficient clinical benefit to the patient of which evidence of harm is one aspect'" (National Health Service England, 2023, p. 4).
[9] The U.S. lacks a centralized medical policy-making body, resulting in what has been described as a "bewildering regulatory maze" (Field, 2008, p. 607).
[10] For an example, see Seattle Children's Hospital (n.d.). Note: it appears some pediatric gender clinics have recently removed public references to WPATH and have also removed the backups of the websites, making them inaccessible to citation.
[11] See World Professional Association for Transgender Health (n.d.).
[12] For example, Mt. Sinai's transgender psychiatry fellowship: "Fellows are provided time and financial compensation to attend the U.S. Professional Association for Transgender Health or World Professional

WPATH's *Standards of Care* in clinical protocols and physician training.[13] WPATH-certified trainers further extend WPATH's reach into professional training at institutional and community levels.[14] WPATH certification not only is encouraged but also in some cases mandated.[15] This widespread integration has effectively established WPATH as the de facto authority for defining clinical competency, treatment eligibility criteria, and ethical frameworks across much of U.S. medicine.

### 10.1.3 WPATH's role in insurance reimbursement

Many U.S. public and private health insurers and regulatory bodies rely on SOC-8 when making coverage determinations. Requirements for credentialing, assessing medical necessity, and making coverage decisions almost universally reference WPATH's *Standards of Care*. Major U.S. private insurers, including Anthem,[16] Kaiser,[17] Aetna,[18] Cigna,[19] and UnitedHealthcare,[20] explicitly reference SOC-8 to define medical necessity, eligibility criteria, and coverage decisions.

---

Association for Transgender Health bi-annual conferences" (Icahn School of Medicine at Mt. Sinai, n.d.-b). Mt. Sinai's transgender surgery fellowship attending faculty includes Marci Bowers, the former president of WPATH (Icahn School of Medicine at Mt. Sinai, n.d.-a). Oregon Health and Sciences University's gender surgery fellowship program director is "the surgical lead for the World Professional Association for Transgender Health (WPATH) and the United States Professional Association for Transgender Health (USPATH) meetings" (OHSU School of Medicine Surgery, n.d.).

[13] For example, the Stanford Medicine Children's gender clinic website states, "the expert members of the Gender Clinic team consists [sic] of providers from pediatric endocrinology, adolescent medicine, pediatric urology and social services, supporting each child's or adolescent's gender identity. All our providers are members of the World Professional Association for Transgender Health (WPATH)" (Stanford Medicine Children's Health, n.d.). Fenway Health references WPATH as the authority in the field: "The World Professional Association of Transgender Health (WPATH) monitors current research and new knowledge about evidence-based medicine for transgender people. It publishes Standards of Care and Ethical Guidelines for health care providers, which 'articulate a professional consensus about the psychiatric, psychological, medical, and surgical management of gender dysphoria' to guide clinicians in providing quality care for transgender and gender diverse people, including children and adolescents" (Fenway Health, n.d.).

[14] See Harvard Medical School's continuing medical education (Harvard Medical School, n.d.), led by senior WPATH leaders involved in the production of SOC-8 (e.g., Sari Reisner, WPATH board member). Also see the following training initiatives: Gender Health Training Institute (n.d.); Silver Hill Hospital/World Professional Association for Transgender Health (n.d.).

[15] For example, the Washington State Department of Corrections mandates that physicians providing "gender-affirming care" must be WPATH-certified or obtain certification within two years (Washington State Department of Corrections, 2025). The Oregon Health Authority is another example (see following section).

[16] Anthem (2023). WPATH is referenced 35 times as the basis for all recommendations.

[17] Kaiser Permanente (2023). Transition and detransition policies require "WPATH letters."

[18] Aetna (2024). Adolescents are to meet "WPATH criteria" for hormonal interventions.

[19] Cigna (2025).

[20] Stroumsa & Kirkland (2020).

Government payers, such as Medicaid programs, also commonly rely on WPATH guidelines as the primary basis for developing their medical policies. In 2024, Oregon became the first state to officially adopt SOC-8 as its standard of care, committing the Oregon Health Authority to cover treatments based entirely on WPATH guidelines. Oregon additionally requires that if a patient is denied coverage for medical or surgical intervention related to gender transition, the clinicians reviewing the patient appeal must complete WPATH-aligned training:

> health care providers reviewing adverse benefit determinations denying or limiting access to gender-affirming treatment complete the “WPATH SOC-8 Health Plan Providers Training,” which is specifically designed for providers responsible for such reviews, or an equivalent training.[21]

This is notable as WPATH SOC-8 lists a wide range of procedures that should be provided to patients wishing to receive them. These include, in addition to puberty blockers, cross-sex hormones, mastectomy, and male-to-female or female-to-male genital surgeries, procedures such as vaginoplasty with a “retention of penis and/or testicle” (also known as penis-preserving vaginoplasty), removal of genitals entirely to create a “flat front” appearance, and uterine transplantation for male patients. Procedures listed as potentially necessary also include body contouring, liposuction/lipofilling, facelift, blepharoplasty, various implants, hair transplantation, vocal cord surgery, and a wide range of other appearance-modifying surgical procedures.[22]

## 10.2 The development of SOC-8 and the Adolescent chapter

Unlike most professional medical associations, WPATH does not require its members to be medical professionals. Full professional membership with voting privileges is also available to professionals in such fields as law, family studies, anthropology, and other areas. Reflecting the diverse aims of its broad membership, WPATH treatment

[21] Oregon Department of Consumer and Business Services (2024a). This position was further strengthened in the final ruling in Oregon Department of Consumer and Business Services (2024b).
[22] Coleman et al. (2022, p. S136).

guidelines are designed to serve multiple purposes, ranging from clinical care to political advocacy.

Published in 2022, SOC-8 marked WPATH's first attempt to develop guidelines that were "evidence-based" and aimed to meet higher methodological standards through reliance on SRs.[23] The previous version, SOC-7, published in 2011 and described in Chapter 4, under which PMT began rapidly to accelerate, did not rely on SRs. Instead, its recommendations were based on "cultural shifts" and other factors.[24]

In pursuit of its goal to develop an evidence-based guideline, WPATH entered into a contractual agreement with the Evidence-Based Practice Center (EPC) at Johns Hopkins University (JHU), tasking JHU experts with conducting SRs and serving as methodological advisors to ensure a trustworthy guideline development process.[25] Given the sharp increase in the numbers of adolescents seeking PMT, and the rapid growth of pediatric gender clinics and PMT providers in the U.S., WPATH recognized the need to develop a robust adolescent section, acknowledging that "the Adolescent chapter is going to be one of the most scrutinized chapters in the entire standards of care."[26]

As the process of guideline development began, WPATH focused on two cornerstone issues for PMT: the evidence regarding the effectiveness of endocrine interventions in treating GD, and the evidence that adolescents have the capacity to consent to such treatments.

### 10.2.1 Hope for evidence of effectiveness

At the outset of its collaboration with JHU's EPC team, WPATH leadership expressed confidence that an SR would yield "evidence-based statements" supporting both the

---

[23] See Sinai (2022): "The World Professional Association for Transgender Health (WPATH) Standards of Care Version 7 (SOC7) are not evidence-based. The WPATH website clearly states that SOC8 is the first version being developed using an evidence-based approach."
[24] The prior version, SOC-7, stated that its recommendations were "based upon significant cultural shifts, advances in clinical knowledge, and appreciation of the many health care issues that can arise for transsexual, transgender, and gender nonconforming people beyond hormone therapy and surgery" (Coleman et al., 2012, p. 166).
[25] Coleman et al. (2022, pp. S248–S249); Karen Robinson is named as the EPC lead and listed as a member of the SOC-8 Guideline Steering Committee.
[26] *Boe v. Marshall*, No. 2:22-cv-00184: 560-18 (2024, p. 42).

benefits of PMT interventions and the capacity of adolescents to consent to them. SOC-8 Adolescent chapter co-chair Scott Leibowitz wrote:

> We are a unique chapter when it comes to the evidence based review because we do feel that there is a justification to do a literature review on what we postulate will be evidence based statements about the interventions (even though we expect the evidence to be graded low). Essentially the literature reviews on some of our statements—as we plan on submitting once I edit them to incorporate the feedback from our workgroup—are important for the following reasons:
>
> - Studies that demonstrate the psychological effectiveness of some of the interventions (blockers, hormones) in adolescence all included cohorts who went through a rather rigorous psychological assessment. We would like to talk this through as a group because it's a very important point.
> - There is also literature on adolescent decision making and capacity to make informed decisions that carry lifelong ramifications. Since our chapter is a new chapter for the standards of care, and it focuses in on a developmental age group/assessment, (as opposed to other chapters that are more intervention specific), we are going to want to justify certain statements with graded evidence in terms of looking at the literature on *decision making in the developmental cohort (adolescence)* in general.[27]

The JHU evidence evaluation team was presented with the expectation that their appraisal would support the "gender-affirming" medical approach WPATH had been advancing for over a decade. The original plan was for SOC-8 recommendations—asserting that treatment effects are beneficial and that adolescents possess sufficient capacity to consent to medical interventions—to be labeled "evidence-based," even if the quality of the evidence was low.[28] However, the evidence evaluation challenged

[27] Boe v. Marshall*,* No. 2:22-cv-00184: 560-18 (2024, pp. 43–44).
[28] From a WPATH internal email exchange related to SOC-8: "Adolescent medical decision making literature is something that the Johns Hopkins team is able to help out in terms of a literature review and grading" (Boe v. Marshall*,* No. 2:22-cv-00184: 560-18, 2024, p. 116); for discussion of grading recommendations, see Chapter 9.

WPATH's expectations on both fronts: adolescent capacity to consent, and the benefits of PMT overall.

### 10.2.2 Adolescent capacity to consent

In response to a request from JHU, Annelou de Vries, the leading Dutch developer of PMT and a co-chair of SOC-8's Adolescent chapter section, supplied the JHU team with publications she believed demonstrate adolescent competence to consent to PMT.[29] Upon reviewing these publications, however, the JHU team informed WPATH that they provided, at best, "limited indirect evidence" and were insufficient to support a statement asserting that adolescents possess the capacity to consent.[30]

Following the JHU team's findings, WPATH abandoned its original plan to base its claim about adolescent capacity to consent on evidence. Instead, the Adolescent chapter of SOC-8 features a section on consent that stresses the importance of careful assessment but cites the same studies that JHU had deemed insufficient to answer the question of competence. The section also features a discussion about the "unique situations in which an adolescent minor is consenting for their own treatment without parental permission."[31]

The section fails to acknowledge the dearth of reliable information about whether adolescents in a state of clinical distress can meaningfully consent to drastic interventions—with many known and some unknown risks—in the absence of demonstrable physical disease and without credible knowledge of their likely future identity trajectory.

The ethical challenges of obtaining informed consent from adolescents regarding the procedures that are expected to threaten their fertility is illustrated by a candid comment

[29] The primary investigator of the Dutch Protocol and WPATH Adolescent chapter co-lead (de Vries) provided the relevant literature on adolescent consent for JHU evaluation, writing: "some articles on decision making in teens; these are review articles, but show that there is some evidence. I think we need this sort of evidence base on decision making capacity in adolescents, regarding medical affirming treatment" (Boe v. Marshall*,* No. 2:22-cv-00184: 560-18, 2024, p. 106).
[30] The JHU response to WPATH regarding the literature on adolescent consent to PMT stated, "The articles forwarded provide limited indirect evidence for this question. Please let me know if I missed something" (Boe v. Marshall*,* No. 2:22-cv-00184: 560-18, 2024, p. 106).
[31] Coleman et al. (2022, pp. S61, Section 6.12.c).

from a WPATH physician, who observed, “it’s always a good theory that you talk about fertility preservation with a 14-year-old, but I know I’m talking to a blank wall,” adding, “they’d be like, ew, kids, babies, gross.”[32]

### 10.2.3 Treatment effects

In contrast to WPATH’s early abandonment of efforts to evaluate minors' capacity to consent, SRs assessing the treatment effects of puberty blockers (PBs), cross-sex hormones (CSH), and surgeries were completed by the JHU team. As the following sections in this chapter detail, WPATH perceived the JHU evidence appraisals as unfavorable to its goals of promoting broad access to these interventions for minors. In response, WPATH leadership moved to suppress the findings, barring the JHU evidence evaluation team from publishing its results.

The Adolescent chapter does not disclose that the SR regarding the effects of PMT had, in fact, been conducted. Instead, the chapter claims that SRs are not feasible:

> Despite the slowly growing body of evidence supporting the effectiveness of early medical intervention, the number of studies is still low, and there are few outcome studies that follow youth into adulthood. Therefore, a systematic review regarding outcomes of treatment in adolescents is not possible.[33]

Ultimately, SOC-8 recommended that adolescents wishing to undergo PMT be provided with PBs, CSH, and surgery. The recommendations are couched in cautious-sounding language, stating that GD should be “sustained over time,” particularly before administering CSH. However, no clear standard is set; the only guidance offered is the vague and clinically meaningless phrase “several years, leaving critical decisions open to broad and subjective interpretation”:

> Given potential shifts in gender-related experiences and needs during adolescence, it is important to establish the young person has experienced

[32] Hughes (2024, p. 12).
[33] Coleman et al. (2022, p. S46).

several years of persistent gender diversity/incongruence prior to initiating less reversible treatments such as gender-affirming hormones or surgeries.[34]

As the following sections describe, the recommendations were deliberately crafted to allow any "willing" medical provider to prescribe hormones or perform surgeries on minors, even those with significant co-occurring mental health conditions.

## 10.3 The process of creating SOC-8

The creation of trustworthy, evidence-based guidelines requires first assembling a guideline development group (GDG) that is free from conflicts of interest (COI) or, at minimum, where COIs are transparently disclosed and rigorously managed. Only after this foundation is established should SRs proceed, addressing pre-specified guideline questions. Finally, recommendations should be based on SRs of evidence and should consider additional factors, with the aim of improving healthcare quality for individual patients and improving public health and access to care.

Although WPATH originally embarked on an evidence-based guideline development process, internal documents reveal significant deviations from internationally recognized clinical guideline development standards established by organizations such as the National Academy of Medicine[35] (NAM) and the World Health Organization (WHO).[36] These serious deviations from established standards meant that the GDG could not fulfill its promise of producing credible, evidence-based guidelines.

### 10.3.1 Conflicts of interest management

Managing COIs—both financial[37] and intellectual[38]—is essential for producing trustworthy clinical practice guidelines. Intellectual conflicts may even surpass financial

[34] Coleman et al. (2022, p. S60).
[35] Graham et al. (2011), published under its previous name, Institute of Medicine (IOM).
[36] SOC-8's reference to WHO's International Classification of Diseases (ICD) appears to have intended to be WHO's *Handbook for Guideline Development*, 2nd Edition. See Boe v. Marshall, No. 2:22-cv-00184: 700-3 (2024, p. 204).
[37] The WHO defines financial COI as any "paid work, consulting income or honoraria and travel stipends; support for research, including direct monetary contributions or donations of equipment, laboratory space, etc.;" "that is related to, or could be affected by, the outcome" of the guideline development process (World Health Organization, 2014, p. 63).
[38] NAM and WHO define intellectual COIs relevant to clinical practice guideline development as "academic activities that create the potential for an attachment to a specific point of view that could unduly affect an individual's judgment about a specific recommendation" (Guyatt, 2010, p. 739).

ones in their influence,[39] especially when guidelines rely heavily on expert consensus. The selection of the GDG[40] chair plays a pivotal role in ensuring the integrity of clinical guideline development.[41] WHO recommends selecting a guideline chair who is free of significant conflicts and neutral between differing perspectives.[42] NAM advises using "unconflicted methodologists"[43] to lead recommendation development, working alongside clinical experts as advisors rather than panel members. Both NAM and WHO stress that conflicted members should constitute no more than a minority of any GDG, emphasizing ongoing COI management throughout the entire guideline development process.[44] In 2022, the Endocrine Society adopted NAM's recommendations, prioritizing reduced conflicts even if it limits expert involvement.[45]

When the principal investigator of the JHU EPC team became involved in the SOC-8 process, she observed that they "would expect many, if not most, SOC8 members to have competing interests."[46] SOC-8's final COI statement reads as follows:

> Conflict of interests [sic] were reviewed as part of the selection process for committee members and at the end of the process before publication. No conflicts of interest were deemed significant or consequential.[47]

Based in part on correspondence between WPATH and the EPC team during the development of SOC-8, there are serious questions regarding the accuracy of this statement.

SOC-8 GDG members, including Chair Eli Coleman, had unmanaged financial and/or non-financial COIs that were plausibly "significant or consequential." Coleman had both financial and non-financial interests in the topic. He was the lead author of SOC-7[48] and had coauthored academic publications in support of expanded access to medical

---

[39] Guyatt et al. (2015, p. 540).
[40] SOC-8's GDG comprised a guidelines steering committee with a chair and two co-chairs, who in turn appointed 26 chapter leads, 77 chapter members, and 16 stakeholders.
[41] Graham et al. (2011, p. 87).
[42] World Health Organization (2014, p. 61).
[43] Graham et al. (2011, pp. 81–82).
[44] World Health Organization (2014, p. 71); Graham et al. (2011, p. 7).
[45] McCartney et al. (2022).
[46] *Boe v. Marshall*, No. 2:22-cv-00184: 560-16 (2024, p. 2).
[47] Coleman et al. (2022, p. S177).
[48] Coleman et al. (2012).

transition.[49] Using WHO criteria, his professional activities and academic profile, which were closely aligned with advancing medical transition, likely constitute both intellectual and financial COIs.[50]

Additionally, Coleman's academic work was supported with funding from the Tawani Foundation, chaired by Jennifer Pritzker, a philanthropist and advocate for transgender issues.[51] The foundation funded a research center at the University of Minnesota, and Coleman played a significant role in its development. Public statements confirm that the Tawani Foundation also funded the majority of the out-of-pocket costs associated with SOC-8's development.[52]

With Coleman as chair of the GDG, the importance of managing COIs appears to have been consistently misunderstood or undervalued. Coleman admitted under deposition that disclosure statements were not presented until at least six months *after* members had already been selected.[53] In a December 21 (2018) email sent to the SOC-8 education committee, EPC's Karen Robinson stated, "Disclosure, and any necessary management of potential conflicts, should take place prior to the selection of guideline members. Unfortunately, this was not done here."[54]

For former WPATH president Marci Bowers, who played an influential role in shaping SOC-8, the idea of appointing an unconflicted professional to lead the project was outright nonsensical.[55] Another SOC-8 member wrote to the EPC to explain that "unlike other medical guidelines, trans health care is a socially and politically charged issue," and strongly recommended that the JHU team therefore rewrite their COI forms for this

---

[49] Eisenberg et al. (2020); Rider et al. (2018).
[50] "Financial and nonfinancial interests can overlap. For example, intellectual interests related to career advancement obviously have a monetary component. Examples of roles or positions that might interfere with the objective assessment of a body of evidence include: prior publication of a study or SR that is part of the evidence base under consideration in the guideline; prior public declaration of a firm opinion or position, as in public testimony during a regulatory or judicial process, or in an editorial in a journal; or professional or personal affiliation with an organization advocating for products or services related to the subject of the guideline" (World Health Organization, 2014, p. 63).
[51] Boe v. Marshall*,* No. 2:22-cv-00184: 700-3 (2024, p. 239).
[52] Boe v. Marshall*,* No. 2:22-cv-00184: 700-3 (2024, p. 239).
[53] Boe v. Marshall*,* No. 2:22-cv-00184: 700-3 (2024, pp. 219–222).
[54] Boe v. Marshall*,* No. 2:22-cv-00184: 560-16 (2024, p. 2).
[55] Boe v. Marshall*,* No. 2:22-cv-00184: 564-8 (2024, p. 121).

particular guideline.[56] Part of the justification for different treatment was that COIs were so prevalent within the GDG that it would be "impossible" for the group to be free of them.[57] One submitted COI form, on the question of non-financial interests, recorded that "everyone involved in the SOC process has a non-financial interest."[58]

Although WPATH later claimed that none of the SOC-8 members' COIs were significant or consequential, several members clearly met the internationally recognized definitions of COIs established by the NAM and WHO—the kind of conflicts known to bias clinical practice guidelines and erode their trustworthiness. For instance, SOC-8 chapter leaders Dan Karasic and Loren Schechter were paid expert witnesses in legal cases directly related to medical transition before and during the SOC-8 development process,[59] a role NAM explicitly identifies as a COI.[60] Schechter, co-chair of the surgery chapter and a plastic surgeon who derives part of his livelihood from performing gender transition surgeries, voiced concerns to fellow GDG members about openly acknowledging insufficient evidence, noting the potential impact this would have on two federal court cases in which he was serving as a paid expert witness.[61] Despite this clear overlap of financial interest and guideline content, SOC-8 chair Eli Coleman considered it "ethically justifiable" for members involved in active litigation to advocate for guideline changes that could strengthen their legal positions.[62]

---

[56] Boe v. Marshall*,* No. 2:22-cv-00184: 560-16 (2024, p. 3).
[57] Boe v. Marshall*,* No. 2:22-cv-00184: 560-16 (2024, p. 3).
[58] Boe v. Marshall*,* No. 2:22-cv-00184: 560-24 (2024, p. 8).
[59] Schechter provided testimony for Dekker v. Weida, No. 4:22-cv-00325 (N.D. Fla. filed Sept. 7, 2022); Willis v. Flagg, No. 17-cv-02754 (N.D. Ill. filed Apr. 10, 2017); Bruce v. South Dakota, No. 3:17-cv-03023-RAL (D.S.D. filed Oct. 5, 2017); Boyden v. Conlin, No. 17-cv-00264-WMC (W.D. Wis. filed Apr. 6, 2017); Kadel v. Folwell, No. 1:19-cv-00272 (M.D.N.C. filed Mar. 11, 2019); Toomey v. State of Arizona, No. 4:19-cv-00035-RM-LAB (D. Ariz. filed Jan. 23, 2019); and Fain v. Crouch, No. 3:20-cv-00740 (S.D.W. Va. filed Nov. 12, 2020).

Karasic provided testimony for C.P. v. Blue Cross Blue Shield of Illinois, No. 3:20-cv-06145 (W.D. Wash. filed Nov. 24, 2020); Kadel v. Folwell, No. 1:19-cv-00272 (M.D.N.C. filed Mar. 11, 2019); Fain v. Crouch, No. 3:20-cv-00740 (S.D.W. Va. filed Nov. 12, 2020); Brandt v. Rutledge, No. 4:21-cv-00450 (E.D. Ark. filed May 25, 2021); K.C. v. Individual Members of the Indiana Medical Licensing Board, No. 1:23-cv-00595-JPH-KMB (S.D. Ind. filed Apr. 5, 2023); Dekker v. Weida, No. 4:22-cv-00325-RH-MAF (N.D. Fla. filed Sept. 7, 2022); and Doe v. Ladapo, No. 4:23-cv-00114-RH-MAF (N.D. Fla. filed Mar. 23, 2023).
[60] Graham et al. (2011, p. 79).
[61] Boe v. Marshall*,* No. 2:22-cv-00184: 700-13 (2024, p. 56).
[62] Boe v. Marshall*,* No. 2:22-cv-00184: 700-3 (2024, p. 158).

WPATH's process not only permitted significant financial and intellectual COIs among GDG members. It also allowed the creation of substantial panel composition bias—a phenomenon known as "panel stacking" (see Section 9.2.3). This occurs when GDGs predominantly consist of members sharing similar viewpoints or vested interests, thereby threatening the validity and trustworthiness of clinical guidelines. Experts in evidence-based medicine describe panel stacking as a major threat, emphasizing that it can profoundly reduce the credibility of recommendations, particularly when, as in pediatric gender medicine, the evidence is limited, contentious, or unsystematically reviewed.[63]

Kepp et al. note that "recruitment specifically because of expressed viewpoints and allegiance is a recognized major problem for guideline development." In their own example from an appraisal of a consensus statement on COVID-19 recommendations, the authors characterized a panel with a "35% (or more) prevalence" of advocates of COVID-19 elimination ("Zero-COVID") as "extreme."[64] For SOC-8, WPATH required that all members of the GDG be "WPATH Full Members in good standing."[65] Marci Bowers explicitly stated that it was important for participants to be "advocates" for WPATH's "gender-affirming" approach to be considered for the GDG,[66] further underscoring the GDG's bias.

Internal documents revealed that WPATH actively monitored SOC-8 members and disciplined those who publicly questioned WPATH's "gender-affirming" approach, creating an environment that discouraged critical dialogue. Psychologist Laura Edwards-Leeper, chair of WPATH's Child and Adolescent Committee and a member of both the child and adolescent SOC-8 committees, co-authored a *Washington Post* opinion piece with Erica Anderson,[67] a psychologist and then-president of WPATH's U.S. chapter, arguing that WPATH "largely seems to be a dangerous echo chamber"

---

[63] Kepp et al. (2024, p. 5).
[64] Kepp et al. (2024, p. 6).
[65] Coleman et al. (2022, p. 248).
[66] Boe v. Marshall*,* No. 2:22-cv-00184: 564-8 (2024, pp. 119–120). This response came after it was pointed out to Bowers that selecting GDG members based on their "advocacy" for medical treatment was in "tension" with selecting GDG members who could be "impartial arbiters" on the evidence for those treatments.
[67] Edwards-Leeper & Anderson (2021).

resistant to constructive criticism. Edwards-Leeper privately warned WPATH leaders that their intolerance for dissent and attempts to “muzzle clinicians” risked damaging the organization's credibility among professionals, patients, and educated parents.[68] Anderson faced a formal reprimand[69] after criticizing (with Bowers) the quality and consistency of care provided under the SOC framework.[70]

This combination of poorly managed COIs and restrictive membership practices significantly undermines the credibility and scientific integrity of SOC-8 as a clinical practice guideline. The GDG’s handling of the SRs of evidence WPATH commissioned for development of SOC-8 further highlights the serious threat to clinical integrity that plagued the guideline development process.

### 10.3.2 Suppression of evidence

NAM stipulates that trustworthy guidelines must be based on SRs of existing evidence. SOC-8 was promoted as the first to be “evidence-based,”[71] with its chair claiming it followed “the most rigorous protocol in the world to ensure these standards reflect scientific evidence.”[72] The Methodology section states that SOC-8 “incorporated the recommendations on clinical practice guideline development set forth by the National Academies of Medicine and the World Health Organization, which addressed transparency, conflict-of-interest policy, committee composition, and group process.”[73]

In 2018, as part of its development of a new clinical guideline, WPATH commissioned more than a dozen SRs from the EPC at JHU. SRs were completed and handed over to WPATH for its chapters on assessment, primary care, endocrinology, surgery, reproductive medicine, and voice therapy.[74]

These expert reviews had the potential to advance current understanding of the state of the evidence, but their usefulness cannot be evaluated because WPATH successfully

---

[68] Boe v. Marshall*,* No. 2:22-cv-00184: 560-26 (2024, p. 153).
[69] Boe v. Marshall*,* No. 2:22-cv-00184: 560-26 (2024, pp. 114–115).
[70] Shrier (2021b).
[71] “This version of the Standards of Care is the first to be developed using an evidence-based approach” (Radix, n.d., p. 13).
[72] Coleman (2023).
[73] Coleman et al. (2022, p. S247).
[74] Boe v. Marshall*,* No. 2:22-cv-00184: 560-17 (2024, p. 38).

suppressed them. In an email exchange from August 2020, a senior author from EPC, writing to the Agency for Healthcare Research and Quality (AHRQ),[75] stated that their SRs "found little to no evidence about children and adolescents" and that WPATH had been "trying to restrict our [JHU's] ability to publish."[76]

In a memo to all SOC-8 working group members, WPATH leadership reported that they "were caught on the wrong foot" when they learned that JHU wanted to publish reviews that would likely undermine WPATH's "gender-affirming" approach.[77] Despite their initial resistance, the JHU researchers ultimately capitulated to WPATH's new terms, allowing SOC-8's chair, co-chairs, a handpicked chapter member, and WPATH's Board of Directors to pre-approve manuscript content before any independent drafting could occur. Under WPATH's imposed process,[78] researchers were required to submit a proposal form outlining the planned results and conclusions before drafting even began—and again once the manuscript was ready for publication—ensuring that leadership could steer findings to align with predetermined agendas rather than allowing an independent, evidence-driven process.[79]

---

[75] A unit of the U.S. Department of Health and Human Services.
[76] Boe v. Marshall*,* No. 2:22-cv-00184: 560-23 (2024, p. 23) The AHRQ official acknowledged the message: "Knowing that there is little/no evidence about children and adolescents is helpful." Nevertheless, two years later HHS released a memo in which it asserted that "[r]esearch demonstrates that gender-affirming care improves the mental health and overall well-being of gender diverse children and adolescents" (OPA: Office of Population Affairs, n.d.).
[77] Boe v. Marshall*,* No. 2:22-cv-00184: 523-1 (2024, p. 14).
[78] See Figure 10.1.
[79] Boe v. Marshall*,* No. 2:22-cv-00184: 523-1 (2024, p. 8).

## Figure 10.1: WPATH approval process for manuscripts

1. The lead author submits a proposal of the publication to WPATH with the following headings: Background; Aim(s); Method; Results;

*WPATH Policy Use of Data for SOC8 – Version 2*
*Approved by WPATH Board of Directors – August 2020*

JHU_000003198

EXHIBIT 1 7



Conclusion (Maximum 1 page and states which SOC8 chapter the publication is linked to);
2. It is WPATH's responsibility that the proposal is shared with the Chair and Co-Chairs of the SOC8, the members of the WPATH Board of Directors and all members of the SOC8 chapter linked to the proposed publication within 14 days after receipt of the proposal. The aim will be to identify an individual (s) from the chapter (maximum 2 individuals if a publication concerns more than one chapter) who will work with the lead author(s) of the proposed publication (unless the lead author is already working with one or more Working Group members); it is the responsibility of the Working Group as a whole to identify and to nominate one of their members, either by vote or general consensus within the Working Group.
3. WPATH will keep a record of the possible proposals with deadlines for draft submissions - in order to avoid the development of multiple papers with the same aims using the same data;
4. It is WPATH Executive Committee's responsibility to ensure that a vote is held within 30 days after the dissemination of the proposal.
5. It will be a blind vote and approval to write the paper is granted to the author(s) by majority vote. In case of a tie, the WPATH President will have the deciding vote.
6. It is the President's responsibility to respond to the author(s) with approval or disapproval within fifty-six (56) days of submission of the proposal to WPATH.
7. Once the manuscript draft is ready for publication, the lead author will submit the publication to WPATH
8. It is WPATH Executive Committee's responsibility to ensure that the manuscript is disseminated to the Chair of the SOC8, the Co-Chairs of the SOC8, and the members of the WPATH Board of Directors within 7 days after receipt of the manuscript.
9. It is WPATH Executive Committee's responsibility to ensure that a vote is held within 14 days after the dissemination of the manuscript to the Chair and Co-Chairs of the SOC8 and Board members.
10. It will be a blind vote and approval is granted to author(s) for publication by majority vote. The Chair and Co-Chairs of the SOC8 and Board members all have one equal vote. In case of a tie, the WPATH President will have the deciding vote.

Among the terms required for gaining WPATH approval was ensuring that the SRs' findings supported, or at least did not undermine, WPATH's goal of promoting greater access to medical interventions. Additionally, the SOC-8 chapter's working group leader or an appointed representative or the SOC-8 chair/co-chairs and at least one person

who identified as transgender were required to oversee and approve the manuscript's design, drafting, and final content.[80]

Despite this close involvement and editorial control, all final documents were required to include a statement to the effect that "the authors are solely responsible for the content of the manuscript, and the manuscript does not necessarily reflect the view of WPATH."[81]

### Figure 10.2: Pathway to manuscript approval

**Pathway to approval for use of WPATH Data**

WPATH grants approval to use the Data for publication to any interested party, when:

a. the directives outlined under the aim of this policy have been fulfilled and;
b. the author(s) have acknowledged that WPATH has sponsored the acquisition of the data in the publication and;
c. the author(s) have acknowledged that the authors are solely responsible for the content of the manuscript, and the manuscript does not necessarily reflect the view of WPATH in the publication and;
d. The publication ("manuscript") has been approved by WPATH via a designated approval process.

**Designated approval process for publication of Data (see Figure 1)**




WPATH's stated goal was to "ensure that publication does not negatively affect the provision of transgender healthcare in the broadest sense."[82] Following this

[80] Boe v. Marshall, No. 2:22-cv-00184: 523-1 (2024, pp. 5–6).
[81] Boe v. Marshall, No. 2:22-cv-00184: 523-1 Exhibit 1 (n.d., p. 8). See Figure 10.2.
[82] Boe v. Marshall, No. 2:22-cv-00184: 560-17 (2024, p. 92).

renegotiation, only one SR, Baker et al. (2021), was published.[83] Internal WPATH documents reveal that Baker et al. complied with all the mandatory steps of WPATH's updated approval policy—from approving the conclusions before the manuscript was drafted to ensuring extensive WPATH engagement in the process and obtaining the final approvals. The Baker et al. SR was published with the mandatory disclaimer that "WPATH had no role in study design, data collection, analysis, interpretation, or drafting" of the SR. However, internally, WPATH actually recorded[84] its engagement in the design, drafting, and final approval of the article.[85]

[83] One other systematic review (Wilson et al., 2020) was published prior to the policy update.
[84] See checklist in Figure 10.3 below.
[85] Wilson et al. (2020) includes the same statement but was published prior to the new agreement, so it is not possible to determine the degree to which WPATH influenced its drafting and design.

### Figure 10.3: Checklist for Baker et al.[86]

**Checklist for JHU SOC8 systematic review papers**

Title of Paper: Hormone Therapy, Mental Health, and Quality of Life among Transgender People: A Systematic Review

Supporting Chapter: initial question part of questions from Hormone Chapter

Proposed Authors: Kellan E. Baker, MPH, Lisa M. Wilson, ScM, Ritu Sharma, BSc, Vadim Dukhanin, MD, MHS, Kristen McArthur, BA, Karen A. Robinson, PhD

Acknowledged Authors: None

| | |
|---|---|
| Yes or No | This paper provides data that advances the knowledge in the field of transgender health in a positive way |
| Yes or No | This paper will be published in a reputable, academic, peer-reviewed journal |
| | Journal proposed for first submission The Lancet Diabetes & Endocrinology |
| Yes or No | Involves the work group leader of the chapter or alternatively a designated representative of that specific SOC8 Chapter in the design, drafting of the article and final approval of the article |
| | Name of persons involved *chapter members provided original list of questions for reviews* |
| Yes or No | Involves at least one member of the transgender community in the design, drafting of the article and final approval of the article *chapter members provided original list of questions for reviews* |
| | Name of person if not open about trans status, if not open about trans status then enter N/A |
| Yes or No | Adheres to the WPATH language policy |
| | |

WPATH's policy appears to have effectively blocked the planned[87] and completed[88] research—including critical evidence appraisals—from being developed into publishable manuscripts. As a result, important SRs addressing the safety of PBs, CSH, and surgery for adolescents were suppressed, keeping key findings out of the scientific record and shielding them from professional scrutiny.[89]

[86] Source: Boe v. Marshall, No. 2:22-cv-00184: 560-17 (2024, p. 41).
[87] Robinson, Sharma, Baker, et al. (2019); Robinson, Sharma, Wilson, et al. (2019); Sharma et al. (2018).
[88] In total, only 2 systematic reviews were published, and only one (Baker et al., 2021) followed the policy update.
[89] See Chapter 7 for a more extensive discussion.

As established in Section 10.3.1, members of the GDG were committed to PMT and believed their positions to be grounded in evidence. Indeed, a central goal for SOC-8 was to deliver an updated version explicitly supported by robust evidence. However, once the GDG began working with methodological experts and applying evidence-based medicine (EBM) standards, it quickly became clear that their understanding of what constituted "strong evidence" was fundamentally at odds with established scientific criteria. Evidence that the GDG previously regarded as strong or compelling was frequently downgraded under EBM standards to low or very low quality, revealing a troubling gap between WPATH members' beliefs about evidence and the actual rigor of the underlying research. This process is clearly articulated by SOC-8 Chair Eli Coleman under points six ("Expert Consultation in Guideline Development") and seven ("Research Agenda") of a 12-point draft following SOC-8's publication:

> As we faced challenges of developing and revising the methodology of SOC 8, we had to rely on Johns Hopkins, which while some degree helpful, was very constraining. We were able to consult with other experts and was [sic] able to learn that there were other ways of developing guidelines that were probably more appropriate for the state of our science. As a result, our methodology evolved and was improved—however, we were not able to be as systematic as we could have been … Now that we have reviewed the evidence, we are painfully aware of the gaps in the literature and the kinds of research that are needed to support our recommendations and strengthened [sic] the level of evidence in support of them.[90]

When confronted with SRs that did not adequately support its positions—particularly given their stated legal and advocacy concerns (see next section)—the GDG chose not to adjust its views but to find an alternative methodology to support its recommendations. As SOC-8 GDG Co-Chair Jon Arcelus explained in an email to other GDG members, "[t]here are many recommendations in the SOC that don't have direct

[90] Boe v. Marshall*,* No. 2:22-cv-00184: 700-18 (2024, pp. 8–9).

evidence (most of the direct evidence is in the hormone chapter) but they have background evidence. This is why we have Delphi."[91]

A consensus-building process, Delphi is not a substitute for evidence-based recommendations but rather a method for GDGs to reconcile disagreement in the interpretation of SRs, or in deciding how evidence should inform treatment recommendations.[92] Guidelines that are not based on SRs inadvertently risk promoting suboptimal or even harmful care. This is why guidelines that rely only on consensus are not considered trustworthy.[93]

### 10.3.3 Redefinition of medical necessity

SOC-8 makes a strong recommendation that PBs, CSH, and surgery be considered "medically necessary" for eligible adolescents:

> We recommend health care systems should provide medically necessary gender affirming psychological, medical and surgical treatments for trans and gender diverse children, adolescents, and adults."[94]

The development of the "medical necessity" statement in SOC-8 starkly illustrates how many WPATH contributors prioritized goals other than ensuring the highest-quality care for adolescents with GD. A good example is WPATH's rewording of patient "wishes" as patient "needs" with the intent to frame them as "medically necessary." At first, the statement described the desired interventions as "wishes":

> There is strong evidence demonstrating the benefits in quality of life and wellbeing of gender affirming treatments, including endocrine and surgical procedures, properly indicated and performed as outlined by the Standards of Care (Version 8), in TGD people *wishing these treatments.*[95]

However, the final SOC-8 statement reads:

---

[91] Boe v. Marshall*,* No. 2:22-cv-00184: 560-37 (2024, p. 101). Delphi is a structured consensus-building method in which a GDG iteratively reviews and rates statements to achieve agreement; SOC-8 utilized a 75% threshold for consensus.
[92] Djulbegovic & Guyatt (2019).
[93] Lima, Tangamornsuksan et al. (2023).
[94] Boe v. Marshall*,* No. 2:22-cv-00184: 700-10 (2024, p. 32).
[95] Boe v. Marshall*,* No. 2:22-cv-00184: 700-10 (2024, p. 38).

> There is strong evidence demonstrating the benefits in quality of life and well-being of gender-affirming treatments, including endocrine and surgical procedures, properly indicated and performed as outlined by the Standards of Care (Version 8), in TGD people *in need of these treatments*.[96]

This consequential textual change was the result of WPATH members recognizing the implications of their word choice for insurance and legal contexts. The change was made based on the following request during the drafting phase:

> Thank you, I also very much like this statement and the supporting write-up. There is one word, though, in the middle (on the right side of the page) of the last paragraph on the first page of the document: "wishing." This word gives me pause, and perhaps I am being too sensitive, but one of the biggest obstacles trans people experience in getting support for coverage of our care is that we are told "you can't always get what you want" and "wishing does not make it so." Wishing makes the needed care seem optional, and we are often told we are imagining that we are not who we are and we should just suck it up. Would it be possible or advisable or prudent to replace "wishing" with "in need of" here? Thanks for your consideration, and for your great work on this.[97]

This was accompanied by WPATH's explicit instruction to providers to use the "Endocrine Disorder" diagnosis as an alternative for the mental health diagnosis of GD[98]:

---

[96] Coleman et al. (2022, p. 18, emphasis added).
[97] Boe v. Marshall, No. 2:22-cv-00184: 700-10 (2024, p. 28).
[98] Rosenthal (2021b, Slide 11). See Figure 10.4.

**Figure 10.4: WPATH training instructs providers to use "Endocrine disorder" code**




Together, these internal WPATH communications reveal that the "medical necessity" framing in SOC-8 was constructed to remove key safeguarding criteria and make patient desires central to treatment decisions. This was confirmed by another GDG member who candidly observed that the guidelines exist to allow any "goodwilling" clinician to meet patients' wishes—however medically inappropriate they may be.

> I think it is clear as hell that the SOC8 refers to the necessity of treatment (in its broadest sense) of TGD people who pursue treatment (in its broadest sense) for their gender dysphoria (small "d": because it refers to the symptom of distress - which is a very broad category and one that any 'goodwilling' clinician can use for this purpose (or: in the unescapable medical lingo we, as physicians arc stuck with: those who fulfil a diagnosis of Gender Dysphoria and Gender Incongruence as per APA/WHO).[99]

The request to substitute "wish" for "need" and emphasize "medical necessity" was welcomed by WPATH leaders, who responded that the assertion of medical necessity

[99] Boe v. Marshall, No. 2:22-cv-00184: 700-10 (2024, p. 37).

would influence the "obtuse and unhealthy" U.S. healthcare system by compelling insurance coverage through the courts:

> Thank you for putting this together; you've done a great job with this. Indeed, it is important that such a statement is part of the actual SOC. And, indeed, the original Medical Necessity Statement was specific to the U.S. because this was where we were experiencing the problem with our obtuse and unhealthy system of healthcare "coverage" and we needed a tool for our attorneys to use in defending access to care here. I have long wanted this (and many of our other policy statements) to become part of the SOC because that gives them greater force.[100]

GDG Chair Eli Coleman stated that while WPATH had no definition of "medically necessary," he understood this to be primarily a term used by insurance companies to determine which conditions or procedures to cover.[101] The SOC-8 legal and political goals are discussed in the next section.

### 10.3.4 Legal and political considerations

Internal documents reveal that SOC-8 authors manipulated guideline language with the explicit aim of shaping court rulings, legislative actions, and insurance coverage decisions, revealing a clear departure from the principles of unbiased, evidence-driven clinical guideline development. For example, contributors to the "Institutional Environments" chapter disclosed that "social justice lawyers" had advised them against rigorous evidence reviews, stating that such reviews might reveal limited or insufficient evidence, placing them "in an untenable position in terms of affecting policy or winning lawsuits."[102] As discussed above, a key motivation for including a "medical necessity" statement in the guidelines was described as a strategic move to provide "a tool for our attorneys to use in defending access to care" within the U.S. legal context.[103]

---

[100] Boe v. Marshall, No. 2:22-cv-00184: 700-10 (2024, pp. 33–34)
[101] Boe v. Marshall, No. 2:22-cv-00184: 700-3 (2024, p. 166).
[102] Boe v. Marshall, No. 2:22-cv-00184: 560-24 (2024, p. 3).
[103] Boe v. Marshall, No. 2:22-cv-00184: 700-10 (2024, pp. 33–34).

Schechter also expressed concerns about language, cautioning colleagues that terms such as “insufficient evidence” and “limited data” could strengthen legal arguments claiming medical interventions are experimental, and noting his own role as an expert witness in related federal cases.[104] Karasic, chair of the SOC-8 Mental Health chapter, highlighted the critical legal implications of defining treatments for adolescents as “medically necessary,” stating that this determination affects court cases, policy decisions, and insurance coverage.[105] Elsewhere, Karasic emphasized the urgency of addressing this issue clearly in SOC-8 given multiple ongoing lawsuits—some potentially reaching the Supreme Court of the United States—concerning whether medical gender interventions are “medically necessary” or “experimental or cosmetic.”[106]

One internal communication explicitly advised against using specific numerical age guidelines for treatments, stating, “I would avoid absolute numbers [for ages] that can be taken out of context or used in court” because they would disadvantage the people “we are trying to advocate for.”[107] Elsewhere, editorial input was provided specifically to help “Chase” [presumably a reference to Chase Strangio, Deputy Director for Transgender Justice with the ACLU’s LGBT & HIV Project].[108] GDG Chair Coleman urged the group to adopt a stronger defensive stance, stating, “we need a more detailed defense that we can use ... in the many court cases that will be coming up … especially around adolescence.”[109] One contributor even acknowledged prioritizing political advocacy goals explicitly over scientific accuracy, stating that SOC-8 should “land in such a way as to have serious effect in the law and policy settings...even if the wording isn’t quite correct for people who have the background you and I have.”[110]

Further, the U.S. healthcare context was clearly a specific focus of the SOC-8 authors. Karasic (SOC-8 Mental Health chapter chair) wrote:

[104] Boe v. Marshall, No. 2:22-cv-00184: 700-13 (2024, p. 56).
[105] Boe v. Marshall, No. 2:22-cv-00184: 560-24 (2024, p. 43).
[106] Boe v. Marshall, No. 2:22-cv-00184: 700-10 (2024, p. 44).
[107] Boe v. Marshall, No. 2:22-cv-00184: 560-34 (2024, p. 25).
[108] Boe v. Marshall, No. 2:22-cv-00184: 591-24 (2024, p. 9).
[109] Boe v. Marshall, No. 2:22-cv-00184: 700-8 (2024, p. 40).
[110] Boe v. Marshall, No. 2:22-cv-00184: 560-34 (2024, p. 25).

> But there are elements of the Medical Necessity statement that are critical to insurance reimbursement and access to care in the U.S., though not so in every country, and these should have a place somewhere in SOC 8. If WPATH SOC 8 fails to adequately support access to trans care in the U.S. by overgeneralizing wording, it may be globally applicable, but it is not globally useful, insofar as the U.S. is part of the globe. There should be room in SOC 8 to address concerns of national health systems, or other non-reimbursement focused systems without making SOC 8 less useful to U.S. trans care … Medical necessity is at the center of dozens of lawsuits in the U.S. right now over state actions to make trans care inaccessible, as well as being at the center of all reimbursement for trans care in the U.S. … it is critical that WPATH SOC 8 gets this right, which I think it does, currently."[111]

Incorporation of legal advocacy goals into guideline language, explicitly for purposes of influencing policy and litigation outcomes, conflicts sharply with accepted international standards emphasizing scientific rigor and impartiality.

Internal documents reveal that WPATH leadership was aware that the guidelines would be criticized due to the "continuing pressure in healthcare to provide evidence-based care." Coleman noted ongoing resistance from "academics and scientists who are naturally skeptical," "parents of youth who are caught in the middle of this controversy," and pressures arising from the "increasing number of regret cases and individuals who are vocal in their retransition process who are quick to blame clinicians for allowing themselves to transition despite an informed consent process."[112]

In response to anticipated criticism of SOC-8, Coleman drafted a "12-point strategic plan to advance gender-affirming care."[113] The plan acknowledged that all members of the GDG were "painfully aware that there are many gaps in research to back up our recommendations," and emphasized the importance of building consensus among

---

[111] Boe v. Marshall*,* No. 2:22-cv-00184: 700-10 (2024, p. 65).
[112] Boe v. Marshall*,* No. 2:22-cv-00184: 700-18 (2024, p. 5).
[113] Boe v. Marshall*,* No. 2:22-cv-00184: 700-18 (2024, p. 6).

medical groups in support of SOC-8. Coleman observed that the endorsement of medical organizations "has been an extremely powerful argument" in "legal battles":[114]

> As we are facing so many legal battles over trans health care and rights, the statement that the SOC has so many endorsements has been an extremely powerful argument. We need to be able to get the support of these important organizations and know how to indicate their support accurately or this argument in these court cases could be challenged.[115]

## 10.4 Elimination of age minimums

The handling of minimum age recommendations for clinical interventions for adolescents in SOC-8 exemplifies what happens when guideline development is compromised by ideological beliefs, COIs, and disregard for established evidence standards.

Initially, SOC-8 included age minimums for certain interventions: 14 years for cross-sex hormones; 15 years for mastectomy; 16 years for breast augmentation and facial surgery; 17 years for metoidioplasty, orchiectomy, vaginoplasty, hysterectomy, and fronto-orbital remodeling; and 18 years for phalloplasty. In July 2022, WPATH faced significant pressure from Admiral Rachel Levine, the U.S. assistant secretary for health, whose office communicated concern that listing specific, minor ages would trigger restrictive legislative actions. Internally, some SOC-8 members expressed discomfort about acceding to pressures from the federal government. "I don't know how I feel about allowing U.S. politics to dictate international professional clinical guidelines that went through Delphi," said one SOC-8 co-chair.[116] Another complained that it "is not appropriate to take any feedback from a nonmedical professional seriously."[117] Despite

[114] Boe v. Marshall, No. 2:22-cv-00184: 560-40 (2024, pp. 6–8). Of note, although SOC-7 is now outdated, it was SOC-7 that was responsible for establishing the "gender-affirming" medical approach in the U.S. and internationally. The email from the lead author of both SOC-7 and SOC-8, Coleman, discloses that despite the widespread narrative that SOC-7 had been endorsed by all medical organizations, no such endorsements ever occurred. Coleman said he had "no idea how it was ever said that so many medical organizations … endorsed SOC 7" (Boe v. Marshall, No. 2:22-cv-00184: 700-3, 2024, pp. 262–264).
[115] Boe v. Marshall, No. 2:22-cv-00184: 560-40 (2024, p. 8).
[116] Boe v. Marshall, No. 2:22-cv-00184: 700-15 (2024, p. 33).
[117] Boe v. Marshall, No. 2:22-cv-00184: 700-15 (2024, p. 27).

these reservations, WPATH's apparent investment in securing endorsement from the Biden administration led it to agree to downgrade age guidelines from "recommendations" to "suggestions," thereby circumventing the original consensus process by making these changes without conducting a new round of validation.[118]

The issue of minimum ages resurfaced when the American Academy of Pediatrics (AAP) threatened to publicly oppose SOC-8 unless all age thresholds were eliminated—further exposing how political pressure, rather than scientific evidence or clinical judgment, dictated the final content of the guidelines.[119] Under pressure and facing open opposition from a key ally, WPATH leaders capitulated and agreed to eliminate minimum age criteria for all hormonal and surgical procedures (except phalloplasty). They did so despite acknowledging privately that the individuals within the AAP who were issuing the demand were very junior and lacked the authority or expertise to credibly dictate clinical standards.[120]

In the process of removing minimum ages, WPATH's president wrote that it was "disappointing that politics always trumps common sense and what is best for patients."[121] Another WPATH leader confided that the deletion of age minimums "is a balancing act between what I feel to be true and what we need to say."[122] SOC-8 Co-Chair Jon Arcelus said that removing ages would "make a joke of our methodology."[123]

The rushed, 11th-hour changes—made outside any formal or transparent guideline development process—resulted in SOC-8 initially being published with its original age recommendations still intact. Only after publication did WPATH scramble to issue a correction via an erratum in their official journal, the *International Journal of Transgender Health*, quietly removing age restrictions to align with political demands rather than

---

[118] Boe v. Marshall, No. 2:22-cv-00184: 700-3 (2024, pp. 292–295); Boe v. Marshall, No. 2:22-cv-00184: 700-15 (2024, p. 33). SOC-8's final round of Delphi processing was in January 2022 (Coleman et al., 2022, p. S251).
[119] Coleman explains that removing ages "led to them [i.e. AAP] formally not opposing the SOC. Yes this is highly confidential" (Boe v. Marshall, No. 2:22-cv-00184: 700-17, 2024, p. 153).
[120] Boe v. Marshall, No. 2:22-cv-00184: 700-16 (2024, p. 201).
[121] Boe v. Marshall, No. 2:22-cv-00184: 700-15 (2024, p. 26).
[122] Boe v. Marshall, No. 2:22-cv-00184: 700-6 (2024, p. 103).
[123] Boe v. Marshall, No. 2:22-cv-00184: 700-16 (2024, p. 110).

clinical evidence.[124] The current, published version of SOC-8 states that all recommendations went through the Delphi process. However, Coleman later acknowledged that removal of age minimums did not go through Delphi.[125]

## 10.5 Continued reliance on SOC-8

It remains concerning that SOC-8 continues to exert substantial influence over U.S. healthcare. WPATH's misconduct during the development of SOC-8 was covered by major news outlets including *The New York Times*,[126] *The Economist*,[127] *The Boston Globe*,[128] *Fox News,*[129] and *National Review,*[130] as well as by the *BMJ*, a leading medical journal.[131] Despite these reports, with the exception of the American Society of Plastic Surgeons,[132] major American medical associations have not issued public statements addressing the concerns detailed in this chapter.

In an amicus brief submitted to the Supreme Court of the United States for the upcoming case *U.S. v. Skrmetti*,[133] the AAP and 21 other medical organizations describe SOC-8 as an "established, evidence-based clinical guideline." The brief does not address any of the concerns or revelations regarding the guidelines' development outlined in this chapter. Similarly, a group of 11 prominent "adolescent medicine specialists, pediatricians, clinicians, methodologists, professors, and researchers"—including professionals affiliated with the medical schools of Harvard University, Stanford University, and the University of Pennsylvania—asserts in a separate brief that SOC-8 has "all" the National Academy of Medicine's "hallmarks of reliability."[134]

The U.S. Department of Justice (DOJ) intervened in 2022 to challenge Alabama's age limit law in *Boe v. Marshall*, thereby becoming familiar with the subpoenaed documents

[124] Correction (2022).
[125] Boe v. Marshall, No. 2:22-Cv-00184: 700-3 (2024, pp. 294–295).
[126] Ghorayshi (2024b).
[127] The Economist (2024).
[128] Selin Davis (2024b).
[129] Joseph (2024).
[130] Whelan (2024a).
[131] Block (2024a).
[132] Sapir (2024c).
[133] U.S. v. Skrmetti (No. 23-477), American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations, Amicus curiae brief (2024, p. 8).
[134] U.S. v. Skrmetti (No. 23-477), Clinical Practice Guideline Experts, Amicus curiae brief (2024, p. 22).

from WPATH. Nevertheless, in August 2024—two months after the documents were unsealed—the DOJ in a merits brief filed in *U.S. v. Skrmetti* described WPATH as “the leading association of medical professionals treating transgender individuals” and asserted that “[t]he Nation’s leading medical and mental health organizations recognize [SOC-8] as reflecting the accepted standard of care for treating gender dysphoria.”[135]

[135] U.S. v. Skrmetti (No. 23-477), Brief for the petitioner (2024, p. 3).

# Chapter 11 Collapse of Medical Safeguarding

When children or adolescents develop feelings of severe discomfort with their sexed bodies, parents understandably worry and consult pediatricians or therapists for advice. These frontline clinicians in turn refer them to specialists, believing that this requires special expertise. Both parents and the clinicians they initially consult likely expect that those with expertise in "gender" will conduct a comprehensive evaluation to rule out other, perhaps more common causes of such feelings. They may further assume that puberty blockers (PBs), cross-sex hormones (CSH), and surgery are offered only in rare cases, when less invasive alternatives are ineffective, and after careful consideration of the patient's unique developmental needs as well as the profound uncertainties and risks of the treatments.

This chapter documents how the original Dutch Protocol that underpins pediatric medical transition (PMT) has undergone transformation in the U.S. to become a "child led" process in which the patient's personal "embodiment goals" form the basis for the determination of "medical necessity." Section 11.1 revisits the Dutch Protocol (critically assessed in earlier chapters) and explores how the original safeguards on the practice of pediatric medical transition (PMT) have been systematically dismantled in the U.S. Section 11.2 evaluates the frequent assertion that PMT is "rare," questioning whether this claimed infrequency genuinely indicates rigorous assessment standards. Section 11.3 discusses a deeper shift in PMT objectives, highlighting how the concept and role of "assessment" have fundamentally changed. Section 11.4 introduces whistleblowers with direct experience in PMT who, similarly to their counterparts in the U.K.,[1] have revealed practices they consider unsafe and inconsistent with established clinical standards, providing additional evidence of expedited pathways to medical interventions in leading pediatric gender clinics across the U.S.

## 11.1 The Dutch Protocol and the relaxation of its criteria in the U.S.

According to WPATH SOC-8, the Dutch studies associated with the Dutch Protocol provide "[t]he most robust longitudinal evidence supporting the benefits of gender-

[1] Barnes (2023).

affirming medical and surgical treatments in adolescence …"[2] In his testimony before the Florida Boards of Medicine and Osteopathic Medicine, Aron Janssen, vice chair of clinical affairs at Lurie's Pritzker Department of Child and Adolescent Psychiatry, who also serves as chair of the American Academy of Child and Adolescent Psychiatry's Sexual Orientation and Gender Identity Issues Committee, said that "the best longitudinal data we have on transgender youth comes primarily out of the Dutch clinic … The Dutch model of care [is] the prevailing model of care that most of the American clinics have based their care upon."[3] SOC-8 seems to acknowledge the guardrails recommended in the Dutch Protocol, contrasting the "detailed comprehensive diagnostic assessment process" of that Protocol with treatment based on "limited or no assessment." According to WPATH, the latter approach "has no empirical support and therefore carries the risk that the decision to start gender-affirming medical interventions may not be in the long-term best interest of the young person at that time."[4]

### 11.1.1 U.S. gender clinics' departure from the Dutch Protocol

In 2022, investigative reporters from Reuters interviewed "doctors and other staff at 18 gender clinics across the country" and found that "[n]one described anything like the months-long assessments [the Dutch clinicians] adopted in their research." Seven of the 18 clinics said they were comfortable prescribing hormones on an adolescent's first visit, provided clinicians saw no "red flags."[5]

The Dutch clinicians themselves recognized the divergence of the American model from their approach.[6] Noting the shift in age-of-onset, sex ratio, and mental health profile in the pediatric clinical population, Annelou de Vries wrote in 2020 that "[t]hese youth did not yet participate in the early evaluation studies. This raises the question of whether the positive outcomes of early medical interventions also apply to adolescents who more recently present in overwhelming large numbers for transgender care, including

[2] WPATH is referring to de Vries et al. (2011) and de Vries et al. (2014), discussed in several earlier chapters.
[3] Florida Boards of Medicine and Osteopathic Medicine Joint Rules/Legislative Committee (2022), 47:45–48:03.
[4] Coleman et al. (2022).
[5] Terhune et al. (2022).
[6] For a study on how different countries have responded to the Dutch Protocol see Kozlowska et al. (2024).

those that come at an older age, possibly without a childhood history of [gender incongruence]."[7] In 2021, Thomas Steensma complained that "the rest of the world is blindly adopting our research …"[8] Steensma reiterated this position in 2023, explicitly distancing his work from the child-led model prevalent in the United States, stating, "That's not our approach."

Of note, the Dutch Protocol did not recommend surgeries prior to legal adulthood, but according to WPATH guidelines, which are followed in the United States,[9] most surgeries, including most genital surgeries, may be deemed medically necessary for certain adolescents with GD.[10] Accordingly, adolescents with GD do undergo mastectomies[11] and (much less commonly) genital surgeries.[12] In the published research on mastectomies in adolescent females with GD,[13] some participants were as young as 12 years old.[14]

## 11.2 Is pediatric medical transition "rare"?

To bolster the perception that medical gatekeeping ensures patient safety, advocates of PMT frequently assert that medical interventions are "rarely prescribed" to minors. In 2022, for example, the president of the American Academy of Pediatrics (AAP) asserted in an opinion piece published in *The Wall Street Journal* that "for the vast majority of children," the "gender-affirming" approach recommends the "opposite" of medical interventions.[15] These claims are not supported by the data.

In 2025, a *JAMA Pediatrics* study utilizing insurance data reported that about 0.1% of American 17-year-olds, or one in 1,000, received CSH between 2018 and 2022. The authors concluded that hormonal interventions are therefore "rare" and decried the "politicization of gender-affirming care for transgender youth … driven by a narrative

[7] de Vries (2020).
[8] Tetelepta (2021a). There is an English translation available: Tetelepta (2021b).
[9] Coleman et al. (2022).
[10] E.g., "A key challenge in adolescent transgender care is the quality of evidence evaluating the effectiveness of medically necessary gender-affirming medical *and surgical treatments* (GAMSTs)" (Coleman et al., 2022, S45-S46, emphasis added).
[11] Wright et al. (2023); Ghorayshi (2022); Sapir (2024c).
[12] Milrod & Karasic (2017); Terhune et al. (2022).
[13] Ascha et al. (2022); Olson-Kennedy, Warus, et al. (2018); Tang et al. (2022).
[14] Tang et al. (2022).
[15] Szilagyi (2022a).

that millions of children are using hormones and that this type of care is too freely given."[16]

Such claims ignore a number of critical facts. First, no serious critic or skeptic of PMT has claimed that "millions of children are using hormones." Second, whether a prevalence of one in 1,000 is "rare" is subjective. For context, the prevalence of Type 2 diabetes in less than one in 1,000—a rate that medical authorities have described as "high" and even as "an awakening epidemic."[17] Third, even medical interventions that are objectively "rare" can raise profound ethical concerns. For example, "only" about 600 out of millions of African American men were recruited into the highly unethical Tuskegee syphilis study.

A central question in the debate over the frequency of medical interventions, and by extension whether they are "rare" or "freely given," concerns the appropriate choice of denominator. The authors of the *JAMA* study calculated prevalence using the total population of American adolescents as the denominator. However, in a press release accompanying the study, one of the authors noted that access to hormones was "surprisingly low, given that over 3% of high school youth identify as transgender"—implicitly invoking a different denominator.

Another denominator, which yields an even higher estimated frequency, is the number of adolescents diagnosed with GD and/or referred to a gender clinic, where they ostensibly undergo an "assessment" to determine whether medical interventions are indicated. Data on the rate of medicalization among adolescents diagnosed with GD and/or referred to a gender clinic are lacking.

Reports from individual clinics suggest that medicalization is the norm, rather than the exception. For example, pediatric endocrinologist Daniel Shumer of the Comprehensive Gender Services Program (CGSP) at University of Michigan Health estimated that "65 percent" of pediatric patients referred to his clinic end up receiving CSH.[18] According to data collected by Jamie Reed, a case worker at the Washington University School of

[16] Hughes et al. (2025).
[17] Lawrence et al. (2021); Kingsbury & Greene (2025) and the research articles cited therein.
[18] Doe v. Horne, No. 4:23-cv-00185-JGZ: 265 (2025, p. 52).

Medicine Pediatric Transgender Center at St. Louis Children's Hospital, 67 percent of the clinic's patients were prescribed endocrine interventions during her four-year tenure at the clinic.[19] Finally, WPATH has itself implied that medical interventions are appropriate for "most adolescents" who seek them. In its response to the release of the Cass Review in the U.K., WPATH issued a statement criticizing the Review as being "rooted in the false premise that non-medical alternatives to care will result in less adolescent distress for most adolescents…"[20]

## 11.3 Shift in objectives and the new meaning of "assessment"

The AAP and other American medical associations argue that transition-related medical decisions for minors are made in consultation with parents and only after a "robust diagnostic assessment."[21] Under the original Dutch Protocol, assessments were intended to predict lifelong transsexuality, with pubertal suppression conceptualized as part of the diagnostic process (buying "time to think"). By contrast, the "gender-affirming" model, as it has evolved in the United States, prioritizes the autonomy of children and adolescents, allowing their current "embodiment goals" to direct treatment decisions.[22]

A systematic review of recommendations for the management of GD in children and adolescents found an absence of "[d]etailed guidance" and "no consensus about the aim or clinical approach"[23] of assessment. Understanding the realities of clinical care for youth with GD in the U.S. requires appreciating the shift in the meaning of assessment, which reflects a deeper change in the goals of PMT. According to the Dutch approach, the goal was to predict lifelong "transsexualism." Mental health professionals were to ascertain whether a GD diagnosis was appropriate and if so, whether it was likely to persist through adulthood. Although advocates of this approach generally regard a

---

[19] Broyles & Trakas (n.d.).
[20] Block (2024c). The original statement from WPATH/USPATH (2024, April 12) was deleted from WPATH's website (404 Not Found | WPATH, n.d.). The April 12 WPATH/USPATH statement was covered by the NPR station WBUR (Scheimer et al., 2024). WPATH subsequently changed the statement, removing the referenced passage (see World Professional Association for Transgender Health & United States Professional Association for Transgender Health, 2024a; 2024b).
[21] U.S. v. Skrmetti (No. 23-477), American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations, Amicus curiae brief (2024).
[22] Block (2023d).
[23] Taylor, Hall, Heathcote et al. (2024b, s80).

diagnosis of GD as a necessary condition for medical interventions, there is considerable disagreement about whether it is sufficient.

More recently, advocates of early intervention have argued that “trans kids know who they are”[24] and that the goal of treatment is to help them achieve their personal “embodiment goals.”[25] If an adolescent’s self-conception or embodiment goals later change, this is not considered a failure of treatment but part of a “gender journey.”[26] In 2023, Jason Rafferty, the lead author of the AAP’s 2018 policy statement, “Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents,” explained that PMT is about “affirming and validating the child’s sense of identity from day one through to the end.” If a child says, “I’m X, we operate under the assumption that what they’re telling us is their truth, that the child’s sense of reality and feeling of who they are is the navigational beacon to sort of orient treatment around.” If patients later detransition, this does not mean that the treatments were inappropriate, even if the interventions’ effects are partly or fully irreversible: “They’re not treatment failures if that’s what’s affirming,” Rafferty said.[27]

Of note, the more cautious approach, which seeks diagnostic and prognostic clarity and aims at improvements in mental health, has been found to be unsupported by evidence. No test can reliably predict the natural course of an adolescent’s identity development. The U.K.’s Cass Review found that a gender dysphoria diagnosis “is not predictive that the individual will go on to have longstanding trans identity.”[28] Clinicians who adopt the earlier diagnostic-oriented model might perceive their approach as more cautious relative to colleagues practicing the newer “affirming” model; however, research on outcomes from both approaches has been rated unreliable.

One indicator of the changing definition of “assessment” is that leading gender clinicians—who until recently characterized PBs as a “fully reversible” and temporary “pause button” intended to give patients “time to think”—now acknowledge that these

[24] See footnote 33 in Chapter 2.
[25] Ashley et al. (2023); Boskey et al. (2025, p. 2); Brennan et al. (2025, p. 5); Mosier-Mills et al. (2024).
[26] “Clinicians should see detransition as one of many possible steps in a person’s gender journey” (Ashley et al., 2025, p. 7).
[27] Block (2023d).
[28] Cass (2024, p. 146).

drugs function as the first step in a broader medical transition protocol and must be considered in conjunction with cross-sex hormones. For example, in an amicus brief submitted to the Supreme Court of the United States, a leading advocate for PMT, Meredithe NcNamara of the Yale School of Medicine, and colleagues, fault the University of York systematic reviews, commissioned for the Cass Review, for failing to conceptualize PBs and CSH as a single “consistent, well-organized standard of care.” According to McNamara et al., if, as research suggests, “the vast majority of adolescents with gender dysphoria who receive puberty blockers progress to cross-sex hormone therapy,” that is not because PBs interfere with the natural process of GD resolution but “because [the adolescents] are indeed transgender and because their diagnosis of gender dysphoria is accurate.”[29] This explanation for the observed high persistence of GD lacks empirical support due to the absence of controlled prospective studies and raises concerns about motivated reasoning. Many of the brief’s authors are actively engaged in the practice of PMT and therefore have intellectual and financial conflicts of interest.[30]

### 11.3.1 Ambiguity in SOC-8

On the surface, WPATH SOC-8 might appear to recommend a cautious approach toward assessment. Mental health providers are to conduct a “comprehensive biopsychosocial assessment” prior to initiating medical interventions in order “to understand the adolescent’s strengths, vulnerabilities, diagnostic profile, and unique needs to individualize their care.”[31] At the same time, however, WPATH recommends that clinicians use the *International Classification of Diseases* (ICD-11) diagnosis of “Gender Incongruence of Adolescence and Adulthood,” which, unlike the DSM-5 diagnosis of “Gender Dysphoria,” requires only “marked and persistent incongruence between an individual’s experienced gender and the assigned sex.” Because SOC-8 defines transgender in a similar way (“people whose gender identities and/or gender

---

[29] U.S. v. Skrmetti (No. 23-477), Expert Researchers and Physicians, Amicus curiae brief (2024, pp. 16–17).
[30] The lead author, McNamara, has positioned herself in media and court appearances as a provider of PMT to minors. However, in a deposition McNamara revealed that she does not in fact administer PMT to minors with GD. See Sapir (2024b).
[31] Coleman et al. (2022, Chapter 6).

expressions are not what is typically expected for the sex to which they were assigned at birth") and provides no meaningful distinction between this meaning of transgender and gender non-conformity, SOC-8 effectively recognizes transgender identification as a medical condition justifying medical interventions.[32]

It is widely recognized that a fundamental tension exists between WPATH's desire to treat transgender identity (gender incongruence) as a normal and healthy variation of human development and its insistence that gender incongruence requires "medically necessary" treatment. This tension was explicitly acknowledged in medical literature supporting PMT contemporaneous with the preparation and publication of the fifth edition of the DSM. For example, in 2013, Jack Drescher, a prominent clinician-advocate of PMT, noted the significant difficulty in reconciling the "contradictory narratives" of "reducing stigma (which underlies the call for removal of the gender diagnoses [from the DSM]) and maintaining access to care (which requires the existence of a diagnosis in order to obtain needed medical treatment covered by third party payers)."[33]

In the lead-up to SOC-8's publication, *The New York Times* reported on disagreements among proponents of PMT concerning the proposed assessment recommendations for adolescents. One clinician told the *Times* it was "harmful and destructive and abusive and unethical and immoral" to require that a candidate for medical transition have longstanding GD since childhood—a key element of the Dutch Protocol. Another described the assessment recommendations as a "comprehensive inquisition of [an adolescent's] gender." The International Transgender Health Group criticized WPATH's draft chapter for its "harmful assertion of psychogatekeeping" and for "undermin[ing] patient autonomy." Asked whether it was appropriate to assess "the basis of a kid's gender identity," physician Colt St. Amand, a coauthor of SOC-8, told the *Times* that this "just reeks of some old kind of conversion-therapy-type things … People are who they say they are, and they may develop and change, and all are normal and OK." St. Amand was "less concerned with certainty around identity, and more concerned with

[32] See Chapter 13; The acronym "T/GNC" [transgender and gender-nonconforming] is commonly used in literature supportive of PMT.
[33] Drescher (2014, pp. 11–12).

hearing the person's embodiment goals. Do you want to have a deep voice? Do you want to have breasts? You know, what do you want for your body?"[34]

### 11.3.2 SOC-8 guardrails abandoned

Although WPATH's guidelines do not necessarily discourage mental healthcare, they likewise do not require it as a precondition for PMT. Some guideline authors opposed even minimal requirements for mental health support, arguing that such provisions were analogous to "conversion therapy."[35] SOC-8's only formal recommendation is for a "comprehensive biopsychosocial assessment," although WPATH emphasizes that its guideline is "flexible," thereby leaving room for considerable variation in clinical practice.[36]

In 2024, leaked discussions among WPATH members illustrated the extent to which the organization's own members' practice is not always consistent with SOC-8 recommendations. Some WPATH members candidly acknowledged foregoing even minimal psychological evaluations and moving quickly toward hormonal interventions. The candid nature of these exchanges suggests that non-adherence to the guidelines is not a source of professional shame, and not an isolated phenomenon.[37] The flexibility embedded in SOC-8 has facilitated significant gaps between the guidelines' theoretical standards and the practical reality in clinical settings.

Further, this flexibility has effectively provided leaders in the field of PMT with a basis to argue that assessment should not serve the purpose of differential diagnosis or medical "gatekeeping" but rather should function primarily to inform patients and their caregivers about the nature and effects of medical interventions. In 2020, a Canadian conference presentation reported that among pediatric gender clinics surveyed, half did not require any mental health assessment prior to initiation of hormonal interventions.[38] As one group of clinicians recently stated:

---

[34] Bazelon (2022b).
[35] Bazelon (2022a).
[36] Coleman et al. (2022, p. S6).
[37] Hughes (2024).
[38] Lawson et al. (2020).

> When a family comes to a mental health provider requesting a letter for a biopsychosocial assessment for pubertal suppression, work begins by explaining, in developmentally appropriate language, that this is not an assessment of whether they ‘are actually transgender,’ as many patients worry; rather this assessment is meant to help them understand the intricacies of pubertal suppression, so that they can make the best decision for themselves. The primary goal is to provide information, while identifying all potential avenues of support (social, educational, medical, and legal) related to gender.[39]

Jack Turban, the lead author of this statement and Director of the Gender Psychiatry Program at the University of California San Francisco, has said that differential diagnosis is pointless and may even be harmful. He disputes the notion that mental health assessment can reduce the risk of later regret, claiming that “there’s not data [sic] that … any of these assessments make that [outcome] less likely.”[40] According to Turban, children and adolescents “are just going to figure out the answers and then tell you what you want to hear. And you’ve set up this argumentative relationship with your patient or client.”

Robert Garofalo of Lurie Children’s Hospital in Chicago agrees that determining the causes of a child’s feelings of alienation from their body through assessment is unnecessary.

> Sometimes parents will come in and be like, “I want to make sure that my young person, my child, is really trans … Can you help me with that?” And I’ll turn to the child and be like, “yeah, so, you know, what gender identity do you have?” … You know, there’s no form, there’s no scale, there’s no psychological battery of tests that needs to be done. Really, any young person can answer that question for themselves … Parents … think that they’re going to come in and have this evaluation that is gonna help determine their child’s gender identity, when really

[39] Turban et al. (2025, pp. 12–13).
[40] GenderGP (2021).

> … our work sometimes is just getting them to recognize that anyone's gender identity … is a normal variation …[41]

Amy Tishelman, formerly of the Gender Multispecialty Service at Boston Children's Hospital, expressed discontent with the new model of assessment in an interview with *The Boston Globe*. "I've never been happy with that way of characterizing it. I feel like an assessment should encompass more than just, 'Should a person get medical intervention, or shouldn't they?'"[42] In contrast, physician A.J. Eckert, former medical director at Anchor Health Initiative in Connecticut, avowed: "If you are trans, I believe you." For Eckert, minors "are best equipped to make decisions about [their] own body." Eckert further clarified that while medical interventions at Anchor Health are not provided before puberty, psychological therapy is not mandatory because "being trans is not a pathology."[43]

### 11.3.3 Collapse of assessment times

The erosion of medical safeguarding practices within American gender clinics is evident in the significant reductions in patient assessment durations at prominent institutions.

#### 11.3.3.1 Boston Children's Hospital

GeMS at Boston Children's Hospital is the nation's first pediatric gender clinic and is highly regarded internationally. Whereas in 2013 GeMS allocated a minimum of 20 hours for mental health assessments per patient, court records indicate that by 2021 the clinic had reduced these evaluations to approximately two hours per patient.[44] Laura Edwards-Leeper, the clinic's founding psychologist, characterized this change as "shocking." Amy Tishelman, a former GeMS psychologist and SOC-8 developer, described it as "reckless."[45] Tishelman's tenure ended following disagreements with colleagues, culminating in litigation. Current co-director Kerry McGregor defended the reduction in assessment times, stating that two-hour assessments were initiated around

---

[41] Figliolia (2025).
[42] Damiano (2024b).
[43] Edwards-Leeper & Anderson (2021); the quote from Eckert is in Eckert (2020).
[44] Alder (2024).
[45] Ryan (2024a).

2017–2018 and are "appropriate" given the expanding patient load.[46] Endocrinologist and GeMS director Jeremi Carswell remarked in 2021 that puberty blockers were being prescribed "a lot like candy."[47]

### 11.3.3.2 Children's Hospital Los Angeles

Johanna Olson-Kennedy, medical director of the Center for Trans Youth Health and Development at Children's Hospital Los Angeles, has acknowledged that she approves some of her minor patients for endocrine interventions after "a couple of hours" of assessment.[48] In December 2024, Olson-Kennedy and the hospital were named as defendants in a lawsuit filed by a former patient whom Olson-Kennedy allegedly approved for PBs at age 12 following a single consultation with no involvement of a mental health professional. The lawsuit further alleges that Olson-Kennedy told the parents of the patient that the patient faced suicide risk without medical interventions, despite no prior suicidal history. Subsequently, the patient was put on testosterone at 13, underwent a double mastectomy at 14, and was recommended for hysterectomy at 17.[49]

### 11.3.3.3 Lurie Children's Hospital

In a webinar hosted by AMAZE, a producer of sex education content for students, Robert Garofalo of Lurie Children's in Chicago explained how his clinic handles parents who have doubts about the safety of medical interventions.

> Most of the young people who come in are wanting to figure out how fast they can get on hormones and what is the safest process to do that … 80% of the young people who come are often really activist [sic] in their mindset and come dragging their parents to the medical visit … The counterweight to that is the parents who are often coming in with questions about how can this be done safely, is this really the right decision, and so it's really a bit of a puzzle to put the pieces together to make sure that you are meeting the patient's needs but also

[46] Damiano (2024a).
[47] Lindquist (2022).
[48] Deposition of J. Olson-Kennedy in LB v Premera Blue Cross NO. 2:23:Cv-00953-TSZ (2024, p. 63).
[49] Complaint, Breen v. Olson-Kennedy*,* No. 24STCV32096 (2024).

> moving the parents along … in a way that continues to get them educated so that they feel comfortable with the decisions they're about to make, because the truth is that these young people need their parents to be well and to do this well, and so it's our job as pediatricians to make sure that the entire family unit in some ways hopefully moves forward in an ideal situation in a way that feels supportive and nurturing. So, it's usually the young person who comes in knowing exactly what they want and us trying to navigate a process to ensure that's done safely and allaying parents' fears.

Garofalo went on to elaborate on his understanding of what shared decision-making means:

> If the medical provider thinks they have the answer [to whether medical interventions are appropriate] then they're the wrong medical provider. The answer lies within the young person and the family. Your job as a healthcare provider is to help them along that path, to find the answers and the solutions that feel authentic and healthy for them.[50]

#### 11.3.3.4 Seattle Children's Hospital

In a response to Tordoff et al. (2022), a study conducted at Seattle Children's Gender Clinic,[51] one commentator pointed out that the control group, which received only psychotherapy, might have shown comparatively worse mental health due to selection bias: "patients with coexisting mental concerns may have been potentially discouraged from accepting the treatments until their coexisting conditions were addressed."[52] Lead author Diana Tordoff responded to the comment by pointing out that "youth who reported moderate to severe depression, anxiety, or suicidal thoughts were not precluded access to PB/GAH [puberty blockers and gender-affirming hormones], especially since initiating PB/GAH is known to improve or mitigate these symptoms."[53] Eighteen-year-olds "were provided care using an informed consent model and were not

[50] Figliolia (2025).
[51] Tordoff et al. (2022); see Section 6.2.2 for further discussion.
[52] Tordoff et al. (2022) [online comment; March 7, 2022].
[53] Tordoff et al. (2022) [online comment; March 13, 2022].

required to complete a mental health assessment." Tordoff also noted that Seattle Children's practices were consistent with the (then draft) SOC-8 guidelines.[54]

#### 11.3.3.5 UCSF Benioff

In 2018, the organization Gender Spectrum hosted a panel with Ilana Sherer, a pediatrician and gender clinician, and Diane Ehrensaft, a clinical psychologist at UCSF Benioff and one of the principal architects of the "gender-affirming" approach in the United States. Sherer said that she sees "lots and lots of kids" who "don't have [gender] dysphoria, that really don't have mental health issues, and so to say to them 'you have to go get a letter from a mental health provider' feels challenging to me." But since a letter of support is required for medical interventions, Sherer went on to explain that "what we've started to do in our clinics is have someone like Diane [Ehrensaft] ... go in and do a brief assessment, and give their rubber—I know you [addressing Ehrensaft] said you don't rubber-stamp, but basically in my mind that's what it feels like—and so then we can move on and say 'OK, now we can talk about what you're actually here for.'"[55]

#### 11.3.3.6 Planned Parenthood

Specialized gender clinics are not the only institutions prescribing hormonal interventions to adolescents. According to a 2024 investigative report published in *The Free Press*, Planned Parenthood is "the country's leading provider" of hormones for young people. Approximately 40% of the more than 40,000 patients for whom Planned Parenthood prescribed hormones in 2023 were between the ages of 18 and 22. Some branches, however, "offer hormones starting at age 16 with parental approval." In recent years, Planned Parenthood clinics have adopted an expedited access policy on an "informed consent" basis. Nicole Chaisson, medical director of Planned Parenthood North Central States, told *The Free Press* that "Gatekeeping is not necessary. People are the experts of their own body and of their own journey, and as long as they can

[54] Tordoff et al. (2022) [online comment; March 13, 2022].
[55] Sherer (2018).

make decisions, they should be the agent of their own healthcare." Chaisson said it was appropriate for teenagers to "leave the clinic with their prescription" after a single visit.[56]

Jamie Reed, the former case manager at the Washington University pediatric gender clinic in St. Louis, had previously worked at Planned Parenthood. Reed testified in a deposition that the St. Louis gender clinic would refer minor patients to Planned Parenthood "when we did not have consent from legal guardians" because Planned Parenthood would get "these kid's scripts [prescriptions] when they did not meet" diagnostic criteria. Although Planned Parenthood requires consent from an adult caregiver to prescribe hormones to minors, Reed said that Planned Parenthood "would not verify who the adult is that is bringing [the minor patient] to the building."[57]

## 11.4 The whistleblowers

In public statements, advocates and practitioners of PMT routinely imply that assessment functions as a form of medical gatekeeping, suggesting that PBs, CSH, and surgeries are offered cautiously and only to patients who genuinely require such interventions. Meredithe McNamara has argued that it is a "misconception" that "a child's disclosure of gender dysphoria leads to impulsive, irreversible decisions." Rather, "decisions on whether, when, and how to pursue medical interventions are slow-moving, rigorous, and individualized."[58] In his testimony before the Florida Boards of Medicine and Osteopathic Medicine in 2022, Aron Janssen, of Lurie Children's, said that treatments follow a "careful and thorough assessment of a patient's mental health including co-occurring conditions, history of trauma, substance use, among many other factors."[59]

In recent years, however, whistleblowers with firsthand experience working in gender clinic environments have come forward with compelling counterexamples. Their testimonies have often been dismissed, ignored, marginalized, or disparaged by colleagues. Several have also faced retaliation because of their disclosures.

---

[56] Block (2024d).
[57] Noe v. Parson, No. 23AC-CC04530 (2024, p. 172).
[58] McNamara (2024).
[59] Florida Boards of Medicine and Osteopathic Medicine Joint Rules/Legislative Committee (2022), a 43:57.

### 11.4.1 Laura Edwards-Leeper and Erica Anderson

In 2021, Laura Edwards-Leeper, the founding psychologist of the first pediatric gender clinic in the United States, and Erica Anderson, a clinical psychologist and former president of the U.S. Professional Association for Transgender Health (USPATH), became the first prominent whistleblowers in the United States. In an opinion piece for *The Washington Post,* Edwards-Leeper and Anderson warned that adolescents were "being rushed into" medical interventions without sufficient psychological assessment or deliberation. "A flood of referrals to mental health providers and gender medical clinics, combined with a political climate that sees the treatment of each individual patient as a litmus test of social tolerance, is spurring many providers into sloppy, dangerous care,"[60] they wrote.

Following publication in *The Washington Post*, USPATH sought to impose a moratorium on Anderson's ability to speak to the press while WPATH was finalizing its SOC-8. Anderson resigned from the organization in protest.[61]

In an interview with journalist Abigail Shrier, Anderson cautioned that the current PMT approach involved "sloppy healthcare work," which could result in young people making decisions they would later regret. Marci Bowers, a gynecologist and surgeon who, like Anderson, identifies as transgender, echoed these concerns in the same interview. Bowers observed that although medical interventions initially seemed promising, in practice they had not yielded better—or even equivalent—outcomes compared to earlier approaches. Bowers specifically voiced concern about the long-term implications of these interventions on reproductive capacity, sexual health, and the ability of patients to experience intimacy.[62]

Despite criticizing the "gender-affirming" approach now dominant in their field, Anderson and Edwards-Leeper continue to believe that at least some children and adolescents benefit from medical transition. Bowers issued a detailed letter of apology to WPATH

---

[60] Edwards-Leeper & Anderson (2021).
[61] Selin Davis (2022).
[62] Shrier (2021b).

leadership[63] and remained with the organization, serving as its president from 2022 to 2024.

### 11.4.2 Jamie Reed

In 2022, Christopher Lewis and Sarah Garwood, then co-directors of the Washington University School of Medicine Pediatric Transgender Center at St. Louis Children's Hospital, testified before the Missouri House Judiciary Committee that "[m]edical interventions are done with a thorough and multidisciplinary team approach, which includes mental health assessment and requires consent from all custodial parents or caregivers."[64] Opening with the unfounded assertion that PMT is "literally lifesaving" (see Section 4.3.4 for discussion of suicide risk), Lewis, the Center's endocrinologist, emphasized that "[f]or pubertal transgender adolescents, medical services are started only after meeting strict eligibility criteria… [This] includes mental health professionals who have adequately documented and explored various aspects of gender and mental health exploration [sic], psychosocial medical concerns and conditions, and ability to understand their decisions and provide assent."[65]

These assertions were later disputed by Jamie Reed, who worked for four years at the Center as a case manager responsible for patient intake and oversight. In deposition testimony, Reed stated that Lewis had indicated at an early stage that he "[didn't] care" if patients met criteria for gender dysphoria. It was "not a requirement for [him] to prescribe hormones."[66] An investigation by *The New York Times* provided additional details about the clinic's practices and corroborated most aspects of Reed's testimony. According to the investigation, one patient, who subsequently detransitioned, received a prescription for testosterone following a single visit, without prior assessment by any mental health professional. When WPATH SOC-8 was published in September 2022, Lewis texted Karen Hamon, the Center's nurse, saying: "Right now I have no idea how to meet what would be the most intensive interpretations of the SOC."[67]

---

[63] Boe v. Marshall, No. 2:22-cv-00184: 700-5 (2024, pp. 67–71).
[64] Lewis & Garwood (2022, 9:14:55).
[65] Lewis & Garwood (2022, 9:16:40).
[66] Noe v. Parson, No. 23AC-CC04530 (2024, p. 244).
[67] Ghorayshi (2023b).

According to Reed, the Center responded to a five-fold increase in its patient caseload by offering mental health providers a letter-of-support template for them to sign, in the hope that this would speed up the process of approval for endocrine treatments. It "was just copy paste," Reed testified in a deposition. Reed said that when she brought her concerns to Lewis, he "didn't care and was going to pass it [the letter] anyway".[68]

Concerned that the Center was not tracking patient outcomes, Reed and Hamon created a "red flag list," a private Excel spreadsheet in which they documented cases of patients with complex mental health presentations. As reported by the *Times*, the list included "a patient on testosterone [who] stopped taking schizophrenia medication without consulting a doctor and another [who] had visual and olfactory hallucinations. Another had been in an inpatient psychiatric unit for five months."[69] Reed also described an adolescent female from an "unstable family" who was in "an uncertain living situation and had a history of drug use" and was put on hormones at age 16, followed by a double mastectomy at 18. Three months later she regretted the surgery and informed the clinic, "I want my breasts back."[70] According to the *Times*, the patient contacted the surgeon at Washington University twice about her wish for breast reconstruction, but did not receive a response.[71]

Reed recalled a 17-year-old girl who was given testosterone and reported "bleeding from the vagina." The girl was advised to use a heavy pad to absorb the blood. "In less than an hour she had soaked through an extra heavy pad, her jeans, and a towel she had wrapped around her waist. The nurse at the center told her to go to the emergency room right away." The Center "found out later this girl had had intercourse, and because testosterone thins the vaginal tissues, her vaginal canal had ripped open. She had to be sedated and given surgery to repair the damage."[72]

Reed reported that when she raised concerns regarding inadequate mental health assessment and safeguarding with the Center's physicians, her objections were

---

[68] Noe v. Parson, No. 23AC-CC04530 (2024, p. 165).
[69] Ghorayshi (2023b).
[70] Reed (2023a).
[71] Ghorayshi (2023b).
[72] Reed (2023a).

repeatedly dismissed and she was advised to "Get on board, or get out." Individuals who expressed doubts frequently faced "being called a transphobe."[73] A similar phenomenon of intimidation was documented at the Tavistock's Gender Identity Development Service in the U.K.[74]

Reed, who is lesbian, profoundly regrets her past involvement in PMT, and has since become a leading advocate for restrictions on practices she regards as harmful, especially for youth with emergent same-sex attraction who are overrepresented among patients.[75] The Center stopped providing PMT following the enactment of Missouri's Senate Bill 49 (SB 49).[76] Lewis, the Center's endocrinologist, accepted a job in Colorado, where he currently practices PMT at Children's Hospital Colorado.[77]

### 11.4.3 Tamara Pietzke

In February 2024, Tamara Pietzke, a licensed clinical social worker and therapist at MultiCare Health System in Tacoma, Washington, disclosed harmful practices occurring in her clinical environment.[78] Pietzke described patients with significant comorbid mental health conditions and complicated life histories, who, despite these vulnerabilities, were approved for hormonal interventions.

One patient, a 13-year-old adolescent female, had diagnoses of depression, anxiety, post-traumatic stress disorder, and intermittent explosive disorder. She had experienced childhood abuse, neglect, and sexual violence, and, according to Pietzke, reported that "horror and porn movies … were the only ones available in her house." The patient also told Pietzke that her mother practiced bestiality. She communicated in therapy sessions by displaying extremely sadistic and graphic pornographic videos to Pietzke on her phone. The patient also was reported to have autism spectrum disorder, a factor that may have contributed to her communication difficulties. Pietzke noted that the girl would "age-regress" by "watching *Teletubbies* and sucking on a pacifier."[79] A restraining order

[73] Reed (2023a).
[74] Barnes (2023); Cass (2024).
[75] Reed (2023b).
[76] Washington University (2023).
[77] University of Colorado Anschutz Medical Campus (n.d.).
[78] Pietzke (2024a).
[79] Pietzke (2024a).

was also in place against the patient's mother, who had previously attempted to harm the girl's sister in her presence. The girls were being raised by their mother's former boyfriend.

In addition to these obvious red flags, Pietzke noted that her 13-year-old patient never asked for testosterone and failed to demonstrate an understanding of the hormone when the subject was raised. Nevertheless, the gender clinic at Mary Bridge Children's Hospital, part of MultiCare, approved the teenager for testosterone on her first visit. The clinic requested that Pietzke sign a letter of support clearing the patient of any mental health contraindications. Pietzke refused, and the case was referred to the hospital's risk management team. Instead of siding with Pietzke, however, the risk management team reassigned the adolescent to another therapist. Pietzke wrote to Amber Rolfe, MultiCare's in-house "gender-affirming care" expert, explaining her concerns and even citing Sections 6.3 and 6.12 from the Adolescent chapter of WPATH SOC-8 in support of her decision.

Rolfe disagreed with Pietzke's clinical judgment and citations from SOC-8, insisting that nothing in the patient's history, behavior, or concurrent diagnoses was a contraindication for hormone treatment.[80] "There is not valid, evidenced based, peer reviewed research that would indicate that gender dysphoria arises from anything other than gender (including trauma, autism, other mental health conditions, etc.)," Rolfe wrote to Pietzke.[81] "At it's [sic] core the diagnosis centers on an incongruence of gender identity and assigned gender at birth." Rolfe also suggested that Pietzke examine her biases and consider transferring the client "to someone who is comfortable with providing gender affirming care."[82] Pietzke resigned from MultiCare shortly thereafter and went public with her story.

### 11.4.4 Eithan Haim

Eithan Haim, a surgeon formerly affiliated with Texas Children's Hospital (TCH), became a whistleblower after discovering that TCH was performing medical transition

[80] Sapir (2024a).
[81] Rolfe (2023).
[82] Rolfe (2023).

procedures on minors despite publicly announcing a cessation of such procedures.[83] In 2022, prompted by a Texas Attorney General's opinion describing PMT as potentially abusive, TCH declared it would pause hormone interventions for transgender-identifying youth.[84] Despite this declaration, Haim became aware of ongoing practices that he asserted contradicted these claims; three days following the public statement, an 11-year-old patient received a puberty blocking implant, and similar interventions continued throughout the subsequent year involving dozens of other patients.[85] In May 2023, Haim anonymously provided de-identified hospital records and related documents to journalist Christopher Rufo, which resulted in a public exposé. The released data suggested that TCH had misled the public about halting its PMT program.[86]

Haim was charged with four felony counts under the Health Insurance Portability and Accountability Act (HIPAA). Prosecutors argued that Haim was not authorized to access patient data and that he did so with intent to maliciously harm the hospital.[87] The charges carried penalties of up to 10 years' imprisonment. Haim pleaded not guilty, denying his access to patient records was inappropriate, and asserting his disclosures were whistleblower actions aimed at safeguarding children rather than malicious acts.[88] The allegations were unusual, as HIPAA violations are typically addressed through civil rather than criminal procedure. The choice to pursue criminal charges raised suspicion that the federal government's actions were retaliatory in nature.[89]

The DOJ's indictment against Haim had to be amended multiple times after it was revealed that the government was mistaken about Haim's involvement with TCH. A second indictment had to be revised again because Haim was charged with actions as crimes that are not criminal under the law. The third indictment, which was shorn of most of the initial factual allegations, was for unauthorized access to patient records with intent to cause harm to doctors and the hospital, not patients. In January 2025,

83 Haim (2024).
84 Campion (2022).
85 Haim (2024).
86 Alder (2025).
87 Trombly (2024).
88 Alder (2025).
89 Trombly (2024).

after months of legal contention and growing public criticism of the prosecution as "lawfare," federal prosecutors dismissed all charges against Haim with prejudice, effectively exonerating him.[90]

In November 2024, Haim's lawyers informed the DOJ that the lead prosecutor in the case, Tina Ansari, and her family, had "substantial financial and political ties" to Texas Children's Hospital and Baylor College of Medicine, resulting in a potential conflict of interest.[91] Shortly thereafter, Ansari withdrew from the case.[92]

[90] House Judiciary Committee (U.S. Congress) (2025).
[91] Patrick (2024).
[92] Whelan (2024b).

# Chapter 12 Medical Association Response

This chapter examines how, despite growing recognition of its problems, the 8th version of the World Professional Association for Transgender Health (WPATH) *Standards of Care* (SOC-8) continues to have substantial influence on the medical field. This can be better understood by examining the critical role that major medical and mental health associations (MMHAs) play within the U.S. healthcare system (Section 12.1). Section 12.2 explores the reasons why MMHAs have not properly responded to updated evidence, nor to serious ethical concerns; Section 12.3 is a summary conclusion.

## 12.1 The role of major medical and mental health associations

Given the decentralized and fragmented nature of the U.S. healthcare system, MMHAs play a central role in shaping clinical practice guidelines, healthcare policy, and medical practices. They educate clinicians on emerging research, develop authoritative clinical practice guidelines, publish peer-reviewed journals, facilitate interdisciplinary collaboration, and engage in professional advocacy on behalf of their members. Typically, MMHAs limit full professional membership to practitioners actively engaged in clinical medicine or the mental health disciplines and enforce professional codes of conduct under which members may face sanctions or loss of privileges for noncompliance. MMHAs derive their authority in large part from their perceived adherence to rigorous professional standards and to science.

However, despite their scientific orientation, MMHAs are not immune to institutional biases, including groupthink and the disproportionate influence of vocal, specialized subcommittees. These specialized groups may receive broad deference from the larger organization, especially when their initiatives are framed in the language of civil or human rights. Consequently, MMHAs can inadvertently become echo chambers where dissent is suppressed, confirmation biases go unchecked, and professional deference is exploited. This dynamic of institutional capture is hardly unique to MMHAs: it occurs whenever support for a particular viewpoint is concentrated within a small, motivated subgroup, while opposing views are diffuse, less attentive, and less organized. As a result of this dynamic, the general public may inaccurately perceive the wider membership of individual MMHAs as uniformly aligned with the professed position of

their professional association. It is easy to overlook the fact that fundamentally, these organizations operate as trade associations, with a primary role of protecting their members' autonomy and professional interests. Although individual clinicians generally are motivated by altruism, it should not be assumed that the collective actions of an organization always reflect the values or intentions of its individual members.[1]

Historical examples demonstrate that despite their crucial role in safeguarding patients' interests, MMHAs have at times resisted necessary medical reforms, even when confronted with strong evidence of their urgency. For instance, the American Academy of Pediatrics (AAP) delayed rescinding its 2000 guidelines discouraging early peanut exposure for two years after evidence emerged linking the policy to increased rates of peanut allergies.[2] Similarly, professional organizations resisted evidence-based recommendations to limit arthroscopic knee surgeries, lobbying against healthcare reforms despite clear evidence of limited efficacy.[3] MMHAs may impede or even oppose evidence-based medicine when the professional or financial interests of their members are threatened by medical practice reversal.

The reliance of MMHAs on WPATH is exemplified by the Endocrine Society (ES) clinical practice guideline for the treatment of gender dysphoria (GD). As discussed in Chapter 9, the close alignment of these groups' guidelines suggests a lack of robust, independently derived frameworks for care, potentially limiting critical appraisal and alternative perspectives within the field. Notably, Joshua Safer, who is leading the 2024 revision of ES guidelines, is himself closely associated with WPATH and is a prominent advocate for pediatric medical transition (PMT).[4] His leadership role raises concerns about compliance with the National Academy of Medicine's standards for trustworthy guideline development, in particular with regard to conflict of interest management (see 10.3.1).[5]

---

[1] For a discussion of this phenomenon and its consequences for medical policy, see Patashnik et al. (2017).
[2] See Section 1.2.2.
[3] Patashnik et al. (2017, Chapter 2).
[4] Sapir (2024d).
[5] Graham et al. (2011, p. 87).

MMHAs have been reluctant to transparently address the weak evidence base underlying PMT. For example, the American Psychiatric Association's (APA) textbook *Gender-Affirming Psychiatric Care*[6] has faced internal criticism for failing to acknowledge the scientific debate and the policy shifts occurring internationally.[7] A petition with over 7,000 signatures, many from medical and mental health professionals, has called for the withdrawal or correction of the textbook,[8] yet APA leadership has not issued a substantive response.[9] Similarly, the American Academy of Child and Adolescent Psychiatry (AACAP) has rejected multiple proposals addressing important evidence and dissenting perspectives that were submitted to its conferences.[10] The AAP likewise has repeatedly declined to platform critical perspectives at its events.[11] This pattern of organizational defensiveness fosters environments in which clinicians feel compelled to self-censor.

The AAP has rejected multiple internal requests to conduct systematic reviews of the evidence underpinning PMT.[12] Although AAP leadership ultimately agreed in principle to a systematic review, it simultaneously reaffirmed the existing policy[13]—a move that evidence-based medicine experts have criticized as methodologically unsound and premature, as it presupposes the outcome of a review intended to impartially evaluate the evidence.[14] To date, there is no evidence the AAP has begun the review.

After the National Health Service (NHS)-commissioned Cass Review was published in April 2024, several affiliates of the American Psychological Association (APA) prohibited its very discussion on their professional listservs. When a San Francisco-area psychologist posted information about the Cass Review on a listserv of Division 39 of the APA, the listserv moderator blocked the post, citing a 2020 "Letter of Apology to

---

[6] Goetz & Keuroghlian (2023).
[7] Satel (2024).
[8] Foundation Against Intolerance & Racism (2024).
[9] Posner (2024).
[10] Sibarium (2023).
[11] Shrier (2021a).
[12] Block (2023c).
[13] Wyckoff (2023). AAP policy statements automatically expire after 5 years unless readopted, revised, or revoked.
[14] Ghorayshi (2023a).

LGBTQ+ Communities" that forbids "speech that is injurious to LGBTQ+ members."[15] The Pennsylvania Psychological Association (PPA), a state affiliate of the APA, sent an email to all its members informing them that the Cass Review was "no longer welcomed for discussion" on its professional listserv. The PPA explained that the Review "fail[s] to meet" the PPA's "professional standards," and that "LGBTQIA+" members and their "allies" might feel "targeted, harmed, and hurt by this literature being repeatedly shared."[16] A clinical psychologist who describes herself as "a liberal feminist" and who has "marched in Pride marches" told the *BMJ* that she was "reprimanded" by the Illinois Psychological Association after posting about the Cass Review on a therapist listserv.[17]

## 12.2 Factors contributing to neglect of evidence and open debate

Hilary Cass, past president of the Royal College of Paediatrics and Child Health and leader of the U.K.'s comprehensive review of pediatric gender medicine services, has stated that American physicians are "out of date" in their approach to pediatric gender medicine.[18] Several factors may help explain the reluctance of American MMHAs to engage fully with the shifting perspectives on evidence and ethics in this area of practice.

First, in managing unusual or complex conditions, primary care providers and generalist clinicians often rely on the expertise of specialists to inform their clinical decisions.[19] When the former also hold leadership positions in medical organizations and are tasked with shaping policies for the treatment of youth with GD, they often defer to specialized committees—such as committees devoted to LGBT issues—whose members they regard as the organization's content experts. These committees typically are composed of professionals whose careers are closely tied to supporting or delivering medical transition, limiting their ability to impartially evaluate the evidence due to significant intellectual and financial conflicts of interest. While reliance on specialist committees

[15] Selin Davis (2024a).
[16] Ryan (2024c).
[17] Block (2024b).
[18] Ghorayshi (2024a).
[19] Tzartzas et al. (2019).

poses fewer risks in well-established subspecialties with decades of robust research,[20] pediatric gender medicine remains a new, highly controversial field characterized by a limited and low-certainty evidence base.

Second, the framing of PMT as a civil rights matter[21] may have contributed to premature and uncritical support at both the individual and institutional levels. Most medical professionals are broadly supportive of civil rights.[22] U.S. specialty committees often frame PMT as a morally righteous or progressive cause, leading many professionals reflexively to adopt supportive positions. Given that transgender identification is relatively common among youth—estimated at 2–5%, though precise figures remain uncertain—many clinicians and policymakers also may have personal connections, such as friends or loved ones who identify as transgender. These personal ties, combined with a genuine desire to be compassionate and supportive, may understandably make it more difficult for professionals to critically and objectively evaluate the evidence base or ethical considerations underlying PMT.

Third, by the time the weak evidence and growing international retreat from the practice became difficult to ignore, several major U.S. MMHAs had been actively promoting PMT and denouncing its critics.[23] As a result, some organizations responded to international developments defensively rather than reflectively, viewing the shifts as a potential challenge to their institutional credibility.[24] The only notable exception to this pattern appears to be the American Society of Plastic Surgeons which, following the publication

---

[20] It should be noted, however, that with respect to developing reliable clinical practice guidelines the role of clinicians with intellectual conflicts of interest should be minimal: see Graham et al. (2011); McCartney et al. (2022).

[21] In 2016 psychologist Diane Ehrensaft, leading proponent of the "gender-affirming" approach, explicitly conceptualized her work as having “finally created a civil rights movement” (Ehrensaft, 2016, p. 355). Some medical guidelines in this field also call for specific political activism on the part of clinicians; e.g., the AAP policy statement (Rafferty et al., 2018). The editorial board of *The Washington Post*, recognizing the failure of pediatric gender specialists to self-regulate in the U.S., recently called for “new research of maximum possible rigor, overseen by scientists *who are not gender medicine practitioners*” (Washington Post Editorial Board, 2024, emphasis added).

[22] Levine & Abbruzzese (2023).

[23] Szilagyi (2022b).

[24] E.g. Endocrine Society (2024); Hoffman (2024).

of the Cass Review, publicly adopted a more cautious stance regarding the use of surgical interventions for treating pediatric GD.[25]

Experts within pediatric gender medicine hold sharply divergent views about best practices.[26] However, the absence of professional consensus is often obscured, as dissenting voices are seldom included on specialty committees responsible for policy development. Researchers who study detransition, investigate social influences underlying epidemiologic changes in GD presentations, express concerns about PMT, or advocate for a more cautious approach to pediatric GD frequently encounter hostility and a lack of support from major publishers, medical societies, and academic institutions.[27] Organizations advocating for higher evidentiary standards, journalists reporting on the controversies, and academics writing about issues related to sex and gender have also faced hostility and attempts at public shaming.[28] Activist organizations have contributed significantly to this dynamic, often targeting individuals and groups that question or critically examine prevailing practices in gender medicine.[29]

When MMHAs update their treatment guidelines and position statements, experts who question the evidence supporting PMT are excluded from guideline development

[25] American Society of Plastic Surgeons (2024).
[26] As the Cass Review found, "clinicians who have spent many years working in gender clinics have drawn very different conclusions from their clinical experience about the best way to support young people with gender-related distress. Some feel [they should] access a medical pathway at an early stage. Others feel that we are medicalising children and young people whose multiple other difficulties are manifesting through gender confusion and gender-related distress" (Cass, 2024a, p. 13). Examples of divergent clinical opinions can be found by comparing two papers on the role of mental health assessments: Levine (2024); Turban et al. (2025). Differing treatment approaches are also described in Levine et al. (2022a) and two follow-up articles: Drescher (2023); Levine et al. (2022b).
[27] For some examples, see Barnes (2023); Bazelon (2022a); Brown University (2019); Byrne & Gorin (2025); Edwards-Leeper & Anderson (2021); Gecsoyler (2024); Jenkins & Panozzo (2024); Keenan & Lovett (2025); LGBTQIA+ Coalition (2022); Pietzke (2024a, 2024b); Reed (2023a); Schenck (2022); Society for Evidence-Based Gender Medicine (2023d); Turley (2024).
[28] 100 signatories (2023); GLAAD (2023a, 2023b); Hansford (2024); Hooven (2023); Singal (2023a, 2023b); Weale (2025).
[29] In addition to the examples above, a recent article recounted therapists' experiences of attending a training workshop where the representative of the political activist group Southern Poverty Law Center (SPLC) spoke about efforts to "hunt" therapists who practice exploratory therapy, with the goal of leveling complaints leading to licensure revocations. Another therapist reported having been formally investigated by her graduate school for sharing information about new pediatric gender medicine evidence from Europe, an investigation which remains on her permanent record (Jenkins & Panozzo, 2024). SPLC also chose to wield the emotional power of the "hate group" label on several groups that have engaged in evidence-based evaluation of PMT or the development of alternative approaches.

committees.[30] Efforts to exclude dissenting perspectives from conferences and publications have been documented.[31] In addition, there is growing evidence of self-censorship among clinicians and researchers, driven by concerns about professional repercussions and reputational risks.[32] Some proponents of PMT explicitly endorse the use of silencing tactics and reputational attacks:

> The point of activism is sometimes 'silencing,' if by that one means destroying the credibility of professionals that activists deem dangerous.[33]

Medical professionals' years of training and social status leave them acutely aware of and sensitive to reputational risks. Fear of online attacks and social disapproval within professional medical societies may have contributed to widespread self-censorship among clinicians, mirroring similar trends observed across academia.[34] This dynamic is further reinforced when PMT is framed as a civil rights issue or a struggle against discrimination and oppression. Under this framing, critics—even those raising evidence-based concerns—are labeled "anti-trans" or intolerant by reputable, influential sources.[35] As Hilary Cass observed in the introduction to the Cass Review,

> There are few other areas of healthcare where professionals are so afraid to openly discuss their views, where people are vilified on social media, and where name-calling echoes the worst bullying behaviour. This must stop. Polarisation and stifling of debate do nothing to help the young people caught in the middle of a stormy social discourse, and in the long run will also hamper the research that is essential to finding the best way of supporting them to thrive.[36]

The American healthcare system relies heavily on MMHAs to create, organize, and disseminate knowledge and to referee scholarly dialogue through journals and

---

[30] Marci Bowers, president of WPATH when its 2022 guidelines were published, acknowledged that it was "absolutely" important for someone to be an "advocate" of the "gender-affirming" approach to be considered for the committee. See Boe v. Marshall, No. 2:22-cv-00184: 564-8 (2024). Furthermore, most members of the guideline development committee had conflicts of interest, which were poorly managed.
[31] Curlin (2024); Kaliebe & Johnson (2024); Kaltiala (2023); Mason (2021); Sapir (2025).
[32] Clark et al. (2024); Pfaus (2023).
[33] Nichols (2008).
[34] Clark et al. (2024); Curlin (2024); Pfaus (2023).
[35] E.g., Endocrine Society (2024); Szilagyi (2022b).
[36] Cass (2024, p. 13).

conferences. Regardless of the underlying causes, major MMHAs have issued advocacy-driven recommendations prematurely, without adequate scientific support.[37] This contributed to a degradation of the norms of open inquiry and constructive disagreement—norms that are essential for the credibility of MMHAs and their capacity to issue trustworthy, evidence-based guidance.

## 12.3 Conclusion

The significant influence MMHAs exert over professional opinion, clinical practice, and healthcare policy extends broadly across the healthcare landscape. In the area of pediatric gender medicine, prominent MMHAs have aligned their clinical guidelines and policy statements with WPATH SOC-8. This reliance on WPATH guidelines effectively imported into MMHAs many of the methodological and ethical deficiencies documented in WPATH's guideline development process. Consequently, problems originating within WPATH have not remained isolated but have instead propagated through influential MMHAs, contributing to a broader erosion of clinical standards, scientific rigor, and open academic discourse.

Today, MMHAs wield considerable influence over both public and professional perceptions of medical practices through statements frequently cited in the media. These shape broader societal attitudes toward both the medical field generally and the practices within that field specifically. The implicit social contract underlying MMHAs' self-regulatory privileges rests on the expectation that these organizations will prioritize the best interests of patients and society. However, MMHAs' handling of issues related to PMT illustrates how institutional biases, reliance on external guidance from advocacy-oriented groups, and internal political dynamics can undermine their regulatory effectiveness and scientific credibility.

[37] See also Chapters 6-8.

PART 4

# ETHICS REVIEW

# Chapter 13 Ethical Considerations

This chapter discusses central ethical issues in pediatric medical transition (PMT), which involves the use of puberty blockers (PBs), cross-sex hormones (CSH), and surgery to suppress or alter the development of sex- and age-typical sex characteristics in physically healthy children or adolescents.[1] These interventions are used as treatment for the conditions of "Gender dysphoria" (GD) in the *Diagnostic and Statistical Manual* (DSM-5-TR) or "Gender incongruence of adolescence or adulthood" in the *International Classification of Diseases* (ICD-11).[2] In assessing the effects of PBs, CSH, and surgery, researchers typically focus on conventional psychiatric outcomes such as depression, anxiety, and suicidality; recently, some have added novel outcome measures such as "chest dysphoria," "appearance congruence," and "gender euphoria."[3]

However, some clinician-researchers have called into question what they call the "logic of improvement," according to which PMT is justified only if it enables "a progression from 'doing worse' to 'doing better,' ultimately leading to an overall improvement in the individual's functioning and well-being."[4] Acknowledging that the evidence that PMT has this effect is weak, these clinicians argue that conventional outcome measures should be supplemented with—if not replaced by—patient-determined outcomes.[5] In the same vein, other advocates of PMT claim that focusing on clinical improvement is "pathologizing" and question the need for any clinical indication beyond the adolescent's "embodiment goals"[6] or mere desire for the intervention.[7] The guiding question of this chapter is whether the provision of hormonal or surgical interventions for these shifting and sometimes contradictory purposes is consistent with well-established principles of

---

[1] Patients may reach Tanner Stage 2 of puberty by age 8 or 9. An 8- or 9-year-old person is uncontroversially a child. However, for the sake of brevity the remainder of this chapter will use "adolescents" rather than "children and adolescents" in most cases to refer to this patient population.
[2] American Psychiatric Association (2022); World Health Organization (2022b).
[3] See, respectively, Olson-Kennedy, Warus et al. (2018); Chen et al. (2023); Blacklock et al. (2025).
[4] Oosthoek et al. (2024, p. 10).
[5] Oosthoek et al. (2024, p. 17).
[6] Ashley (2019, pp. 480–482).
[7] Chu (2024).

medical ethics. Despite the high stakes—medical, social, political, and legal—this urgent question has received relatively little critical attention from bioethicists.

After a brief note on consent (Section 13.1), Section 13.2 summarizes how the medical profession's shift away from medical paternalism toward shared decision-making has strengthened patient protections against unwanted medical interventions via the mechanism of informed consent. This move toward greater respect for patient autonomy, however, does not negate clinicians' professional and ethical obligation to protect and promote their patients' health.

Section 13.2.3 turns to the pediatric context, where the latter obligation is especially strict due to the distinctive vulnerability of children and adolescents as well as their underdeveloped decision-making capacity. The best available evidence indicates an unfavorable risk/benefit profile for the prescription of hormonal and surgical interventions for adolescents with GD. The prescription of these interventions also raises justice-related concerns for members of this medically and socially vulnerable population.

Section 13.3 examines an alternative justification for PMT, one grounded in a purported right to access the medical resources needed to satisfy the patient's preferences for body modification. The shift to this alternative justification, which follows researchers' decades-long inability to demonstrate clear medical benefit, suggests that advocates of PMT have significantly altered the criteria for success.[8] The chapter then turns to a brief discussion of patient regret in Section 13.4 before concluding with some remarks on research ethics in Section 13.5.

## 13.1 Consent

Some disagreements in this field center on the question of whether adolescents have medical decision-making competence (MDC)—that is, whether they can provide

[8] "Clinicians remarked that there is no agreed fixed point of reference on which to judge the success of an intervention, let alone a societal consensus on the appropriate response" (Cass, 2024a, Appendix 3, p. 9).

informed consent or assent to transition-related medical interventions.[9] Some proponents of these interventions believe they can.[10] In support of this position, some point to research showing that many adolescent patients have MDC as assessed using a quantitative semi-structured interview tool.[11] They also note that there are other invasive, life-shaping interventions to which adolescents and their guardians commonly and unproblematically assent or consent. For example, an adolescent may assent to treatment of leukemia, even when the treatment may cause future infertility. An adolescent also may assent to amputation of a limb that is diseased or damaged beyond repair. There are many similar situations in which assent by the adolescent, and legal consent by the parents, is given to an intervention necessary to preserve the adolescent's overall health but which also causes foreseen serious adverse side effects.

Some critics of PMT, on the other hand, maintain that patients—some of whom are only eight or nine years old when they reach Tanner Stage 2 of puberty and thereby become candidates for PBs[12]—are too immature[13] to adequately understand the full range of consequences of medical transition. These young people cannot deliberate about the relevant considerations in a manner that is appropriately attentive to the seriousness and complexity of the decision. Critics point out that even proponents of PMT recognize that children and adolescents lack the cognitive and social maturity to deliberate well about their future fertility.[14]

Moreover, critics assert—reasonably[15]—that providers of PMT often fail properly to inform patients and their guardians about the uncertainty of the clinical evidence for medical benefit and that they overstate the probability and magnitude of the harms of

---

[9] "Consent" and "assent" here are technical terms. In the U.S. minors cannot provide *legal consent* for medical treatment (there are limited exceptions, e.g. for emancipated minors or for a narrow range of interventions such as treatment for sexually transmitted infections). Guardians provide legal consent while minors provide *assent*, or agreement to the intervention.
[10] Giordano et al. (2021); Mosier-Mills et al. (2024).
[11] Vrouenraets et al. (2021); See also Marino et al. (2024).
[12] See Chapter 7.
[13] Diekema (2020).
[14] Vrouenraets et al. (2022).
[15] See Chapter 11.

non-medicalization.[16] Finally, as noted in Chapter 2, clinicians providing PMT routinely employ euphemistic and morally loaded language, which can mislead or unduly influence patients and their guardians. The concern, then, is that this combination of high pressure, low information, and reflexive "affirmation" undermines the possibility of genuinely informed consent or assent.

Informed consent is critically important, but before it is even a consideration, the intervention must be otherwise ethically permissible. For example, before asking whether patients can consent to any proposed intervention, from antibiotics to lobotomy, a clinician must determine whether the intervention has a favorable risk/benefit profile as a treatment for the patient's condition. Thus, while informed consent plays a central role in medical ethics and clinical practice and informs discussions about the distinctive challenges that attend decision-making in pediatrics, this Review's ethical analysis of PMT focuses primarily on the necessarily prior step. Namely: do these interventions have favorable risk/benefit profiles?

## 13.2 From paternalism to shared decision-making and patient-centered care

Over the course of the 20th century, advances in the biomedical sciences, expansion of healthcare delivery systems, increasing professionalization in medicine, and a series of medical scandals and seminal legal cases led to greater sensitivity among clinicians and researchers to the rights of patients and participants in medical research. Judges, regulators, lawmakers, and ethicists introduced constraints on the power of clinicians to impose their values, preferences, and perspectives on patients.[17] The "paternalistic model" in medicine, according to which "doctor knows best," gave way to a more egalitarian model of "shared decision-making" that emphasizes respect for the autonomy and authority of competent patients and research participants. There is now universal consensus that respect for patient autonomy requires clinicians to provide patients with information relevant to their medical options and to act on competent

[16] Reluctant parents have reported being asked by their child's clinicians whether they (the parents) preferred having "a dead son or a living daughter." In an interview, Dr. Johanna Olson-Kennedy stated, "We often ask parents, Would you rather have a dead son than a live daughter?" (ABC News, 2011).
[17] Faden et al. (1986).

patients only with patients' consent. As the American Medical Association's *Code of Medical Ethics* puts it, patients have the right "[t]o make decisions about the care the physician recommends and to have those decisions respected. A patient who has decision-making capacity may accept or refuse any recommended medical intervention."[18] Patients are protected from unwanted medical interventions not only by professional and ethical norms but by the law. As Justice Cardozo famously wrote, "a surgeon who performs an operation without his patient's consent, commits an assault, for which he is liable in damages."[19]

### 13.2.1 Respect for autonomy vs *caveat emptor*

Crucially, the shift from medical paternalism to shared decision-making does not absolve clinicians of their ethical and professional obligation to protect and promote the health and well-being of their patients. Beneficence "undergirds all medical and health care professions and their institutional settings."[20] As mentioned in Chapter 1, clinicians have ancient but enduring ethical duties to avoid harming their patients and to promote their health and welfare: "The health and well-being of my patient will be my first consideration."[21]

The principle of respect for patient autonomy does not justify subjecting patients to interventions that pose medically unnecessary risks of harm, or which are otherwise nonbeneficial, even when patients prefer, request, or demand those interventions. An ethical analysis of PMT published by Finnish health authorities provides a succinct explanation:

> In healthcare, self-determination primarily manifests as the right to refuse treatments within the available service spectrum. This principle must be balanced against the freedom of individuals to express their own gender identity. Nevertheless, autonomy in healthcare does not imply unrestricted freedom to select treatments based purely on personal preference; rather, patient autonomy

[18] American Medical Association (2016).
[19] Schloendorff v. Society of New York Hospital (1914).
[20] Beauchamp & Childress (2019, p. 217)
[21] Parsa-Parsi (2017, p. 1971).

> involves the choice among treatments *that are medically justified* and included within the recognized service options.[22]

The well-established moral and legal right of competent patients to refuse any medical intervention does not entail a corollary right to receive nonbeneficial interventions. The Institute of Medicine's Committee on Quality of Health Care in America warns clinicians against providing interventions based on this illicit inference, stating, "When a patient seeks inappropriate health care services, the challenge for clinicians is to find ways of reducing this conflict … If a conflict cannot be resolved through counseling, the clinician should refuse to provide nonbeneficial services."[23]

In refusing requests for nonbeneficial interventions, clinicians do not force anything upon their patients. They do not threaten, deceive, or mislead them. Nor do they withhold relevant information about risks, benefits, and available alternatives. In other words, withholding nonbeneficial interventions does not entail acting on patients without their informed consent. Conflating the right of patients to refuse medical intervention or to choose among the beneficial options offered by their clinicians with the wholly separate "right" to determine which interventions must be offered transforms the ethos of beneficent respect in medicine to the crude, responsibility-abdicating ethos of medical consumerism: *caveat emptor.*

> Using patient autonomy to justify acquiescence to patients' requests for nonbeneficial services violates professional integrity. Professional integrity requires physicians to adhere to standards of intellectual and moral excellence. Physicians achieve intellectual excellence by submitting clinical judgment to disciplined, evidence-based reasoning. Physicians achieve moral excellence by protecting patients' health-related interests as a primary concern, keeping self-

---

[22] Saarni & Uusitalo (2020, p. 41, emphasis added). Original text: "Itsemääräämisoikeus terveydenhuollossa toteutuu ensisijaisesti oikeutena kieltäytyä palveluvalikoimaan kuuluvista hoitotoimista. Tämä on tasapainotettava sen näkökulman kanssa, että ihmiset saavat itse vapaasti ilmaista omaa sukupuolista identiteettiään. Autonomialla ei terveydenhuollossa kuitenkaan tarkoiteta vapaata oikeutta valita hoitoja omien preferenssien perusteella, vaan potilas voi valita palveluvalikoiman ja lääketieteellisesti perusteltujen hoitomuotojen sisällä."

[23] Committee on Quality of Health Care in America, Institute of Medicine (2001, p. 77). See also the "Physicians Charter" mentioned in Section 1.3.

> interests systematically secondary. Commitment to professional integrity requires that physicians challenge requests for nonbeneficial interventions.[24]

### 13.2.2 Nonmaleficence, beneficence, and autonomy in pediatrics

Uncontroversially, then, the norms of medicine require clinicians to protect and promote the health and well-being of their patients. This means they must abstain from providing nonbeneficial interventions even when such interventions are requested by competent patients. In the domain of pediatrics, these norms limit the authority not only of patients (who in any case lack full decision-making capacity) but of parents as well. The American Academy of Pediatrics' (AAP) Committee on Bioethics puts it as follows:

> Pediatric health care providers have legal and ethical duties to provide a standard of care that meets the pediatric patient's needs and not necessarily what the parents desire or request. Parental decision-making should primarily be understood as parents' responsibility to support the interests of their child and to preserve family relationships, rather than being focused on their rights to express their own autonomous choices. It is important to note that parental authority regarding medical decision-making for their minor child or young adult who lacks the capacity for medical decision-making is constrained compared with the more robust autonomy in medical decision-making enjoyed by competent adults making decisions regarding their own care.[25]

The "constraint" on patient and parental authority is grounded in the medical best interests of the child:

> In pediatrics, the duties to protect and promote health-related interests of the child and adolescent by the physician are also grounded in the fiduciary relationship (to act in the best interest of the patient and subordinating one's own interests) between the physician and patient, but these duties may conflict with the parent's or patient's wishes …[26]

---

[24] Brett & McCullough (2012, p. 149).
[25] Committee on Bioethics et al. (2016, p. e5). First published in 2016, this report was reaffirmed by the AAP in 2023.
[26] Committee on Bioethics et al. (2016, p. e2).

In its influential policy statement, "Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents," the AAP states that in navigating disagreements between parents and children clinicians should "maintain their primary responsibility to the welfare of the child."[27] Thus, while the statement recommends that "transgender and gender-diverse" youth have access to PMT, this recommendation is contingent not on the autonomy rights of patients or their guardians,[28] but rather on these interventions' purported contribution to patient health and well-being. [29] This affirms the longstanding, consensus view of medicine's fundamental aim as protecting and promoting the health and well-being of patients.

### 13.2.3 Risk/benefit in pediatric medical transition

To discharge their duties of nonmaleficence and beneficence, clinicians must ensure, insofar as reasonably possible, that any interventions they offer to patients have clinically favorable risk/benefit profiles relative to the set of available alternatives, which includes doing nothing.[30] As described in Chapter 5, systematic reviews (SRs) of the

---

[27] Rafferty et al. (2018, p. 8).
[28] Bester (2024).
[29] It is worth noting, however, that while the AAP and WPATH support PMT, they do not promote intervening over a patient's objections. Neither group holds that a patient with gender dysphoria/incongruence who refuses puberty blockers, cross-sex hormones, or surgery should be strongly encouraged or, if necessary, forced to receive them. This distinguishes medical transition from other interventions claimed to offer great, potentially lifesaving benefit. In gender medicine and perhaps nowhere else, whether transition-related medical interventions are deemed medically necessary seems to hinge largely on whether the patient desires them. See Chapter 11 for more on this issue.
[30] An intervention has a clinically favorable risk/benefit profile when the expected medical benefits outweigh the expected medical harms. Expected benefits and harms are determined by their probabilities and magnitudes. This is a standard method for guiding action and policy, including in medicine, though the precise manner in which it is carried out can vary and depends on many variables, including risk tolerance, the way "benefit" and "harm" are defined and measured, the way probabilities are assigned, and the way uncertainty/ignorance is accounted for. Of course, it would not be difficult to adopt expected utility theory, defining "benefit" and "harm" and assigning values to the relevant variables, in a way that would render a verdict markedly different from the negative one reached in this Review. That said, the claims made here about the probability and magnitude of harms and benefits are grounded in the best available evidence. Sometimes, the probabilities are known with a high degree of certainty. For example, the probability that mastectomy will lead to an inability to breastfeed is 1.0 or close to it. Puberty blockers and cross-sex hormones threaten sexual function, though the precise magnitude of the problem and its distribution in the treated patient population is unknown. Where precise or even rough values are not available due to the absence of quality research, the analysis in this Review assumes plausible, if rough, estimates. As for the nature of medical benefits and harms and their relative weights, the Review's working assumptions cohere with common moral intuition, standard medical judgment as revealed in medical diagnostic criteria, and the outcomes of interest to clinicians and researchers, as well as the law. For example, the analysis would conclude that a minor improvement in depressive symptoms does count

evidence for benefit of hormonal or surgical intervention in the treatment of GD in adolescents have concluded that this evidence is of low or very low certainty. This means that the true effects of the interventions may or are likely to be substantially different from the effects reported in the studies.[31] In other words, the best available evidence indicates that PBs, CSH, and surgery have not been shown to improve mental health outcomes.

At the same time, there is increasing recognition of the risks and harms associated with PMT, which are supported by clinical research or grounded in established biological theory.[32] While the value or disvalue of some outcomes, such as hirsutism in females, may be determined primarily by the preferences or tastes of patients, other possible outcomes, such as impaired cognitive function, greater susceptibility to hormone-sensitive cancers, cardiac disease, reduced bone density, sexual dysfunction, infection, and infertility[33] are objectively detrimental to health. Such medical harms, or plausible

as a benefit but that such a benefit, even if assured, does not outweigh moderate or even low but non-negligible risks of infertility or serious sexual dysfunction, loss of breastfeeding function, or lifelong medical dependency, which the Review considers harms.

[31] Balshem et al. (2011).

[32] See Chapter 5 and Chapter 7.

[33] It may be objected that infertility is not necessarily a harm. One version of this objection is that for some young patients, perhaps those who have very clearly expressed that they do not want and will never want genetically-related children, infertility is not a harm since it is consistent with their chosen life plan. The response to this objection is that the medical profession does not ordinarily permit voluntary permanent contraception (sterilization) in children or adolescents and always takes the risk of infertility seriously in assessing the risk/benefit profile of any intervention that plausibly may impact reproductive health. That is to say that as a matter of well-established sociological fact, infertility is recognized by the medical profession as a harm (Geis et al., 2024). The second version of the objection relies on the claim that some patients are willing to accept infertility as a consequence of medical transition, even if they do not intend infertility. These patients prefer to remain fertile, all else being equal, but because all else is not equal they accept interventions that will undermine their fertility. The response to this objection is that such preferences reveal that these patients view infertility as a harm. The real question in the latter case is whether there is good reason to believe that the benefits of medical intervention outweigh this harm, and the answer to this question will depend on the evidence regarding benefits. Finally, research suggests that many transgender-identified people do want children and that some who medically transition experience decisional regret over their infertility. This suggests they also view infertility as a harm even if they do not regret their transition. See Asseler et al. (2024); Stolk et al. (2023).

risks thereof,[34] should not be imposed on children or adolescents in the absence of a reasonable expectation of proportionate medical benefit.[35]

Although a favorable risk/benefit profile is necessary to justify an intervention, it is not sufficient.[36] The intervention must be favorable relative not only to doing nothing but also to other known alternatives. With respect to PMT, a relevant alternative is some combination of psychotherapeutic interventions.[37] Like the evidence for hormonal and surgical interventions, evidence regarding alternative approaches to GD is sparse and inconclusive,[38] though as Chapter 14 reveals there is good reason to believe that psychotherapy can be an effective intervention. Regarding the potential harms of psychotherapy for adolescents with GD, a systematic review of the evidence found no evidence of negative or adverse effects in any of the studies examined (although absence of evidence for harm does not imply evidence of no harm, psychotherapy does not carry the medical or surgical risks associated with PMT).[39]

One possible objection is that although the evidence supporting hormonal and surgical interventions is of low or very low certainty, this does not prove that the interventions are ineffective. For all we know, the interventions may be *more* effective than researchers have reported. The methodological weaknesses of the studies do not prove inefficacy—they tell us only that we cannot infer much of anything about beneficial effects. The same limitations apply to evidence on harms—after all, because there are no well-designed randomized controlled trials (RCTs) of PMT, it follows that there are no well-designed RCTs demonstrating sexual dysfunction, infertility, bone density loss, impaired cognitive function, susceptibility to hormone-sensitive cancers, and other potential

[34] Sweden's National Board of Health and Welfare concluded that "the risks of puberty blockers and gender-affirming treatment are likely to outweigh the expected benefits of these treatments" (Socialstyrelsen, 2022a, p. 3).
[35] The "should not" here is a moral "should not." It does not entail any conclusions about what the law should permit or require. The relationship between ethics and the law is complex and is not taken up in this Review.
[36] If considerations not directly related to health are included in the risk/benefit analysis, there may be cases where an intervention that is marginally less effective in promoting health may be recommended (e.g. when the marginally more effective treatment is much more expensive). And of course, to say that the clinicians should offer the more favorable intervention is not to say that patients do not have the right (in most cases) to refuse it.
[37] See Chapter 14.
[38] Cass (2024a, pp. 153–154).
[39] Heathcote et al. (2024, pp. s19–s32, Suppl. 2).

harms. Some argue that in the face of uncertain evidence both for benefit and for harm, patients themselves (and their families), with expert clinicians providing relevant clinical information, should decide how to proceed.[40] Medical decisions under uncertainty, the reasoning goes, should be made by those with the greatest personal stake in the outcome. In pediatrics, this means children and adolescents, supported (usually) by their families.

This objection properly expresses concern for patient health and well-being as well as respect for the developing decision-making capacity of children and adolescents (and the greater capacity of their guardians). But it fails, for two reasons.

First, the objection understates the cumulative case for evidence of harm. We can be certain in the ordinary sense of “certain” that these interventions cause harm, even if we do not have “high certainty” evidence in the technical sense employed in evidence-based medicine (EBM).[41] We do not need results from RCTs to be certain that removing an adolescent’s breasts will eliminate or substantially impair capacity for breastfeeding. Nor do we need RCTs to establish that PBs and CSH stunt growth of the penis, increasing the risks associated with future surgery.[42] And apart from any systematic reviews of published studies, basic human physiology indicates that blocking puberty at Tanner Stage 2 and following with CSH will negatively impact fertility. That advocates of PMT recommend fertility counselling before undergoing these interventions is evidence that they, too, anticipate the risk of infertility and regard it as a harm. Other forms of evidence, such as indirect evidence from research on adults, also contribute to the case that these interventions cause harm.[43] Finally, research on PMT has focused largely on potential benefits to mental health, with less attention given to potential physical harms, compounding the problem of publication bias.[44]

Second, even granting that the uncertainty of the evidence makes it impossible to assign precise values to the probabilities or magnitudes of various potential outcomes, it

[40] Antommaria (2024).
[41] Smith & Pell (2003)
[42] Terhune et al. (2022).
[43] See Chapter 7.
[44] See Chapter 6 for discussion of publication bias.

does not follow that clinicians are dependent on their patients to guide clinical decision-making.[45] Rather, the obligation to avoid serious harm justifies a precautionary approach, particularly in the absence of evidence for a proportionately serious threat to the patient's health without the intervention. In their seminal textbook on medical ethics, Beauchamp and Childress write:

> Depending on what is valued and what is at risk, it may be ethically justifiable and even obligatory to take steps, in the absence of conclusive scientific evidence, to avoid a hazard where the harm would be both serious and irreversible—that is, a catastrophe. Triggering conditions for these measures include plausible evidence of potential major harm where it is not possible to adequately characterize and quantify risk because of scientific uncertainty and ignorance. The process of developing precautionary norms should not be viewed as an alternative to risk analysis and scientific research. It should instead be viewed as a way to supplement risk appraisals when the available scientific evidence does not permit firm characterizations of the probability or magnitude of plausible risks.[46]

It seems clear that the triggering conditions for adopting a precautionary approach to the use of hormonal and surgical interventions for the treatment of pediatric GD have been met. When precautionary considerations are added to the cumulative case for harm, the ethical argument against PMT becomes compelling.

> The importance of avoiding harm is emphasized by the fact that many treatments (e.g., surgery, hormone therapy) can lead to relatively common and potentially serious long-term adverse effects. This necessitates particularly strong justification (i.e., clear evidence of benefits and the decision-maker's competence) before administering such treatments or accepting these risks. In practice, physically modifying healthy bodies is generally associated with potential harms or risks. Empirical evidence concerning the long-term benefit-to-

[45] One would hope this would come as a relief to clinicians and especially to pediatricians, though some seem happy to let children lead the way. See Chapter 11.
[46] Beauchamp & Childress (2019, p. 250)

> harm ratio of these interventions is often limited. In other words, avoiding harm prompts considerations similar to those raised by competence: when evidence of benefit is uncertain, but risks are probable, the ethical imperative to minimize harm is further underscored.[47]

The unfavorable risk/benefit profile distinguishes PMT from many other off-label uses of drugs and medical devices. Advocates for PMT point to the prevalence of off-label prescribing in pediatrics,[48] but the legitimacy of some off-label uses does not license the prescription of any pharmaceutical to any patient for any reason. The favorable risk/benefit threshold, or, more minimally, the precautionary threshold, must be met irrespective of whether the intervention is approved by FDA. Off-label use of an intervention is sometimes justifiable based on studies of the intervention in a different patient population or for a different indication. Such use may be warranted when there is a reasonable expectation of benefit, when there are no superior alternatives, and when the prognosis, absent medical intervention, is predicted to be worse for the patient than the negative effects of the off-label drug.

This is decidedly not the situation with PMT. The natural history of pediatric GD is poorly understood[49] and decades of research has shown that early-onset GD usually resolves without medical intervention.[50] There is no compelling evidence that the same will not prove true in the case of adolescent-onset symptoms, and limited evidence suggesting it will.[51] And in any case, it is widely acknowledged that clinicians are unable to

[47] Saarni & Uusitalo (2020, p. 41); our translation. Original text: "Haittojen välttämisen tärkeyttä korostaa se, että monista hoidoista voi seurata varsin yleisiä ja vakaviakin pitkän tähtäimen haittoja (esim. kirurgia, hormonihoidot), jolloin hoitojen antamiselle (eli näiden riskien ottamiselle) pitää olla erityisen hyvät perusteet (eli näyttö hyödyistä sekä päätöksentekijän kompetenssista). Käytännössä terveiden kehojen fyysiseen muokkaukseen voidaan katsoa useimmissa tapauksissa liittyvän haittoja tai riskejä. Empiirinen näyttö hoitojen pitkän tähtäimen hyöty/haitta-suhteesta on useissa tapauksissa vähäistä. Toisin sanoen haitan välttäminen johtaa siis samankaltaiseen pohdintaan kuin kompetenssikysymys: jos näyttö hyödyistä on epävarmaa mutta haitat todennäköisiä, haittojen minimoinnin tärkeys eettisenä periaatteena korostuu."
[48] Meng et al. (2022).
[49] See Chapter 4.
[50] Ristori & Steensma (2016); Singh et al. (2021).
[51] Bachmann et al. (2024); Byrne (2024a); Rawee et al. (2024); Sun et al. (2023)

distinguish patients whose GD will persist from those whose GD will resolve.[52] Further, there are concerns about the role medicalization itself may play in contributing to the persistence of the conditions being treated,[53] and less invasive and less risky interventions are available.[54] Lastly, medical intervention has known and plausible harms,[55] and decades of research conducted by leading academic institutions have failed to produce reliable evidence of medical benefit.[56]

### 13.2.4 Justice

According to the Belmont Report, published in 1978 in the wake of the U.S. Public Health Service's Untreated Syphilis Study at Tuskegee, "An injustice occurs when some benefit to which a person is entitled is denied without good reason or when some burden is imposed unduly."[57] While the Belmont report set out ethical principles to guide human subjects research, the principle of justice applies also to clinical medicine. Advocates for PMT sometimes claim it is unjust to withhold PBs, CSH, or surgeries from youth with GD.[58] They cite research finding that this patient population has significant healthcare needs and also suffers from social marginalization and stigma.[59] These patients indeed are vulnerable along multiple axes, and it would be an injustice to deny them safe and effective medical care. It would also be unjust, however, to subject them to serious hormonal and surgical interventions that lack a favorable risk/benefit profile. In fact, it seems particularly unjust to subject youth struggling with complex psychiatric, neurodevelopmental, and psychosocial challenges to the harms associated with these interventions. The justice principle has been rightly invoked but wrongly applied.

---

[52] "Although a diagnosis of gender dysphoria has been seen as necessary for initiating medical treatment, it is not reliably predictive of whether that young person will have longstanding gender incongruence in the future, or whether medical intervention will be the best option for them." (Cass, 2024a, p. 29). The recent German clinical guidelines note that its own review found no studies that could supply empirical criteria to determine whether GD or gender incongruence would persist into or beyond adolescence (German Society for Child and Adolescent Psychiatry, Psychosomatics and Psychotherapy (DGKJP), 2025, p. 188).
[53] Jorgensen (2023a).
[54] See Chapter 14.
[55] See Chapter 7.
[56] See Chapter 5.
[57] National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research (2010).
[58] Kimberly et al. (2018); Maung (2024).
[59] Hatzenbuehler & Pachankis (2016); Rider et al. (2018).

In both her Interim and Final Reports, Cass notes concerns brought to her by patients and families about "diagnostic overshadowing."[60] Diagnostic overshadowing is a form of bias that leads clinicians to misattribute symptoms of one condition to a different previously diagnosed condition. This can happen, for example, when clinicians mistakenly attribute patients' complaints of physical discomfort to the patient's previously diagnosed psychiatric condition, a mistake that may lead to misdiagnosis and inadequate treatment.[61] Diagnostic overshadowing is especially salient in mental health care contexts, where a patient with psychiatric problems, neurodevelopmental challenges, or cognitive disabilities may be treated one-dimensionally as a "case" of some psychiatric diagnosis rather than holistically as a person susceptible to a range of health problems unrelated to that diagnosis.

In the context of PMT, the concern is that the diagnosis of GD tends to obscure causes of distress and crowd out other mental health care needs, particularly when patients are referred to specialty gender clinics. The gender clinic model of care becomes Maslow's hammer to which every problem appears as a nail. The risk of diagnostic overshadowing increases insofar as (1) clinicians fail to provide comprehensive psychiatric evaluations;[62] (2) clinicians face pressure from colleagues, patients, and parents to "affirm" patients prematurely, that is, prior to providing them sufficient time to develop and mature;[63] and (3) co-occurring mental health challenges or problem behaviors are reflexively assumed to be minority stress-mediated sequelae of the patient's GD diagnosis.[64] To neglect the mental health care needs of members of an already vulnerable population of youth with complex psychiatric, neurodevelopmental, and psychosocial challenges is to deny them a benefit to which they are entitled, and to expose them to medically unnecessary risk of harm is to impose a burden unduly.

There are additional problems related to justice. Compared to their age-matched peers, same-sex attracted youth are significantly overrepresented among patients presenting

[60] Cass (2022a, p. 46; 2024b, p. 200).
[61] Hallyburton (2022); Jones et al. (2008); Reiss et al. (1982).
[62] Damiano (2024a).
[63] Edwards-Leeper & Anderson (2021).
[64] Papers claiming minority stress explains various health problems of transgender-identified adolescents include Delozier et al. (2020); Dolotina & Turban (2022); Hunter et al. (2021).

to gender clinics.[65] As noted in Chapter 3, this phenomenon has been observed from the beginning. Of the 70 patients recruited by de Vries and colleagues in the Netherlands from 2000 to 2008, 62 reported being exclusively same-sex attracted, six reported being bisexual, and one reported being exclusively opposite-sex attracted.[66] That is, the original Dutch Protocol patient cohort was comprised almost entirely of gay, lesbian, and bisexual patients[67]—one of whom died as a result of surgical complications from vaginoplasty following pubertal blockade and cross-sex hormones.[68] Reports of negative attitudes towards homosexuality, which may be internalized, are not uncommon in this field.[69] One of the earliest clinical reports on adolescent transition describes a family concerned that their son's gender nonconformity was a sign of homosexuality.

> It is of interest to note that [the patient's family] were all reassured to discover that George was not a *homosexual*. The diagnosis of 'transexual' provided an explanation for his feminine behavior and was, especially for the parents, psychologically relieving.[70]

Given the medical profession's history of pathologizing and medicalizing same-sex attraction,[71] serious justice-related concerns are raised by the overrepresentation of gay, lesbian, and bisexual adolescents among patients receiving unproven interventions that adversely impact fertility and sexual function.

---

[65] Drescher & Yarbrough (2024); Singh et al. (2021); Wood et al. (2013).
[66] de Vries et al. (2011, Table 1). The remaining one patient reported "don't know yet."
[67] Biggs (2023b).
[68] Biggs (2023b); de Vries et al. (2014); Negenborn et al. (2017) Bachmann et al. (2024); Sun et al. (2023).
[69] Barnes (2023); Sansfaçon et al. (2023); Littman (2021).
[70] Newman (1970). Given clinician reports of his self-reported sexual behavior and desires, it is almost certain that George was gay.
[71] Hodge (1950); Murphy (1992); Shidlo et al. (2001). From Hodge: "Male aged 37 years, who came voluntarily, being concerned by his definite homosexual bias which, though it had not since puberty found overt expression, was nevertheless a source of great worry and unhappiness … He appeared after close investigation to be a homosexual deviant of very long standing—an 'innate' pattern rather than one of traumatic 'level fixation'—and he failed to respond to psychotherapy. Treatment by oestrone has been followed by loss of sexual libido and he reports considerable 'mental relief.'" (p. 135) See also Chapter 3 for the influential case of George/Christine Jorgensen and the subsequent wave of lesbian and gay people who sought medical transition.

## 13.3 Alternative clinical rationales

Clinical research on pediatric medical transition has focused primarily on its effects on psychiatric morbidity and to a lesser extent on psychosocial function. The original Dutch Protocol required patients to have “Gender Identity Disorder” (GID), as GD was then called. The diagnostic criteria for GID and its DSM-5 successor GD include clinically significant distress and/or functional impairment.[72] While the diagnostic criteria for GD closely mirror the previous criteria for GID, the DSM-5 more explicitly emphasizes that cross-sex identity, by itself, does not constitute a pathology. The attendant distress, if present, is what is pathological. As such, medical interventions target the patient’s distress or impairment, not the underlying identification.

That patients must have a mental health disorder to access medical resources has long troubled some patients and advocacy groups.[73,74] Some clinical protocols require patients to undergo assessment to determine if they meet (*inter alia*) the distress or impairment criterion—it is not enough that a patient attests to cross-sex identification or incongruence. These criteria thereby create an impediment[75] for people who do not suffer distress or impairment but who nevertheless wish to medically alter their bodies. To access the interventions they want, these patients may need to exaggerate or feign symptoms or else shop for clinicians willing to rubber stamp a diagnosis.[76]

One possible solution to this challenge is simply to eliminate any requirement for a medical diagnosis. Doing this would remove the obstacle of assessment from the path

---

[72] Because GID and GD are DSM diagnoses and the DSM is a manual of mental disorders, this is not surprising. However, it does constrain the options available to clinician-researchers insofar as reimbursement requires a DSM diagnosis, i.e. the categorization of the patient as suffering from a mental disorder.
[73] Drescher (2017).
[74] Objections to medical “gatekeeping” and tensions between patients and clinicians regarding the pathologization of cross-sex identification predate the Dutch Protocol and the medicalization of pediatric gender distress by decades. Adults, wishing for hormones and surgeries to satisfy their longing to modify their bodies and to be perceived as members of the other sex, have butted heads with psychiatrists, psychologists, endocrinologists, and surgeons since the early 20th century when the first “sex change” procedures took place. Disciplinary turf wars between experts, with each field vying for authority over diagnosis and treatment, contributed to the ongoing professional uncertainty over the fundamental aims of medical intervention and the appropriate balance of power between patients and clinicians. See Meyerowitz (2009); Shuster (2021).
[75] Jacobsen (2024).
[76] For accounts of patients feigning symptoms and manufacturing histories in order to convince clinicians of their medical need, see Ashley (2019); Pimenoff & Pfäfflin (2011); Shuster (2021).

of patients seeking medical interventions. The problem with this solution for the DSM and the ICD working groups was that removing the diagnoses altogether would make reimbursement for medical intervention difficult or impossible. The tension between ensuring reimbursement and thereby access, on the one hand, and satisfying the demands of patients and activist groups for depathologization, on the other, required compromises on the part of DSM and ICD developers.[77] The DSM developers depathologized incongruence and pathologized distress. The ICD-11 developers had more options because unlike the DSM, which is devoted exclusively to mental disorders, the ICD catalogues all diseases and health conditions. Having considered the various possibilities,[78] the ICD-11 working group decided to move the diagnosis out of the mental health chapter, where it was believed to contribute to stigma, and into a new chapter, “Conditions Related to Sexual Health,” where it would be less stigmatizing but still useful for purposes of reimbursement.

Consequently, present DSM and ICD diagnoses comprise different frameworks shaped by historical contingencies—including, crucially, payment considerations.[79] According to the DSM-5, experiencing gender incongruence itself is not pathological, while associated distress or impairment are, rendering GD a mental disorder. Meanwhile, according to the ICD-11, gender incongruence (that is, being transgender according to contemporary understandings of what it is to be transgender) itself is pathological, but not a mental health disorder. ICD-11’s diagnosis, Gender Incongruence of Adolescence or Adulthood, includes no requirement of distress or impairment for medicalization. Thus, DSM-5 and ICD-11 differ on whether hormonal and surgical interventions are treatments for a mental health problem or rather some other kind of pathology, on whether transgender identity itself is pathological, and on whether a patient must be distressed or impaired to receive reimbursable medical intervention. Despite these differences and inconsistencies, both diagnoses are employed to justify and reimburse the provision of hormonal and surgical interventions to adolescents.

---

[77] Drescher (2015).
[78] Drescher et al. (2012).
[79] See Drescher (2015); Drescher & Yarbrough (2024).

The more permissive approach to medicalization is defended by some clinicians,[80] bioethicists, and activists.[81] For example, bioethicist Florence Ashley argues that the provision of hormonal and surgical interventions to adolescents is justified by the interventions' capacity to satisfy patients' "gender embodiment goals":

> Adolescent medical transition aims at preventing or altering the development of sexual characteristics to achieve the individual's gender embodiment goals. Given its purpose, the effectiveness of adolescent medical transition is defined by its ability to achieve the sought physiological outcomes—a standard undisputedly met.[82]

While the Dutch Protocol was designed to alleviate adolescents' psychiatric distress and improve psychosocial functioning, Ashley's approach drops the requirement of clinical improvement—achieving the patient's embodiment goals is enough.[83] Elsewhere, Ashley explains that some people seek hormonal or surgical interventions not because they are suffering from a pathology but rather because these treatments can deliver certain desired experiences such as "gender euphoria" and "creative transfiguration." Gender euphoria is a "distinct enjoyment or satisfaction caused by the correspondence between the person's gender identity and gendered features associated with a gender other than the one assigned at birth."[84,85] Creative transfiguration, Ashley writes, "is more difficult to capture in words. Foregrounding creativity and aspirational aesthetics, creative transfiguration sees the body as a gendered art piece that can be made ours through transition-related interventions."[86]

---

[80] See Chapter 11.
[81] Chu (2024).
[82] Ashley (2022a, p. 127).
[83] See Gorin (2024). It is notable that de Vries, the lead author of the two seminal papers (de Vries et al 2011 and 2014) that established the Dutch Protocol, has more recently questioned the "logic of improvement" that undergirds that original clinical rationale and has favorably cited the approach advocated by Ashley (Oosthoek et al., 2024).
[84] Ashley & Ells (2018, p. 24). The definition of gender euphoria offered by Ashley and Ellis entails that no one who does not experience incongruence can experience gender euphoria. According to other writers, however, gender euphoria is "quite common… among trans and cis folks alike." (Kukla, 2024, p. 288).
[85] Researchers recently have developed a scale intended to measure gender euphoria (Blacklock et al., 2025).
[86] Ashley (2019, p. 481).

Because contemporary gender medicine countenances a multiplicity of "genders," this newer emphasis on embodiment goals moves beyond the "sex change" framework of previous decades, in which male patients acquired female-typical characteristics to "live as women" and female patients acquired male-typical characteristics to "live as men" (see Chapter 3). Nothing in the newer "gender affirming" approach limits the number of bodily variations clinicians may be asked to create. Some girls or women want just a bit of stubble while others want full beards and flat chests; some boys or men want softer skin and breasts but wish to keep their penises intact. Expanding clinical offerings reflect these expanding embodiment goals. Surgeons provide penis-preserving vaginoplasty for patients who want both male and female genitals and offer "nullification" procedures for patients who identify as nonbinary and want no external genitals at all. There are at least as many physical combinations for patients to acquire as there are "gender identities"—indeed more, since presumably each gender identity can be embodied in different ways.[87]

While the ICD-11 does not mention "gender euphoria" or "gendered art pieces," the diagnostic criteria for Gender Incongruence of Adolescence or Adulthood implicitly formalize the "embodiment goals" approach to medical transition. The diagnosis is explained as follows:

> Gender Incongruence of Adolescence and Adulthood is characterized by a marked and persistent incongruence between an individual's experienced gender and the assigned sex, which often leads to a desire to 'transition', in order to live and be accepted as a person of the experienced gender, through hormonal treatment, surgery or other health care services to make the individual's body align, as much as desired and to the extent possible, with the experienced gender. The diagnosis cannot be assigned prior the onset of puberty. Gender variant behavior and preferences alone are not a basis for assigning the diagnosis.[88]

[87] James et al. (2015).
[88] World Health Organization (2022b).

According to Jack Drescher, a member of the World Health Organization's (WHO) Working Group on the Classification of Sexual Disorders and Sexual Health, which was tasked with making recommendations for the ICD's eleventh edition, to qualify for the diagnosis of Gender Incongruence of Adolescence or Adulthood, a patient need satisfy only two of the following four criteria:

1. Strong dislike or disagreement with primary or secondary sexual characteristics due to incongruence with the experienced gender.
2. Strong desire to get rid of some of those sexual characteristics due to the incongruence with the experienced gender.
3. Strong desire to have the primary or secondary sexual characteristics of the experienced gender.
4. Strong desire to be treated and accepted as a person of the felt gender.[89]

It is hard to see how either of the first two criteria could be used to diagnose gender incongruence. ICD-11 says that gender incongruence is "characterized by a marked and persistent incongruence between an individual's experienced gender and the assigned sex …"[90] Criteria (1) and (2) themselves include incongruence and so the diagnosis, when met by the first two criteria, suggests that a person has gender incongruence because they have attitudes or desires due to incongruence.[91]

Setting problems of circularity aside, an adolescent can be diagnosed with gender incongruence by satisfying (3) and (4),[92] which amount to having certain strong embodiment goals. A male who strongly desires to have (some? all?) the sex characteristics of a female and to be treated or accepted as such, or a female who strongly desires to have (some? all?) the sex characteristics of a male and to be treated

89 Drescher & Yarbrough (2024, p. 2508).
90 World Health Organization (2022a).
91 The problem of circularity is also discussed in Chapter 2. It is also unclear what it could mean to be in a state of "disagreement" with one's sex characteristics. Perhaps the authors mean that one finds one's sex characteristics disagreeable, that is, unpleasant. This makes sense, as long as the unpleasantness does not rise to the level of distress, which would transform gender incongruence into something like gender dysphoria and thereby undermine the rationale for moving the gender incongruence diagnosis out of the mental disorder chapter of ICD-11.
92 Whether the criteria must be met for a specific period of time is unclear. ICD-11 does not specify a time requirement; Drescher and Yarbrough say "several months" (Drescher & Yarbrough, 2024, p. 2508).

or accepted as such, qualifies for the diagnosis. According to the ICD-11, a patient with such desires has a "condition related to sexual health" and, therefore, clinicians have a rationale for providing, and being reimbursed for, hormonal or surgical interventions.

It is noteworthy that the ICD-11 employs identical diagnostic criteria for adolescents and adults, despite the clear physiological and psychological developmental differences between these populations and their respective capacities for decision-making and self-understanding. Neither DSM-5-TR nor ICD-11 provide any explanation for why children or adolescents might desire to modify their sex traits or to be treated or accepted as someone other than a member of their sex, and counseling approaches that might explore possible explanations with patients often are labeled "conversion therapy" by advocates of the "gender-affirming" approach.[93] As far as the DSM-5-TR and ICD-11 diagnoses are concerned, it makes no difference that a patient of 10 or 13 or 17 might wish to modify their body and be perceived and treated as someone other than a member of their sex for any number of reasons. These may include discomfort with one's homosexuality, a history of sexual trauma, pubertal distress, the rejection of perceived sex-based roles, and/or psychiatric comorbidities. For the ICD-11, desire alone is sufficient to justify a medical diagnosis and, within the "gender-affirming care" framework, set the adolescent on a course of PMT.

If using hormonal and surgical interventions to reduce psychiatric morbidity associated with gender dysphoria lacks a favorable risk/benefit profile, using these interventions merely to satisfy adolescents' embodiment goals veers from clinical error into clinical recklessness.

## 13.4 Regret

Patient regret has begun to receive significant attention in discussions of PMT. Proponents of PMT claim that regret is extremely rare.[94] Some also claim that since mental health assessments have not been shown to reduce regret rates, they should not be required prior to prescribing.[95] The tacit assumption is that absence of regret is

[93] Ashley (2023). See Chapter 14.
[94] Crabtree et al. (2024); Kidd & Sequeira (2024); McNamara et al. (2024); Turban et al. (2021).
[95] Ashley et al. (2023); Wu & Keuroghlian (2023). See also Chapter 11.

an indication of medical benefit or at least of absence of harm. Other researchers point out that research on regret, like most research in PMT, is severely lacking and that we do not know the true prevalence of regret.[96] Whether implicitly or explicitly, proponents and critics alike consider the question of regret as central to the ethics of PMT.

That some patients report profound regret after undergoing invasive, life-changing medical interventions is clearly of importance. However, regret alone (just like satisfaction alone) is not a valid indicator of whether an intervention is medically justified. Not only is regret a complex phenomenon itself,[97] but its relation to ethical considerations in medicine, and to benefit and harm in particular, is tenuous. Patients sometimes come to regret consenting to interventions that were in fact well-justified, that is, interventions that did offer a favorable risk/benefit profile at the time the intervention was proposed. Patients may come to regret such interventions because they suffer harmful complications that were unlikely to occur but did occur in their case. Or they may come to regret the interventions for other reasons. For example, a woman may undergo a spine surgery for which there is compelling evidence of net benefit to her health and yet come to regret the surgery because the modest relief of pain seems to her retrospectively to have not been worth the cost or hassle involved in recovering from the surgery. Or perhaps the improvement in her health allowed her to take some course of action that turned out to make her life worse, all things considered. That she comes to regret the surgery does not mean that it was clinically or ethically unjustified, nor that her clinician violated medical ethics.

Conversely, humans have a remarkable capacity to incorporate suffering and loss into their life stories. A man may be paralyzed as the result of a spine surgery that did not prospectively offer a favorable risk/benefit profile, and which should never have been attempted by the surgeon. Yet months or years later the man may report that he does not regret undergoing the surgery, because the injury and debility it caused led him to focus more attention on the love and care of his family and friends. Or perhaps, as able-bodied, he was isolated and lonely but now, due to his greater physical dependency, he

---

[96] Cohn (2023); Jorgensen (2023b); MacKinnon, Expósito-Campos et al. (2023).
[97] Landman (1987).

finds a supportive community within which he develops a new identity that imbues his life with structure and purpose. Or maybe as a result of his injury he simply comes to appreciate more deeply the gift of life in its fragility. That this man does not regret the surgery does not imply that his decision to consent to it was prudent, nor that the surgeon was justified in offering the surgery.

The implications for PMT are complex. The provision of hormonal or surgical interventions to physically healthy adolescents cannot be vindicated by purportedly low rates of regret. Some patients who have suffered objective medical harm and then detransitioned nevertheless do not regret having been medicalized.[98] Nor can the interventions be condemned based on the fact that some adolescents who have undergone them do report regret. The central question for PMT is not: “Do these medically transitioned patients have regret?” A more fundamental question is, “Does medical transition provide health benefits proportionate to its harms?” The best available evidence, along with a risk/benefit analysis and precautionary approach ethically appropriate to pediatrics, shows that the answer to the latter question is almost certainly “no.”

## 13.5 Research Ethics

Multiple SRs, commissioned by leading international health authorities and conducted by independent academic researchers, have concluded that the evidence underpinning the expected benefits of PMT is of low or very low certainty.[99] A natural response among researchers to the absence of higher quality evidence is to conduct more and better research. Whether and how such research should be conducted, however, is a matter of significant ethical controversy.

One controversy concerns RCTs, the “gold standard” for clinical research.[100] Some proponents of PMT claim that RCTs on the effects of PBs or CSH would be infeasible and unethical.[101] With respect to feasibility, because the effects of PMT interventions are

---

[98] For some real examples, see Sansfaçon et al. (2023).
[99] See Chapter 5.
[100] Hariton et al. (2018).
[101] Ashley et al. (2024, 407-418).

so apparent, it is not possible to blind researchers and participants in an RCT for which the control group receives only psychotherapeutic support. Some worry that many adolescents would refuse to participate in a study that does not guarantee they receive hormonal interventions, or that they would drop out if randomized to the control group. These challenges may be harder to overcome in the current climate in which adolescents have been led to believe that hormonal and surgical interventions are well-supported by the evidence and even life-saving.[102] However, randomization does not require blinding, and until an RCT is attempted, speculation about how potential participants will respond is just that—speculation.

With respect to research ethics, one objection to conducting RCTs is that such research would violate the principle of equipoise. In their textbook, *Principles of Biomedical Ethics*, Beauchamp and Childress explain that "[t]he community of reasonable physicians is … in a state of 'clinical equipoise'" when "[n]o one knows, prior to conducting the research, whether it is more advantageous to be in the control group or in the experimental group … In this model, no patient, then, will receive something known to be less effective or to have a higher risk than an available alternative."[103]

Advocates for PMT allege that it would violate the principle of equipoise to conduct an RCT of PMT in which the control group receives only psychological counseling, "given the numerous studies associating adolescent gender-affirming interventions with improved mental health."[104] This allegation is unfounded, however, because it mischaracterizes the state of the science. Indeed, if equipoise were violated, it plausibly would be in the other direction, given the more certain evidence of harm. In the end, while their reasons differ, there may be a point of agreement between proponents of PMT and some of its critics concerning the impermissibility of conducting RCTs for hormonal or surgical interventions for pediatric GD.

It is not clear that hormonal or surgical interventions for GD can ethically be offered in a trial, irrespective of trial design. Currently, researchers in the U.K. are planning a PB

[102] Clayton, A. (2023).
[103] Beauchamp & Childress (2019), p. 365; See also Freedman (1987).
[104] Ashley et al. (2024, p. 408).

trial. At the time of this Review's writing, the trial has not yet received official ethics approval, and details regarding the trial's design, which outcomes will be studied, what the inclusion and exclusion criteria will be, and so on, have not been published. Some critics of PMT already are raising concerns about the proposed study. They worry about prescribing PBs even in research settings given the recognized inability of clinicians to distinguish between patients whose GD will persist into adulthood from those whose GD will resolve on its own,[105] and the high likelihood that any patient who begins PBs will go on to CSH and possibly surgery.[106] Since most adolescents who take PBs go on to CSH, and since it is CSH and surgery that provide the sought-after physical characteristics in PMT, it is unclear whether PBs are a stand-alone treatment and should be studied as such.

Other critics point out that safer types of research—for example, research into various psychotherapeutic approaches—have yet to be explored with this population of patients. They also point out that U.S. gender clinics have yet to collect longitudinal data on existing patients.

There are other important ethical problems to consider. The Nuremberg Code is a foundational and internationally accepted statement of norms guiding human subjects research and it includes the following:

> The experiment should be so designed and based on the results of animal experimentation and a knowledge of the natural history of the disease or other problem under study, that the anticipated results justify the performance of the experiment.[107]

This suggests that, insofar as PMT poses risks that can be explored through animal studies, such studies should be conducted before these treatments are further tested on humans. Animal studies could help clarify how hormonal interventions affect fertility,

---

[105] Feinmann (2025).
[106] E.g. Brik et al. (2020); Carmichael et al. (2021); Karakılıç Özturan et al. (2023a); van der Loos, Klink et al. (2023); Wiepjes et al. (2018).
[107] BMJ (1996).

brain development,[108] bone development (including future risk of fracture), and cardiovascular outcomes. Such studies also could help clarify to what extent and under what conditions fertility can be recovered after suppression by hormonal interventions.

The World Medical Association's Declaration of Helsinki is another foundational and internationally accepted statement of guidance for human subjects research. It includes the following:

> All medical research involving human participants must be preceded by careful assessment of predictable risks and burdens to the individuals and groups involved in the research in comparison with foreseeable benefits to them and to other individuals or groups affected by the condition under investigation. Measures to minimize the risks and burdens must be implemented. The risks and burdens must be continuously monitored, assessed, and documented by the researcher.
>
> Physicians and other researchers may not engage in research involving human participants unless they are confident that the risks and burdens have been adequately assessed and can be satisfactorily managed.[109]

It is not ethical to subject adolescents to hormonal and surgical interventions used in PMT, even in a research trial, until and unless the state of the evidence suggests a favorable risk/benefit profile for the studied intervention, *and* the researchers have well-grounded confidence that the foreseeable "risks and burdens have been adequately assessed and can be satisfactorily managed." As explained in this Review, the state of the science does not support a favorable risk/benefit profile, nor does it give researchers a basis for confidence that the risks of PMT can be satisfactorily managed.

Finally, the Belmont Report, authorized by the National Research Act of 1974 and published in 1979 by the United States National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research, is a landmark statement of

---

[108] Chen and colleagues, for example, write, "studies in rodents show ovarian hormones, acting during puberty, program cognitive flexibility by exerting long-lasting effects on excitatory-inhibitory balance in the pre-frontal cortex . . . [and] testosterone, acting during puberty, programs the ability to adapt behavior as a function of social experience" (Chen et al., 2020, Table 2).
[109] World Medical Association (2025).

ethical principles to guide human subjects research in the United States. The Belmont Report affirms that research on humans should not be conducted until and unless that research is "justified on the basis of a favorable risk/benefit assessment" arrived at through "systematic, nonarbitrary analysis of risks and benefits." It continues:

> Thus, there should first be a determination of the validity of the presuppositions of the research; then the nature, probability and magnitude of risk should be distinguished with as much clarity as possible … It should also be determined whether an investigator's estimates of the probability of harm or benefits are reasonable, as judged by known facts or other available studies … [and] When research involves significant risk of serious impairment, review committees should be extraordinarily insistent on the justification of the risk (looking usually to the likelihood of benefit to the subject … ).[110]

As demonstrated throughout this Review, the presuppositions that guide PMT have not been shown to be valid; the nature, probability and magnitude of risks associated with PMT have not been distinguished with sufficient clarity; PMT proponents' estimates of the probability of harm and benefit have not been shown to be reasonable, as judged by known facts and available studies; and the risks of serious impairment that PMT involves have not been shown to be justified. For these reasons, administering PMT to adolescents, even in a research context, is in tension with well-established ethical norms for human subjects research.

---

[110] National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research (2010).

PART 5

# PSYCHOTHERAPY

# Chapter 14 Psychotherapy

This chapter reviews psychotherapy (talk therapy) for gender dysphoria (GD).[1] First, the chapter describes relevant trends in society at large and in the medical profession; specifically, trends in youth mental health (Section 14.1) and in diagnostic and social labels (Section 14.2). Section 14.3 discusses the role of mental health assessment in the care of youth with GD. Section 14.4 briefly recounts the re-emergence of psychotherapy as the primary treatment for this patient population in Europe, and Section 14.5 discusses psychotherapy and its specific application to GD.

## 14.1 Youth mental health

Puberty is the biological, developmental process during which a child becomes a sexually mature adult.[2] Puberty overlaps significantly with adolescence, the period between childhood and adulthood.[3] During puberty, hormonal fluctuations can affect mood and behavior.[4] The onset of puberty often coincides with heightened sensitivity to social dynamics and self-image along with increasing vulnerability to stress and anxiety. Emotional regulation can become challenging as adolescents navigate the complexities of identity formation and peer relationships. Cognitive development accelerates, allowing deeper abstract thinking and self-reflection, which can contribute to existential questioning and emotional instability.[5] Adolescence also involves learning to function independently, as part of identity formation and individuation from the family of origin. Rebellion and resistance to parents and other caregivers or authority figures frequently occur during this process. Adolescents often struggle with long-term planning and are more susceptible to risk taking, as drives for stimulation and affiliation increase but the prefrontal cortex, responsible for executive functions, is still maturing.[6]

---

[1] Gender Dysphoria is a formal diagnosis in the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5): see Appendix 2. In this chapter and throughout the Review the term “gender dysphoria” is used to refer to sex-related distress or discomfort, not the formal diagnosis (see Chapter 1, Note 1).
[2] See Chapter 7.
[3] According to the American Academy of Pediatrics (AAP), adolescence spans ages 12-21 (Hardin et al., 2017). See also National Academies of Sciences, Engineering, and Medicine (2019, pp. 22–23).
[4] Viner (2015).
[5] E.g., Reena (2015); Steinberg (2005).
[6] Steinberg (2009).

### 14.1.1 Trends in youth mental health

In 2021, the American Academy of Pediatrics (AAP), the American Academy of Child and Adolescent Psychiatry (AACAP), and the Children's Hospital Association declared a "National State of Emergency in Children's Mental Health."[7] In December of that year, U.S. Surgeon General Admiral Vivek Murthy issued an Advisory on Protecting Youth Mental Health, highlighting rising rates of depression, anxiety, hopelessness, and self-harm among youth—trends that worsened during the COVID-19 pandemic. The Lancet Psychiatry Commission on youth mental health noted a similar worldwide trend.[8]

In the U.S., there has been a significant increase in mental illness among teens and young adults since 2010.[9] Data reveal sharply increased rates of diagnosed depression and anxiety; some studies indicate that these rates have more than doubled.[10] Increases also have been documented in rates of suicidal ideation and behavior and self-harm,[11] emergency room visits and hospitalizations for self-harm,[12] and death by suicide.[13] Young people today experience weaker social connections and greater feelings of loneliness. Since 2010, adolescents have had fewer in-person social

---

[7] American Academy of Child and Adolescent Psychiatry et al. (2021).
[8] McGorry et al. (2024).
[9] Twenge (2020).
[10] Data from a large national database showed that rates of major depressive episodes among adolescents aged 12 to 17 increased by 52% from 2005 to 2017 (from 8.7% to 13.2%) and by 63% among young adults aged 18 to 25 from 2009 to 2017 (from 8.1% to 13.2%) (Twenge et al., 2019). The "Anxious Generation" website, using Centers for Disease Control and Prevention (CDC) data, shows that rates of major depressive disorder from 2010 to 2022 more than doubled for both boys and girls, with major depression in boys increasing by 161% and in girls by 145%. Mental illness for college students increased, with a 134% increase in anxiety and 106% increase in depression over that same period (Rausch & Haidt, 2023). A cohort study of approximately 1.7 million individuals aged 5 to 22 years in Southern California revealed that from 2017 to 2021 the overall incidence of depression increased by approximately 60%, and anxiety by 31% (Xiang et al., 2024). A survey of a Midwestern school district found from 2012 to 2018 there was a 29% increase in youth screening positive for past-month anxiety (Parodi et al., 2022). See also Goodwin et al. (2020); Keyes & Platt (2024).
[11] See CDC trends report, 2013-2023 (Centers for Disease Control and Prevention, 2023).
[12] See Gutiérrez-Sacristán et al. (2022) for information about increase in psychiatric hospitalizations during the COVID-19 pandemic, for example. See also McGorry et al. (2024).
[13] Suicide death rates for children and young adults aged 10 to 24 years increased 62% from 2007 (6.8 per 100,000 individuals) to 2021 (11.0 per 100,000 individuals) (Curtin et al., 2023). Youth suicides began to rise in the 2000s, with a sharper upward trend starting around 2012; see Farah et al. (2023); Miron et al. (2019); Twenge (2020).

interactions with peers compared to previous generations.[14] The deterioration in youth mental health has no one simple explanation. Researchers and theorists have identified several potential factors, including overprotective parenting,[15] the decline in free play,[16] and the ubiquity of smartphones and social media.[17] In 2023, the Surgeon General released an Advisory of Social Media and Youth Mental Health, which called attention to the potential risks associated with social media use for children and adolescents.[18]

## 14.2 Diagnostic and social labels

The rise in reported mental health problems may be partly attributable to overdiagnosis. Some argue that the rise in mental health awareness campaigns aimed at reducing stigma and increasing understanding may have led some young people to interpret normal behaviors and typical developmental challenges as a mental health disorder.[19] Being labeled with a mental health diagnosis can influence how young people see themselves, affect their belief in the possibility of change, and shape how others perceive them. The very act of classifying psychiatric conditions changes the behavior of patients and clinicians. Although diagnostic labels are important for research—where categorizing people or experiences is often necessary—they can oversimplify the

---

[14] Twenge et al. (2021); Twenge (2023). Based on CDC data, adolescents have, over time, reported increased feelings of meaninglessness, as well as less willingness to engage in risk-taking behaviors. This includes behavior such as drug and alcohol consumption, but also encompasses developmental experiences such as working or learning to drive a vehicle (Haidt, 2024).
[15] Wang et al. (2024); Winnicott (1965); Zhang & Ji (2024).
[16] According to the AAP: "Children need to develop a variety of skill sets to optimize their development and manage toxic stress. Research demonstrates that developmentally appropriate play with parents and peers is a singular opportunity to promote the social-emotional, cognitive, language, and self-regulation skills that build executive function and a prosocial brain" (Yogman et al., 2018).
[17]Increased use of technologies, including social media, caused a displacement of other activities, such in-person socializing, schoolwork, sleep, sports, reading, and other hobbies. Heavy use of smart phones and social media is ubiquitous among teenagers today (Rothwell, 2023; Twenge et al., 2022; Twenge & Campbell, 2019; Vogels et al., 2022), and common among pre-teens (Rideout et al., 2022). Social media in particular may result in worsening mood and negative self-image in adolescent girls (Choukas-Bradley, 2024; Rodgers & Rousseau, 2022; Scott et al., 2023), and in some cases may play an etiologic role in increasing presentations of specific psychiatric and neurologic issues (Giedinghagen, 2023; Haltigan et al., 2023; Hull & Parnes, 2021; Padín et al., 2021; Pringsheim et al., 2021; Weigle & Shafi, 2024). Social media has introduced a new sociomedical phenomenon in which individuals may find a sense of belonging online through identification with an illness or condition, which may place them at risk of inappropriate or unnecessary medical care (Corzine & Roy, 2024). For a meta-analysis that found reasons for skepticism about the evidence for the effects of social media on mental health, see Ferguson (2025).
[18] Office of the Surgeon General (2023).
[19] Foulkes & Andrews (2023).

richness and complexity of human experiences for the benefit of a standardized clinical language. To some extent, skillful clinicians can compensate for this reductionism,[20] but they cannot prevent diagnostic labels from escaping the clinic and being used in unintended ways in the wider culture.[21]

Overdiagnosis can lead to overtreatment; unnecessary tests, procedures or medical interventions may cause harm rather than helping. Loosening the diagnostic criteria for a condition will likely increase overdiagnosis and the risk of iatrogenic harm, so definitions should be formulated responsibly:

> … any changes [to diagnoses] should use a systematic, transparent approach where benefits and harms are explicit, especially when they lead to an increase in the prevalence of disease, and broadening of definitions should require evidence of clinical benefit.[22]

Although the term "gender identity" was used in the 1960s,[23] it did not appear in the *Diagnostic and Statistical Manual of Mental Disorders* until 1980 (third edition, DSM-III). "Gender Identity Disorders" was a subcategory of "Psychosexual Disorders," further divided into "Transsexualism" (for late adolescents and adults) and "Gender Identity Disorder of Childhood."[24] In the DSM-IV, published in 1994,[25] "Transsexualism" vanished, and "Gender Identity Disorder" (GID), covering both adults and children, appeared under "Sexual and Gender Identity Disorders." The DSM-5, published in 2013,[26] replaced "Gender Identity Disorder" with "Gender Dysphoria" and designated it as a separate category. This last change "focused the diagnosis on the gender identity-related distress that some transgender people experience (and for which they may seek

---

[20] Johnstone (2018).
[21] Hacking (1998); Shorter (1993). See also Brossard (2019); Elliott (2000); Haslam (2016); Lindholm & Wickström (2020); Smids & Vasterman (2025).
[22] Kale & Korenstein (2018, p. 8). The field of psychiatry is no stranger to the phenomenon of misdiagnosis, overdiagnosis and overtreatment; see, for example, Harris & Carey (2008), Havens et al. (2022), and Moreno et al. (2007) for discussion of controversies related to overdiagnosis of pediatric bipolar disorder.
[23] See Chapter 2.
[24] American Psychiatric Association (1980).
[25] American Psychiatric Association (1994).
[26] American Psychiatric Association (2013).

psychiatric, medical, and surgical treatments) rather than on transgender individuals or identities themselves."[27]

The intention of the DSM's linguistic evolution—from "Transsexualism," to "GID," to "GD"—was to reduce stigma. A parallel linguistic evolution in society at large has resulted in the increasing adoption of labels such as "nonbinary," "genderqueer," "queer," "gender-fluid," "two-spirit," and "transgender."[28] The individuals who identify with these labels—unlike historical or contemporary "transsexuals"[29]—are not a patient group of any kind. "Transgender," "nonbinary," and similar words are not medical terms: they apply to a diverse group of individuals, many of whom are neither dysphoric nor desire any medical or surgical interventions. If there is a common experience, it is "incongruence" between "experienced gender" or "gender identity" and "assigned sex." As the 2022 Text Revision of the DSM-5 explains, "not all individuals will experience distress from incongruence."[30]

As discussed in Chapter 4, social influences have plausibly contributed to the dramatic increase in adolescents presenting to pediatric gender medicine (PGM) clinics over the past decade.[31] Adolescents' need for belonging and acceptance[32] can be met by online communities and spaces centered around identity. The growing use of identity labels such as "transgender" and "nonbinary" among adolescents is an important topic for social science research. In the current U.S. healthcare environment, self-labeling of this kind increases the likelihood that a young person will seek input from a gender clinic,

---

[27] Drescher (2017). According to a systematic review of cross-sex hormones and mental health outcomes commissioned by the World Professional Association for Transgender Health (WPATH), "[the diagnostic changes] clarify that the target of gender-affirming medical interventions is not the person's gender identity itself but rather the clinically significant distress that can accompany a misalignment between gender identity and sex assigned at birth" (Baker et al., 2021, p. 2). For the diagnostic criteria, see Appendix 2.
[28] See James et al. (2015), and also Section 13.4 of the previous chapter, on "gendered art pieces."
[29] Some individuals who have medically and surgically transitioned still claim this label: e.g., "I do consider myself more as a Transsexual person, which to me is somebody who wanted to switch genders. I always wanted to be a man, I identify as a man, that's what I am, I don't identify as a Transperson at all" (LOTL staff, 2014). See also American Psychological Association (2023), and Chapter 3.
[30] American Psychiatric Association (2022). See also Chapters 2 and 11.
[31] See also the discussion of rapid-onset gender dysphoria (ROGD) in the same chapter.
[32] Especially in girls, e.g., Archer (2019); Prinstein et al. (2005); Rose & Rudolph (2006).

where medical transition may be recommended as early as the first appointment (see Chapter 12).[33]

## 14.3 Controversies regarding assessment and the role of the psychotherapist

In the Dutch research that underpins the contemporary pediatric medical transition (PMT) approach, the psychotherapist occupied an essential role. The original Dutch approach involved an intensive assessment process.[34] Adolescents who began medical transition were required by the protocol to continue to receive regular mental health care.[35]

When discussing contemporary applications of PMT in the U.S., providers often describe a similar approach: multidisciplinary, slow, careful, and methodical.[36] For healthcare providers, the term "multidisciplinary" may connote the lengthy, intensive deliberations that occur at "tumor boards"[37] or during organ transplantation assessments. In inpatient psychiatric units, it is considered preferable to have a multidisciplinary approach, for example involving nursing staff, psychologists, occupational therapists and social workers.[38]

However, in PGM, multidisciplinary teams (MDTs) often do not function like the collaborative model just described. They are more similar to the common healthcare scenario in which a patient sees a cardiologist for cardiac clearance before undergoing

[33] Discussion of labels is also salient to the treatment of the prepubertal patient cohort with GD. As discussed in Chapter 2, the relatively recent practice of calling gender dysphoric youth "transgender children" may increase the likelihood these patients will be placed on a medicalized pathway.
[34] As described in Delemarre-van de Waal & Cohen-Kettenis (2006), "[In] the first diagnostic phase, information must be obtained from both the adolescent and the parents on various aspects of general and psychosexual development of the adolescent, the adolescent's current functioning and functioning of the family. Standardized psychological assessment is a part of the procedure. The patient is always seen by two members of the gender team. If a child and adolescent psychologist makes the diagnosis, the child is also seen by a child and adolescent psychiatrist and vice versa" (p. S132).
[35] Delemarre-van de Waal & Cohen-Kettenis (2006). Mental health visits were required every 3 months.
[36] E.g., from ABC News: "[Kellan] Baker [the executive director of the Whitman-Walker Institute, an LGBTQ research organization and care provider] said the decision to pursue gender-affirming care is often a lengthy process that includes teams of medical care providers and mental health professionals who work with families to talk about their child's experience, their needs, their choices, and more…'We're talking months of appointments with a mental health specialist. We're talking lots of conversations between providers, parents, and kids,' Baker said" (Alfonseca & Geho, 2024).
[37] Okasako & Bernstein (2022).
[38] Russ (2021).

an orthopedic procedure. Under some models, the mental health professional (MHP) seeing the minor with GD writes a note or may just fill in a pre-written template; this is taken to an endocrinologist, who prescribes, or a surgeon, who operates.[39] Further, individuals who comprise the MDTs may all subscribe to the PMT model of care, which prioritizes administration of endocrine and surgical interventions to patients who desire them.[40] This is different from traditional MDTs where various specialties approach problem-solving from different perspectives, enhancing the accuracy of the diagnosis and identification of effective treatments.[41]

The MDT model in the context of PMT has created considerable uncertainty about whether the MHP or the physician providing the medical (and/or surgical) interventions bears the ultimate responsibility for the decision. This may have resulted in "diffusion of responsibility," a phenomenon in which "individuals can underperform in circumstances of shared accountability."[42] With respect to the U.K.'s National Health Service (NHS), the Cass Review's interim report provided some clarity by stipulating that the pediatric endocrinologist, as the physician providing the intervention, should be responsible for assessing the patient and formulating a full differential diagnosis. In other words, according to the interim report, receipt of a therapist's letter should not be sufficient for the prescription of hormonal intervention.[43]

In the U.S., no such clarity exists regarding which MDT professionals are ultimately responsible for medical interventions. Endocrinologists and surgeons may believe that the medical necessity of any intervention has been determined by the MHPs who made the diagnosis.[44] Whether the MHP "letter of approval" for hormones or surgery

---

[39] See description of the university-based multidisciplinary clinic in Reed (2023a). See description of two-hour long assessments at Boston Children's Hospital in Damiano (2024a).
[40] To further mitigate the potential biases of established MDT teams who subscribe to the PMT model, the National Health Service (NHS) in England issued a new clinical policy for cross-sex hormones in 2024. It calls for independent oversight, specifying that new national MDTs must include "clinicians *not directly involved* in the formation of the individual's care plan," who must agree "on the suitability of the individual receiving [CSH]" (National Health Service England, 2024c).
[41] Morabito et al. (2024).
[42] Marcotte et al. (2020, p. 802).
[43] Cass (2022a).
[44] See, for example, the role of endocrinologists as described in Karakılıç Özturan et al. (2023b). The field of pediatric gender medicine is unusual in this respect: "It [is] not the norm for doctors to prescribe powerful medication to people—especially children—they themselves [did] not diagnos[e]" (Barnes, 2023, p. 337).

constitutes a formal treatment indication will likely be determined by ongoing lawsuits brought by young people against the clinicians who treated them. In practice, these MHP approval letters may primarily serve to ease the ethical concerns of the physicians.[45]

Some prominent PMT advocates assert that children and adolescents should not receive *any* mental health assessment prior to initiation of hormonal interventions or surgeries.[46] As a principal investigator of NIH-funded research on PMT, Johanna Olson-Kennedy, a U.S. pediatrician and president-elect of the U.S. Professional Association for Transgender Healthcare (USPATH), likened the initiation of PMT to treating diabetes, asserting: "I don't send someone to a therapist when I'm going to start them on insulin."[47]

## 14.4 Psychotherapy for GD: Re-emergence in Europe

Three European countries—Sweden, Finland, and England—have conducted independent systematic reviews of evidence commissioned by their public health authorities.[48] All three concluded that the risks of medicalization may outweigh the benefits for children and adolescents with GD at the population level, and subsequently sharply restricted access to medical gender transition interventions for minors.[49] All three countries now suggest traditional mental health approaches and have begun efforts to de-exceptionalize GD. Psychotherapy is now the recommended first-line treatment, as it is for all psychological distress based on the conventions of "conservative management."[50]

Per England's National Health Service (NHS):

---

[45] Levine (2024, p. 4).
[46] As described in McDeavitt (2025, p. 1298), "The argument for doing away with mental health assessments is often articulated alongside the opinion that the presence of a DSM-5 diagnosis of gender dysphoria (or indeed any type of psychological distress) should not have to be required in order for an adolescent to be initiated on PBs/GAH." See Mosier-Mills et al. (2024), for example, and similar arguments in Ashley (2022a, 2022b, 2023).
[47] Singal (2018).
[48] Ludvigsson et al. (2023); National Institute for Health and Care Excellence (2020b, 2020a); Pasternack et al. (2019); Taylor, Mitchell, Hall, Heathcote et al. (2024); Taylor, Mitchell, Hall, Langton et al. (2024).
[49] See Chapter 4.
[50] Adhiyaman & Ambalavanan (2021).

> The primary intervention for children and young people … is psychosocial (including psychoeducation) and psychological support and intervention; the main objective is to alleviate distress associated with gender dysphoria and promote the individual's global functioning and wellbeing.[51]

Per Finland's Council for Choices in Health Care in Finland (COHERE):

> The first-line treatment for gender dysphoria is psychosocial support and, as necessary, psychotherapy and treatment of possible comorbid psychiatric disorders.[52]

Per Sweden's National Guidelines:

> The psychosocial care of young people with gender dysphoria needs to be adapted to the needs of the individual adolescent. Psychosocial support that helps adolescents deal with natal puberty without medication needs to be the first option when choosing care measures. For those suffering from mental health problems, measures such as supportive counseling, psychotherapy, child psychiatric treatment, and suicide prevention need to be offered and adapted to the nature and severity of the mental health problem and the young person's overall situation.[53]

## 14.5 Psychotherapy and its application to gender dysphoria

Psychotherapy is the least invasive intervention for addressing psychological distress, regardless of its etiology, and it has been recognized as the international standard of care for a wide range of mental health diagnoses. However, the evidence for psychotherapy for GD is of very low certainty. As noted in Chapter 5, there are multiple reasons for the paucity of data, and "there has been a failure to systematically consider how psychosocial interventions should be used and to research their efficacy."[54]

[51] National Health Service England (2022, p. 2).
[52] Council for Choices in Healthcare Finland (2020b, p. 5).
[53] Socialstyrelsen (2022b, p. 45).
[54] Cass (2024a, p. 155).

### 14.5.1 Psychotherapy for conditions frequently co-occurring with gender dysphoria

The etiology of GD in youth remains understudied. However, patients presenting to PGM clinics today have a range of neurodevelopmental disorders and mental health conditions, including comorbid depression, anxiety, eating disorders, self-harm, and suicidality.[55] Some studies suggest that in more than 70% of cases, other DSM diagnoses appeared before the GD.[56] Etiologically, the relationship between the GD and the high rate of co-occurring mental health conditions in this population is unclear.[57] As explained by psychologist Kenneth Zucker,

> it may be that the gender dysphoria has emerged as secondary to another, more "primary" mental health diagnosis, such as autism spectrum disorder or borderline personality disorder, or as a result of a severe trauma (e.g., sexual abuse). Another explanation is that gender dysphoria is inherently distressing, i.e., the marked incongruence between one's felt gender and somatic sex—even within psychosocial milieus that are largely "affirming/supportive"—which leads to clinically significant symptoms such as anxiety or depression.[58]

Regardless of its etiology, psychotherapy as an effective intervention for depression, the most common mood disorder, has been studied extensively and is supported by high-quality evidence. For example, cognitive behavioral therapy (CBT), an (often) manualized therapy that helps patients recognize the reciprocal relationships between

---

[55] See Section 4.3.
[56] Becerra-Culqui et al. (2018); Kaltiala-Heino et al. (2015); Kozlowska et al. (2021).
[57] Littman (2021), a study that analyzed online survey data from a convenience sample of detransitioners, found that 40.6% of females and 25.8% of males reported that their "feelings of being transgender actually were the result of a mental health condition." 44.9% of females and 16.1% of males reported that "feelings of being transgender actually were the result of trauma" (p. 3364). The Cass Review reported that "Clinicians have described … how in patients with [body dysmorphic disorder, or BDD], the intense focus on appearance is most commonly on facial features, but that some experience distress about genitalia or breasts. In this situation it can be difficult to determine whether the distress is due to BDD or gender dysphoria. However, at the end of a treatment package for BDD some young people say they no longer feel ill at ease with their birth-registered gender, while some may have less distress about their genitalia or breasts but still have marked gender incongruence and proceed to a social or medical gender transition" (Cass, 2024a, p. 92).
[58] Zucker (2019). In addition to these two possibilities, a third theory is that "co-occurring mental health issues are simply secondary to factors such as family rejection or social ostracism within the peer group vis-à-vis the gender dysphoria" (p. 3). This "minority stress model" is discussed later in the present chapter.

thoughts, feelings, physiology, and behaviors, has evidence for benefit across age groups.[59] Psychodynamic psychotherapy (PDT) focuses on relational interactions, the role of formative life events, and unconscious processes, with the aim of facilitating emotional expression and interpersonal effectiveness.[60] Research indicates that PDT is effective in adults with depression, and there is also evidence of benefit for younger populations.[61] Another approach for adolescent depression with evidence for benefit is family-based treatment (FBT).[62]

Anxiety disorders also are highly prevalent in children and adolescents. The AACAP clinical practice guidelines strongly recommend that children and adolescents (ages 6-18) be offered CBT to address social anxiety, generalized anxiety, separation anxiety, specific phobias, or panic disorder.[63] PDT is less-well studied for anxiety, but may also be effective.[64]

For suicidality and self-harm in adolescents, evidence suggests that dialectical behavioral therapy (DBT), an approach that combines CBT with mindfulness and

[59] "Manualized" therapeutic approaches follow specific, standardized guidelines. CBT is the most well-studied. A recent meta-analysis of CBT for depression, including more than 50,000 patients across all age groups and 409 randomized controlled trials (RCTs), found that "CBT is effective in the treatment of depression with a moderate to large effect size, and that its effect is still significant up to 12 months (Cuijpers et al., 2023, p. 114). Other forms of psychotherapy were also found to be significantly beneficial. With respect to studies specifically focused on children and adolescents, evidence suggests CBT had modest positive effects on depressive symptoms (Espada et al., 2023).
[60] Opland & Torrico (2025).
[61] A systematic review of PDT for adults, which used the GRADE framework for evidence assessment, found "high quality evidence for depressive disorders and somatic symptom disorders, and moderate quality evidence for anxiety and personality disorders, that PDT achieves clinically meaningful effects in target symptoms and functioning compared to controls and is associated with low risk of harms and reasonable costs" (Leichsenring et al., 2023, p. 286). Midgley et al. (2021) is a narrative review of studies on PDT for children and adolescents (including some RCTs), finding "evidence of effectiveness for psychodynamic therapy in treating a wide range of mental health difficulties in children and adolescents" (p. 1).
[62] For example, attachment-based family therapy is an evidence-based approach to treating adolescent mood disorders, including depression, using a combination of separate (adolescent-only and parents-only) and joint family sessions (Diamond et al., 2021).
[63] This recommendation was based on a commissioned Agency for Healthcare Research and Quality (AHRQ)/Mayo Clinic systematic review and meta-analysis that included 60 RCTs and almost 7,000 pediatric patients. It found moderate-strength evidence that CBT improves primary anxiety symptoms and global functioning (Walter et al., 2020).
[64] Leichsenring et al. (2015); Midgley et al. (2021).

interpersonal skills training,[65] is an effective treatment.[66] Guidance published by the Substance Abuse and Mental Health Services Administration (SAMHSA) in 2020 found strong evidence that DBT was associated with reductions in suicidality (ideation, non-suicidal self-injury, and suicide attempts).[67] Another evidence-supported intervention, attachment-based family therapy, supports adolescents and parents as they rebuild trust and safety within their relational patterns, gradually reducing the risk of self-harm and suicidality.[68]

Eating disorders also frequently co-occur with GD.[69] CBT has shown some effectiveness as treatment for eating disorders in adults,[70] and CBT, DBT, and family-based treatment or family therapy for eating disorders (FT-ED) have shown effectiveness in adolescents.[71] Such approaches initially target the presenting issue by helping parents and caregivers support their children more effectively, while issues related to identity development are addressed as the condition improves. These family-based treatments are considered first-line interventions for treating adolescent eating disorders, particularly anorexia nervosa and bulimia nervosa.

Body dissatisfaction, which is common in adolescence, is treated with specific evidence-informed protocols. A combination of CBT and selective serotonin reuptake inhibitors (SSRIs) is recommended by the National Institute of Health and Care Excellence (NICE) in the U.K. for body dysmorphic disorder. It also recommends that parents and caregivers actively participate in the treatment process.[72]

---

[65] DBT originated as a treatment for adults with borderline personality disorder with chronic suicidality. Its focus is on helping patients achieve mindfulness, interpersonal effectiveness, emotional regulation, and distress tolerance (Substance Abuse and Mental Health Services Administration, 2020).

[66] This is in direct contrast to hormonal interventions, which have *not* been shown to reduce suicidality or suicide in minors with GD. See Section 4.3.4 and Chapter 5.

[67] This SAMHSA guidance considered evidence to be “strong” if positive impact was demonstrated by two or more RCTs (or other controlled trials). Nine studies (of varying methodologies) of DBT for suicidality in adolescents were included in this evidence review; two were RCTs (Substance Abuse and Mental Health Services Administration, 2020).

[68] Diamond et al. (2010).

[69] From a theoretical standpoint, eating disorders and GD both have been conceptualized as arising, in some cases, out of a subconscious desire to avoid the development of adult sex characteristics, perhaps in part due to maladaptive coping strategies or to avoid sexual objectification (Nadrowski, 2023).

[70] Öst et al. (2024).

[71] Datta et al. (2023); Lock et al. (2010); Vogel et al. (2021).

[72] National Institute for Health and Care Excellence (2005).

When discussing the broader issue of the high prevalence of GD in patients presenting with conditions like eating disorders, body dysmorphic disorder, and functional tic-like behaviors, the Cass Review noted:

> The distressing symptoms that occur in these 'body and mind' conditions are real, and like pain or discomfort that arises from other causes can be addressed and helped with psychological interventions. It is very important that gender-questioning young people are able to access these evidence-based treatments.[73]

The Cass Review also observed:

> Some therapies, which are well proven for associated mental health problems, already have a strong evidence base. Where it is clear that children/young people have such problems, they should receive the appropriate therapies in the same way as any other young person.[74]

### 14.5.2 Psychotherapy for gender dysphoria

The overview of systematic reviews (see Chapter 5 and Appendix 4) found a dearth of evidence for psychotherapeutic interventions for youth with GD. As summarized in the Cass Review,

> there is a lack of evidence about alternative approaches for managing gender-related distress, and it is difficult to obtain information about routine clinical practice or pathways of care for children and young people who do not receive medical interventions. An explicit clinical pathway must be developed for non-medical interventions, as well as a research strategy for evaluating their effectiveness.[75]

Although several studies suggest that psychotherapy for GD may effectively resolve the condition noninvasively,[76] the quality of the evidence is very low certainty.[77] At the same time, the overview identified two SRs deemed as trustworthy (at low risk of bias), and

[73] Cass (2024a, p. 93)
[74] Cass (2024a, p. 155).
[75] Cass (2024a, p. 157).
[76] Churcher Clarke & Spiliadis (2019); Cohen-Kettenis & Kuiper (1984); Costa et al. (2015); Smith et al. (2001); Spiliadis (2019).
[77] See Chapter 5.

noted that "neither systematic review suggested that there is indication of harm from psychotherapy." One of the SRs concluded:

> Most analyses of mental health, psychological and/or psychosocial outcomes showed either benefit or no change, with none indicating any negative/ adverse effects of the interventions offered.[78]

Although there is no reliable evidence to suggest that psychotherapy for GD is harmful, some proponents of PMT have alleged that it is a form of "conversion therapy." This allegation is addressed in the following section; the final section surveys psychotherapeutic approaches to GD.

#### 14.5.2.1 The charge of "conversion therapy"

Although psychotherapy for GD is described by its practitioners as "neutral" and "unbiased,"[79] some advocates for PMT maintain that such "exploratory" approaches are equivalent to conversion practices.[80]

"Conversion therapy"—sometimes called "reparative therapy"—originally referred to efforts to change the sexual orientation of gay and lesbian people. In 1973, homosexuality was officially de-pathologized by the American Psychiatric Association (APA) when it was declassified as a mental disorder (via its removal from the DSM).[81] While proponents of PMT have characterized exploratory psychotherapeutic approaches for GD as a form of "conversion therapy," others have claimed that PMT

---

[78] Heathcote et al. (2024, p. s19).
[79] D'Angelo et al. (2021, p. 12).
[80] E.g. Ashley (2022b, 2023); see also the quotation by Colt St. Amand conflating psychological assessments for minors seeking medical or surgical transition with conversion therapy in Bazelon (2022a). Turban, Beckwith et al. (2020), a widely-cited peer-reviewed analysis of data from the 2015 U.S. Transgender Survey (USTS) concluded that individuals who recalled having been exposed to "gender identity conversion efforts" in the past were more likely to have experienced recent psychological distress and lifetime history of suicidal thoughts, but D'Angelo et al. (2021, p. 12) pointed out that this analysis was based on a "simplistic 'affirmation' versus 'conversion' binary … The notion that all therapy interventions for GD can be categorically classified into this simplistic binary betrays a misunderstanding of the complexity of psychotherapy. At best, this blunt classification overlooks a wide range of ethical and essential forms of agenda-free psychotherapy that do not fit into such a binary; at worst, it effectively mis-categorizes ethical psychotherapies that do not fit the "affirmation" descriptor as conversion therapies" (p. 7). For methodological concerns about the USTS itself, see Chapter 4, Note 117.
[81] Drescher (2010, p. 434); McNally (2011, pp. 21–24). The first edition (1952) of the DSM classified same-sex attraction as a type of "sociopathic personality disturbance" (American Psychiatric Association, 1952, pp. 38–39).

*itself* deserves that label. This latter group contends that altering a person's body in response to distress rooted in internalized social disapproval is no more appropriate than attempting to change someone's sexual orientation for similar reasons.[82] Public and academic debates over what constitutes "conversion" in the context of youth with GD have been hindered by the politicization of the issue.[83]

Critics of exploratory psychotherapy for GD claim that therapists are trying to "promote gender identities that are aligned with the person's sex assigned at birth."[84,85] A less theoretically-laden description would be that some therapists are trying to help children and adolescents come to terms with their bodies.[86] Discomfort with the sexed body or with societal sex-based expectations is common during puberty and adolescence. For this and other reasons, characterizing as "conversion therapy" any approach focused on reducing a minor's distress about their body or social role is a problematic and potentially harmful rhetorical device.[87] There is evidence that the specter of being

[82] See Bannerman (2019) and Hamedani (2014). A recent bioethics article argues that "a society that marginalizes youth who do not conform to gender norms must, as a matter of justice, change its ways. The burden of enacting this change is all of ours to bear. It should not be borne by the bodies of our youth" (Gorin, 2024, p. 43).
[83] Defenses of psychotherapy for GD have roundly rejected the label of "conversion therapy": e.g., "Psychotherapy resides outside the affirmation-conversion binary and aims to address the distress of gender-dysphoric youth rather than to correct a sense of misalignment. Psychotherapy does not attempt to force change or impose any predetermined notion … A core ethical principle of psychotherapy is that therapists must respect patient autonomy and self-determination and refrain from any attempt to influence the patient … A genuine psychotherapeutic process starts from a position of not knowing and seeks to open things up. Anything else is a misuse of psychotherapy" (D'Angelo, 2023, p. 3).
[84] The full quotation is: "Trans conversion practices refer to sustained efforts to promote gender identities that are aligned with the person's sex assigned at birth and/or to discourage behaviours associated with a gender other than the person's sex assigned at birth" (Ashley, 2022b, p. 26). This seems to more broadly characterize conversion therapy as an attempt to encourage conformity with sex stereotypes. However, as explained by D'Angelo, "Psychotherapy does not impose restrictive gender stereotypes, as is sometimes claimed, but critically examines them" (D'Angelo, 2023, p. 1). Such examination is necessary, because restrictive stereotypes could plausibly have contributed to the patient's GD.
[85] The 2020 United Nations (UN) Report on Conversion Therapy begins by explaining that "conversion therapy" refers to "interventions of a wide-ranging nature, all of which have in common the belief that a person's sexual orientation or gender identity (SOGI) can and should be changed. Such practices aim (or claim to aim) at changing people from gay, lesbian or bisexual to heterosexual and from trans or gender diverse to cisgender" (United Nations, 2020). See Lawford-Smith (2024) for discussion of recent legislation banning "conversion therapy" as the UN understands it.
[86] Once it is recognized that the operative notion of "gender identity" has not been properly explained (see Chapter 2), the charge of "conversion therapy" makes little sense. If gender identity is obscure, the goal of changing the patient's gender identity is equally obscure.
[87] E.g., D'Angelo (2023); D'Angelo et al. (2021); Edwards-Leeper & Anderson (2021); Jenkins & Panozzo (2024); McDeavitt (2025); Sinai & Sim (2024). Also, as noted in the Cass Review, "The role of

labeled a "conversion therapist"— a damaging accusation given the profession's history with the mistreatment of gay people—has created a climate of anxiety among mental health professionals. Therapists worry that failing to affirm or recommend medical interventions for youth who meet the World Professional Association for Transgender Health's (WPATH) eligibility criteria could jeopardize their careers and reputations.[88]

Equating "exploratory therapy" with "conversion therapy" is misguided for two additional key reasons. First, exploratory therapy was a fundamental and mandatory element of the original Dutch Protocol, which serves as the foundation for the current PMT model.[89] Second, quality psychotherapy is exploratory *by definition*: it is "a process of shared decision making in which the therapist … guides the patient in exploration of their material but does not input their own beliefs or ideas."[90]

The conflation of psychotherapy with conversion therapy has been condemned not only by expert therapists who question the current emphasis on medical transition and surgical transition for youth, but also by practitioners and researchers in the PMT field itself.[91]

#### 14.5.2.2 Psychotherapeutic approaches

The effectiveness of psychotherapy for a wide range of mental health problems, including those that often present with GD, suggests it may also be beneficial for GD specifically. The Cass Review's emphasis on the de-exceptionalization of youth with GD underscored the observation that clinicians

---

psychological therapies in supporting children and young people with gender incongruence or distress has been overshadowed by an unhelpfully polarised debate around conversion practices. Terms such as 'affirmative' and 'exploratory' approaches have been weaponised to the extent that it is difficult to find any neutral terminology" (Cass, 2024a, p. 150).

[88] Jenkins & Panozzo (2024). As summarized in McDeavitt (2025): "Some therapists who engage in exploratory talk therapy with [transgender and gender diverse] youth have faced licensure complaints related to accusations of "conversion therapy"—complaints made not by patients, but by activists and colleagues. One therapist reported having attended a workshop … in which activists described "hunting" for such therapists with the goal of bringing lawsuits and prompting licensure revocation."

[89] Weaknesses of the original Dutch research are discussed in Chapter 4.

[90] Sinai & Sim (2024, p. 148); see also Churcher Clarke & Spiliadis (2019).

[91] For example, psychologist Laura Edwards Leeper has stated that "Conflating conversion therapy and identity exploration is perhaps the largest threat to both gender-distressed cisgender youth and transgender youth, alike. The rhetoric being used to conflate the two must stop immediately" (McDeavitt, 2025, p. 1298). See also Edwards-Leeper & Anderson (2021).

> just need the appropriate training, support and most importantly the confidence to do what [they] have been trained to do and treat this population as [they] would any other young person in distress.[92]

Unfortunately, efforts to research the influence of cultural and social factors, trauma, or co-occurring mental health conditions on GD have been denigrated as "harmful."[93] When combined with the highly charged accusation of "conversion therapy," therapists may be under significant pressure to assume—often without critical evaluation—that mental health issues co-occurring with GD are primarily the result of minority stress.[94] This pressure may cause clinicians to overlook the significant possibility that in some patients, GD has *arisen from* trauma, "primary" mental health concerns, or neurodevelopmental conditions (see Section 14.1 above). Publications by psychotherapists working with this population have noted that patients with GD may seek hormonal or surgical interventions in response to experiences of sexual violence, negative attitudes towards homosexuality, or bullying related to self-expression, interests, or behaviors that deviate from sex stereotypes.[95]

If these possibilities are ignored, medical and surgical interventions may be recommended as the obvious treatment.[96] The mischaracterization of psychotherapy for GD as "conversion therapy" or "doing nothing" may also contribute to a nocebo effect, disincentivizing therapists from providing care and patients from engaging in it.[97] In this way, the denigration of psychotherapy has "a chilling effect on the ethical

---

[92] Cass (2024a, p. 15).
[93] E.g. Coalition for the Advancement and Application of Psychological Science (2021).
[94] Application of minority stress theory to mental health disparities in sexual minority adults was originally done in Meyer (2003). As defined in Chelliah et al. (2024), the "minority stress framework…has been used to conceptualize relationships between…mental health disparities and stressors associated with a minority identity or status." This framework, which (like all other conceptual frameworks) has its limitations (Bailey, 2020; Zucker et al., 2016), has over the past 5-10 years been widely-relied upon in the pediatric gender medicine literature (see examples in Chapter 13). Although it is important for therapists to elucidate patient experiences of bullying or hostility, it is not psychotherapeutically sound practice to make reflexive assumptions, especially when these assumptions could lead to inappropriate treatment recommendations.
[95] Churcher Clarke & Spiliadis (2019); D'Angelo et al. (2021); Lemma (2018); Sinai & Sim (2024); Spiliadis (2019).
[96] E.g. Tordoff (2022).
[97] Clayton (2023).

psychotherapists' willingness to take on complex GD patients, which will make it much harder for GD individuals to access quality mental health care."[98]

The practice of reflexive assumption contravenes fundamental principles of the psychotherapeutic approach, which emphasizes curiosity and consideration of *all* factors that may have contributed to the patient's problems.[99] It is also challenged by research on desistance and detransition.[100]

Stephen Levine, professor of psychiatry at Case Western Reserve University, has explained how the psychotherapeutic approach includes biological, psychological and social factors to formulate GD holistically:

> [If] the evaluator understands the focus of the [mental health assessment] to be on identifying the predisposing, precipitating, and maintaining forces on the patient's identity, a long list of influences will be explored. Problems such as autism, ADHD, difficulty making friends, crises of loneliness, depression, restrictive or excess eating, sexual abuse, and feedback from virtual friends will be investigated. The [therapist] will explore suicidality, self-harm, pre- and post-trans-identity psychiatric problems, and relationships with each parent. The parents will provide a developmental history beginning with pregnancy.[101]

Psychiatrist and psychoanalyst Roberto D'Angelo, a proponent of psychotherapy for GD, describes the role of psychotherapy for minors with GD as follows:

> Psychotherapy does not impose restrictive gender stereotypes, as is sometimes claimed, but critically examines them. It empowers young people to develop creative solutions to their difficulties and promotes agency and autonomy. Importantly, an exploratory psychotherapeutic process can help to clarify whether

[98] D'Angelo et al. (2021, p. 13).
[99] As the Cass Review noted, "a single focus on gender raises the issue of 'diagnostic overshadowing' … children [may have] more than one presenting issue, but different services … dealing with each issue in isolation, without considering how they might impact on each other" (Cass, 2024a, p. 200). See also discussion of diagnostic overshadowing in Section 13.2.4.
[100] E.g. Littman (2021).
[101] Levine (2024, p. 775).

> gender dysphoria is a carrier for other psychological or social problems that may not be immediately apparent.[102]

Given that this population often presents with complex psychosocial histories and multiple mental health concerns, psychotherapy takes a holistic approach—addressing the full range of issues rather than focusing exclusively on GD. "Transdiagnostic psychotherapy"— that is, therapy that works across or with multiple diagnoses or problems—is already a convention.[103] While there is a clear need to develop and study therapeutic approaches tailored specifically for GD, effective therapy need not always center on a single issue. Psychotherapy for adolescents with GD is a well-suited intervention, as it is intended to help patients develop self-understanding, engage with emotional vulnerability, and build practical strategies for managing distress.

Human psychology is complex and the presence of one psychiatric diagnosis often increases the likelihood of others. A transdiagnostic psychotherapeutic approach—designed to address underlying patterns across multiple conditions—may be particularly effective in reducing distress among youth with GD, as it has been in other complex cases. The goals of psychotherapy remain the same regardless of a young person's self-identification: to alleviate distress and improve interpersonal and social functioning.

Table 14.1 below presents a brief overview of psychotherapeutic modalities that are relevant for children and adolescents with GD.

[102] D'Angelo (2023, p. 1).
[103] Jeppesen et al. (2021).

## Table 14.1

| Type of psychotherapeutic modality | Definition of modality | Application to GD |
| --- | --- | --- |
| **Manualized approaches**[104] | These approaches are performed according to manualized instructions that provide structure and standardization. The most-studied approach is cognitive behavioral therapy (CBT), which helps patients identify thoughts, feelings, and behaviors and the way they impact one another. Manualized therapies focus on development of coping skills and behavioral activation. Dialectical behavioral therapy, commonly used to address self-harm and suicidality, fosters distress-management techniques and interpersonal effectiveness. Manualized approaches typically involve several months of weekly individual or group sessions, and patients complete therapy-related assignments between sessions. | Manualized approaches are an evidence-based treatment for mental health problems that co-occur with GD, such as depression, anxiety, and eating disorders. For GD, manualized approaches can help patients identify thoughts and feelings related to sex-based distress, including cognitive distortions. Therapists can help patients develop healthy coping skills for managing this specific type of distress and can encourage behavioral activation. For example, engaging in physical activity, in-person social socialization, and/or mindfulness practices, can over time, decrease ruminations, including ruminations on sex-related discomfort. |

104 In Austin et al. (2018), mental health outcomes (including depression) improved with CBT in 8 adolescents who identified as transgender (subgroup of study population; unclear if hormonal interventions were used). Hollinsaid et al. (2020) re-analyzed data from four RCTs of standard manualized psychotherapeutic approaches, focusing on the cohort of 64 patients who had expressed desire to be the other sex (it is unclear how many would have met criteria for GD, however; additionally, there was no information about hormonal interventions). These patients' internalizing and externalizing symptoms improved, albeit more slowly than other patients. In Lucassen et al. (2021) the depression outcome measure did not change after online CBT in 14 patients who identified as transgender. In Silveri et al. (2021) mental health outcomes improved in 62 adolescents who self-identified as transgender/gender-expansive after CBT, DBT, and family therapy, integrated into a two-week long residential treatment program for psychiatric problems. In a study reporting longitudinal data on 26 adolescents (Bluth et al., 2023), mental health outcomes (including depression and suicidality) improved after eight sessions of mindfulness-based group therapy in transgender-identified patients who were not taking hormonal interventions.

| Type of psychotherapeutic modality | Definition of modality | Application to GD |
|---|---|---|
| **Psychodynamic approach**[105] | This is a psychoanalytic approach that involves exploration of ego defenses and unconscious motivations. Through exploration of transference, patients come to better understand their interpersonal dynamics. Psychodynamic psychotherapy classically involves biweekly or weekly sessions and is not time-limited. | This approach is evidence-based for mental health conditions that co-occur with GD. Additionally, psychodynamic work around the theme of cross-sex identification or sex-related distress can facilitate exploration of patients' early childhood experiences, family of origin, beliefs/values system, and interpersonal patterns in familial and romantic relationships as well as in school/work environments. This approach can help patients gain deeper understanding of their personal identity, including any external factors that may contribute to their cross-sex identification and desire for medical/surgical interventions. Patients can gain clarity about their own wishes or desires for medical or surgical transition interventions. |
| **Family therapy**[106] | This approach identifies problems affecting the patient and the family unit and aims to strengthen familial bonds and improve communication skills, by supporting work around attachment ruptures, communication and understanding different family members' perspectives. It may involve parental education and development of strategies for improved interpersonal effectiveness within the family unit. | A child or adolescent exhibiting GD may occasionally lead to intense conflict and distress within the family unit. In family-based approaches a knowledgeable therapist can provide education about GD to parents and promote well-being of the family by bolstering effective communication and interpersonal skills. Family therapy is an evidence-based approach to treating adolescent eating disorders, where familial distress and embodied distress are heightened, as in GD. Family therapy is either the first-line intervention or the treatment of choice for many diagnoses in adolescence. |

### 14.5.2.3 Evidence for benefit

As discussed earlier, the overview of systematic reviews conducted for this Review found that evidence for the effectiveness of psychotherapy for GD (or for co-occurring mental health problems in patients with GD) is of very low certainty. When direct evidence for the role of psychotherapy in children and adolescents with GD is lacking, the best available evidence can be obtained from the robust evidence supporting

[105] For case reports, vignettes, and case series describing the incorporation of dynamic aspects into exploratory work, see Churcher Clarke & Spiliadis (2019); D'Angelo (2020); Spiliadis (2019). For descriptions of dynamic approaches, see D'Angelo (2023); Sinai & Sim (2024).
[106] For a case report of family therapy for an adolescent with suicidality, see Russon et al. (2022). See also Silveri et al. (2021) and Churcher Clarke & Spiliadis (2019). For example of parent psychoeducation, see Levine (2024).

treatment effectiveness for children and adolescents with similar types of psychological distress. Psychotherapy is a noninvasive intervention that can be used transdiagnostically. It generally promotes improved mental health and psychosocial functioning and carries little risk.[107] As the Cass Review noted,

> the focus on the use of puberty blockers for managing gender-related distress has overshadowed the possibility that other evidence-based treatments may be more effective.[108]

[107] See also Baron & Dierckxsens (2022); Clayton (2023); Levine et al. (2022b).
[108] Cass, 2024a (p. 31).

# Limitations, Strengths, and Conclusion

## Limitations

The present Review has some limitations.[1]

1. This document is not intended to serve as a clinical practice guideline (CPG) and does not aim to issue treatment recommendations.[2] The Review was shaped by a distinct set of goals: namely, to clarify the evidentiary landscape; identify areas of uncertainty; and support the development of accountable care models. As such, it does not follow formal guideline development procedures, such as the use of Grading of Recommendations Assessment, Development, and Evaluation (GRADE) to inform clinical recommendations. The purview of this Review is limited to evidence and best practices for the care of minors.

2. This Review does not make any specific policy recommendations regarding the regulation of medicine. For instance, it does not make policy recommendations about the treatment of children and adolescents who have already begun puberty blockers or cross-sex hormones.

## Strengths

This Review also has some strengths.

1. Although not a CPG, this document provides clinicians and other decision makers with essential pieces of knowledge regarding pediatric gender medicine (PGM).

    a. *Quality of evidence*: This Review describes the very low-quality evidence underpinning treatment approaches in pediatric gender medicine (Chapter 5).

    b. *Risk profile of hormones and surgeries*: This Review contains an extensive description of potential or plausible harms associated

[1] For strengths and limitations specific to the overview of systematic reviews (SRs), see Chapter 5.
[2] This is not technically a limitation (as this Review does not purport to be a CPG), but a clarification.

with certain treatment options (namely, hormonal interventions and surgeries), some of which are significant (Chapter 7).

c. *Ethics review*: This Review contains an ethical assessment of the use of hormonal interventions and surgeries for treatment of gender dysphoria (GD) in children and adolescents. It concludes that these interventions are inconsistent with widely endorsed principles of medical ethics (Chapter 13).

d. *Consideration of alternative treatments*: The role of psychotherapy, which has been sidelined in discussions of PGM, is one focus of this Review. This Review examines psychotherapy for GD in detail and concludes that its risk/benefit profile is favorable (Chapter 14).

2. The review of guidelines (Chapter 9) demonstrates that CPGs recommending psychotherapy for pediatric GD are higher-quality and are commensurate with evidence from PGM systematic reviews (SRs). In contrast, CPGs recommending an approach involving standard-of-care use of puberty blockers (PBs), cross-sex hormones (CSH), or surgery are lower-quality, with recommendations that are not commensurate with evidence from SRs. CPGs followed in the U.S., in particular WPATH's, are of the latter type and are inadequate to inform clinical practice for a vulnerable and distressed population of children and adolescents. High quality CPGs are urgently needed in this field.
3. This Review describes the enforced professional insularity of the field of pediatric gender medicine and the intense and hostile nature of the debates around PGM. Stakeholders should keep these in mind when presented with claims of medical consensus among U.S. medical organizations (Chapter 12).

## Conclusion

The delegation of authority to the medical profession rests on an implicit social contract: Doctors as a profession receive the 'privilege of self-regulation' and

> financial awards on the expectation that they will serve the health needs of individual patients and society.[3]

A central theme of this Review is that many U.S. medical professionals and associations have fallen short of their duty to prioritize the health interests of young patients. First, there was a rapid expansion and implementation of a clinical protocol that lacked sufficient scientific and ethical justification. Second, when confronted with compelling evidence that this protocol did not deliver the health benefits it promised, and that other countries were changing their policies appropriately, U.S. medical professionals and associations failed to reconsider the "gender-affirming" approach. Third, conflicting evidence—evidence that challenged the foundational assumptions of the protocol and the professional standing of its advocates—was mischaracterized or insufficiently acknowledged. Finally, dissenting perspectives were marginalized, and those who voiced them were disparaged.

While no clinician or medical association intends to fail their patients—particularly those who are most vulnerable—the preceding chapters demonstrate that this is precisely what has occurred.

[3] Patashnik et al. (2017, p. 10).

# APPENDICES

# Appendix 1. Abbreviations

| | |
|---|---|
| AACAP | American Academy of Child and Adolescent Psychiatry |
| AAP | American Academy of Pediatrics |
| AGREE | Appraisal of Guidelines for Research and Evaluation |
| AHRQ | Agency for Healthcare Research and Quality |
| AMA | American Medical Association |
| AMSTAR | A MeaSurement Tool to Assess systematic Reviews |
| APA | American Psychological Association/American Psychiatric Association |
| ASD | Autism Spectrum Disorder; also ASC (Autism Spectrum Condition) |
| BDD | Body Dysmorphic Disorder |
| BMI | Body Mass Index |
| CBT | Cognitive Behavioral Therapy |
| CDC | Centers for Disease Control and prevention |
| CMS | Centers for Medicare and Medicaid |
| COHERE | Council for Choices in Health Care (Finland) |
| COI | Conflict of Interest |
| CPG | Clinical Practice Guideline |
| CPP | Central Precocious Puberty |
| CSH | Cross-Sex Hormones |
| DBT | Dialectical Behavioral Therapy |
| DSD | Disorder (Difference) of Sex Development |
| DSM | *Diagnostic and Statistical Manual of Mental Disorders* |
| DSM-5-TR | DSM, 5th edition, Text Revision (latest version, 2024) |
| DSM-5 | DSM, 5th edition (2013) |
| DSM-IV | DSM, 4th edition (1994) |
| DSM-III | DSM, 3rd edition (1980) |
| EBM | Evidence-Based Medicine |
| EPC | Evidence-based Practice Center (at Johns Hopkins) |
| ES | Endocrine Society |
| FAERS | FDA's Event Reporting System |

| | |
|---|---|
| FBT | Family-Based Treatment |
| FDA | Food and Drug Administration |
| FM | Female-to-Male |
| FP | Fertility Preservation |
| FSH | Follicle-Stimulating Hormone |
| FT-ED | Family Therapy for Eating Disorders |
| GD | Gender Dysphoria (DSM-5; formerly Gender Identity Disorder (GID) in the DSM-IV) |
| GDG | Guideline Development Group |
| GeMS | Gender Multispeciality Service (at Boston Children's; formerly Gender Management Service) |
| GICE | Gender Identity Conversion Efforts |
| GIDS | Gender Identity Development Service (U.K.) |
| GnRHa | Gonadotropin Releasing Hormone Agonist |
| GRADE | Grading of Recommendations Assessment, Development and Evaluation |
| HBIGDA | Harry Benjamin International Gender Dysphoria Association |
| HH | Hypogonadotropic Hypogonadism |
| HPG | Hypothalamic-Pituitary Gonadal axis |
| HRC | Human Rights Campaign |
| ICD-11 | WHO's International Classification of Diseases, 11th edition (latest version, 2022) |
| IQ | Intelligence Quotient |
| ITJH | *International Journal of Transgender Health* |
| JAMA | *Journal of the American Medical Association* |
| JHU | Johns Hopkins University |
| LH | Luteinizing Hormone |
| MDC | Medical Decision-making Competence |
| MDT | MultiDisciplinary Teams |
| MF | Male-to-Female |
| MHP | Mental Health Professional |
| MMHA | Major Medical and mental Health Association |

| | |
|---|---|
| NAM | National Academy of Medicine |
| NEJM | *New England Journal of Medicine* |
| NGCF | Netherlands Gender Care Foundation |
| NHS | National Health Service (U.K.) |
| NICE | National Institute for Health and Care Excellence (U.K.) |
| NIH | National Institutes of Health |
| NLM | National Library of Medicine |
| NOS | Newcastle-Ottawa Scale |
| OCD | Obsessive Compulsive Disorder |
| PBs | Puberty Blockers |
| PCOS | Polycystic Ovary Syndrome |
| PDT | PsychoDynamic Therapy |
| PGM | Pediatric Gender Medicine |
| PICO | Population, Intervention, Comparator, Outcome |
| PMT | Pediatric Medical Transition |
| PRISMA | Preferred Reporting Items for Systematic reviews and Meta-Analyses |
| RCT | Randomized Controlled Trial |
| RoB 2 | Cochrane Risk-of-Bias tool |
| ROBINS-I | Risk of Bias in Non-randomized Studies - of Interventions |
| ROBIS | Risk of Bias in Systematic reviews |
| ROGD | Rapid-Onset Gender Dysphoria |
| RSG | Review of Data, Statistics and Research on Sex and Gender (U.K., 2025) |
| SAMHSA | Substance Abuse and Mental Health Services Administration |
| SOC-8 | *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8 (latest version, 2022) |
| SOC-7 | *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People*, Version 7 (2012) |
| SOC-6 | *Standards of Care for Gender Identity Disorders*, Version 6 (2001) |
| SR | Systematic Review |
| SRS | Sex Reassignment Surgery |
| SSRI | Selective Serotonin Reuptake Inhibitor |

| | |
|---|---|
| TGD | Transgender and Gender Diverse |
| UCSF | University of California, San Francisco |
| USPATH | United States Professional Association for Transgender Health |
| USTS | US Transgender Survey |
| WHO | World Health Organization |
| WPATH | World Professional Association for Transgender Health |

# Appendix 2. Diagnostic Criteria

**DSM-III (1980)**[1]

*Diagnostic criteria for Transsexualism*

A. Sense of discomfort and inappropriateness about one's anatomic sex.

B. Wish to be rid of one's own genitals and to live as a member of the other sex.

C. The disturbance has been continuous (not limited to periods of stress) for at least two years.

D. Absence of physical intersex or genetic abnormality.

E. Not due to another mental disorder, such as Schizophrenia.

*Diagnostic criteria for Gender Identity Disorder of Childhood*

*For females:*

A. Strongly and persistently stated desire to be a boy, or insistence that she is a boy (not merely a desire for any perceived cultural advantages from being a boy).

B. Persistent repudiation of female anatomic structures, as manifested by at least one of the following repeated assertions:

(1) that she will grow up to become a man (not merely in role)

(2) that she is biologically unable to become pregnant

(3) that she will not develop breasts

(4) that she has no vagina

(5) that she has, or will grow, a penis

C. Onset of the disturbance before puberty.

*For males:*

[1] American Psychiatric Association (1980, pp. 261–266).

A. Strongly and persistently stated desire to be a girl, or insistence that he is a girl.

B. Either (1) or (2):

(1) persistent repudiation of male anatomic structures, as manifested by at least one of the following repeated assertions:

(a) that he will grow up to become a woman, (not merely in role)

(b) that his penis or testes are disgusting or will disappear

(c) that it would be better not to have a penis or testes

(2) preoccupation with female stereotypical activities as manifested by a preference for either cross-dressing or simulating female attire, or by a compelling desire to participate in the games and pastimes of girls

C. Onset of the disturbance before puberty.

**DSM-IV (1994)**[2]

*Diagnostic criteria for Gender Identity Disorder*

A. A strong and persistent cross-gender identification (not merely a desire for any perceived cultural advantages of being the other sex). In children, the disturbance is manifested by four (or more) of the following:

(1) repeatedly stated desire to be, or insistence that he or she is, the other sex

(2) in boys, preference for cross-dressing or simulating female attire; in girls, insistence on wearing only stereotypical masculine clothing

(3) strong and persistent preferences for cross-sex roles in make-believe play or persistent fantasies of being the other sex

[2] American Psychiatric Association (1994, pp. 537–538).

(4) intense desire to participate in the stereotypical games and pastimes of the other sex

(5) strong preference for playmates of the other sex

In adolescents and adults, the disturbance is manifested by symptoms such as a stated desire to be the other sex, frequent passing as the other sex, desire to live or be treated as the other sex, or the conviction that he or she has the typical feelings and reactions of the other sex.

B. Persistent discomfort with his or her sex or sense of inappropriateness in the gender role of that sex.

In children, the disturbance is manifested by any of the following: in boys, assertion that his penis or testes are disgusting or will disappear or assertion that it would be better not to have a penis, or aversion toward rough-and-tumble play and rejection of male stereotypical toys, games, and activities; in girls, rejection of urinating in a sitting position, assertion that she has or will grow a penis, or assertion that she does not want to grow breasts or menstruate, or marked aversion toward normative feminine clothing.

In adolescents and adults, the disturbance is manifested by symptoms such as preoccupation with getting rid of primary and secondary sex characteristics (e.g., request for hormones, surgery, or other procedures to physically alter sexual characteristics to simulate the other sex) or belief that he or she was born the wrong sex.

C. The disturbance is not concurrent with a physical intersex condition.

D. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

**DSM-5 (2013)**[3]

*Gender Dysphoria*

[3] American Psychiatric Association (2013, pp. 452–453).

Diagnostic Criteria

*Gender Dysphoria in Children*

A. A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least six of the following (one of which must be Criterion A1):

1. A strong desire to be of the other gender or an insistence that one is the other gender (or some alternative gender different from one's assigned gender).

2. In boys (assigned gender), a strong preference for cross-dressing or simulating female attire: or in girls (assigned gender), a strong preference for wearing only typical masculine clothing and a strong resistance to the wearing of typical feminine clothing.

3. A strong preference for cross-gender roles in make-believe play or fantasy play.

4. A strong preference for the toys, games, or activities stereotypically used or engaged in by the other gender.

5. A strong preference for playmates of the other gender.

6. In boys (assigned gender), a strong rejection of typically masculine toys, games, and activities and a strong avoidance of rough-and-tumble play; or in girls (assigned gender), a strong rejection of typically feminine toys, games, and activities.

7. A strong dislike of one's sexual anatomy.

8. A strong desire for the primary and/or secondary sex characteristics that match one's experienced gender.

B. The condition is associated with clinically significant distress or impairment in social, school, or other important areas of functioning.

*Gender Dysphoria in Adolescents and Adults*

A. A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:

1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).

2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).

3. A strong desire for the primary and/or secondary sex characteristics of the other gender.

4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B. The condition is associated with clinically significant distress or impairment in social, occupational or other important areas of functioning.

**ICD-11 (2022)**[4]

*Gender incongruence of adolescence or adulthood*

[4] World Health Organization (2022b).

Gender Incongruence of Adolescence and Adulthood is characterized by a marked and persistent incongruence between an individual's experienced gender and the assigned sex, which often leads to a desire to 'transition', in order to live and be accepted as a person of the experienced gender, through hormonal treatment, surgery or other health care services to make the individual's body align, as much as desired and to the extent possible, with the experienced gender. The diagnosis cannot be assigned prior to the onset of puberty. Gender variant behavior and preferences alone are not a basis for assigning the diagnosis.

*Gender incongruence of childhood*

Gender incongruence of childhood is characterized by a marked incongruence between an individual's experienced/expressed gender and the assigned sex in pre-pubertal children. It includes a strong desire to be a different gender than the assigned sex; a strong dislike on the child's part of his or her sexual anatomy or anticipated secondary sex characteristics and/or a strong desire for the primary and/or anticipated secondary sex characteristics that match the experienced gender; and make-believe or fantasy play, toys, games, or activities and playmates that are typical of the experienced gender rather than the assigned sex. The incongruence must have persisted for about 2 years. Gender variant behavior and preferences alone are not a basis for assigning the diagnosis.

# Appendix 3. Systematic Reviews and Evidence-Based Medicine

Imagine a courtroom where guilt or innocence is decided solely by the police, drawing on their extensive experience of investigating crime. Someone can be convicted of murder, say, on the verdict of these criminal experts, who have seen many murders before, and who have firm opinions about the sort of people most likely to commit them.

Such a courtroom would be better than nothing. The police have relevant knowledge and experience and are not simply guessing. But it would be far inferior to a real courtroom, where police testimony is just part of the evidence brought before judge and jury: the blood-stained knife, fingerprints, cellphone records, eyewitness testimony, and so on, are all included. Moreover, every piece of evidence is critically examined, weighed, and compared. The attitude is more scientific. Not all evidence is equal: eyewitness testimony can be unreliable, whereas properly collected DNA evidence is of high quality. Independent pieces of evidence (DNA, cellphone records) can point to the same conclusion, making the verdict more secure. Of course, the process is imperfect, but it's a vast improvement over simply relying on the opinions of police officers.

Medicine used to be more like the first (hypothetical) courtroom than the second:

> Clinical practice was historically viewed as the "art of medicine." Expert opinion, experience, and authoritarian judgment were the foundation for decision making. The use of scientific methodology, as in biomedical research, and statistical analysis, as in epidemiology, were rare in the world of medicine.[1]

Starting in the 1970s, evidence-based medicine (EBM) has attempted to move medicine from the first courtroom to the second, towards more empirical rigor.

EBM "is the conscientious, explicit, and judicious use of current best evidence in making decisions about the care of individual patients."[2] The fundamental EBM principle is that clinical practice and practice guidelines should be based on the totality of evidence,

[1] Sur & Dahm (2011, p. 487).
[2] Sackett et al. (1996, p. 71).

assessed and synthesized in clear and reproducible ways from the medical literature. EBM contrasts with "eminence-based medicine," in which physicians make clinical decisions based on personal experience and expertise, and treatment guidelines themselves are created using a process humorously described as "GOBSAT" ("good old boys sitting around a table").[3]

It is important to emphasize that EBM does not say that evidence about treatments should be the *only* factor in medical decisions. Quite the opposite. According to the American Medical Association's (AMA) *User's Guides to Medical Literature: Essentials of Evidence-Based Clinical Practice*:

> [E]vidence alone is never sufficient to make a clinical decision. Decision makers must always trade off the benefits and risks, burden, and costs associated with alternative management strategies and, in doing so, consider their patients' unique predicament and values and preferences.[4]

Evidence is never sufficient to make health policy either, although policy makers have different priorities than clinicians. A clinician's primary concern is for the individual patient and their "unique predicament"; policy makers need to set general rules and standards with public health in mind. They may consider the cost-effectiveness of treatment, public values and preferences, the feasibility of widely offering the treatment, how its benefits can be distributed fairly, and so forth.

EBM uses a "hierarchy of evidence," often depicted as pyramid with colored layers, as in Figure A.1. Since the layers represent different types of study, the hierarchy is more strictly a hierarchy of *research methods* than a hierarchy of evidence. The pyramid in Figure A.1 should not be taken too seriously: many pyramids have been proposed, with varying numbers of layers and kinds of labels, not to mention colors.[5] In fact, the AMA's

---

[3] Lima, Tangamornsuksan et al. (2023, p. 1).
[4] Guyatt et al. (2015, p. 10, emphasis omitted). "Burden [of treatment]" means "the inconvenience of attending to the treatment's optimal use, of its monitoring, the limitations in lifestyle that it entails, and the possibility of interactions with other treatments" (p. 426). "Values and preferences" refer to "the collection of goals, expectations, predispositions, and beliefs that individuals have for certain decisions and their potential outcomes. The incorporation of patient values and preferences in decision making is central to evidence-based medicine" (p. 490).
[5] Blunt (2022). For another pyramid, see Cass (2024a, p. 55).

*User's Guides to Medical Literature* contains no such illustration.[6] But the basic point these pyramids make is sound: some ways of gathering evidence about the effects of a treatment are better than others. Systematic reviews (SRs, to be explained below) and meta-analyses are better than randomized controlled trials (RCTs), which are better than cohort studies and case reports,[7] with expert opinion coming in last. The medical consensus based on expert opinion or experience has been shown to be wrong many times before, after rigorous experimental studies were conducted. (See Section 1.2.2.)

EBM prioritizes findings from population-level research, such as RCTs and observational epidemiological studies. This can have drawbacks, sometimes resulting in insufficient consideration of biochemical or physiological evidence from laboratory, animal, or in vitro studies.[8]

In the last few decades EBM has been refined and improved. This appendix includes a brief introduction to SRs, the methodology to systematically identify, synthesize, and assess the best available evidence, and to Grading of Recommendations Assessment, Development, and Evaluations (GRADE), the methodology to assess the quality of evidence and determine the strength of recommendations.

---

[6] See Guyatt et al. (2015, p. 48, Figure 4-1), which displays a simple three-level hierarchy of evidence in a blue box.

[7] A *meta-analysis* combines data from separate similar studies and statistically analyses the result. Two studies may investigate the same treatment in sufficiently different ways so that a meta-analysis of both is not possible. SRs may involve meta-analyses but need not. A *randomized controlled trial* (RCT) allocates treatment/non-treatment randomly to a group (*cohort*) of patients and follows them over time; the no-treatment group is the *control* group. Control groups may receive another kind of treatment, a *placebo* (an inert pill or procedure that superficially mimics the treatment), or no treatment at all. In a *double-blind* RCT neither the patients nor the attending medical staff know who is in the treatment group and who is in the control group. *Cohort studies* (or *longitudinal* studies) examine groups of patients over time, either *prospectively* (data collected as the study proceeds) or *retrospectively* (the data has already been collected, say in past medical records); there is no randomization to treatment/non-treatment as in an RCT. A *case-control* study starts with two groups, those who have the disease or condition of interest (the *cases*), and those who don't (the *controls*), and examines them retrospectively. The latter two kinds of study are called *observational*, to contrast them with RCTs. A *case report* describes a single patient's treatment and outcome; a *case series* is a collection of similar case reports.

[8] Clarke et al. (2014).

**Figure A1.1 Example EBM Pyramid**




**1. Systematic reviews**

SRs synthesize evidence from multiple studies in the medical literature and assess its quality, using a standard and reproducible methodology. The general steps are outlined below:[9]

*Research questions and study eligibility criteria*

SRs begin by asking four questions. What is the population being studied? What is the intervention or treatment? What groups are being compared to the group that received the treatment? What results or outcomes are of interest? This is the “PICO” framework: Population, Intervention, Comparator, Outcome. Study eligibility criteria are defined accordingly and documented.

*Comprehensive search*

Having defined the eligibility criteria for studies, the next step is to locate them. A properly conducted search requires expertise, and includes searching a variety of

[9] What follows is simplified; for more detail see Higgins et al. (2019).

medical databases, for instance Embase (produced by the publisher Elsevier) and Medline (produced by the U.S. National Library of Medicine (NLM)). The search could also cover registries of clinical trials and so-called grey literature (material outside academic publishing, such as reports and government documents).

*Study selection*

Reviewers then screen the search results, looking at a study's title and abstract, and then its full text to determine if the study is eligible to be included in the SR. This study selection process follows the pre-defined eligibility criteria. To minimize the risk of bias in the review process, independent duplicate screening may be applied in both the stage of title and abstract screening, and the stage of full text screening.

*Data extraction and effect estimate computation*

The reviewers extract all relevant data from the studies. The procedure is standardized, and the same kind of data is extracted from all studies. Most of this is in the methods and results sections of the study (and the supplementary material). Depending on the data, there are various ways of measuring the effect of an intervention; the extracted data may need to be converted to a consistent format so the treatment effect estimates reported across eligible studies can be combined as a pooled effect estimate.

*Risk of bias assessment*

*Bias* is "systematic error, or deviation from the truth, in results. Biases can lead to under-estimation or over-estimation of the true intervention effect and can vary in magnitude: some are small (and trivial compared with the observed effect) and some are substantial (so that an apparent finding may be due entirely to bias)."[10] Two or more independent reviewers assess the risk of bias of each study, using appropriate tools. One major consideration for choosing a risk of bias tool is the type of study design. For example, Version 2 of the Cochrane Risk-of-Bias tool for randomized trials (RoB 2) is the recommended tool to assess the risk of bias in randomized trials included in

---

[10] Higgins et al. (2019, pp. 177–178). Note that "biased" here does not mean *prejudiced*. Fair and impartial researchers may produce a "biased" study in the sense relevant to this Appendix.

Cochrane Reviews, while Risk Of Bias In Non-randomized Studies - of Interventions (ROBINS-I) is the recommended tool to assess the risk of bias in non-randomized studies.

*Data synthesis and analysis*

One key step for SRs is evidence synthesis, synthesizing or combining the results from the different studies. Meta-analyses of effect estimates (a quantitative synthesis strategy) may be performed, as well as sensitivity analyses (which examine whether the results would change if different statistical assumptions were made, if outcomes were defined slightly differently, and so on). If a meta-analysis is not feasible, other ways of synthesizing the results are available. A narrative that describes results study by study is not acceptable.[11]

*Quality of evidence assessment*

The quality of the evidence is now evaluated using, for instance, the methodological framework GRADE (explained in the following section).

*Discussion and conclusion*

The discussion section of the SR includes: "Summary of main results (benefits and harms); potential biases in the review process; overall completeness and applicability of evidence; certainty of the evidence; agreements and disagreements with other studies or reviews."[12] The conclusions section considers the implications for clinical practice and for research.

High-quality SRs organize their PICO information, search strategy, methodologies, and findings according to the Preferred Reporting Items for Systematic reviews and Meta-Analyses (PRISMA) statement, which facilitates completeness, accuracy, transparency, and replicability.[13] Registering the protocol for a SR in a system such as PROSPERO increases transparency and trustworthiness of an SR.

---

[11] McKenzie & Brennan (2024).
[12] Higgins et al. (2019, p. 404, quotation marks and capitalization omitted).
[13] Page et al. (2021). See also Santesso et al. (2020).

## 2. GRADE

Grading of Recommendations Assessment, Development, and Evaluations is a widely adopted framework for assessing the quality (or "certainty") of the evidence and strength of recommendations.[14] GRADE uses four tiers to classify quality:

> *High*: We are very confident that the true effect lies close to that of the estimate of the effect.
>
> *Moderate*: We are moderately confident in the effect estimate: The true effect is likely to be close to the estimate of the effect, but there is a possibility that it is substantially different
>
> *Low*: Our confidence in the effect estimate is limited: The true effect may be substantially different from the estimate of the effect
>
> *Very low*: We have very little confidence in the effect estimate: The true effect is likely to be substantially different from the estimate of effect.[15]

There is frequent confusion about the relationship between GRADE and tools that assess individual studies for risk of bias such as RoB 2 and ROBINS-I. When assessing risk of bias, the reviewers are assessing individual studies. When SR authors assess the quality or certainty of evidence with GRADE, they are assessing the total body of evidence. They ask: How confident should we be in the effect estimate (for instance, the estimate of average mortality, level of depression, degree of disease progression), given the evidence derived from all the included studies? GRADE does consider risk of bias in the individual studies that yielded the estimate, but that is just one of five factors that can downgrade the quality of the evidence. The other four are *inconsistency* (how consistent the results are across all the studies reporting on the same outcome); *indirectness* (how applicable the evidence is to the PICO in question); *imprecision* (whether the sample is too small or confidence intervals[16] surrounding the estimates too

---

[14] However, because GRADE "has become increasingly complex, such that new as well as existing users may find it unwieldy," a simplified and slightly revised version has recently been proposed, "Core GRADE" (Guyatt et al., 2025).
[15] Balshem et al. (2011, Table 2). See also M. Prasad (2024, p. 2).
[16] A confidence interval is a range of effect values and is used to quantify uncertainty about effect estimates.

wide), and *publication bias* (for instance, whether studies with negative results have not been published).[17] Evidence quality can be upgraded if there is a large effect size, a clear dose-response relationship, or if confounding factors would likely reduce the observed effect but did not.

GRADE not only provides guidance on assessing the quality of evidence, but guidance on recommending treatments. Key determinants for the strength of recommendations include the balance between benefits and harms of the alternative treatments, the certainty of evidence, values and preferences, and cost and resource allocation. Values and preferences of patients are a major consideration, especially when the certainty of evidence is low or very low.

In GRADE, there is an "explicit separation of the process for assessing the quality of a body of evidence from the process for making recommendations based in part on those assessments. Although higher quality evidence is more likely to be associated with strong recommendations than lower quality evidence, a particular level of quality does not imply a particular strength of recommendation. Sometimes, low or very low-quality evidence can lead to a strong recommendation."[18] For example, a low-cost safe treatment supported by low-quality evidence could lead to a strong recommendation if the potential benefits are large and there is no alternative. Conversely, a treatment might be supported by high quality evidence and yet not be strongly recommended, because it has side effects that some patients would not be willing to accept.

A treatment might be potentially promising but have harmful side effects with only weak evidence of benefit. In such cases a recommendation for "treatment-only-in-research" may be given under the following conditions:

> [T]here is insufficient evidence supporting an intervention for a panel to recommend its use; further research has a large potential for reducing uncertainty about the effects of the intervention; and further research is deemed good value for the anticipated costs.[19]

---

[17] Higgins et al. (2019, Table 2-1).
[18] Balshem et al. (2011, p. 402).
[19] J. Andrews et al. (2013, p. 724).

### 3. Overviews of reviews

Overviews of reviews, or "umbrella reviews," such as the one performed to systematically assess the clinical evidence for this Review, use a similar methodology to SRs to evaluate SRs themselves. Overviews employ explicit and systematic methods to identify and analyze multiple systematic reviews that address related research questions within a common topic area, with the goal of synthesizing results across key outcomes.[20] This approach is particularly useful when multiple systematic reviews exist on overlapping or related research questions within the same topic area, or when stakeholders need a high-level synthesis to inform clinical, policy, or public health decision-making. Like SRs, overviews use GRADE or related tools and standardized reporting practices.

The process of an overview follows these steps:

1. Systematically search for all SRs addressing the relevant PICOs.

2. Identify and include the eligible SRs

3. Extract information about the estimated treatment effects, and assess each SR for risk of bias using a tool such as "Risk of Bias in Systematic reviews" (ROBIS)

4. Collect, analyze, and present the data from included systematic reviews, including characteristics of the SRs and their included primary studies; risk of bias of included primary studies; outcome data; and certainty of evidence for pre-defined, clinically important outcomes. Specifically, for each outcome of interest, reviewers summarize the information about treatment estimates from the SRs.

To assess the certainty of evidence, reviewers may opt to summarize and report the original GRADE ratings reported by the SRs in the included systematic reviews. However, reviewers may need to re-analyze outcome data from systematic reviews or conduct GRADE assessments themselves using the information reported in the SRs, for example, when the SRs do not include GRADE assessment, or when there is disagreement across included SRs.

---

[20] Pollock et al. (2024).

Performing a new SR is preferred when there is a lack of recent SRs or when existing SRs are limited in quality; but if the literature contains several recent high-quality SRs the overview is an approved option.[21]

**4. Other types of reviews**

Not every medical publication with "review" in its title is an SR or an overview of SRs. Such publications can be useful but are not systematic and reproducible syntheses of evidence. Other types of reviews include:

*Narrative reviews*

Also called *literature reviews*, a narrative review is "a review article (such as a typical book chapter) that is not conducted using methods to minimize bias (in contrast to a systematic review)."[22] For this reason, narrative reviews must be treated with caution, although they can be helpful as an introduction to a research topic.

*Scoping reviews*

The purpose of a scoping review is to survey the available research on a specific topic. Scoping reviews are systematic and reproducible like SRs but are usually not as rigorous. The aim of a scoping review is to survey existing research and suggest areas for future study, not to assess the evidence for a particular intervention.[23]

[21] Pollock et al. (2024).
[22] Guyatt et al. (2015, p. 461).
[23] Tricco et al. (2016).

# Appendix 4. Overview of Systematic Reviews: Methodology, Evidence Synthesis, Tables

This Appendix is published separately.

# BIBLIOGRAPHY

100 signatories. (2023, May 5). *Open Letter re: Archives of Sexual Behavior*. https://web.archive.org/web/20230630173254/https://asbopenletter.com

404 Not Found | WPATH. (n.d.). Retrieved April 21, 2025, from https://web.archive.org/web/20250924110716/https://wpath.org/media/cms/Documents/Public%20Policies/2024/17.05.24%20R%20esponse%20Cass%20Review %20FINAL%20with%20ed%20note.pdf

Abbasi, K. (2024). The Cass review: An opportunity to unite behind evidence informed care in gender medicine. *BMJ*, q837.

Abbruzzese, E., Levine, S. B., & Mason, J. W. (2023). The myth of “reliable research” in pediatric gender medicine: A critical evaluation of the Dutch studies—and research that has followed. *Journal of Sex and Marital Therapy*, *49*(6), 673–699.

ABC News. (2011, August 29). Transgender kids pioneer early changes to identity, body. *ABC News*. https://web.archive.org/web/20110921102510/https://abcnews.go.com/Health/tra nsgender-kids-pioneer-early-identity-body/story?id=14404963

Achille, C., Taggart, T., Eaton, N. R., Osipoff, J., Tafuri, K., Lane, A., & Wilson, T. A. (2020). Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: Preliminary results. *International Journal of Pediatric Endocrinology*, *2020*(1), 8.

ACLU. (2021, April 1). *Doctors Agree: Gender-Affirming Care is Life-Saving Care*. ACLU. https://web.archive.org/web/20250924153133/https://live-aclu-wp.pantheonsite.io/news/lgbtq-rights/doctors-agree-gender-affirming-care-is-life-saving-care

Actavis Pharma, Inc. (2018, October 31). Label: Testosterone cypionate injection. *DailyMed*. https://web.archive.org/web/20250512230607/https://dailymed.nlm.nih.gov/daily med/drugInfo.cfm?setid=d7b57b68-dca6-4df2-b3f2-7017d7b69f17&msclkid=4ed2db18cd5411ecba911bd6e4bded62

Adhiyaman, V., & Ambalavanan, S. (2021, May 10). Conservative management: Are we still practising it as we should? *The BMJ Opinion*. https://web.archive.org/web/20250505113920/https://blogs.bmj.com/bmj/2021/05/10/conservative-management-are-we-still-practising-it-as-we-should/

Adkins, D. (2016, May 13). Carcaño v. McCrory*,* No. 1:16-cv-00236.

Aetna. (2024). *Gender Affirming Surgery: Clinical Policy Bulletin*. https://web.archive.org/web/20250327185555/https://www.aetna.com/cpb/medical/data/600_699/0615.html

Afonso, J., Ramirez-Campillo, R., Clemente, F. M., Büttner, F. C., & Andrade, R. (2024). The perils of misinterpreting and misusing “publication bias” in meta-analyses: An education review on funnel plot-based methods. *Sports Medicine*, *54*(2), 257–269.

AFP. (2025, April 20). Brazil prohibits hormone therapy for transgender minors. *MSN News*. https://web.archive.org/web/20250428141832/https://www.msn.com/en-in/news/other/brazil-prohibits-hormone-therapy-for-transgender-minors/ar-AA1D66l7

Agarwal, A., Hunt, B. J., Stegemann, M., Rochwerg, B., Lamontagne, F., Siemieniuk, R. A., Agoritsas, T., Askie, L., Lytvyn, L., Leo, Y.-S., Macdonald, H., Zeng, L., Alhadyan, A., Muna, A.-M., Amin, W., Da Silva, A. R. A., Aryal, D., Barragan, F. A. J., Bausch, F. J., … Vandvik, P. O. (2020). A living WHO guideline on drugs for covid-19. *BMJ*, m3379.

Akobeng, A. K. (2005). Principles of evidence based medicine. *Archives of Disease in Childhood*, *90*(8), 837–840.

Alder, S. (2024, November 14). Boston Children's Hospital ordered to pay $1.9 million in discrimination lawsuit. *HIPAA Journal*. https://www.hipaajournal.com/boston-childrens-hospital-1-9-million-discrimination-lawsuit

Alder, S. (2025, January 27). DOJ drops charges against surgeon who exposed continuing transgender care at Texas Children's. *HIPAA Journal*. https://web.archive.org/web/20250317024625/https://www.hipaajournal.com/doj-unseals-criminal-hipaa-charges-eithan-haim/

Alfonseca, K., & Geho, L. (2024, February 9). Transgender youth care misconceptions lead physicians, researchers to set the record straight. ABC News. https://web.archive.org/web/20250506143231/https://abcnews.go.com/Politics/researchers-dive-common-gender-affirming-care-youth-misconceptions/story?id=107041920

Allen, L. R., Watson, L. B., Egan, A. M., & Moser, C. N. (2019). Well-being and suicidality among transgender youth after gender-affirming hormones. *Clinical Practice in Pediatric Psychology*, *7*(3), 302–311.

American Academy of Child and Adolescent Psychiatry, American Academy of Pediatrics, & Children's Hospital Association. (2021, October). *A Declaration from the American Academy of Child and Adolescent Psychiatry, American Academy of Pediatrics, and Children's Hospital Association*. AACAP.Org. https://web.archive.org/web/20250504004715/https://www.aacap.org/App_Themes/AACAP/Docs/press/Declaration_National_Crisis_Oct-2021.pdf

American Board of Internal Medicine Foundation. (2002). *Medical Professionalism in the New Millennium: A Physician Charter*. https://web.archive.org/web/20250501184435/https://www.abimfoundation.org/what-we-do/physician-charter

American Board of Pediatrics. (2024, May 29). *Adolescent Medicine Certification*. https://web.archive.org/web/20250924114254/https://www.abp.org/content/adolescent-medicine-certification

American Medical Association. (2016). *Code of Medical Ethics: Patient Rights (Opinion 1.1.3)*. American Medical Association. https://web.archive.org/web/20250527181652/https://code-medical-ethics.ama-assn.org/ethics-opinions/patient-rights

American Medical Association. (2021). *Advancing Health Equity: Guide to Language, Narrative and Concepts*. American Medical Association.

American Medical Association. (2022). *Advocating for the LGBTQ community*. https://web.archive.org/web/20250511100430/https://www.ama-assn.org/delivering-care/population-care/advocating-lgbtq-community

American Psychiatric Association. (1952). *Diagnostic and Statistical Manual of Mental Disorders* (1st ed.). American Psychiatric Association.

American Psychiatric Association. (1968). *Diagnostic and Statistical Manual of Mental Disorders* (2nd ed.). American Psychiatric Association.

American Psychiatric Association. (1980). *Diagnostic and Statistical Manual of Mental Disorders* (3rd ed.). American Psychiatric Association.

American Psychiatric Association. (1994). *Diagnostic and Statistical Manual of Mental Disorders* (4th ed.). American Psychiatric Association.

American Psychiatric Association. (2013). *Diagnostic and Statistical Manual of Mental Disorders* (5th ed.). American Psychiatric Association.

American Psychiatric Association. (2022). *Diagnostic and Statistical Manual of Mental Disorders—Text Revision* (5th ed.). American Psychiatric Association.

American Psychiatric Association. (2023, July 18). Letter to Congress from 63 organizations on gender-affirming care. https://web.archive.org/web/20250503001539/https://www.psychiatry.org/getattachment/2dbcc56f-7a59-4a81-9b3f-c2c8c4cffc48/APA-Group-Letter-Congressional-Leadership-Gender-Affirming-Care-07182023.pdf

American Psychological Association. (2023, March 9). *Answers to Your Questions About Transgender People, Gender Identity, and Gender Expression*. https://web.archive.org/web/20250504121742/https://www.apa.org/topics/lgbtq/transgender.pdf

American Psychological Association. (2024a, February). *Gender*. APA Style. https://web.archive.org/web/20250507131752/https://apastyle.apa.org/style-grammar-guidelines/bias-free-language/gender

American Psychological Association. (2024b). *APA Policy Statement on Affirming Evidence-Based Inclusive Care for Transgender, Gender Diverse, and Nonbinary Individuals, Addressing Misinformation, and the Role of Psychological Practice and Science*. https://web.archive.org/web/20250511182154/https://www.apa.org/about/policy/transgender-nonbinary-inclusive-care.pdf

American Society of Plastic Surgeons. (2024, August 14). ASPS statement to press regarding gender surgery for adolescents. https://web.archive.org/web/20250507064527/https://www.plasticsurgery.org/for-medical-professionals/publications/psn-extra/news/asps-statement-to-press-regarding-gender-surgery-for-adolescents

Andrews, J. C., Schünemann, H. J., Oxman, A. D., Pottie, K., Meerpohl, J. J., Coello, P. A., Rind, D., Montori, V. M., Brito, J. P., Norris, S., Elbarbary, M., Post, P., Nasser, M., Shukla, V., Jaeschke, R., Brozek, J., Djulbegovic, B., & Guyatt, G. H. (2013). GRADE guidelines: 15. Going from evidence to recommendation—determinants of a recommendation's direction and strength. *Journal of Clinical Epidemiology*, *66*(7), 726–735.

Andrews, J., Guyatt, G. H., Oxman, A. D., Alderson, P., Dahm, P., Falck-Ytter, Y., Nasser, M., Meerpohl, J., Post, P. N., Kunz, R., Brozek, J., Vist, G., Rind, D., Akl, E. A., & Schünemann, H. J. (2013). GRADE guidelines: 14. Going from evidence to recommendations: the significance and presentation of recommendations. *Journal of Clinical Epidemiology*, *66*(7), 719–725.

Anthem. (2023). *Clinical UM Guideline: Gender Affirming Surgery*. https://web.archive.org/web/20250307181942/https://files.providernews.anthem.com/2715/CG-SURG-27.pdf

Antommaria, A. H. M. (2024). Decision-making for adolescents with gender dysphoria. *Perspectives in Biology and Medicine*, *67*(2), 244–260.

Appleby, L. (2024). *Review of Suicides and Gender Dysphoria at the Tavistock and Portman NHS Foundation Trust: Independent Report*. Department of Health and Social Care. https://web.archive.org/web/20250503195421/https://www.gov.uk/government/publications/review-of-suicides-and-gender-dysphoria-at-the-tavistock-and-portman-nhs-foundation-trust/review-of-suicides-and-gender-dysphoria-at-the-tavistock-and-portman-nhs-foundation-trust-independent-report

Archer, J. (2019). The reality and evolutionary significance of human psychological sex differences. *Biological Reviews of the Cambridge Philosophical Society*, *94*(4), 1381–1415.

Archives of Disease in Childhood. (2024, April 9). Gender identity service series. *BMJ Journals*. https://web.archive.org/web/20250523043532/https://adc.bmj.com/pages/gender-identity-service-series

Arnoldussen, M., Hooijman, E. C., Kreukels, B. P., & de Vries, A. L. (2022). Association between pre-treatment IQ and educational achievement after gender-affirming treatment including puberty suppression in transgender adolescents. *Clinical Child Psychology and Psychiatry*, *27*(4), 1069–1076.

Arsenych, A. (2024, April 11). Ontarian wins legal battle for public funding of gender-affirming surgery argued as “experimental.” *CTV News*. https://web.archive.org/web/20250507144704/https://www.ctvnews.ca/toronto/article/ontarian-wins-legal-battle-for-public-funding-of-gender-affirming-surgery-argued-as-experimental/

Ascha, M., Sasson, D. C., Sood, R., Cornelius, J. W., Schauer, J. M., Runge, A., Muldoon, A. L., Gangopadhyay, N., Simons, L., Chen, D., Corcoran, J. F., & Jordan, S. W. (2022). Top surgery and chest dysphoria among transmasculine and nonbinary adolescents and young adults. *JAMA Pediatrics*, *76*(11), 1115–1122.

Ashley, F. (2019). Gatekeeping hormone replacement therapy for transgender patients is dehumanising. *Journal of Medical Ethics*, *45*(7), 480–482.

Ashley, F. (2022a). Adolescent medical transition is ethical: An analogy with reproductive health. *Kennedy Institute of Ethics Journal*, *32*(2), 127–171.

Ashley, F. (2022b). *Banning Transgender Conversion Practices: A Legal and Policy Analysis*. UBC Press.

Ashley, F. (2023). Interrogating gender-exploratory therapy. *Perspectives on Psychological Science*, *18*(2), 472–481.

Ashley, F., & Ells, C. (2018). In favor of covering ethically important cosmetic surgeries: Facial feminization surgery for transgender people. *American Journal of Bioethics*, *18*(12), 23–25.

Ashley, F., Parsa, N., Kus, T., Leveille, L., Schevers, K., & Rider, G. N. (2025). Gatekeeping gender-affirming care is detrimental to detrans people. *International Journal of Transgender Health*, 1–18.

Ashley, F., Parsa, N., Kus, T., & MacKinnon, K. R. (2023). Do gender assessments prevent regret in transgender healthcare? A narrative review. *Psychology of Sexual Orientation and Gender Diversity*.

Ashley, F., Tordoff, D. M., Olson-Kennedy, J., & Restar, A. J. (2024). Randomized-controlled trials are methodologically inappropriate in adolescent transgender healthcare. *International Journal of Transgender Health*, *25*(3), 407–418.

Asseler, J. D., de Nie, I., Van Rooij, F. B., Steensma, T. D., Mosterd, D., Verhoeven, M. O., Goddijn, M., Huirne, J. A. F., & van Mello, N. M. (2024). Transgender persons' view on previous fertility decision-making and current infertility: A qualitative study. *Human Reproduction*, *39*(9), 2032–2042.

Austin, A., Craig, S. L., & D'Souza, S. A. (2018). An AFFIRMative cognitive behavioral Intervention for transgender youth: Preliminary effectiveness. *Professional Psychology, Research and Practice*, *49*(1), 1–8.

Australian Associated Press. (2025, January 28). Queensland halts prescription of puberty blockers and hormones for children with gender dysphoria. *The Guardian*. https://web.archive.org/web/20250501184534/https://www.theguardian.com/australia-news/2025/jan/28/queensland-halts-prescription-of-puberty-blockers-and-hormones-for-children-with-gender-dysphoria

Australian Government National Health and Medical Research Council. (2025). *National Clinical Practice Guidelines for the Care of Trans and Gender Diverse People Under 18 with Gender Dysphoria*. https://web.archive.org/web/20250506002056/https://www.nhmrc.gov.au/health-advice/guidelines-care-trans-and-gender-diverse-people

Bachmann, C. J., Golub, Y., Holstiege, J., & Hoffmann, F. (2024). Gender identity disorders among young people in Germany: Prevalence and trends, 2013–2022. An analysis of nationwide routine insurance data. *Deutsches Ärzteblatt International*. https://web.archive.org/web/20250502015427/https://di.aerzteblatt.de/int/archive/article/239563

Bailey, J. M. (2020). The minority stress model deserves reconsideration, not just extension. *Archives of Sexual Behavior*, *49*(7), 2265–2268.

Bailey, J. M., & Blanchard, R. (2017). Gender dysphoria is not one thing. *4thWaveNow*. https://web.archive.org/web/20250509092915/https://4thwavenow.com/2017/12/07/gender-dysphoria-is-not-one-thing/

Bailey, J. M., & Diaz, S. (2023). Rapid-onset gender dysphoria: Parent reports on 1,655 possible cases. *Journal of Open Inquiry in Behavioral Science*.

Bailey, J. M., & Zucker, K. J. (1995). Childhood sex-typed behavior and sexual orientation: A conceptual analysis and quantitative review. *Developmental Psychology*, *31*(1), 43–55.

Baker, K. E., Wilson, L. M., Sharma, R., Dukhanin, V., McArthur, K., & Robinson, K. A. (2021). Hormone therapy, mental health, and quality of life among transgender people: A systematic review. *Journal of the Endocrine Society*, *5*(4), 1–16.

Baker, K., & Restar, A. (2022). Utilization and costs of gender-affirming care in a commercially insured transgender population. *Journal of Law, Medicine and Ethics*, *50*(3), 456–470.

Bakker, A. (2021). *The Dutch Approach: Fifty Years of Transgender Health Care at the VU Amsterdam Gender Clinic*. Boom.

Bakker, J. (2024). Neurobiological characteristics associated with gender identity: Findings from neuroimaging studies in the Amsterdam cohort of children and adolescents experiencing gender incongruence. *Hormones and Behavior*, *34*, 105601.

Baldinger-Melich, P., Urquijo Castro, M. F., Seiger, R., Ruef, A., Dwyer, D. B., Kranz, G. S., Klöbl, M., Kambeitz, J., Kaufmann, U., & Windischberger, C. (2020). Sex matters: A multivariate pattern analysis of sex-and gender-related neuroanatomical differences in cis-and transgender individuals using structural magnetic resonance imaging. *Cerebral Cortex*, *30*(3), 1345–1356.

Balshem, H., Helfand, M., Schünemann, H. J., Oxman, A. D., Kunz, R., Brozek, J., Vist, G. E., Falck-Ytter, Y., Meerpohl, J., & Norris, S. (2011). GRADE guidelines: 3. Rating the quality of evidence. *Journal of Clinical Epidemiology*, *64*(4), 401–406.

Bannerman, L. (2019, July 26). Puberty blocking drugs: 'For the past four years I've been stuck as a child.' *The Times*. https://web.archive.org/web/20250503001546/https://www.thetimes.com/uk/healthcare/article/transgender-children-puberty-blocking-drugs-for-the-past-four-years-i-ve-been-stuck-as-a-child-5s6tkh7z2

Barnes, H. (2023). *Time to Think: The Inside Story of the Collapse of the Tavistock's Gender Service for Children*. Swift.

Baron, T., & Dierckxsens, G. (2022). Two dilemmas for medical ethics in the treatment of gender dysphoria in youth. *Journal of Medical Ethics*, *48*(9), 603–607.

Bartick, M., Dahlen, H., Gamble, J., Walker, S., Mathisen, R., & Gribble, K. (2025). Reconsidering "inclusive language:" Consequences for healthcare and equitableness of a growing linguistic movement to address gender identity with a path forward. *Sexual and Reproductive Healthcare*, *44*, 101088.

Baxendale, S. (2024). The impact of suppressing puberty on neuropsychological function: A review. *Acta Paediatrica*, *113*(6), 1156–1167.

Bazelon, E. (2022a, June 15). The battle over gender therapy. *New York Times*. https://web.archive.org/web/20250507094658/https://www.nytimes.com/2022/06/15/magazine/gender-therapy.html

Bazelon, E. (2022b, June 15). A medical frontier. *New York Times*. https://web.archive.org/web/20250501184517/https://www.nytimes.com/2022/06/15/briefing/transgender-care-experts-divide.html

Beauchamp, T. L., & Childress, J. F. (2019). *Principles of Biomedical Ethics* (8th ed.). Oxford University Press.

Becerra-Culqui, T. A., Liu, Y., Nash, R., Cromwell, L., Flanders, W. D., Getahun, D., Giammattei, S. V., Hunkeler, E. M., Lash, T. L., Millman, A., Quinn, V. P., Robinson, B., Roblin, D., Sandberg, D. E., Silverberg, M. J., Tangpricha, V., & Goodman, M. (2018). Mental health of transgender and gender nonconforming youth compared with their peers. *Pediatrics*, *141*(5), e20173845.

Becker-Hebly, I., Fahrenkrug, S., Campion, F., Richter-Appelt, H., Schulte-Markwort, M., & Barkmann, C. (2021). Psychosocial health in adolescents and young adults with gender dysphoria before and after gender-affirming medical interventions: A descriptive study from the Hamburg Gender Identity Service. *European Child and Adolescent Psychiatry*, *30*(11), 1755–1767.

Benjamin, H. (1966). *The Transsexual Phenomenon*. Julian Press.

Benjamin, H. (1967a). Introduction. In C. Jorgensen, *Christine Jorgensen: A Personal Autobiography*. Paul S. Eriksson.

Benjamin, H. (1967b). Transvestism and transsexualism in the male and female. *Journal of Sex Research*, *3*(2), 107–127.

Bentler, S. E., Liu, L., Obrizan, M., Cook, E. A., Wright, K. B., Geweke, J. F., Chrischilles, E. A., Pavlik, C. E., Wallace, R. B., Ohsfeldt, R. L., Jones, M. P., Rosenthal, G. E., & Wolinsky, F. D. (2009). The aftermath of hip fracture: Discharge placement, functional status change, and mortality. *American Journal of Epidemiology*, *170*(10), 1290–1299.

Bester, J. C. (2024). Minors lack the autonomy to consent to gender-affirming care: Best interests must be primary. *Hastings Center Report*, *54*(3), 57–58.

Bhargava, A., Arnold, A. P., Bangasser, D. A., Denton, K. M., Gupta, A., Hilliard Krause, L. M., Mayer, E. A., McCarthy, M., Miller, W. L., Raznahan, A., & Verma, R. (2021). Considering sex as a biological variable in basic and clinical studies: An endocrine society scientific statement. *Endocrine Reviews*, *42*(3), 219–258.

Biggs, M. (2020). Puberty blockers and suicidality in adolescents suffering from gender dysphoria. *Archives of Sexual Behavior*, *49*(7), 2227–2229.

Biggs, M. (2021). Revisiting the effect of GnRH analogue treatment on bone mineral density in young adolescents with gender dysphoria. *Journal of Pediatric Endocrinology and Metabolism*, *34(7): 937–939*.

Biggs, M. (2022). Suicide by clinic-referred transgender adolescents in the United Kingdom. *Archives of Sexual Behavior*, *51*, 685–690.

Biggs, M. (2023a). Psychosocial functioning in transgender youth after hormones [letter to the editor]. *New England Journal of Medicine*, *389*(16), 1536–1537.

Biggs, M. (2023b). The Dutch Protocol for juvenile transsexuals: Origins and evidence. *Journal of Sex and Marital Therapy*, *49*(4), 348–368.

Blacklock, C. A., Tollit, M. A., Pace, C. C., Elphinstone, B., Zwickl, S., Cheung, A. S., Citron, K., Marsan, S., Zucker, N., Buzwell, S., & Pang, K. C. (2025). The Gender Euphoria Scale (GES): Development of a tool to measure gender euphoria. *International Journal of Transgender Health*, 1–12. https://doi.org/10.1080/26895269.2024.2447768

Blanchard, R. (1989). The classification and labeling of nonhomosexual gender dysphorias. *Archives of Sexual Behavior*, *18*(4), 315–334.

Block, J. (2023a). Gender dysphoria in young people is rising—And so is professional disagreement. *BMJ*, *380*, 382.

Block, J. (2023b). Norway's guidance on paediatric gender treatment is unsafe, says review. *BMJ*, p697.

Block, J. (2023c). US paediatric leaders back gender affirming approach while also ordering evidence review. *BMJ*, p1877.

Block, J. (2023d, July 11). Youth gender medicine has become a hall of mirrors. *Boston Globe*. https://web.archive.org/web/20250502015402/https://www.bostonglobe.com/2023/11/07/opinion/gender-affirming-care-trans-kids/

Block, J. (2024a). Dispute arises over World Professional Association for Transgender Health's involvement in WHO's trans health guideline. *BMJ*, q2227.

Block, J. (2024b). Gender medicine in the US: how the Cass review failed to land. *BMJ*, *385*, q1141.

Block, J. (2024c, April 16). WPATH calls Cass Report rooted in false premise; *X/Twitter post*. https://x.com/writingblock/status/1780333432234823803

Block, J. (2024d, July 24). How did Planned Parenthood become one of the country's largest suppliers of testosterone? *The Free Press*. https://web.archive.org/web/20250501184531/https://www.thefp.com/p/how-did-planned-parenthood-become

Blunt, C. J. (2022, July 12). The pyramid schema: The origins and impact of evidence pyramids. https://web.archive.org/web/20250501184148/http://cjblunt.com/the-pyramid-schema/

Bluth, K., Lathren, C., Clepper-Faith, M., Larson, L. M., Ogunbamowo, D. O., & Pflum, S. (2023). Improving mental health among transgender adolescents: Implementing mindful self-compassion for teens. *Journal of Adolescent Research*, *38*(2), 271–302.

BMJ. (1996). The Nuremberg Code (1947). *BMJ, 313*, 1448.

Boe v. Marshall, No. 2:22-Cv-00184 (M.D. Ala., 2022). https://web.archive.org/web/20250504230251/https://www.courtlistener.com/docket/63252064/boe-v-marshall/

Boerner, H. (2022, August 1). What the science on gender-affirming care for transgender kids really shows. *Scientific American*. https://web.archive.org/web/20250505020433/https://www.scientificamerican.com/video/what-the-science-on-gender-affirming-care-for-transgender-kids-really-shows/

Boogers, L. S., Reijtenbagh, S. J. P., Wiepjes, C. M., Van Trotsenburg, A. S. P., Den Heijer, M., & Hannema, S. E. (2024). Time course of body composition changes in transgender adolescents during puberty suppression and sex hormone treatment. *Journal of Clinical Endocrinology and Metabolism*, *109*(8), e1593–e1601.

Boogers, L. S., Van Der Loos, M. A. T. C., Wiepjes, C. M., Van Trotsenburg, A. S. P., Den Heijer, M., & Hannema, S. E. (2023). The dose-dependent effect of estrogen on bone mineral density in trans girls. *European Journal of Endocrinology*, *189*(2), 290–296.

Borah L., Zebib L., Sanders H.M., Lane M., Stroumsa D., Chung K.C. (2023). State restrictions and geographic access to gender-affirming care for transgender youth. *JAMA, 330*(4), 375–378.

Boskey, E. R., Scheffey, K. L., Pilcher, S., Barerra, E. P., McGregor, K., Carswell, J. M., Kant, J. D., & Kremen, J. (2025). A retrospective cohort study of transgender adolescents' gender-affirming hormone discontinuation. *Journal of Adolescent Health*, S1054139X24005548.

Boyd, I., Hackett, T., & Bewley, S. (2022). Care of transgender patients: A general practice quality improvement approach. *Healthcare*, *10*(1), 121.

Breehl, L., & Caban, O. (2025). Physiology, puberty. In *StatPearls*. StatPearls Publishing. https://web.archive.org/web/20250501184512/https://www.ncbi.nlm.nih.gov/books/NBK534827/

Brennan, J. M., Sinha, S., Boot-Haury, J., & Joseph, K. M. (2025). Getting to the bottom of it: Comparative medical and psychological risk for gonadectomy among individuals with and without presurgical psychological assessment. *International Journal of Transgender Health*, 1–18.https://doi.org/10.1080/26895269.2025.2454288

Brett, A. S., & McCullough, L. B. (2012). Addressing requests by patients for nonbeneficial interventions. *JAMA*, *307*(2), 149.

Brezin, F., Busiah, K., Leroy, C., Fiot, E., Bensignor, C., Amouroux, C., Caquard, M., Cartault, A., Castets, S., Delcour, C., Devernay, M., Feigerlova, E., Hoarau, M., Lebon-Labich, B., Lambert, A.-S., Rouleau, S., Trouvin, M.-A., Vautier, V., & Martinerie, L. (2024). Endocrine management of transgender adolescents: Expert consensus of the french society of pediatric endocrinology and diabetology working group. *Archives de Pédiatrie*. https://doi.org/10.1016/j.arcped.2024.08.003

Brierley, J., Larcher, V., Hadjipanayis, A. A., & Grossman, Z. (2024). European Academy of Paediatrics statement on the clinical management of children and adolescents with gender dysphoria. *Frontiers in Pediatrics*, *12*, 1298884.

Brignardello-Petersen, R., Carrasco-Labra, A., & Guyatt, G. H. (2021). How to interpret and use a clinical practice guideline or recommendation: Users' guides to the medical literature. *JAMA*, *326*(15), 1516–1523.

Brik, T., Vrouenraets, L. J. J. J., de Vries, M. C., & Hannema, S. E. (2020). Trajectories of adolescents treated with gonadotropin-releasing hormone analogues for gender dysphoria. *Archives of Sexual Behavior*, *49*(7), 2611–2618.

Brossard, B. (2019). Why mental disorders flourish and wither: Extending the theory of ecological niches. *Social Science and Medicine*, *237*, 112445.

Brouwers, M. C., Kho, M. E., Browman, G. P., Burgers, J. S., Cluzeau, F., Feder, G., Fervers, B., Graham, I. D., Grimshaw, J., Hanna, S. E., Littlejohns, P., Makarski, J., Zitzelsberger, L., & for the AGREE Next Steps Consortium. (2010). AGREE II: Advancing guideline development, reporting and evaluation in health care. *Canadian Medical Association Journal*, *182*(18), E839–E842.

Brown University. (2019, March 19). *Updated: Brown Statements on Gender Dysphoria Study*. https://web.archive.org/web/20250501184444/https://www.brown.edu/news/2019-03-19/gender

Broyles, V., & Trakas, E. (n.d.). *For Immediate Release.* Child & Parental Rights Campaign.

Brubaker, R. (2025). Gender identity: The career of a category. *Theory and Social Inquiry*, *1*(1), 1–50.

Brunskell-Evans, H., & Moore, M. (Eds.). (2018). *Transgender Children and Young People: Born in Your Own Body*. Cambridge Scholars Publishing.

Bullough, B., Bullough, V. L., & Elias, J. (Eds.). (1997). *Gender Blending*. Prometheus.

Bumphenkiatikul, T., Sakpetch, T., Sungnuch, P., Huang, X., Hataiyusuk, S., & Wainipitapong, S. (2025). Non-medical gender affirming practices among transgender individuals: A systematic review on the health implications of chest binding and genital tucking. *International Journal of Sexual Health.* https://doi.org/10.1080/19317611.2025.2560416

Bungener, Sara. L., de Vries, A. L. C., Popma, A., & Steensma, T. D. (2020). Sexual experiences of young transgender persons during and after gender-affirmative treatment. *Pediatrics*, *146*(6), e20191411.

Bustos, V. P., Bustos, S. S., Mascaro, A., Del Corral, G., Forte, A. J., Ciudad, P., Kim, E. A., Langstein, H. N., & Manrique, O. J. (2021). Regret after gender-affirmation surgery: A systematic review and meta-analysis of prevalence. *Plastic and Reconstructive Surgery: Global Open*, *9*(3), e3477.

Butler, C., & Hutchinson, A. (2020). Debate: The pressing need for research and services for gender desisters/detransitioners. *Child and Adolescent Mental Health*, *25*(1), 45–47.

Button, K. S., Kounali, D., Thomas, L., Wiles, N. J., Peters, T. J., Welton, N. J., ... & Lewis, G. (2015). Minimal clinically important difference on the Beck Depression Inventory-II according to the patient's perspective. *Psychological Medicine*, *45*(15), 3269–3279.

Byrne, A. (2023a). More on "gender identity." *Archives of Sexual Behavior*, *52*(7), 2719–2721.

Byrne, A. (2023b). The origin of "gender identity." *Archives of Sexual Behavior*, *52*(7), 2709–2711.

Byrne, A. (2024a). Another myth of persistence? *Archives of Sexual Behavior*, *53*(10), 3705–3709.

Byrne, A. (2024b). *Trouble with Gender: Sex Facts, Gender Fictions*. Polity Press.

Byrne, A., & Gorin, M. (2025). A deafening silence: Bioethics and gender-affirming healthcare. In L. Krauss (Ed.), *The War on Science*. Post Hill Press. https://web.archive.org/web/20250501151059/https://philarchive.org/archive/BYRADSv3

Cambridge Health Alliance. (n.d.). *Puberty Blocker Fact Sheet*. https://web.archive.org/web/20250501144422/https://www.challiance.org/file%20library/services%20and%20programs/primary%20care/lgbtq-plus%20living%20well/puberty-blocker-handout-eng-1.pdf

Campion, S. (2022, March 5). Texas Children's Hospital halts hormone-related prescription therapies for transgender children. *ABC13 Houston*. https://web.archive.org/web/20250501184155/https://abc13.com/transgender-children-mental-health-lgbtq-rights-texas-politics/11621048/

Cantor, J. M. (2020). Transgender and gender diverse children and adolescents: Fact-checking of AAP policy. *Journal of Sex and Marital Therapy*, *46*(4), 307–313.

Cantu, A. L., Moyer, D. N., Connelly, K. J., & Holley, A. L. (2020). Changes in anxiety and depression from intake to first follow-up among transgender youth in a pediatric endocrinology clinic. *Transgender Health*, *5*(3), 196–200.

Carande-Kulis, V. (2022). Standards required for the development of CDC evidence-based guidelines. *MMWR Supplements*, *71*.

Care Quality Commission. (2021). *Gender Identity Services Inspection Report*. https://web.archive.org/web/20250125065413/https://api.cqc.org.uk/public/v1/reports/6e4fbf84-909c-46d7-835c-caf304cdd485?20221129062700

Carmichael, P., Butler, G., Masic, U., Cole, T. J., De Stavola, B. L., Davidson, S., Skageberg, E. M., Khadr, S., & Viner, R. M. (2021). Short-term outcomes of pubertal suppression in a selected cohort of 12 to 15 year old young people with persistent gender dysphoria in the UK. *PLoS ONE*, *16*(2), e0243894.

Cass, H. (2022a). *Independent Review of Gender Identity Services for Children and Young People: Interim Report*. https://webarchive.nationalarchives.gov.uk/ukgwa/20230504111012/https://cass.independent-review.uk/wp-content/uploads/2022/03/Cass-Review-Interim-Report-Final-Web-Accessible.pdf

Cass, H. (2022b, August 18). *Entry 8—Beyond the Headlines*. https://webarchive.nationalarchives.gov.uk/ukgwa/20250310143907/https://cass.independent-review.uk/entry-8-beyond-the-headlines/

Cass, H. (2024a). *Independent Review of Gender Identity Services for Children and Young People: Final Report*. https://webarchive.nationalarchives.gov.uk/ukgwa/20250310143933/https://cass.independent-review.uk/home/publications/final-report/

Cass, H. (2024b, May 16). *Independent Review of Gender Identity Services for Children and Young People: Adult Gender Dysphoria Clinics*. https://web.archive.org/web/20250501184502/https://www.england.nhs.uk/wp-content/uploads/2024/08/PRN01451-letter-from-dr-cass-to-john-stewart-james-palmer-may-2024.pdf

Cauldwell, D. O. (2006). Psychopathia transexualis. In S. Stryker & S. Whittle (Eds.), *The Transgender Studies Reader* (Vol. 1). Taylor & Francis.

Cavlan, D., Bharwani, N., & Grossman, A. (2010). Androgen- and estrogen-secreting adrenal cancers. *Seminars in Oncology*, *37*(6), 638–648.

Cavve, B. S., Bickendorf, X., Ball, J., Saunders, L. A., Thomas, C. S., Strauss, P., Marion, L., Siafarikas, A., Ganti, U., Wiggins, A., & Moore, J. K. (2024). Reidentification with birth-registered sex in a western Australian pediatric gender clinic cohort. *JAMA Pediatrics*, *178*(5), 446–453.

Center for Biologics Evaluation and Research (CBER) and Center for Drug Evaluation and Research (CDER) (2023, October). *Benefit-Risk Assessment for New Drug and Biological Products Guidance for Industry.* US Department of Health and Human Services Food and Drug Administration. https://web.archive.org/web/20250501184503/https://www.fda.gov/media/152544 / download

Centers for Disease Control. (2025, March 21). *Measles Cases and Outbreaks*. https://web.archive.org/web/20250501164129/https://www.cdc.gov/measles/data-research/

Centers for Disease Control and Prevention. (2023). Youth risk behavior surveillance—United States, 2021. *Morbidity and Mortality Weekly Report*, *72*(1).

Chelliah, P., Lau, M., & Kuper, L. E. (2024). Changes in gender dysphoria, interpersonal minority stress, and mental health among transgender youth after one year of hormone therapy. *Journal of Adolescent Health*, *74*(6), 1106–1111.

Chen, D., Berona, J., Chan, Y.-M., Ehrensaft, D., Garofalo, R., Hidalgo, M. A., Rosenthal, S. M., Tishelman, A. C., & Olson-Kennedy, J. (2023). Psychosocial functioning in transgender youth after 2 years of hormones. *New England Journal of Medicine*, *388*(3), 240–250.

Chen, D., Berona, J., & Olson-Kennedy, J. (2023). Psychosocial functioning in transgender youth after Hormones [author's reply to letters to the editor]. *New England Journal of Medicine*, *389*(16), 1538–1539.

Chen, D., Simons, L., Johnson, E. K., Lockart, B. A., & Finlayson, C. (2017). Fertility preservation for transgender adolescents. *Journal of Adolescent Health*, *61*(1), 120–123.

Chen, D., Strang, J. F., Kolbuck, V. D., Rosenthal, S. M., Wallen, K., Waber, D. P., Steinberg, L., Sisk, C. L., Ross, J., Paus, T., Mueller, S. C., McCarthy, M. M., Micevych, P. E., Martin, C. L., Kreukels, B. P. C., Kenworthy, L., Herting, M. M., Herlitz, A., Haraldsen, I. R. J. H., … Garofalo, R. (2020). Consensus parameter: Research methodologies to evaluate neurodevelopmental effects of pubertal suppression in transgender youth. *Transgender Health*, *5*(4), 246–257.

Cheng, P. J., Pastuszak, A. W., Myers, J. B., Goodwin, I. A., & Hotaling, J. M. (2019). Fertility concerns of the transgender patient. *Translational Andrology and Urology*, *8*(3), 209–218.

Cheung, C. R., Abbruzzese, E., Lockhart, E., Maconochie, I. K., & Kingdon, C. C. (2025). Gender medicine and the Cass Review: Why medicine and the law make poor bedfellows. *Archives of Disease in Childhood*, *110*, 251–255.

Chew, D., Anderson, J., Williams, K., May, T., & Pang, K. (2018). Hormonal treatment in young people with gender dysphoria: A systematic review. *Pediatrics*, *141*(4), e20173742.

Chiniara, L. N., Viner, C., Palmert, M., & Bonifacio, H. (2019). Perspectives on fertility preservation and parenthood among transgender youth and their parents. *Archives of Disease in Childhood*, *104*(8), 739–744.

Choukas-Bradley, S. (2024). Adolescents' social media use and body image. In *Your Wellbeing in a Technology Rich World.* MIT Press. https://web.archive.org/web/20250501184425/https://wip.mitpress.mit.edu/pub/gik297kw/release/1

Christensen, J. A., Oh, J., Linder, K., Imhof, R. L., Croarkin, P. E., Bostwick, J. M., & McKean, A. J. S. (2025). Systematic review of interventions to reduce suicide risk in transgender and gender diverse youth. *Child Psychiatry and Human Development*, *56*(1), 88–100.

Chu, A. L. (2024, March 11). Freedom of sex: The moral case for letting trans kids change their body. *New York Magazine*. https://web.archive.org/web/20250501184404/https://nymag.com/intelligencer/article/trans-rights-biological-sex-gender-judith-butler.html

Churcher Clarke, A., & Spiliadis, A. (2019). 'Taking the lid off the box': The value of extended clinical assessment for adolescents presenting with gender identity difficulties. *Clinical Child Psychology and Psychiatry*, *24*(2), 338–352.

Ciancia, S., Dubois, V., Craen, M., Klink, D., Verroken, C., Vanderschueren, D., & Cools, M. (2024). Effects of puberty suppression on bone, body composition, handgrip strength and glucolipid profile in early-pubertal transgender adolescents. *International Journal of Transgender Health*, 1–13.

Cigna. (2025). *Gender dysphoria treatment: Medical coverage policy*. https://web.archive.org/web/20250331010654/https://static.cigna.com/assets/chcp/pdf/coveragePolicies/medical/mm_0266_coveragepositioncriteria_gender_reassignment_surgery.pdf

Clark, C. J., Fjeldmark, M., Lu, L., Baumeister, R. F., Ceci, S., Frey, K., Miller, G., Reilly, W., Tice, D., Von Hippel, W., Williams, W. M., Winegard, B. M., & Tetlock, P. E. (2024). Taboos and self-censorship among U.S. psychology professors. *Perspectives on Psychological Science*, 17456916241252085.

Clarke, B., Gillies, D., Illari, P., Russo, F., & Williamson, J. (2014). Mechanisms and the evidence hierarchy. *Topoi*, *33*(2), 339–360.

Clarke, J. (2022). Sex assigned at birth. *Columbia Law Review*, *122*(7), 1821–1898.

Clayton, A. (2023). Gender-affirming treatment of gender dysphoria in youth: A perfect storm environment for the placebo effect: the implications for research and clinical practice. *Archives of Sexual Behavior*, 52 483–494.

Clayton, A., Malone, W. J., Clarke, P., Mason, J., & D'Angelo, R. (2021). Commentary: The Signal and the Noise—questioning the benefits of puberty blockers for youth with gender dysphoria—a commentary on Rew et al. (2021). *Child and Adolescent Mental Health*, *3*, 259–262.

Clayton, A., Smids, J., & McDeavitt, K. (2025). Letter to the Editor on "Timing of puberty suppression in transgender adolescents and sexual functioning after vaginoplasty (van der Meulen et al., 2024)." *Journal of Sexual Medicine*, qdaf030.

Coalition for the Advancement and Application of Psychological Science. (2021, July 26). *CAAPS Position Statement on Rapid Onset Gender Dysphoria (ROGD)*. https://www.caaps.co/rogd-statement

Cohen-Kettenis, P. T., & Gooren, L. J. (1999). Transsexualism: A review of etiology, diagnosis and treatment. *Journal of Psychosomatic Research*, *46*(4), 315–333.

Cohen-Kettenis, P. T., & Kuiper, B. (1984). Transseksualiteit en psychotherapie. *Tijdschrift Voor Psychotherapie*, 10(3), 153–166.

Cohen-Kettenis, P. T, & Pfäfflin, F. (2003). *Transgenderism and Intersexuality in Childhood and Adolescence: Making Choices*. SAGE Publications, Inc.

Cohen-Kettenis, P. T., Schagen, S. E. E., Steensma, T. D., de Vries, A. L. C., & Delemarre-van de Waal, H. A. (2011). Puberty suppression in a gender-dysphoric adolescent: A 22-year follow-up. *Archives of Sexual Behavior*, *40*, 843–847.

Cohn, J. (2023). The detransition rate is unknown. *Archives of Sexual Behavior*, *52*(5), 1937–1952.

Coleman, E. (2023, July 22). I helped write gender-affirming care standards. Texas is going the wrong way. *Dallas News*. https://web.archive.org/web/20250501184455/https://www.dallasnews.com/opinion/commentary/2023/07/22/i-helped-write-gender-affirming-care-standards-texas-is-going-the-wrong-way/

Coleman, E., Bockting, W., Botzer, M., Cohen-Kettenis, P., DeCuypere, G., Feldman, J., Fraser, L., Green, J., Knudson, G., Meyer, W. J., Monstrey, S., Adler, R. K., Brown, G. R., Devor, A. H., Ehrbar, R., Ettner, R., Eyler, E., Garofalo, R., Karasic, D. H., … Zucker, K. (2012). Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. *International Journal of Transgenderism*, *13*(4), 165–232.

Coleman, E., Radix, A. E., Bouman, W. P., Brown, G. R., de Vries, A. L. C., Deutsch, M. B., Ettner, R., Fraser, L., Goodman, M., Green, J., Hancock, A. B., Johnson, T. W., Karasic, D. H., Knudson, G. A., Leibowitz, S. F., Meyer-Bahlburg, H. F. L., Monstrey, S. J., Motmans, J., Nahata, L., … Arcelus, J. (2022). Standards of care for the health of transgender and gender diverse people, version 8. *International Journal of Transgender Health*, *23*(sup1), S1–S259.

Committee on Bioethics, Katz, A. L., Macauley, R. C., Mercurio, M. R., Moon, M. R., Okun, A. L., Opel, D. J., & Statter, M. B. (2016). Informed consent in decision-making in pediatric practice. *Pediatrics*, *138*(2), e20161484.

Committee on Quality of Health Care in America, Institute of Medicine. (2001). *Crossing the Quality Chasm: A New Health System for the 21st Century*. National Academy Press.

Complaint, Breen v. Olson-Kennedy, No. 24STCV32096 (Cal. Super. Ct., L.A. Cnty. December 5, 2024).

Cornell Health. (n.d.). *CornellHealth: Informed Consent for Masculinizing Hormone Therapy*. https://web.archive.org/web/20250501184350/https://health.cornell.edu/sites/health/files/docs/External%20Weblinks/Masculinizing-Hormones-Informed-Consent-Cornell-Health.pdf

Cornell University, & What We Know Project. (2017). What does the scholarly research say about the effect of gender transition on transgender well-being? https://web.archive.org/web/20250501184424/https://whatweknow.inequality.cornell.edu/topics/lgbt-equality/%20what-does-the-scholarly-research-say-about-the-well-being-of-transgender-people%20/

Correction. (2022). *International Journal of Transgender Health*, 23(Sup1), S259–S261.

Corzine, A., & Roy, A. (2024). Inside the black mirror: Current perspectives on the role of social media in mental illness self-diagnosis. *Discover Psychology*, *4*(1), 40.

Cosker-Rowland, R. (2025). *Gender Identity: What It Is and Why It Matters*. Oxford University Press.

Costa, R., Dunsford, M., Skagerberg, E., Holt, V., Carmichael, P., & Colizzi, M. (2015). Psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria. *Journal of Sexual Medicine*, *12*(11), 2206–2214.

Council for Choices in Health Care Finland. (2020a). *Alaikäisten sukupuoli-identiteetin variaatioihin liittyvän dysforian lääketieteelliset hoitomenetelmät* [Medical treatment methods for dysphoria related to gender variance in minors]. palveluvalikoima.fi/documents/1237350/22895008/Alaik%C3%A4iset_suositus.pdf/c987a74c-dfac-d82f-2142-684f8ddead64/Alaik%C3%A4iset_suositus.pdf?t=1592317701000

Council for Choices in Health Care Finland. (2020b). *Recommendation of the Council for Choices in Health Care in Finland (PALKO / COHERE Finland)* [unofficial certified translation]. https://web.archive.org/web/20250428201703/https://segm.org/sites/default/files/Finnish_Guidelines_2020_Minors_Unofficial%20Translation.pdf

Council for Choices in Health Care Finland. (2020c). *Summary of a Recommendation by COHERE Finland*. https://web.archive.org/web/20250501184406/https://palveluvalikoima.fi/documents/1237350/22895008/Summary_minors_en.pdf/aaf9a6e7-b970-9de9-165c-abedfae46f2e/Summary_minors_en.pdf

Crabtree, L., Connelly, K. J., Guerriero, J. T., Battison, E. A. J., Tiller-Ormord, J., Sutherland, S. M., & Moyer, D. N. (2024). A more nuanced story: Pediatric gender-affirming healthcare is associated with satisfaction and confidence. *Journal of Adolescent Health*, *75*(5), 772–779.

Crowley, F., Mihalopoulos, M., Gaglani, S., Tewari, A. K., Tsao, C.-K., Djordjevic, M., Kyprianou, N., Purohit, R. S., & Lundon, D. J. (2023). Prostate cancer in transgender women: Considerations for screening, diagnosis and management. *British Journal of Cancer*, *128*(2), 177–189.

Cuijpers, P., Miguel, C., Harrer, M., Plessen, C. Y., Ciharova, M., Ebert, D., & Karyotaki, E. (2023). Cognitive behavior therapy vs. control conditions, other psychotherapies, pharmacotherapies and combined treatment for depression: A comprehensive meta-analysis including 409 trials with 52,702 patients. *World Psychiatry: Official Journal of the World Psychiatric Association (WPA)*, *22*(1), 105–115.

Curlin, F. (2024, July 23). Medicalized gender transition and the silence of medicine and bioethics. *Sensible Medicine*. https://web.archive.org/web/20250501184528/https://www.sensible-med.com/p/medicalized-gender-transition-and

Curridori, F. (2024, May 15). Disforia di genere, al via la commissione che detterà le nuove linee guida. *Il Giornale*. https://web.archive.org/web/20240515150751/https://www.ilgiornale.it/news/interni/disforia-genere-commissione-che-detter-nuove-linee-guida-2322237.html

Curtin, S. C., Garnett, M. F., & Ahmad, F. B. (2023). *Provisional Estimates of Suicide by Demographic Characteristics: United States, 2022*. https://web.archive.org/web/20250501184427/https://stacks.cdc.gov/view/cdc/135466.

Cservenka, A., Stroup, M. L., Etkin, A., & Nagel, B. J. (2015). The effects of age, sex, and hormones on emotional conflict-related brain response during adolescence. *Brain and Cognition, 99,* 135–150.

Da Silva, L. M. B., Freire, S. N. D., Moretti, E., & Barbosa, L. (2024). Pelvic floor dysfunction in transgender men on gender-affirming hormone therapy: A descriptive cross-sectional study. *International Urogynecology Journal 35*(5), 1077–1084.

Dahlen, S., Connolly, D., Arif, I., Junejo, M. H., Bewley, S., & Meads, C. (2021). International clinical practice guidelines for gender minority/trans people: Systematic review and quality assessment. *BMJ Open*, *11*(4), e048943.

Damiano, M. (2024a, November 01). ‘Some were not happy’: At Boston Children’s Hospital, a dispute over how to screen children for gender transition. *Boston Globe*. https://web.archive.org/web/20250000000000*/https://www.bostonglobe.com/2024/11/01/metro/gender-affirming-care-trans-boston-childrens-hospital/

Damiano, M. (2024b, December 20). A leader in transgender health explains her concerns about the field. *Boston Globe*. https://web.archive.org/web/20250501184443/https://www.bostonglobe.com/2024 /11/01/metro/gender-affirming-care-trans-boston-childrens-hospital/

D’Angelo, R. (2020). Who is Phoenix? *Journal of Medical Ethics*, *46*(11), 753–754.

D’Angelo, R. (2023). Supporting autonomy in young people with gender dysphoria: Psychotherapy is not conversion therapy. *Journal of Medical Ethics*, *51*(1), 3–9.

D'Angelo, R., Syrulnik, E., Ayad, S., Marchiano, L., Kenny, D. T., & Clarke, P. (2021). One size does not fit all: In support of psychotherapy for gender dysphoria. *Archives of Sexual Behavior*, *50*(1), 7–16.

Darzi, A. W. (2008). Evidence-based medicine and the NHS: a commentary. *Journal of the Royal Society of Medicine*, *101*(7), 342–344.

Datta, N., Matheson, B. E., Citron, K., Van Wye, E. M., & Lock, J. D. (2023). Evidence based update on psychosocial treatments for eating disorders in children and adolescents. *Journal of Clinical Child and Adolescent Psychology*, *52*(2), 159–170.

Dawkins, R. (1976). *The Selfish Gene* (40th anniversary edition, 2006). Oxford University Press.

de Blok, C. J. M., Wiepjes, C. M., Nota, N. M., van Engelen, K., Adank, M. A., Dreijerink, K. M. A., Barbé, E., Konings, I. R. H. M., & den Heijer, M. (2019). Breast cancer risk in transgender people receiving hormone treatment: Nationwide cohort study in the Netherlands. *BMJ*, l1652.

de Blok, C. J., Wiepjes, C. M., van Velzen, D. M., Staphorsius, A. S., Nota, N. M., Gooren, L. J., Kreukels, B. P., & den Heijer, M. (2021). Mortality trends over five decades in adult transgender people receiving hormone treatment: a report from the Amsterdam cohort of gender dysphoria. *The Lancet. Diabetes and Endocrinology*, *9*(10), 663–670.

de Graaf, N. M., Giovanardi, G., Zitz, C., & Carmichael, P. (2018). Sex ratio in children and adolescents referred to the gender identity development service in the UK (2009–2016). *Archives of Sexual Behavior*, *47*(5), 1301–1304.

de Graaf, N. M., Steensma, T. D., Carmichael, P., VanderLaan, D. P., Aitken, M., Cohen-Kettenis, P. T., & Zucker, K. J. (2022). Suicidality in clinic-referred transgender adolescents. *Adolescent Psychiatry*, *1*, 67–83.

de Nie, I., Asseler, J. D., Arnoldussen, M., Baas, S., de Vries, A. L. C., Huirne, J. A. F., Steensma, T. D., den Heijer, M., & van Mello, N. M. (2024). Reflecting on the importance of family building and fertility preservation: Transgender people's experiences with starting gender-affirming treatment as an adolescent. *Transgender Health*, 9(4), 298–306.

de Vries, A. L. C. (2020). Challenges in timing puberty suppression for gender-nonconforming adolescents. *Pediatrics*, *146*(4), e2020010611.

de Vries, A. L. C. (2022). Ensuring care for transgender adolescents who need it: Response to 'Reconsidering informed consent for trans-identified children, adolescents and young adults.' *Journal of Sex and Marital Therapy*, *49*(1), 108–114.

de Vries, A. L. C., Cohen-Kettenis, P. T., & Delemarre-van de Waal, H. (2006). Clinical management of gender dysphoria in adolescents. *International Journal of Transgenderism*, *9*(3–4), 83–94.

de Vries, A. L. C., & Cohen-Kettenis, P. T. (2012). Clinical management of gender dysphoria in children and adolescents: The Dutch approach. *Journal of Homosexuality*, *59*(3), 301–320.

de Vries, A. L. C., & Hannema, S. E. (2023). Growing evidence and remaining questions in adolescent transgender care. *New England Journal of Medicine*, *388*(3), 275–277.

de Vries, A. L. C., McGuire, J. K., Steensma, T. D., Wagenaar, E. C. F., Doreleijers, T. A. H., & Cohen-Kettenis, P. T. (2014). Young adult psychological outcome after puberty suppression and gender reassignment. *Pediatrics*, *134*(4), 696–704.

de Vries, A. L. C., Noens, I. L. J., Cohen-Kettenis, P. T., van Berckelaer-Onnes, I. A., & Doreleijers, T. A. (2010). Autism spectrum disorders in gender dysphoric children and adolescents. *Journal of Autism and Developmental Disorders*, *40*(8), 930–936.

de Vries, A. L. C., Richards, C., Tishelman, A. C., Motmans, J., Hannema, S. E., Green, J., & Rosenthal, S. M. (2021). Bell v Tavistock and Portman NHS Foundation Trust [2020] EWHC 3274: Weighing current knowledge and uncertainties in decisions about gender-related treatment for transgender adolescents. *International Journal of Transgender Health*, *22*(3), 217–224.

de Vries, A. L. C., Steensma, T. D., Doreleijers, T. A. H., & Cohen-Kettenis, P. T. (2011). Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study. *Journal of Sexual Medicine*, *8*(8), 2276–2283.

Delemarre-van de Waal, H. A., & Cohen-Kettenis, P. T. (2006). Clinical management of gender identity disorder in adolescents: A protocol on psychological and paediatric endocrinology aspects. *European Journal of Endocrinology*, *155*(suppl_1), S131–S137.

Delozier, A. M., Kamody, R. C., Rodgers, S., & Chen, D. (2020). Health disparities in transgender and gender expansive adolescents: A topical review from a minority stress framework. *Journal of Pediatric Psychology*, *45*(8), 842–847.

Department of Health and Social Care. (2024, May 29). New regulations restrict the prescribing and supply of puberty-suppressing hormones to children and young people under 18. *GOV.UK*. https://web.archive.org/web/20250501184507/https://www.gov.uk/government/news/new-restrictions-on-puberty-blockers

Deposition of J. Olson-Kennedy in LB v Premera Blue Cross NO. 2:23:Cv-00953-TSZ - 11/18/2024.

Derwahl, M., & Nicula, D. (2014). Estrogen and its role in thyroid cancer. *Endocrine-Related Cancer*, *21*(5), T273–283.

Deutsch, M. (2020a, July). *Information on Estrogen Hormone Therapy | Gender Affirming Health Program*. https://web.archive.org/web/20250322013733/https://transcare.ucsf.edu/article/information-estrogen-hormone-therapy

Deutsch, M. (2020b, July). *Information on Testosterone Hormone Therapy | Gender Affirming Health Program*. https://web.archive.org/web/20250316094138/https://transcare.ucsf.edu/article/information-testosterone-hormone-therapy

DH v. Snyder Case: 21-15668, 07/07/2021, ID: 12164749, DktEntry: 22.

Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L. V., Långström, N., & Landén, M. (2011). Long-term follow-up of transsexual persons undergoing sex reassignment surgery: Cohort study in Sweden. *PLoS ONE*, *6*(2), e16885.

Dhejne, C., Öberg, K., Arver, S., & Landén, M. (2014). An analysis of all applications for sex reassignment surgery in Sweden, 1960–2010: Prevalence, incidence, and regrets. *Archives of Sexual Behavior*, *43*(8), 1535–1545.

Diamond, G. S, Diamond, G. M., & Levy, S. (2021). Attachment-based family therapy: Theory, clinical model, outcomes, and process research. *Journal of Affective Disorders*, *294*, 286–295.

Diamond, G. S., Wintersteen, M. B., Brown, G. K., Diamond, G. M., Gallop, R., Shelef, K., & Levy, S. (2010). Attachment-based family therapy for adolescents with suicidal ideation: A randomized controlled trial. *Journal of the American Academy of Child and Adolescent Psychiatry*, *49*(2), 122–131.

Diekema, D. S. (2020). Adolescent brain development and medical decision-making. *Pediatrics*, *146*(Supplement 1), S18–S24.

Djulbegovic, B., & Guyatt, G. H. (2019). Evidence vs consensus in clinical practice guidelines. *JAMA*, *322*(8), 725.

Djulbegovic, B., & Guyatt, G. H. (2017). Progress in evidence-based medicine: A quarter century on. *The Lancet*, *390*(10092), 415–423.

Docter, R. (2013). *Becoming a Woman: A Biography of Christine Jorgensen*. Routledge.

Doe v. Horne, No. 4:23-cv-00185-JGZ (D. Ariz. 2023).

Dolotina, B., & Turban, J. L. (2022). A multipronged, evidence-based approach to improving mental health among transgender and gender-diverse Youth. *JAMA Network Open*, *5*(2), e220926.

Donkin, A., Rodseth, R., & Giddy, J. (2025). A call for SASOP to review their position on the care of 'transgender and non-binary youth.' *South African Journal of Psychiatry*, *31*.

Dopp, A. R., Peipert, A., Buss, J., De Jesus-Romero, R., Palmer, K., & Lorenzo-Luaces, L. (2024). *Interventions for Gender Dysphoria and Related Health Problems in Transgender and Gender-Expansive Youth: A Systematic Review of Benefits and Risks to Inform Practice, Policy, and Research*. RAND. https://web.archive.org/web/20250501163212/https://www.rand.org/pubs/research_reports/RRA3223-1.html

Dowshen, N., Baker, K., Garofalo, R., Chen, D., Inwards-Breland, D. J., Sequeira, G., ... & McNamara, M. (2025). A critical scientific appraisal of the Health and Human Services Report on pediatric gender dysphoria. *Journal of Adolescent Health*, *77*(3), 342–345.

Drescher, J. (2010). Queer diagnoses: Parallels and contrasts in the history of homosexuality, gender variance, and the Diagnostic and Statistical Manual. *Archives of Sexual Behavior*, *39*(2), 427–460.

Drescher, J. (2014). Controversies in gender diagnoses. *LGBT Health*, *1*(1), 10–14.

Drescher, J. (2015). Queer diagnoses revisited: The past and future of homosexuality and gender diagnoses in DSM and ICD. *International Review of Psychiatry*, *27*(5), 386–395.

Drescher, J. (2017, November). *Gender Dysphoria Diagnosis*. American Psychiatric Association. https://web.archive.org/web/20250501184526/https://www.psychiatry.org:443/psychiatrists/diversity/education/transgender-and-gender-nonconforming-patients/gender-dysphoria-diagnosis

Drescher, J. (2023). Informed consent or scare tactics? A response to Levine et al.'s "Reconsidering informed consent for trans-identified children, adolescents, and young adults." *Journal of Sex and Marital Therapy*, *49*(1):99–107.

Drescher, J., Cohen-Kettenis, P., & Winter, S. (2012). Minding the body: Situating gender identity diagnoses in the ICD-11. *International Review of Psychiatry*, *24*(6), 568–577.

Drescher, J., & Yarbrough, E. (2024). Gender incongruence. In A. Tasman, M. B. Riba, R. D. Alarcón, C. A. Alfonso, S. Kanba, D. Lecic-Tosevski, D. M. Ndetei, C. H. Ng, & T. G. Schulze (Eds.), *Tasman's Psychiatry*. Springer International Publishing.

Eckert, A. J. (2020, December 18). *WTF is Gender-Affirming Medicine?!* https://www.youtube.com/watch?v=uwBdkln-ciw

Edwards-Leeper, L., & Anderson, E. (2021, November 24). The mental health establishment is failing trans kids. *Washington Post*. https://web.archive.org/web/20250501184540/https://www.washingtonpost.com/outlook/2021/11/24/trans-kids-therapy-psychologist/

Edwards-Leeper, L., & Spack, N. P. (2012). Psychological evaluation and medical treatment of transgender youth in an interdisciplinary "Gender Management Service" (GeMS) in a major pediatric center. *Journal of Homosexuality*, *59*(3), 321–336.

Eguale, T., Buckeridge, D. L., Verma, A., Winslade, N. E., Benedetti, A., Hanley, J. A., & Tamblyn, R. (2016). Association of off-label drug use and adverse drug events in an adult population. *JAMA Internal Medicine*, *176*(1), 55.

Ehrensaft, D. (2014). Found in transition: Our littlest transgender people. *Contemporary Psychoanalysis*, *50*(4), 571–592.

Ehrensaft. (2016). *The Gender Creative Child*. The Experiment.

Ehrensaft, D. (2017a). Gender nonconforming youth: Current perspectives. *Adolescent Health, Medicine and Therapeutics*, *8*, 57–67.

Ehrensaft, D. (2017b, July 14). Adams v. The School Board of St. Johns County, Florida, No.3:17-cv-00739-TJC-JBT. https://web.archive.org/web/20250501151153/https://lambdalegal.org/wp-content/uploads/2017/07/022-3._ehrensaft_declaration_2017-07-19.pdf

Eisenberg, J., Felleman, S., Bear, B., Mercier, R., Kazak, A. E., & Schwartz, B. I. (2024). Psychological symptoms and service utilization in prepubertal and pubertal transgender and gender-diverse patients. *Journal of Pediatric and Adolescent Gynecology*, *37*(1), 45–50.

Eisenberg, M. E., McMorris, B. J., Rider, G. N., Gower, A. L., & Coleman, E. (2020). "It's kind of hard to go to the doctor's office if you're hated there." A call for gender-affirming care from transgender and gender diverse adolescents in the United States. *Health and Social Care in the Community*, *28*(3), 1082–1089.

Elbe, L., Meyer, S., & Caughie, P. L. (2020). *Man Into Woman: A Comparative Scholarly Edition*. Bloomsbury Academic.

Elhakeem, A., Frysz, M., Tilling, K., Tobias, J. H., & Lawlor, D. A. (2019). Association between age at puberty and bone accrual from 10 to 25 years of age. *JAMA Network Open*, *2*(8), e198918.

Elliott, C. (2000, December). A new way to be mad. *The Atlantic*. https://web.archive.org/web/20250503195359/https://www.theatlantic.com/magazine/archive/2000/12/a-new-way-to-be-mad/304671/

Emmanuel, M., & Bokor, B. R. (2022). Tanner Stages. In *StatPearls*. StatPearls Publishing. https://web.archive.org/web/20250501184512/https://www.ncbi.nlm.nih.gov/books/NBK470280/

Endocrine Society. (2023, June 12). *AMA Strengthens its Policy on Protecting Access to Gender-Affirming Care*. https://web.archive.org/web/20250501184512/https://www.ncbi.nlm.nih.gov/books/NBK470280/

Endocrine Society. (2024, May 8). *Endocrine Society Statement in Support of Gender-Affirming Care*. https://web.archive.org/web/20250501053204/https://www.endocrine.org/news-and-advocacy/news-room/2024/statement-in-support-of-gender-affirming-care

Entwistle, K. (2020). Debate: Reality check: Detransitioner's testimonies require us to rethink gender dysphoria. *Child and Adolescent Mental Health*, *26*(1),15–16.

Ergun-Longmire, B., Vining-Maravolo, P., Graham, B., & Greydanus, D. E. (2023). A narrative review: Treatment outcomes of central precocious puberty (CPP). *Pediatric Medicine*, *6*(11), 15–15.

Erlangsen, A., Jacobsen, A. L., Ranning, A., Delamare, A. L., Nordentoft, M., & Frisch, M. (2023). Transgender identity and suicide attempts and mortality in Denmark. *JAMA*, *329*(24), 2145.

Escandón, J. M., Bustos, V. P., Bustos, S. S., Mascaro, A., Del Corral, G., Ciudad, P., Kim, E. A., Langstein, H. N., & Manrique, O. J. (2021). Reply: Regret after gender-affirmation surgery: A systematic review and meta-analysis of prevalence. *Plastic and Reconstructive Surgery: Global Open*, *9*(11), e3954.

Espada, J., Sánchez-López, A., & Morales, A. (2023). Effectiveness of psychological treatments for depression in childhood and adolescence: A review of reviews. *Revista de Psicología Clínica Con Niños y Adolescentes*, *10*(1).

Eugster, E. A. (2019). Treatment of central precocious puberty. *Journal of the Endocrine Society*, *3*(5), 965–972.

Expósito-Campos, P., & D'Angelo, R. (2021). Letter to the Editor: Regret after gender-affirmation surgery: A systematic review and meta-analysis of prevalence. *Plastic and Reconstructive Surgery: Global Open*, *9*(11), e3951.

Expósito-Campos, P., Pérez-Fernández, J. I., & Salaberria, K. (2023). Empirically supported affirmative psychological interventions for transgender and non-binary youth and adults: A systematic review. *Clinical Psychology Review*, *100*, 102229.

Faden, R. R., Beauchamp, T. L., & King, N. M. P. (1986). *A History and Theory of Informed Consent*. Oxford University Press.

Farah, R., Rege, S. V., Cole, R. J., & Holstege, C. P. (2023). Suspected suicide attempts by self-poisoning among persons aged 10–19 years during the COVID-19 pandemic—United States, 2020–2022. *MMWR. Morbidity and Mortality Weekly Report*, *72*(16), 426–430.

Feinmann, J. (2025). Puberty blockers: Former Tavistock clinicians say they wouldn't refer patients to NHS trial. *BMJ*, *388*, r504.

Fenway Health. (n.d.). *FACTS about Anti-Trans Youth Bills*. https://web.archive.org/web/20250525050335/https://fenwayhealth.org/the-fenway-institute/health-policy/transyouthmatter/

Fenway Health. (2024a). *Informed Consent for Feminizing Hormone Therapy*. https://web.archive.org/web/20240527145336/https:/fenwayhealth.org/wp-content/uploads/Consent_Form_for_Feminizing_Therapy.pdf

Fenway Health. (2024b). *Informed Consent for Masculinizing Hormone Therapy*. https://web.archive.org/web/20240527145318/https:/fenwayhealth.org/wp-content/uploads/Consent_Form_for_Masculinizing_Therapy.pdf

Fenway Health. (2025). *Risks and Benefits of Puberty Suppression*. https://web.archive.org/web/20250109100916/https:/fenwayhealth.org/wp-content/uploads/Puberty-Suppression-Risks-and-Benefits-English.pdf

Ferguson, C. J. (2025). Do social media experiments prove a link with mental health: A methodological and meta-analytic review. *Psychology of Popular Media*, *14*(2), 201–206.

Field R. I. (2008). Why is health care regulation so complex? *P & T: A Peer-Reviewed Journal for Formulary Management*, *33*(10), 607–608.

Figliolia, J. (2025, April 18). The dangerous and muddled logic of gender medicine. *City Journal*. https://web.archive.org/web/20250501184450/https://www.city-journal.org/article/gender-medicine-trans-identifying-minors-wpath

Fisher, A. D., Ristori, J., Romani, A., Cassioli, E., Mazzoli, F., Cocchetti, C., Pierdominici, M., Marconi, M., Ricca, V., Maggi, M., Vignozzi, L., & Castellini, G. (2024). Back to the future: Is GnRHa treatment in transgender and gender diverse adolescents only an extended evaluation phase? *Journal of Clinical Endocrinology and Metabolism*, *109*(6), 1565–1579.

Florida Boards of Medicine and Osteopathic Medicine Joint Rules/Legislative Committee. (2022, October 28). *Joint Rules/Legislative Committee Rule Workshop*. Florida Channel. https://web.archive.org/web/20250501184418/https://thefloridachannel.org/videos /10-28-22-florida-boards-of-medicine-and-osteopathic-medicine-joint-rules-legislative-committee-rule-workshop/

Forcier, M., Van Schalkwyk, G., & Turban, J. (2020). *Pediatric Gender Identity: Gender-Affirming Care for Transgender and Gender Diverse Youth*. Springer.

Foulkes, L., & Andrews, J. L. (2023). Are mental health awareness efforts contributing to the rise in reported mental health problems? A call to test the prevalence inflation hypothesis. *New Ideas in Psychology*, *69*, 101010.

Fraser, L. (2009). Psychotherapy in the World Professional Association for Transgender Health's *Standards of Care*: Background and recommendations. *International Journal of Transgenderism*, *11*(2), 110–126.

Freedman, B. (1987, July 16). Equipoise and the ethics of clinical research. *New England Journal of Medicine*, *317*, 141–145.

Futuyama, D. J., & Kirkpatrick. (2017). *Evolution*. Sinauer.

Gagnon, D. R., Zhang, T.-J., Brand, F. N., & Kannel, W. B. (1994). Hematocrit and the risk of cardiovascular disease—The Framingham Study: A 34-year follow-up. *American Heart Journal*, *127*(3), 674–682.

Gawlik-Starzyk, A., Dora, M., Baran, D., Szostakiewicz, Ł., Trofimiuk-Müldner, M., Müldner-Nieckowski, Ł., Bielska-Brodziak, A., Adamczewska-Stachura, M., Antosz, A., Bajszczak, K., Barg, E., Barteczka-Eckert, B., Chodecka, A., Cichoń, L., Dobiała, E., Drosdzol-Cop, A., Fornalik, I., Holka-Pokorska, J., Iniewicz, G., … Grabski, B. (2025). Framework guidelines for the process of caring for the health of adolescent transgender (T) and non-binary (NB) people experiencing gender dysphoria—The position statement of the expert panel. *Endokrynologia Polska*, *76*(1), 1–28.

Gecsoyler, S. (2024, April 20). Hilary Cass warned of threats to safety after ‘vile’ abuse over NHS gender services review. *The Guardian*. https://web.archive.org/web/20250501184534/https://www.theguardian.com/society/2024/apr/20/doctor-hilary-cass-warned-of-threats-to-safety-after-vile-abuse-over-nhs-gender-services-review

Geis, G. M., Saunders, B. S., Hillard, P., Committee on Bioethics, Yeargin-Allsopp, M., Geis, G. M., Loeff, D. S., Michelson, K. N., Ott, M., Elster, N., Diekema, D. S., Arora, K., McGee, M., Emanuel, A., Council on Children With Disabilities, Noritz, G., Agrawal, R., Bell, D. S., Foster, J. E. A., … Committee on Bioethics. (2024). Examining permanent contraception for children, adolescents, and young adults with intellectual developmental disorder: Ethical, legal, and medical considerations: Clinical report. *Pediatrics*, *154*(5), e2024068955.

GenderGP. (2021, March 2). How many people detransition? Exploring detransition - Jack Turban. *GenderGP*. https://web.archive.org/web/20250501184505/https://www.gendergp.com/exploring-detransition-with-dr-jack-turban/

Gender Health Training Institute. (n.d.). *Trainings*. https://web.archive.org/web/20250208171030/https://www.genderhealthtraining.com/trainings/

Georges, E., Brown, E. C. B., & Cohen, R. S. (2024). Prohibition of gender-affirming care as a form of child maltreatment: Reframing the discussion. *Pediatrics*, *153*(1), e2023064292.

German Society for Child and Adolescent Psychiatry, Psychosomatics and Psychotherapy (DGKJP). (2025). *AWMF-Leitlinie: Geschlechtsinkongruenz und Geschlechtsdysphorie im Kindes- und Jugendalter: Diagnostik und Behandlung (S2k)*. AWMF Registry No. 028-014. Version 1.0. https://web.archive.org/web/20250501184408/https://register.awmf.org/assets/guidelines/028-014l_S2k_Geschlechtsinkongruenz-Geschlechtsdysphorie-Kinder-Jugendliche-Diagnostik-Behandlung_2025-03_1.pdf

Getahun, D., Nash, R., Flanders, W. D., Baird, T. C., Becerra-Culqui, T. A., Cromwell, L., Hunkeler, E., Lash, T. L., Millman, A., Quinn, V. P., Robinson, B., Roblin, D., Silverberg, M. J., Safer, J., Slovis, J., Tangpricha, V., & Goodman, M. (2018). Cross-sex Hormones and acute cardiovascular events in transgender persons: A cohort study. *Annals of Internal Medicine*, *169*(4), 205.

Ghorayshi, A. (2022, September 26). More trans teens are choosing 'top surgery.' *New York Times*. https://web.archive.org/web/20250501184518/https://www.nytimes.com/2022/09/26/health/top-surgery-transgender-teenagers.html

Ghorayshi, A. (2023a, August 3). Medical group backs youth gender treatments, but calls for research review. *New York Times*. https://web.archive.org/web/20250501184518/https://www.nytimes.com/2023/08/03/health/aap-gender-affirming-care-evidence-review.html

Ghorayshi, A. (2023b, August 23). How a small gender clinic landed in a political storm. *New York Times*. https://web.archive.org/web/20250501184519/https://www.nytimes.com/2023/08/23/health/transgender-youth-st-louis-jamie-reed.html

Ghorayshi, A. (2024a, May 13). Hilary Cass says U.S. doctors are 'out of date' on youth gender medicine. *New York Times*. https://web.archive.org/web/20250501184519/https://www.nytimes.com/2024/05/13/health/hilary-cass-transgender-youth-puberty-blockers.html

Ghorayshi, A. (2024b, June 25). Biden officials pushed to remove age limits for trans surgery, documents show. *New York Times*. https://web.archive.org/web/20250501184520/https://www.nytimes.com/2024/06/25/health/transgender-minors-surgeries.html

Ghorayshi, A. (2024c, October 24). U.S. study on puberty blockers goes unpublished because of politics, doctor says. *New York Times*. https://web.archive.org/web/20250501184521/https://www.nytimes.com/2024/10/23/science/puberty-blockers-olson-kennedy.html

Giedinghagen, A. (2023). The tic in TikTok and (where) all systems go: Mass social media induced illness and Munchausen's by internet as explanatory models for social media associated abnormal illness behavior. *Clinical Child Psychology and Psychiatry*, *28*(1), 270–278.

Gill-Peterson, J. (2018). *Histories of the Transgender Child*. University of Minnesota Press.

Giordano, S., Garland, F., & Holm, S. (2021). Gender dysphoria in adolescents: Can adolescents or parents give valid consent to puberty blockers? *Journal of Medical Ethics*, *47*, 324–328.

GLAAD. (2023a, February 14). (Updated) 180+ Journalists, New York Times contributors call out biased coverage of transgender people in joint letter as 100+ organizations and notables echo call, citing patterns of inaccurate, harmful trans coverage in the New York Times. https://web.archive.org/web/20250501152655/https://glaad.org/releases/new-york-times-contributors-call-out-biased-coverage-of-transgender-people-in-joint-letter

GLAAD. (2023b, April 21). *Jesse Singal*. GLAAD Accountability Project. https://web.archive.org/web/20250501150847/https://glaad.org/gap/jesse-singal/

Glintborg, D., Christensen, L. L., & Andersen, M. S. (2024). Transgender healthcare: Metabolic outcomes and cardiovascular risk. *Diabetologia*, *67*(11), 2393–2403.

Goetz, T. G., & Keuroghlian, A. S. (2023). *Gender-Affirming Psychiatric Care*. American Psychiatric Association Publishing.

Gomez-Lumbreras, A., & Villa-Zapata, L. (2024). Exploring safety in gender-affirming hormonal treatments: An observational study on adverse drug events using the Food and Drug Administration adverse event reporting system database. *Annals of Pharmacotherapy*, 10600280241231612.

Gonnabathula, K. P., & Yakubu, M. A. (2023). The impact of sex hormones on cognition and treatment: A review. *International Journal of Medical, Pharmacy and Drug Research, 7*(3), 9–15.

Goodwin, R. D., Weinberger, A. H., Kim, J. H., Wu, M., & Galea, S. (2020). Trends in anxiety among adults in the United States, 2008–2018: Rapid increases among young adults. *Journal of Psychiatric Research*, *130*, 441–446.

Gorin, M. (2024). What Is the aim of pediatric ‘gender-affirming’ care? *Hastings Center Report*, *54*(3), 35–50.

Government of Alberta. (2024, October 31). *Advancing Policies to Support the Health Care System*. https://web.archive.org/web/20250501184437/https://www.alberta.ca/advancing-policies-to-support-the-health-care-system.

Graham, R., Mancher, M., Miller Wolman, D., Greenfield, S., & Steinberg, E. (Eds.). (2011). *Clinical Practice Guidelines We Can Trust*. National Academies Press. https://web.archive.org/web/20250501184149/http://www.ncbi.nlm.nih.gov/books/NBK209539/

Green, A. E., DeChants, J. P., Price, M. N., & Davis, C. K. (2022). Association of gender-affirming hormone therapy with depression, thoughts of suicide, and attempted suicide among transgender and nonbinary youth. *Journal of Adolescent Health*, *70*(4), 643–649.

Green, R. (1966). Transsexualism: mythological, historical, and cross-cultural aspects. In H. Benjamin, *The Transsexual Phenomenon*. Julian Press.

Green, R., Roberts, C. W., Williams, K., Goodman, M., & Mixon, A. (1987). Specific cross-gender behaviour in boyhood and later homosexual orientation. *British Journal of Psychiatry*, *151*, 84–88.

Greenson, R. R. (1964). On homosexuality and gender identity. *International Journal of Psycho-Analysis*, *45*, 217–219.

Gregory, A. (2021, November 27). Dutch government 'truly sorry' for gender recognition law that required sterilisation for legal recognition. *The Independent*. https://web.archive.org/web/20250501184509/https://www.independent.co.uk/news/world/europe/dutch-transgender-sterilisation-law-apology-b1965384.html

Gribble, K. (2025). The desexing of language in women's health research and care: A story of marginalization of science, cultural imperialism, and abuse of power. In L. Krauss (Ed.), *The War on Science*. Post Hill Press.

Grimstad, F. W., Knoll, M. M., & Jacobson, J. D. (2021). Oxandrolone use in trans-masculine youth appears to Increase adult height: Preliminary evidence. *LGBT Health*, *8*(4), 300–306.

Grynberg, M., Fanchin, R., Dubost, G., Colau, J.-C., Brémont-Weil, C., Frydman, R., & Ayoubi, J.-M. (2010). Histology of genital tract and breast tissue after long-term testosterone administration in a female-to-male transsexual population. *Reproductive BioMedicine Online*, *20*(4), 553–558.

Gutiérrez-Sacristán, A., Serret-Larmande, A., Hutch, M. R., Sáez, C., Aronow, B. J., Bhatnagar, S., Bonzel, C.-L., Cai, T., Devkota, B., Hanauer, D. A., Loh, N. H. W., Luo, Y., Moal, B., Ahooyi, T. M., Njoroge, W. F. M., Omenn, G. S., Sanchez-Pinto, L. N., South, A. M., Sperotto, F., … Zucco, C. (2022). Hospitalizations associated with mental health conditions among adolescents in the US and France during the COVID-19 pandemic. *JAMA Network Open*, *5*(12), e2246548.

Guyatt, G. H. (2010). The vexing problem of guidelines and conflict of interest: A potential solution. *Annals of Internal Medicine*, *152*(11), 738.

Guyatt, G. H., Cairns, J., Churchill, D., Cook, D., Haynes, B., Hirsh, J., Irvine, J., Levine, M., Levine, M., & Nishikawa, J. (1992). Evidence-based medicine: A new approach to teaching the practice of medicine. *JAMA*, *268*(17), 2420–2425.

Guyatt, G. H., Oxman, A. D., Kunz, R., Atkins, D., Brozek, J., Vist, G., Alderson, P., Glasziou, P., Falck-Yttr, Y., & Schünemann, H. J. (2011). GRADE guidelines: 2. Framing the question and deciding on important outcomes. *Journal of Clinical Epidemiology*, *64*(4), 395–400.

Guyatt, G. H., Oxman, A. D., Kunz, R., Brozek, J., Alonso-Coello, P., Rind, D., Devereaux, P. J., Montori, V. M., Freyschuss, B., Vist, G., Jaeschke, R., Williams, J. W., Murad, M. H., Sinclair, D., Falck-Ytter, Y., Meerpohl, J., Whittington, C., Thorlund, K., Andrews, J., & Schünemann, H. J. (2011). GRADE guidelines: 6. Rating the quality of evidence—Imprecision. *Journal of Clinical Epidemiology*, *64*(12), 1283–1293.

Guyatt, G. H., Oxman, A. D., Kunz, R., Woodcock, J., Brozek, J., Helfand, M., Alonso-Coello, P., Falck-Ytter, Y., Jaeschke, R., Vist, G., Akl, E. A., Post, P. N., Norris, S., Meerpohl, J., Shukla, V. K., Nasser, M., & Schünemann, H. J. (2011). GRADE guidelines: 8. Rating the quality of evidence—indirectness. *Journal of Clinical Epidemiology*, *64*(12), 1303–1310.

Guyatt, G. H., Oxman, A. D., Kunz, R., Woodcock, J., Brozek, J., Helfand, M., Alonso-Coello, P., Glasziou, P., Jaeschke, R., Akl, E. A., Norris, S., Vist, G., Dahm, P., Shukla, V. K., Higgins, J., Falck-Ytter, Y., & Schünemann, H. J. (2011). GRADE guidelines: 7. Rating the quality of evidence—inconsistency. *Journal of Clinical Epidemiology*, *64*(12), 1294–1302.

Guyatt, G. H., Oxman, A. D., Montori, V., Vist, G., Kunz, R., Brozek, J., Alonso-Coello, P., Djulbegovic, B., Atkins, D., Falck-Ytter, Y., Williams, J. W., Meerpohl, J., Norris, S. L., Akl, E. A., & Schünemann, H. J. (2011). GRADE guidelines: 5. Rating the quality of evidence—publication bias. *Journal of Clinical Epidemiology*, *64*(12), 1277–1282.

Guyatt, G. H., Oxman, A. D., Sultan, S., Glasziou, P., Akl, E. A., Alonso-Coello, P., Atkins, D., Kunz, R., Brozek, J., Montori, V., Jaeschke, R., Rind, D., Dahm, P., Meerpohl, J., Vist, G., Berliner, E., Norris, S., Falck-Ytter, Y., Murad, M. H., & Schünemann, H. J. (2011). GRADE guidelines: 9. Rating up the quality of evidence. *Journal of Clinical Epidemiology*, *64*(12), 1311–1316.

Guyatt, G. H., Oxman, A. D., Vist, G. E., Kunz, R., Falck-Ytter, Y., Alonso-Coello, P., & Schünemann, H. J. (2008). GRADE: An emerging consensus on rating quality of evidence and strength of recommendations. *BMJ*, *336*(7650), 924–926.

Guyatt, G. H., Oxman, A. D., Vist, G., Kunz, R., Brozek, J., Alonso-Coello, P., Montori, V., Akl, E. A., Djulbegovic, B., & Falck-Ytter, Y. (2011). GRADE guidelines: 4. Rating the quality of evidence—study limitations (risk of bias). *Journal of Clinical Epidemiology*, *64*(4), 407–415.

Guyatt, G. H., Haynes, R. B., Jaeschke, R. Z., Cook, D. J., Green, L., Naylor, C. D., Wilson, M. C., Richardson, W. S., Evidence-Based Medicine Working Group, & Evidence-Based Medicine Working Group. (2000). Users' guides to the medical literature: XXV. Evidence-based medicine: Principles for applying the users' guides to patient care. *JAMA*, *284*(10), 1290–1296.

Guyatt, G. H., Hultcrantz, M., Agoritsas, T., Iorio, A., Vandvik, P. O., & Montori, V. M. (2025). Why Core GRADE is needed: Introduction to a new series in *The BMJ*. *BMJ*, *389*, e081902.

Guyatt, G. H., Oxman, A. D., Kunz, R., Falck-Ytter, Y., Vist, G. E., Liberati, A., & Schünemann, H. J. (2008). Going from evidence to recommendations. *BMJ (Clinical Research Ed.)*, *336*(7652), 1049–1051.

Guyatt, G. H., Rennie, D., Meade, M., & Cook, D. (Eds.). (2015). *Users' Guides to the Medical Literature: Essentials of Evidence-Based Clinical Practice* (3rd edition). McGraw-Hill Education.

Hacking, I. (1998). *Mad Travelers: Reflections on the Reality of Transient Mental Illnesses*. University of Virginia Press.

Haidt, J. (2024). *The Anxious Generation: How the Great Rewiring of Childhood is Causing an Epidemic of Mental Illness*. Penguin Press.

Haig, D. (2023). On the origins of gender identity. *Archives of Sexual Behavior*, *52*(7), 2717–2718.

Haim, E. (2024, January 12). Not on my watch: A whistleblower on "gender-affirming care" speaks out. *City Journal*. https://web.archive.org/web/20250501184449/https://www.city-journal.org/article/a-whistleblower-on-gender-affirming-care-speaks-out

Hall, R. C. W., Hall, R. C. W., & Chapman, M. J. (2005). Psychiatric complications of anabolic steroid abuse. *Psychosomatics*, *46*(4), 285–290.

Hall, R., Taylor, J., Hewitt, C. E., Heathcote, C., Jarvis, S. W., Langton, T., & Fraser, L. (2024). Impact of social transition in relation to gender for children and adolescents: A systematic review. *Archives of Disease in Childhood*, *109*(Suppl 2), s12-s18.

Hallyburton, A. (2022). Diagnostic overshadowing: An evolutionary concept analysis on the misattribution of physical symptoms to pre-existing psychological illnesses. *International Journal of Mental Health Nursing*, *31*(6), 1360–1372.

Haltigan, J. D., Pringsheim, T. M., & Rajkumar, G. (2023). Social media as an incubator of personality and behavioral psychopathology: Symptom and disorder authenticity or psychosomatic social contagion? *Comprehensive Psychiatry*, *121*, 152362.

Hamburger, C. (1953). The desire for change of sex as shown by personal letters from 465 men and women. *Acta Endocrinologica*, *14*(4), 361–375.

Hamburger, C., Copenhagen, G. K., Sturup, Herstedvester, & Dahl-Iversen. (1953). Tranvestism: Hormonal, psychiatric, and surgical treatment. *Journal of the American Medical Association*, *152*(5), 391.

Hamedani, A. (2014, November 3). The gay people pushed to change their gender. *BBC News*. https://web.archive.org/web/20250501184439/https://www.bbc.com/news/magazine-29832690

Hannema, S. E., Busiah, K., Butler, G., Claahsen-van De Grinten, H. L., Cools, M., Gawlik-Starzyk, A. M., Klink, D., Main, K. M., Martinerie, L., Richter-Unruh, A., Skordis, N., & De Vries, M. C. (2024). Endocrine management of transgender and gender diverse adolescents: Expert opinion of the ESPE Working Group on Gender Incongruence and the Endo-ERN Main Thematic Group on Sexual Development and Maturation. *Hormone Research in Paediatrics*, 1–41.

Hansen, M. V., Giraldi, A., Main, K. M., Tingsgård, J. V., & Ewers, M. (2023). Sundhedsfaglige tilbud til børn og unge med kønsubehag [Healthcare services for children and adolescents with gender dysphoria]. *Ugeskrift for Laeger*, *185*(77), V11220740.

Hansford, A. (2024, June 10). Two anti-trans organisations listed as ‘hate groups’ by civil rights charity. *Pink News*. https://web.archive.org/web/20250501145150/https://www.thepinknews.com/2024/06/10/anti-trans-organisations-hate-groups-southern-poverty-law-center/

Hardin, A. P., Hackell, J. M., Committee on Practice and Ambulatory Medicine, Simon, G. R., Boudreau, A. D. A., Baker, C. N., Barden, G. A., III, Meade, K. E., Moore, S. B., & Richerson, J. (2017). Age limit of pediatrics. *Pediatrics, 140*(3), e20172151.

Hare, D. L. (2023). Psychosocial functioning in transgender youth after hormones [letter to the editor]. *New England Journal of Medicine*, *389*(16), 1537.

Harmon, A. (2024, December 4). These 26 states have restricted gender-transition treatments for minors since 2021. *New York Times*. https://web.archive.org/web/20250501184521/https://www.nytimes.com/2024/12/04/us/gender-transition-bans-states.html

Hariton, E., & Locascio, J. J. (2018). Randomised controlled trials—the gold standard for effectiveness research. *BJOG: An International Journal of Obstetrics and Gynaecology*, *125*(13), 1716.

Harris, G., & Carey, B. (2008, June 8). Researchers fail to reveal full drug pay. *New York Times*. https://web.archive.org/web/20250501184515/https://www.nytimes.com/2008/06/08/us/08conflict.html

Harris, R. M., Kolaitis, I. N., & Frader, J. E. (2020). Ethical issues involving fertility preservation for transgender youth. *Journal of Assisted Reproduction and Genetics*, *37*(10), 2453–2462.

Harry Benjamin International Gender Dysphoria Association. (1979, February 12). *Standards of Care: The Hormonal and Surgical Sex Reassignment of Gender Dysphoric Persons,* Version 1.

Harry Benjamin International Gender Dysphoria Association. (2001, February). *Standards of Care for Gender Identity Disorders,* Sixth Version. https://web.archive.org/web/20250328095134/https://www.cpath.ca/wp-content/uploads/2009/12/WPATHsocv6.pdf

Harvard Medical School. (n.d.). *Advancing Excellence in Transgender Health: A Course for the Whole Care Team*. https://web.archive.org/web/20250321040231/https://cmecatalog.hms.harvard.edu/advancing-excellence-transgender-health

Haslam, N. (2016). Looping effects and the expanding concept of mental disorder. *Journal of Psychopathology*, *22*(1), 4–9.

Hatzenbuehler, M. L., & Pachankis, J. E. (2016). Stigma and minority stress as social determinants of health among lesbian, gay, bisexual, and transgender youth: Research evidence and clinical implications. *Pediatric Clinics*, *63*(6), 985–997.

Havelock Ellis, H. (1937). *Studies in the Psychology of Sex* (Vol. 2). Random House.

Havens, J. F., Marr, M. C., & Hirsch, E. (2022). Editorial: From bipolar disorder to disruptive mood dysregulation disorder: Challenges to diagnostic and treatment specificity in traumatized youths. *Journal of the American Academy of Child and Adolescent Psychiatry*, *61*(3), 364–365.

Health and Human Services. (2025, February 19). *Sex-Based Definitions*. https://web.archive.org/web/20250502015426/https://womenshealth.gov/article/sex-based-definitions

Health Council of the Netherlands. (2024, May 13). Adviesaanvraag minister voor Medische Zorg over transgenderzorg [Request for advice from the Minister for Medical Care on transgender care]. https://web.archive.org/web/20250501150826/https://www.gezondheidsraad.nl/documenten/adviesaanvragen/2024/05/13/adviesaanvraag-minister-voor-mz-over-transgenderzorg

Heathcote, C., Taylor, J., Hall, R., Jarvis, S. W., Langton, T., Hewitt, C. E., & Fraser, L. (2024). Psychosocial support interventions for children and adolescents experiencing gender dysphoria or incongruence: A systematic review. *Archives of Disease in Childhood*, *109*, s19–s32.

Heino, E., Fröjd, S., Marttunen, M., & Kaltiala, R. (2023). Transgender identity is associated with severe suicidal ideation among Finnish adolescents. *International Journal of Adolescent Medicine and Health*, *35*(1), 101–108.

Hembree, W. C., Cohen-Kettenis, P., Delemarre-van de Waal, H. A., Gooren, L. J., Meyer, W. J., Spack, N. P., Tangpricha, V., & Montori, V. M. (2009). Endocrine treatment of transsexual persons: An Endocrine Society clinical practice guideline. *Journal of Clinical Endocrinology and Metabolism*, *94*(9), 3132–3154.

Hembree, W. C., Cohen-Kettenis, P. T., Gooren, L., Hannema, S. E., Meyer, W. J., Murad, M. H., Rosenthal, S. M., Safer, J. D., Tangpricha, V., & T'Sjoen, G. G. (2017). Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *Endocrine Practice*, *23*(12), 1437–1437.

Herdt, G. (1996). *Third Sex, Third Gender: Beyond Sexual Dimorphism in Culture and History*. Zone Books.

Hertoft, P., & Sørensen, T. (1979). Transsexuality: Some remarks based on clinical experience. In R. Porter & J. Whelan (Eds.), *Ciba Foundation Symposium 62 - Sex, Hormones and Behaviour*. Wiley.

Hidalgo, M. A., Chen, D., Tishelman, A. C., Olson-Kennedy, J., Chan, Y.-M., Garofalo, R., Petras, H., Rosenthal, S. M., & Ehrensaft, D. (2024). Childhood gender diversity and mental health: Protocol for the longitudinal, Observational Gender Journey Project. *JMIR Research Protocols*, *13*, e55558.

Hidalgo, M. A., Ehrensaft, D., Tishelman, A. C., Clark, L. F., Garofalo, R., Rosenthal, S. M., Spack, N. P., & Olson, J. (2013). The gender affirmative model: What we know and what we aim to learn. *Human Development*, *56*(5), 285–290.

Higgins, J. P. T., Chandler, J., Cumpston, J., Li, T., Page, M. J., & Welch, V. A. (Eds.). (2019). *Cochrane Handbook for Systematic Reviews of Interventions* (2nd ed.). John Wiley & Sons Ltd.

Higgins, J., Thomas, J., Higgins, J., Cumpston, M., Li, T., Page, M., & Welch, V. (Eds.). (2024). *Cochrane Handbook for Systematic Reviews of Interventions*, Version 6.5. Cochrane. https://web.archive.org/web/20250501163213/https://training.cochrane.org/handbook/current

Hisle-Gorman, E., Schvey, N. A., Adirim, T. A., Rayne, A. K., Susi, A., Roberts, T. A., & Klein, D. A. (2021). Mental healthcare utilization of transgender youth before and after affirming treatment. *Journal of Sexual Medicine*, *18*(8), 1444–1454.

Hodge, R. S. (1950). Medico-legal aspects of the treatment of the sexual offender, with discussion of a method of treatment by gland extracts. *Medico-Legal Journal*, *18*(4), 130–144.

Hoffman, B. D. (2024, May 23). Pediatrics group's policy on gender-affirming care. *New York Times*. https://web.archive.org/web/20250501151747/https://www.nytimes.com/2024/05/23/opinion/biden-trump-polls.html

Hoffmann-Eßer, W., Siering, U., Neugebauer, E. A. M., Brockhaus, A. C., McGauran, N., & Eikermann, M. (2018). Guideline appraisal with AGREE II: Online survey of the potential influence of AGREE II items on overall assessment of guideline quality and recommendation for use. *BMC Health Services Research*, *18*(1), 143.

Hollinsaid, N. L., Weisz, J. R., Chorpita, B. F., Skov, H. E., & Price, M. A. (2020). The effectiveness and acceptability of empirically supported treatments in gender minority youth across four randomized controlled trials. *Journal of Consulting and Clinical Psychology*, *88*(12), 1053–1064.

Hooven, C. K. (2023). Academic freedom Is social justice: Sex, gender, and cancel culture on campus. *Archives of Sexual Behavior*, *52*(1), 35–41.

House Judiciary Committee (U.S. Congress). (2025, April 9). *Hearing announcement: "Ending lawfare against whistleblowers who protect children."* https://web.archive.org/web/20250501184357/https://judiciary.house.gov/committee-activity/hearings/ending-lawfare-against-whistleblowers-who-protect-children-0

Hughes, L. D., King, W. M., Gamarel, K. E., Geronimus, A. T., Panagiotou, O. A., & Hughto, J. M. W. (2022). Differences in all-cause mortality among transgender and non-transgender people enrolled in private insurance. *Demography*, *59*(3), 1023–1043.

Hughes, M. (2024). The WPATH files. *Environmental Progress*. https://web.archive.org/web/20250501184343/https://environmentalprogress.org/s/WPATH-Report-and-Files111.pdf

Hughes L. D., Charlton B. M., Berzansky I., Corman J. D. (2025). Gender-affirming medications among transgender adolescents in the US, 2018–2022. *JAMA Pediatrics*, *179*(3), 342–344.

Hull, M., & Parnes, M. (2021). Tics and TikTok: Functional tics spread through social media. *Movement Disorders Clinical Practice*, *8*(8), 1248–1252.

Human Rights Campaign. (n.d.). *Map: Attacks on Gender-Affirming Care by State*. https://web.archive.org/web/20250501180741/https://www.hrc.org/resources/attacks-on-gender-affirming-care-by-state-map

Hunter, J., Butler, C., & Cooper, K. (2021). Gender minority stress in trans and gender diverse adolescents and young people. *Clinical Child Psychology and Psychiatry*, *26*(4), 1182–1195.

Hutchinson, A., Midgen, M., & Spiliadis, A. (2020). In support of research into rapid-onset gender dysphoria. *Archives of Sexual Behavior*, *49*(1), 79–80.

Icahn School of Medicine at Mt. Sinai. (n.d.-a). *Mount Sinai Transgender Surgical Fellowship Program*. https://web.archive.org/web/20250427145402/https://icahn.mssm.edu/education/residencies-fellowships/list/transgender-surgical-fellowship

Icahn School of Medicine at Mt. Sinai. (n.d.-b). *Transgender Psychiatry Fellowship at The Mount Sinai Hospital*. https://web.archive.org/web/20250427145007/https://icahn.mssm.edu/education/residencies-fellowships/list/transgender-psychiatry-fellowship

Irwig, M. S. (2018). Cardiovascular health in transgender people. *Reviews in Endocrine and Metabolic Disorders*, *19*(3), 243–251.

Irwig, M. S. (2022). Detransition among transgender and gender-diverse people—An increasing and increasingly complex phenomenon. *Journal of Clinical Endocrinology and Metabolism*, *107*(10), e4261-e4262.

Italian National Bioethics Committee. (2024, November 22). Risposta al quesito del Ministero della Salute sull'utilizzo della triptorelina nel caso di diagnosi di "disforia di genere" [The use of triptorelin in the treatment of puberty disorders]. https://web.archive.org/web/20250501184159/https://bioetica.governo.it/media/ymhlpqt4/abstract-triptorelina.pdf

Jackson, D. (2023). Suicide-related outcomes following gender-affirming treatment: A review. *Cureus*, *15*(3), e36425.

Jackson, S. S., Brown, J., Pfeiffer, R. M., Shrewsbury, D., O'Callaghan, S., Berner, A. M., Gadalla, S. M., & Shiels, M. S. (2023). Analysis of mortality among transgender and gender diverse adults in England. *JAMA Network Open*, *6*(1), e2253687.

Jacobsen, K. (2024). Prioritizing trans autonomy over medical authority in gender-affirming care: The role of risk and uncertainty. *Bulletin of Applied Transgender Studies*, *2*(1–2), 1–19.

Jacoby, S. (2022, February 25). What is gender-affirming care? Admiral Rachel Levine explains. *Today*. https://web.archive.org/web/20250501184538/https://www.today.com/health/health/gender-affirming-care-admiral-rachel-levine-rcna17677

James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2015). *The Report of the 2015 U.S. Transgender Survey*. National Center for Transgender Equality. https://web.archive.org/web/20250501054307/https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf

Janssen, D. F. (2023). Who invented gender identity? *Archives of Sexual Behavior*, *52*, 2713–2716.

Jarin, J., Pine-Twaddell, E., Trotman, G., Stevens, J., Conard, L. A., Tefera, E., & Gomez-Lobo, V. (2017). Cross-sex hormones and metabolic parameters in adolescents with gender dysphoria. *Pediatrics*, *139*(5), e20163173.

Jedrzejewski, B. Y., Marsiglio, M. C., Guerriero, J., Penkin, A., OHSU Transgender Health Program "Regret and Request for Reversal" workgroup, & Berli, J. U. (2023). "Regret after gender affirming surgery – A multidisciplinary approach to a multifaceted patient experience." *Plastic and Reconstructive Surgery*, *152*(1), 206–214.

Jenkins, P., & Panozzo, D. (2024). "Ethical care in secret": Qualitative data from an international survey of exploratory therapists working with gender-questioning clients. *Journal of Sex and Marital Therapy*, *50*(5), 557–582.

Jensen, R. K., Jensen, J. K., Simons, L. K., Chen, D., Rosoklija, I., & Finlayson, C. A. (2019). Effect of concurrent gonadotropin-releasing hormone agonist treatment on dose and side effects of gender-affirming hormone therapy in adolescent transgender patients. *Transgender Health*, *4*(1), 300–303.

Jeppesen, P., Wolf, R. T., Nielsen, S. M., Christensen, R., Plessen, K. J., Bilenberg, N., Thomsen, P. H., Thastum, M., Neumer, S.-P., Puggaard, L. B., Agner Pedersen, M. M., Pagsberg, A. K., Silverman, W. K., & Correll, C. U. (2021). Effectiveness of transdiagnostic cognitive-behavioral psychotherapy compared with management as usual for youth with common mental health problems: A randomized clinical trial. *JAMA Psychiatry*, *78*(3), 250.

Johns, M. M., Lowry, R., Andrzejewski, J., Barrios, L. C., Demissie, Z., McManus, T., Rasberry, C. N., Robin, L., & Underwood, J. M. (2019). Transgender identity and experiences of violence victimization, substance use, suicide risk, and sexual risk behaviors among high school students—19 states and large urban school districts, 2017. *MMWR. Morbidity and Mortality Weekly Report*, *68*(3), 67–71.

Johnstone, L. (2018). Psychological formulation as an alternative to psychiatric diagnosis. *Journal of Humanistic Psychology*, *58*(1), 30–46.

Jones, S., Howard, L., & Thornicroft, G. (2008). “Diagnostic overshadowing”: Worse physical health care for people with mental illness. *Acta Psychiatrica Scandinavica*, *118*, 169–171.

Jorgensen, C. (1967). *Christine Jorgensen: A Personal Autobiography*. Paul S. Eriksson.

Jorgensen, S. C. J. (2023a). Iatrogenic harm in gender medicine. *Journal of Sex and Marital Therapy*, *49*(8), 939–944.

Jorgensen, S. C. J. (2023b). Transition regret and detransition: Meanings and uncertainties. *Archives of Sexual Behavior*, *52*, 2173–2184.

Jorgensen, S. C. J. (2023c). Psychosocial functioning in transgender youth after hormones [letter to the editor]. *New England Journal of Medicine*, *389*(16), 1537–1538.

Jorgensen, S. C. J., Hunter, P. K., Regenstreif, L., Sinai, J., & Malone, W. J. (2022). Puberty blockers for gender dysphoric youth: A lack of sound science. *Journal of the American College of Clinical Pharmacy*, *1005–1007*(9), 3.

Jorgensen, S., & Masson, C. (2024, May 18). Puberty blockers for gender dysphoria and the open future principle. *Impact Ethics*. https://web.archive.org/web/20250501184353/https://impactethics.ca/2024/05/18/puberty-blockers-for-gender-dysphoria-and-the-open-future-principle/

Joseph, J. (2024, June 26). Biden officials pushed to drop age limit on trans surgeries for minors: Report. *Fox News*. https://web.archive.org/web/20250501150454/https://www.foxnews.com/politics/biden-officials-pushed-drop-age-limit-trans-surgeries-minors-report

Joseph, T., Ting, J., & Butler, G. (2019). The effect of GnRH analogue treatment on bone mineral density in young adolescents with gender dysphoria: Findings from a large national cohort. *Journal of Pediatric Endocrinology and Metabolism*, *32*(10), 1077–1081.

Joyce, H. (2021). *Trans: When Ideology Meets Reality*. Oneworld.

Kaiser Permanente. (2023). *UR 65 Gender-Affirming Procedures Medical Necessity Criteria*. https://web.archive.org/web/20250116062211/https://healthy.kaiserpermanente.org/content/dam/kporg/final/documents/health-plan-documents/coverage-information/clinical-review-gender-affirming-procedures-nw.pdf

Kale, M. S., & Korenstein, D. (2018). Overdiagnosis in primary care: Framing the problem and finding solutions. *BMJ*, *362*.

Kaliebe, K., & Johnson, N. M. (2024, May 7). Exclusive: The American Psychiatric Association rejects evidence-based gender medicine presentation. *Restore Childhood*. https://web.archive.org/web/20250501184409/https://restorechildhood.substack.com/p/exclusive-the-american-psychiatric

Kaltiala, R. (2023, October 30). Gender-affirming care is dangerous: I know because I helped pioneer it. *The Free Press*. https://web.archive.org/web/20250501052821/https://www.thefp.com/p/gender-affirming-care-dangerous-finland-doctor

Kaltiala, R., Heino, E., Työläjärvi, M., & Suomalainen, L. (2020). Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria. *Nordic Journal of Psychiatry*, *74*(3), 213–219.

Kaltiala, R., Holttinen, T., & Tuisku, K. (2023). Have the psychiatric needs of people seeking gender reassignment changed as their numbers increase? A register study in Finland. *European Psychiatry*, *66*(1), e93.

Kaltiala-Heino, R., Bergman, H., Työläjärvi, M., & Frisen, L. (2018). Gender dysphoria in adolescence: Current perspectives. *Adolescent Health, Medicine and Therapeutics*, *9*, 31–41.

Kaltiala-Heino, R., & Lindberg, N. (2019). Gender identities in adolescent population: Methodological issues and prevalence across age groups. *European Psychiatry*, *55*, 61–66.

Kaltiala-Heino, R., Sumia, M., Työläjärvi, M., & Lindberg, N. (2015). Two years of gender identity service for minors: Overrepresentation of natal girls with severe problems in adolescent development. *Child and Adolescent Psychiatry and Mental Health*, *9*(1), 9.

Karakılıç Özturan, E., Öztürk, A. P., Baş, F., Erdoğdu, A. B., Kaptan, S., Kardelen, A. D., Poyrazoğlu, Ş., Yıldız, M., Direk, N., Yüksel, Ş., & Darendeliler, F. (2023a). Endocrinological approach to adolescents with gender dysphoria: Experience of a pediatric endocrinology department in a tertiary center in Turkey. *Journal of Clinical Research in Pediatric Endocrinology*, *15*(3), 276–284.

Karakılıç Özturan, E., Öztürk, A. P., Baş, F., Erdoğdu, A. B., Kaptan, S., Kardelen Al, A. D., Poyrazoğlu, Ş., Yıldız, M., Direk, N., Yüksel, Ş., & Darendeliler, F. (2023b). In response to: “Letter to: Endocrinological approach to adolescents with gender dysphoria: Experience of a pediatric endocrinology department in a tertiary center in Turkey.” *Journal of Clinical Research in Pediatric Endocrinology*, *15*(4), 451–452.

Karalexi, M. A., Georgakis, M. K., Dimitriou, N. G., Vichos, T., Katsimpris, A., Petridou, E. Th., & Papadopoulos, F. C. (2020). Gender-affirming hormone treatment and cognitive function in transgender young adults: A systematic review and meta-analysis. *Psychoneuroendocrinology*, *119*, 104721.

Kates, G. (2001). *Monsieur d’Eon Is a Woman: A Tale of Political Intrigue and Sexual Masquerade*. Johns Hopkins University Press.

Keenan, A., & Lovett, R. (2025, February 24). At least 2 NYU affiliates involved in organizations that promote anti-trans practices. *Washington Square News*. https://web.archive.org/web/20250501012212/https://nyunews.com/features/news/2025/02/24/affiliates-tied-to-anti-trans-practices/

Kepp, K. P., Aavitsland, P., Ballin, M., Balloux, F., Baral, S., Bardosh, K., Bauchner, H., Bendavid, E., Bhopal, R., Blumstein, D. T., Boffetta, P., Bourgeois, F., Brufsky, A., Collignon, P. J., Cripps, S., Cristea, I. A., Curtis, N., Djulbegovic, B., Faude, O., … Ioannidis, J. P. A. (2024). Panel stacking is a threat to consensus statement validity. *Journal of Clinical Epidemiology*, *173*, 111428.

Kerr, N. L. (1998). HARKing: Hypothesizing after the results are known. *Personality and Social Psychology Review*, *2*(3), 196–217.

Keyes, K. M., & Platt, J. M. (2024). Annual research review: Sex, gender, and internalizing conditions among adolescents in the 21st century - trends, causes, consequences. *Journal of Child Psychology and Psychiatry, and Allied Disciplines*, *65*(4), 384–407.

Khatchadourian, K., Amed, S., & Metzger, D. L. (2014). Clinical management of youth with gender dysphoria in Vancouver. *Journal of Pediatrics*, *164*(4), 906–911.

Kidd, K. M., & Sequeira, G. M. (2024). Misinformation related to discontinuation and regret among adolescents receiving gender-affirming care. *Journal of Adolescent Health, 75*(5), 698–699.

Kimberly, L. L., Folkers, K. M., Friesen, P., Sultan, D., Quinn, G. P., Bateman-House, A., Parent, B., Konnoth, C., Janssen, A., Shah, L. D., Bluebond-Langner, R., & Salas-Humara, C. (2018). Ethical issues in gender-affirming care for youth. *Pediatrics*, *142*(6), e20181537.

Kingsbury, I., & Greene, J. P. (2025, January). The gender-affirming care double standard. *City Journal*. https://web.archive.org/web/20250501184450/https://www.city-journal.org/article/gender-affirming-care-type-2-diabetes-crisis

Klaver, M., De Mutsert, R., Van Der Loos, M. A. T. C., Wiepjes, C. M., Twisk, J. W. R., Den Heijer, M., Rotteveel, J., & Klink, D. T. (2020). Hormonal treatment and cardiovascular risk profile in transgender adolescents. *Pediatrics*, *145*(3), e20190741.

Klaver, M., de Mutsert, R., Wiepjes, C. M., Twisk, J. W. R., den Heijer, M., Rotteveel, J., & Klink, D. T. (2018). Early hormonal treatment affects body composition and body shape in young transgender adolescents. *Journal of Sexual Medicine*, *15*(2), 251–260.

Klink, D., Caris, M., Heijboer, A., van Trotsenburg, M., & Rotteveel, J. (2015). Bone mass in young adulthood following gonadotropin-releasing hormone analog treatment and cross-sex hormone treatment in adolescents with gender dysphoria. *Journal of Clinical Endocrinology and Metabolism*, *100*(2), E270–E275.

Klipstein, S., Fallat, M. E., Savelli, S., Committee on Bioethics, Section of Hematology/Oncology, & Section on Surgery. (2020). Fertility preservation for pediatric and adolescent patients with cancer: Medical and ethical considerations. *Pediatrics*, *145*(3), e20193994.

Korte, A., Goecker, D., Krude, H., Lehmkuhl, U., Grüters-Kieslich, A., & Beier, K. M. (2008). Gender identity disorders in childhood and adolescence. *Deutsches Ärzteblatt International*, *105*(48), 834–841.

Kota, A. S., & Ejaz, S. (2023). Precocious puberty. In *StatPearls*. StatPearls Publishing. https://web.archive.org/web/20250501184512/https://www.ncbi.nlm.nih.gov/books/NBK544313/

Kozlowska, K., Ambler, G. R., Dechêne, S., Almaraz Almaraz, M. C., Eliacheff, C., Entwistle, K., Esteva de Antonio, I., Gómez Gil, E., Hofman, P., Hunter, P., Kaltiala, R., Koener, B., Landén, M., Ledrait, A., Maguire, A. M., Masson, C., O'Malley, S., Raven, M., Ryan, H., … Scher, S. (2024). Evolving national guidelines for the treatment of children and adolescents with gender dysphoria: International perspectives. *Human Systems*, *5*(2), 89–152.

Kozlowska, K., Chudleigh, C., McClure, G., Maguire, A. M., & Ambler, G. R. (2021). Attachment patterns in children and adolescents with gender dysphoria. *Frontiers in Psychology*, *11*, 582688.

Kreukels, B. P. C., Köhler, B., Nordenström, A., Roehle, R., Thyen, U., Bouvattier, C., de Vries, A. L. C., Cohen-Kettenis, P. T., Köhler, B., Cohen-Kettenis, P., de Vries, A., Arlt, W., Wiesemann, C., Slowikowska-Hilczer, J., de la Perriere, A. B., Sultan, C., Paris, F., Bouvattier, C., Thyen, U., … Szarras-Czapnik, M. (2018). Gender dysphoria and gender change in disorders of sex development/intersex conditions: Results from the DSD-LIFE Study. *Journal of Sexual Medicine*, *15*(5), 777–785.

Kuiper, B., & Cohen-Kettenis, P. (1988). Sex reassignment surgery: A study of 141 Dutch transsexuals. *Archives of Sexual Behavior*, *17*(5), 439–457.

Kukla, Q. R. (2024). Healthism, elite capture, and the pitfalls of an expansive concept of health. In M. Schermer & N. Binney (Eds.), *A Pragmatic Approach to Conceptualization of Health and Disease*. Springer International Publishing.

Kulatunga Moruzi, C., & Lawler, J. (2024). Frailties of memory: Implications for therapists treating gender dysphoric youth. *Journal of Sex and Marital Therapy*, *51*(1), 110–125.

Kulatunga-Moruzi, C. (2023). Research and analyses by Turban et al. fail to refute rapid-onset gender dysphoria. *Journal of Adolescent Health*, *73*(6), 1162.

Kuohung, W., & Hornstein, M. D. (2024, May 31). Female infertility: Causes. *UpToDate*. https://web.archive.org/web/20250501184538/https://www.uptodate.com/contents / female-infertility-causes

Kuper, L. E., Stewart, S., Preston, S., Lau, M., & Lopez, X. (2020). Body dissatisfaction and mental health outcomes of youth on gender-affirming hormone therapy. *Pediatrics*, *145*(4), e20193006.

Labcorp. (2024). Estrogens, total. https://web.archive.org/web/20240913082123/https://www.labcorp.com/tests/004549/estrogens-total

Labcorp. (2025a). Estradiol, sensitive, LC/MS. https://web.archive.org/web/20250422164130/https://www.labcorp.com/tests/140244/estradiol-sensitive-lc-ms

Labcorp. (2025b). Testosterone, total, women, children, and hypogonadal males, LC/MS-MS. https://web.archive.org/web/20250818083950/https://www.labcorp.com/tests/070001/testosterone-total-women-children-and-hypogonadal-males-lc-ms-ms

Laidlaw, M. K., & Jorgensen, S. (2024). Exploring safety in gender-affirming hormonal treatments: An observational study on adverse drug events using the Food and Drug Administration adverse event reporting system database. *Annals of Pharmacotherapy*, 10600280241278913.

Laidlaw, M. K., Lahl, J., & Thompson, A. (2025). Fertility preservation: is there a model for gender-dysphoric youth? *Frontiers in Endocrinology*, *16*, 1386716.

Laidlaw, M. K., Van Meter, Q. L., Hruz, P. W., Van Mol, A., & Malone, W. J. (2019). Letter to the editor: “Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society Clinical Practice Guideline.” *Journal of Clinical Endocrinology and Metabolism*, 104(3), 686–687.

Laidlaw, M. K., Van Mol, A., Van Meter, Q., & Hansen, J. E. (2021). Letter to the Editor from Laidlaw et al: “Erythrocytosis in a large cohort of transgender men using testosterone: A long-term follow-up study on prevalence, determinants, and exposure years.” *Journal of Clinical Endocrinology and Metabolism*, dgab514.

Landman, J. (1987). Regret: A theoretical and conceptual analysis. *Journal for the Theory of Social Behaviour*, *17*(2), 135–160.

Lane, B. (2024, November 24). No hormones on Chile’s public purse. https://web.archive.org/web/20250501184504/https://www.genderclinicnews.com/p/no-hormones-on-chiles-public-purse

Lavender, R., Shaw, S., Maninger, J.-K., Butler, G., Carruthers, P., Carmichael, P., & Masic, U. (2023). Impact of hormone treatment on psychosocial functioning in gender-diverse young people. *LGBT Health*, *10*(5), 382–390.

Lawford-Smith, H. (2024). Sexual orientation and gender identity conversion therapy: Or, who put the ‘GI’ in ‘SOGI’? *Journal of Open Inquiry in Behavioral Science*.

Lawrence, J. M., Divers, J., Isom, S., Saydah, S., Imperatore, G., Pihoker, C., Marcovina, S. M., Mayer-Davis, E. J., Hamman, R. F., Dolan, L., Dabelea, D., Pettitt, D. J., Liese, A. D., & SEARCH for Diabetes in Youth Study Group. (2021). Trends in prevalence of Type 1 and Type 2 diabetes in children and adolescents in the US, 2001–2017. *JAMA*, *326*(8), 717.

Lawson, M. L., Gotovac, S., Couch, B., Gale, L., Vandermorris, A., Ghosh, S., & Bauer, G. R. (2024). Pathways to care for adolescents attending a first hormone appointment at Canadian gender affirming medical clinics: a cross-sectional analysis from the Trans Youth CAN! study. *Journal of Adolescent Health*, *74*(1), 140–147.

Lawson, ML., Couch, R., Gale, L., Ghosh, S., Gotovac, S., Vandermorris, A., Bauer, GR., for the Trans Youth CAN! Research Team. (2020, November 16). WPATH 2022: Pathways to care for trans youth accessing gender affirming medical care in Canada: New research from Trans Youth CAN! https://web.archive.org/web/20250501202530/https://transyouthcan.ca/results/wpath-2020-5/

Lee, J. Y., & Rosenthal, S. M. (2023). Gender-affirming care of transgender and gender-diverse youth: Current concepts. *Annual Review of Medicine*, *74*(1), 107–116.

Lee, W. G., Butler, G., Carmichael, P., Rashid, T., Yasmin, E., Morley, R., Barrett, J., Christopher, N., & Sangster, P. (2023). Urological and gynaecological considerations for the use of gonadotropin-releasing hormone analogues in transgender and nonbinary adolescents: A narrative review. *European Urology Focus*, *9*(1), 35–41.

Leichsenring, F., Abbass, A., Heim, N., Keefe, J. R., Kisely, S., Luyten, P., Rabung, S., & Steinert, C. (2023). The status of psychodynamic psychotherapy as an empirically supported treatment for common mental disorders: An umbrella review based on updated criteria. *World Psychiatry: Official Journal of the World Psychiatric Association (WPA)*, *22*(2), 286–304.

Leichsenring, F., Luyten, P., Hilsenroth, M. J., Abbass, A., Barber, J. P., Keefe, J. R., Leweke, F., Rabung, S., & Steinert, C. (2015). Psychodynamic therapy meets evidence-based medicine: A systematic review using updated criteria. *The Lancet Psychiatry*, *2*(7), 648–660.

Lemma, A. (2018). Trans-itory identities: Some psychoanalytic reflections on transgender identities. *International Journal of Psychoanalysis*, *99*(5), 1089–1106.

Levin, R. N., Erickson-Schroth, L., Mak, K., & Edmiston, E. K. (2023). Biological studies of transgender identity: A critical review. *Journal of Gay and Lesbian Mental Health*, *27*(3), 254–283.

Levine, R. (2022, April 30). One supportive adult. *Speaking While Female*. https://web.archive.org/web/20250501144717/https://speakingwhilefemale.co/health-levine/

Levine, S. B. (2024). What is the purpose of the initial psychiatric evaluation of minors with gender dysphoria. *Journal of Sex and Marital Therapy*, 50(6), 773–786.

Levine, S. B., & Abbruzzese, E. (2023). Current concerns about gender-affirming therapy in adolescents. *Current Sexual Health Reports*, *15*(2), 113–123.

Levine, S. B., Abbruzzese, E., & Mason, J. W. (2022a). Reconsidering informed consent for trans-identified children, adolescents, and young adults. *Journal of Sex and Marital Therapy*, *48*(7), 706–727.

Levine, S. B., Abbruzzese, E., & Mason, J. W. (2022b). What are we doing to these children? Response to Drescher, Clayton, and Balon commentaries on Levine et al., 2022. *Journal of Sex and Marital Therapy*, *49*(1), 115–125.

Levine, S. B., Brown, G. R., Coleman, E., Cohen-Kettenis, P. T., Van Maasdam, J., Pfafflin, F., & Schaefer, L. C. (1998, June 15). *The Standards of Care for Gender Identity Disorders*, Fifth Version. HBIGDA/WPATH.

Lewis, C., & Garwood, S. (April 21, 2022). Testimony of Christopher Lewis & Sarah Garwood, Co-Directors, Wash. Univ. Sch. of Med. Pediatric Transgender Ctr., before the Mo. H. Judiciary Comm. https://web.archive.org/web/20250501152856/https://sg001-harmony.sliq.net/00325/Harmony/en/PowerBrowser/PowerBrowserV2/20200831/ -1/5401?mediaStartTime=20220421091210&mediaEndTime=20220421095128&viewMode=3&globalStreamId=4

LGBTQIA+ Coalition. (2022, March 23). *LGBTQIA+ Coalition Dr Levine Letter*. https://web.archive.org/web/20250501153712/https://www.documentcloud.org/documents/21560985-lgbtqia-coalition-dr-levine-letter/

Li, A. (2023a). Harry Benjamin and the birth of transgender medicine. *Canadian Medical Association Journal*, *195*(48), E1665–E1667.

Li, A. (2023b). *Wondrous Transformations*. University of North Carolina Press.

Lima, J. P., Mirza, R. D., & Guyatt, G. H. (2023). How to recognize a trustworthy clinical practice guideline. *Journal of Anesthesia, Analgesia and Critical Care*, *3*(1), 9.

Lima, J. P., Tangamornsuksan, W., & Guyatt, G. H. (2023). Trustworthy evidence-based versus untrustworthy guidelines: Detecting the difference. *Family Medicine and Community Health*, *11*(4), e002437.

Lin, L. H., Hernandez, A., Marcus, A., Deng, F.-M., & Adler, E. (2022). Histologic findings in gynecologic tissue from transmasculine individuals undergoing gender-affirming surgery. *Archives of Pathology and Laboratory Medicine*, *146*(6), 742–748.

Lindholm, S. K., & Wickström, A. (2020). 'Looping effects' related to young people's mental health: How young people transform the meaning of psychiatric concepts. *Global Studies of Childhood*, *10*(1), 26–38.

Lindquist, S. (2022, October 10). Puberty blockers like candy; *X/Twitter post*. https://x.com/SpencerLndqst/status/1579559359792971776

Littman, L. (2018). Rapid-onset gender dysphoria in adolescents and young adults: A study of parental reports. *PLoS ONE*, *13*(8), e0202330.

Littman, L. (2021). Individuals treated for gender dysphoria with medical and/or surgical transition who subsequently detransitioned: A survey of 100 detransitioners. *Archives of Sexual Behavior*, *50*(8), 3353–3369.

Littman, L., O'Malley, S., Kerschner, H., & Bailey, J. M. (2024). Detransition and desistance among previously trans-identified young adults. *Archives of Sexual Behavior*, *53*, 57–76.

Lock, J., Le Grange, D., Agras, W. S., Moye, A., Bryson, S. W., & Jo, B. (2010). Randomized clinical trial comparing family-based treatment with adolescent-focused individual therapy for adolescents with anorexia nervosa. *Archives of General Psychiatry*, *67*(10), 1025.

Loke, Y. K., Price, D., Herxheimer, A., & the Cochrane Adverse Effects Methods Group. (2007). Systematic reviews of adverse effects: Framework for a structured approach. *BMC Medical Research Methodology*, *7*(1), 32.

López de Lara, D., Pérez Rodríguez, O., Cuellar Flores, I., Pedreira Masa, J. L., Campos-Muñoz, L., Cuesta Hernández, M., & Ramos Amador, J. T. (2020). Psychosocial assessment in transgender adolescents. *Anales de Pediatría*, *93*(1), 41–48.

LOTL staff. (2014, January 7). Exclusive interview with Buck Angel. *LOTL*. https://web.archive.org/web/20250501145401/https://www.lotl.com/identity/transgender/exclusive-interview-with-buck-angel/

Lucassen, M. F., Stasiak, K., Fleming, T., Frampton, C., Perry, Y., Shepherd, M., & Merry, S. N. (2021). Computerized cognitive behavioural therapy for gender minority adolescents: Analysis of the real-world implementation of SPARX in New Zealand. *Australian and New Zealand Journal of Psychiatry*, *55*(9), 874–882.

Ludvigsson, J. F., Adolfsson, J., Höistad, M., Rydelius, P.-A., Kriström, B., & Landén, M. (2023). A systematic review of hormone treatment for children with gender dysphoria and recommendations for research. *Acta Paediatrica*, *112*(11), 2279–2292.

Luo, X., Liang, Y., Hou, L., Wu, W., Ying, Y., & Ye, F. (2021). Long-term efficacy and safety of gonadotropin-releasing hormone analog treatment in children with idiopathic central precocious puberty: A systematic review and meta-analysis. *Clinical Endocrinology*, *94*(5), 786–796.

MacKinnon, K. R., Expósito-Campos, P., & Gould, W. A. (2023). Detransition needs further understanding, not controversy. *BMJ*, e073584.

MacKinnon, K. R., Gould, W. A., Enxuga, G., Kia, H., Abramovich, A., Lam, J. S. H., & Ross, L. E. (2023). Exploring the gender care experiences and perspectives of individuals who discontinued their transition or detransitioned in Canada. *PLoS ONE*, *18*(11), e0293868.

MacKinnon, K. R., Kia, H., Salway, T., Ashley, F., Lacombe-Duncan, A., Abramovich, A., Enxuga, G., & Ross, L. E. (2022). Health care experiences of patients discontinuing or reversing prior gender-affirming treatments. *JAMA Network Open*, *5*(7), e2224717.

Macoveanu, J., Henningsson, S., Pinborg, A., Jensen, P., Knudsen, G. M., Frokjaer, V. G., & Siebner, H. R. (2016). Sex-steroid hormone manipulation reduces brain response to reward. *Neuropsychopharmacology, 41*(4), 1057–1065.

Madsen, M. C., van Dijk, D., Wiepjes, C. M., Conemans, E. B., Thijs, A., & den Heijer, M. (2021). Erythrocytosis in a large cohort of trans men using testosterone: A long-term follow-up study on prevalence, determinants, and exposure years. *Journal of Clinical Endocrinology and Metabolism*, *106*(6), 1710–1717.

Makary, M. (2024). *Blind Spots: When Medicine Gets It Wrong, and What It Means for Our Health*. Bloomsbury Publishing.

Malpas, J., Pellicane, M. J., & Glaeser, E. (2022). Family-based interventions with transgender and gender expansive youth: Systematic review and best practice recommendations. *Transgender Health*, *7*(1), 7–29.

Maraka, S., Singh Ospina, N., Rodriguez-Gutierrez, R., Davidge-Pitts, C. J., Nippoldt, T. B., Prokop, L. J., & Murad, M. H. (2017). Sex steroids and cardiovascular outcomes in transgender individuals: A systematic review and meta-analysis. *Journal of Clinical Endocrinology and Metabolism*, *102*(11), 3914–3923.

Marchiano, L. (2017). Outbreak: On transgender teens and psychic epidemics. *Psychological Perspectives*, *60*(3), 345–366.

Marconi, E., Monti, L., Marfoli, A., Kotzalidis, G. D., Janiri, D., Cianfriglia, C., Moriconi, F., Costa, S., Veredice, C., Sani, G., & Chieffo, D. P. R. (2023). A systematic review on gender dysphoria in adolescents and young adults: Focus on suicidal and self-harming ideation and behaviours. *Child and Adolescent Psychiatry and Mental Health*, *17*(1), 110.

Marcotte, L. M., Krimmel-Morrison, J., & Liao, J. M. (2020). How to keep diffusion of responsibility from undermining value-based care. *AMA Journal of Ethics*, *22*(9), E802–807.

Margolis, S. (2018). Evidence-based medicine. *Australian Journal for General Practitioners*, *47*, 325–325.

Marino, L. G., Boguszewski, K. E., Stephens, H. F., & Taylor, J. F. (2024). Capacity to consent: A scoping review of youth decision-making capacity for gender-affirming care. *BMC Medical Ethics*, *25*(108), 1–11.

Marins, L. R., Rosito, T. E., Kliemann, L. M., Capp, E., & Corleta, H. V. E. (2024). Gender affirming hormone therapy and transgender women fertility: Histologic predictors of germ cell presence. *Revista Brasileira de Ginecologia e Obstetrícia / RBGO Gynecology and Obstetrics*, *46*, e-rbgo33.

Mason, J. (2021, August 3). Dear AAP National Conference 2021 Representative. *Society for Evidence-Based Gender Medicine*. https://web.archive.org/web/20250501184413/https://segm.org/sites/default/files/AAP%20NCE%202021.pdf

Matoso, A., Khandakar, B., Yuan, S., Wu, T., Wang, L. J., Lombardo, K. A., Mangray, S., Mannan, A. A. S. R., & Yakirevich, E. (2018). Spectrum of findings in orchiectomy specimens of persons undergoing gender confirmation surgery. *Human Pathology*, *76*, 91–99.

Maung, H. H. (2024). Gender affirming hormone treatment for trans adolescents: A four principles analysis. *Journal of Bioethical Inquiry*, *21*(2), 345–363.

Mayo-Wilson, E., Qureshi, R., & Li, T. (2023). Conducting separate reviews of benefits and harms could improve systematic reviews and meta-analyses. *Systematic Reviews*, *12*, 67.

McCartney, C. R., Corrigan, M. D., Drake, M. T., El-Hajj Fuleihan, G., Korytkowski, M. T., Lash, R. W., Lieb, D. C., McCall, A. L., Muniyappa, R., Piggott, T., Santesso, N., Schünemann, H. J., Wiercioch, W., McDonnell, M. E., & Murad, M. H. (2022). Enhancing the trustworthiness of the Endocrine Society's Clinical Practice Guidelines. *Journal of Clinical Endocrinology and Metabolism*, *107*(8), 2129–2138.

McDeavitt, K. (2024). Paediatric gender medicine: longitudinal studies have not consistently shown improvement in depression or suicidality. *Acta Paediatrica*,*113*(8), 1757–1771.

McDeavitt, K. (2025). Citation issues in the American Academy of Pediatrics policy statement on transgender and gender-diverse children and adolescents (Rafferty, 2018). *Archives of Sexual Behavior*, *54*, 1297–1305.

McDeavitt, K., Cohn, J., & Levine, S. B. (2025). Critiques of the Cass Review: Fact-checking the peer-reviewed and grey literature. *Journal of Sex and Marital Therapy*, *51*(2), 175–199.

McGorry, P. D., Mei, C., Dalal, N., Alvarez-Jimenez, M., Blakemore, S.-J., Browne, V., Dooley, B., Hickie, I. B., Jones, P. B., McDaid, D., Mihalopoulos, C., Wood, S. J., El Azzouzi, F. A., Fazio, J., Gow, E., Hanjabam, S., Hayes, A., Morris, A., Pang, E., … Killackey, E. (2024). The Lancet Psychiatry Commission on youth mental health. *The Lancet Psychiatry*, *11*(9), 731–774.

McGregor, K., McKenna, J. L., Williams, C. R., Barrera, E. P., & Boskey, E. R. (2024). Association of pubertal blockade at Tanner 2/3 with psychosocial benefits in transgender and gender diverse youth at hormone readiness assessment. *Journal of Adolescent Health*, *74*(4), 801–807.

McKenzie, J. E., & Brennan, S. E. (2024). Chapter 12: Synthesizing and presenting findings using other methods [last updated October 2019]. In *Cochrane Handbook for Systematic Reviews of Interventions*, Version 6.5. Cochrane. https://web.archive.org/web/20250501195623/www.training.cochrane.org/handbook

McNally, R. J. (2011). *What Is Mental Illness?* Harvard University Press.

McNamara, M. (2024, March 7). A huge misconception about gender-affirming care for trans kids. *Boston Globe*. https://web.archive.org/web/20250501184443/https://www.bostonglobe.com/2024 /03/07/opinion/transgender-youth-medical-treatment-misconceptions/

McNamara, M., Baker, K., Connelly, K., Janssen, A., Olson-Kennedy, J., Pang, K. C., Scheim, A., Turban, J., & Alstott, A. (2024). *An Evidence-Based Critique of "The Cass Review" on Gender-affirming Care for Adolescent Gender Dysphoria*. https://web.archive.org/web/20250501184400/https://law.yale.edu/sites/default/files/documents/integrity-project_cass-response.pdf

McPherson, S., & Freedman, D. E. P. (2023). Psychological outcomes of 12–15-year-olds with gender dysphoria receiving pubertal suppression in the UK: Assessing reliable and clinically significant change. *Journal of Sex and Marital Therapy*, *50*(3), 315–325.

Meadow, T. (2018). *Trans Kids: Being Gendered in the Twenty-First Century*. University of California Press.

Meng, M., Zhou, Q., Lei, W., Tian, M., Wang, P., Liu, Y., Sun, Y., Chen, Y., & Li, Q. (2022). Recommendations on off-label drug use in pediatric guidelines. *Frontiers in Pharmacology*, *13*, 892574.

Meyer, I. H. (2003). Prejudice, social stress, and mental health in lesbian, gay, and bisexual populations: Conceptual issues and research evidence. *Psychological Bulletin, 129*(5), 674–697.

Meyerowitz, J. J. (2009). *How Sex Changed: A History of Transsexuality in the United States*. Harvard University Press.

Midgley, N., Mortimer, R., Cirasola, A., Batra, P., & Kennedy, E. (2021). The evidence-base for psychodynamic psychotherapy with children and adolescents: A narrative synthesis. *Frontiers in Psychology*, *12*, 1188.

Millington, K., Finlayson, C., Olson-Kennedy, J., Garofalo, R., Rosenthal, S. M., & Chan, Y.-M. (2021). Association of high-density lipoprotein cholesterol with sex steroid treatment in transgender and gender-diverse youth. *JAMA Pediatrics*, *175*(5), 520.

Milrod, C., & Karasic, D. H. (2017). Age is just a number: WPATH-affiliated surgeons' experiences and attitudes toward vaginoplasty in transgender females under 18 years of age in the United States. *Journal of Sexual Medicine*, *14*(4), 624–634.

Miron, O., Yu, K.-H., Wilf-Miron, R., & Kohane, I. S. (2019). Suicide rates among adolescents and young adults in the United States, 2000–2017. *JAMA*, *321*(23), 2362–2364.

Miroshnychenko, A., Ibrahim, S., Roldan, Y., Kulatunga-Moruzi, C., Montante, S., Couban, R., Guyatt, G., & Brignardello-Petersen, R. (2025). Gender affirming hormone therapy for individuals with gender dysphoria aged <26 years: A systematic review and meta-analysis. *Archives of Disease in Childhood*, *110*(6), 437–445.

Miroshnychenko, A., Roldan, Y., Ibrahim, S., Kulatunga-Moruzi, C., Montante, S., Couban, R., Guyatt, G., & Brignardello-Petersen, R. (2025). Puberty blockers for gender dysphoria in youth: A systematic review and meta-analysis. *Archives of Disease in Childhood*, *110*(6), 429–436.

Miroshnychenko, A., Roldan, Y. M., Ibrahim, S., Kulatunga-Moruzi, C., Dahlin, K., Montante, S., Couban, R., Guyatt, G., & Brignardello-Petersen, R. (2024). Mastectomy for individuals with gender dysphoria below 26 years of age: A systematic review and meta-analysis. *Plastic and Reconstructive Surgery*, *155*(6), 915–923. (In print 2025; epub 2024.)

Mittal, P. K., Little, B., Harri, P. A., Miller, F. H., Alexander, L. F., Kalb, B., Camacho, J. C., Master, V., Hartman, M., & Moreno, C. C. (2017). Role of imaging in the evaluation of male infertility. *RadioGraphics*, *37*(3), 837–854.

Money, J. (1955). Hermaphroditism, gender and precocity in hyperadrenocorticism: Psychologic findings. *Bulletin of the Johns Hopkins Hospital*, *96*(6), 253–264.

Morabito, A., Mercadante, E., Muto, P., Manzo, A., Palumbo, G., Sforza, V., Montanino, A., Sandomenico, C., Costanzo, R., Esposito, G., Totaro, G., De Cecio, R., Picone, C., Porto, A., Normanno, N., Capasso, A., Pinto, M., Tracey, M., Caropreso, G., & Pascarella, G. (2024). Improving the quality of patient care in lung cancer: Key factors for successful multidisciplinary team working. *Exploration of Targeted Anti-Tumor Therapy*, *5*(2), 260–277.

Morandini, J. S., Kelly, A., De Graaf, N. M., Malouf, P., Guerin, E., Dar-Nimrod, I., & Carmichael, P. (2023). Is social gender transition associated with mental health status in children and adolescents with gender dysphoria? *Archives of Sexual Behavior*, *52*(3), 1045–1060.

Moreno, C., Laje, G., Blanco, C., Jiang, H., Schmidt, A. B., & Olfson, M. (2007). National trends in the outpatient diagnosis and treatment of bipolar disorder in youth. *Archives of General Psychiatry*, *64*(9), 1032.

Mosier-Mills, A., Kim, H.-H., & Keuroghlian, A. S. (2024). Removing barriers and honoring autonomy: Rethinking mental health professional assessments in adolescent gender-affirming medical care. *Harvard Review of Psychiatry*, *32*(3), 96–100.

Murphy, T. F. (1992). Redirecting sexual orientation: Techniques and justifications. *Journal of Sex Research*, *29*(4), 501–523.

Nadrowski, K. (2023). A new flight from womanhood? The importance of working through experiences related to exposure to pornographic content in girls affected by gender dysphoria. *Journal of Sex and Marital Therapy*, *50*(3), 293–302.

Nahata, L., Tishelman, A. C., Caltabellotta, N. M., & Quinn, G. P. (2017). Low fertility preservation utilization among transgender youth. *Journal of Adolescent Health*, *61*(1), 40–44.

Narayan, S. K., Hontscharuk, R., Danker, S., Guerriero, J., Carter, A., Blasdel, G., Bluebond-Langner, R., Ettner, R., Radix, A., Schechter, L., & Berli, J. U. (2021). Guiding the conversation—Types of regret after gender-affirming surgery and their associated etiologies. *Annals of Translational Medicine*, *9*(7), 605–605.

National Association of Social Workers. (n.d.). *Debunking the Myths about Gender-Affirming Care*. Retrieved March 27, 2025, from https://web.archive.org/web/20250501184202/https://www.socialworkers.org/LinkClick.aspx?fileticket=SfQYdWPJAoY%3D&portalid=0

National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research. (2010). Appendix E: The Belmont report: Ethical principles and guidelines for the protection of human subjects of research. In V. Mihajlovic-Madzarevic, *Clinical Trials Audit Preparation*. Wiley.

National Health Service England. (2022, October 20). *Interim Service Specification: Specialist Service for Children and Young People with Gender Dysphoria (Phase 1 Providers)*. NHS England. https://web.archive.org/web/20250128051650/https://www.engage.england.nhs.uk/specialised-commissioning/gender-dysphoria-services/user_uploads/b1937_i-specialist-service-for-children-and-young-people-with-gender-dysphoria-phase-1-providers-201022-1.pdf

National Health Service England (2023). *Puberty Suppressing Hormones (PSH) for Children and Adolescents who have Gender Incongruence/Dysphoria.* NHS England. https://web.archive.org/web/20250502051324/https://www.engage.england.nhs.uk/consultation/puberty-suppressing-hormones/user_uploads/engagement-report-interim-policy-on-puberty-suppressing-hormones-for-gender-incongruence-or-dysphoria.pdf

National Health Service England. (2024a). *Children and Young People's Gender Services: Implementing the Cass Review recommendations*. NHS England. https://web.archive.org/web/20250501184500/https://www.england.nhs.uk/long-read/children-and-young-peoples-gender-services-implementing-the-cass-review-recommendations/

National Health Service England. (2024b, August 6). *Review of NHS Adult Gender Dysphoria Clinics.* NHS England. https://web.archive.org/web/20250501184501/https://www.england.nhs.uk/long-read/review-of-nhs-adult-gender-dysphoria-clinics/

National Health Service England. (2024c). *Prescribing of Gender Affirming Hormones (Masculinising or Feminising Hormones) as Part of the Children and Young People's Gender Service*. NHS England. https://web.archive.org/web/20250501184501/https://www.england.nhs.uk/wp-content/uploads/2024/03/clinical-commissioning-policy-prescribing-of-gender-affirming-hormones.pdf

National Institute for Health and Care Excellence. (2005, November 29). *Obsessive-Compulsive Disorder and Body Dysmorphic Disorder: Treatment (Clinical Guideline)*. National Institute for Health and Care Excellence. https://web.archive.org/web/20250501184514/https://www.nice.org.uk/guidance/cg31/chapter/Recommendations#steps-3-to-5-treatment-options-for-people-with-ocd-or-bdd

National Institute for Health and Care Excellence. (2020a). *Evidence Review: Gender-Affirming Hormones for Children and Adolescents with Gender Dysphoria*. National Institute for Health and Care Excellence. https://webarchive.nationalarchives.gov.uk/ukgwa/20250310143633/https://cass.independent-review.uk/wp-content/uploads/2022/09/20220726_Evidence-review_Gender-affirming-hormones_For-upload_Final.pdf

National Institute for Health and Care Excellence. (2020b). *Evidence Review: Gonadotrophin Releasing Hormone Analogues for Children and Adolescents with Gender Dysphoria*. National Institute for Health and Care Excellence. https://webarchive.nationalarchives.gov.uk/ukgwa/20250310143633/https://cass.independent-review.uk/wp-content/uploads/2022/09/20220726_Evidence-review_GnRH-analogues_For-upload_Final.pdf

National Institute for Health and Care Research. (2024). *PATHWAYS: Puberty Suppression and Transitional Healthcare with Adaptive Youth Services*. https://web.archive.org/web/20250501184345/https://fundingawards.nihr.ac.uk/award/NIHR167530

Navabi, B., Tang, K., Khatchadourian, K., & Lawson, M. L. (2021). Pubertal suppression, bone mass, and body composition in youth with gender dysphoria. *Pediatrics*, *14*8(4), e2020039339.

Negenborn, V. L., van der Sluis, W. B., Meijerink, W. J. H. J., & Bouman, M.-B. (2017). Lethal necrotizing cellulitis caused by ESBL-producing E. coli after laparoscopic intestinal vaginoplasty. *Journal of Pediatric and Adolescent Gynecology*, *30*, e19–e21.

Newman, L. E. (1970). Transsexualism in adolescence: Problems in evaluation and treatment. *Archives of General Psychiatry*, *23*(2), 112–121.

Nichols, M. (2008). Dreger on the Bailey controversy: Lost in the drama, missing the big Picture. *Archives of Sexual Behavior*, *37*(3), 476–480.

Nienaber, C. S., & Van Der Walt, D. (1991). True idiopathic precocious puberty presenting at six months of age; a case report. *European Journal of Obstetrics and Gynecology and Reproductive Biology*, *38*(3), 243–245.

Noe v. Parson, No. 23AC-CC04530 (Mo. Cir. Ct., Cole Cnty. July 11, 2024).

Nota, N. M., Wiepjes, C. M., de Blok, C. J. M., Gooren, L. J. G., Kreukels, B. P. C., & den Heijer, M. (2019). Occurrence of acute cardiovascular events in transgender individuals receiving hormone therapy: Results from a large cohort study. *Circulation*, *139*(11), 1461–1462.

Notini, L., Earp, B. D., Gillam, L., McDougall, R. J., Savulescu, J., Telfer, M., & Pang, K. C. (2020). Forever young? The ethics of ongoing puberty suppression for non-binary adults. *Journal of Medical Ethics*, *46*(11), 743–752.

Office of the Surgeon General. (2023). *Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory*. US Department of Health and Human Services. https://web.archive.org/web/20250501184151/https://www.ncbi.nlm.nih.gov/books/NBK594761/

OHSU School of Medicine Surgery. (n.d.). *Advanced Gender Surgery Fellowship*. https://www.ohsu.edu/school-of-medicine/surgery/advanced-gender-surgery-fellowship

Okasako, J., & Bernstein, C. (2022). Multidisciplinary tumor boards and guiding patient care: The AP role. *Journal of the Advanced Practitioner in Oncology*, *13*(3), 227–230.

Olson, K. R., Durwood, L., DeMeules, M., & McLaughlin, K. A. (2016). Mental health of transgender children who are supported in their identities. *Pediatrics*, *137*(3), e20153223.

Olson, K. R., Durwood, L., Horton, R., Gallagher, N. M., & Devor, A. (2022). Gender identity 5 years after social transition. *Pediatrics*, *150*(2), e2021056082.

Olson-Kennedy, J. (2019, September 23). Georgulas v. Younger, No. DF-15-09887-S.

Olson-Kennedy, J. (2022, September 11). Dekker v. Marstiller, No. 4:22-cv-00325-RH-MAF.

Olson-Kennedy, J., Chan, Y.-M., Rosenthal, S., Hidalgo, M. A., Chen, D., Clark, L., Ehrensaft, D., Tishelman, A., & Garofalo, R. (2019). Creating the Trans Youth Research Network: A collaborative research endeavor. *Transgender Health*, *4*(1), 304–312.

Olson-Kennedy, J., Okonta, V., Clark, L. F., & Belzer, M. (2018). Physiologic response to gender-affirming hormones among transgender youth. *Journal of Adolescent Health*, *62*(4), 397–401.

Olson-Kennedy, J., Wang, L., Wong, C. F., Chen, D., Ehrensaft, D., Hidalgo, M. A., Tishelman, A. C., Chan, Y.-M., Garofalo, R., Radix, A. E., & Rosenthal, S. M. (2025). Emotional health of transgender youth 24 months after initiating gender-affirming hormone therapy. *Journal of Adolescent Health*, S1054139X24005664.

Olson-Kennedy, J., Warus, J., Okonta, V., Belzer, M., & Clark, L. F. (2018). Chest reconstruction and chest dysphoria in transmasculine minors and young adults: Comparisons of nonsurgical and postsurgical cohorts. *JAMA Pediatrics*, *172*(5), 431.

Oosthoek, E. D., Stanwich, S., Gerritse, K., Doyle, D. M., & De Vries, A. L. C. (2024). Gender-affirming medical treatment for adolescents: A critical reflection on “effective” treatment outcomes. *BMC Medical Ethics*, *25*(1), 154.

OPA: Office of Population Affairs, H. (n.d.). *Gender-Affirming Care and Young People*. https://web.archive.org/web/20250501171948/https://opa.hhs.gov/sites/default/files/2023-08/gender-affirming-care-young-people.pdf

Foundation Against Intolerance & Racism. (2024, January). Open letter to the American Psychiatric Association regarding the publication of *Gender-affirming psychiatric care*. https://web.archive.org/web/20250501184503/https://www.fairforall.org/open-letters/open-letter-apa/

Opland, C., & Torrico, T. J. (2025). Psychodynamic therapy. In *StatPearls*. StatPearls Publishing. https://web.archive.org/web/20250501184153/https://www.ncbi.nlm.nih.gov/books/NBK606117/

Oregon Department of Consumer and Business Services. (2024a, November 19). *2025 Gender-Affirming Treatment Rule* [Notice of proposed rulemaking]. https://web.archive.org/web/20250407011047/https://dfr.oregon.gov/laws-rules/Documents/Proposed/20241104-gender-affirming-treatment.pdf

Oregon Department of Consumer and Business Services. (2024b, December 23). *2025 Gender-Affirming Treatment Rule*. https://web.archive.org/web/20250518140604/https://dfr.oregon.gov/laws-rules/Documents/id41-2024_rule-order.pdf

Öst, L.-G., Brattmyr, M., Finnes, A., Ghaderi, A., Havnen, A., Hedman-Lagerlöf, M., Parling, T., Welch, E., & Wergeland, G. J. (2024). Cognitive behavior therapy for adult eating disorders in routine clinical care: A systematic review and meta-analysis. *International Journal of Eating Disorders*, *57*(2), 249–264.

Padín, P. F., González-Rodríguez, R., Verde-Diego, C., & Vázquez-Pérez, R. (2021). Social media and eating disorder psychopathology: A systematic review. *Cyberpsychology: Journal of Psychosocial Research on Cyberspace*, *15*(3).

Page, M. J., McKenzie, J. E., Bossuyt, P. M., Boutron, I., Hoffmann, T. C., Mulrow, C. D., Shamseer, L., Tetzlaff, J. M., Akl, E. A., Brennan, S. E., Chou, R., Glanville, J., Grimshaw, J. M., Hróbjartsson, A., Lalu, M. M., Li, T., Loder, E. W., Mayo-Wilson, E., McDonald, S., … Moher, D. (2021). The PRISMA 2020 statement: An updated guideline for reporting systematic reviews. *BMJ*, *372*, n71.

Pang, K. C., Notini, L., McDougall, R., Gillam, L., Savulescu, J., Wilkinson, D., Clark, B. A., Olson-Kennedy, J., Telfer, M. M., & Lantos, J. D. (2020). Long-term puberty suppression for a nonbinary teenager. *Pediatrics*, *145*(2), e20191606.

Pang, K. C., Peri, A. J. S., Chung, H. E., Telfer, M., Elder, C. V., Grover, S., & Jayasinghe, Y. (2020). Rates of fertility preservation use among transgender adolescents. *JAMA Pediatrics*, *174*(9), 890.

Papkoor, J., Wotton, C., Schmierer, K., Giovannoni, G., & Goldacre, M. (2016). Gender identity disorders and multiple sclerosis risk: A national record-linkage study. *Multiple Sclerosis*, *22*(13), 1759–1762.

Parker, G. A. (2011). The origin and maintenance of two sexes (anisogamy), and their gamete sizes by gamete competition. In T. Togashi & P. A. Cox (Eds.), *The Evolution of Anisogamy: A Fundamental Phenomenon Underlying Sexual Selection*. Cambridge University Press.

Parodi, K. B., Holt, M. K., Green, J. G., Porche, M. V., Koenig, B., & Xuan, Z. (2022). Time trends and disparities in anxiety among adolescents, 2012–2018. *Social Psychiatry and Psychiatric Epidemiology*, *57*(1), 127–137.

Parsa-Parsi, R. W. (2017). The revised declaration of Geneva: A modern-day physician's pledge. *JAMA*, *318*(20), 1971–1972.

Pasternack, I., Söderström, I., Saijonkari, M., & Mäkelä, M. (2019). Lääketieteelliset menetelmät sukupuolivariaatioihin liittyvän dysforian hoidossa: Systemaattinen katsaus [Medical approaches to treating gender dysphoria: A systematic review]. Summaryx Oy.

Patashnik, E. M., Gerber, A. S., & Dowling, C. M. (2017). *Unhealthy Politics: The Battle over Evidence-Based Medicine*. Princeton University Press.

Patrick, R. (2024, November 13). Re: United State of America v. Eithan Haim, No. 24-CR-00298. https://eppc.org/wp-content/uploads/2024/11/2024-11-13-Letter-re-Ansari-Conflict75.pdf

Pedersen-Bjergaar, K. (1964). Christian Hamburger on the occasion of his sixtieth birthday. *European Journal of Endocrinology*, *45*(4 Supplement), S3–S7.

Peled, I. (2016). *Masculinities and Third Gender: The Origins and Nature of an Institutionalized Gender Otherness in the Ancient Near East*. Ugarit-Verlag.

Pettit, M. (2013). Becoming glandular: Endocrinology, mass culture, and experimental lives in the interwar age. *American Historical Review*, *118*(4), 1052–1076.

Pfaus, J. G. (2023). The cancer of cancel culture: Spreading “correct” scientific ideologies across North American academia. *Archives of Sexual Behavior*, *52*(1), 43–47.

Pietzke, T. (2024a, February 5). I was told to approve all teen gender transitions. I refused. *The Free Press*. https://web.archive.org/web/20250501184531/https://www.thefp.com/p/i-refused-to-approve-all-teen-gender-transitions

Pietzke, T. (2024b, February 15). ‘I was fired after blowing the whistle.’ *The Free Press*. https://web.archive.org/web/20250501151450/https://www.thefp.com/p/i-was-fired-after-blowing-the-whistle

Pillerová, M., Borbélyová, V., Pastorek, M., Riljak, V., Hodosy, J., Frick, K. M., & Tóthová, L. (2022). Molecular actions of sex hormones in the brain and their potential treatment use in anxiety disorders. *Frontiers in Psychiatry, 13*, 972158.

Pimenoff, V., & Pfäfflin, F. (2011). Transsexualism: Treatment outcome of compliant and noncompliant patients. *International Journal of Transgenderism*, *13*(1), 37–44.

Pol, H. E. H., Cohen-Kettenis, P. T., Van Haren, N. E. M., Peper, J. S., Brans, R. G. H., Cahn, W., Schnack, H. G., Gooren, L. J. G., & Kahn, R. S. (2006). Changing your sex changes your brain: Influences of testosterone and estrogen on adult human brain structure. *European Journal of Endocrinology*, *155*(suppl_1), S107–S114.

Pollock, M., Fernandes, R. M., Becker, L. A., Pieper, D., & Hartling, L. (2024). Chapter V: Overviews of reviews [last updated August 2023]. In *Cochrane Handbook for Systematic Reviews of Interventions*, Version 6.5. Cochrane. https://web.archive.org/web/20250501195623/www.training.cochrane.org/handbook

Posner, G. (2024, April 17). 'Non-binary, neurodivergent' activist ordering psychiatrists to push 'gender affirming' surgery over therapy. *New York Post*. https://web.archive.org/web/20250412111205/https://nypost.com/2024/04/17/opinion/non-binary-activist-teddy-goetz-ordering-psychiatrists-to-push-gender-affirming-surgery-over-therapy/

Practice Committee of the American Society for Reproductive Medicine. (2019). Fertility preservation in patients undergoing gonadotoxic therapy or gonadectomy: A committee opinion. *Fertility and Sterility*, *112*(6), 1022–1033.

Prasad, M. (2024). Introduction to the GRADE tool for rating certainty in evidence and recommendations. *Clinical Epidemiology and Global Health*, *25*, 101484.

Prasad, V. K., & Cifu, A. S. (2019). *Ending Medical Reversal: Improving Outcomes, Saving Lives*. Johns Hopkins University Press.

Pringsheim, T., Ganos, C., McGuire, J. F., Hedderly, T., Woods, D., Gilbert, D. L., Piacentini, J., Dale, R. C., & Martino, D. (2021). Rapid onset functional tic-like behaviors in young females during the COVID-19 pandemic. *Movement Disorders*, *36*(12), 2707–2713.

Prinstein, M. J., Borelli, J. L., Cheah, C. S. L., Simon, V. A., & Aikins, J. W. (2005). Adolescent girls' interpersonal vulnerability to depressive symptoms: A longitudinal examination of reassurance-seeking and peer relationships. *Journal of Abnormal Psychology*, *114*(4), 676–688.

Qureshi, R., Mayo-Wilson, E., & Li, T. (2022). Harms in systematic reviews paper 1: An introduction to research on harms. *Journal of Clinical Epidemiology*, *143*, 186–196.

Radix, A. (n.d.). *Standards of Care Version 8 Update* [Presentation]. Callen-Lorde Community Health Center.

Rafferty, J., AAP Committee on Psychosocial Aspects of Child and Family Health, AAP Committee on Adolescence, & AAP Section on Lesbian, Gay, Bisexual and Transgender Health and Wellness. (2018). Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents. *Pediatrics*, *142*(4), e20182162.

Ramos, G. G. F., Mengai, A. C. S., Daltro, C. A. T., Cutrim, P. T., Zlotnik, E., & Beck, A. P. A. (2021). Systematic review: Puberty suppression with GnRH analogues in adolescents with gender incongruity. *Journal of Endocrinological Investigation*, *44*(6), 1151–1158.

Rausch, Z., & Haidt, J. (2023, March 29). The teen mental illness epidemic is international, Part 1: The Anglosphere. *After Babel*. https://web.archive.org/web/20250501184356/https://www.afterbabel.com/p/international-mental-illness-part-one

Rawee, P., Rosmalen, J. G. M., Kalverdijk, L., & Burke, S. M. (2024). Development of gender non-contentedness during adolescence and early adulthood. *Archives of Sexual Behavior*, *5*3(5), 1813–1825.

Reed, J. (2023a, February 9). I thought I was saving trans kids. Now I'm blowing the whistle. *The Free Press*. https://web.archive.org/web/20250501184532/https://www.thefp.com/p/i-thought-i-was-saving-trans-kids

Reed, J. (2023b, December 23). Jamie Reed: The courage to admit you're wrong. *The Free Press*. https://web.archive.org/web/20250501184533/https://www.thefp.com/p/whistleblower-jamie-reed-courage-admit-wrong

Reena, M. (2015). Psychological changes during puberty—Adolescent school girls. *Universal Journal of Psychology*, *3*(3), 65–68.

Reiss, S., Levitan, G. W., & Szyszko, J. (1982). Emotional disturbance and mental retardation: Diagnostic overshadowing. *American Journal of Mental Deficiency*, *86*(6), 567–574.

Respaut, R., & Terhune, C. (2022, October 6). Putting numbers on the rise in children seeking gender care. *Reuters Investigates*. https://web.archive.org/web/20250501082110/https://www.reuters.com/investigates/special-report/usa-transyouth-data/

Respaut, R., Terhune, C., & Conlin, M. (2022, December 22). Why detransitioners are crucial to the science of gender care. *Reuters Investigates*. https://web.archive.org/web/20250501145713/https://www.reuters.com/investigates/special-report/usa-transyouth-outcomes/

Rew, L., Young, C. C., Monge, M., & Bogucka, R. (2021). Review: Puberty blockers for transgender and gender diverse youth: A critical review of the literature. *Child and Adolescent Mental Health*, *26*(1), 3–14.

Rideout, V., Peebles, A., Mann, S., & Robb, M. (2022). Common Sense census: Media use by tweens and teens, 2021*. Common Sense*. https://web.archive.org/web/20250501184453/https://www.commonsensemedia.org/sites/default/files/research/report/8-18-census-integrated-report-final-web_0.pdf

Rider, G. N., McMorris, B. J., Gower, A. L., Coleman, E., & Eisenberg, M. E. (2018). Health and care utilization of transgender and gender nonconforming youth: A population-based study. *Pediatrics*, *141*(3), e20171683.

Ristori, J., & Steensma, T. D. (2016). Gender dysphoria in childhood. *International Review of Psychiatry*, *28*(1), 13–20.

Riva-Morales, I. D. L., Gama, A., Zhou, R., Choy, B., Isaila, B., Nezami, B. G., Brannigan, R., Bowen, D., & Yang, X. (2025). Clinicopathologic analysis and digital pathology evaluation of orchiectomy specimens in gender-affirmation surgery. *Pathology - Research and Practice*, *269*, 155914.

Roberts, C. M., Klein, D. A., Adirim, T. A., Schvey, N. A., & Hisle-Gorman, E. (2022). Continuation of gender-affirming hormones among transgender adolescents and adults. *Journal of Clinical Endocrinology and Metabolism*, *107*(9), e3937-e3943.

Robinson, K., Sharma, R., Baker, K. E., Dukhanin, V., & Wilson, L. M. (2019). *Effects of Gender-Affirming Surgeries for Treatment of Gender Dysphoria in Transgender People*. https://web.archive.org/web/20250925145852/https://www.crd.york.ac.uk/PROSPERO/view/CRD42019135075

Robinson, K., Sharma, R., Wilson, L., & Baker, K. (2019). *Interventions for Speech, Voice, and Communication in Transgender People*. https://web.archive.org/web/20250925152356/https://www.crd.york.ac.uk/PROSPERO/view/CRD42019124845

Rodgers, R. F., & Rousseau, A. (2022). Social media and body image: Modulating effects of social identities and user characteristics. *Body Image*, *41*, 284–291.

Rohayem, J., Alexander, E. C., Heger, S., Nordenström, A., & Howard, S. R. (2024). Mini-puberty, physiological and disordered: Consequences, and potential for therapeutic replacement. *Endocrine Reviews*, *45*(4), 460–492.

Rolfe, A. (2023). *RE: Client Question* [Private email]. https://web.archive.org/web/20250501184401/https://media4.manhattan-institute.org/wp-content/uploads/sites/5/Amber-Rolfe-e-mail-11_9.pdf

Rose, A. J., & Rudolph, K. D. (2006). A review of sex differences in peer relationship processes: Potential trade-offs for the emotional and behavioral development of girls and boys. *Psychological Bulletin*, *132*(1), 98–131.

Rosenthal, S. M. (2021a). Challenges in the care of transgender and gender-diverse youth: An endocrinologist's view. *Nature Reviews Endocrinology*, *17*(10), 581–591.

Rosenthal, S. M. (2021b). Insurance coverage and coding considerations in gender affirming hormonal care for adolescents & young adults. PPT presentation.

Rosenthal, S. M., Hembree, W. C., Cohen-Kettenis, P. T., Gooren, L., Hannema, S. E., Meyer, W. J., Murad, M. H., Safer, J. D., Tangpricha, V., & T'Sjoen, G. G. (2019). Response to Letter to the Editor: "Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline." *Journal of Clinical Endocrinology and Metabolism*, *104*(11), 5102–5103.

Rothblatt, M. (1995). *The Apartheid of Sex: A Manifesto on the Freedom of Gender*. Crown Publishers.

Rothwell, J. (2023). *Parenting Mitigates Social Media-Linked Mental Health Issues.* https://web.archive.org/web/20250501184352/https://ifstudies.org/ifs-admin/resources/briefs/ifs-gallup-parentingsocialmediascreentime-october2023-1.pdf

Roy, M. K., Bothwell, S., Kelsey, M. M., Ma, N. S., Moreau, K. L., Nadeau, K. J., Rothman, M. S., & Nokoff, N. J. (2024). Bone density in transgender youth on gender-affirming hormone therapy. *Journal of the Endocrine Society*, *8*(5), bvae045.

Russ, M. J. (2021). The psychiatric inpatient multidisciplinary team meeting: A model for current practice. *Journal of Psychiatric Practice*, *27*(2), 101.

Russell, I., Pearson, B., & Masic, U. (2021). A longitudinal study of features associated with autism spectrum in clinic referred, gender diverse adolescents accessing puberty suppression treatment. *Journal of Autism and Developmental Disorders*, *51*(6), 2068–2076.

Russon, J., Smithee, L., Simpson, S., Levy, S., & Diamond, G. S. (2022). Demonstrating attachment-based family therapy for transgender and gender diverse youth with suicidal thoughts and behavior: A case study. *Family Process*, *61*(1), 230–245.

Ruuska, S.-M., Tuisku, K., Holttinen, T., & Kaltiala, R. (2024). All-cause and suicide mortalities among adolescents and young adults who contacted specialised gender identity services in Finland in 1996–2019: A register study. *BMJ Mental Health*, *27*(1), e300940.

Ryan, B. (2024a, October 31). 'Shocking' and 'reckless': Top gender clinic assesses children for gender-altering medical treatments in just 2 hours, lawsuit lays bare. *New York Sun*. https://web.archive.org/web/20250501184516/https://www.nysun.com/article/shocking-and-reckless-top-gender-clinic-assesses-children-for-gender-altering-medical-treatments-in-just-2-hours-lawsuit-lays-bare

Ryan, B. (2024b, December 6). The UK will spend $13.9 million on a puberty blocker study—but to what end? *Hazard Ratio*. https://web.archive.org/web/20250409183953/https://benryan.substack.com/p/the-uk-will-spend-139-million-on

Ryan, B. (2024c, July 19). Pennsylvania Psychological Association forbids any mention on its professional listserv of Britain's Cass Review about pediatric gender medicine, points to WPATH guidelines instead. *Hazard Ratio*. https://web.archive.org/web/20250415162341/https://benryan.substack.com/p/pennsylvania-psychological-association

Ryan, B. (2025, March 12). LEAKED: Trans-care training videos by beleaguered top gender-clinic doctor, part 1. *Hazard Ratio*. https://web.archive.org/web/20250501184158/https://benryan.substack.com/p/leaked-trans-care-training-videos

Saarni, S., & Uusitalo, S. (2020). *Sukupuolen variaatioihin liittyvän dysforian lääketieteelliset hoidot: Analyysi eettisistä kysymyksistä*. Palveluvalikoimaneuvoston (COHERE). https://web.archive.org/web/20241129022559/https://palveluvalikoima.fi/documents/1237350/22895008/Valmistelumuistion+liite+5_EUnetHTA+eettinen+analyysi.pdf/7a641ae3-141b-84dd-44ad-ebf23909e239/Valmistelumuistion+liite+5_EUnetHTA+eettinen+analyysi.pdf?t=15 92317706000

Sackett, D. L., Rosenberg, W. M. C., Gray, J. A. M., Haynes, R. B., & Richardson, W. S. (1996). Evidence based medicine: What it is and what it isn't. *BMJ*, *312*(7023), 71–72.

Safer, J. D., & Tangpricha, V. (2019). Care of the transgender patient. *Annals of Internal Medicine*, *171*(1), ITC1–ITC16.

Sandhu, S., Liu, M., & Keuroghlian, A. S. (2025). The future of US sexual and gender minority health policy. *JAMA Internal Medicine*, *185*(4), 364–365.

Sansfaçon, A. P., Gelly, M. A., Gravel, R., Medico, D., Baril, A., Susset, F., & Paradis, A. (2023). A nuanced look into youth journeys of gender transition and detransition. *Infant and Child Development*, *32*, e2402.

Santesso, N., Glenton, C., Dahm, P., Garner, P., Akl, E. A., Alper, B., Brignardello-Petersen, R., Carrasco-Labra, A., De Beer, H., & Hultcrantz, M. (2020). GRADE guidelines 26: Informative statements to communicate the findings of systematic reviews of interventions. *Journal of Clinical Epidemiology*, *119*, 126–135.

Sapir, L. (2024a, February 16). What happened at MultiCare? *City Journal*. https://web.archive.org/web/20250501184453/https://www.city-journal.org/article/what-happened-at-multicare

Sapir, L. (2024b, August 2). The deposition of Meredithe McNamara. *City Journal*. https://web.archive.org/web/20250501184452/https://www.city-journal.org/article/the-deposition-of-meredithe-mcnamara

Sapir, L. (2024c, August 12). A consensus no longer. *City Journal*. https://web.archive.org/web/20250501184449/https://www.city-journal.org/article/a-consensus-no-longer

Sapir, L. (2024d, February 17). Stacking the deck. *City Journal*. https://web.archive.org/web/20250501145412/https://www.city-journal.org/article/stacking-the-deck-for-gender-affirming-care

Sapir, L. (2025, February 24). The corruption of *The New England Journal of Medicine*. *City Journal*. https://web.archive.org/web/20250501184451/https://www.city-journal.org/article/new-england-journal-of-medicine-transgender-activists

Satel, S. (2024, February 13). A textbook case of social justice medicine run amok. *Washington Monthly*. https://web.archive.org/web/20250501145546/http://washingtonmonthly.com/2024/02/13/gender-affirming-care-a-textbook-case-of-social-justice-run-amok/

Schagen, S. E. E., Wouters, F. M., Cohen-Kettenis, P. T., Gooren, L. J., & Hannema, S. E. (2020). Bone development in transgender adolescents treated with GnRH analogues and subsequent gender-affirming hormones. *Journal of Clinical Endocrinology and Metabolism*, *105*(12), e4252-e4263.

Scheimer, D., Chakrabarti, M., Skoog, T. (2024, May 8). 'Cass Review' author: More 'caution' advised for gender-affirming care for youth. *On Point*. https://web.archive.org/web/20250505175815/https://www.wbur.org/onpoint/2024 /05/08/hilary-cass-review-caution-nhs-gender-affirming-care-youth

Schenck, K. (2022, March 28). Ohio LGBTQ+ orgs call for ties to be cut with psychiatrist whose words are used to deny trans rights. *The Buckeye Flame*. https://web.archive.org/web/20250501184418/https://thebuckeyeflame.com/2022/03/28/open-letter-levine/

Schloendorff v. Society of New York Hospital, No. 211 N.Y. 125, 105 N.E. 92 (1914).

Schneider, M. S., Bockting, W. O., Ehrbar, R. D., Lawrence, A. A., Rachlin, K., & Zucker, K. J. (2009). *Report of the Task Force on Gender Identity and Gender Variance*. American Psychological Association.

Scott, G. (2025, March 20). Ban on changing children's gender on NHS medical records. *The Times*. https://web.archive.org/web/20250406042511/https://www.thetimes.com/uk/politics/article/wes-streeting-nhs-ban-changing-childrens-gender-09dh0g6n7

Scott, G. G., Pinkosova, Z., Jardine, E., & Hand, C. J. (2023). "Thinstagram": Image content and observer body satisfaction influence the when and where of eye movements during instagram image viewing. *Computers in Human Behavior*, *138*, 107464.

Seattle Children's Hospital (n.d.). *Gender Clinic: Education and Resources for Healthcare Professionals*. https://web.archive.org/web/20250405170537/https://www.seattlechildrens.org/clinics/gender-clinic/education-resources-healthcare-professionals/

Seiger, R., Hahn, A., Hummer, A., Kranz, G. S., Ganger, S., Woletz, M., Kraus, C., Sladky, R., Kautzky, A., Kasper, S., Windischberger, C., & Lanzenberger, R. (2016). Subcortical gray matter changes in transgender subjects after long-term cross-sex hormone administration. *Psychoneuroendocrinology*, *74*, 371–379.

Selin Davis, L. (2022, January 6). A trans pioneer explains her resignation from the US professional association for transgender health. *Quillette*. https://web.archive.org/web/20250501184408/https://quillette.com/2022/01/06/a-transgender-pioneer-explains-why-she-stepped-down-from-uspath-and-wpath/

Selin Davis, L. (2024a, October 11). Medical groups are censoring the Cass Review. *Broadview.* https://web.archive.org/web/20250425232038/https://www.broadview.news/p/medical-groups-are-censoring-the

Selin Davis, L. (2024b, December 3). Legal challenges to red-state bans on youth gender care have illuminated a coverup. *Boston Globe*. https://web.archive.org/web/20250501184445/https://www.bostonglobe.com/2024 /12/04/opinion/youth-gender-medicine-wpath-soc-8/

Sharma, R., Robinson, K., Wilson, L. M., & Baker, K. E. (2018). *Effects of Hormone Therapy in Transgender People (PROSPERO 2018)*. https://www.crd.york.ac.uk/PROSPERO/view/CRD42018115379

Shaw, D., Manara, A., & Dalle Ave, A. L. (2022). The ethics of semantics in medicine. *Journal of Medical Ethics*, *48*(12), 1026–1031.

Sherer, I. (2018). *Gender Spectrum Conference: Symposium*. https://www.youtube.com/shorts/n8E4sidarKQ

Shidlo, Ariel., Schroeder, M., & Drescher, J. (2001). Sexual conversion therapy: Ethical, clinical and research perspectives. In *Sexual Conversion Therapy: Ethical, Clinical and Research Perspectives*. Haworth Medical Press.

Shorter, E. (1993). *From Paralysis to Fatigue: A History of Psychosomatic Illness in the Modern Era*. Free Press.

Shrier, A. (2020). *Irreversible Damage: The Transgender Craze Seducing our Daughters*. Regnery Publishing.

Shrier, A. (2021a, August 9). A pediatric association stifles debate on gender dysphoria. *Wall Street Journal*. https://web.archive.org/web/20250501184543/https://www.wsj.com/opinion/pediatric-association-gender-dysphoria-children-transgender-cancel-culture-11628540553

Shrier, A. (2021b, October 4). Top trans doctors blow the whistle on 'sloppy' care. *The Free Press*. https://web.archive.org/web/20250501184533/https://www.thefp.com/p/top-trans-doctors-blow-the-whistle

Shuster, S. M. (2021). *Trans Medicine: The Emergence and Practice of Treating Gender*. New York University Press.

Sibarium, A. (2023, August 11). They support sex changes for children, with safeguards. A top child psychiatry group won't let them speak at its annual conference. *Washington Free Beacon*. https://web.archive.org/web/20250501184346/https://freebeacon.com/campus/they-support-sex-changes-for-children-with-safeguards-a-top-child-psychiatry-group-wont-let-them-speak-at-its-annual-conference/

Silver Hill Hospital/World Professional Association for Transgender Health. (n.d.). *Best Practices in Transgender Health: Evidence Based Medical and Mental Health Care.* https://web.archive.org/web/2/https://silverhillhospital.org/wp-content/uploads/2018/07/GEI-Course-Silver-Hill-August-2-2.pdf

Silver, C., Calvey, R., Martin, A., & Butterworth, J. (2025). Towards best-practice healthcare for transgender patients: Quality improvement in United Kingdom general practice. *Healthcare*, *13*(4), 353.

Silveri, M. M., Schuttenberg, E. M., Schmandt, K., Stein, E. R., Rieselbach, M. M., Sternberg, A., Cohen-Gilbert, J. E., Katz-Wise, S. L., Blackford, J. U., Potter, A. S., Potter, M. P., Sarvey, D. B., McWhinnie, C. M., Feinberg, J. E., & Boger, K. D. (2021). Clinical outcomes following acute residential psychiatric treatment in transgender and gender diverse adolescents. *JAMA Network Open*, *4*(6), e2113637–e2113637.

Sinai, J. (2022). The current gender-affirming care model in BC is unvalidated and outdated. *BCMJ*, *64*(3), 106.

Sinai, J., & Sim, P. (2024). Psychodynamic psychotherapy for gender dysphoria is not conversion therapy. *Journal of the Canadian Academy of Child and Adolescent Psychiatry*, *33*(2), 145–153.

Singal, J. (2018, July/August). When children say they're trans. *The Atlantic*. https://web.archive.org/web/20250501184530/https://www.theatlantic.com/magazine/archive/2018/07/when-a-child-says-shes-trans/561749/

Singal, J. (2022a, April 6). Researchers found puberty blockers and hormones didn't improve trans kids' mental health at their clinic. Then they published a study claiming the opposite (Updated). *Singal-Minded*. https://web.archive.org/web/20250501025816/https://jessesingal.substack.com/p/researchers-found-puberty-blockers

Singal, J. (2022b, September 21). The University of Washington is putting trans kids at risk by distorting suicide research. *Singal-Minded*. https://web.archive.org/web/20250501184356/https://jessesingal.substack.com/p/the-university-of-washington-is-putting

Singal, J. (2023a, April 25). On Alejandra Caraballo vs. Benjamin Ryan vs. Steven Thrasher. *Singal-Minded*. https://web.archive.org/web/20250501155839/https://jessesingal.substack.com/p/on-alejandra-caraballo-vs-benjamin

Singal, J. (2023b, November 21). The rage behind Transgender Map. *UnHerd*. https://web.archive.org/web/20250501184421/https://unherd.com/2023/11/the-rage-behind-transgender-map/

Singh, D., Bradley, S. J., & Zucker, K. J. (2021). A follow-up study of boys with gender identity disorder. *Frontiers in Psychiatry*, *12*, 632784.

Singh-Ospina, N., Maraka, S., Rodriguez-Gutierrez, R., Davidge-Pitts, C., Nippoldt, T. B., Prokop, L. J., & Murad, M. H. (2017). Effect of sex steroids on the bone health of transgender individuals: A systematic review and meta-analysis. *Journal of Clinical Endocrinology and Metabolism*, *102*(11), 3904–3913.

Skauen, J. E., Pallesen, S., Bjørnebekk, A., Chegeni, R., Syvertsen, A., Petróczi, A., & Sagoe, D. (2023). Prevalence and correlates of androgen dependence: a meta-analysis, meta-regression analysis and qualitative synthesis. *Current Opinion in Endocrinology, Diabetes, and Obesity*, *30*(6), 309–323.

Smids, J., & Vasterman, P. (2025). From transsexuality to gender diversity: Hacking's looping theory as an explanation for the sharply increasing number of adolescents seeking gender affirming medical care. *Filosofie and Praktijk*, *46*(1), 42–68.

Smith, C. M. (2005). Origin and uses of *Primum non nocere*—Above all, do no harm! *Journal of Clinical Pharmacology*, *45*(4), 371–377.

Smith, G. C. S., & Pell, J. P. (2003). Parachute use to prevent death and major trauma related to gravitational challenge: Systematic review of randomised controlled trials. *BMJ*, *327*, 1459–1461.

Smith, Y. L. S., Van Goozen, S. H. M., & Cohen-Kettenis, P. T. (2001). Adolescents with gender identity disorder who were accepted or rejected for sex reassignment surgery: A prospective follow-up study. *Journal of the American Academy of Child and Adolescent Psychiatry*, *40*(4), 472–481.

Smith, Y. L. S., Van Goozen, S. H. M., Kuiper, A. J., & Cohen-Kettenis, P. T. (2005). Sex reassignment: Outcomes and predictors of treatment for adolescent and adult transsexuals. *Psychological Medicine*, *35*(1), 89–99.

Socialstyrelsen. (2020). *The Evolution of the Diagnosis of Gender Dysphoria: Prevalence, Co-Ooccurring Psychiatric Diagnoses and Mortality from Suicide* [unofficial translation]. https://web.archive.org/web/20250523173519/https://www.transgendertrend.com/wp-content/uploads/2020/11/English-NBHW-report-002.pdf

Socialstyrelsen. (2022a). *Care of Children and Adolescents with Gender Dysphoria: Summary of National Guidelines.* https://web.archive.org/web/20250501184529/https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2023-1-8330.pdf

Socialstyrelsen. (2022b). *Care of Children and Adolescents with Gender Dysphoria* [unofficial certified translation from Boe v. Marshall, No. 2:22-cv-00184: 5595 (2024)]. https://web.archive.org/web/20250528191906/https://storage.courtlistener.com/recap/gov.uscourts.almd.77755/gov.uscourts.almd.77755.559.5.pdf

Socialstyrelsen. (2022c). *Vård av barn och ungdomar med könsdysfori: Nationellt kunskapsstöd med rekommendationer till profession och beslutsfattare* [Care of children and adolescents with gender dysphoria]. https://web.archive.org/web/20250501184528/https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2022-12-8302.pdf

Society for Evidence-Based Gender Medicine. (2021, July 2). One year since Finland broke with WPATH “Standards of Care.” *Society for Evidence-Based Gender Medicine Spotlight*. https://web.archive.org/web/20250501184411/https://segm.org/Finland_deviates_from_WPATH_prioritizing_psychotherapy_no_surgery_for_minors

Society for Evidence-Based Gender Medicine (2022a, March 3). National Academy of Medicine in France advises caution in pediatric gender transition. *Press Release.* https://segm.org/France-cautions-regarding-puberty-blockers-and-cross-sex-hormones-for-youth

Society for Evidence-Based Gender Medicine (2022b, May 6). Early social gender transition in children in associated with high rates of transgender identity in early adolescence. *Society for Evidence-Based Gender Medicine Spotlight*. https://web.archive.org/web/20250502011336/https://segm.org/early-social-gender-transition-persistence

Society for Evidence-Based Gender Medicine. (2023a, July 9). Transgender identity and suicide attempts and mortality in Denmark. *Society for Evidence-Based Gender Medicine Spotlight*. https://web.archive.org/web/20250501184413/https://segm.org/transgender_suicide_mortailty_Denmark

Society for Evidence-Based Gender Medicine. (2023b, August 17). Denmark sharply restricts youth gender transitions. *Society for Evidence-Based Gender Medicine Spotlight*. https://web.archive.org/web/20250501184410/https://segm.org/Denmark-sharply-restricts-youth-gender-transitions

Society for Evidence-Based Gender Medicine. (2023c, November 19). The 2023 Dutch debate over youth transitions. *Society for Evidence-Based Gender Medicine Spotlight*. https://web.archive.org/web/20250501184410/https://segm.org/Dutch-protocol-debate-Netherlands

Society for Evidence-Based Gender Medicine. (2023d, June 10). Springer to retract a key paper in response to activist demands. *Society for Evidence-Based Gender Medicine Spotlight*. https://web.archive.org/web/20250501145441/https://segm.org/retraction-of-key-publication-in-response-to-activist-pressures

Society for Evidence-Based Gender Medicine. (2024a, February 23). Suicide mortality among gender-dysphoric adolescents and young adults in Finland. *Society for Evidence-Based Gender Medicine Spotlight*. https://web.archive.org/web/20250501184412/https://segm.org/Suicide-Gender-Dysphoric-Adolescent-Young-Adult-Finland-2024

Society for Evidence-Based Gender Medicine. (2024b, July 11). WPATH influence undermines WHO's transgender guidelines. *Society for Evidence-Based Gender Medicine Spotlight*. https://web.archive.org/web/20250501184414/https://segm.org/wpath-evidence-manipulation-risks-discrediting-WHO-transgender-guidelines

Society for Evidence-Based Gender Medicine. (2024c, July 19). The gender dysphoria diagnosis in young people has a "low diagnostic stability," finds a new German study. *Society for Evidence-Based Gender Medicine Spotlight*. https://web.archive.org/web/20250501184412/https://segm.org/gender-dysphoria-diagnosis-desistance-germany

Society for Evidence-Based Gender Medicine. (2024d, December 19). Italy joins the list of countries recommending restrictions on puberty blockers for gender dysphoria. *Society for Evidence-Based Gender Medicine Spotlight*. https://web.archive.org/web/20250501151721/https://segm.org/Italy-Puberty-Blockers-Therapy-Bioethics

Society for Evidence-Based Gender Medicine. (2025, March 26). 2025 German guidelines for diagnosis and treatment of gender incongruence and gender dysphoria of childhood and adolescence. *Society for Evidence-Based Gender Medicine Spotlight*. https://web.archive.org/web/20250502065617/https://segm.org/German-guidelines-gender-dysphoria-youth-2025

Spencer, B. (2025, April 2). NHS swaps gender drugs for 'holistic' care. *The Sunday Times*. https://web.archive.org/web/20250420045726/https://www.thetimes.com/uk/healthcare/article/nhs-swaps-gender-drugs-for-holistic-care-jxhm3b6vk

Spiliadis, A. (2019). Towards a gender exploratory model: Slowing things down, opening things up and exploring identity development. *Metalogos Systemic Therapy Journal*, *35*(1), 1–9.

Stanford Medicine Children's Health. (n.d.). *Pediatric and Adolescent Gender Clinic*. https://web.archive.org/web/20250217175937/https://www.stanfordchildrens.org/en/services/gender.html

Staphorsius, A. S., Kreukels, B. P., Cohen-Kettenis, P. T., Veltman, D. J., Burke, S. M., Schagen, S. E., Wouters, F. M., Delemarre-van de Waal, H. A., & Bakker, J. (2015). Puberty suppression and executive functioning: An fMRI-study in adolescents with gender dysphoria. *Psychoneuroendocrinology*, *56*, 190–199.

Steensma, T. D., van der Ende, J., Verhulst, F. C., & Cohen-Kettenis, P. T. (2013). Gender variance in childhood and sexual orientation in adulthood: A prospective study. *Journal of Sexual Medicine*, *10*(11), 2723–2733.

Steensma, T. D., Cohen-Kettenis, P. T., & Zucker, K. J. (2018). Evidence for a change in the sex ratio of children referred for gender dysphoria: Data from the Center of Expertise on Gender Dysphoria in Amsterdam (1988–2016). *Journal of Sex and Marital Therapy*, *44*(7), 713–715.

Steinberg, L. (2005). Cognitive and affective development in adolescence. *Trends in Cognitive Sciences*, *9*(2), 69–74.

Steinberg, L. (2009). Adolescent development and juvenile justice. *Annual Review of Clinical Psychology*, *5*(1), 459–485.

Steinmetz, K. (2014, May 19). The transgender tipping point. *Time*. https://web.archive.org/web/20250504113016/https://time.com/135480/transgender-tipping-point/

Stoffers, I. E., de Vries, M. C., & Hannema, S. E. (2019). Physical changes, laboratory parameters, and bone mineral density during testosterone treatment in adolescents with gender dysphoria. *Journal of Sexual Medicine*, *16*(9), 1459–1468.

Stolk, T. H. R., Asseler, J. D., Huirne, J. A. F., van den Boogaard, E., & van Mello, N. M. (2023). Desire for children and fertility preservation in transgender and gender-diverse people: A systematic review. *Best Practice and Research Clinical Obstetrics and Gynaecology*, *87*, 102312.

Stoller, R. J. (1964). A contribution to the study of gender identity. *International Journal of Psycho-Analysis*, *45*(2–3), 220–226.

Strang, J. F., Chen, D., Nelson, E., Leibowitz, S. F., Nahata, L., Anthony, L. G., Song, A., Grannis, C., Graham, E., Henise, S., Vilain, E., Sadikova, E., Freeman, A., Pugliese, C., Khawaja, A., Maisashvili, T., Mancilla, M., & Kenworthy, L. (2022). Transgender youth executive functioning: Relationships with anxiety symptoms, Autism Spectrum Disorder, and gender-affirming medical treatment status. *Child psychiatry and human development*, *53*(6), 1252–1265.

Strang, J. F., Meagher, H., Kenworthy, L., de Vries, A. L. C., Menvielle, E., Leibowitz, S., Janssen, A., Cohen-Kettenis, P., Shumer, D. E., Edwards-Leeper, L., Pleak, R. R., Spack, N., Karasic, D. H., Schreier, H., Balleur, A., Tishelman, A., Ehrensaft, D., Rodnan, L., Kuschner, E. S., … Anthony, L. G. (2018). Initial clinical guidelines for co-occurring autism spectrum disorder and gender dysphoria or incongruence in adolescents. *Journal of Clinical Child and Adolescent Psychology*, *47*(1), 105–115.

Strauss, P., Ball, J., Bonney, S., Costanza, M., Cavve, B. S., Hird, K., Saunders, L. A., Bickendorf, X., Thomas, C. S., Mahfouda, S., Fitzgerald, M., Moore, J. K., & Lin, A. (2024). A critical discussion of pediatric gender measures to clarify the utility and purpose of "measuring" gender. *International Journal of Transgender Health*.

Stringer, K. (2023, March 31). The benefits of gender-affirming care. *SPH Blog*. https://web.archive.org/web/20250501184415/https://sph.washington.edu/news-events/sph-blog/benefits-gender-affirming-care

Stroumsa, D., & Kirkland, A. R. (2020). Health coverage and care for transgender people: Threats and opportunities. *New England Journal of Medicine*, *383*(25), 2397–2399.

Stryker, S. (2000). Introduction. In C. Jorgensen, *Christine Jorgensen: A Personal Autobiography*. Cleis Press.

Suarez N. A., Trujillo L., McKinnon I. I., et al. (2024). Disparities in school connectedness, unstable housing, experiences of violence, mental health, and suicidal thoughts and behaviors among transgender and cisgender high school students: Youth Risk Behavior Survey, United States, 2023. *MMWR*, *73*(Suppl-4), 50–58.

Substance Abuse and Mental Health Services Administration. (2020). *Treatment for Suicidal Ideation, Self-Harm, and Suicide Attempts Among Youth*. https://web.archive.org/web/20250501151906/https://library.samhsa.gov/sites/default/files/pep20-06-01-002.pdf

Sugy, P. (2024, December 12). La Haute Autorité de santé veut un accès gratuit à la transition de genre pour tous, à partir de 16 ans. *Le Figaro*. https://web.archive.org/web/20250413134304/https://www.lefigaro.fr/actualite-france/la-haute-autorite-de-sante-veut-un-acces-gratuit-a-la-transition-de-genre-pour-tous-a-partir-de-16-ans-20241212

Sullivan, A. (2025). *Review of Data, Statistics and Research on Sex and Gender*. Social Research Institute, UCL.

Sun, C.-F., Xie, H., Metsutnan, V., Draeger, J. H., Lin, Y., Hankey, M. S., & Kablinger, A. S. (2023). The mean age of gender dysphoria diagnosis is decreasing. *General Psychiatry*, *36*(3), e100972.

Sur, R. L., & Dahm, P. (2011). History of evidence-based medicine. *Indian Journal of Urology*, *27*(4), 487–489.

Szilagyi, M. (2022a, August 21). Academy of pediatrics responds on trans treatment for kids. *Wall Street Journal*. https://web.archive.org/web/20250501184542/https://www.wsj.com/articles/trans-gender-pediatric-aap-kids-children-care-surgery-affirm-treatment-11660942086

Szilagyi, Moira. (2022b, August 10). Why we stand up for transgender children and teens. *AAP Voices Blog*. https://web.archive.org/web/20250501184434/https://www.aap.org/en/news-room/aap-voices/why-we-stand-up-for-transgender-children-and-teens/

Swedish Agency for Health Technology Assessment and Assessment of Social Services. (2022). Hormonbehandling vid könsdysfori - barn och unga En systematisk översikt och utvärdering av medicinska aspekter [Hormone therapy at gender dysphoria - children and young people A systematic review and evaluation of medical aspects]. https://web.archive.org/web/20250501184527/https://www.sbu.se/contentassets/ea4e698fa0c4449aaae964c5197cf940/hormonbehandling-vid-konsdysfori_barn-och-unga.pdf

Tang, A., Hojilla, J. C., Jackson, J. E., Rothenberg, K. A., Gologorsky, R. C., Stram, D. A., Mooney, C. M., Hernandez, S. L., & Yokoo, K. M. (2022). Gender-affirming mastectomy trends and surgical outcomes in adolescents. *Annals of Plastic Surgery*, *88*, 7.

Tanner, J. M. (1962). *Growth at Adolescence: With a General Consideration of the Effects of Hereditary and Environmental Factors Upon Growth and Maturation from Birth to Maturity* (2nd ed.). Blackwell Scientific.

Taylor, J., Hall, R., Heathcote, C., Hewitt, C. E., Langton, T., & Fraser, L. (2024a). Clinical guidelines for children and adolescents experiencing gender dysphoria or incongruence: A systematic review of guideline quality (part 1). *Archives of Disease in Childhood*, *109*(Suppl 2), s65-s72.

Taylor, J., Hall, R., Heathcote, C., Hewitt, C. E., Langton, T., & Fraser, L. (2024b). Clinical guidelines for children and adolescents experiencing gender dysphoria or incongruence: A systematic review of recommendations (part 2). *Archives of Disease in Childhood*, *109*(Suppl 2), s73-s82.

Taylor, J., Hall, R., Langton, T., Fraser, L., & Hewitt, C. E. (2024a). Care pathways of children and adolescents referred to specialist gender services: A systematic review. *Archives of Disease in Childhood*, *109*(Suppl 2), s57-s64.

Taylor, J., Hall, R., Langton, T., Fraser, L., & Hewitt, C. E. (2024b). Characteristics of children and adolescents referred to specialist gender services: A systematic review. *Archives of Disease in Childhood*, *109*(Suppl 2), s3-s11.

Taylor, J., Mitchell, A., Hall, R., Heathcote, C., Langton, T., Fraser, L., & Hewitt, C. E. (2024). Interventions to suppress puberty in adolescents experiencing gender dysphoria or incongruence: A systematic review. *Archives of Disease in Childhood*, *109*(Suppl 2), s33-s47.

Taylor, J., Mitchell, A., Hall, R., Langton, T., Fraser, L., & Hewitt, C. E. (2024). Masculinising and feminising hormone interventions for adolescents experiencing gender dysphoria or incongruence: A systematic review. *Archives of Disease in Childhood*, *109*(Suppl 2), s48-s56.

Tetelepta, B. (2021a, February 27). Dringend meer onderzoek nodig naar transgenderzorg aan jongeren: ‘Waar komt de grote stroom kinderen vandaan?’ [More research is urgently needed into transgender care for young people: “Where does the large increase of children come from?”]. *Algemeen Dagblad*. https://web.archive.org/web/20250503015730/https://www.ad.nl/nijmegen/dringe nd-meer-onderzoek-nodig-naar-transgenderzorg-aan-jongeren-waar-komt-de-grote-stroom-kinderen-vandaan~aec79d00/

Tetelepta, B. (2021b, February 27). More research is urgently needed into transgender care for young people: “Where does the large increase of children come from?” [unofficial translation]. *Voorzij voor Vrouwen*. https://web.archive.org/web/20250501184540/https://www.voorzij.nl/more-research-is-urgently-needed-into-transgender-care-for-young-people-where-does-the-large-increase-of-children-come-from/

Temple Newhook, J., Pyne, J., Winters, K., Feder, S., Holmes, C., Tosh, J., Sinnott, M.-L., Jamieson, A., & Pickett, S. (2018). A critical commentary on follow-up studies and “desistance” theories about transgender and gender-nonconforming children. *International Journal of Transgenderism*, *19*(2), 212–224.

Terhune, C., Respaut, R., & Conlin, M. (2022, October 6). As more transgender children seek medical care, families confront many unknowns. *Reuters Investigates*. https://web.archive.org/web/20250501184526/https://www.reuters.com/investigates/special-report/usa-transyouth-care/

The Economist. (2024, June 27). Research into trans medicine has been manipulated. *The Economist*. https://web.archive.org/web/20250501184456/https://www.economist.com/united-states/2024/06/27/research-into-trans-medicine-has-been-manipulated

The Lancet. (2025, February). Information for authors. *The Lancet*. https://web.archive.org/web/20250501203736/https://www.thelancet.com/pb-assets/Lancet/authors/tl-info-for-authors-1740074875577.pdf

The Lancet Child & Adolescent Health. (2021). A flawed agenda for trans youth. *The Lancet Child and Adolescent Health*, *5*(6), 385.

Thompson, L., Sarovic, D., Wilson, P., Irwin, L., Visnitchi, D., Sämfjord, A., & Gillberg, C. (2023). A PRISMA systematic review of adolescent gender dysphoria literature: 3) treatment. *PLOS Global Public Health*, *3*(8), e0001478.

Thompson, L., Sarovic, D., Wilson, P., Sämfjord, A., & Gillberg, C. (2022a). A PRISMA systematic review of adolescent gender dysphoria literature: 1) Epidemiology. *PLOS Global Public Health*, *2*(3), e0000245.

Thompson, L., Sarovic, D., Wilson, P., Sämfjord, A., & Gillberg, C. (2022b). A PRISMA systematic review of adolescent gender dysphoria literature: 2) Mental health. *PLOS Global Public Health*, *2*(5), e0000426.

Toland, M. K., Bonasia, K., Bentz, J., DelBaugh, R. M., Vitale, E. J., Scudder, P. N., & Damiano, E. A. (2023). Uterine and ovarian histopathology after testosterone for gender affirmation: A systematic review. *Transgender Health*, trgh.2022.0207.

Tordoff, D. M. (2022). Author response to comment "Selection of cohorts is influenced by the same factors as the measured outcome variables." *JAMA Network Open*. https://web.archive.org/web/20250501032030/https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2789423

Tordoff, D. M., Lunn, M. R., Chen, B., Flentje, A., Dastur, Z., Lubensky, M. E., Capriotti, M., & Obedin-Maliver, J. (2023). Testosterone use and sexual function among transgender men and gender diverse people assigned female at birth. *American Journal of Obstetrics and Gynecology*, *229*(6), 669.e1-669.e17.

Tordoff, D. M., Wanta, J. W., Collin, A., Stepney, C., Inwards-Breland, D. J., & Ahrens, K. (2022). Mental health outcomes in transgender and nonbinary youths receiving gender-affirming care. *JAMA Network Open*, *5*(2), e220978.

Transparency Podcast. (n.d.). *Special Series—National Transgender Health Summit—Ep. 2—Dr Karasic* [Broadcast]. Retrieved June 4, 2023, from https://www.youtube.com/watch?v=FVj6fPhjxT4

Tricco, A. C., Lillie, E., Zarin, W., O'Brien, K., Colquhoun, H., Kastner, M., Levac, D., Ng, C., Sharpe, J. P., Wilson, K., Kenny, M., Warren, R., Wilson, C., Stelfox, H. T., & Straus, S. E. (2016). A scoping review on the conduct and reporting of scoping reviews. *BMC Medical Research Methodology*, *16*(1), 15.

Trombly, M. (2024, December 4). Federal judge refuses gag order on Dallas doctor accused of taking patient data on trans care. *Houston Landing*. https://web.archive.org/web/20250501145750/https://houstonlanding.org/federal-judge-refuses-gag-order-on-dallas-doctor-accused-of-taking-patient-data-on-trans-care

Turban, J. (2020, February 6). What South Dakota doesn't get about transgender children. *New York Times*. https://web.archive.org/web/20250501184516/https://www.nytimes.com/2020/02/06/opinion/transgender-children-medical-bills.html

Turban, J. L. (2018). Potentially reversible social deficits among transgender youth. *Journal of Autism and Developmental Disorders*, *48*(12), 4007–4009.

Turban, J. L. (2024). *Free to Be: Understanding Kids and Gender Identity*. Atria Books.

Turban, J. L., Beckwith, N., Reisner, S. L., & Keuroghlian, A. S. (2020). Association between recalled exposure to gender identity conversion efforts and psychological distress and suicide attempts among transgender adults. *JAMA Psychiatry*, *77*(1), 68.

Turban, J. L., Brady, C., & Olson-Kennedy, J. (2022). Understanding and supporting patients with dynamic desires for gender-affirming medical interventions. *JAMA Network Open*, *5*(7), e2224722.

Turban, J. L., Dolotina, B., King, D., & Keuroghlian, A. S. (2022). Sex assigned at birth ratio among transgender and gender diverse adolescents in the United States. *Pediatrics*, *150*(3), e2022056567.

Turban, J. L., & Ehrensaft, D. (2018). Research review: Gender identity in youth: treatment paradigms and controversies. *Journal of Child Psychology and Psychiatry*, *59*(12), 1228–1243.

Turban, J. L., King, D., Carswell, J. M., & Keuroghlian, A. S. (2020). Pubertal suppression for transgender youth and risk of suicidal ideation. *Pediatrics*, *145*(2), e20191725.

Turban, J. L., Loo, S. S., Almazan, A. N., & Keuroghlian, A. S. (2021). Factors leading to "detransition" among transgender and gender diverse people in the United States: A mixed-methods analysis. *LGBT Health*, *8*(4), 273–280.

Turban, J. L., Thornton, J., & Ehrensaft, D. (2025). Biopsychosocial assessments for pubertal suppression to treat adolescent gender dysphoria. *Journal of the American Academy of Child and Adolescent Psychiatry*, *64*(1), 12–16.

Turley, J. (2024, September 13). Sixth Circuit hands down major free speech win for professor against the University of Louisville. https://jonathanturley.org/2024/09/13/sixth-circuit-hands-down-major-free-speech-win-for-professor-against-the-university-of-louisville/

Twenge, J. M. (2020). Increases in depression, self-harm, and suicide among U.S. adolescents after 2012 and links to technology use: Possible mechanisms. *Psychiatric Research and Clinical Practice*, *2*(1), 19–25.

Twenge, J. M. (2023). *Generations: The Real Differences Between Gen Z, Millennials, Gen X, Boomers, and Silents—and What They Mean for America's Future*. Atria Books.

Twenge, J. M., & Campbell, W. K. (2019). Media use is linked to lower psychological well-being: Evidence from three datasets. *Psychiatric Quarterly*, *90*(2), 311–331.

Twenge, J. M., Cooper, A. B., Joiner, T. E., Duffy, M. E., & Binau, S. G. (2019). Age, period, and cohort trends in mood disorder indicators and suicide-related outcomes in a nationally representative dataset, 2005–2017. *Journal of Abnormal Psychology*, *128*(3), 185–199.

Twenge, J. M., Haidt, J., Blake, A. B., McAllister, C., Lemon, H., & Le Roy, A. (2021). Worldwide increases in adolescent loneliness. *Journal of Adolescence*, *93*, 257–269.

Twenge, J. M., Haidt, J., Lozano, J., & Cummins, K. M. (2022). Specification curve analysis shows that social media use is linked to poor mental health, especially among girls. *Acta Psychologica*, *224*.

Tzartzas, K., Oberhauser, P.-N., Marion-Veyron, R., Bourquin, C., Senn, N., & Stiefel, F. (2019). General practitioners referring patients to specialists in tertiary healthcare: A qualitative study. *BMC Family Practice*, *20*(1), 165.

United Nations. (2020, May 1). *Report on Conversion Therapy*. https://www.ohchr.org/en/calls-for-input/report-conversion-therapy

University of Colorado Anschutz Medical Campus. (n.d.). *Section of Endocrinology Faculty*. https://web.archive.org/web/20250501150912/https://medschool.cuanschutz.edu/pediatrics/sections/endocrinology/endo-faculty

University of Utah College of Pharmacy, Drug Regimen Review Center. (2025). *Gender-Affirming Medical Treatments for Pediatric Patients with Gender Dysphoria*. Salt Lake City, UT: University of Utah. https://web.archive.org/web/20250601064306/https://le.utah.gov/AgencyRP/reportingDetail.jsp?rid=636

U.S. v. Skrmetti (No. 23-477), *American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations*, Amicus curiae brief (Supreme Court of the United States, September 3, 2024). https://web.archive.org/web/20250501184152/http://www.supremecourt.gov/DocketPDF/23/23-477/323964/20240903155151548_23-477%20tsac%20Brief%20of%20Amici%20Curiae%20AAP%20et%20al..pdf

U.S. v. Skrmetti (No. 23-477), *Brief for the Petitioner* (Supreme Court of the United States, June 24, 2023). https://web.archive.org/web/20250412165923/https://www.supremecourt.gov/DocketPDF/23/23-477/323551/20240827210326240_23-477tsUnitedStates.pdf

U.S. v. Skrmetti (No. 23-477), *Clinical Practice Guideline Experts*, Amicus curiae brief (Supreme Court of the United States, September 3, 2024). https://web.archive.org/web/20250421233749/https://www.supremecourt.gov/DocketPDF/23/23-477/323982/20240903164457972_23-477_Amicus%20Brief.pdf

U.S. v. Skrmetti (No. 23-477), *Expert Researchers and Physicians*, Amicus curiae brief (Supreme Court of the United States, September 3, 2024). https://web.archive.org/web/20250408155518/https://www.supremecourt.gov/DocketPDF/23/23-477/323851/20240904161709482_23-477%20Amicus%20Brief.pdf

Van Cauwenberg, G., Dhondt, K., & Motmans, J. (2021). Ten years of experience in counseling gender diverse youth in Flanders, Belgium. A clinical overview. *International Journal of Impotence Research*, *33*(7), 671–678.

van de Grift, T. C., van Gelder, Z. J., Mullender, M. G., Steensma, T. D., de Vries, A. L. C., & Bouman, M.-B. (2020). Timing of puberty suppression and surgical options for transgender youth. *Pediatrics*, *146*(5), e20193653.

van der Loos, M. A. T. C., Hannema, S. E., Klink, D. T., den Heijer, M., & Wiepjes, C. M. (2022). Continuation of gender-affirming hormones in transgender people starting puberty suppression in adolescence: A cohort study in the Netherlands. *The Lancet. Child and Adolescent Health*, S2352-4642(22)00254-1.

van der Loos, M. A. T. C., Klink, D. T., Hannema, S. E., Bruinsma, S., Steensma, T. D., Kreukels, B. P. C., Cohen-Kettenis, P. T., de Vries, A. L. C., den Heijer, M., & Wiepjes, C. M. (2023). Children and adolescents in the Amsterdam cohort of gender dysphoria: Trends in diagnostic- and treatment trajectories during the first 20 years of the Dutch protocol. *Journal of Sexual Medicine*, qdac029.

van der Loos, M. A. T. C., Vlot, M. C., Klink, D. T., Hannema, S. E., Den Heijer, M., & Wiepjes, C. M. (2023). Bone mineral density in transgender adolescents treated with puberty suppression and subsequent gender-affirming Hormones. *JAMA Pediatrics*, *177*(12), 1332.

van der Meulen, I. S., Arnoldussen, M., van der Miesen, A. I., Hannema, S. E., Steensma, T. D., de Vries, A. L., & Kreukels, B. P. (2025). Sexual satisfaction and dysfunction in transgender adults following puberty suppression treatment during adolescence. *Journal of Sexual Medicine, 22*(8), 1493–1503.

van der Meulen, I. S., Bungener, S. L., van der Miesen, A. I. R., Hannema, S. E., Kreukels, B. P. C., Steensma, T. D., Bouman, M.-B., & de Vries, A. L. C. (2025). Timing of puberty suppression in transgender adolescents and sexual functioning after vaginoplasty. *Journal of Sexual Medicine*, *22*(1), 196–204.

Vandenbussche, E. (2022). Detransition-related needs and support: A cross-sectional online survey. *Journal of Homosexuality*, *69*(9), 1602–1620.

van Zijverden, L. M., Thijs, A., van Diemen, J. J. K., Wiepjes, C. M., & den Heijer, M. (2025). Transgender persons receiving gender-affirming hormone therapy: risk of acute cardiovascular events in a Dutch cohort study. *European Heart Journal*. https://doi.org/10.1093/eurheartj/ehaf837

Vasey, P. L. (2022, May 11). Stop imposing Western LGBTQ+ identities on non-Western cultures. It's gender colonialism. *Newsweek*. https://web.archive.org/web/20250501184513/https://www.newsweek.com/stop-imposing-western-lgbtq-identities-non-western-cultures-its-gender-colonialism-opinion-1705785

Vasey, P. L., & VanderLaan, D. P. (2014). Evolving research on the evolution of male androphilia. *Canadian Journal of Human Sexuality*, *23*, 137–147.

Viner, R. (2015). Puberty, the brain and mental health in adolescence. In J.-P. Bourguignon, J.-C. Carel, & Y. Christen (Eds.), *Brain Crosstalk in Puberty and Adolescence* (Vol. 13). Springer International Publishing.

Vlot, M. C., Klink, D. T., den Heijer, M., Blankenstein, M. A., Rotteveel, J., & Heijboer, A. C. (2017). Effect of pubertal suppression and cross-sex hormone therapy on bone turnover markers and bone mineral apparent density (BMAD) in transgender adolescents. *Bone*, *95*, 11–19.

Vogel, E. N., Singh, S., & Accurso, E. C. (2021). A systematic review of cognitive behavior therapy and dialectical behavior therapy for adolescent eating disorders. *Journal of Eating Disorders*, *9*(1), 131.

Vogels, E., Risa, G.-W., & Massarat, N. (2022, August 10). *Teens, Social Media and Technology 2022*. The Pew Center. https://web.archive.org/web/20250501105853/https://www.pewresearch.org/internet/2022/08/10/teens-social-media-and-technology-2022/

Vrouenraets, L. J. J. J., de Vries, A. L. C., Arnoldussen, M., Hannema, S. E., Lindauer, R. J. L., de Vries, M. C., & Hein, I. M. (2022). Medical decision-making competence regarding puberty suppression: Perceptions of transgender adolescents, their parents and clinicians. *European Child and Adolescent Psychiatry*, *32*(11), 2343–2361.

Vrouenraets, L. J. J. J., de Vries, A. L. C., de Vries, M. C., van der Miesen, A. I. R., & Hein, I. M. (2021). Assessing medical decision-making competence in transgender youth. *Pediatrics*, *148*(6), e2020049643.

Wagner, S., Panagiotakopoulos, L., Nash, R., Bradlyn, A., Getahun, D., Lash, T. L., Roblin, D., Silverberg, M. J., Tangpricha, V., Vupputuri, S., & Goodman, M. (2021). Progression of gender dysphoria in children and adolescents: A longitudinal study. *Pediatrics*, e2020027722.

Walter, H. J., Bukstein, O. G., Abright, A. R., Keable, H., Ramtekkar, U., Ripperger-Suhler, J., & Rockhill, C. (2020). Clinical practice guideline for the assessment and treatment of children and adolescents with anxiety disorders. *Journal of the American Academy of Child and Adolescent Psychiatry*, *59*(10), 1107–1124.

Wang, D., Wang, R., Yu, P., Meng, X., & Hu, Y. (2024). The relationship between overparenting and adolescent anxiety: The mediating role of cognitive avoidance. *International Journal of Mental Health Promotion*, *26*(8).

Washington Post Editorial Board. (2024, December 15). Look to science, not law, for real answers on youth gender medicine. *Washington Post*. https://web.archive.org/web/20250501184539/https://www.washingtonpost.com/opinions/2024/12/15/skrmetti-case-youth-transition-trans-supreme-court/

Washington State Department of Corrections. (2025). *Gender Affirming Medical Specialist – Physician 3*. https://web.archive.org/web/20250409191034/https://www.governmentjobs.com/careers/washington/doc/jobs/4774718/gender-affirming-medical-specialist-physician-3-hq

Washington University. (2023, September 11). Statement on Washington University Transgender Center. *Newsroom*. https://web.archive.org/web/20250501170200/https://source.washu.edu/2023/09/statement-on-washington-university-transgender-center/

Weale, S. (2025, March 26). University of Sussex fined £585,000 for failing to uphold freedom of speech. *The Guardian*. https://web.archive.org/web/20250501014825/https://www.theguardian.com/education/2025/mar/26/university-of-sussex-fined-freedom-of-speech-investigation-kathleen-stock

Weigle, P. E., & Shafi, R. M. A. (2024). Social media and youth mental health. *Current Psychiatry Reports*, *26*(1), 1–8.

Weiner, S. (2018, July 10). The solemn truth about medical oaths. *AAMC News*. https://web.archive.org/web/20250427015154/https://www.aamc.org/news/solemn-truth-about-medical-oaths

Whelan, E. (2024a, October 16). WPATH's eunuchs. *National Review*. https://www.nationalreview.com/bench-memos/wpaths-eunuchs/

Whelan, E. (2024b, November 22). 'Terminated': DOJ attorney prosecuting whistleblower Dr. Eithan Haim has been removed from case over conflicts of interest. *National Review*. https://www.nationalreview.com/bench-memos/terminated-doj-attorney-prosecuting-whistleblower-dr-eithan-haim-has-been-removed-from-case-over-conflicts-of-interest/

White, A. A., Lin, A., Bickendorf, X., Cavve, B. S., Moore, J. K., Siafarikas, A., Strickland, D. H., & Leffler, J. (2022). Potential immunological effects of gender-affirming hormone therapy in transgender people – an unexplored area of research. *Therapeutic Advances in Endocrinology and Metabolism*, *13*, 20420188221139612.

Whiting, P., Savović, J., Higgins, J. P. T., Caldwell, D. M., Reeves, B. C., Shea, B., Davies, P., Kleijnen, J., & Churchill, R. (2016). ROBIS: A new tool to assess risk of bias in systematic reviews was developed. *Journal of Clinical Epidemiology*, *69*, 225–234.

Wiepjes, C. M., den Heijer, M., Bremmer, M. A., Nota, N. M., Blok, C. J. M., Coumou, B. J. G., & Steensma, T. D. (2020). Trends in suicide death risk in transgender people: Results from the Amsterdam cohort of gender dysphoria study (1972–2017). *Acta Psychiatrica Scandinavica*, *141*(6), 486–491.

Wiepjes, C. M., Nota, N. M., de Blok, C. J. M., Klaver, M., de Vries, A. L. C., Wensing-Kruger, S. A., de Jongh, R. T., Bouman, M.-B., Steensma, T. D., Cohen-Kettenis, P., Gooren, L. J. G., Kreukels, B. P. C., & den Heijer, M. (2018). The Amsterdam cohort of gender dysphoria study (1972–2015): Trends in prevalence, treatment, and regrets. *Journal of Sexual Medicine*, *15*(4), 582–590.

Williams Institute. (2024, April). *The Impact of 2024 Anti-Transgender Legislation on Youth*. Williams Institute, UCLA School of Law. https://web.archive.org/web/20250502065544/https://williamsinstitute.law.ucla.edu/publications/2024-anti-trans-legislation/

Wilson, L. M., Baker, K. E., Sharma, R., Dukhanin, V., McArthur, K., & Robinson, K. A. (2020). Effects of antiandrogens on prolactin levels among transgender women on estrogen therapy: A systematic review. *International Journal of Transgender Health*, *21*(4), 391–402.

Winnicott, D. W. (1965). *The Maturational Processes and the Facilitating Environment: Studies in the Theory of Emotional Development*. International Universities Press.

Wittlin, N. M., Gallagher, N. M., Atwood, S., & Olson, K. R. (2025). Mental health during medical transition in a US and Canadian sample of early socially transitioned transgender youth. *Journal of Adolescent Health*, *76*(2), 228–237.

Wood, H., Sasaki, S., Bradley, S. J., Singh, D., Fantus, S., Owen-Anderson, A., Di Giacomo, A., Bain, J., & Zucker, K. J. (2013). Patterns of referral to a gender identity service for children and adolescents (1976–2011): Age, sex ratio, and sexual orientation. *Journal of Sex & Marital Therapy*, *39*(1), 1–6.

World Health Organization. (2014). *WHO Handbook for Guideline Development* (2nd ed.). https://iris.who.int/bitstream/handle/10665/145714/9789241548960_eng.pdf

World Health Organization. (2022a). *Gender Incongruence and Transgender Health in the ICD*. https://web.archive.org/web/20250501184540/https://www.who.int/standards/classifications/frequently-asked-questions/gender-incongruence-and-transgender-health-in-the-icd

World Health Organization. (2022b). *ICD-11*. https://web.archive.org/web/20250501041410/https://icd.who.int/en/

World Medical Association (2025). World Medical Association Declaration of Helsinki: Ethical principles for medical research involving human participants. *JAMA*, *333*(1):71–74.

World Professional Association for Transgender Health. (n.d.). *GEI Global Impact*. https://web.archive.org/web/20250504092727/https://wpath.org/gei/gei-global-impact/

World Professional Association for Transgender Health & United States Professional Association for Transgender Health. (2024a, April 12). *WPATH and USPATH Comment on the Cass Review.* https://wpath.org/media/cms/Documents/Public%20Policies/2024/17.05.24%20Response%20Cass%20Review%2
INAL%20with%20ed%20note.pdf?_t=1716075965 [Link no longer active].

World Professional Association for Transgender Health & United States Professional Association for Transgender Health. (2024b, May 17). *WPATH and USPATH Comment on the Cass Review*. https://web.archive.org/web/20250502031440/https://wpath.org/wp-content/uploads/2024/11/17.05.24-Response-Cass-Review-FINAL-with-ed-note.pdf

Wright J. D., Chen L., Suzuki Y, Matsuo K., Hershman D. L. (2023). National estimates of gender-affirming surgery in the US. *JAMA Network Open*,*6*(8), e2330348.

Wu, C. A., & Keuroghlian, A. S. (2023). Moving beyond psychiatric gatekeeping for gender-affirming surgery. *JAMA Surgery*, *158*(3), 231.

Wyckoff, A. S. (2023, August 4). AAP reaffirms gender-affirming care policy, authorizes systematic review of evidence to guide update. *AAP News*. https://web.archive.org/web/20250501100315/https://publications.aap.org/aapnews/news/25340/AAP-reaffirms-gender-affirming-care-policy

Xiang, A. H., Martinez, M. P., Chow, T., Carter, S. A., Negriff, S., Velasquez, B., Spitzer, J., Zuberbuhler, J. C., Zucker, A., & Kumar, S. (2024). Depression and anxiety among US children and young adults. *JAMA Network Open*, *7*(10), e2436906.

Xu, R., Diamond, D. A., Borer, J. G., Estrada, C., Yu, R., Anderson, W. J., & Vargas, S. O. (2022). Prostatic metaplasia of the vagina in transmasculine individuals. *World Journal of Urology*, *40*(3), 849–855.

Yogman, M., Garner, A., Hutchinson, J., Hirsh-Pasek, K., Golinkoff, R. M., Committee on Psychological Aspects of Child and Family Health, & Council on Communications and Media (2018). The power of play: A pediatric role in enhancing development in young children. *Pediatrics*, *142*(3), e20182058.

Yoon, D. Y., & Kim, J. H. (2016). An 11-month-old girl with central precocious puberty caused by hypothalamic hamartoma. *Annals of Pediatric Endocrinology and Metabolism*, *21*(4), 235.

Zeng, L., Helsingen, L. M., Bretthauer, M., Agoritsas, T., Vandvik, P. O., Mustafa, R. A., Busse, J., Siemieniuk, R. A. C., Lytvyn, L., Li, S.-A., Yang, M., Yan, L., Zhang, L., Brignardello-Petersen, R., & Guyatt, G. H. (2023). A novel framework for incorporating patient values and preferences in making guideline recommendations: Guideline panel surveys. *Journal of Clinical Epidemiology*, *161*, 164–172.

Zepf, F., Buchmann, J., Flechtner, H., Banaschewski, T., Fleischhacker, C., Golub, Y., Häßler, F., Hohmann, S., Huss, M., Kratz, O., Brunner, R., Siniatchkin, M., Roessner, V., Bachmann, C., & Banaschewski, T. (2024, May 12). Gemeinsame Kommentierung des aktuellen Entwurfs der neuen S2k-Leitlinie "Geschlechtsinkongruenz und Geschlechtsdysphorie im Kindes- und Jugendalter" [Joint commentary on the current draft of the new S2k guideline "Gender incongruence and gender dysphoria in childhood and adolescence"]. https://web.archive.org/web/20250501184544/https://www.zi-mannheim.de/fileadmin/user_upload/downloads/forschung/KJP_downloads/Gemeinsame_Kommentierung_Leitlinienentwurf_S2k-240521.pdf

Zepf, F., König, L., Kaiser, A., Ligges, C., Ligges, M., Roessner, V., Banaschewski, T., & Holtmann, M. (2024). Beyond NICE: Aktualisierte systematische übersicht zur evidenzlage der pubertätsblockade und hormongabe bei minderjährigen mit geschlechtsdysphorie. *Zeitschrift für Kinder- und Jugendpsychiatrie und Psychotherapie*, 1422-4917/a000972.

Zhang, Q., & Ji, W. (2024). Overparenting and offspring depression, anxiety, and internalizing symptoms: A meta-analysis. *Development and Psychopathology*, *36*(3), 1307–1322.

Zhang, Q., Rechler, W., Bradlyn, A., Flanders, W. D., Getahun, D., Lash, T. L., McCracken, C., Nash, R., Panagiotakopoulos, L., Roblin, D., Sandberg, D. E., Silverberg, M. J., Tangpricha, V., Vupputuri, S., & Goodman, M. (2021). Changes in size and demographic composition of transgender and gender non-binary population receiving care at integrated health systems. *Endocrine Practice*, *27*(5), 390–395.

Zhang, Y., Alonso-Coello, P., Guyatt, G. H., Yepes-Nuñez, J. J., Akl, E. A., Hazlewood, G., Pardo-Hernandez, H., Etxeandia-Ikobaltzeta, I., Qaseem, A., Williams, J. W., Tugwell, P., Flottorp, S., Chang, Y., Zhang, Y., Mustafa, R. A., Rojas, M. X., & Schünemann, H. J. (2019). GRADE Guidelines: 19. Assessing the certainty of evidence in the importance of outcomes or values and preferences—Risk of bias and indirectness. *Journal of Clinical Epidemiology*, *111*, 94–104.

Zhang, Y., Coello, P. A., Brożek, J., Wiercioch, W., Etxeandia-Ikobaltzeta, I., Akl, E. A., Meerpohl, J. J., Alhazzani, W., Carrasco-Labra, A., Morgan, R. L., Mustafa, R. A., Riva, J. J., Moore, A., Yepes-Nuñez, J. J., Cuello-Garcia, C., AlRayees, Z., Manja, V., Falavigna, M., Neumann, I., … Schünemann, H. J. (2017). Using patient values and preferences to inform the importance of health outcomes in practice guideline development following the GRADE approach. *Health and Quality of Life Outcomes*, *15*(1), 52.

Zhang, Y., Coello, P. A., Guyatt, G. H., Yepes-Nuñez, J. J., Akl, E. A., Hazlewood, G., Pardo-Hernandez, H., Etxeandia-Ikobaltzeta, I., Qaseem, A., Williams, J. W., Tugwell, P., Flottorp, S., Chang, Y., Zhang, Y., Mustafa, R. A., Rojas, M. X., Xie, F., & Schünemann, H. J. (2019). GRADE guidelines: 20. Assessing the certainty of evidence in the importance of outcomes or values and preferences—inconsistency, imprecision, and other domains. *Journal of Clinical Epidemiology*, *111*, 83–93.

Zhu, J., & Chan, Y.-M. (2015). Fertility issues for patients with hypogonadotropic causes of delayed puberty. *Endocrinology and Metabolism Clinics of North America*, *44*(4), 821–834.

Zubiaurre-Elorza, L., Junque, C., Gómez-Gil, E., & Guillamon, A. (2014). Effects of cross-sex hormone treatment on cortical thickness in transsexual individuals. *Journal of Sexual Medicine*, *11*(5), 1248–1261.

Zucker, K. J. (2005). Gender identity disorder in children and adolescents. *Annual Review of Clinical Psychology*, *1*, 467–492.

Zucker, K. J. (2018). The myth of persistence: Response to “A critical commentary on follow-up studies and ‘desistance’ theories about transgender and gender non-conforming children” by Temple Newhook et al. (2018). *International Journal of Transgenderism*, *19*(2), 231–245.

Zucker, K. J. (2019). Adolescents with gender dysphoria: Reflections on some contemporary clinical and research issues. *Archives of Sexual Behavior*, *48*(7), 1983–1992.

Zucker, K. J., Lawrence, A. A., & Kreukels, B. P. C. (2016). Gender dysphoria in adults. *Annual Review of Clinical Psychology*, *12*, 217–247.

Zwickl, S., Burchill, L., Wong, A. F. Q., Leemaqz, S. Y., Cook, T., Angus, L. M., Eshin, K., Elder, C. V., Grover, S. R., Zajac, J. D., & Cheung, A. S. (2023). Pelvic pain in transgender people using testosterone therapy. *LGBT Health*, *10*(3), 179–190.