**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN ACADEMY OF HIV MEDICINE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>HEALTH RESOURCES AND SERVICES ADMINISTRATION, *et al.*,<br><br>Defendants. | Case No. 26-cv-12638-WGY |

# DEFENDANTS' POST-HEARING BRIEF

## INTRODUCTION

This case is about whether the Ryan White Comprehensive AIDS Resources Emergency Act of 1990, 42 U.S.C. §§ 300ff-11 to 300ff-140, permits the Health Resources and Services Administration ("HRSA") to attach certain conditions on its funding for the treatment of HIV/AIDS as part of the Ryan White HIV AIDS Program ("RWHAP" or "Ryan White Program"). Defendants provide this Post-Hearing Brief to summarize their substantive arguments for why Plaintiffs' claims should be denied[1].

Put simply, the primary question before the Court is whether HRSA may condition Ryan White Program funds on being used for the purpose Congress authorized — treating HIV/AIDS and certain co-occurring conditions among individuals with HIV/AIDS— rather than for purposes

[1] This brief supplements the substantive arguments previously made in Defendants' Opposition to Preliminary Injunction and Motion to Dismiss APA Claims, ECF Nos. 46 and 70. Defendants' jurisdictional arguments are addressed in Defendants' Opposition to Preliminary Injunction and Memorandum in support of Motion to Dismiss, ECF Nos. 46 and 55.

outside that statutory mandate. The answer to that question is yes.[2] Congress has authorized the agency to impose these conditions, by using broad language to define what activities may be funded and simultaneously giving HHS discretion to define what services fall into those categories. For this reason, Congress restricted itself to providing a list of *categories* of services that may be funded by the Program, classifying them further as "core medical services," "support services," and "early intervention services," and providing a further 13 different sub-categories of "core medical services," whose language still required further agency interpretation and determination whether a particular treatment's funding fell within the Ryan White Program's authorization. *See* 42 U.S.C. § 300ff-51 (c) (3) (A)-(M), "Establishment of a Program," whose list of "core medical services" sub-categories include, besides "AIDS Drug Assistance Program treatments under section 300ff–26 of this title" and "AIDS pharmaceutical assistance," such unspecified umbrella terms as "mental health services," "outpatient and ambulatory care," "medical nutrition therapy," and "home health care." *See also id.*, § 300ff-22 (b) (3) (A)-(M), "General Use of Grants," which employs the same list of sub-categories, without further elaboration. In turn, the agency reasonably imposed the challenged conditions such that those conditions are not arbitrary and capricious.

The key issue in this case is that the challenged grant conditions only apply to services *provided by federal funds*. The statute establishing and governing the Ryan White Program defines the core, support, and early intervention services that may be funded by the Program. 42 U.S.C. §

[2] To the extent that the new conditions affect prior existing grants, Plaintiffs' suit belongs before the Court of Federal Claims, which under the Tucker Act has exclusive jurisdiction over breach of contract claims against the Government. *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025) (granting stay as to district court's judgment vacating grant terminations because, under the APA, the district court did not have jurisdiction to adjudicate claims based on grants or to order relief designed to enforce obligations to pay money pursuant to those grants); *Dep't of Ed. v. California*, 604 U.S. 650, 651 (2025) (finding that the government was likely to succeed in showing that the district court lacked jurisdiction to order the payment of money under the APA).

300ff-51 (c), (d), and (e). Specifically, the statute does not include "gender-affirming care" in the list of core medical services. Additionally, while the statute does permit funding for other categories of services such as "outpatient and ambulatory patient services," it is within HHS's delegated authority to interpret these categories in compliance with the statute where Congress does not provide further guidance. In fact, HHS has routinely issued guidelines on allowable uses of funds in the context of this program. *See*, *e.g.*, Ryan White Allowable Uses of Funds Policy Clarification Notice 16-02, https://ryanwhite.hrsa.gov/sites/default/files/ryanwhite/grants/service-category-pcn-16-02-final.pdf, particularly at pp. 2-3 ("HRSA RWHAP funds are intended to support only the HIV-related needs of eligible individuals. Recipients and subrecipients must be able to make an explicit connection between any service supported with HRSA RWHAP funds and the intended client's HIV care and treatment, or care-giving relationship to a person living with HIV (PLWH)." Additionally, the discretion to determine what constitutes a covered support service is explicitly delegated to the Agency by statute. 42 U.S.C. at 300ff-14(c), 22(b), and 51 (d)(1) ("the term 'support services' means services, subject to the approval of the Secretary"). The Agency has determined that services related to "gender-affirming care" do not meet the criteria of the statute and, therefore, will not be provided with Ryan White Program funds. The agency did so reasonably in light of the list of core medical services Congress wrote into statute and the discretion Congress gave it. The challenged conditions in the relevant NOFOS are consistent with the guidance HRSA gave elsewhere governing the use of Program funds and was not arbitrary or capricious.

