UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| AMERICAN ACADEMY OF HIV MEDICINE; HIV MEDICINE ASSOCIATION; INTERNATIONAL ASSOCIATION OF PROVIDERS OF AIDS CARE; JENNIFER K. BRODY, M.D.; and CHRISTOPHER B. FOX, N.P., Plaintiffs, | ) | |
| v. | ) | CIVIL ACTION NO. 26-12638-WGY |
| HEALTH RESOURCES AND SERVICES ADMINISTRATION; THOMAS J. ENGELS, in his official capacity as Administrator of the Health Resources and Services Administration; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; and ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, Defendants. | ) | |

YOUNG, D.J. November 19, 2026

**FINDINGS OF FACT, RULINGS OF LAW, AND ORDER FOR JUDGMENT FEDERAL RULE OF CIVIL PROCEDURE 52(A)**

> **"Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.**

President Donald J. Trump, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025).

> **These kids want to live that way, and want to have a good time, have at it . . . I'm happy about it because that is what I fought for, so they can do whatever . . . they want.**

Richard M. Fierro, Army veteran who, with a Navy Officer, and a transgender woman, heroically subdued a mass murderer in a LGBTQ+[1] nightclub.[2]

These diametrically opposing viewpoints (and myriad views in between) represent sincere and deeply felt views concerning vitally important personal matters. None of them are "the law."[3]

---

[1] "LGBTQ+ is 'an acronym for lesbian, gay, bisexual, transgender and queer with a + sign to recognize the limitless sexual orientations and gender identities used by members [within the] community.'" MacDonald v. Brewer Sch. Dep't, 651 F. Supp. 3d 243, 252 n.2 (D. Me. 2023) (internal quotations and alterations omitted) (quoting Glossary of Terms, Hum. Rts. Campaign (Jan. 12, 2023), https://www.hrc.org/resources/glossary-of-terms [https://perma.cc/SUK2-CA5T]).

[2] The provenance of this quote is worth recounting. See Appendix A, infra, at 159.

[3] A presidential executive order is not "the law" as generally understood. "The Constitution limits [the president's] functions in the **lawmaking** process to the

America has no orthodoxy on these deeply individual issues of personal expression. Governmental actors cannot proscribe what our citizens may think about these matters. That includes me. Thus, while it is appropriate to note the backgrounds from which this case arises, nothing said herein is intended to -- nor could it -- express any view concerning the propriety of individual gender expression.

This case turns on the President's efforts to proceed **legally** by way of regulation. This Court must therefore consider whether the laws of this nation -- perhaps the Constitution itself -- stand in the way.

## I. INTRODUCTION

This is a civil action brought by the American Academy of HIV Medicine (the "Academy"), HIV Medicine Association ("HIVMA"), International Association of Providers of AIDS Care ("IAPAC") (collectively, the "Associational Plaintiffs"), Jennifer K. Brody, M.D., and Christopher B. Fox, N.P. (together, the "Provider Plaintiffs"). Associational and Provider Plaintiffs challenge several funding conditions attached to federal grants awarded to assist in the treatment of HIV/AIDS.

---

recommending of laws he thinks wise and the vetoing of laws he thinks bad." Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587 (1952) (emphasis added). The role of presidential executive orders is further explicated in Appendix B, infra, at 161, as such orders play a direct role in this case.

The conditions, promulgated by the Health Resources and Services Administration ("HRSA"), the United States Department of Health and Human Services ("HHS") (together, the "Agency Defendants"), and their leaders, Administrator Thomas J. Engels and Secretary Robert F. Kennedy, Jr. (together, the "Public Official Defendants"), restrict grant recipients' ability to acknowledge the gender identity of transgender patients and prohibit recipients from engaging in gender-affirming care. Associational and Provider Plaintiffs seek declaratory judgment, vacatur, and injunctive relief, citing the Administrative Procedure Act ("APA"), the Affordable Care Act ("ACA"), the Due Process Clause of the Fifth Amendment, and the Free Speech Clause of the First Amendment.

For the reasons stated below, the Court has jurisdiction over all but Associational and Provider Plaintiffs' free-standing ACA non-interference mandate claim and thus GRANTS IN PART AND DENIES IN PART Agency and Public Official Defendants' motion to dismiss. Further, the Court GRANTS declaratory judgment, vacatur, and injunctive relief.

## II. PROCEDURAL HISTORY

On June 10, 2026, the Associational and Provider Plaintiffs filed suit against the Agency and Public Official Defendants. See generally Compl., ECF No. 1. The complaint challenges several funding conditions imposed by Agency and Public Official

Defendants -- members of the Trump Administration -- that limit the scope of federal grants awarded to assist in the treatment of HIV/AIDS. See id. ¶¶ 164-82.

Associational and Provider Plaintiffs bring seven counts against the conditions, four based in violations of the APA and three based in violations of separate statutory or constitutional provisions:

Count 1: Violation of the APA; Arbitrary and Capricious.

Count 2: Violation of the APA; Not in Accordance with Law.

Count 3: Violation of the APA; Exceeds Statutory Authority.

Count 4: Violation of the APA; Contrary to Constitutional Right, Power, Privilege, or Immunity.

Count 5: Violation of the ACA; Non-interference and Non-discrimination mandates.

Count 6: Violation of the Fifth Amendment; Due Process.

Count 7: Violation of the First Amendment; Free Speech.

See generally Compl. Altogether, Associational and Provider Plaintiffs seek declaratory judgment as to the legality of the conditions, vacatur of the conditions, and injunctive relief prohibiting Agency and Public Official Defendants from applying the conditions, or materially similar conditions, against Associational Plaintiffs' members and Provider Plaintiffs themselves. See id. at 69-70.

On the same day the complaint was filed, the Associational and Provider Plaintiffs moved for preliminary injunctive relief. See Pls.' Mot. Prelim. Inj. ("Pls.' Mot."), ECF No. 9. On July 20, 2026, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, this Court collapsed the motion for preliminary injunction into a trial on the merits. See Order, ECF No. 49. Shortly thereafter, on August 14, 2026, Agency and Public Official Defendants filed an initial Administrative Record, see generally Admin. R. ("R."), ECF No. 53, and moved to dismiss the complaint, arguing this Court lacked jurisdiction, see generally Mot. Dismiss Pls.' Compl. ("Defs.' Mot. Dismiss"), ECF No. 54. On August 24, 2026, Associational and Provider Plaintiffs moved to complete the Administrative Record. See generally Mot. Complete Admin. R., ECF. No. 57.

On September 9, 2026, the Court held its Final Pretrial Conference, during which the Court allowed in part the motion to complete the record. See Elec. Clerk's Notes, ECF No. 73. During the conference, the parties agreed to argue the motion to dismiss at the same time as trial on the merits. See id. On September 18, 2026, the Agency and Public Official Defendants filed the Supplemental Administrative Record. See generally Suppl. Admin. R. ("Suppl. R."), ECF No. 77.

On September 23, 2026, the Court heard arguments on the motion to dismiss and held trial on all counts, during which the

Court admitted in evidence several exhibits stipulated by the parties. See Elec. Clerk's Notes, ECF No. 80. Following the trial, the Court took the matter under advisement. See id. The Court now addresses the case in full.

## III. FINDINGS OF FACT[4]

### A. The Ryan White HIV/AIDS Program

In 1990, in response to the HIV/AIDS epidemic, Congress created the Ryan White HIV/AIDS Program ("Ryan White Program"

---

[4] The unique procedural posture of this case warrants an explanation of the order of this opinion. As the motion to dismiss for lack of subject-matter jurisdiction was heard at the same time as the trial on the merits, this Court must first rule on the motion to dismiss before reaching the merits. Cf. American Pub. Health Ass'n v. Nat'l Inst. of Health (American Pub. Health Ass'n I), 786 F. Supp. 3d 237, 250 (D. Mass. 2025). In doing so, the Court generally considers only allegations raised in the plaintiff's complaint and -- with respect to the standing challenges -- those raised in affidavits. See id.; Gonzalez v. United States, 284 F.3d 281, 288 (1st Cir. 2002). But see Atieh v. Riordan, 727 F.3d 73, 76 (1st Cir. 2013) ("[T]he plausibility standard does not apply to a complaint for judicial review of final agency action . . . ."). When a jury is not present, however, the trial judge is the ultimate trier of facts and must consider all proper evidence. See Fed. R. Civ. P. 39(b); Williams v. Illinois, 567 U.S. 50, 69 (2012), abrogated on other grounds, 602 U.S. 779 (2024). In challenges to agency action under the APA, "judicial review of the agency's decision must proceed on the administrative record." Atieh, 727 F.3d at 75. Challenges to agency action on bases other than the APA allow for review beyond the administrative record. See, e.g., Webster v. Doe, 486 U.S. 592, 604-05 (1988) (highlighting that the "District Court has the latitude to control any discovery process," of constitutional claims raised alongside APA claims challenging agency action). To prevent separate recitations of fact for the motion to dismiss, the APA claims, and the statutory and constitutional claims, this opinion sets forth the findings of fact that include allegations made in the complaint, the Administrative Record, and the trial exhibits. As demonstrated below, the Court considers only those facts

or, the "Program"). See Decl. Andrea Weddle ("Weddle Decl.") ¶ 15, ECF No. 12; R. at 0037-40, 0055-56; Suppl. R. at 0155. The Program, created by the Ryan White Comprehensive AIDS Resources Emergency Act ("Ryan White Act" or, the "Act"), 42 U.S.C. §§ 300ff et seq., serves the majority of people diagnosed with HIV in the United States, see Weddle Decl. ¶ 15; Suppl. R. at 0147. Administered by the HRSA, a division of HHS, see Suppl. R. at 0091, the Program is broken into several parts that serve different purposes and recipients, see Decl. Bruce Packett ("Packett Decl.") ¶ 26, ECF No. 11; R. at 0038; Trial Ex. 2 at 10.[5] Parts A and B serve as a funding passthrough for local, state, and territorial governments. See Packett Decl. ¶ 26; Suppl. R. at 0149. Parts C, D, and F function as grants directly to providers, community-based organizations, and other entities. See Packett Decl. ¶ 26; Suppl. R. at 0153-55.[6]

---

relevant to each analysis when determining the various issues before it.

[5] The Ryan White Program's Part B Supplemental Notice of Funding Opportunity ("NOFO") -- though not included in either the produced Administrative Record or Supplemental Administrative Record -- is stipulated as part of the Administrative Record. See Trial Tr. 4:25-5:24.

[6] Part C funds are often used to support staff salaries. See Decl. Christopher Fox ("Fox Decl.") ¶ 23, ECF. No. 15; see also Trial Ex. 3 at 10 (stipulated as part of the Administrative Record). Part D funds often care for women of childbearing age and people below age 26. See Fox Decl. ¶ 26; see also Trial Ex. 5 at 9-11 (stipulated as part of the Administrative Record). Part F funds contribute to educational and other programs. See Fox Decl. ¶ 27; Trial Ex. 4 at 6-8 (stipulated as part of the Administrative Record).

The Program has four main goals: preventing the spread of HIV, improving health outcomes for those with HIV, reducing health disparities and inequities of those with HIV, and ultimately addressing the HIV epidemic. See Packett Decl. ¶ 25; R. at 0038. To accomplish these ends, Congress has expanded the Program substantially over time to fund not just treatment for HIV, but also co-occurring conditions and support services. See Weddle Decl. ¶ 17. As a result, the Program serves as a wraparound model to provide the full range of healthcare needs of those living with HIV. See Decl. Michelle Collins-Ogle ("Collins-Ogle Decl.") ¶ 15, ECF No. 17; R. at 0038; Suppl. R. at 150-51.

In doing so, the Program has been rather successful. See Weddle Decl. ¶ 20; R. at 0038; Trial Ex. 2 at 11. Those engaged in the Program have higher viral suppression rates than the national average, and Ryan White Program expansions have increased access to care, retention in care, and adherence to treatment among those living with HIV. See Weddle Decl. ¶¶ 17, 20; R. at 0038; Trial Ex. 2 at 11. This is particularly striking when considering the focus group of the Program: medically underserved and vulnerable populations. See Packet Decl. ¶ 22; R. at 0038; Suppl. R. at 0149, 0153-0156. Without the Program, many people living with HIV would not be able to

receive medically necessary healthcare, and many providers would be unable to provide such care. See Weddle Decl. ¶ 15.

**B. Transgender Patients and the Ryan White Program**

Though serving all populations, the Ryan White Program has served the transgender community in particular. See id. ¶¶ 21-23; Trial Ex. 39 at 2. To understand the Ryan White Program's impact in this case, several working definitions must be provided:

> Persons who are transgender have a gender identity that differs from the sex that they were assigned at birth. Transgender women (also known as trans women, transfeminine persons, or women of transgender experience) are women who were assigned male sex at birth (born with male anatomy). Transgender men (also known as trans men, transmasculine persons, or men of transgender experience) are men who were assigned female sex at birth (i.e. born with female anatomy). In addition, certain persons might identify outside the gender binary of male or female or move back and forth between different gender identities and use such terms as "gender nonbinary," "genderqueer," or "gender fluid" to describe themselves. Persons who use terms such as "agender" or "null gender" do not identify with having any gender. The term "cisgender" is used to describe persons who identify with their assigned sex at birth . . . .
>
> Gender identity is independent of sexual orientation. Sexual orientation identities among transgender persons are diverse. Persons who are transgender or gender diverse might have sex with cisgender men, cisgender women, or other transgender or gender nonbinary persons.

Trial Ex. 44 at 1; Sexually Transmitted Infections Treatment Guidelines, 2021, Ctr. for Disease Control & Prevention (July 22, 2021), https://www.cdc.gov/std/treatment-guidelines/trans

.htm [https://perma.cc/J2PJ-3FUJ].

The transgender community has been disproportionately impacted by the HIV epidemic. See Weddle Decl. ¶ 23; Trial Ex. 42 at I-100. Some estimates suggest that transgender women have an HIV prevalence of 19.9%, sixty-six times higher than that of the general population. See Weddle Decl. ¶ 23; Trial Ex. 42 at I-101; Trial Ex. 67 at 46. Transgender men have an HIV prevalence of 2.56%. See Weddle Decl. ¶ 23; Trial Ex. 42 at I-101; Trial Ex. 67 at 45. In 2022, 2% of all HIV cases occurred within the transgender community, despite the fact that transgender people account for only 0.6% of the country's population. See Weddle Decl. ¶ 23; Trial Ex. 39 at 1; Trial Ex. 42 at I-101. Accordingly, estimates suggest that 2.1% of all people served by the Ryan White Program are transgender. See Weddle Decl. ¶ 22; Trial Ex. 42 at I-101.

For this reason, many medical providers use Ryan White Program funds to provide gender-affirming care. See Packett Decl. ¶ 30; Trial Ex. 39 at 1. This Court adopts the following working definition:

> Gender affirmation describes processes whereby a person receives social recognition, value, and support for their gender identity and expression. Gender affirmation is often described across several dimensions, including social (e.g., social support and acceptance, use of pronouns, names, or clothing that align with their gender identity), medical (e.g., use of hormones or surgery), legal (e.g., legal name change or changing gender markers on identifying documents), and psychological (e.g., the degree of self-acceptance and comfort with their gender identity).

Trial Ex. 42 at I-100 to I-101; Dep't of Health & Hum. Servs., Guidelines for the Use of Antiretroviral Agents in Adults and Adolescents With HIV I-100 to I-101 (2024) [hereinafter Antiretroviral Agents Report], https://clinicalinfo.hiv.gov/sites/clinicalinfo/files/guidelines/archive/adult-adolescent-arv-2024-09-12.pdf [https://perma.cc/2P7F-LJRB].

Within the context of the Ryan White Program itself, "gender-affirming care" is limited to hormonal treatments and the aforementioned social dimension of gender affirmation. See Trial Tr. 19:7-20:17. Hormonal treatment involves:

> Hormonal therapy . . . [which] facilitate[s] the acquisition of the secondary sex characteristics that are associated with the affirmed gender . . . . Feminizing regiments that are used by transgender woman and others who were assigned male at birth usually include estrogens and androgen blockers. Feminizing regiments result in breast growth, redistribution of body fat, softening of the skin, and a decrease in muscle mass. These regiments do not reduce facial (beard) hair or change the voice . . . . Masculinizing regiments for transgender men and others who were assigned female at birth involve parenteral or transdermal testosterone preparations. These regimens are designed to stimulate the growth of facial and body hair, increase muscle mass, and deepen the voice; use of these regimens also results in clitoral enlargement, vaginal atrophy, and amenorrhea.

Trial Ex. 42 at I-103 to I-104; Antiretroviral Agents Report, supra, at I-103 to I-104.

The social components of gender-affirming care may include "being able to respectfully identify and honor [patients'] identities . . . recogniz[ing patients] by their preferred gender . . . using their preferred name, using their preferred pronoun, and . . . providing them with the relevant medical care in order to treat the gender dysphoria that they are experiencing." See Trial Tr. 19:13-20:11; see also Trial Ex. 42 at I-100 to I-101; Antiretroviral Agents Report, supra, I-101 to I-101.

Gender dysphoria is codified in the Diagnostic and Statistical Manual of Mental Disorders, 5th edition, Text

Revision (the "DSM-5-TR"),[7] and refers generally to "a serious medical condition characterized by the clinically significant distress that a transgender person may experience because of the incongruence between their gender identity and their birth-assigned sex." Fox Decl. ¶ 23; see Trial Ex. 67 at 45; see also Suppl. R. at 0176, 0204. Though experienced by some transgender people, gender dysphoria is not experienced by all transgender people, nor is it exclusive to transgender people; gender dysphoria can impact anyone in society. See DSM-5-TR, supra note 7, at 512-13.

### C. Federal Guidance Regarding HIV Treatment

Medical consensus suggests that the use of gender-affirming care in HIV-positive transgender patients improves HIV clinical outcomes. See generally Trial Ex. 59. As a result, the federal government has promulgated guidance emphasizing the importance of gender-affirming care in HIV treatment since at least 2014.

#### 1. April 2014: HHS and HSRA Guide for HIV/AIDS Clinical Care

In April 2014, the HRSA and HHS published the Guide For HIV/AIDS Clinical Care. See generally Trial Ex. 70.[8] The guide

---

[7] See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 512-13 (5th ed., Text Revision 2022) [hereinafter DSM-5-TR]("[a] marked incongruence between one's experienced/expressed gender and assigned gender . . . .").

[8] U.S. Dep't of Health & Hum. Servs. & Health Res. Serv. Admin., Guide For HIV/AIDS Clinical Care (2014).

"is a pillar of the [Ryan White Program]'s mission to continuously improve HIV/AIDS clinical care," and "present[s] best practices in the clinical management of HIV/AIDS disease . . . ." Id. at vii. Among the many recommendations for care, the guide highlights:

> Demonstrating respect and providing excellent care to patients with various cultural backgrounds, beliefs, and sexual orientations are central to medical professionalism. Providers should approach patients in an open and nonjudgmental fashion and be familiar with medical management issues unique to [gay, lesbian, bisexual, and transgender] populations, such as . . . hormonal treatment for transgender patients. Clinical staff members also must be respectful and supportive . . . [and] should be aware of community agencies with resources available to people who are lesbian, gay, or transgender.

Id. at 5-6.

**2. July 2021: CDC Guidelines for Treating Sexually Transmitted Diseases Among Transgender Patients**

On July 22, 2021, the Center for Disease Control and Prevention ("CDC") published guidelines for the treatment of sexually transmitted diseases among transgender people, titled Transgender and Gender Diverse Persons. See generally Trial Ex. 44.[9] The guidelines -- part of larger set of guidelines creating a systematic treatment approach for sexually transmitted diseases -- suggest:

---

[9] Transgender and Gender Diverse Persons, Ctr. for Disease Control & Prevention (July 22, 2021), https://www.cdc.gov/std/treatment-guidelines/trans.htm# [https://perma.cc/TG4E-HWYD].

> Providers should create welcoming environments that facilitate disclosure of gender identity and sexual orientation. Clinics should document gender identity and sex assigned at birth for all patients to improve sexual health care for transgender and gender nonbinary persons . . . . Clinicians can improve the experience of sexual health screening and counseling for transgender persons by asking for their choice of terminology or modifying language (e.g., asking patients their gender pronouns) to be used during clinic visits and history taking and examination.

Id. at 1. In doing so, the guidelines state, "[g]ender-inclusive and trauma-guided health care might increase the number of transgender patients who seek sexual health services, including STI testing, because transgender persons are at high risk for sexual violence." Id. (citations omitted).[10]

**3. December 2021: Ryan White Program Letter**

On December 16, 2021, HHS circulated a Ryan White Program letter going even further. See generally Trial Ex. 39. The letter begins by stating:

[10] Several of the documents discussed herein that provide support for gender-affirming care include a disclaimer added during the second Trump Administration. See Trial Ex. 44 at 1. These disclaimers state, or express similar sentiment to: "Any information on this page promoting gender ideology is extremely inaccurate and disconnected from truth. The Trump Administration rejects gender ideology due to the harms and divisiveness it causes. This page does not reflect reality and therefore the Administration and this Department reject it." Id.

> Ensuring that transgender people with HIV have access to care, treatment and support services that improve their health and decrease risk of morbidity and mortality related to HIV is a priority for the [HRSA] . . . . Providing gender-affirming care is an important strategy to effectively address the health and medical needs of transgender people with HIV.

Id. at 1. It continues, "[Ryan White Program] funds may be used to support gender affirming care across various . . . core medical and support service[s] . . . ." Id. Specifically, Ryan White Program "recipients and subrecipients may provide behavioral and mental health services to clients experiencing gender dysphoria and social and emotional stress related to transgender discrimination, stigma, and rejection." Id. at 2. Accordingly, it concludes, "[HRSA] will continue to monitor HIV clinical outcomes and ensure evidence informed, evidence based, and emerging interventions are shared to support recipients with providing gender-affirming services for transgender people with HIV. We appreciate your efforts to provide affirming, whole person care to transgender people with HIV." Id.

**4. Early 2022: HRSA Social Media Posts**

Two posts from HRSA official social media accounts reaffirm the December 16, 2021, program letter. See Suppl. R. at 0143-44. On January 28, 2022, HRSA's account posted, "ICYMI [meaning "In case you missed it"] #HRSA's #RyanWhite HIV/AIDS Program released a letter reaffirming the importance of providing gender-affirming #HIV care & treatment services to transgender

people w/HIV [meaning "with HIV"] to reduce barriers, ensure access to medication & improve health outcomes." Id. at 0143.

On March 25, 2022, the same account posted a similar message, including a graphic stating, "HRSA's [Ryan White Program] is working to improve viral suppression among transgender and gender diverse clients receiving HIV medical care," and "84.5% of [Ryan White Program] Transgender clients reached viral suppression in 2020." Id. at 0144 (emphasis omitted).

### 5. August 2025: National Ryan White Conference on HIV Care and Treatment

On August 25, 2025, during the 2022 National Ryan White Conference on HIV Care and Treatment, representatives of the HRSA presented a lecture titled, Providing Gender-Affirming Care to People with HIV. See generally Trial Ex. 71. During the presentation, the representatives highlighted that transgender people are disproportionately impacted by the HIV/AIDS epidemic and that gender-affirming care "[i]mproves engagement in care; [i]mproves viral suppression; [i]mproves adherence [to treatment]; [i]mproves mental health outcomes and well being." Id. at 7. Further, representatives highlighted several studies suggesting that gender-affirming care results in better mental health outcomes for children and adults, id. at 40-44, while the

opposite -- conversion efforts -- caused severe mental health harm, id. at 34-38.[11]

### 6. September 2024: HHS Guidelines on Antiretroviral Agents Use in HIV Patients

On September 12, 2024, HHS updated their report titled, Guidelines for the Use of Antiretroviral Agents in Adults and Adolescents With HIV.[12] See generally Trial Ex. 42.[13] Discussing HIV treatment for transgender people, the guidelines explain:

> Transgender people may avoid the health care system due to stigma and past negative experiences (e.g., being called the wrong name or pronoun, being verbally harassed, being asked invasive questions about being transgender, or having to educate their providers about transgender people). For many transgender people, gender-affirming therapy (e.g., feminizing hormones) is a greater priority than HIV treatment and care.
>
> Concerns about adverse interactions between antiretroviral [] drugs and gender-affirming hormone therapy are common among transgender people. One study found that 40% of transgender women with HIV did not take their [antiretroviral] drugs as directed due to concerns about drug-drug interactions, yet less than half had discussed this concern with their providers . . . .

---

[11] "Conversion therapy" in the context of transgender individuals represents attempts to change a person's gender identity from transgender to cisgender. See Trial Ex. 71 at 34.

[12] The term "Antiretroviral Agent(s)" refers to medications used to treat HIV.

[13] Dep't of Health & Hum. Servs., Guidelines for the Use of Antiretroviral Agents in Adults and Adolescents With HIV (2024), https://clinicalinfo.hiv.gov/sites/clinicalinfo/files/guidelines/archive/adult-adolescent-arv-2024-09-12.pdf [https://perma.cc/2P7F-LJRB].

> Individuals are more likely to engage in HIV care when gender affirmation needs are met. A national study of transgender people with HIV found that participants who work with HIV care providers who affirm their gender (e.g., providers who use their chosen name and pronoun) were more likely to be virologically suppressed.

Id. at I-102. Accordingly, the guidelines advise, "[c]lincians should also ask people with HIV about their gender identity, chosen names, and pronouns, using developmentally appropriate language." Id. at I-103.