## ARGUMENT

## I. HRSA Complied with the APA in Imposing the Challenged Conditions.[3]

"The APA's arbitrary-and-capricious standard requires" only that an "agency action be reasonable," and "[j]udicial review under that standard is deferential." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). This standard "deems the agency action presumptively valid provided the action meets a minimum rationality standard." *Sierra Club v. EPA*, 353 F.3d 976, 978 (D.C. Cir. 2004) (citation omitted); *see also Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (noting narrowness of arbitrary-and-capricious standard and that "a reviewing court 'may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions.'" (quoting *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009)). Reasonableness rests on "a rational connection between the facts found and the choice made." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Thus, all that is required is that there be some rational connection between the relevant facts the agency found and the choice the agency made.

Defendants "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Nor does the mere fact that the new policy deviates from prior administrations' approach in that issue-area mean that the change is subject to heightened scrutiny, because such an approach would perversely penalize attempts to reassess and adjust public policy in spheres with high scientific or medical uncertainty or debate: "New administrations are entitled

[3] This argument summarizes arguments made in Defendants' Opposition to Preliminary Injunction and Motion to Dismiss APA Claims, ECF Nos. 46 and 70.

to reevaluate and modify agency practices, even longstanding ones." *People for the Ethical Treatment of Animals v. Dep't of Agric.*, 918 F.3d 151, 158 (D.C. Cir. 2019).

The imposition of the Challenged Conditions accords with the APA. At the outset, it is a basic principle that federal agencies must limit grant expenditures to costs that are authorized under a program statute because unauthorized expenses violate the Appropriations Clause of the Constitution, Art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law"). Also, the Purpose Statute provides that appropriations are only available for the specific purposes for which they were made. *See* 31 U.S.C. § 1301. The Supreme Court also recognizes the fundamental principle that "[t]he established rule is that the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress." *See United States v. MacCollom*, 426 U.S. 317, 321 (1976); *see also Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (recognizing that payments from the federal treasury are limited to those authorized by statute).

Consistent with this principle, Congress has established broad criteria under which the Secretary may issue grants. *See, e.g.*, 42 U.S.C. § 300ff-51. This include using the federal funding for "core medical services," *id.* § 300ff-51(c)(3). The statute contains a list of specific sub-categories of care for "core medical services" that does not include the types of services excluded by the Challenged Conditions, for example, sex-trait modification procedures. Those medical services do not include the types of services excluded by the Challenged Conditions. Furthermore, Congress also authorized federal funds to pay for "support services," *id.* § 300ff-51(d)(1), which are those services that—"subject to the approval of the Secretary"—"are needed for individuals with HIV/AIDS to achieve their medical outcomes," *id.* § 300ff-51(d)(1), with "medical outcomes" being defined as "those outcomes affecting the HIV-related clinical status of an

individual with HIV/AIDS," *id.* § 300ff-51(d)(2). Those conditions, again, focus on HIV-status of the patients—indicating that Congress intended the Secretary to limit grant conditions to HIV-focused treatment and outcomes. Other authorizing provisions are similarly broad. *See, e.g.*, *id.* § 300ff-22; *id.* § 300ff-71**.** The Challenged Conditions, which limit the provision of federal funds to those services that Congress focused on, thus accord with the APA.