### 7. February 2025: HHS Protections for LGBTQ+ People

On February 18, 2025, HHS reviewed an article -- **still active on its website without any disclaimer** -- titled, Protecting the Rights of Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex (LGBTQI+) People. See Suppl. R. at 0157-0162.[14] It states:

> HHS stands with transgender and gender nonconforming youth and their families -- and the significant majority of expert medical associations -- in unequivocally stating that gender affirming care for minors, when medically appropriate and necessary, improves their physical and mental health. **Attempts to restrict, challenge, or falsely characterize this potentially lifesaving care as abuse is dangerous.** Such attempts block parents from making critical health care decisions for their children, create a chilling effect on health care providers who are necessary to provide care for these youth, and ultimately negatively impact the health and well-being of transgender and gender nonconforming youth . . . .

[14] Protecting the Rights of Lesbian, Gay, Bisexual, Transgender, Queer, and Intersex (LGBTQI+) People, Dep't of Health & Hum. Sevs. (Feb. 18, 2025), https://www.hhs.gov/ocr/lgbtqi/index.html [https://perma.cc/28FG-QRJ3] (last visited Nov. 19, 2026).

> As a law enforcement agency, OCR [meaning the Office of Civil Rights] is investigating and, where appropriate, enforcing Section 1557 of the Affordable Care Act cases involving discrimination on the basis of sexual orientation or gender identity in accordance with all applicable law.

Id. at 0158-59 (emphasis added). The article further includes a hyperlink allowing individuals to file a discrimination complaint to HHS's Office of Civil Rights. See id. at 0159.

In light of this guidance, many healthcare providers utilizing Ryan White Program funding provide gender-affirming care. See Weddle Decl. ¶¶ 21, 35; Packett Decl. ¶ 30; Trial Ex. 39 at 1. Ryan White Program funds are so critical to the provision of gender-affirming care that without them, many providers would be unable to provide gender-affirming care. See Packett Decl. ¶¶ 34-35.

**D. Trump Administration's Attacks on Transgender People**

During the trial on the merits, the following exchange occurred:

> THE COURT: I'm asking not to be provocative, I'm asking because I don't know the answer and I'd like to know the answer . . . . The order of the President of the United States, um, I think fairly read, expresses the view that transgender citizens don't exist. Please tell me I'm wrong.
>
> (Pause.)
>
> [GOVERNMENT'S ATTORNEY]: I can't.

Trial Tr. 39:9-25.

Since the beginning of the second Trump Administration, President Trump and members of his Administration have launched a systematic attack on transgender people that simultaneously demonizes and denies their existence. Mere hours after President Trump's second inauguration, the President's social media account reposted a post by the "@TeamTrump" handle that read: "Thanks to President Trump, American women are hereby protected from radical gender ideology [fire emoji.]" Trial Ex. 91. This post was an omen.

**1. Executive Order 14168**

On January 20, 2025 -- his first day in office -- President Trump signed Executive Order 14168, titled Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government.[15] The Executive Order identifies:

> Across the country, ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers. This is wrong. Efforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being. The erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system . . . .

[15] Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025).

> This unhealthy road is paved by an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms, replacing the immutable biological reality of sex with . . . [a] subjective sense of self unmoored from biological facts . . . [This] improperly transforms laws and policies designed to protect sex-based opportunities into laws and policies that undermine them, replacing longstanding, cherished legal rights and values with an identity-based, inchoate social contempt.

Suppl. R. at 0097.

For this reason, the Executive Order continues: "It is the policy of the Unites States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality." Id. In doing so, the Executive Order takes steps to combat "gender ideology," which it defines as:

> "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

Id. at 0097-98.

Specifically, the Executive Order states:

> Agencies shall remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages. Agency forms that require an individual's sex shall list male or female, and shall not request gender identity. Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology . . . .
>
> Federal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology.

Id. at 0098 (subdivisions omitted).

**2. Executive Order 14183**

A week later, on January 27, 2025, President Trump signed Executive Order 14183, titled Prioritizing Military Excellence and Readiness.[16] The Executive Order takes aim at "radical gender ideology [meant] to appease activists unconcerned with the requirements of military service like physical and mental health, selflessness, and unit cohesion." Suppl. R. at 0129. Accordingly, the Executive Order declares that:

> [E]xpressing a false "gender identity" divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service . . . adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life. A man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member.

[16] Exec. Order No. 14183, 90 Fed. Reg. 8757 (Jan. 27, 2025).

> For the sake of our Nation and the patriotic Americans who volunteer to serve it, military service must be reserved for those mentally and physically fit for duty.

Id.

In doing so, the Executive Order bars transgender people from serving in the miliary:

> It is the policy of the United States Government to establish high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity. This policy is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria. This policy is also inconsistent with shifting pronoun usage or use of pronouns that inaccurately reflect an individual's sex.

Id.

### 3. Executive Order 14187

The next day, January 28, 2025, President Trump signed Executive Order 14187, titled Protecting Children From Chemical and Surgical Mutilation.[17] The order asserts:

> Across the country today, medical professionals are maiming and sterilizing a growing number of impressionable children under the radical and false claim that adults can change a child's sex through a series of irreversible medical interventions. This dangerous trend will be a stain on our Nation's history, and it must end . . . .
>
> Accordingly, it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called "transition" of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive life-altering procedures.

Suppl. R. at 0132.

[17] Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025).

Specifically, chemical and surgical mutilation are defined as:

> [T]he use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex . . . to align an individual's physical appearance with an identity that differs from his or her sex; and surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or . . . alter or remove an individual's sexual organs to minimize or destroy their natural biological functions. This phrase sometimes is referred to as "gender affirming care."

Id.

The Executive Order also requires that, "within 90 days of the date of this order, the Secretary of [HHS] shall publish a review of the existing literature on best practices for promoting the health of children who assert gender dysphoria, rapid-onset gender dysphoria, or other identity-based confusion." Id. This report was published on November 19, 2025, titled Treatment For Pediatric Gender Dysphoria: Review of Evidence and Best Practices ("Pediatric Report"). See generally id. at 0163-0572.[18]

**4. Executive Order 14190**

President Trump's barrage of executive orders continued on January 29, 2025. That day, President Trump signed Executive

[18] As later explained, the Agency Defendants rely on this report to justify the conditions challenged in this lawsuit.

Order 14190, titled Ending Radical Indoctrination in K-12 Schooling.[19] The order observes:

> Parents trust America's schools to provide their children with a rigorous education and to instill a patriotic admiration for our incredible Nation and the values for which we stand.
>
> In recent years, however, parents have witnessed schools indoctrinate their children in radical, anti-American ideologies while deliberately blocking parental oversight . . . . [Y]oung men and women are made to question whether they were born in the wrong body and whether to view their parents and their reality as enemies to be blamed. These practices not only erode critical thinking but also sow division, confusion, and distrust, which undermine the very foundations of personal identity and family unity.
>
> Imprinting anti-American, subversive, harmful, and false ideologies on our Nation's children not only violates longstanding anti-discrimination civil rights law in many cases, but usurps basic parental authority. For example, steering students toward surgical and chemical mutilation without parental consent or involvement or allowing males access to private spaces designated for females may contravene Federal laws that protect parental rights . . . .

Suppl. R. at 0135.

The Executive Order promises to "enforce the law to ensure that recipients of Federal funds providing K-12 education comply with all applicable laws prohibiting discrimination in various contexts and protecting parental rights." Id. To accomplish these ends, the Executive Order directs the Secretary of Education, Secretary of Defense, and Secretary of HHS to recommend policy solutions "eliminating Federal funding or

[19] Exec. Order No. 14190, 90 Fed. Reg. 8853 (Jan. 29, 2025).

support for illegal and discriminatory treatment and indoctrination in K-12 schools, including based on gender ideology." Id. at 0136. Further, it states:

> The Attorney General shall coordinate with State attorneys general and local district attorneys in their efforts to enforce the law and file appropriate actions against K-12 teachers and school officials who violate the law by: sexually exploiting minors; unlawfully practicing medicine by offering diagnoses and treatment without the requisite license; or otherwise unlawfully facilitating the social transition of a minor student.

Id. at 0137 (subdivisions omitted). The "social transition," as defined in the Executive Order, roughly equates to the social dimension of gender-affirming care. See id. at 0136.[20]

**5. Executive Order 14201**

On February 5, 2025, President Trump signed Executive Order 14201, titled Keeping Men Out of Women's Sports.[21] The Executive

---

[20] Specifically, the Executive Order defines the "social transition" as:

> [T]he process of adopting a "gender identity" or "gender marker" that differs from a person's sex. This process can include psychological or psychiatric counseling or treatment by a school counselor or other provider; modifying a person's name (e.g., "Jane" to "James") or pronouns (e.g., "him" to "her"); calling a child "nonbinary"; use of intimate facilities and accommodations such as bathrooms or locker rooms specifically designated for persons of the opposite sex; and participating in school athletic competitions or other extracurricular activities specifically designated for persons of the opposite sex. "Social transition" does not include chemical or surgical mutilation.

Suppl. R. at 0136.

[21] Exec. Order No. 14201, 90 Fed. Reg. 9279 (Feb. 5, 2025).

Order -- designed to limit funding and prevent transgender women from participating in female-only sports -- notes: "In recent years, many educational institutions and athletic associations have allowed men to compete in women's sports. This is demeaning, unfair, and dangerous to women and girls, and denies women and girls the equal opportunity to participate and excel in competitive sports." Suppl. R. at 0140. As such, the Executive Order makes it, "the policy of the United States to rescind all funds from educational programs that deprive women and girls of fair athletic opportunities, which results in the endangerment, humiliation, and silencing of women and girls and deprives them of privacy." Id.

**6. Executive Order 14332**

Several months later, on August 7, 2025, President Trump signed Executive Order 14332, titled Improving Oversight of Federal Grantmaking.[22] In seeking to ensure that "[e]very tax dollar the Government spends [] improve[s] American lives or advance[s] American interests," Suppl. R. at 0101, the Executive Order established new criteria and procedures for agencies awarding federal grants, see id. at 0101-05. To emphasize the necessity of such changes, the Order highlights examples of grants that failed to "improve American lives or advance

[22] Exec. Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025).

American interests." Id. at 0101. Such examples include grants that have "developed transgender-sexual-education programs," supported "diversity, equity, and inclusion and other far-left initiatives," and promoted "anti-American ideologies." Id.

To further this end, the Order required that "[d]iscretionary awards must, where applicable, demonstrably advance the President's policy priorities. Discretionary awards shall not be used to fund, promote, encourage, subsidize, or facilitate . . . denial by the grant recipient of the sex binary in humans or the notion that sex is a chosen or mutable characteristic." Id. at 0103 (subdivisions omitted).

### 7. Presidential Proclamation 10911

The Administration's attacks on transgender people have also extended beyond executive orders. On April 3, 2025, President Trump issued Presidential Proclamation 10911, titled National Child Abuse Prevention Month, 2025.[23] The Proclamation states: "This National Child Abuse Prevention Month, we commit to empowering every child in America to lead a fulfilling life of dignity and love -- and we pledge to bring every abuser, predator, and evildoer who threatens the health and safety of our children to swift justice." Trial Ex. 83 at 1.

The Proclamation continues, identifying:

---

[23] Proclamation No. 10911, 90 Fed. Reg. 15203 (Apr. 3, 2025).

> [O]ne of the most prevalent forms of child abuse facing our country today is the sinister threat of gender ideology. Proponents of the gender ideology movement are outrageously indoctrinating our children with the devastating lie that they are trapped in the wrong body—and that the only way they can be truly happy is to alter their sex with hormone therapy, puberty blockers, and sexual mutilation surgery. The evil and backwards lies of gender insanity are robbing our children of their happiness, health, and freedom, while imposing unimaginable heartbreak on parents and families. As [President Trump] stated during [his] Joint Address to the Congress last month, [his] message to every American child is simple: you are perfect exactly the way God made you.

Id.

Highlighting the Administration's effort to combat this "abuse," the Proclamation identifies the issuance of Executive Order 14187 as a positive step, reminding the public that the order "prohibit[s] public schools from indoctrinating our children with transgender ideology, while also taking action to cut off all taxpayer funding to any institution that engages in the sexual mutilation of our youth." Id.

**8. Attacks in the Press and Social Media**

Throughout -- and beyond -- the time during which these presidential actions occurred, the Trump Administration has also taken non-official steps to demonize and deny the existence of transgender people.

On February 27, 2025, President Trump's personal social media account posted a message urging Iowa to pass "a Bill to remove Radical Gender Ideology from [its] Laws. Iowa should

follow the lead of [his] Executive Order, saying there are only two genders . . . ." Trial Ex. 90.

On August 21, 2025, an official HHS social media account posted: "We delivered a clear message: federal funds must be used responsibly. California's Personal Responsibility Education Program grant was revoked today because it failed to remove delusional gender ideology that isn't part of the program's mission. We stand firm on doing the right thing for our children." Suppl. R. at 0145.

Thereafter, on September 27, 2025, the same account highlighted Secretary Robert F. Kennedy, Jr.'s address at the United Nations General Assembly, noting that Secretary Kennedy "[o]pposed destructive gender ideology," and that, "[t]he United States will walk away from the [World Health Organization], but we will never walk away from the world -- or our commitment to end chronic disease." Id. at 0146.

On March 31, 2026 -- shortly before Easter Sunday -- the White House issued a press release, titled President Trump Ended Democrats' "Transgender for Everybody" Insanity.[24] The release began:

[24] Press Release, White House, President Trump Ended Democrats' "Transgender for Everybody" Insanity (Mar. 31, 2026).

> Two years ago today, the Biden Administration desecrated Easter Sunday with a "transgender" message that elevated radical leftist ideology over faith, family, and biological truth. This Easter season, the Trump Administration is celebrating a decisive victory: the swift and unrelenting dismantling of subversive, woke policies that endangered children, eroded women's rights, assaulted common sense, and dragged America toward moral and cultural decline.

Trial Ex. 82 at 1.

Finally, on June 30, 2026, the White House issued a further press release, titled Supreme Court Bolsters President Trump's Push to Eliminate Transgender Insanity.[25] Describing the Supreme Court's decision in West Virgina v. B.P.J, 609 U.S. 958 (2026), the press release notes that "President Trump and his entire Administration will continue safeguarding women's sports, shielding children from radical gender ideology, and restoring biological truth throughout the federal government, just as he promised on the campaign trail." Trial Ex. 81 at 2.[26]

---

[25] Press Release, White House, Supreme Court Bolsters President Trump's Push to Eliminate Transgender Insanity (June 30, 2026).

[26] The Administration's attacks on transgender people did not stop on June 30, 2026; they continue even throughout the course of this litigation. On October 7, 2026, President Trump attacked Senator-Elect Annie Andrews through his personal social media account by posting an attack advertisement characterizing her as supporting transgender people and, through implication, making transgender people appear as pedophiles. See generally Video posted by President Trump (@realDonaldTrump), Truth Social, We Can't Trust Annie Andrews (Oct. 7, 2026), https://truthsocial.com/@realDonaldTrump/posts/117399931237063983 [https://perma.cc/2QAD-QT27]. The attacks recounted above consist only of those included in the record of this case.

**E. Implementation of Ryan White Funding Conditions**

In early 2026, the Trump Administration's attacks on transgender people coalesced around the Ryan White Program. On March 11, 2026, the HRSA promulgated a document titled, FY 2026 HRSA General Terms and Conditions ("HRSA Terms and Conditions"). See Suppl. R. at 0084-89. The HRSA Terms and Conditions "apply to both existing funding as well as prospective funding," Trial Tr. 10:1-25, and define the policies governing all grants administered by the HRSA -- including those under the Ryan White Program, see Suppl. R. at 0084. Specifically, the HRSA Terms and Conditions require Ryan White Program funding recipients to "ensure that all activities funded under this award are implemented in a manner consistent with HRSA's mission and strategic priorities as authorized by law." Id. at 0088. This includes "[n]ot supporting medical interventions for gender dysphoria in minors that lack a strong evidence base," and "[a]pplying sex-based definitions grounded in biological reality." Id.

The HRSA Terms and Conditions also incorporate HRSA's Strategic Priorities Statement (the "Priorities") and HHS's Grants Policy Statement. See id. at 0084, 0088; see also id. at 0090-93; Trial Ex. 11.[27] HRSA's Strategic Priorities note that:

[27] HHS's Grants Policy Statement -- though not included in either the produced Administrative Record or Supplemental

> [M]edical interventions, such as puberty blockers, cross-sex hormones, and surgeries, that attempt to transition minors away from their sex are supported by extremely weak evidence base and have an unfavorable risk/benefit profile. It is a HRSA priority to protect children from these practices, and, to the extent allowable by law. [sic] HRSA programs will deprioritize programs that engage in these practices.

Suppl. R. at 0091. Further, the Priorities state that "[i]t is a HRSA priority to recognize that a person's sex as either male or female is unchangeable and determined by objective biology, and to ensure its programs accurately reflect science, including the biological reality of sex." Id.

HHS's Grants Policy Statement establishes similar requirements. It says in pertinent part:

> By accepting this award, including the obligation, expenditure, or drawdown of award funds, recipient certifies . . . [that it is] complaint with Title IX of the Education Amendments of 1972 . . . including the requirements set forth in Presidential Executive Order 14168 titled Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government . . . and [that] recipient will remain compliant for the duration of the agreement.

Trial Ex. 11 at 21-22.

Following the issuance of the HRSA Terms and Conditions, the HRSA began promulgating several NOFOs under the Ryan White Act. See, e.g., Trial Exs. 1-4. The NOFOs generally describe the process by which to apply for funding under the Ryan White Program, as well as certain conditions with which funding

---

Administrative Record -- is stipulated as part of the Administrative Record. See Trial Tr. 4:25-5:24.

recipients must comply. See generally Trial Exs. 1-4 (describing Ryan White Program funding conditions). While the parties agree that all funds under the Ryan White Program are subject to the HRSA Terms and Conditions, HRSA's Strategic Priorities Statement, and HHS's Grants Policy Statement, see Trial Tr. 10:1-5, all but one of the Ryan White Program NOFOs include language prohibiting Ryan White Program funds from being used to "fund, promote, encourage, subsidize, or facilitate . . . denial by the recipient of the sex binary in humans, or the belief that sex is a chosen or mutable characteristic." Trial Ex. 2 at 5 ("Part B Suppl. NOFO"); Trial Ex. 3 at 4 ("Part C NOFO");[28] Trial Ex. 4 at 4 ("Part F NOFO");[29] Trial Ex. 5 at 4 ("Part D NOFO").[30] The remaining NOFO states that providers "may only allow [sex] hormones to be dispersed to treat HIV/AIDS or prevent the serious deterioration of health arising from HIV/AIDS, rather than for non-statutory purposes such as

---

[28] The Ryan White Program's Part C NOFO -- though not included in either the produced Administrative Record or Supplemental Administrative Record -- is stipulated as part of the Administrative Record. See Trial Tr. 4:25-5:24.

[29] The Ryan White Program's Part F NOFO -- though not included in either the produced Administrative Record or Supplemental Administrative Record -- is stipulated as part of the Administrative Record. See Trial Tr. 4:25-5:24.

[30] The Ryan White Program's Part D NOFO -- though not included in either the produced Administrative Record or Supplemental Administrative Record -- is stipulated as part of the Administrative Record. See Trial Tr. 4:25-5:24.

specified sex-trait modification procedures." Trial Ex. 6 at 41 ("ADAP NOFO").[31]

Taken together, the HRSA Terms and Conditions, HRSA's Strategic Priorities Statement, HHS's Grants Policy Statement, and the various NOFOs governing Ryan White Program funds (altogether, the "Challenged Conditions") prevent healthcare providers from using Ryan White Program funds to engage in any form of gender-affirming care. Whether it be prescribing gender-affirming hormonal therapy or simply being empathetic with patients and using their preferred name and pronouns, under the Challenged Conditions, healthcare providers cannot use Ryan White Program funds to these ends.[32]

**F. The Parties**

**1. Associational Plaintiffs**

**a. American Academy of HIV Medicine**

The Academy is a nonprofit organization constituting the nation's largest association of independent HIV providers. See Packett Decl. ¶ 7; Compl. ¶ 22. The Academy represents over 5,000 HIV care providers who collectively provide care to the

[31] The Ryan White Program's ADAP NOFO -- though not included in either the produced Administrative Record or Supplemental Administrative Record -- is stipulated as part of the Administrative Record. See Trial Tr. 4:25-5:24.

[32] Significantly, at no point in this litigation have Agency and Public Official Defendants denied the impact of the Challenged Conditions.

majority of HIV patients in the country. See Packett Decl. ¶ 8; Compl. ¶ 23. The mission of the Academy is to "ensure that healthcare professionals have the resources needed to provide prevention, treatment, and care for those with or at risk for HIV and related conditions to achieve optimal health." Packett Decl. ¶ 9; see Compl. ¶ 22.

Academy members rely on all parts of Ryan White Program funding to provide care, including gender-affirming care to transgender patients. See Packett Decl. ¶¶ 16, 22, 28, 30; Compl. ¶ 24.[33] For many providers, Ryan White Program funds are the only sufficient funding source to support the provision of gender-affirming care, see Packett Decl. ¶ 33; Compl. ¶ 191, and the funds and care are deeply integrated into providers' programs, see Packett Decl. ¶¶ 32, 35; Compl. ¶ 189. Without these funds, many HIV patients would be unable to receive gender-affirming care. See Packett Decl. ¶¶ 31, 33; Compl. ¶ 191

Under the Challenged Conditions, Academy members could not provide gender-affirming care with Ryan White Program funds, thus forcing them to "not acknowledg[e or] respect[] transgender patients' identities." Packett Decl. ¶ 34; see Compl. ¶¶ 189,

---

[33] 37% of Academy members rely on Ryan White Program funds to provide HIV care. See Packett Decl. ¶ 22. Of that group, 40% provide gender-affirming care. See id. ¶ 30.

194. Accordingly, Academy members would face operational disruptions and a drain on resources that could cause "service reductions, hiring freezes, layoffs of support staff, delayed procurements, program closures, and general loss of income for medical practices." Packett Decl. ¶ 35; see Compl. ¶ 190. Further, many Academy members would be forced to act against their ethical obligations as healthcare providers. See Packett Decl. ¶ 36; Compl. ¶ 189.

**b. HIV Medicine Association**

HIVMA is a division of the Infectious Diseases Society of America -- a nonprofit organization. See Weddle Decl. ¶ 3; Compl. ¶ 27. HIVMA represents about 6,000 healthcare professionals from across the country who seek to "advance a comprehensive and humane response to the HIV pandemic, informed by science and social justice." Weddle Decl. ¶ 8; Compl. ¶ 27. HIVMA works to "increase access to healthcare services and coverage for people with HIV and populations heavily impacted by HIV and to foster a robust, diverse, and culturally competent HIV workforce." Weddle Decl. ¶ 8; Compl. ¶ 28. Further, HIVMA leads the Ryan White Medical Providers Coalition, which is a "leading voice in federal advocacy related to [Ryan White Program] funding and policies." Weddle Decl. ¶ 13; Compl. ¶ 29.

Like the Academy, HIVMA's members rely on all parts of the Ryan White Program to treat patients with HIV. See Weddle Decl.

¶ 10; Compl. ¶ 31. This includes transgender patients, for whom some members provide with gender-affirming care. See Weddle Decl. ¶ 10; Compl. ¶ 31. In fact, because the Ryan White Program has long provided a stable, comprehensive source of funding to support HIV patients, HIVMA members have structured integrated care models that include gender-affirming care and rely on Ryan White Program funds. See Weddle Decl. ¶ 48; Compl. ¶ 189. Without these funds, HIVMA members may not be able to provide the comprehensive care HIV patients need. See Weddle Decl. ¶ 49; Compl. ¶ 191.

Under the Challenged Conditions, HIVMA members would be unable to provide gender-affirming care and would face substantial logistical and administrative challenges. See Weddle Decl. ¶¶ 48, 50; Compl. ¶ 190. The Challenged Conditions would "force [HIVMA] providers to dismantle established care models[;] withdraw needed services from the transgender patients who depend on them; require them to discriminate against transgender patients, which would cause these patients to fall out of care; and jeopardize both individual health outcomes and broader public health goals." Weddle Decl. ¶ 50; see Compl. ¶¶ 189-94. Further, the Challenged Conditions could cause certain providers to close operations and would require medical providers to act in contradiction to their medical ethics. See Weddle Decl. ¶¶ 47-52; Compl. ¶¶ 189-90.

**c. International Association of Providers of AIDS Care**

IAPAC is a U.S. nonprofit with members across the world. See Zuniga Decl. ¶ 7; Compl. ¶ 32. IAPAC has over 30,000 members internationally, 8,500 members in the United States, and conducts programing in over 150 countries. See Zuniga Decl. ¶¶ 7, 11; Compl. ¶ 32. "IAPAC's mission is to expand access to and improve the quality of prevention care, treatment, and support services provided to people affected by and living with HIV and its co-occurring conditions." Zuniga Decl. ¶ 8; see Compl. ¶ 32.

Across all IAPAC members, over 60% provide medical care to HIV patients using funding from all parts of the Ryan White Program. See Zuniga Decl. ¶ 13; Compl. ¶¶ 33, 35. Included within this medical care is gender-affirming care for transgender patients. See Zuniga Decl. ¶ 13; Compl. ¶ 33. Without Ryan White Program funds, IAPAC members may be unable to provide gender-affirming care, and patients may lose access to gender-affirming care altogether. See Zuniga Decl. ¶¶ 37, 39; Compl. ¶ 191.

Under the Challenged Conditions, IAPAC members will end gender-affirming medical care programs rather than risk access to Ryan White Program funds. See Zuniga Decl. ¶ 37; Compl. ¶ 189-90. This would cause patients to refuse to see healthcare

providers and thus result in lost revenue for IAPAC members' health clinics. See Zuniga Decl. ¶¶ 38, 41; Compl. ¶ 190.