Nor are these conditions arbitrary and capricious. It was reasonable for the agency to limit federal funding for the purposes that Congress established. Here, the government provided the reasons for its actions—changes in priorities. *See* ECF No. 1-1. Though Plaintiffs disagree with the government's reasons, that does not convert HRSA's actions into those that are arbitrary and capricious. The Plaintiffs, like this court, may not substitute their judgment for that of the agency's. *State Farm,* 463 U.S. at 43. The updated fiscal year 2026 General Terms and Conditions establish that HRSA undertook a systematic review of the grant awards and the agency's priorities—i.e., the relevant data—to determine whether funding under the Ryan White program comported with statutory requirements and administrative priorities. The APA does not require exhaustive explanation for every action. *Cf. Fox*, 556 U.S. at 514 (no heightened standard); *Ren v. USCIS*, 60 F.4th 89, 93 (4th Cir. 2023) (deferential review). The record shows reasoned consideration prior to imposing the challenged conditions in accordance with the applicable law— which satisfies the APA.

That is a permissible exercise of HRSA's discretion to manage the scope of its own program, and it is the only question this Court need resolve on Counts I–IV.

## II. HRSA Complied with the APA in Compiling the Administrative Record.

In compiling the Administrative Record for this case, HRSA initially produced all non-privileged documents that HRSA considered, directly or indirectly, in imposing the challenged

Notice of Funding Opportunity (NOFO) conditions at issue in this case. "An administrative record must consist of 'all documents and materials *directly or indirectly* considered by [the] agency decision-makers and includes evidence contrary to the agency's position." *Roe v. Mayorkas*, No. 22-cv-10808, 2024 WL 5198705 at *7 (D. Mass. Oct. 2, 2024), (quoting *Town of Norfolk v. U.S. Army Corps of Eng'rs*, 137 F.R.D. 183, 185 (D. Mass. 1991.) *aff'd*, 968 F.2d 1438 (1st Cir. 1992)).

Dissatisfied with the record, Plaintiffs moved to complete it. ECF No. 57. They argued that the Administrative Record should have included several public-facing statements made after the new conditions were imposed, several Executive Orders that were unrelated to the Ryan White HIV/AIDS Program and which the Agency did not consider in imposing the challenged conditions, and prior drafts of and communications about the NOFO conditions. *See* ECF No. 58. At the pretrial conference, the Court ordered Defendants to supplement the record with the Executive Orders, public statements cited by Plaintiffs, and any non-privileged communications referenced in the documents produced initially. Defendants supplemented the record with those documents and also included the Pediatric Report, which HRSA indirectly relied on in imposing the challenged conditions.[4] Plaintiffs may not think that Report is relevant, or they may wish that HRSA had considered other documents before issuing the challenged conditions, but

---

[4] Although a FACA claim regarding one document Defendants included in a supplemental administrative record is not at issue in this case, Defendants maintain that the FACA is not typically implicated when an agency engages individuals external to the government to provide consultative input for an informational report or research review for the agency's consideration. *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton,* 997 F.2d 898, 915 (D.C. Cir. 1993) ("When we examine a particular group or committee to determine whether FACA applies, we must bear in mind that a range of variations exist in terms of the purpose, structure, and personnel of the group. Perhaps it is best characterized as a continuum . . . . At the other end of the continuum is an unstructured arrangement in which the government seeks advice from what is only a collection of individuals who do not significantly interact with each other. That model, we think, does not trigger FACA.")

Defendants are not obligated to include every document Plaintiffs believe should have been considered before issuing the conditions. HRSA included the documents the Agency considered in its decisionmaking when it compiled the Administrative Record, in full compliance with both the APA and the Court's Order. Nothing more is required. On the contrary: "[t]he designation of the Administrative Record, like any established administrative procedure, is entitled to a presumption of administrative regularity." *Roe*, 2024 WL 5198705 at *2 (quoting *Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019)).

## III. The Challenged Conditions Do Not Violate the Affordable Care Act (Count V)[5]

Plaintiffs fundamentally confuse and conflate restrictions on the use of federal funds for a particular medical purpose with discrimination against some subset of those who wish to use those funds for another medical purpose. Plaintiffs argue that the Challenged Conditions violate Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116. Complaint, Dkt. 1, 60-62. Section 1557 of the Affordable Care Act provides that "an individual shall not . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, . . . or under any program or activity that is administered by an Executive Agency," on the basis of sex. 42 U.S.C. § 18116(a). Plaintiffs claim that "[t]he Challenged Conditions discriminate based on sex by requiring healthcare providers participating in the Ryan White Program to withhold healthcare from their transgender patients for the purpose of gender transition or treatment of their gender dysphoria." Complaint, Dkt 1, ¶ 253. This claim fails as a matter of both fact and law.