**2. Provider Plaintiffs**

**a. Jennifer K. Brody, M.D.**

Jennifer K. Brody, M.D., is a primary care physician in Boston, Massachusetts, who serves as Director of HIV Services at Boston Health Care for the Homeless Program. See Brody Decl. ¶¶ 6, 7; Compl. ¶ 36. Brody is a member of the Academy, HIVMA, and IAPAC. See Brody Decl. ¶ 8; Compl. ¶ 36. Brody provides care to 350-400 HIV patients, including those who are transgender. See Brody Decl. ¶¶ 10-11; Compl. ¶ 37. As part of this care, Brody provides gender-affirming care using Ryan White Program funds under Parts A, B, and C. See Brody Decl. ¶¶ 5, 12, 16; Compl. ¶ 37. Without Ryan White Program funds, Brody would be unable to provide gender-affirming care to her patients, and her patients would lose access to such care. See Brody Decl. ¶¶ 39, 44, 46; Compl. ¶¶ 189-91.

The Challenged Conditions would effectively prohibit Brody from providing gender-affirming care to her patients. See Brody Decl. ¶¶ 39, 40; Compl. ¶ 187. In doing so, Brody's practice would face operational challenges and service disruptions in determining how it could abide by Ryan White Program conditions and would "jeopardize staffing, including nursing and case management positions, and could cause the program to collapse."

See Brody Decl. ¶¶ 43, 47; Compl. ¶ 190. Further, Brody would be forced to violate her medical ethics. See Brody Decl. ¶ 40; Compl. ¶ 189.

**b. Christopher B. Fox, N.P.**

Christopher B. Fox, N.P., is a nurse practitioner in Portland, Oregon, and Assistant Professor of Medicine at Oregon Health and Science University. See Fox Decl. ¶ 6; Compl. ¶ 38. Fox is also a member of the Academy and is credentialed as an HIV specialist by the Academy. See Fox Decl. ¶ 9; Compl. ¶ 38. Fox provides primary HIV care to approximately 300 patients, including to several transgender patients for whom he provides gender-affirming care. See Fox Decl. ¶¶ 10-11, 22; Compl. ¶ 39. Gender-affirming care is deeply integrated in his practice, and he relies on Ryan White Program funding to provide this care. See Fox Decl. ¶¶ 31-34; Compl. ¶ 39. Without the funds made available by the Ryan White Program, Fox would be unable to provide any form of primary care, including gender-affirming care. See Fox Decl. ¶ 31; see also Compl. ¶ 191.

The Challenged Conditions would "prohibit [Fox] from acknowledging, affirming, or respecting the identities of [his] transgender patients." Fox Decl. ¶ 35; Compl. ¶ 187. They place Fox into a difficult position: "If [he] cannot continue to respectfully record and use a patient's name, gender identity, and pronouns, it is likely that [his] transgender

patients would stop coming and would drop off from all care . . . if [he does, he] risks losing all Ryan White [Program] funding." Fox Decl. ¶ 39; see Compl. ¶ 189. The Challenged Conditions would cause his clinic to face logistic difficulties, operational difficulties, and a potential loss of staffing, and Fox would be forced to violate his medical ethics. See Fox Decl. ¶¶ 31, 35, 45; Compl. ¶¶ 189-90.

### 3. The Defendants

The HRSA is a division of HHS that administers the Ryan White Program. See Compl. ¶ 42. Thomas J. Engels is the Administrator of the HRSA and is sued in his official capacity. See Compl. ¶ 43. HHS is an official agency of the United States government tasked with implementing health policy. See Compl. ¶ 44. Robert F. Kennedy, Jr., is the Secretary of HHS and is sued in his official capacity. See Compl. ¶ 45.

## IV. RULINGS OF LAW

### A. Jurisdiction and Motion to Dismiss

"It is familiar law that a federal court always has jurisdiction to determine its own jurisdiction." United States v. Ruiz, 536 U.S. 622, 628 (2002) (citing United States v. United Mine Workers, 330 U.S. 258, 291 (1947)). Here, Agency and Public Official Defendants move to dismiss the complaint for lack of subject-matter jurisdiction. See generally Defs.' Mot. Dismiss. They contend dismissal is proper for five reasons:

Reason 1: Associational and Provider Plaintiffs' claims are unripe.

Reason 2: Associational and Provider Plaintiffs lack standing.

Reason 3: The Challenged Conditions are committed to agency discretion by law.

Reason 4: The Challenged Conditions are not discrete, final agency actions.

Reason 5: Associational and Provider Plaintiffs' claims fall under the Tucker Act.

See generally Mem. Supp. Defs.' Mot. Dismiss, ECF No. 55. For the reasons stated below, the Court GRANTS IN PART AND DENIES IN PART Agency and Public Official Defendants' motion to dismiss.

**1. Ripeness**

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157 (2014). The doctrines of both "standing and ripeness 'originate' from [this] same Article III limitation," and very often standing and ripeness "boil down to the same question." Id. at 157 n.5 (first quoting DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 335 (2006); then quoting MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128 n.8 (2007)). For this reason, standing and ripeness are often confused. While standing asks the question

of "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction," ripeness asks, "whether the harm asserted has matured sufficiently to warrant judicial intervention." Warth v. Seldin, 422 U.S. 490, 498, 499 n.10 (1975) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)).

"Ripeness analysis has two prongs: 'fitness' and 'hardship.'" Reddy v. Foster, 845 F.3d 493, 501 (1st Cir. 2017) (citing Texas v. United States, 523 U.S. 296, 300-01 (1998)). These prongs "implicate[] both constitutional and prudential justiciability concerns." Algonquin Gas Transmission, LLC v. Weymouth, 919 F.3d 54, 62 (1st Cir. 2019). As to fitness, the constitutional component asks, "whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all." Id. (quoting Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 536 (1st Cir. 1995)). "The prudential component of the fitness test asks whether resolution of the case turns on 'legal issues not likely to be significantly affected by further factual development.'" Id. (quoting Ernst & Young, 45 F.3d at 536). In determining hardship, courts look to "whether granting relief would serve a useful purpose, or, put another way, whether the sought-after declaration would be of practical assistance in setting the

underlying controversy to rest." Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 693 (1st Cir. 1994).

Agency and Public Official Defendants contend that neither the fitness nor hardship prong of ripeness are satisfied. See Mem. Supp. Defs.' Mot. Dismiss at 7-8. They argue that any injury, should one exist, "depends on whether and how potential grant recipients respond to conditions that have not yet been imposed on any award they hold." Id. at 8. As this response is not yet certain, they argue, Associational and Provider Plaintiffs' claims cannot be ripe for adjudication. See id.

The complaint and record rebut this. The complaint states: "The [HRSA's Terms and Conditions] apply to and are incorporated **into all funding provided through and administered by HRSA,** including any funding under the Ryan White Program." Compl. ¶ 165 (emphasis added). Assuming that Rule 12(b)(6)'s plausibility standard applies to ripeness as it does to standing at the motion to dismiss stage, when "tak[ing] the complaint's well-pleaded facts as true and indulg[ing] all reasonable inferences in the pleader's favor," this allegation provides enough to support the premise that the Challenged Conditions apply today -- not at some unknown time in the future. See Hochendoner v. Genzyme Corp., 823 F.3d 724, 730-31 (1st Cir. 2016) (highlighting also that analysis of failure to state a

claim and the existence of standing are "conceptually distinct").

Further, the Administrative Record provides evidence that the Challenged Conditions apply today. In APA cases, "the plausibility standard has no place . . . . The relevant inquiry is . . . not whether the facts set forth in a complaint state a plausible claim but, rather, whether the administrative record sufficiently supports the agency's decision." Atieh, 727 F.3d at 76. Thus, the Administrative Record's statement that the HRSA's Terms and Conditions "appl[y] to all active awards," refutes the Agency and Public Official Defendants' contrary claim. R. at 0027.[34]

In this context, where the Challenged Conditions impact the current Ryan White Program funds of Associational Plaintiffs' members and Provider Plaintiffs, the claims do not "involve[] uncertain and contingent events." See Algonquin Gas Transmission, 919 F.3d at 62 (quoting Ernst & Young, 45 F.3d at 536). Instead, they turn on "legal issues not likely to be significantly affected by further factual development." See id. (quoting Ernst & Young, 45 F.3d at 536). The fitness prong of ripeness is satisfied.

---

[34] So does the Trial Transcript. See Trial Tr.10:1-5 (asserting that the HRSA's Terms and Conditions "apply to both existing funding as well as prospective funding . . . .").

As to the hardship prong, Associational and Provider Plaintiffs seek determination of the permissibility of the Challenged Conditions. See Compl. at 69. Ultimately, Associational and Provider Plaintiffs seek to answer a question: "Can the Executive Branch unilaterally add conditions to Ryan White Program funds that prohibit providers from engaging in gender-affirming care?" By declaring the Challenged Conditions as impermissible and granting vacatur and injunctive relief, this Court's actions "would be of practical assistance in setting the underlying controversy to rest." See Narragansett Indian Tribe, 19 F.3d at 693. The hardship prong of ripeness is satisfied.

Associational and Provider Plaintiffs have demonstrated that any injury they may face is presently occurring or will occur in the immediate future. Their claims are ripe for adjudication.

### 2. Standing

#### a. General Principles

To invoke standing, plaintiffs must demonstrate they "[have] suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged actions; and redressable by a favorable ruling.'" Murthy v. Missouri, 603 U.S. 43, 57 (2024) (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013)). This inquiry "is

claim-specific: a plaintiff must have standing to bring each and every claim that [they] assert." Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012) (citing Pagán v. Calderón, 448 F.3d 16, 26 (1st Cir. 2006)).

Of these three requirements, the injury requirement is most often confused. For an injury to be concrete, it need only be real, meaning "not abstract." Spokeo, Inc. v. Robins, 578 U.S. 330, 340 (2016) (internal quotations and citation omitted). Real injuries can be either tangible or intangible, and economic injuries "readily qualify as concrete injuries under Article III." TransUnion LLC v. Ramirez, 594 U.S. 413, 425 (2021); see Spokeo, 578 U.S. at 340. To be particularized, "the injury must affect the plaintiff in a personal and individual way." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 n.1 (1992). For future injuries, imminence is narrowly construed. See Clapper, 568 U.S. at 409. "Allegations of possible future injury do not satisfy the requirements of [Article] III. A threatened injury must be 'certainly impending' to constitute injury in fact." Whitmore v. Arkansas, 495 U.S. 149, 158 (1990) (quoting Babbitt v. Farm Workers, 442 U.S. 289, 298 (1979).

As to traceability and redressability, traceability requires only "a causal connection between the injury and the conduct complained of." Lujan, 504 U.S. at 560. Redressability requires "a likelihood that the requested relief will redress

the alleged injury." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103 (1998) (citing Simon v. E Ky. Welfare Rts. Org., 426 U.S. 26, 45-46 (1976)). Traceability and redressability "are often 'flip sides of the same coin' . . . the two key questions in most standing disputes are injury in fact and causation." Food & Drug Admin. v. All. for Hippocratic Med., 602 U.S. 367, 380-81 (2024) (quoting Sprint Commc'n Co. v. APCC Servs., Inc., 554 U.S. 269, 288 (2008)).

**b. Associational Plaintiffs' Members and Provider Plaintiffs Standing**

Agency and Public Official Defendants contend that because the Associational Plaintiffs' members and Provider Plaintiffs "cannot identify future grant awards that do not yet exist," they do not have standing to sue. Mem. Supp. Defs.' Mot. Dismiss at 9. Not so. As highlighted above, the Challenged Conditions attach to current funding streams afforded under the Ryan White Program. See Compl. ¶¶ 164-65; R. at 0027; Trial Tr. 10:1-5. Accordingly, so long as the Challenged Conditions, as implemented, (1) cause; (2) an injury in fact to the providers; (3) that is redressable by the Court; Associational Plaintiffs' members and Provider Plaintiffs have standing. See Murthy, 603 U.S. at 57.

That is the case here. The complaint asserts that the Challenged Conditions "will force providers like Provider

Plaintiffs and Associational Plaintiffs' members to choose between complying with the Challenged Conditions or providing medically necessary [gender-affirming] care." Compl. ¶ 189. Regardless of which path providers choose, they will face injury. If the Associational Plaintiffs' members and the Provider Plaintiffs continue to provide gender-affirming care for transgender patients in violation of the Challenged Conditions, they will face a loss of Ryan White Program funding. See Compl. ¶¶ 171, 191; see also Suppl. R. at 0085, 0089 (discussing termination provisions).[35] This constitutes an economic injury sufficient to satisfy Article III's injury requirement on the ACA claim. See TransUnion LLC, 594 U.S. at 425; Spokeo, 578 U.S. at 340.

---

[35] The fact that there is a possibility, albeit remote, that Agency and Public Official Defendants would not actually enforce the Challenged Conditions does not defeat standing. The Supreme Court has "permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent." Susan B. Anthony List, 573 U.S. at 159. Here, such is the case. The Administrative Record highlights that the Challenged Conditions are already in effect. See R. at 0027. Further, the fact the Administrative Record shows that, in other instances, Agency and Public Official Defendants have stripped funding from organizations refusing to satisfy other grant funding conditions lends further support to the belief that threatened enforcement is sufficiently imminent. See Suppl. R. at 0145; see also Steffel v. Thompson, 415 U.S. 452, 459 (1974) (stating prosecution of others engaged in similar actions as petitioner demonstrated the petitioner's "concern with arrest has not been 'chimerical. . . .'").

The same is true for those who will stop providing gender-affirming care to satisfy the Challenged Conditions' requirements. Those providers will face economic damages in the form of "administrative burden[s], compliance costs, [and] staffing pressures," which may "reduce services, eliminate programs . . . delay procurements, or close programs altogether." Compl. ¶ 201.[36] In either context, Associational Plaintiffs' members and Provider Plaintiffs will personally suffer real economic injury, sufficient to confer a concrete and particularized injury for standing purposes. See Lujan, 504 U.S. at 560 n.1; TransUnion LLC, 594 U.S. at 425. The fact that Associational Plaintiffs' members and Provider Plaintiffs have a choice in how they respond to the Challenged Conditions is immaterial -- they are stuck between a rock and a hard place; either outcome is sufficient to confer standing to sue. Cf. Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 533 (2022)

---

[36] Associational and Provider Plaintiffs also suggest that if these programs are ended, transgender HIV patients will stop receiving any care from **these** medical providers, which would result in lost revenues for Associational Plaintiffs' members and Provider Plaintiffs' clinics. See Zuniga Decl. ¶¶ 38, 41. Though perhaps too attenuated for purposes of the traceability component of Article III standing, these facts nevertheless support the existence of an injury in fact. See Diamond Alt. Energy, LLC v. Env't Prot. Agency, 606 U.S. 100, 112 (2025) ("[c]ourts must distinguish the 'predictable' from the 'speculative' effects of government action or judicial relief on third parties.").

(highlighting "self-imposed trap" presented by school district's actions in other First Amendment context).

Further, no dispute exists regarding the traceability or redressability prongs of standing. Agency and Public Official Defendants do not challenge that -- assuming an injury to Associational Plaintiffs' members and Provider Plaintiffs exists -- the injury is caused by the Challenged Conditions. See Mem. Supp. Defs.' Mot. Dismiss at 8-11. Nor could they. "Article III 'requires no more than de facto causality.'" Department of Com. v. New York, 588 U.S. 752, 768 (2019) (quoting Block v. Messe, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.)). As such, but-for causation "likely satisf[ies] the second prong of the constitutional test for standing." Duke Power Co. v. Carolina Env't Study Grp., Inc., 438 U.S. 59, 74-75 (1978).

Such is the case here. But-for the implementation of the Challenged Conditions, Associational Plaintiffs' members and Provider Plaintiffs would not be required either to untangle gender-affirming care from their treatment programs or lose a critical funding stream for their care. See Compl. ¶¶ 189-91, 201. Traceability is satisfied.

Similarly, Agency and Public Official Defendants do not contest that this Court could redress the injury posed to Associational Plaintiffs' members and Provider Plaintiffs. See Mem. Supp. Defs.' Mot. Dismiss at 8-11. Instead, they argue

that, should relief be afforded, it be limited. See id. at 18. More on this later, but undoubtably, this Court can -- **and will** -- fashion relief that would remedy this injury. For instance, this Court could "hold unlawful and set aside" the Challenged Conditions under the APA, and could otherwise enjoin Agency and Public Official Defendants from promulgating similar such rules as to **these** Associational Plaintiffs' members and Provider Plaintiffs. See 5 U.S.C. § 706(2); Trump v. CASA, Inc., 606 U.S. 831, 841-42 (2025) (limiting courts' ability to provide injunctive relief to only the parties before the court). In doing so, Associational Plaintiffs' members and Provider Plaintiffs would not be threatened by the Challenged Conditions and would not fall between the proverbial rock and hard place. Redressability is satisfied. Associational Plaintiffs' members and Provider Plaintiffs have standing.

### c. Associational Plaintiffs

One additional issue within standing needs addressing: associational standing. The typical standing requirements of injury, traceability, and redressability can apply to organizations. See Doe v. Trump, 157 F.4th 36, 47 (1st Cir. 2025). Nonetheless, "organization[s] also may establish 'associational standing' to sue in a 'representational capacity'" for their members. Id. (quoting Hunt v. Wash. State

Apple Advert. Comm'n, 432 U.S. 333, 343, 345 (1977)).[37] To do so, "the organization must show that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" Id. (quoting Hunt, 432 U.S. at 343).

As to the first prong, Agency and Public Official Defendants pose no new arguments. See Mem. Supp. Defs.' Mot. Dismiss at 10-11. Instead, they contend the same issues that supposedly plague Provider Plaintiffs' claims undermine Associational Plaintiffs' members' claims as well, thus preventing Associational Plaintiffs from establishing associational standing. See id. at 10. For the same reasons explained above, those arguments are rejected here. The first prong of associational standing is satisfied.[38]

---

[37] Agency and Public Official Defendants make the balky argument that while they "acknowledge that the Supreme Court has recognized the theory of associational standing, they preserve their challenge to the theory of associational standing for further review." Mem. Supp. Defs.' Mot. Dismiss at 11. This Court is "duty-bound to respect 'the hierarchy of the federal court system created by the Constitution and Congress.'" National Insts. of Health v. Am. Pub. Health Ass'n, 145 S. Ct. 2658, 2665 (2025) (Gorsuch, J., concurring) (quoting Hutto v. Davis, 454 U.S. 370, 375 (1982)). As such, it rejects these arguments and adheres to Hunt and its progeny. Agency and Public Official Defendants' rights are saved.

[38] Even if this Court were to determine that Associational Plaintiffs' members who opt not to receive Ryan White Program

Regarding the second prong, Agency and Public Official Defendants raise no arguments. See id. at 10-11. Indeed, the interests Associational Plaintiffs seek to protect "are germane to the organization[s'] purpose[s]." Doe, 157 F.4th at 47. The Academy seeks to "ensure that healthcare professionals have the resources needed to provide prevention, treatment, and care for those with or at risk for HIV and related conditions to achieve optimal health." Packett Decl. ¶ 9; see Compl. ¶ 22. HIVMA hopes to "increase access to healthcare services and coverage for people with HIV and populations heavily impacted by HIV and to foster a robust, diverse, and culturally competent HIV workforce." Weddle Decl. ¶ 8; Compl. ¶ 28. IAPAC views its mission as "expand[ing] access to and improv[ing] the quality of prevention care, treatment, and support services provided to people affected by and living with HIV and its co-occurring conditions." Zuniga Decl. ¶ 8; see Compl. ¶ 32. Accordingly, assuring that those treating HIV have access to funds that allow them to provide the "empathetic care" patients so desperately need is directly relevant to each organization's mission. See

---

funds do not have standing, Associational Plaintiffs would still have standing to sue because some of their members would opt to receive Ryan White Program funds and thus face injury. See Decl. Danielle Doe ("Doe Decl.") ¶ 52, ECF No. 16; Warth, 422 U.S. at 511.

Trial Tr. 20:13. The second prong of associational standing is satisfied.

Finally, Agency and Public Official Defendants do contest whether individual members of Associational Plaintiffs are necessary for adjudication of their claims. See Mem. Supp. Defs.' Mot. Dismiss at 10-11. Agency and Public Officials suggest that because the complaint "does not identify which members have suffered a non-speculative injury, the individualized inquiry Plaintiffs seek to avoid remains an open threshold question." Id.

That is plain wrong. The Complaint **does** identify members of Associational Plaintiffs who have suffered a non-speculative injury: Brody and Fox. See Compl. ¶¶ 36, 38 (discussing membership of Brody and Fox in each association). With these members identified, the Court can answer the question of whether individual members of Associational Plaintiffs are necessary for adjudication: they are not.

The First Circuit has made clear that "[a]ctions for declaratory, injunctive and other forms of prospective relief have generally been held particularly suited to group representation." Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp., 799 F.2d 6, 12 (1st Cir. 1986). This is especially true when the relevant evidence to resolve

the claim is common to all and when the relief sought will impact all in the same way. See id.

Such is the case here. The evidence necessary to resolve the claims presented here turn on the Administrative Record and the Agency and Public Official Defendants' reasons for instituting the Challenged Conditions. See Atieh, 727 F.3d at 75 (highlighting central inquiry in APA cases is the administrative record). This Court need not decide how the Challenged Conditions will impact each and every member of Associational Plaintiffs. Instead, it need only determine whether the Challenged Conditions were properly imposed. See Warth, 422 U.S. at 511 ("The association must allege that its members, **or any one of them**, are suffering immediate or threatened injury . . . .") (emphasis added).

Further, with respect to the relief awarded, the inquiry is focused on whether the relief will impact all parties in the same way. See Camel Hair & Cashmere Inst. of Am., Inc., 799 F.2d at 12. While here, the specific injury being resolved may affect whether Associational Plaintiffs' members continue to provide gender-affirming care, the impact of any potential relief would be the same -- the Challenged Conditions would no longer have effect. See id. (stating relief would be the same to all of Associational Plaintiff's members when an injunction would prevent the sale of mislabeled coats). Accordingly, the

Court sees no reason why individual members of Associational Plaintiffs are necessary for the resolution of this suit. The third prong of associational standing is satisfied. Associational Plaintiffs may sue on their members' behalf.

**d. Claim-Specific Standing**

Associational Plaintiffs' members and Provider Plaintiffs have demonstrated that an injury in fact, traceable to Agency and Public Official Defendants' actions, and redressable by this Court, exists. Furthermore, Associational Plaintiffs have demonstrated that the interests furthered by this suit are germane to their organizational purposes and that individual members are not necessary for adjudication of this matter. Associational and Provider Plaintiffs have standing to bring suit under the APA.

Importantly, the parties did not address in their briefing whether standing was satisfied as to each and every claim. See Pls.' Pretrial Br. at 9-11, ECF No. 69; Mem. Supp. Defs.' Mot. Dismiss at 8-11. Nonetheless, because standing is a "threshold question in every federal case," Warth, 442 U.S. at 498, and because "[a] federal court is under an unflagging duty to ensure that it has jurisdiction over the subject matter of the cases it proposes to adjudicate," American Policyholders Ins. Co. v. Nyacol Prods., Inc., 989 F.2d 1256, 1258 (1st Cir. 1993), the

Court considers this question as to the free-standing First Amendment, Due Process, and ACA claims.

**i. Count VII: Independent First Amendment Claim**

Associational and Provider Plaintiffs have sufficiently pled standing as to their First Amendment claim. In the complaint, Associational and Provider Plaintiffs note that under the Challenged Conditions, they are barred "from acknowledging, affirming, or respecting their transgender patients' identities in any context." Compl ¶ 193. This prohibition is currently in place, as the Challenged Conditions apply to current lines of Ryan White Program funding. See Compl. ¶ 164; R. at 0027; Trial Tr. 10:1-5. As such, Associational and Provider Plaintiffs face a present injury in the loss of their First Amendment freedoms. See Sindicato Puertorriqueño de Trabajores v. Fortuño, 699 F.3d 1, 10-11 (1st Cir. 2012). This is directly traceable to the Challenged Conditions, and is an injury redressable by the Court. Associational and Provider Plaintiffs have standing to assert their First Amendment claim.

**ii. Count VI: Independent Due Process Claim**

Associational and Provider Plaintiffs have sufficiently pled standing to assert a Due Process Claim on behalf of their patients. The complaint notes that "[t]he Challenged Conditions also discriminate based on sex and transgender status against

the transgender patients to whom Plaintiffs provide healthcare." Compl. ¶ 268. Discrimination is an injury for standing purposes, but only as to the person who suffers it. See, e.g., Barr v. Am. Ass'n of Pol. Consultants, Inc., 591 U.S. 610, 634-35 (2020).

Provider Plaintiffs assert, however, that they have third-party standing. See Pls.' Pretrial Br. at 11. To have third-party standing:

> [T]hree important criteria [must be] satisfied: The litigant must have suffered an injury in fact, thus giving him or her a sufficiently concrete interest in the outcome of the issue in dispute, the litigant must have a close relation to the third party, and there must exist some hindrance to the third party's ability to protect his or her own interests.

Powers v. Ohio, 499 U.S. 400, 411 (1991) (internal quotations omitted) (citing Singleton v. Wulff, 428 U.S. 106, 112-16 (1976)).

Each aspect is satisfied here. Provider Plaintiffs have suffered an injury in this case -- economic and First Amendment harms. Provider Plaintiffs, as transgender patients' healthcare providers, have a sufficiently close relationship with the patients suffering discrimination. See Singleton, 428 U.S. at 117-18 (first citing Griswold v. Connecticut, 381 U.S. 479 (1965); then citing Doe v. Bolton, 410 U.S. 179 (1973), abrogated on other grounds by Dobbs v. Jackson Women's Health Org., 597 U.S. 215 (2022); and then citing Roe v. Wade, 410 U.S.