[5] This argument summarizes arguments made in Defendants' Opposition to Preliminary Injunction, ECF No. 46.

First, the Challenged Conditions in the NOFOs and HRSA General Terms and Conditions restrict only *the use of Ryan White Program funds* for specific sex-trait modification procedures or for the denial of the human sexual binary. (For the latter, *see also* Part V, addressing the Plaintiffs' Count VII First Amendment arguments.) Trans-identifying individuals with HIV/AIDS and their medical providers and caregivers will continue to receive full funding for their treatment for HIV/AIDS under the Program, along with other co-occurring medical conditions other than gender dysphoria—including coverage for hormones, when used to address health complications arising from HIV/AIDS. Participants in the Program are not required to withhold medical treatment from trans-identifying patients for the purposes of sex-trait modification procedures or treatment of gender dysphoria; HRSA merely states that, pursuant to its discretion under statute, Ryan White Program funds cannot be used for this purpose.

Second, Plaintiffs' claim fails as a matter of law. The Court has expressed its awareness of recent Supreme Court precedent that informs its analysis of the issues in the case. *See* Trial Transcript, ECF No. 82, 33:8-11 ("I have been concerned about the Supreme Court's decision in *Skrmetti* and, um -- concerned in the sense that I think I must carefully, and I will, absolutely follow it.") (referring to *United States v. Skrmetti*, 605 U.S. 495 (2025)). In *Skrmetti*, the Supreme Court held that Tennessee's child-protection law proscribing sex transition interventions for minors, including the use of puberty blockers, cross-sex hormones, and surgery to address gender dysphoria, was not subject to heightened scrutiny because it did not classify based on sex or "transgender status." 605 U.S. at 511. Rather, the Court explained, the law "prohibits healthcare providers from administering puberty blockers and hormones to minors for certain *medical uses*, regardless of a minor's sex." *Id*. (emphasis in original). Consequently, the state law was not discriminatory. *Id*. at 522.

Similarly, here, the Challenged Conditions do not classify based on sex. Indeed, they do not classify based on any status. Rather, they classify based on the *medical use* of the treatments paid for with Ryan White Program funds. Indeed, the Challenged Conditions here satisfy rational-basis review in a more straightforward way than the state law in *Skrmetti*: the Challenged Conditions do not purport to ban anything; they only align federal funding with that authorized by statute, as well as the Administration's policy priorities, pursuant to the discretion allowed the Agency under statute. Ultimately, regulations addressing the use of federal funds for specific sex-trait modification procedures reflect "the weight of fierce scientific and policy debates about the safety, efficacy, and propriety of medical treatments in an evolving field". *Id* at 525. By the logic of *Skrmetti*, they do not discriminate based on sex and satisfy rational basis review.

## IV. The Challenged Conditions Do Not Violate the Equal Protection Clause (Count VI)[6]

The Plaintiffs' claim that the Challenged Conditions violate their equal protection rights under the Fifth Amendment fails, for reasons that again follow from *Skrmetti*. Complaint, Dkt. 1, 62-66. In *Skrmetti*, the Court further held that the Tennessee law did not discriminate against trans-identifying individuals or classify on the basis of transgender status, without deciding whether trans-identifying individuals are a suspect class to begin with. *Skrmetti*, 605 U. S. at 517. ("This Court has not previously held that transgender individuals are a suspect or quasi-suspect class. And this case, in any event, does not raise that question because [the challenged law] does not classify on the basis of transgender status.")

---

[6] This argument summarizes arguments made in Defendants' Opposition to Preliminary Injunction, ECF No. 46.

Specifically, the Court concluded that the Tennessee law's prohibition on medical interventions for gender dysphoria, gender identity disorder, and gender incongruence did not discriminate against trans-identifying individuals because "there is a 'lack of identity' between transgender status and the excluded medical diagnoses," given that those seeking the same treatment (hormones) for purposes other than an excluded condition contained both non-trans-identifying persons and trans-identifying persons alike. *Id.* at 519. Similarly, here, "there is a 'lack of identity' between transgender status" and the receipt under the Ryan White Program of federal funds for treatment with human sex hormones, given that both trans-identifying individuals and non-trans-identifying individuals with HIV/AIDS are equally eligible for Ryan White Program funding for such medical interventions, for purposes other than specific sex-trait modification procedures.