113 (1973), overruled on other grounds by Dobbs, 597 U.S. 215). Further, this Court agrees with others that have found that transgender patients such as those here "likely face barriers to being able to protect their own interests under the circumstances." San Francisco A.I.D.S. Found. v. Trump, 786 F. Supp. 3d 1184, 1213 (N.D. Cal. 2025); see American Ass'n of Physicians for Hum. Rts., Inc. v. Nat'l Insts. of Health, 795 F. Supp. 3d 678, 693-94 (D. Md. 2025); Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs., 485 F. Supp. 3d 1, 35-36 (D.D.C. 2020); see also Brody Decl. ¶¶ 10-11 (noting patients experience poverty and homelessness).[39] Accordingly, Provider Plaintiffs can assert Due Process claims on behalf of their transgender patients.[40]

**iii. Count V: Independent ACA Claims**

Associational and Provider Plaintiffs may assert a free-standing ACA claim based on the non-discrimination mandate, but not on the non-interference mandate. The parties have not

---

[39] Further, the Supreme Court "has allowed standing to litigate the rights of third parties when enforcement of the challenged restrictions **against the litigant** would result indirectly in the violation of **third parties' rights.**" Warth, 422 U.S. at 510 (emphasis added) (first citing Doe, 410 U.S. at 188, abrogated on other grounds by Dobbs, 597 U.S. 215; then citing Griswold, 381 U.S. at 481; and then citing Barrows v. Jackson, 346 U.S. 249, 257 (1953)).

[40] Additionally, because Provider Plaintiffs have standing and are members of Associational Plaintiffs, Associational Plaintiffs, too, can state this claim. See Warth, 422 U.S. at 511; Pls.' Pretrial Br. at 11 n.25.

identified a private right of action under the ACA that would permit individuals to sue, nor is this Court aware of one in most contexts. See Pls.' Pretrial Br. at 9-11; Mem. Supp. Defs.' Mot. Dismiss at 8-11; see also Christine H. Monahan, Private Enforcement of the Affordable Care Act: Toward an "Implied Warranty of Legality" in Health Insurance, 126 Yale L.J. 1118, 1123 (2017). Federal regulations, however, create a private right of action under the ACA's non-discrimination mandate. See 45 C.F.R. pt. 95. For substantially the same reasons as stated above in the APA standing analysis, Associational and Provider Plaintiffs have standing to sue under this provision. They do not have statutory standing to sue under the non-interference mandate.

**iv. Conclusion**

Associational and Provider Plaintiffs have standing to sue on all but the free-standing ACA claim under the non-interference mandate. Accordingly, Associational and Provider Plaintiffs' free-standing ACA claim is **DISMISSED** as to the non-interference mandate, but **not** as to the non-discrimination mandate. Further, Associational and Provider Plaintiffs **may** invoke the non-interference mandate as a basis to invalidate the Challenged Conditions under the APA as not in accordance with law.

### 3. Agency Discretion

"The APA establishes a 'basic presumption of judicial review for one suffering legal wrong because of agency action.'" Department of Homeland Sec. v. Regents of Univ. of Cal., 591 U.S. 1, 16-17 (2020) (internal quotations and brackets omitted) (quoting Abbott Lab'ys v. Gardner, 387 U.S. 136, 140 (1967)). Nonetheless, "[t]hat presumption can be rebutted by a showing . . . that the 'agency action is committed to agency discretion by law.'" Id. at 17 (quoting 5 U.S.C. § 701(a)(2)).

"[T]o honor the presumption of review, [the Supreme Court] ha[s] read the exception in [Section] 701(a)(2) quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv., 586 U.S. 9, 23 (2018) (quoting Lincoln v. Vigil, 508 U.S. 182, 191 (1993)). This is because "[i]n such a case, the statute can be taken to have committed the decision-making to the agency's judgment absolutely," "not just the limited discretion inherent in every agency action." 2 Am. Jur. 2d Administrative Law § 400 (footnotes omitted).

Only a few cases have applied this exception, and only in instances of "agency decisions that courts have traditionally regarded as unreviewable." Weyerhaeuser Co., 586 U.S. at 23.

It appears that only four traditionally unreviewable agency decisions have been identified: (1) an agency's decision not to institute enforcement proceedings, see Heckler v. Chaney, 470 U.S. 821, 831 (1985); (2) an agency's refusal to reconsider an action on account of material error, see Interstate Com. Comm'n v. Bhd. of Locomotive Eng'rs, 482 U.S. 270, 282 (1987); (3) a decision by the Central Intelligence Agency to fire an employee to protect national security, see Webster v. Doe, 486 U.S. 592, 599-601 (1988); and (4) the "allocation of funds from a lump-sum appropriation," Lincoln, 508 U.S. at 192 (discussing instances in which Congress "appropriates lump-sum amounts without statutorily restricting what can be done with those funds").

Agency and Public Official Defendants attempt to group the Challenged Conditions within Lincoln's lump-sum appropriation exception. See Mem. Supp. Defs.' Mot. Dismiss at 12. They argue:

> The [Ryan White Act] contemplates broadly drawn topics and guidelines that would not provide a meaningful rubric for judicial review. Congress has not provided any "law to apply" with respect to what constitutes "core medical services" and "support services" for individuals living with HIV, 42 U.S.C. §§ 300ff-14(a), 300ff-22, 300ff-51, which is the statutory language that Plaintiffs claim requires the federal government to fund "gender-affirming care" under the program.

Mem. Supp. Defs.' Mot. Dismiss at 12. This claim is unconvincing for several reasons, including that **in the same exact section as cited in their brief,** the Ryan White Act

defines both the terms "core medical services" and "support services" for people living with HIV/AIDS. See 42 U.S.C. §§ 300ff-14(c)-(d), 300ff-22(b)-(c), 300ff-51(c)-(d).[41]

The Agency and Public Official Defendants' non-reviewability claim is still more unconvincing given the distinctions that exist between the Ryan White Act and the lump-sum appropriations present in Lincoln and its progeny. In Lincoln, Congress appropriated funds to support American Indian and Alaska Native people. See 508 U.S. at 185. The authorizing statutes -- the Snyder Act and the Indian Health Care Improvement Act -- authorized in broad terms a federal agency to "expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of Indians," and to provide mental-health care, authorizing "therapeutic and residential treatment centers." Id. (citations omitted). Eventually, a program called the Indian Children's Program emerged from these appropriations, however, "the appropriations Acts for the relevant period d[id] not so much as mention the [p]rogram, and both the Snyder Act and the Improvement Act likewise speak about Indian health only in general terms." Id. at 186, 193-94.

[41] The fact Agency and Public Official Defendants seemingly did not read the Ryan White Act in full before imposing the Challenged Conditions does not bode well for their defense on the APA claims.

This is distinguishable from the Ryan White Act. At the very least, the act authorizing expenditures and modifying the United States Code to encapsulate the program states its name -- the act is plainly titled the Ryan White Comprehensive AIDS Resources Emergency Act of 1990.[42] The statute creates an expansive program intended to "make financial assistance available to [s]tates and other public or private nonprofit entities to provide for the development, organization, coordination and operation of more effective and cost efficient systems for the delivery of essential services to individuals and families with HIV disease." 42 U.S.C. § 300ff.

As part of this program, the authorizing statute requires the use of funds to "provide core medical services . . . []including services regarding the co-occurring conditions of the individuals[]." 42 U.S.C. §§ 300ff-14(c)(1), 300ff-22(b)(1), 300ff-51(c)(1). As defined by the statute:

[42] Ryan White Comprehensive AIDS Resources Emergency Act of 1990, Pub. L. No. 101-381, 104 Stat. 576 (codified as amended at 42 U.S.C. §§ 300ff to 300ff-140).

> "[C]ore medical services," with respect to an individual with HIV/AIDS (including the co-occurring conditions of the individual), means the following services:
>
> (A) Outpatient and ambulatory health services.
>
> (B) AIDS Drug Assistance Program treatments . . . .
>
> (C) AIDS pharmaceutical assistance.
>
> (D) Oral health care.
>
> (E) Early intervention services . . . .
>
> (F) Health insurance premium and cost sharing assistance for low-income individuals . . . .
>
> (G) Home health care.
>
> (H) Medical nutrition therapy.
>
> (I) Hospice services.
>
> (J) Home and community-based health services . . . .
>
> (K) Mental health services.
>
> (L) Substance abuse outpatient care.
>
> (M) Medical case management, including treatment adherence services.

42 U.S.C. §§ 300ff-14(c)(3), 300ff-22(b)(3), 300ff-51(c)(3). "Co-occurring conditions means one or more adverse health conditions in an individual with HIV/AIDS, without regard to whether the individual has AIDS and without regard to whether the conditions arise from HIV." 42 U.S.C. § 300ff-88(2).

The statute also permits funds to be used for "support services," meaning "services, subject to the approval of the Secretary, that are needed for individuals with HIV/AIDS to

achieve their medical outcomes." 42 U.S.C. §§ 300ff-14(d)(1), 300ff-22(c)(1), 300ff-51(d)(1). "Medical outcomes means those outcomes affecting the HIV-related clinical status of an individual with HIV/AIDS." 42 U.S.C. §§ 300ff-14(d)(2), 300ff-22(c)(2), 300ff-51(d)(2).

While some room for interpretation may exist within this elaborate statutory scheme, it is a far cry from the mere lump-sum appropriations present in Lincoln that fall within agency discretion. See 508 U.S. at 192. Agency and Public Official Defendants cannot rely on Lincoln's exception.

Further, to the extent Agency and Public Official Defendants seek this Court declare a new area of agency decisions as traditionally unreviewable, the Court declines to do so. The only basis for such a ruling would be, as Agency and Public Official Defendants argue, "where the relevant statute 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" Lincoln, 508 U.S. at 191 (quoting Heckler, 470 U.S. at 830). As described above, that is not the case here.

The Challenged Conditions are not actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). They are reviewable by this Court under the APA.

### 4. Discrete, Final Agency Action

Aside from the initial limitations set forth in 5 U.S.C. § 701(a), the APA further limits review of agency action to "final agency action." 5 U.S.C. § 704. Two critical components make up this limitation. First, there must be a "discrete agency action." Norton v. S. Utah Wilderness All., 542 U.S. 55, 64 (2004). Second, the agency action must be "final." Bennett v. Spear, 520 U.S. 154, 177-78 (1997).

As to the first component, the test is relatively simple. To challenge a discrete agency action, parties cannot institute a "broad programmatic attack" on something an agency is doing in general. Norton, 542 U.S. at 64; see Lujan, 497 U.S. at 890-91. At the very least, parties must challenge an action of the agency, whether it be an order, regulation, or series of orders and regulations. See Lujan, 497 U.S. at 890-91. Parties "cannot seek wholesale improvement of [a] program by court decree." Id. at 891 (emphasis omitted).

As to the second component, the test is more nuanced:

> As a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the "consummation" of the agency's decisionmaking process -- it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

Bennett, 520 U.S. at 177-78 (first quoting Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 113 (1948);

then quoting Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71 (1970)). Undoubtedly, an agency decision that actively governs, and has not been reconsidered, represents final agency action under the APA. Cf. Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 478-79 (2001) (discussing identical standard in EPA context).

Agency and Public Official Defendants argue that the Challenged Conditions are neither discrete agency actions nor final agency actions. See Mem. Supp. Defs.' Mot. Dismiss at 13-15. Instead, they contend that "in bringing this challenge on behalf of many health care providers and broadly challenging the terms and conditions writ large, [Associational and Provider] Plaintiffs' claims amount to a broad programmatic attack," and that "[t]he [C]hallenged [C]onditions are, at most, expressions of agency policy and program administration." Id. at 14.

Regarding the "broad programmatic attack," Agency and Public Official Defendants are correct in stating that the challenge here is sweeping, but only because Associational and Provider Plaintiffs assert seven different bases for invalidating the Challenged Conditions. See generally Compl. Indeed, Associational and Provider Plaintiffs are not seeking "wholesale improvement of this program by court decree," instead, they challenge several regulations and funding conditions they view as improper. Compare Lujan, 497 U.S. at

891 (emphasis omitted), with Compl. ¶¶ 182.[43] The fact that Associational and Provider Plaintiffs challenge several agency actions simultaneously is inapposite. This Court, like the First Circuit, is "not aware of any supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once." New York v. Trump, 133 F.4th 51, 68 (1st Cir. 2025). The Challenged Conditions are discrete agency actions.

So too are they final agency actions. Associational and Provider Plaintiffs cite several cases -- including one from this Court -- to support the proposition that conditions on grant funding demonstrate the "consummation" of an agency's decision-making process. See Pls.' Resp. Opp'n Defs.' Mot. Dismiss ("Pls.' Resp. Opp'n Mot. Dismiss") at 10-12, ECF No. 75; see also American Pub. Health Ass'n v. Nat'l Insts. of Health (American Pub. Health Ass'n II), 791 F. Supp. 3d 119, 175 (D. Mass. 2025); Rhode Island Coal. Against Domestic Violence v. Kennedy, 812 F. Supp. 3d 180, 191 (D.R.I. 2025); Illinois v. Fed. Emergency Mgmt. Agency, 801 F. Supp. 3d 75, 89 (D.R.I.

---

[43] Associational and Provider Plaintiffs inartfully describe several of the Challenged Conditions as "any other actions implementing the General Order with regard to the Ryan White Program." Compl. ¶ 182. The Court construes this broadside to be limited to HRSA's Terms and Conditions, HRSA's Strategic Priorities Statement, HHS's Grants Policy Statement, and the various NOFOs governing Ryan White Program funds.

2025); Rhode Island Coal. Against Domestic Violence v. Bondi, 794 F. Supp. 3d 58, 68 (D.R.I. 2025); New York v. Admin. for Child. & Fams., 833 F. Supp. 3d 361, 388 (S.D.N.Y. 2026); San Francisco Unified Sch. Dist. v. AmeriCorps, 789 F. Supp. 3d 716, 740 (N.D. Cal. 2025); California ex rel. Becerra v. Sessions, 284 F. Supp. 3d 1015, 1031 (N.D. Cal. 2018). Fair enough. The Court agrees fully with this line of cases and adds only that, on these facts, where the Challenged Conditions actually govern current lines of funding held by Associational and Provider Plaintiffs, see R. at 0027, the Challenged Conditions must, by necessity, constitute the consummation of the agency's decision-making process, cf. Whitman, 531 U.S. at 478-79. This is true regardless whether the agency has "dressed its decision with the conventional procedural accoutrements of finality." Id. at 479.

Further, while these cases also support Bennett's second prong -- the proposition that the promulgation of funding conditions on grant funding creates legal consequences -- the Court need not rely on these alone. The HRSA's Terms and Conditions themselves state, "[i]n accordance with [federal regulations], HRSA may terminate this award in whole or in part, to the extent permitted by law, if it determines that the award no longer effectuates the program goals or agency priorities outlined in these terms." Suppl. R. at 0089. The HRSA Terms and Conditions thus expressly declare that they, along with the

incorporated HRSA Strategic Priorities Statement and HHS's Grants Policy Statement, create legal consequences for those currently receiving funding. See id. at 0084, 0088-89 (incorporating policies); see also R. at 0027 (stating funding conditions currently apply). These policies constitute final agency action.

Separate from the HRSA Terms and Conditions, HRSA's Strategic Priorities Statement, and HHS's Grants Policy Statement, Agency and Public Official Defendants argue that the various Ryan White Program NOFOs do not constitute final agency action because no funds have yet been awarded under the NOFOs. See Mem. Supp. Defs.' Mot. Dismiss at 14-15. Regardless of the factual veracity of these claims, several courts -- including this Court -- have recognized a distinction between the promulgation of conditions on funding and the decision to award or terminate funds under those conditions. See American Pub. Health Ass'n II, 791 F. Supp. 3d at 175; Illinois, 801 F. Supp. 3d at 89, 89 n.6 (collecting cases); see also Massachusetts v. Nat'l Insts. of Health, 164 F.4th 1, 12 (1st Cir. 2026) ("[T]he issuance of the Supplemental Guidance is a separate agency action from the withholding of funds promised under the grant agreements."). The decision to issue updated NOFOs including potentially problematic terms, "constitute[s] final agency actions at the macro-level, and the resultant, downstream

individual terminations and other effects are also independent final agency action as to each of the affected grants." American Pub. Health Ass'n II, 791 F. Supp. 3d at 175.[44] This is because the NOFOs "govern the grant application process," and impact the eligibility of those applying for grants under the Ryan White Program. Freedom Network USA v. Trump 830 F. Supp. 3d 681, 712-13 (E.D. Ill. 2026). As such, "legal consequences will flow" from the NOFOs. See Bennett, 520 U.S. at 178 (internal quotations and citation omitted); see also Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Hum. Servs., 337 F. Supp. 3d 308, 329 (S.D.N.Y. 2018) ("[C]ourts routinely hold that agency action is final where it affects grant eligibility criteria.").

The Challenged Conditions are discrete, final agency actions. They are reviewable by this Court under the APA.

**5. Tucker Act Jurisdiction**

"The United States is immune from suit unless it unequivocally consents." Maine Cmty. Health Options v. United States, 590 U.S. 296, 322 (2020) (citing United States v. Navajo Nation, 556 U.S. 287, 289 (2009)). Nonetheless, "[t]he [g]overnment has waived immunity to certain damages suits in the

[44] This distinction impacts the Court's subject-matter jurisdiction under the Tucker Act. See Massachusetts, 164 F.4th at 10-11.

Court of Federal Claims through the Tucker Act." Id. Specifically, "Congress granted the [Court of Federal Claims] exclusive jurisdiction over . . . claims 'founded . . . upon any express or implied contract with the United States.'" Massachusetts, 164 F.4th at 10 (quoting 28 U.S.C. § 1491(a)(1)). In doing so, "the Tucker Act 'impliedly forbids' bringing such actions 'in a federal district court' pursuant to the APA[]." Id. (quoting Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys., 357 F.3d 62, 68 (D.C. Cir. 2004)). "A lawsuit that 'is essentially a contract dispute' thus belongs in the [Court of Federal Claims] rather than in a district court." Id. (quoting American Sci. & Eng'g, Inc. v. Califano, 571 F.2d 58, 61 (1st Cir. 1978)).

Where these concepts become difficult is in "the interplay between the APA and the Tucker Act." Id. In the last few years, the First Circuit and Supreme Court have "develop[ed] a robust body of caselaw to determine whether an ostensibly APA-based claim is a breach-of-contract claim in disguise," and thus, whether lower courts have jurisdiction over the claims. Id. Specifically, the Supreme Court's decision in National Institutes of Health v. American Public Health Association, 145 S. Ct. 2658 (2025) -- which reviewed a decision of this Court -- and the First Circuit's decision in Massachusetts v. National Institutes of Health, 164 F.4th 1 (1st Cir. 2026), are

particularly helpful.[45] In National Institutes of Health, Justice Barrett's concurrence "plainly distinguishe[s] between challenges to agency-wide policies, which belong in the district court, and challenges to the withholding of contractually awarded funds that result from those policies, which belong in the [Court of Federal Claims]." Massachusetts, 164 F.4th at 11; see National Insts. of Health, 145 S. Ct. at 2661-62 (Barrett, J., concurring). For this reason, the First Circuit ruled that broad challenges to policies governing federal grants generally fall within the jurisdiction of federal district courts. See Massachusetts, 164 F.4th at 12 (citing National Insts. of Health, 145 S. Ct. at 2661 (Barrett, J., concurring)).

A nearly identical situation presents itself here. Associational and Provider Plaintiffs do not contest -- to the extent it is possible -- the decisions of Agency and Public Official Defendants as to any one award. See generally Compl. Instead, they contest the specific Challenged Conditions **as they apply to the Ryan White Program generally.** See Compl. ¶ 182. While not a "broad programmatic attack" for purposes of Norton and the final agency action analysis, the Challenged Conditions

[45] Agency and Public Official Defendants wholly ignore Massachusetts v. National Insts. of Health, 164 F.4th 1 (1st Cir. 2026). Notwithstanding this, the Court respects "the hierarchy of the federal court system" and follows First Circuit precedent interpreting Supreme Court case law. Hutto, 454 U.S. at 375.

are "agency-wide policies" for purposes of Massachusetts and Tucker Act jurisdiction. Compare Norton, 542 U.S. at 64, with Massachusetts, 164 F.4th at 11-12.

The claims presented here do not challenge contracts between Associational and Provider Plaintiffs and the United States. They are not precluded from this Court's jurisdiction by the Tucker Act.

Having ruled on each basis for dismissal, the Court GRANTS the motion to dismiss as to Associational and Provider Plaintiffs' free-standing ACA non-interference mandate claim. The motion to dismiss is DENIED as to all other claims.

**B. Trial on the Merits**

Before the Court are seven claims by Associational and Provider Plaintiffs arguing the illegality of the Challenged Conditions. See generally Compl. Some of these claims are based in the Constitution. See id. ¶¶ 262-99. Others arise from the ACA. See id. ¶¶ 247-61. Still, others arise from the APA. See id. ¶¶ 203-46.

In many ways, these claims are interrelated. Under the APA, agency actions can be "h[eld] unlawful and set aside" when they are "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. §§ 706(2), 706(2)(B). Additionally, agency actions may be invalidated when they are "not in accordance with law" or are "in excess of statutory jurisdiction, authority, or

limitations." Id. §§ 706(2)(A), 706(2)(C). Accordingly, in cases such as this, plaintiffs often assert APA claims and independent constitutional or statutory claims arising from the same theory. See, e.g., Rhode Island Latino Arts v. Nat'l Endowment for the Arts, 777 F. Supp. 3d 87, 103 (D.R.I. 2025); see also Pls.' Resp. Opp'n Mot. Dismiss at 7 n.6 (highlighting claims are independent and not duplicative). While the evidence that may be considered in a pure APA claim is different from that in a pure constitutional or statutory claim, the analysis is the same. See Rhode Island Latino Arts, 777 F. Supp. 3d at 103; see also Atieh, 727 F.3d at 75; Webster, 486 U.S. at 604-05.

For this reason, the Court groups its reasoning as to parts of Count IV (the APA-based constitutional challenges), with its reasoning as to Count VI (the constitutional due process challenge) and Count VII (the constitutional free-speech challenge). Similarly, the Court groups parts of its reasoning as to Count II (the APA-based statutory challenges) with its reasoning as to Count V (the ACA-based challenge).

While "[a] fundamental and long-standing principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them," Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 445 (1988), sometimes, courts are "obliged to do so in the

proper performance of [their] judicial function," Valley Forge Christian College v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 474 (1982). Indeed, "[i]t is emphatically the province and duty of the judicial department to say what the law is." Marbury v. Madison, 5 U.S. 137, 177 (1803). This case is fundamentally based in the Constitution, and this Court is duty-bound to reach these questions here.[46]

### 1. Counts VII & IV: Violation of the First Amendment's Free Speech Clause

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for

---

[46] While the Court must analyze the constitutional issues presented because they are inherently tied up in the APA claims, see 5 U.S.C. § 706(2)(B), that is not the only reason. APA relief in the form of vacatur is reactive, not prospective. See, e.g., American Pub. Health Ass'n II, 791 F. Supp. 3d at 183 (setting aside only current policies). Associational and Provider Plaintiffs seek prospective injunctive relief based on their ACA and constitutional claims. See Compl. at 69-70. Injunctive relief must be narrowly tailored. See Califano v. Yamasaki, 442 U.S. 682, 702 (1979). Thus, if the Court failed to consider the constitutional issues at issue and decided whether to provide injunctive relief only on the basis of the ACA, any relief would be limited to the extent which it violates the ACA. This would not provide full relief to the parties, as their free speech rights are also violated. When possible, courts ought provide full relief for constitutional injuries. See Bell v. Hood, 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution."). This Court does so here.

a redress of grievances." U.S. Const. amend. I. "In the pantheon of constitutional rights, the First Amendment is indeed the 'First' treasured among all." Toward A Gayer Bicentennial Comm. v. Rhode Island Bicentennial Found., 417 F. Supp. 632, 641 (D.R.I. 1976). As the Supreme Court has explained:

> The framers designed the Free Speech Clause of the First Amendment to protect the "freedom to think as you will and to speak as you think." They did so because they saw the freedom of speech "both as an end and as a means." An end because the freedom to think and speak is among our inalienable human rights. A means because the freedom of thought and speech is "indispensable to the discovery and spread of political truth."

303 Creative LLC v. Elenis, 600 U.S. 570, 584 (2023) (citations omitted).

For this reason, the Supreme Court has enshrined numerous protections for those exercising their free-speech rights under the First Amendment. One such protection is the prohibition on viewpoint discrimination, which prevents "discrimination against speech because of its message." Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 828 (1995).

Associational and Provider Plaintiffs argue that the Challenged Conditions constitute viewpoint discrimination because they represent unconstitutional conditions on funding. See Pls.' Resp. Opp'n Defs.' Pretrial Br. ("Pls.' Opp'n Defs.' Pretrial Br.") at 19-20, ECF No. 76. While some courts have held that unconstitutional conditions on funding constitute viewpoint discrimination, see, e.g., Thakur v. Trump, 176 F.4th

1187, 1202-04 (9th Cir. 2026), cert. denied, 26-210 (U.S. Nov. 16, 2026); Rhode Island Latino Arts, 777 F. Supp. 3d at 110, other courts -- including the Supreme Court -- have not specified whether such conditions are viewpoint discrimination, but have ruled such conditions unconstitutional under the First Amendment, see, e.g., Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc., 570 U.S. 205, 221 (2013). This Court joins the latter line of cases and agrees that the Challenged Conditions are unconstitutional limitations on speech in violation of the First Amendment.