In the absence of a suspect class, the Court held in *Skrmetti* that the Tennessee law need only withstand rational-basis review. "The rational basis inquiry employs a relatively relaxed standard" under which a classification will be upheld "so long as there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* at 522. "Where there exist plausible reasons for the relevant government action, [the court's] inquiry is at an end." *Id.* Similarly, here the same logic applies: the Challenged Conditions are subject to rational-basis review, because they turn on the medical use of the treatments in question, and not on the trans-identifying status of those being treated.

In *Skrmetti*, the Supreme Court held that the Tennessee statute survived rational-basis review in part because the Court considered the current "medical and scientific uncertainty" about the risks and benefits associated with administering puberty blockers and hormones to address gender dysphoria, and recognized that there are "open questions regarding basic factual issues" on

these matters. *Id*. at 498. As the Court concluded, "[t]he Equal Protection Clause does not resolve these disagreements," which are instead left to "the people, their elected representatives, and the democratic process." *Id*. at 525. Similarly, in an area of "medical and scientific uncertainty," the Government can reasonably decide to fund medical treatments for some uses and not for others, and this judgment, subject to correction through the political process, need only satisfy rational-basis review, rather than some heightened standard, because the Challenged Conditions classify on the basis of medical use, and not trans-identifying status. The Challenged Conditions therefore do not violate the Equal Protection Clause.

## V. The Challenged Conditions Do Not Violate the First Amendment (Count VII)[7]

Plaintiffs' claim that the Challenged Conditions violate their free speech rights under the First Amendment fails because these conditions pertain to government's *sponsorship* of speech—not regulation of it. The Supreme Court has long been clear that First Amendment concerns are far less pronounced when the government acts as patron to subsidize speech, as opposed to when it acts as sovereign to regulate it.

Plaintiffs erroneously invoke the doctrine of viewpoint discrimination in challenging these funding conditions. *See* Complaint, Dkt. 1 at 66-68. It is well established that government spending is not subject to traditional First Amendment scrutiny. As the Supreme Court explained, "[t]he Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest . . . . In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the

---

[7] This argument summarizes arguments made in Defendants' Opposition to Preliminary Injunction, ECF No. 46.

exclusion of the other." *Rust v. Sullivan*, 500 U.S. 171, 193 (1991). Thus, "[a]s a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc. (AID)*, 570 U.S. 205, 214 (2013) (collecting cases).

While government funding is not free from the First Amendment in all respects, the relevant First Amendment limitation is the prohibition against unconstitutional "condition." *Id*. at 213-15. Under this limitation, the government may "specify the activities [it] wants to subsidize," but it cannot "leverage funding to regulate speech outside the contours of the programs itself." *Id*. at 214-15 (emphasis added). Thus, for example, limitations on the use of federal funds for a specific purpose—such as "promot[ing] or advocat[ing] [for] the legalization or practice of prostitution or sex trafficking"—is constitutionally permissible, *id*. at 217-18 (citation omitted), but outright conditioning federal funds on a pledge to a policy "explicitly opposing prostitution or sex trafficking" is not, *id*., at 210 (citation omitted). The latter amounts to an unconstitutional condition because it regulates speech even on the recipients' "own time and dime." *Id*. at 218-19.

The conditions Plaintiffs challenge state that:

- "[I]f an [AIDS Drug Assistance Program] provides sex hormones, it may only allow such hormones to be dispensed to treat HIV/AIDS or prevent the serious deterioration of health arising from HIV/AIDS, rather than for non-statutory purposes such as specific sex-trait modification procedures." ECF No. 1-1, at p. 43-44.[8]

---

[8] Despite the truncated quotation in Plaintiffs' Complaint, the full text of the condition, however, prefaces this prohibition with the critical explanation that "HRSA reminds States that *therapeutics funded under the [AIDS Drug Assistance Program]* may only be provided 'to treat HIV/AIDS or prevent the serious deterioration of health arising from HIV/AIDS in eligible individuals, including measures for the prevention and treatment of opportunistic infections'"

- Awards "shall not be used to fund, promote, encourage, subsidize, or facilitate . . . denial by the recipient of the sex binary in humans, or the belief that sex is a chosen or mutable characteristic," and applications that do not align with those requirements "will not receive funding to the extent permitted by law and applicable court orders." ECF No. 1-2, at pp. 2-51.