**a. Animus-Stoked Suppression of Dangerous Ideas**

The Spending Clause of the Constitution is broad. See Agency for Int'l Dev., 570 U.S. at 213. Under the clause, Congress may spend appropriations to "provide for the common Defense and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. This power includes "funding particular state or private programs or activities" and "the authority to impose limits on the use of such funds to ensure they are used in the manner Congress intends." Agency for Int'l Dev., 570 U.S. at 213 (citing Rust v. Sullivan, 500 U.S. 173, 195 n.4 (1991)).

"As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition

may affect the recipient's exercise of its First Amendment rights." Id. at 214 (first citing United States v. Am. Library Ass'n, Inc., 539 U.S. 194, 212 (2003) (plurality opinion); then citing Regan v. Tax'n With Representation of Wash., 461 U.S. 540, 546 (1983)). Nonetheless, the unconstitutional conditions doctrine "recognize[s] a limit on Congress' ability to place conditions on the receipt of funds." Rumsfeld v. F. for Acad. & Institutional Rts., Inc., 547 U.S. 47, 59 (2006). This includes limits imposed by the First Amendment. See id.; see also Agency for Int'l Dev., 570 U.S. at 214.

Supreme Court jurisprudence makes clear that limitations on speech cannot be aimed "at the suppression of dangerous ideas." See Speiser v. Randall, 357 U.S. 513, 519 (1958) (quoting American Commc'ns Ass'n, C.I.O. v. Douds, 339 U.S. 382, 402 (1950)); see also Regan, 461 U.S. at 548. The boundaries of this limitation are not yet clearly established, in part because such illicit regulations come rarely before the courts.

Nonetheless, Associational and Provider Plaintiffs contend that is exactly what is being done here. See Pls.' Pretrial Br. at 38-39, ECF No. 69. Specifically, they note "[t]he Challenged Conditions are designed and intended to silence, defund, and otherwise penalize Plaintiffs for acknowledging that transgender people exist and for providing them with healthcare services

under the Ryan White Program in a manner that affirms who they are." Id. at 38.

Looking at the evidence in both the trial exhibits and the limited Administrative Record, the Court is convinced this is the case here. Indeed, the evidence is overwhelming.

Consider the official actions of President Trump. In Executive Order 14168, President Trump describes those affirming transgender people as "ideologues who deny the biological reality of sex." Suppl. R. at 0097. He states that the belief that transgender people are real and that being transgender is not a mental-health problem is "wrong," "unhealthy," a "false claim," "internally inconsistent," and "unmoored from biological facts." Id. at 0097-98. Further, he continues, these beliefs "fundamentally attack women by depriving them of their dignity, safety, and well-being;" are "an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms;" and "replac[e] longstanding, cherished legal rights and values with an identify-based, inchoate social contempt." Id. at 0097.

In Executive Order 14183, President Trump proposes -- on what basis is never stated -- that the "adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle;" that being transgender is a "falsehood" that "is not

consistent with the humility and selflessness required of a service member;" and that being transgender is "inconsistent with," "honesty, humility, . . . and integrity." Id. at 0129.

In Executive Order 14187, President Trump refers to gender-affirming care as "maiming and sterilizing a growing number of impressionable children," "radical and false," and "dangerous." Id. at 0132.

In Executive Order 14190, President Trump refers to teachers who may acknowledge that students suffer from gender dysphoria as "indoctrinat[ing] [] children in radical, anti-American ideologies," that "erode critical thinking but also sow division, confusion, and distrust, which undermine the very foundations of personal identity and family unity." Id. at 0135. He further characterizes these acknowledgements as "anti-American, subversive, harmful, and false ideologies." Id.

In Executive Order 14201, President Trump describes school policies permitting transgender women and girls from participating in women's sports as "demeaning, unfair, and dangerous . . . which result[] in the endangerment, humiliation, and silencing of women and girls and deprives them of privacy." Id. at 0140.[47]

---

[47] Of course, none of this is "law." It has no force outside the executive branch (save for those who choose to contract with the executive branch or receive any form of federal funding). Even within the executive branch, executive

Outside the Administrative Record but within the later-presented exhibits -- Presidential Proclamation 10911 -- President Trump refers to the affirmation of transgender people as "[o]ne of the most prevalent forms of child abuse facing our country today," and as "evil and backwards lies of gender insanity [that] are robbing our children of their happiness, health, and freedom." Trial Ex. 83 at 1.

Unofficial actions of President Trump and his administration further demonstrate the Unitary Executive's animus toward transgender people. Within the Administrative Record, social media posts by HHS discuss "destructive gender ideology" in reference to the affirmation of transgender people. Suppl. R. at 0146. Outside the Administrative Record but within later-presented exhibits, social media posts by President Trump and press releases from the White House discuss "[r]adical gender ideology" to express the same idea. See Trial Ex. 90 at 1; Trial Ex. 81 at 2. Further, other press releases from the White House discuss "radical left ideology" and call the affirmation of transgender people "subversive, woke policies that endangered children, eroded women's rights, assault[]

orders carry job loss consequences only for those employees with relevant discretionary authority. See Appendix B, infra, at 161. These official presidential pronouncements are, however, compelling evidence of what President Trump thinks.

common sense, and drag[] America toward moral and cultural decline." Trial Ex. 82 at 1.

While different people are entitled to hold different political views and "new administrations are entitled to reevaluate and modify agency practices," People for the Ethical Treatment of Animals v. U.S. Dep't of Agric. & Animal & Plant Health Inspection Serv., 918 F.3d 151, 158 (D.C. Cir. 2019), it is impermissible for such changes to seek only the suppression of ideas those in authority consider dangerous. On the evidence presented here, this Court rules the compelling rationale behind the Challenged Conditions is an attempt to suppress what Agency and Public Officials view as "dangerous ideas," in violation of the First Amendment.[48,49]

Agency and Public Official Defendants' assertions otherwise are to no avail. Quoting Rust, they note "[t]he Government can, without violating the Constitution, selectively fund a program

---

[48] As explained further below, the Challenged Conditions are not adequately supported by any other motivation.

[49] Other courts have reached this same conclusion. In San Francisco A.I.D.S. Foundation v. Trump, the court determined that Executive Order 14168 and relevant funding provisions thereunder "aim[ed] to suppress the dangerous ideas of 'equity,' 'DEI,' and 'gender ideology.'" 786 F. Supp. 3d at 1220. In Rhode Island Latino Arts v. National Endowment for the Arts, the court ruled that funding conditions prohibiting funding for art encouraging "gender ideology" violated the First Amendment and that the ruling was "consistent with the related line of Supreme Court cases that . . . [prohibit] the government [from] us[ing] subsidies to suppress 'dangerous ideas.'" 777 F. Supp. 3d at 109 (citation omitted).

to encourage certain activities it believes to be in the public interest . . . . In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." Defs.' Post-Hearing Br. at 12-13, ECF No. 90 (alterations in original) (quoting Rust, 500 U.S. at 193).

Though an accurate statement of the law, Agency and Public Official Defendants' reliance on Rust is misplaced. In Rust, the Court inquired as to the reasons behind a condition on government grants that barred recipients from using funds to "provide counseling concerning the use of abortion as a method of family planning;" "encourage, promote or advocate abortion as a method of family planning;" and required Title X projects to be "physically and financially separate" from abortion services. Rust, 500 U.S. at 179-80 (internal quotations and citations omitted). The Court determined that the condition was not for the purpose of "'suppressing a dangerous idea,' but [was] a prohibition on a project grantee or its employees from engaging in activities outside of the project's scope," because the authorizing legislation limited the availability of funds under the program "to preconceptional services" and did not "furnish services related to childbirth." Id. at 179, 194.

Not so here. The Challenged Conditions do not flow from any language within the Ryan White Act -- rather, they

**unilaterally** impose limitations on the uses to which congressionally approved funds can be put -- without any supportive language from Congress, either directly or by any reasonable inference. See generally 42 U.S.C. §§ 300ff-11 to 300ff-140.[50] Agency and Public Official Defendants must explain how the Challenged Conditions support the **congressional** intent rather than seeking to suppress so-called "dangerous ideas." They do not do so; indeed they cannot.

The Challenged Conditions thus violate the First Amendment and separately violate the APA.

**b. Diminution of the Marketplace of Ideas**

Further, the Challenged Conditions violate the First Amendment and the APA because they are aimed at diminishing the marketplace of ideas. "[P]ressing constitutional question[s] [] arise if [g]overnment funding [restrictions] resulted in the imposition of a disproportionate burden calculated to drive 'certain ideas or viewpoints from the marketplace.'" National Endowment for the Arts v. Finley, 524 U.S. 569, 587 (1998) (quoting Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105, 116 (1991)). Indeed, preventing the government from driving ideas from public consciousness is "[t]he rationale of the general prohibition" on content-based

---

[50] This fact itself, as explained below, demonstrates the Challenged Conditions violate the APA.

restrictions of speech. R.A.V. v. City of St. Paul, 505 U.S. 377, 387 (1992).

Concerns regarding limitations on the marketplace of ideas have historically presented themselves in the form of taxing and spending. See, e.g., Leathers v. Medlock, 499 U.S. 439, 448-49 (1991); Simon & Schuster, Inc., 502 U.S. at 116; Finley, 524 U.S. at 587. As Leathers explains, "[t]he danger from a tax scheme that targets a small number of speakers is the danger of censorship; a tax on a small number of speakers runs the risk of affecting only a limited range of views." 499 U.S. at 448. The inverse, as Finley notes, presents issues too. See 524 U.S. at 587. If the government decides it will provide a funding subsidy, but manipulates the subsidy in a way that skews the marketplace of ideas to drive out certain ideas, the First Amendment is violated. See id. (agreeing with a concession petitioners made in their brief); see also Brief for Petitioner at 38 n.12, National Endowment for the Arts v. Finley, 524 U.S. 569 (1998) (No. 97-371).

Other cases from this circuit dealing with conditions on government funding analogous to those presented here have raised concerns about the marketplace of ideas. In Rhode Island Latino Arts, the District of Rhode Island considered a challenge to an agency action that would have prohibited art grants that promoted "gender ideology." 777 F. Supp. 3d at 94-98. In its

First Amendment analysis, the court suggested that the funding condition was of the kind intended to limit the marketplace of ideas, but ruled the limitation violated the First Amendment on other grounds. See id. at 107, 110.

Here, these concerns are not hypothetical, but rather certain and direct. Over half of those diagnosed with HIV receive healthcare services through the Ryan White Program. See Suppl. R. at 0147. Without Ryan White Program funding, many patients would not have access to gender-affirming care at all. See Zuniga Decl. ¶ 39; Collins-Ogle Decl. ¶¶ 40-42; Roe Decl. ¶¶ 38-40; Doe Decl. ¶ 59. Accordingly, with the implementation of the Challenged Conditions, a whole subset of society becomes devoid of the ideas gender-affirming care provides.

It is true that Agency and Public Official Defendants need not sponsor the expression of every conceivable idea in society. See Rust, 500 U.S. at 193; Regan, 461 U.S. at 549 ("a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right . . . ."); cf. Harris v. McRae, 448 U.S. 297, 316 (1980) ("although government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation."). Nevertheless, if the Agency and Public Defendants choose to sponsor expression, they may not skew the marketplace of ideas **with the intent** of driving out certain ideas. See

Finley, 524 U.S. at 587. That is the situation here. Sectors of society are losing access to the ideas gender-affirming care espouses because the Trump Administration -- as shown above -- views them as "dangerous" and wants them removed from society. This cannot pass constitutional muster.

The Challenged Conditions violate the First Amendment and the APA on this ground as well.

**c. Non-Programmatic Regulation of Speech**

The improper motivations behind the Challenged Conditions are sufficient, in and of themselves, to violate the First Amendment and APA. Yet even assuming that the Challenged Conditions were implemented with proper motivations in mind, they still violate the First Amendment and APA because they regulate speech outside the contours of the Ryan White Program.

There is a "relevant distinction that has emerged from [Supreme Court] cases [] between conditions that define the limits of the government spending program . . . and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." Agency for Int'l Dev., 570 U.S. at 214-15. When a regulation falls into this second category, it violates the First Amendment. See id. at 221.

This distinction "is not always self-evident," however there are some bright-line rules. Id. at 217. For instance, the government cannot require "funding recipients adopt -- as

their own -- the Government's view on an issue of public concern." Id. at 218. Further, when "[a] recipient cannot avow the belief dictated by the [government] when spending [government] funds, and then turn around and assert a contrary belief, or claim neutrality, when participating in activities on its own time and dime," the funding conditions reach beyond the contours of the program and violate the First Amendment. Id.

On the facts presented here, multiple components of the Challenged Conditions raise constitutional questions.

**i. HHS's Grants Policy Statement**

HHS's Grants Policy Statement, which applies to all Ryan White Program funds, see Suppl. R. at 0086; Trial Ex. 11 at 5, requires that:

> By applying for or accepting federal funds from HHS, recipients certify compliance with all federal antidiscrimination laws and these requirements and that complying with those laws is a material condition of receiving federal funding streams. Recipients are responsible for ensuring subrecipients, contractors, and partners also comply.
>
> All recipients subject to Title IX requirements must also adhere to the following term:
>
> By accepting this award, including the obligation, expenditure, or drawdown of award funds, recipient certifies as follows:
>
> Recipient is compliant with . . . the requirements set forth in Presidential Executive Order 14168 titled Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government,

Trial Ex. 11 at 21-22.

The impact of this certification provision is unclear. Read in a favorable light, the provision could be interpreted to mean that recipients of federal funding must certify that they are not using federal government funds to promote "gender ideology." Under this reading, the certification provision, by itself, may not regulate speech outside the contours of the Ryan White Program, and thus may not impose constitutional difficulties.

Nonetheless, other readings of the provision are possible. The provision may also be read to mean that the recipients of federal funding must certify that they do not promote "gender ideology," regardless of the funds being used to do so. Under this reading, recipients of Ryan White Program funds could never espouse ideas affirming transgender people, even "when participating in activities on its own time and dime." Agency for Int'l Dev., 570 U.S. at 218. Under this reading, constitutional issues arise.

Indeed, other courts have read similar provisions in this way. See, e.g., Chicago Women in Trades v. Trump, 778 F. Supp. 3d 959, 974 (N.D. Ill. 2025). On January 21, 2025, President Trump signed Executive Order 14173 titled, Ending Illegal Discrimination and Restoring Merit-Based Opportunity.[51] The

[51] Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025).

Executive Order purported to limit the ability of public and private sector organizations from enforcing diversity, equity, and inclusion ("DEI")[52] initiatives and included a certification provision that required:

---

[52] Demonizing DEI appears to have been an extraordinarily effective campaign slogan in 2024. See generally Heritage Found., Project 2025 -- Mandate for Leadership: The Conservative Promise (2023), https://static.heritage.org/project2025/2025_MandateForLeadership_FULL.pdf [https://perma.cc/3DYA-TVGJ]. It has, however, proved extremely ineffective as a tool for governing. The reason? Standing alone, the acronym is devoid of meaning. In handling American Public Health Association v. National Institutes of Health, 786 F. Supp. 3d 237 (D. Mass 2025), appeal pending, 25-1612 (1st Cir. June 24, 2026), try as I might, I could never wring a definition out of the government's lawyers. Finally, I pressed them to tell me: as they were anti-DEI, were they in favor of the antonym? -- "homogeneity, inequity, exclusion?" The government denied it. The government wound up defending a very broad reading of Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181 (2023).

Fair enough. Yet extinguishing any vestige of affirmative action in governmental health grants is not -- nor can it ever be -- a license for race discrimination. Yet that is precisely what happened when the so-called Department of Government Efficiency ("DOGE") instructed the National Institutes of Health to begin abruptly terminating research grants fully funded by Congress. See Trial Transcript 83:7-11, American Pub. Health Ass'n v. Nat'l Insts. of Health, 791 F. Supp. 3d 119 (D. Mass 2025)(No. 1:25-cv-10814-WGY)("[T]his represents racial discrimination and discrimination against America's LGBTQ community, that's what this is."). No possible reading of Students for Fair Admission, Inc. supports deliberate race discrimination. It insults the Supreme Court to act otherwise. The Civil War Amendments are still part of our Constitution. As Chief Justice Roberts pointedly remarked in the birthright citizenship litigation, "It's the same Constitution." Argument Transcript 34:21, Trump v. Barbara, 609 U.S. 719 (2026) (No. 25-365).

If DEI stands for anything at all, DOGE appears to think it means white male supremacy, iniquity, and exclusion of large numbers of our citizens. The phrase simply has no place in our

> [T]he contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions . . . and [a] term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws.

See id. at 975; Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025).

Discussing the First Amendment implications of the certification provision, two courts determined the provision required parties to certify that they did not engage in any DEI programs, regardless of whether the federal government was sponsoring it. See Chicago Women in Trades, 778 F. Supp. 3d at 984; San Francisco A.I.D.S. Found., 786 F. Supp. 3d at 1220. But see National Urb. League v. Trump, 783 F. Supp. 3d 61, 99 (D.D.C. 2025) (reaching opposite conclusion).

The same result could be reached here. While the language of HHS's Grants Policy Statement's certification provision is slightly different than that of the certification provision in Executive Order 14173, both require that funding recipients agree that following federal anti-discrimination laws is material to receiving payments and that recipients certify that they comply with an executive order. Compare Trial Ex. 11 at

---

federal courts where the pediment of our Supreme Court proclaims, "Equal Justice Under Law." Oscar Hamerstein had it right. "You've got to be taught to Hate." Oscar Hamerstein, You've Got to Be Carefully Taught, in South Pacific (Music by Richard Rodgers 1949).

21-22, with Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025).

Ultimately, the factual record here is not sufficiently developed to determine which reading is proper, but, in this Court's view, the provision at least raises questions as to the constitutional legitimacy of the Challenged Conditions.

**ii. Operational Impact of Challenged Conditions**

More clearly violating the First Amendment is the operational impact of the Challenged Conditions. Granting Agency and Public Official Defendants the benefit of the doubt and assuming that the HHS Grants Policy Statement's certification provision applies only to activities funded by the Ryan White Program, the Challenged Conditions, altogether, prohibit healthcare providers from using Ryan White Program funds to "acknowledge[,] or document[,] or even respect the identities of their transgender patients," or to provide gender-affirming care. Trial Tr. 10:7-19, 20:12-21:23. Accordingly, healthcare providers receiving Ryan White Program funds could -- hypothetically -- engage in these activities "on [their] own time and dime," without violating the Challenged Conditions, thus avoiding any impact of the Challenged Conditions on speech outside the contours of the Ryan White Program. See Agency for Int'l Dev., 570 U.S. at 218-19.

As this Court noted in American Association of University Professors v. Rubio, however, "we live in the real world." 802 F. Supp. 3d 120, 131 n.5 (D. Mass. 2025). As Associational and Provider Plaintiffs explain, such a neat division is simply operationally impossible. In implementing the Challenged Conditions, many questions arise. Would providers need to hire staff outside of those whose salaries are funded by the Ryan White Program in order to be able to affirm the identities of transgender patients? See Fox Decl. ¶ 36. Would it be impermissible for staff who support patients receiving gender-affirming care to contact patients who receive treatment under the Ryan White Program? See Doe Decl. ¶ 55. If the answer to either of these questions is yes -- as it seems to be -- it is logistically impossible for Ryan White Program funding recipients to engage in gender-affirming care outside the Ryan White Program.

Other courts have come to different conclusions. In National Urban League v. Trump, a court determined that because funding conditions similar to the Challenged Conditions did not "tell agencies to cancel contracts with entities doing equity-related work outside their contracts or to ensure that federal funds do not support grantees promoting gender ideology with non-federal funds," they did not constitute a First Amendment violation. 783 F. Supp. 3d at 99.

While perhaps correct in that case, the court's simple analysis is insufficient here. As the Supreme Court has noted, Agency and Public Official Defendants "cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise." Legal Servs. Corp. v. Velazquez, 531 U.S. 533, 547 (2001); see Agency for Int'l Dev., 570 U.S. at 215. This Court must look to "[t]he effect[s] of the restriction." Legal Servs. Corp., 531 U.S. at 547. Here, the effect of the Challenged Conditions is that Ryan White Program funding recipients cannot realistically affirm transgender people or engage in gender-affirming care, even outside of Ryan White Program activities.[53] "[B]y [their] very nature," the Challenged Conditions "affect[] 'protected conduct outside the scope of the federally funded program.'" Agency for Int'l Dev., 570 U.S. at 218 (quoting Rust, 500 U.S. at 197). **That is unconstitutional.** The Challenged Conditions violate the First Amendment and the APA.

[53] Though true that Associational and Provider Plaintiffs need not accept Ryan White Program funds, the constitutional injury Agency for International Development contemplates is being forced to choose between accepting a government subsidy or engaging in free speech. See 570 U.S. at 218-19. Funding conditions that force that choice violate the First Amendment. See id.

### 2. Counts VI & IV: Violation of the Fifth Amendment's Due Process Clause

Under the Fifth Amendment, "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V. This protection -- the Fifth Amendment's Due Process Clause -- applies only to actions by the federal government. See Martínez-Rivera v. Sánchez Ramos, 498 F.3d 3, 8 (1st Cir. 2007); see also Dusenbery v. United States, 534 U.S. 161, 167 (2002). In its plain language, it "does not contain an equal protection" component. Bolling v. Sharpe, 347 U.S. 497, 499 (1954). Nonetheless, the Supreme Court has recognized that discrimination by the federal government constitutes "a denial of due process of law" under the Fifth Amendment. Id.; see Schneider v. Rusk, 377 U.S. 163, 168 (1964). As such, there is an "equal protection component of the Due Process Clause of the Fifth Amendment," United States Dep't of Agric. v. Moreno, 413 U.S. 528, 533 (1973), which is "precisely the same as [] equal protection [] under the Fourteenth Amendment," Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n.2 (1975).

Under this analysis, whether a discriminatory regulation is permissible turns on whom it discriminates against, the objectives behind the regulation, and the means by which those objectives are achieved. See Roe v. Farwell, 999 F. Supp. 174,

193-94 (D. Mass. 1998). Typically, "laws dealing with suspect classifications . . . are subject to strict scrutiny and quasi-suspect classifications, like [sex], are subject to intermediate scrutiny. All other classifications need only be rationally related to a legitimate government interest." Id. Nevertheless, regulations "motivated by an invidious discriminatory purpose" to discriminate on the basis of sex are subject to intermediate scrutiny. United States v. Skrmetti, 605 U.S. 495, 516 (2025) (citing Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 271-74 (1979); Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 264-66 (1977)).[54]

Associational and Provider Plaintiffs argue that the Challenged Conditions constitute discrimination on the basis of both transgender status and sex, are subject to intermediate scrutiny, and violate the equal protection component of the Fifth Amendment's Due Process Clause. See Pls.' Pretrial Br. at 34-36. Agency and Public Official Defendants contend otherwise, suggesting that the Supreme Court's recent decision in United States v. Skrmetti, 605 U.S. 495 (2025), forecloses this analysis. See Defs.' Post-Hearing Br. at 10-12. At first

[54] In the context of discrimination on the basis of sex, the terms "intermediate scrutiny" and "heightened scrutiny" are used interchangeably. See Skrmetti, 605 U.S. at 510.

glance, Agency and Public Official Defendants are correct; however, after a thorough review of Skrmetti, this Court is convinced Skrmetti's reasoning does not apply to the facts presented here.[55]

**a. United States v. Skrmetti**

The Supreme Court's decision in United States v. Skrmetti delt with a narrow question: whether state law can ban the provision of gender-affirming care to minors without violating equal protection. See 605 U.S. at 500. The Court ruled state law can. See id. at 525-26.

Specifically, the case dealt with a Tennessee law that banned the provision of gender-affirming care to minors. See id. at 506. The regulation made it illegal for both transgender boys and transgender girls to receive hormonal or surgical care

---

[55] Another court within the First Circuit has also set aside Skrmetti's reasoning as inapplicable in a case involving discrimination against transgender people. See Bernier v. Turbocam, Inc., 814 F. Supp. 3d 229 (D.N.H. 2026); see also American Ass'n of Physicians for Hum. Rts., Inc., 795 F. Supp. 3d 678 (D. Md. 2025). Similarly, the D.C. Circuit has determined that when regulations surrounding gender-affirming care are motivated by animus, they are subject to, and fail, rational basis review. See Talbott v. United States, 176 F.4th 720, 745-47 (D.C. Cir. 2026), cert. pending, No. 26-272 (U.S. Aug. 27, 2026). While this Court in American Public Health Association v. National Institutes of Health determined that Skrmetti's reasoning applied and refused to provide injunctive relief, see 791 F. Supp. 3d at 128 n.5, today, the dust has settled around Skrmetti, and case law has evolved. Further, it is the invidious discriminatory motivation behind the Challenged Conditions, as described below, that makes Skrmetti inapplicable here. See Skrmetti, 605 U.S. at 519.

intended to "enabl[e] a minor to identify with, or live as, a purported identity inconsistent with the minor's sex," or "treat[e] purported discomfort or distress from a discordance between the minor's sex and asserted identity." Id. (brackets omitted) (quoting Tenn. Code Ann. § 68-33-103). It did not bar the use of hormonal treatment "to treat a minor's congenital defect, precocious (or early) puberty, disease or physical injury." Id. at 507 (quoting Tenn. Code Ann. § 68-33-103).[56] The regulation was motivated out of a desire to protect children from what the state legislature viewed as the harmful effects of gender-affirming care. See id. at 505-06. No argument was raised suggesting it was motivated by discriminatory purposes. See id. at 516, 519 ("[t]he plaintiffs, moreover, have not argued that SB1's prohibitions are mere pretexts designed to effect an invidious discrimination against transgender individuals.").[57]

---

[56] "The law defines the term '[c]ongenital defect' to include an 'abnormality present in a minor that is inconsistent with the normal development of a human being of the minor's sex,' but excludes from its definitions of '[c]ongenital defect' and 'disease' [the following:] 'gender dysphoria, gender identity disorder, [and] gender incongruence.'" Id. (quoting Tenn. Code Ann. §§ 68-33-102 to 68-33-103).