These conditions bind the *use* of federal funds granted under the Ryan White Program; they do not disqualify grantees based on their actions outside their use of those funds. These conditions restrict the use of Ryan White Program funds to the statutory purpose of "preventing the serious deterioration of health arising from HIV/AIDS" and, therefore, are not arbitrary and capricious. The conditions do not prohibit any means of addressing a patient by a grantee. They do not instruct a provider on how to speak to, refer to, or interact with a trans-identifying patient. And they do not categorically exclude trans-identifying people from Ryan White Program-funded care — a trans-identifying person living with HIV/AIDS remains fully eligible for every service the program funds for the treatment of HIV/AIDS, including sex hormones where medically necessary to treat HIV/AIDS or to prevent HIV/AIDS-related health deterioration. All the conditions exclude is spending these particular federal funds on procedures and purposes the statute was never intended to cover in the first place and that appear nowhere on Congress's list of core medical services for the Program to fund.

Accordingly, the Challenged Conditions do not impose an unconstitutional condition on Plaintiffs' speech; rather, as permitted under *Rust* and *AID*, the provisions align the government's

---

(emphasis added). The document then introduces the restriction on the use of sex hormone treatments with "[f]or example," as an instance of such an excluded use of Ryan White Program funds. Health Res. & Servs. Admin., U.S. Dep't of Health & Hum. Servs., *Notice of Funding Opportunity, AIDS Drug Assistance Program (ADAP) Emergency Relief Funds (ERF)*, p. 41, Opportunity No. HRSA-26-012 (Nov. 3, 2025) [https://perma.cc/GEN8-Z7AC].

sponsorship of activities—in this case the treatment of persons with HIV/AIDS--with its policy priorities. In doing so, none of the Challenged Conditions seek to regulate a grantee's speech "outside the contours of" any such provision of medical treatment under the Ryan White Program—*i.e.* they do not prohibit Program participants or grantees from supporting "gender ideology" or denying human gender is binary or providing "gender-affirming care" or gender dysphoria treatment, including human sex hormones for same, on their "own time and dime." *AID*, 570 U.S. at 218. Plaintiffs merely cannot do so *using Ryan White Program funds*. The Supreme Court has repeatedly held that the government does not penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it. *See, e.g., Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (explaining that government "is not required to assist others in funding the expression of particular ideas"); *United States v. Am. Library Ass'n*, 539 U.S. 194, 212 (2003) (plurality) (a "'decision not to subsidize the exercise of a fundamental right does not infringe the right'" (quoting *Rust*, 500 U.S. at 193)); *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) (government "is not required to subsidize First Amendment rights").

Simply put, the Government is permitted to have policy priorities, and it does not violate the First Amendment by not affirmatively funding activities that do not align with those policies.

## CONCLUSION

For the reasons set forth above, in Defendants' motion to dismiss and opposition to Plaintiffs' motion for a preliminary injunction, and articulated at trial, the Court should enter judgment for Defendants on Plaintiffs' claims.

Respectfully submitted:

BRETT A. SHUMATE
Assistant Attorney General

JOSEPH BORSON
Assistant Director, Federal Programs Branch

P. R. Goldstone
Trial Attorney, Federal Programs Branch

By: *<u>/s/ --P. R. Goldstone</u>*
Peter R. ("P. R.") Goldstone
(B.B.O. # 682050)
Trial Attorney, Federal Programs Branch
Civil Division
Department of Justice
1100 L Street NW, 11th Floor
Washington, DC 20530
(202) 598-0912
Peter.R.Goldstone@usdoj.gov

Dated: October 9, 2026

## CERTIFICATE OF SERVICE

I, P. R. Goldstone, hereby certify that a true copy of the above document was served upon all parties of record via this court's electronic filing system and upon any non-registered parties via regular mail.

Dated: October 9, 2026

*<u>/s/ --P. R. Goldstone</u>*
Peter R. ("P. R.") Goldstone
Trial Attorney, Federal Programs Branch
Civil Division
Department of Justice