[57] Importantly, the laws present in Skrmetti are wholly different than the regulations at issue here. The laws upheld in Skrmetti derive from states' police powers, under which they have "wide discretion to pass legislation in areas where there is medical and scientific uncertainty." Skrmetti, 605 U.S. at 524 (quoting Gonzales v. Carhart, 550 U.S. 124, 163 (2007)); see Catholic Charities of Jackson, Lenawee, & Hillsdale Cntys. v.

Three transgender minors sued to challenge the provision, arguing that the regulations constituted discrimination on the basis of sex or transgender status. See id. at 511, 517. They argued that because "an adolescent whose biological sex is female cannot receive puberty blockers or testosterone to live and present as a male, but an adolescent whose biological sex is male can," and vice versa, the regulations turned on sex or transgender status. Id. at 512-13, 517.

The Supreme Court rejected that theory. Instead, it concluded that the regulations turned on the type of medical treatment provided, as it barred all minors -- male and female -- from receiving gender-affirming hormonal care. See id. at 514-515. Further, while acknowledging that "a law that classifies on the basis of sex may fail heightened scrutiny if the classifications rest on impermissible stereotypes," the

---

Whitmer, 162 F.4th 686, 712 (6th Cir. 2025) (Bloomekatz, J. dissenting). The regulations at issue here, alternatively, provide a funding scheme that allows doctors to receive federal funding for providing medical care that is **legal** in the state in which they provide the care. See Trial Tr. 13:10-14:11. Neither the Ryan White Act nor the Challenged Conditions require or prohibit the availability of gender-affirming care; they impact only the availability of federal funds to doctors who provide this care to patients under the Ryan White Program. See id. This Court does not suggest that states cannot bar the provision of certain medical care -- indeed, they can, subject to the limits of the U.S. Constitution. See Skrmetti, 605 U.S. at 525-26; see also id. at 516 (leaving open the question of whether laws motivated by an "invidious discriminatory purpose" violate the Equal Protection Clause).

Court noted that such analysis is only proper when a law's classifications covertly or overtly classify on the basis of sex **or have an "invidious discriminatory purpose" of discriminating on the basis of sex**. Id. at 516 (emphasis added). Since such was not the case there, **the Court did not engage in that inquiry**. See id.

Additionally, the Supreme Court as a whole did not determine whether "transgender individuals are a suspect or quasi-suspect class," id. at 517, or whether discrimination on the basis of transgender status automatically constitutes discrimination on the basis of sex, see id. at 520. Nevertheless, the concurrences and dissent did. As to the first question -- whether transgender individuals are either a suspect or quasi-suspect class -- Justices Barrett, Thomas, and Alito asserted that they are not. See id. at 548 (Barret, J., concurring); id. at 565 (Alito, J., concurring). Justices Sotomayor, Jackson, and Kagan asserted that they are. See id. at 601 (Sotomayor, J., dissenting). As to the second question -- whether discrimination on the basis of transgender status constitutes discrimination on the basis of sex -- Justices Thomas concluded it does not. See id. at 527 (Thomas, J., concurring). Justices Sotomayor, Jackson, and Kagan concluded that it does. See id. at 590-91, 600 (Sotomayor, J., dissenting).

b. Bostock v. Clayton County

This second question comes into play because of the Supreme Court's opinion in Bostock v. Clayton County, 590 U.S. 644 (2020). In Bostock, the Supreme Court considered whether an "employer can fire someone simply for being homosexual or transgender." Id. at 651. On the basis of Title VII of the Civil Rights Act of 1964, the Supreme Court made clear an employer may not. See id. at 651-52.

The case came to the Supreme Court after three different employers fired three different employees for being either gay or transgender. See id. at 653-54; see also id. at 665 (stating employers "do not dispute that they fired the plaintiffs for being homosexual or transgender."). Following their termination, "[e]ach employee brought suit under Title VII alleging unlawful discrimination on the basis of sex." Id. at 654. Interpreting the statute, the Supreme Court held that "[i]f the employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee -- put differently, if changing the employee's sex would have yielded a different choice by the employer -- a statutory violation has occurred." Id. at 659-60.

Applying this to the case of gay or transgender employees, the Supreme Court determined that "it is impossible to discriminate against a person for being homosexual or

transgender without discriminating against that individual based on sex." Id. at 660. It continued with an eloquent example:

> Consider, for example, an employer with two employees, both of whom are attracted to men. The two individuals are, to the employer's mind, materially identical in all respects, except that one is a man and the other a woman. If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague. Put differently, the employer intentionally singles out an employee to fire based in part on the employee's sex, and the affected employee's sex is a but-for cause of his discharge. Or take an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. Again, the individual employee's sex plays an unmistakable and impermissible role in the discharge decision.

Id. The fact that both the employee and employer would "likely respond that [they were fired] because they were gay or transgender" is irrelevant. Id. at 666. The Court explained:

> In conversation, a speaker is likely to focus on what seems most relevant or informative to the listener. So an employee who has just been fired is likely to identify the primary or most direct cause rather than list literally every but-for cause. To do otherwise would be tiring at best. But these conversational conventions do not control Title VII's legal analysis, which asks simply whether sex was a but-for cause [of the termination].

Id. at 666-67. As such, discrimination on the basis of sexual orientation or gender-identity was sex-based discrimination, impermissible under Title VII. See id. at 651-52.

In dissent, Justices Alito and Thomas argued that Bostock's reasoning was wrong in the Title VII context and should not be applied in other contexts. See id. at 685, 733 (Alito, J., dissenting). Specifically, they noted:

> [T]he Court's decision may exert a gravitational pull in constitutional cases. Under our precedents, the Equal Protection Clause prohibits sex-based discrimination unless a "heightened" standard of review is met. By equating discrimination because of sexual orientation or gender identity with discrimination because of sex, the Court's decision will be cited as a ground for subjecting all three forms of discrimination to the same exacting standard of review.

Id. at 733 (citations omitted).[58] That is what this Court confronts today.

**c. Discrimination on the Basis of Sex**

These cases make clear several principles of law this Court is duty-bound to apply. Under Skrmetti's analysis, it appears to this Court that regulations which seek to ban or limit gender-affirming care never turn on the basis that those intending to receive the care are transgender. See 605 U.S. at 518-20. As such, Skrmetti did not reach the question of whether

---

[58] The majority addressed this point: "The employers worry that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination . . . . But none of these other laws are before us . . . and we do not prejudge any such question today." Id. at 681 (majority opinion).

transgender people are a suspect or quasi-suspect class. See id. at 517. This Court will not do so either.[59]

Nonetheless, as Skrmetti acknowledges, in cases of sex-based discrimination, a regulation may impermissibly discriminate on the basis of sex and violate equal protection "where a law's classifications are neither covertly nor overtly based on sex." Id. at 516 (citations omitted). If the regulation was "motivated by an invidious discriminatory purpose," it may violate equal protection. Id. at 516 (citing Personnel Adm'r of Mass., 442 U.S. at 271-74 (citations omitted). In the context of this case then, regulations banning gender-affirming care -- although not covertly or overtly classified on the basis of sex -- constitute sex-based discrimination if they are motivated by a discriminatory purpose. See id.

Bostock and Skrmetti leave wide-open the question of whether discrimination based on transgender status constitutes

---

[59] To be sure, this Court acknowledges the growing line of reasoning present in some cases that describes transgender people as belonging to either a suspect or quasi-suspect class. See Grimm v. Gloucester Cnty. Sch. Bd., 972 F.3d 586, 611 (4th Cir. 2020); Karnoski v. Trump, 926 F.3d 1180, 1199-1201 (9th Cir. 2019); Talbott v. United States, 775 F. Supp. 3d 283, 319-22, 319 n.23 (D.D.C. 2025), rev'd in part on other grounds, 176 F.4th 720 (collecting cases); see also Skrmetti, 605 U.S. at 600-01 (Sotomayor, J., dissenting); Eknes-Tucker v. Governor of Alabama, 114 F.4th 1241, 1318 (11th Cir. 2024) (en banc denial) (Rosenbaum, J., dissenting).

sex-based discrimination in the equal protection context. See id. at 520; Bostock, 590 U.S. at 681. Accordingly, to determine whether the Challenged Conditions violate the Due Process Clause, this Court must answer two questions. First, it must determine whether transgender-based discrimination is sex-discrimination in the equal protection context. If it is not, no further analysis is needed. If it is, however, then this Court must determine whether the Challenged Conditions are "motivated by an invidious discriminatory purpose" of discrimination against transgender people -- and thus on the basis of sex. Skrmetti, 605 U.S. at 516. If they are, the Challenged Conditions must be subjected to intermediate scrutiny. See id.

**i. Transgender Discrimination as Sex Discrimination**

As to the first question -- whether discrimination based on transgender status equates to sex-based discrimination in the equal protection context -- this Court answers that question with an emphatic "yes."

Nothing within Supreme Court or First Circuit precedent counsels otherwise. Again, Skrmetti left open the question of whether Bostock's reasoning applies beyond Title VII, see id. at 520, and several courts considering the question have applied Bostock beyond Title VII, see Boston All. of Gay, Lesbian,

Bisexual & Transgender Youth v. U.S. Dep't of Health & Hum. Servs., 557 F. Supp. 3d 224, 244 (D. Mass. 2021) (Saris, J.); Tirrell v. Edelblut, 748 F. Supp. 3d 19, 34-36 (D.N.H. 2024); Grimm, 972 F.3d at 616; Anderson v. Crouch, 169 F.4th 474, 493 (4th Cir. 2026) (stating that Skrmetti's interpretation of Bostock's causation analysis controls, but that Bostock applies outside Title VII); Grabowski v. Arizona Bd. of Regents, 69 F.4th 1110, 1116 (9th Cir. 2023); Fowler v. Stitt, 104 F.4th 770, 789-90 (10th Cir. 2024), vacated, 145 S. Ct. 2840 (2025) (mem.).[60] But see L.W. v. Skrmetti, 83 F.4th 460, 484 (6th Cir. 2023), aff'd on other grounds, 605 U.S. 495 (2025); Brandt v. Griffin, 147 F.4th 867, 880 (8th Cit. 2025) ("This court need not decide whether Bostock's reasoning applies in Equal Protection Clause cases because applying Bostock's reasoning does not change the outcome of this case.").

Further, the application of Bostock's logic beyond Title VII is consistent with several appellate courts, including the First Circuit, which have "recognized that the analytical framework for proving discriminatory treatment under Title VII is equally applicable to constitutional . . . claims." Lipsett

[60] It appears that the Supreme Court's reversal in Fowler was due to a faulty causation analysis, as explained in the similar case of Anderson. See Anderson, 169 F.4th at 493; see also Skrmetti, 605 U.S. at 520 (declining to rule on applicability of Bostock beyond Title VII but providing causation analysis).

v. Univ. of P.R., 864 F.2d 881, 896 (1st Cir. 1988) (alterations in original omitted) (quoting White v. Vathally, 732 F.2d 1037, 1039 (1st Cir. 1984)); see Lewis v. City of Union City, 918 F.3d 1213, 1220 n.5 (11th Cir. 2019); Sutherland v. Michigan Dep't of Treasury, 344 F.3d 603, 614 (6th Cir. 2003); Whiting v. Jackson State Univ., 616 F.2d 116, 121 (5th Cir. 1980); Patterson v. Am. Tobacco Co., 535 F.2d 257, 270 (4th Cir. 1976); Waters v. Wisconsin Steel Works of Int'l Harvester Co., 502 F.2d 1309, 1316 (7th Cir. 1974); Holt v. Pennsylvania, 683 Fed. Appx. 151, 160 (3d Cir. 2017) (citing Stewart v. Rutgers, The State Univ., 120 F.3d 426, 431-33 (3d Cir. 1997)); see also New York City Transit Auth. v. Beazer, 440 U.S. 568, 583 n.24 (1979).

This Court sees no basis for disagreement and applies Bostock's logic in the equal protection context. Discrimination on the basis of transgender status, by necessity, is sex-based discrimination. Cf. Bostock, 590 U.S. at 660.

**ii. Invidious Discriminatory Purpose**

As to the second question -- whether the Challenged Conditions are "motivated by an invidious discriminatory purpose" of discrimination against transgender people, see Skrmetti, 605 U.S. at 516 -- the Court's answer is sadly the same: **they are.**

This Court has already chronicled the Trump Administration's clear animosity toward transgender people

evident by the Administrative Record and the later-presented exhibits. For purposes of brevity, it will not do so again. Nonetheless, the most poignant evidence of this animosity does bear repeating:

> THE COURT: I'm asking not to be provocative, I'm asking because I don't know the answer and I'd like to know the answer . . . . The order of the President of the United States, um, I think fairly read, expresses the view that transgender citizens don't exist. Please tell me I'm wrong.
>
> (Pause.)
>
> [GOVERNMENT'S ATTORNEY]: **I can't.**

Trial Tr. 39:9-25. This exchange from the trial on the merits truly captures the discriminatory motivation behind the Challenged Conditions. By Agency and Public Official Defendants' own admission, a core component of the Challenged Conditions "expresses the view that transgender citizens don't exist." Id. This goes beyond mere "[d]ifferential treatment," one of Black's Law Dictionary's definitions for discrimination. See Discrimination, Black's Law Dictionary (12th ed. 2024) ("Differential treatment; [especially] a failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored."). This constitutes full-throated denial.[61]

---

[61] Of course, denying the existence of one group and accepting the existence of another constitutes "[d]ifferential treatment," and thus, discrimination. See Discrimination, Black's Law Dictionary (12th ed. 2024).

The Challenged Conditions are, in addition to an attempt to suppress what Agency and Public Official Defendants consider dangerous speech, "motivated by an invidious discriminatory purpose" of discrimination on the basis of transgender status, and thus, sex. See Skrmetti, 605 U.S. at 516; Bostock, 590 U.S. at 660. They are subject to intermediate scrutiny. See Skrmetti, 605 U.S. at 516.

**iii. Intermediate Scrutiny**

In cases involving sex-discrimination, "[t]he burden of justification is demanding and it rests entirely on the [s]tate." United States v. Virginia, 518 U.S. 515, 533 (1996) (citing Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724 (1982)). The standard is high:

> The State must show "at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." The justification must be genuine, not hypothesized or invented post hoc in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females.

Id. (alterations in original) (citations omitted).

On these facts, the Challenged Conditions fail to satisfy intermediate scrutiny. As discussed both above and below, the only motivations underlying the Challenged Conditions are animus toward transgender people and the desire to suppress speech Agency and Public Officials view as "dangerous." See Suppl. R.

at 0132. The Supreme Court has made clear that "[i]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a **legitimate** governmental interest." Romer v. Evans, 517 U.S. 620, 634-35 (1996) (alterations in original) (quoting United States Dep't of Agric. v. Moreno, 413 U.S. 528, 534 (1973)). Accordingly, on this record, the motivations behind the Challenged Conditions cannot constitute -- as a matter of law -- any legitimate governmental interest, let alone an important governmental interest. See id. The Challenged Conditions therefore fail to satisfy intermediate scrutiny. As a result, they constitute impermissible sex-based discrimination in violation of equal protection.

The Challenged Conditions violate the equal protection component of the Fifth Amendment's Due Process Clause and the APA.

### iv. Rational Basis Review

Skrmetti and Bostock are both decided on narrow grounds, but their implications are far reaching. See Skrmetti, 605 U.S. at 517, 520; Bostock, 590 U.S. at 649-52. As is now clear, when regulations are motivated by an intent to discriminate against transgender people, they constitute sex-based discrimination and

warrant intermediate scrutiny. The Challenged Conditions here fail under intermediate scrutiny.

Nevertheless, even if these regulations were not subject to intermediate scrutiny, they would be subject to rational basis review. See Farwell, 999 F. Supp. at 193-94. Rational basis review requires that there be "any reasonably conceivable state of facts that could provide a rational basis for the [regulation]." Federal Commc'ns Comm'n v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993). As the D.C. Circuit recently explained:

> The "any conceivable reason" doctrine came about because neither Congress nor the President is required to give a reason for every classification at the time they make it. Rational basis doctrine requires us to presume that a classification is based on any plausible legitimate justification we can imagine when no justification was expressly stated contemporaneously; that follows from the presumption that when the legislature (or the President) did not give a reason for the classification at the time that they made it, they are presumed to have acted for any plausible constitutional reason.

Talbott, 176 F.4th at 746 (citations omitted).

Yet, as relatively low a bar as rational basis review sets, it is not without limits:

> [T]he doctrine has never allowed the Court to stick its head in the sand, like the proverbial ostrich, and ignore the justification that was expressly articulated at the time the decision was made. Indeed, the law, like common sense, requires the Court to evaluate the validity of the justification that was proclaimed at the time the classification was made.

Id. (citing Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 463 n.7 (1981)).

For this reason, when a regulation motivated only by animus is reviewed under rational basis, a court can declare it as such and invalidate the provision. See id. at 746-47. Indeed, if it were otherwise and "invidious reasons . . . expressly given for a classification [could] be completely ignored and replaced with our imagined non-invidious reasons, then equal protection jurisprudence has truly become bankrupt." Id. at 747.

Like the D.C. Circuit, this Court rules that the regulations promulgated here, only on the basis of animus, do not withstand rational basis review. See id. at 746-47. The Challenged Conditions fail.

The Challenged Conditions violate the equal protection component of the Fifth Amendment's Due Process Clause and the APA.

### 3. Counts II & V: Violation of the ACA's Non-Discrimination and Non-Interference Mandates[62]

"In 2010, Congress enacted the Patient Protection and Affordable Care Act . . . . The [ACA] aims to increase the number of Americans covered by health insurance and decrease the

---

[62] As discussed above, Associational and Provider Plaintiffs' free-standing ACA claim, on the basis of the non-interference mandate, is DISMISSED. The remainder of the free-standing ACA claim, as well as both prongs of the APA challenge as not in accordance with law under the ACA, live on.

cost of health care. The Act's 10 titles stretch over 900 pages and contains hundreds of provisions." National Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 538-39 (2012). Two provisions of the ACA are relevant to the case here -- the non-discrimination and non-interference mandates. See generally 42 U.S.C. §§ 18116, 18114.

The ACA's non-discrimination mandate prohibits individuals from being "excluded from participation in, [] denied the benefits of, or [] subjected to discrimination under, any health program or activity . . . which is receiving [f]ederal financial assistance," on the basis of race, sex, age, or disability. 42 U.S.C. § 18116(a). By the statute's own terms, this includes broadly, "any program or activity that is administered by an Executive Agency." Id.

The non-interference mandate achieves a different objective. That provision bars the Secretary of Health and Human Services from promulgating any regulation that:

> (1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care;
>
> (2) impedes timely access to health care services;
>
> (3) interferes with communications regarding a full range of treatment options between the patient and the provider;
>
> (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions;
>
> (5) violates the principles of informed consent and the ethical standards of health care professionals; or
>
> (6) limits the availability of health care treatment for the full duration of a patient's medical needs.

42 U.S.C. § 18114.

Associational and Provider Plaintiffs contend the Challenged Conditions violate both the non-discrimination and the non-interreference mandates. See Pls.' Pretrial Br. at 26-29, 32-34. Agency and Public Official Defendants argue otherwise, stating that the Challenged Conditions do not discriminate against transgender people, that Skrmetti forecloses any analysis otherwise, and that Agency and Public Official Defendants may properly choose not to fund gender-affirming care under the Ryan White Act. See Defs.' Post-Hearing Br. at 9-10; Defs.' Mem. Supp. Dismissal on Merits Pls.' Counts I-IV ("Defs.' Pretrial Br.") at 13-14, ECF No. 70. This Court rejects Agency and Public Official Defendants' arguments and rules the Challenged Conditions violate the ACA's non-discrimination and non-interference mandates.

**a. Non-Discrimination Mandate**

In essence, Associational and Provider Plaintiffs' and Agency and Public Official Defendants' arguments as to the ACA's non-discrimination mandate mirror those made under the equal protection analysis. See Pls.' Pretrial Br. at 32-34; Defs.' Post-Hearing Br. at 9-10. The arguments neither present new bases for the application -- or inapplication -- of Bostock or Skrmetti, nor posit that analysis under the ACA's non-discrimination mandate is different than that of constitutional equal protection. See Pls.' Pretrial Br. at 32-34; Defs.' Post-Hearing Br. at 9-10.

Associational and Provider Plaintiffs provide a simple analysis. "To succeed [under the ACA's non-discrimination mandate], a plaintiff must show that (1) the defendant is a covered health program or activity, and (2) the plaintiff was excluded from participation in, denied the benefits of, or subject to discrimination, (3) on the basis of sex." Pls.' Pretrial Br. at 32-33. Agency and Public Official Defendants do not dispute that this is the proper analysis, and the plain language of the statute confirms Associational and Provider Plaintiffs' outline. See 42 U.S.C. § 18116; see also American Ass'n of Physicians for Hum. Rts., Inc., 795 F. Supp. 3d at 695.

For substantially the same reasoning as the above equal protection analysis, this Court sees no basis for distinguishing

Bostock's Title VII claims from ACA claims. Further, having already determined that the Challenged Conditions discriminate against transgender patients on the basis of sex, this Court need only determine whether the Ryan White Program is "a covered health program or activity." Pls.' Pretrial Br. at 33. **It is.** See 42 U.S.C. § 18116 (including "any program or activity that is administered by an Executive Agency" within the non-discrimination mandate).

The Challenged Conditions violate the ACA's non-discrimination mandate.[63] Accordingly, they violate both the ACA and APA.

**b. Non-Interference Mandate**

As other courts have acknowledged, "caselaw construing [the ACA's non-interference mandate] is extremely sparse." Whitman-Walker Clinic, Inc., 485 F. Supp. 3d at 52. Indeed, no First Circuit precedent exists considering the provision, and only one case within the circuit has briefly addressed it. See Family Plan. Ass'n of Maine v. U.S. Dep't of Health & Hum. Servs. (Family Plan. Ass'n I), 404 F. Supp. 3d 286, 308-09 (D. Me. 2019) (reviewing preliminary injunction); Family Plan. Ass'n of

[63] Other courts have reached the same conclusion in similar cases. See, e.g., American Ass'n of Physicians for Hum. Rts., 795 F. Supp. 3d at 695 (post-Skrmetti); PFLAG, Inc. v. Trump, 766 F. Supp. 3d 535, 568-70 (D. Md. 2025); San Francisco A.I.D.S. Found., 786 F. Supp. 3d at 1231-32.

Maine v. U.S. Dep't of Health & Hum. Servs. (Family Plan. Ass'n II), 466 F. Supp. 3d 259, 270-71 (D. Me. 2020) (reviewing summary judgment). Outside the First Circuit, only two federal appellate courts -- sitting en banc and reaching different conclusions -- have analyzed the provision. See California v. Azar, 950 F.3d 1067, 1091-95 (9th Cir. 2020) (en banc); Mayor of Baltimore v. Azar, 973 F.3d 258, 288-92 (4th Cir. 2020) (en banc).

As the Ninth Circuit explained, the non-interference provision is "intended to ensure that HHS," and its subsidiaries, "do[] not improperly impose regulatory burdens on doctors and patients." California, 950 F.3d at 1094. This understanding is clear from the plain language of the statute and has not been contested by the parties here or in any other litigation this Court has identified. See 42 U.S.C. § 18114; see also Pls.' Pretrial Br. at 26-29; Defs.' Pretrial Br. at 13-14.

Further, the parties do not disagree as to the impact of the Challenged Conditions. See Pls.' Pretrial Br. at 26-29; Defs.' Pretrial Br. at 13-14. While Agency and Public Official Defendants contend that Associational and Provider Plaintiffs could engage in the provision of gender-affirming care outside programs funded by the Ryan White Act, see Defs.' Post-Hearing Br. at 9, they do not contest Associational and Provider

Plaintiffs' claims that the Challenged Conditions "impede the provision of care," "interfere with communications between HIV care providers and their transgender patients regarding the full range of treatment options," or "require [providers] to 'act against their ethical obligations as medical providers,'" Pls.' Pretrial Br. at 27-29 (quoting Packett Decl. ¶ 36); see Defs.' Pretrial Br. at 13-14. Instead, Agency and Public Official Defendants contend only that Rust permits this. See Defs.' Pretrial Br. at 13-14; Rust, 500 U.S. at 192, 196.

As discussed above within the context of the First Amendment, Rust makes clear that "[t]he Government can . . . selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." 500 U.S. at 193. Doing so "is not denying a benefit to anyone, but is instead simply insisting that public funds be spent for the purposes for which they were authorized." Id. at 196. Accordingly, Agency and Public Official Defendants argue, the Challenged Conditions "merely reflect Congress's choice not to subsidize certain activities" and do not constitute "regulations that impose burdens on health care providers and their clients." Defs.' Pretrial Br. at 13.

In light of Rust, some of the cases construing the ACA's non-interference mandate have interpreted it as not applying to

"**Congress's** choice not to subsidize certain activities." California, 950 F.3d at 1095 (emphasis added). In California v. Azar, the Ninth Circuit considered a challenge to regulations promulgated by HHS that prohibited Title X funding recipients from "refer[ring] for, []or encourag[ing] abortion." Id. at 1081 (internal quotations and citations omitted). The regulation was promulgated pursuant to Title X's prohibition on funding recipients using funds "in programs where abortion is a method of family planning." Id. at 1074 (quoting 42 U.S.C. § 300a-6). Interpreting the ACA's non-interference mandate within the context of the entire ACA and actions around the time of its enactment, the court determined that the "ACA did not seek to alter the relationship between federally funded grant programs and abortion in a fundamental way," and ruled the regulation did not violate the ACA. See id. at 1094-95.

In Family Planning Association of Maine, the District of Maine considered the same regulation and ruled the same way. See Family Plan. Ass'n I, 404 F. Supp. 3d at 308-09; Family Plan. Ass'n II, 466 F. Supp. 3d at 270-71. The court highlighted that "because the [regulation] does not impose an obstacle in the path of a patient pursuing medical care outside the Title X program, the [regulation] does not run afoul of the ACA." Family Plan. Ass'n II, 446 F. Supp. 3d at 271.

The Fourth Circuit in Mayor of Baltimore v. Azar reached a different conclusion. See 973 F.3d at 291-92. In effect, the Fourth Circuit held that Rust's logic was inapplicable in the context of the ACA's non-interference provision "because the ACA Noninterference Mandate was enacted after that decision." Id. at 289. For this reason, the court permanently enjoined the regulation. See id. at 296.

Regardless of the correct approach, Rust is inapplicable here. As Associational and Provider Plaintiffs correctly point out, the regulation considered in Rust was pursuant to **congressional** action. See Pls.' Opp'n Defs.' Pretrial Br. at 7; Rust, 500 U.S. at 178-81. There, like in California, Mayor of Baltimore, and Family Planning Association of Maine, the regulations limited the ability of Title X funding recipients to provide certain services related to abortion where the authorizing statute for Title X explicitly carved out abortion activities from its scope. See Rust, 500 U.S. at 179-80; California, 950 F.3d at 1081-82; Mayor of Baltimore, 973 F.3d at 271-72; Family Plan. Ass'n I, 404 F. Supp. 3d at 298-301; Family Plan. Ass'n II, 466 F. Supp. 3d at 263-65. The case is wholly different here, where the Challenged Conditions limit the ability of Ryan White Program recipients from providing gender-affirming care, despite no such carve-out in the statute. See generally 42 U.S.C. §§ 300ff-11 to 300ff-140.

While the Agency and Public Official Defendants are right to say that, under Rust, **Congress** may "cho[ose] not to subsidize certain activities," Defs.' Pretrial Br. at 13, the Executive Branch, **unilaterally**, may not. See Federal Election Comm'n v. Cruz, 596 U.S. 289, 301 (2022). Indeed, "[a]n agency, after all, 'literally has no power to act' -- including under its regulations -- unless and until **Congress** authorizes it to do so by statute." Id. (emphasis added) (quoting Louisiana Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n, 476 U.S. 355, 374 (1986)). Accordingly, in the context of funding medical care, unless Congress creates an explicit carve-out for certain services it does not want funded by the expenditure, the ACA's non-interference mandate applies to regulations promulgated pursuant to that expenditure.[64] See, e.g., In re Aiken County, 725 F.3d at 259 ("the President [and subordinate executive agencies] must follow statutory **mandates** . . . . [They] may not decline to follow a statutory mandate or prohibition simply because of

---

[64] Though this Court need not and does not decide whether it follows the Ninth Circuit's rule in California, it observes that the reasoning in that case seems tenuous. Under Rust, Congress could undoubtably direct agencies to promulgate regulations and exempt them from the ACA's non-interference mandate. See 500 U.S. at 193. Absent congressional action to that end, however, agency action cannot defy a duly enacted act of Congress, even in service of a different act. See Cruz, 596 U.S. at 301; In re Aiken County, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.).

policy objections.") (emphasis in original). Here, the Challenged Conditions defy that mandate.

The Challenged Conditions violate the ACA's non-interference mandate. Accordingly, they violate the APA.

### 4. Count I: Violation of the APA -- Arbitrary and Capricious

Outside statutory and constitutional challenges to regulations under the APA, parties may also challenge regulations as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" Ohio v. Env't Prot. Agency, 603 U.S. 279, 292 (2024) (quoting Federal Commc'ns Comm'n v. Prometheus Radio Project, 592 U.S. 414, 423 (2021)). As the Supreme Court said in Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance:

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made."

463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)). This explanation need not result in "ideal clarity," Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974), but it must

demonstrate that the agency engaged in "reasoned decisionmaking," Motor Vehicle Mfrs. Ass'n, 463 U.S. at 52. In other words, arbitrary and capricious review "ensures that the agency has acted within a zone of reasonableness . . . [by] reasonably consider[ing] the relevant issues and reasonably explain[ing] the decision." Prometheus Radio Project, 592 U.S. at 423.

When such consideration and explanation are lacking, agency action is arbitrary and capricious. Id. As the Supreme Court has explained:

> [A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43. While what is considered "an important aspect of the problem" is factually dependent, id., "when [a] prior policy has engendered serious reliance interests[,] that must be taken into account." Federal Commc'ns Comm'n v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009) (citing Smiley v. Citibank (S.D.), N.A., 517 U.S. 735, 742 (1996)).

This is not to say that it is impossible for an agency to change policy. Indeed, "[a]gencies are free to change their existing policies," Encino Motorcars, LLC v. Navarro, 579 U.S.

211, 221 (2016), and "new administrations are entitled to reevaluate and modify agency practices, even longstanding ones," People for the Ethical Treatment of Animals, 918 F.3d at 158; cf. Fox Television Stations, Inc., 556 U.S. at 514 ("We find no basis in the [APA] or in our opinions for a requirement that all agency change be subject to more searching review."). Agencies "need not demonstrate to a court's satisfaction that the reasons for the new policy are **better** than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency **believes** it to be better." Fox Television Stations, Inc., 556 U.S. at 515 (emphasis in original). Nevertheless, when an agency does decide to change policies, it ought "display awareness that it **is** changing position. An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books." Id. (emphasis in original) (citing United States v. Nixon, 418 U.S. 683, 696 (1974)).

In short, while a court's arbitrary and capricious review is "deferential" and is normally limited to the administrative record, courts "are 'not required to exhibit a naiveté from which ordinary citizens are free.'" See New York, 588 U.S. at 780, 785 (quoting United States v. Stanchich, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)).

Here, the Challenged Conditions are blatantly arbitrary and capricious.

**a. Lack of Reasoning and Supportive Evidence**

The strongest basis for this Court's determination is the lack of a non-discriminatory reason behind, and evidence for, the Challenged Conditions. In a February 2026 memorandum to "Leaders, Deputy Leaders, and Chiefs of Staff" at HHS, the Assistant Secretary for Financial Resources appeared to provide a sweeping explanation for all changes to HHS grants -- alignment with the Trump Administration's evolving policy preferences. See Suppl. R. at 0094; see also Defs.' Pretrial Br. at 11 (also citing "changes in priorities" for the rationale behind the Challenged Conditions).[65]

---

[65] Despite the urging of Associational and Provider Plaintiffs, the Court considers only the Administrative Record and documents stipulated as part of the Administrative Record in its arbitrary and capricious analysis. See Pls.' Post-Trial Br. at 4-7, ECF No. 83; see also Trial Tr. 4:25-5:24 (stipulating items in Administrative Record). Nevertheless, the Court notes the curious means by which Agency and Public Official Defendants produced the Administrative Record. In their post-hearing brief, the Agency and Public Official Defendants contend that "HRSA initially produced all non-privileged documents that HRSA considered, directly or indirectly, in imposing the [Challenged Conditions]." See Defs.' Post-Hearing Br. at 6-7. As they acknowledge, that is their obligation. See id. at 7; see also Exxon Corp. v. Dep't of Energy, 91 F.R.D. 26, 33 (N.D. Tex. 1981) (citing Universal Camera Corp. v. Nat'l Lab. Rels. Bd., 340 U.S. 474, 487-88 (1951)). Yet, Agency and Public Official Defendants also state that the later-provided Supplemental Record -- which included Executive Orders "the [Agency and Public Official Defendants] did not consider in imposing the [C]hallenged [C]onditions" -- includes "the Pediatric Report,

In the memorandum, the Assistant Secretary thanked recipients "for [their] hard work in the last year as [they] developed systems to ensure that all grant and contracts are reviewed and approved by [HHS] leadership. This process ensures alignment with [HHS] priorities and goals and avoids duplication of activities across [HHS]." Suppl. R. at 0094. Continuing, he wrote, "[t]he purpose of the NOFO and NOA reviews is to ensure that Divisions, to the extent permitted by law, are funding only activities that align with [HHS] priorities and, where appropriate, ensure efficiency of programming throughout HHS." Id.

Yet, with regard to why the specific Ryan White Program NOFOs were changed, no explanation was provided. In an email exchange from May 7, 2026, an HHS employee explained to others that:

All NOFOs must include the following language:

---

which [Agency and Public Official Defendants] **indirectly relied on** in imposing the [C]hallenged [C]onditions." Defs.' Post-Hearing Br. at 7 (emphasis added). The Court credits this as an oversight, but acknowledges Associational and Provider Plaintiffs' arguments otherwise. See Pls.' Post-Trial Br. at 6-7. Their rights are saved.

> "All activities proposed in your application and budget narrative must align with applicable law, including but not limited to statutes, executive orders, federal regulations, and applicable judicial holdings. Accordingly, discretionary awards shall not be used to fund, promote, encourage, subsidize, or facilitate: racial preferences or other forms of racial discrimination by the recipient, including activities where race or intentional proxies for race will be used as a selection criterion for employment or program participation; denial by the recipient of the sex binary in humans, or the belief that sex is a chosen or mutable characteristic; illegal immigration; or any other initiatives that compromise public safety. If an application does not align, the application will not receive funding to the extent permitted by law and applicable court orders."

R. at 0078-79.

**That is it.** No explanation for the change was provided. In a June 2026 email exchange asking "how and when" the NOFO language was added, the only explanation for the addition was that the Director of the Division of State HIV/AIDS Programs at the HRSA "added the language in question on 9/25/25 with the comment 'Added per HHS. OGC [meaning Office of General Counsel] has approved.'" See R. at 0031-32. The email added further, "I don't have any other communications or knowledge of the addition of the language." Id. at 0031.

As for the reason for the changes to the HHS Terms and Conditions and HHS's Grants Policy Statement, again, none is provided other than the sweeping explanation of "alignment with [HHS] priorities" in the February 2026 memorandum. See Suppl. R. at 0094.

The HRSA's Strategic Priorities Statement may be the closest explanation for the changes. Five major assertions it makes are relevant here. First, it states:

> HRSA is committed to prioritizing gold-standard science and the mission outlined in the Make American Healthy Again Commission Report to deliver better health outcomes. Through its critical public health and workforce programs, HRSA intends to address the nation's most pressing health challenges, including the chronic disease epidemic, the mental health crisis, obesity, nutritional deficiencies, exposure to chemical and environmental toxins, and overreliance on medical interventions.

Suppl. R. at 0090.[66] It continues:

> Our strategy is rooted in time-tested principles: responsible governance, fiscal restraint, local empowerment, and accountability. Through stronger oversight, partnerships with community-based providers, and support for innovation in care delivery, HRSA is advancing its mission while ensuring that federal dollars are not wasted, misdirected, or overextended.
>
> We understand that taxpayer dollars are not unlimited. Every investment must be justified by results. By focusing on measurable outcomes, emphasizing efficiency, and ensuring transparency at every level of operations, HRSA is fulfilling its charge not only to improve healthcare access, but to do so in a way that reflects respect for American taxpayers and the limits of federal responsibility.

Id.

Turning its sights to issues around gender-affirming care, it asserts:

---

[66] A restatement of this view is also presented in the HHS Terms and Conditions. See Suppl. R. at 0088.

> We believe the health and safety of children must be the highest priority. HHS released a comprehensive review [] of the evidence and best practices for promoting the health of children and adolescents with gender dysphoria. This review, informed by an evidence-based medicine approach, found medical interventions, such as puberty blockers, cross-sex hormones, and surgeries, that attempt to transition minors away from their sex are supported by extremely weak evidence base and have an unfavorable risk/benefit profile. It is a HRSA priority to protect children from these practices, and, to the extent allowable by law, HRSA programs will deprioritize programs that engage in these practices. HRSA funds will also not support the costs of such practices where not required by law or relevant court order. On March 6, 2025, a letter was issued [] outlining that HRSA may begin taking steps to update its policies in order to strengthen protections for children against harmful chemical and surgical interventions.

Suppl. R. at 0091.[67] Further, it adds:

> HHS released guidance [] promulgating sex-based definitions rooted in biological truth. It is a HRSA priority to recognize that a person's sex as either male or female is unchangeable and determined by objective biology, and to ensure its programs accurately reflect science, including the biological reality of sex.

Id.[68] Finally, it highlights:

---

[67] A restatement of this view is also presented in the HHS Terms and Conditions. See Suppl. R. at 0088.

[68] A restatement of this view is also presented in the HHS Terms and Conditions. See Suppl. R. at 0088.

> HRSA supports the President's Ending the HIV Epidemic in the US initiative and will not provide funding under the [Ryan White Program] for purposes unrelated to the statute, including for medications that are used without proper authorization or outside of approved medical guidelines. Public resources should support safe, evidence-based care, ensuring that treatments are used appropriately and responsibly to protect patient health and public trust. In a letter dated April 7, 2025, the Trump Administration reaffirmed its commitment to "Make America Healthy Again[]" calling on [Ryan White Program] recipients and subrecipients to align with this vision while emphasizing training, technical assistance, and culturally competent care to strengthen antiretroviral adherence and viral suppression in the fight to end HIV.

Id. at 0092.

From these statements, two potential reasons, beyond the simple explanation of "alignment," may be inferred: a goal of protecting children's health, and engaging in responsible spending.[69] Yet, the evidence presented in the Administrative Record does not demonstrate that the adoption of **these** Challenged Conditions would effectuate such goals.

Nothing in the record engages in any statistical analysis suggesting that excluding gender-affirming care from the Ryan White Program is cost effective, either in terms of reducing total expenditures by the federal government or in helping to end the HIV epidemic. See generally R.; Suppl. R. Similarly, there is no analysis of how such actions would better help protect children. See generally R.; Suppl. R. The

[69] Notably, the Agency and Public Official Defendants do not make this suggestion. See Defs.' Pretrial Br. at 11; Defs.' Post-Hearing Br. at 6.

Administrative Record does not highlight how many, **if any**, children receive gender-affirming care through Ryan White Program funds. See generally R.; Suppl. R. Further, the Administrative Record does not seriously consider whether ending gender-affirming care within the Ryan White Program would improve children's health outcomes. See generally R.; Suppl. R. While the Pediatric Report is included in the Administrative Record and suggests that gender-affirming care provided to minors may lead to negative health outcomes, it is completely devoid of any connection to the Ryan White Program itself. See Suppl. R. at 0163-0572.[70]

Ultimately, these proposed reasons supporting the Challenged Conditions are a farce, completely unsupported by the Administrative Record. The Court need not, and does not, accept them. See New York, 588 U.S. at 785 ("Accepting contrived reasons would defeat the purpose of the enterprise."). The mere

[70] At trial, the Court raised concerns that the Pediatric Report included within the Administrative Record may not satisfy the standards of the Federal Advisory Committee Act. See Trial Tr. 34:8-35:20. The Federal Advisory Committee Act provides certain standards for agency committees and requires agencies "to maintain a fair balance on its committees and to avoid inappropriate influences by both the appointing authority and any special interest." Union of Concerned Scientists v. Wheeler, 954 F.3d 11, 20 (1st Cir. 2020). The parties briefed the issue quickly in their post-trial briefs. See Defs.' Post-Hearing Br. at 7 n.4; Pls.' Post-Trial Br. at 7-10. The Court does not reach the issue, as it agrees with the parties that the report "is not at issue" and "has no bearing" on this case. See Defs.' Post-Hearing Br. at 7 n.4; Pls.' Post-Trial Br. at 7.

interest in aligning the Ryan White Program with the personal policy priorities of the President is, alone, an insufficient justification for such sweeping policy changes under arbitrary and capricious review. See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (noting weighing of evidence necessary). Without more, the Court is left to guess the Agency and Public Official Defendants' reasons for the Challenged Conditions other than animus toward transgender people. That fact, in and of itself, makes the Challenged Conditions arbitrary and capricious. See Fox Television Stations, Inc., 556 U.S. at 515 (stating that a reason is necessary for policy changes).

The Challenged Conditions are arbitrary and capricious and they violate the APA.

**b. Failure to Consider Reliance Interests and Programmatic Integrity**

Alternatively, even if there was a discernable reason for the Challenged Conditions and an evidentiary basis in support, the Challenged Conditions are still arbitrary and capricious because Agency and Public Official Defendants failed to consider reliance interests or the programmatic integrity of the Ryan White Program.

As the Administrative Record makes clear, the Ryan White Program is longstanding and effective. See R. at 0038. Between "2010 to 2023, HIV viral suppression among [Ryan White Program]

clients improved from 87.1% to 90.6%." Id. In 2024, "91.4% of clients receiving HIV medical care were virally suppressed . . . which means they can live longer and healthier lives and cannot sexually transmit HIV." Suppl. R. at 0147. Currently, the Ryan White Program "provide[s] HIV care, treatment, and essential services to more than 600,000 people[,] over half of the people diagnosed with HIV in the United States." Id.

Further, gender-affirming care has been critical to the Ryan White Program's success. The Administrative Record includes posts from the HRSA's social media accounts that describe gender-affirming care as "improv[ing] health outcomes," and noted that between 2010 and 2020, transgender Ryan White Program participants' viral suppression has increased from 61.5% to 84.5%. See Suppl. R. at 0143-44. Even HHS's **still-active** website describes gender-affirming care as "improv[ing minor's] physical and mental health." Id. at 0158-59.

There is no evidence in the Administrative Record suggesting that Agency or Public Official Defendants inquired at all into how the Challenged Conditions would impact those receiving Ryan White Program care, or how the Challenged Conditions would impact the success of the Program. See generally R.; Suppl. R. There were no studies as to the effect, no discussions with stakeholders, or even questions asked, regarding how the Challenged Conditions would be implemented.

See generally R.; Suppl. R. These issues, independent of the Challenged Conditions' other defects, demonstrate a failure of Agency and Public Official Defendants to consider important factors impacting the Ryan White Program. They render the Challenged Conditions arbitrary and capricious. See Fox Television Stations, Inc., 556 U.S. at 515.

The Challenged Conditions are arbitrary and capricious on this ground as well. Accordingly, they violate the APA.[71]

**5. Count II: Violation of the APA -- Not in Accordance with Law**

As this Court has already explained, agency action can be held "unlawful and set aside" when the action is "not in accordance with law." 5 U.S.C. §§ 706(2), 706(2)(A). The Associational and Provider Plaintiffs contend that the Challenged Conditions violate both the ACA and the Ryan White Act itself. See Compl. ¶¶ 218-32; Pls.' Pretrial Br. at 23-29.

---

[71] Associational and Provider Plaintiffs raise several other arguments as to the arbitrary and capricious nature of the Challenged Conditions that focus on how they "[c]onflict [w]ith the Ryan White Program's [p]urpose and [s]tructure." See Pls.' Pretrial Br. at 14-20. As explained below, the Court agrees that the Challenged Conditions violate the Ryan White Act. For purposes of brevity, the Court will not address these arguments except to say that the violation of the Ryan White Act's framework shows that the Agency and Public Official Defendants "failed to consider an important aspect of the problem" and that they did not demonstrate "that the new polic[ies are] permissible under the [Ryan White Act]." See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43; Fox Television Stations, Inc., 556 U.S. at 515.

This Court has already ruled the Challenged Conditions violate the ACA. What of the Ryan White Act itself?

The Appropriations Clause provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by law." U.S. Const. art. I, § 9, cl. 7. This simply means that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." Cincinnati Soap Co. v. United States, 301 U.S. 308, 321 (1937) (citing Reeside v. Walker, 52 U.S. (11 How.) 272, 291 (1850)). Congress has, in a way, further limited this authorization, requiring that "[a]ppropriations shall be applied only to the objects for which the appropriations were made." 31 U.S.C. § 1301(a).

Accordingly, while a federal agency may distribute funds, it may only do so when Congress has authorized it to do so, and for the purposes Congress intends. See Cruz, 596 U.S. at 301; United States v. MacCollom, 426 U.S. 317, 321 (1976) (citing Reeside, 52 U.S. (11 How.) at 291). What Congress has wrought, agencies must follow. See In re Aiken County, 725 F.3d at 259.

The Associational and Provider Plaintiffs' claim turns on whether the Ryan White Act's appropriation encompasses funding for gender-affirming care. The Agency and Public Official Defendants assert, in essence, that because the Act does not explicitly specify that Ryan White Program funds can go toward gender-affirming care, the Agency and Public Official Defendants

are within their power to limit the funding of gender-affirming care. See Defs.' Pretrial Br. at 12; Defs.' Post-Hearing Br. at 5-6; Trial Tr. 38:25-39:7.

"When interpreting a statute, we begin with the text." Lackey v. Stinnie, 604 U.S. 192, 199 (2025). "[W]hen the meaning of the statute's terms is plain, our job is at an end." Bostock, 590 U.S. at 674. Only when a statute's language is ambiguous may courts turn to other evidence to interpret the statute. See id. at 674-75. Indeed, while a "statute's application [may] reach[] 'beyond the principal evil' legislators may have intended or expected to address," that fact "does not demonstrate ambiguity; instead, it simply 'demonstrates the breadth' of a legislative command." Id. at 674 (alteration in original omitted) (first quoting Oncale v. Sundowner Offshore Servs., Inc., 503 U.S. 75, 79 (1998); then quoting Sedima, S.P.R.L v. Imrex Co., 473 U.S. 479, 499 (1985)). "'[I]t is ultimately the provisions of' those legislative commands 'rather than the principal concerns of our legislators by which we are governed.'" Id. (quoting Oncale, 523 U.S. at 79).

The Associational and Provider Plaintiffs point to four sections of the Ryan White Act which they say ought inform this Court's analysis. See Pls.' Pretrial Br. at 24-25. These are Sections 300ff-14, 300ff-22, 300ff-51, and 300ff-88. See id.

Sections 300ff-14, 300ff-22, and 300ff-51 specify, in part, what Ryan White Program funds can be used for. See 42 U.S.C. §§ 300ff-14, 300ff-22, 300ff-51. Under these provisions, Ryan White Program funds:

> [S]hall, of the portion of the grant remaining after reserving amounts for purposes of [other provisions], use not less than 75 percent to provide core medical services that are needed in the [relevant geographic area] for individuals with HIV/AIDS who are identified and eligible under this subchapter (including services regarding the co-occurring conditions of the individuals).

42 U.S.C. §§ 300ff-14(c)(1), 300ff-22(b)(1), 300ff-51(c)(1).

Further, the provisions specify that:

> [T]he term "core medical services", with respect to an individual infected with HIV/AIDS (including the co-occuring conditions of the individual) means the following services:
>
> (A) Outpatient and ambulatory health services.
>
> (B) AIDS Drug Assistance Program treatments . . . .
>
> (C) AIDS pharmaceutical assistance.
>
> (D) Oral health care.
>
> (E) Early intervention services . . . .
>
> (F) Health insurance premium and cost sharing assistance for low-income individuals . . . .
>
> (G) Home health care.
>
> (H) Medical nutrition therapy.
>
> (I) Hospice services.
>
> (J) Home and community-based health services . . . .
>
> (K) Mental health services.
>
> (L) Substance abuse outpatient care.
>
> (M) Medical case management, including treatment adherence services.

42 U.S.C. §§ 300ff-14(c)(3)(A)-(M), 300ff-22(b)(3)(A)-(M), 300ff-51(c)(3)(A)-(M).

Finally, under the provisions, "[t]he term 'co-occuring conditions' means one or more adverse health conditions in an individual with HIV/AIDS, without regard to whether the individual has AIDS and without regard to whether the conditions arise from HIV." 42 U.S.C. § 300ff-88(2). This definition, as the Associational and Provider Plaintiffs point out, tracks

closely with that of the terms "comorbid" and "comorbidity," meaning "existing simultaneously with and usually independently of another medical condition." Comorbid, Merriam-Webster (July 1, 2026), https://www.merriamwebster.com/dictionary/comorbidity?src=search-dict-hed [https://perma.cc/S2WX-HL9J]; see Pls.' Pretrial Br. at 25 n.53.[72]

Taken together, the statute's unambiguous meaning is that Ryan White Program funding recipients must use at least some Ryan White Program funds to provide **any** of the defined "core medical services" to treat patients' HIV/AIDS or **any other medical issue they may have**. See 42 U.S.C. §§ 300ff-14(c)(3)(A)-(M), 300ff-22(b)(3)(A)-(M), 300ff-51(c)(3)(A)-(M), 300ff-88(2). So long as gender-affirming care falls within at least one of the defined "core medical services" under the statute, it falls within Congress's sweeping mandate and cannot be carved out from the Ryan White Program.

---

[72] Other dictionaries share similar definitions. See Comorbidity, Cambridge Dictionary (2026), https://dictionary.cambridge.org/dictionary/english/comorbidity [https://perma.cc/426U-LHLV] ("the fact that people who have a disease or condition also have one or more other diseases or conditions"); Comorbidity, Oxford English Dictionary (2020), https://www.oed.com/dictionary/comorbidity_n?tab=meaning_and_use#10701424 [https://perma.cc/R65E-6U9U] ("[t]he coexistence of two or more diseases, disorders, or pathological processes in one individual, esp[ecially] as a complicating factor affecting the prognosis or treatment of a patient").

Unsurprisingly, gender-affirming care fits well within the congressional mandate. Even the Pediatric Report, which generally questions the efficacy of gender-affirming care, acknowledges that gender-affirming care has been offered as a treatment for gender dysphoria, which it characterizes as a mental health condition. See Suppl. R. at 0173, 0176, 0204. In this way, gender-affirming care represents a "mental health service" that may permissibly occur under the definition of "core medical services." 42 U.S.C. §§ 300ff-14(c)(3)(K), 300ff-22(b)(3)(K), 300ff-51(c)(3)(K). Any attempt to restrict its provision under the Ryan White Act would violate the law.[73]

The Challenged Conditions do just that. They prohibit Ryan White Program funds from being used to recognize and affirm the existence of transgender people, and they bar Ryan White Program recipients from providing gender-affirming care. For this reason, the Challenged Conditions violate the Ryan White Act, are not in accordance with law, and must be struck down under the APA.

---

[73] Associational and Provider Plaintiffs' briefs speak more directly to the concept that gender-affirming care constitutes outpatient care and thus falls within the definition of "core medical services." See Pls.' Pretrial Br. at 25-26; Pls.' Opp'n Defs.' Pretrial Br. at 6. Perhaps it does, but the dearth of the Supplemental Record makes this claim more difficult to assess. Nevertheless, the Associational and Provider Plaintiffs' and Agency and Public Official Defendants' arguments are equally applicable to the analysis the Court adopts. See Pls.' Pretrial Br. at 24-26; Defs.' Pretrial Br. at 12-13.

**6. Count III: Violation of the APA -- Exceeds Statutory Authority**

While the APA establishes several other avenues by which an agency action may be invalidated, the only avenue not involving statutory or constitutional claims relevant here is that within Section 706(2)(C). Under that provision, agency action can be held "unlawful and set aside" when the action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2), 706(2)(C).

When determining whether an agency acted within its authority, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." Loper Bright Enters. v. Raimondo, 603 U.S. 369, 412 (2024). In doing so, courts must "fix the boundaries of delegated authority." Id. at 395 (quoting H. Monaghan, Marbury and the Administrative State, 83 Colum. L. Rev. 1, 27 (1983)) (changes in original omitted).

As this Court understands the Associational and Provider Plaintiffs' challenge, they argue that the Challenged Conditions are in excess of statutory authority "because they impose extra-statutory conditions on funds appropriated by Congress . . . [and] seek to amend the Ryan White statute by imposing grant conditions that were not mandated by Congress." Pls.' Pretrial Br. at 29. As explained later, they argue that the Agency and

Public Official Defendants simultaneously "exceed a delegation of authority" and "act without" authority. Pls.' Opp'n Defs.' Pretrial Br. at 12 (emphasis omitted). In both cases, the Agency and Public Official Defendants' actions would be "outside the bounds of its statutory authority." Compl. ¶ 235. Altogether, these claims suggest Associational and Provider Plaintiffs' claim is based on "ultra vires." Id.

This claim fails. "Before enactment of the APA, those challenging agency action often lacked a statutory cause of action." Nuclear Regul. Comm'n v. Texas, 605 U.S. 665, 680 (2025). Accordingly, "courts recognized a right to equitable relief where an agency's action was ultra vires [sic] -- that is, 'unauthorized by any law and . . . in violation of the rights of the individual.'" Id. (quoting American Sch. of Magnetic Healing v. McAnnulty, 187 U.S. 94, 110 (1902)).

Following the enactment of the APA, however, the Supreme Court's "subsequent cases have strictly limited nonstatutory ultra vires [sic] review." Id. at 681. Today, an ultra vires "claim is essentially a Hail Mary pass -- and in court as in football, the attempt rarely succeeds." Nyunt v. Chairman, Broad. Bd. of Governors, 589 F.3d 445, 449 (D.C. Cir. 2009). "Ultra vires [sic] is [] unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review.'"

Nuclear Regul. Comm'n, 605 U.S. at 681 (quoting Board of Governors, FRS v. MCorp Fin., Inc., 502 U.S. 32, 43 (1991)). Section 706 of the APA does that. See 5 U.S.C. § 706.

Associational and Provider Plaintiffs' ultra vires claim fails as matter of law.[74]

## V. REMEDY

The Court has ruled that the Challenged Conditions violate the APA, the ACA, the Free Speech Clause of the First Amendment, and the Due Process Clause of the Fifth Amendment. It now must fashion a remedy.

Associational and Provider Plaintiffs seek a declaration as to the legality of the Challenged Conditions, vacatur under the APA, and a permanent injunction barring the Agency and Public Official Defendants from "giving effect to the Challenged Conditions -- or any materially similar policy that prohibits [Associational and Provider Plaintiffs] from acknowledging, affirming, and/or respecting the identities of transgender

---

[74] In the alternative, to the extent the Associational and Provider Plaintiffs' claim is not based in ultra vires, any action by Agency and Public Official Defendants that was not in accordance with law because it violated the Ryan White Act, by necessity, was also in excess of the statutory authority granted to Agency and Public Official Defendants by the Ryan White Act. This Court has already determined that the Challenged Conditions violated the Ryan White Act. For this reason, they are also in excess of statutory authority. How these claims are characterized presents a distinction without a difference.

patients or from providing gender-affirming care under the Ryan White Program." Compl. at 70; see Pls.' Pretrial Br. at 39.

### 1. Declaratory Judgment

At no point in this case have the parties disputed the permissibility of this Court declaring the legality of the Challenged Conditions. See Defs.' Opp'n Pls.' Mot. for Prelim. Inj. & Prelim. Relief ("Defs.' Opp'n Pls.' Mot. for Prelim. Inj.") at 29-33, ECF No. 46; Mem. L. Supp. Pls.' Mot. Prelim. Relief & Prelim. Inj. ("Pls.' Mem. Supp. Mot. Prelim. Inj.") at 37-40, ECF No. 10. While the Agency and Public Official Defendants obviously dispute whether the Challenged Conditions are legal, they do not object to declaratory judgment as a form of relief. See Defs.' Opp'n Pls.' Mot. for Prelim. Inj. at 29-33; Pls.' Mem. Supp. Mot. Prelim. Inj. at 37-40.

Accordingly, this Court does now declare that:

(1) The Challenged Conditions violate the APA because they are arbitrary and capricious, not in accordance with law, and contrary to constitutional right.

(2) The Challenged Conditions violate the ACA's non-discrimination mandate.

(3) The Challenged Conditions violate the equal protection component of the Due Process Clause of the Fifth Amendment.

(4) The Challenged Conditions violate the Free Speech Clause of the First Amendment.

**2. Vacatur**

While the parties -- at this stage in the case -- do not dispute whether vacatur is appropriate as a form of relief, see generally Pls.' Pretrial Br.; Defs.' Pretrial Br.; Defs.' Post-Hearing Br., such arguments have been raised before other sessions of this Court, see Trump, 811 F. Supp. 3d at 244; Department of Def., 806 F. Supp. 3d 79 at 120-24; National Sci. Found., 788 F. Supp. 3d 106 at 138-39. Accordingly, this Court briefly addresses them here.[75]

The APA's instruction to "hold unlawful and set aside" agency action has traditionally been interpreted as permitting vacatur. 5 U.S.C. § 706(2); see Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys., 603 U.S. 799, 829 (2024)

---

[75] The Agency and Public Official Defendants, when first opposing Associational and Provider Plaintiffs' motion for preliminary injunction, did state that "the appropriate remedy is to remand [the Challenged Conditions] to the agencies for further consideration or explanation." Defs.' Opp'n Pls.' Mot. for Prelim. Inj. at 30. This argument was supported by one line: "If [vacatur] is the relief [Associational and Provider] Plaintiffs would theoretically be entitled to, it is not appropriate at this preliminary stage of the case to grant the broader relief of requiring the agencies to continue payment under the grants." Id. (citations omitted). To the extent Agency and Public Official Defendants re-assert this argument now, it was addressed through the Court's collapsing of the preliminary injunction motion into a trial on the merits pursuant to Fed. R. Civ. P. 65(a). See Order, ECF No. 49.

(Kavanaugh, J., concurring). Though there is a long history with substantial theoretical and academic discussion on the matter, recounting it is "too awesome for this Court to attempt its summary." Department of Def., 806 F. Supp. 3d at 121. It is sufficient for this Court to say that when issuing vacatur, the order is not party-restricted, and instead applies nationwide. See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting Harmon v. Thornburgh, 878 F.2d 484, 495 (D.C. Cir. 1989)); Texas Med. Ass'n v. U.S. Dep't of Health & Hum. Servs., 110 F.4th 762, 780 (5th Cir. 2024) (Jones, J.), cert. pending, No. 26-491 (U.S. Aug. 11, 2026); Department of Def., 806 F. Supp. 3d at 123; see also CASA, Inc., 606 U.S. at 847 n.10 (not addressing the question of nationwide relief under the APA).

Accordingly, when this Court grants vacatur of the Challenged Conditions, it does so in every context. While this Court is unaware of simultaneous litigation as to the Challenged Conditions raised here, it is aware that in other cases, simultaneous litigation over the same agency action has occurred. See Mayor of Baltimore, 973 F.3d at 280 (noting that the Ninth Circuit considered the same agency action at issue in that case). This is neither efficient nor in the best interest of justice. When relief is granted here, **no federal funding programs** will be subject to the HHS Terms and Conditions, HHS

Grants Policy Statement, or any regulatory expression of the Challenged Conditions presented here.

**3. Permanent Injunctive Relief**

For a court to issue permanent injunctive relief, a four-prong analysis must be satisfied. See Global NAPs, Inc. v. Verizon New England, Inc., 706 F.3d 8, 13 (1st Cir. 2013). A court must conclude "'(1) that a party has suffered [and continues to suffer]' -- or, as here, will suffer -- 'an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the parties, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" Id. (alterations in original omitted) (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)). The last two "factors merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009).

As to the first two factors, the Associational and Provider Plaintiffs have carried their burden. The forgoing analysis indicates -- and the Court hereby rules -- that the Associational Plaintiffs' members and Provider Plaintiffs will suffer injury in the form of monetary damages and limitations to their free-speech rights. Further, their patients will suffer illegal discriminatory treatment. As other courts in this

circuit have stated, "the deprivation of constitutionally-protected rights for even minimal amounts of time constitutes not only injury, but irreparable injury." Providence Firefighters Local 799 v. City of Providence, 26 F. Supp. 2d 350, 354 (D.R.I. 1998) (citing Elrod v. Burns, 427 U.S. 347, 373 (1976); Romero Feliciano v. Torres Gaztambide, 836 F.2d 1, 4 (1st Cir. 1987)). So here. The Associational Plaintiffs' members and Provider Plaintiffs have suffered and will continue to suffer irreparable injury.

This is true even with the vacatur of the Challenged Conditions.[76] As is clear from the animus displayed by the Challenged Conditions and other litigation involving Trump Administration officials, there is a sufficient basis for belief that the Agency and Public Official Defendants may try otherwise to impose similar conditions on the Associational and Provider Plaintiffs once these Challenged Conditions are vacated. See, e.g., San Francisco A.I.D.S. Found., 786 F. Supp. 3d at 1205-06 (chronicling cases involving challenges to DEI and gender ideology executive orders); Kingdom v. Trump, No. 1:25-cv-691-RCL (D.D.C. Aug. 26, 2026), stay denied, 26A416 (U.S. Oct. 21,

[76] This issue was unaddressed in briefing, however, because whether to grant an injunction is within this Court's discretion, the Court addresses the issue. See Global NAPs, Inc., 706 F.3d at 13 (describing grant of permanent injunction as discretionary).

2026) (enjoining agency policy preventing prisoners from receiving gender-affirming care); Illinois v. Dep't of Health & Hum. Servs., No. 1:26-cv-14051-WGY (D. Mass. filed Sep. 2, 2026) (involving regulation barring funding for gender-affirming care under the Children's Health Insurance Program). If this comes to pass, the same injuries presented here will reoccur, thus satisfying the first two prongs of the permanent injunction inquiry.

As to the final two factors, both the balance of hardships and public interest support a permanent injunction. As Associational and Provider Plaintiffs rightly point out "[t]here is a 'substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations.'" Pls.' Pretrial Br. at 40 (quoting New York v. McMahon, 784 F. Supp. 3d 311, 372 (D. Mass. 2025) (Joun, J.); see League of Women Voters of United States v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting Washington v. Reno. 35 F.3d 1093, 1103 (6th Cir. 1994)). Indeed, "there is generally no public interest in the perpetuation of unlawful agency action." Somerville Pub. Schs. v. McMahon, 139 F.4th 63, 76 (1st Cir. 2025) (quoting Newby, 838 F.3d at 12).

A permanent injunction is warranted and will be granted.[77]

[77] The parties dispute the proper scope of the permanent injunction. Agency and Public Official Defendants suggest that

## VI. CONCLUSION

The United States is a fundamentally good nation with a fundamentally good people. It is generous, compassionate, and wonderfully diverse. It is accepting of all, and its people recognize a common heritage. It is not without problems, but is nevertheless exceptional.

The Challenged Conditions here represent a dark departure from these truths. They are based in animus, loathing, and discrimination. They do not stand for justice -- in fact, they defy it. They are contrary to the laws of this nation and cannot continue to stand.

---

"to the extent the Court is inclined to grant Plaintiffs' request for a preliminary injunction, any such relief should be narrowly tailored to apply only to the grants of specific named provider Plaintiffs." Defs.' Opp'n Pls.' Mot. for Prelim. Inj. at 32. Associational and Provider Plaintiffs assert otherwise, noting that "[w]hen organizations establish standing on their members' behalf, [injunctive] relief extends to whose members who are likely to suffer irreparable harm." Pls.' Reply Mem. in Supp. of Pls.' Mot. for Prelim. Relief & Prelim. Inj. at 19-20, ECF No. 47 (citing New Hampshire Indonesian Cmty. Support v. Trump, 157 F.4th 29, 35 (1st Cir. 2025)). This Court agrees. The injunctive relief provided here extends to Provider Plaintiffs, Associational Plaintiffs, and Associational Plaintiffs' members. See New Hampshire Indonesian Cmty. Support, 157 F.4th at 35; Warth, 422 U.S. at 515. Accordingly, while the injunction is **not** a nationwide injunction of the kind prohibited in CASA, Inc., see 606 U.S. at 841-42, because of the composition of Associational Plaintiffs, it **does** cover the healthcare providers of "the majority of patients living with HIV in the United States," Compl. ¶ 23; see Packett Decl. ¶ 8. As such, though not deciding the issue, the Court observes that it appears impossible for Agency and Public Official Defendants to craft regulations governing the Ryan White Program similar to those challenged here without impacting these plaintiffs.

The Court GRANTS Agency and Public Official Defendants' motion to dismiss, ECF No. 54, as to the free-standing ACA non-interference claim but DENIES the motion as to all other claims.

Further, judgment shall enter in favor of Associational and Provider Plaintiffs declaring that:

(1) The Challenged Conditions violate the APA because they are arbitrary and capricious, not in accordance with law, and contrary to constitutional right.

(2) The Challenged Conditions violate the ACA's non-discrimination mandate.

(3) The Challenged Conditions violate the equal protection component of the Due Process Clause of the Fifth Amendment.

(4) The Challenged Conditions violate the Free Speech Clause of the First Amendment.

(5) Accordingly, the Court VACATES the Challenged Conditions and declares they are of no force and effect.

(6) Agency and Public Official Defendants, their officers, agents, servants, employees, attorneys, and all others acting in concert or participation with any of them including any other federal employee bureaucratically subordinate or superior -- save only the President of the United States himself as he may not be enjoined,

see Franklin v. Massachusetts, 505 U.S. 788 (1992) -- are prospectively ENJOINED from promulgating, effectuating or enforcing the Challenged Conditions, or materially similar policies in the context of the Ryan White Program, against Provider Plaintiffs and Associational Plaintiffs' members who continue to receive Ryan White Program funds.

**SO ORDERED.**

WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[78]

[78] This is how my predecessor, Peleg Sprague (D. Mass 1841-1865), would sign official documents. Now that I'm a Senior District Judge, I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 48 years.

**APPENDIX A**

On the night of November 19, 2022, a LGBTQ+ nightclub in Colorado Springs, Colorado hosted an evening drag performance.[79] Among those in attendance were United States Army Veteran Richard M. Fierro, United States Navy Officer Thomas James, and Drea Norman -- a transgender woman.[80] Just before midnight, an armed assailant entered the nightclub and began firing several rounds of ammunition.[81] Hearing the shots fired, Fierro, James, and Norman rushed the assailant and disarmed him, undoubtedly saving several lives.[82]

---

[79] See Sarah Ferguson, Timeline: Club Q Shooting Emergency Response, Fox21News (Nov. 20, 2022), https://www.fox21news.com/club-q-shooting/timeline-club-q-shooting-emergency-response/ [https://perma.cc/B9CV-KENW].

[80] See Oren Liebermann, Eric Levenson & Travis Caldwell, Navy Petty Officer Who Helped Disarm Colorado Nightclub Shooter Speaks Out for the First Time, CNN (Nov. 27, 2022), https://www.cnn.com/2022/11/27/us/colorado-springs-nightclub-shooting-army-veteran-community [https://perma.cc/6R84-LPRC]; Dan Zak, The Hero, Wash. Post (March 16, 2024), https://www.washingtonpost.com/style/of-interest/interactive/2024/richard-fierro-club-q-shooting/ [https://perma.cc/WQB8-5AMG].

[81] See Amir Vera, Elliot C. McLaughlin & Caroll Alvarado, A Bartender Who Found a Place to Shine. A Non-Profit Worker with a 'Huge Heart.' These are the Victims of the Colorado Club Shooting, CNN (Nov. 22, 2022), https://www.cnn.com/2022/11/21/us/club-q-colorado-shooting-victims/index.html [https://perma.cc/7CCM-ANHB].

[82] See Zak, supra note 80.

Unfortunately, five people were killed in the shooting and several more injured.[83] Inquiries soon came from the police, press, and even Congress.[84] Reflecting on the incident, Fierro, speaking about those in attendance, said: "These kids want to live that way, want to have a good time, have at it . . . I'm happy about it because that is what I fought for, so they can do whatever . . . they want."[85]

James Slaugh, a survivor of the shooting, took a different view. Speaking to the House Oversight and Reform Committee, Slaugh said: "The hateful rhetoric you have heard from elected leaders is the direct cause of the horrific shooting at Club Q. We need elected leaders to demonstrate language that reflects love and understanding, not hate and fear."[86]

---

[83] See Elizabeth Wolfe, Holly Yan & Amanda Watts, Police Have Identified the 5 People Killed in Colorado Springs LGBTQ Club Shooting, CNN (Nov. 21, 2022), https://www.cnn.com/2022/11/21/us/colorado-springs-club-q-shooting-monday/index.html [https://perma.cc/DAY6-B2QB].

[84] See Sarah Fortinsky, 'Shame on You': Club Q Survivors Blame GOP Rhetoric for Mass Violence, CNN (Dec. 14, 2022), https://www.cnn.com/2022/12/14/politics/club-q-survivors-hearing/index.html [https://perma.cc/YLB6-7EYY].

[85] See Dave Phillipps, Army Veteran Went Into 'Combat Mode' to Disarm the Club Q Gunman, N.Y. Times (Nov. 29, 2022), https://www.nytimes.com/2022/11/21/us/colorado-springs-shooting-club-q-hero.html [https://perma.cc/3YVV-3WRB].

[86] See Fortinsky, supra note 84.

# APPENDIX B

## Presidential Executive Orders

Hearing argument in this case, I asked Agency and Public Official Defendants' counsel, "Where does he [i.e. the President] get off issuing this?" Trial Tr. 37:17. Upon reflection, that was the wrong question. Moreover, it was rather foolish. What I should have asked was: "How does the Executive Order from which the Challenged Conditions flow relate to the President's sworn duty to 'take Care that the Laws be faithfully executed?'" See U.S. Const. art. II, § 3. When I finally got around to asking **that** question, I got no answer, a fact I cited (twice) in the text of this opinion. See supra, at 21, 114; see also Trial Tr. 39:18-20 ("So what policy then does the executive order serve where . . . it just ignores the existence [of transgender people?]").

Since I was so obviously shaky in my understanding of the rule of executive orders, a brief primer (as much to myself as anyone else) is in order.

Under our constitutional system, it is bedrock that only Congress makes the laws, not the president. As Justice Black -- speaking for the Supreme Court in Youngstown Sheet and Tube Company v. Sawyer, 343 U.S. 579 (1952) -- stated succinctly: "The Constitution limits [the president's] functions in the lawmaking process to the recommending of laws he thinks wise and

the vetoing of laws he thinks bad." Id. at 587; see id. at 632-33 (Douglas, J., concurring) ("The power to recommend legislation, granted to the [p]resident, serves only to emphasize that it is his function to recommend and that it is the function of the Congress to legislate . . . the [president's] power to execute the laws starts and ends with the laws Congress has enacted."). The legislative process, of course, is especially difficult. While courts need only decide the discrete case before them,[87] Congress, fashioning "law" for all the United States, speaks not only to the issue before it, but to the future as well. This is a daunting prospect, and volumes have been written concerning how to go about it.

Recognizing that legislation can never encompass all possible future conditions, Congress wisely gave normative structure to the executive branch (and instruction coupled with some flexibility) in the Administrative Procedure Act, 5 U.S.C. § 500 et seq. Duly adopted federal regulations have the force of law, Chrysler Corp. v. Brown, 441 U.S. 281, 296, 296 n.18 (1979) (collecting cases), and a robust body of jurisprudence has grown up regarding their interpretations. All this is intended to aid the president as to the manner in which Congress

---

[87] Though necessarily more sensitive to the decision's precedential effects the higher the court in question.

intends that the laws are to be "faithfully executed." See U.S. Const. art. II, § 3.

Even so, in the real world of taxing and spending, where Congress alone possesses the appropriations power, there inevitably remain myriad issues: priorities to be established, lacunae to be filled, and day-to-day governing to be accomplished. This is the area for presidential executive orders. They are not "law." They do not emerge from our constitutional law-making process. Rather, they are a distinct presidential prerogative.

They are precisely what the words import -- "orders" to the executive branch concerning how to carry out their intensely complex, multifaceted tasks with loyalty to the President, cf. Trump v. United States, 603 U.S. 593, 608-09 (2024) (citations omitted), so that the President may, in turn, carry out perhaps his central sworn executive function -- to "take Care that the Laws be faithfully executed," see U.S. Const. art. II, § 3.

In the present day, executive orders' effects sweep far beyond the federal executive workforce, seeming inevitably to flow wherever federal funds are dispersed, whether by contract, grant, or otherwise. **This is power** -- real presidential prerogative power. Where the President is perceived as following the "law," albeit with his own imprimatur, this works

tolerably well.[88] Where he is perceived as straying from it, nothing happens -- unless someone with standing can sue, as here.[89]

---

[88] For example, whatever one may think of the President's aggressive policy on mass deportations, no fair-minded person can contend that he is far afield from "taking care" to enforce the law with little constraint. Indeed, **Congress** has invited it. **Congress** excluded immigration from the Administrative Procedure Act, see Ardestani v. Immigr. & Naturalization Serv., 502 U.S. 129, 133 (1991); **Congress** created President Trump's alternative prerogative courts, the so-called immigration courts, Elizabeth Keyes, What Constitution? The Dual State Theory in Immigration Law & Practice, 79 SMU L. Rev. 129, 154-57 (2026); **Congress** sidelined the district court system, see Enwonwu v. Chertoff, 376 F. Supp. 2d 42, 81 (D. Mass. 2005), aff'd, 438 F.3d 22 (1st Cir. 2006); 8 U.S.C. § 1252(a)(5), and **Congress** provided Immigration and Customs Enforcement ("ICE") with a vast, multi-year appropriation, see generally One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72 (2025).

Not so in this case. Congress has been notably circumspect in dealing with these deeply personal matters of individual personhood.

There are limits to this presidential prerogative of course. Even within the Article II executive, we do not countenance unrestricted rule by Executive Order (at least most of them). Cf. John Adams, Thoughts on Government, in 4 Papers of John Adams 74 (Robert J. Taylor ed., 1979), https://www.masshist.org/publications/adams-papers/index.php/view/PJA04dg2 [https://perma.cc/E667-QZTE] ("I know of no better Definition of a Republic than this, that it is an Empire of Laws and not of Men . . . ."). While the President may fire his policymakers for lack of loyalty and replace any of them at will with someone he considers more loyal, he cannot ask anyone to violate the law. For a brilliant essay concerning how this works in actual practice, see generally Cass R. Sunstein, The Morality of Legality, 54 Hofstra L. Rev. 337 (2026).

Likewise, federal ministerial employees who may exercise considerable independent professional judgment within their respective fields (e.g. scientists, meteorologists, pilots, physicians, most lawyers, secretaries, truck drivers) may not be removed because they privately hold views contrary to those of the president. As to this large group of federal employees, political retribution is forbidden. See Olmeda v.

Ortíz-Quiñónez, 434 F.3d 62, 65-66 (1st Cir. 2006) (first citing Elrod, 427 U.S. 347; then citing Branti v. Finkel, 445 U.S. 507 (1980)); see also Ortiz-Resto v. Rivera-Schatz, 546 F. Supp. 3d 126, 133, 138 (D. Mass. 2021), aff'd -- F.4th --, No. 21-1232 (1st Cir. Nov. 3, 2026).

[89] As I explained in American Association of University Professors v. Rubio: "As an experienced litigator [President Trump] has learned that -- at least on the civil side of our courts -- neither our Constitution nor laws enforce themselves, and he can do most anything until an aggrieved person or entity will stand up and say him 'Nay,' i.e. take him to court." 802 F. Supp. 3d at 195-96.